C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs B&L Productions, Inc., California Rifle & Pistol Association, Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, Asian Pacific American Gun Owner Association, Second Amendment Law Center, Inc.

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST; GERALD CLARK; ERIC JOHNSON; CHAD LITTRELL; JAN STEVEN MERSON; CALIFORNIA RIFLE & PISTOAL ASSOCIATION, INCORPORATED; ASIAN PACIIC AMERICAN GUN OWNERS ASSOCIATION; SECOND AMENDMENT LAW CENTER, INC.; and SECOND AMENDMENT FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROB BONTA, in his official capacity as Attorney General of the State of California; KAREN ROSS, in her official capacity as Secretary of California Department of Food & Agriculture and in his personal capacity; TODD SPITZER, in his official capacity as District Attorney of Orange County; 32nd DISTRICT AGRICULTURAL ASSOCIATION; DOES 1-10; <br><br> Defendants. | **CASE NO:** <br><br> **COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF** <br><br> **(1) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH - POLITICAL];** <br><br> **(2) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH-MIXED POLITICAL/ COMMERCIAL];** <br><br> **(3) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH-COMMERCIAL];** <br><br> **(4) VIOLATION OF 42 U.S.C. § 1983 [PRIOR RESTRAINT ON SPEECH];** <br><br> **(5) VIOLATION OF 42 U.S.C. § 1983 [RIGHT TO ASSEMBLY];** <br><br> **(6)  VIOLATION OF 42 U.S.C. § 1983 [EQUAL PROTECTION]** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **NOTICE OF UNCONSTITUTIONALITY OF STATE STATUTE** |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.     Plaintiff B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST has operated popular, safe, heavily regulated, legal, and family-friendly gun shows as a business in California for over 30 years, including at the Orange County Fair & Event Center ("the Fairgrounds").

2.     Crossroads produces gun shows at the Fairgrounds where like-minded individuals gather to engage in commerce related to, and necessary for, the lawful and regulated exercise of Second Amendment rights for themselves, their exhibitors, their patrons, their customers, and the general public. This safe and regulated marketplace promotes public safety, even for people who do not attend gun shows because it will tend to reduce the unregulated transfer of firearms within Orange County. Furthermore, by providing a convenient forum for Californians to exercise their right to acquire firearms locally, gun shows at the Fairgrounds will have the tendency to discourage the sale and importation of firearms from other states with less strict gun laws than California.

3.     Plaintiffs Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., Asian Pacific American Gun Owners Association, and Second Amendment Foundation, Inc., attend and participate in the Crossroads gun show to engage in First Amendment activities that are both necessary and essential to the open, robust, and lawful exercise of their Second Amendment rights. CRPA also has members who attend gun shows and sell ammunition, firearms, and precursor parts.

4.     At the gun show, Plaintiffs associate with like-minded people, participate in public discussions, attend informational forums, distribute and collect information, provide training, make offers for sale, make offers to buy, and engage in legal and political discussions related to the Second Amendment, which are all forms of speech protected by the First Amendment. Discussions include, but are not limited to, firearms and ammunition, firearm technology, firearm safety, and firearm

2

law and politics. Participants also exchange information about where to hunt and where to practice shooting, where and from whom to receive training, gunsmithing, gun repair, gun art, and many other topics that arise from the right to acquire, own, possess, enjoy, and celebrate arms as a quintessentially American artifact with constitutional significance.

5.     Defendants are government actors who, through the adoption and enforcement of Senate Bill 264 (Min), codified at California Penal Code section 27575,[1] which prohibits the sale of firearms, ammunition, and "firearm precursor parts" at the Fairgrounds with the intention and effect of shuttering gun show events altogether, have engaged in and will continue to engage in action that violates Plaintiffs' constitutional rights to free speech, assembly, and equal protection. Their actions also constitute prior restraint.

6.     This action seeks declaratory and injunctive relief against Defendants for violating the United States Constitution. It also seeks damages for lost profits, lost opportunities, and diminished marketing value, and reimbursement for reasonable attorney's fees, costs, and other expenses in bringing this action.

## JURISDICTION AND VENUE

7.     The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, thus raising federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress

8.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is

---

[1] Plaintiffs refer to the challenged law, California Penal Code section 27575, as SB 264 throughout this complaint.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    authorized by 42 U.S.C. § 1988.

2         9.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the

3    32nd District Agricultural Association is located within this district and a substantial

4    part of the events or omissions giving rise to Plaintiffs' claims occurred in this

5    district. Further, the state of California maintains an office for service of process on

6    the Attorney General in Los Angeles County at 300 South Spring Street, Los

7    Angeles, CA 90013-1230.

8                              **PARTIES**

9                             **[Plaintiffs]**

10        10.    Plaintiff B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE

11   WEST, is a for-profit event promoter operating in several western states. Crossroads

12   is in the business of promoting and organizing trade shows throughout the state of

13   California and other western states, including their long-running gun show events

14   held at the Orange County Fair & Event Center ("the Fairgrounds") operated under

15   the d/b/a Crossroads of the West ("Crossroads"). Before the adoption and

16   enforcement of SB 264, Crossroads was the largest vendor of gun show events in

17   California and at the Fairgrounds. Typically, thousands of people attend the gun

18   show on each of the weekends they are held. Crossroads provides the space for these

19   like-minded people to assemble. They have successfully produced and operated

20   multiple safe, legal, and family-friendly gun show events in California and at the

21   Fairgrounds every year for over 30 years. But for Defendants' adoption and

22   enforcement of SB 264, Plaintiff Crossroads would immediately resume producing

23   and promoting gun show events at the Fairgrounds.

24        11.    Plaintiff GERALD CLARK is a resident of Santa Ana, California, and

25   he is an NRA certified instructor. Before the implementation of SB 264, he regularly

26   attended gun shows at the Fairgrounds to purchase firearms, ammunition, parts for

27   firearms already owned, and materials to help him with his training and as a gun

28   owner to be more proficient. He has taught gun safety and training courses for 12

                              4

                              COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   years and has taught those courses at the Crossroads gun show at the Fairgrounds as

2   a Chief Range Safety Officer and Certified Trainer. During the training courses, he

3   talks to others about their rights, the importance of membership in the CRPA, and

4   the Second Amendment. SB 264 burdens his right to engage in otherwise lawful

5   commercial speech in a public forum and restricts his ability to purchase

6   ammunition, firearms, and parts for lawful purposes. And because the ban is

7   intended to make gun shows less profitable and effectively shutter them, it also

8   restricts his right to engage in the unique types of political, educational, and

9   commercial speech that takes place at the gun show. But for Defendants' adoption

10   and enforcement of SB 264, Plaintiff Clark would continue attending and

11   participating in the Crossroads gun show events at the Fairgrounds.

12       12.    Plaintiff ERIC JOHNSON is a resident of Whittier, California, and he

13   is a Certified Trainer, Range Safety Expert, retired coach, and Chief Range Safety

14   Officer. Before the implementation of SB 264, he regularly attended gun shows at

15   the Fairgrounds to purchase firearms, ammunition reloading supplies, ammunition,

16   parts for the firearms he owns, materials for caring for his firearms, and much more.

17   Plaintiff Johnson also attended the Crossroads gun show at the Fairgrounds to

18   engage in expressive activities with like-minded people, including discussions

19   related to firearms, ammunition, and firearm accessories, the shooting sports,

20   politics, and the Second Amendment. He regularly sets up and works the CRPA

21   booths at gun shows. SB 264 burdens his right to engage in otherwise lawful

22   commercial speech in a public forum and restricts his ability to purchase

23   ammunition, firearms, and parts for lawful purposes. And because the ban is

24   intended to make gun shows less profitable and effectively shutter them, it also

25   restricts his right to engage in the unique types of political, educational, and

26   commercial speech that takes place at the gun show. But for Defendants' adoption

27   and enforcement of SB 264, Plaintiff Johnson would continue attending and

28   participating in the Crossroads gun show events at the Fairgrounds.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

13.     Plaintiff CHAD LITTRELL is a resident of La Habra, CA and owns Vytamenc 22 Tactical. Before the implementation of SB 264, his company was a regular vendor at the Crossroads gun shows at the Fairgrounds. At these events, he would sell uppers, precursor parts and AR-15 rifles and discuss issues regarding firearms, ammunition, and gun safety with customers of the gun show. Plaintiff Littrell also attended the Crossroads gun show at the Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting sports, politics, and the Second Amendment. SB 264 burdens his right to engage in otherwise lawful commercial speech in a public forum and restricts his ability to purchase ammunition, firearms, and parts for lawful purposes. And because the ban is intended to make gun shows less profitable and effectively shutter them, it also restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show. Because of the essential shutting down of gun shows at the Fairgrounds, Plaintiff Littrell had to close his business. But for Defendants' adoption and enforcement of SB 264, Plaintiff Clark would re-open his business and continue attending and participating in the Crossroads gun show events at the Fairgrounds.

14.     Plaintiff JAN STEVEN MERSON is a resident of Fullerton, California, and he owns Merson's Machining Tool Making and Gunsmithing. Before the implementation of SB 264, his company (then known as Merson's Custom Tooling & Gunsmith) was a regular vendor at the Crossroads gun shows at the Fairgrounds. At these events, he would sell "firearm precursor parts"—which are legal products in California and are not considered firearms by legal definition. Plaintiff Merson also attended the Crossroads gun show at the Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting sports, politics, and the Second Amendment. SB 264 burdens his right to engage in otherwise lawful commercial

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

speech in a public forum and restricts his ability to purchase ammunition, firearms, and parts for lawful purposes. And because the ban is intended to make gun shows less profitable and effectively shutter them, it also restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show. But for Defendants' adoption and enforcement of SB 264, Plaintiff Merson would continue attending and participating in the Crossroads gun show events at the Fairgrounds.

15.     Plaintiff ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION ("APAGOA") is a nonprofit organization incorporated under the laws of Texas and registered with the California Secretary of State to do business in the state of California. APAGOA is a community of gun owners with an Asian Pacific American ("APA") heritage. It's core focus is to promote safe and responsible gun ownership within the APA community by providing educational materials and other resources to its members and other interested parties. APAGOA advocates for firearm safety, education, and community-building initiatives. And it strives to educate and empower the APA gun owner community so they can use their firearms safely and responsibly. It brings this action on behalf of its approximately 270 members and supporters who reside in California and, but for the implementation of SB 264, would attend and participate in the Crossroads gun show events at the Fairgrounds.

16.     Plaintiff CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED ("CRPA") is a nonprofit membership organization incorporated under the laws of California, with headquarters in Fullerton, California. Among its other activities, CRPA works to preserve and expand constitutional and statutory rights of gun ownership, including the right to self-defense and the right to keep and bear arms. CRPA accomplishes this through its educational offerings, publications, member engagement events, and legislative advocacy and initiatives. CRPA has individual members and business affiliates that attend gun shows. Before the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

implementation of SB 264, CRPA and some of its members were regular vendors at the Crossroads gun shows at the Fairgrounds, where they engaged the public in discussions about the organization and its purposes, the shooting sports, firearms and firearm safety, and the Second Amendment and other political issues. CRPA also attended gun shows at the Fairgrounds to sell organization memberships, advertise its events, distribute its publications, and sell its merchandise, some of which includes expressly pro-gun messaging. Members of CRPA would attend to advertise events, distribute publications, sell merchandise, ammunition, and firearms, some of which includes expressly pro-gun messaging.  CRPA has also hosted political rallies, educational seminars, and range safety officer training at gun shows throughout the state, including those at the Fairgrounds. SB 264 directly burdens the right of CRPA, its officers, employees, volunteers, members, and supporters, to engage in otherwise lawful commercial speech in a public forum and to access firearms, ammunition, and parts for lawful purposes. And because the ban on sales of firearms, ammunition, and parts is intended to make gun shows less profitable and effectively shutter them, it restricts the right of CRPA, its officers, employees, volunteers, members, and supporters, to engage in the unique types of political, educational, and commercial speech that takes place at the gun show. But for Defendants' adoption and enforcement of SB 264, Plaintiff CRPA would continue attending and participating in the Crossroads gun show events at the Fairgrounds. Through this lawsuit, CRPA represents not only its own interests as a gun show vendor, but also the interests of its members as gun show vendors and attendees and supporters of the right to keep and bear arms for lawful purposes.

17. Plaintiff SECOND AMENDMENT LAW CENTER, INC. ("2ALC"), is a nonprofit organization, incorporated under the laws of Nevada with headquarters in Henderson, Nevada, and registered with the California Secretary of State to do business in the state of California. 2ALC works to advance Second Amendment jurisprudence across the country while educating the public, participating in

8

1    scholarly research, and providing thought-provoking writings and content to help

2    advance the Second Amendment. 2LC works to support and protect Second

3    Amendment rights across the country, and they distribute materials at gun shows in

4    California to inform the public about their work. Because the ban on sales of

5    firearms and ammunition at the Fairgrounds is intended to make gun shows less

6    profitable and effectively shutter them, it restricts the rights of 2ALC to share

7    education and training materials with gun owners and those that attend gun show

8    events. In this lawsuit, 2ALC represents its interests as a gun show attendee and

9    purveyor of educational materials.

10          18.    Plaintiff SECOND AMENDMENT FOUNDATION, INC. ("SAF") is a

11   non-profit membership organization. It is incorporated under the laws of the state of

12   Washington and was founded in 1974. SAF has over 700,000 members and

13   supporters nationwide, including thousands of members in California. The purposes

14   of SAF include education, research, publishing, and litigation. It is critical to the

15   success of SAF that its promotional material, publications, and messages about the

16   "right to keep and bear arms" reach demographic groups that are saturated with gun

17   owners, gun buyers, and people of the "gun culture." Gun Shows like the one

18   threatened by the Defendants' actions interfere with this effort. SAF is dedicated to

19   promoting a better understanding about our constitutional heritage to privately own

20   and possess firearms through educational and legal action programs designed to

21   better inform the public about gun control issues. SAF has been a pioneer in

22   innovative defense of the right to keep and bear arms, through its publications and

23   public education programs like the Gun Rights Policy Conference. Those

24   publications and other SAF materials and information are offered at gun show

25   events. Second Amendment Foundation also expends significant sums of money

26   sponsoring public interest litigation to defend its own interests to disseminate

27   information to like-minded individuals, in an individualized setting like a gun show,

28   but SAF also seeks to defend the interests of its member in lawsuits like this present

9

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  effort.

2  **[Defendants]**

3      19.    Defendant GAVIN NEWSOM is the Governor of the State of

4  California. As Governor, he is vested with "the supreme executive power" of the

5  state and "shall see that the law is faithfully executed." Cal. Const. art. 5, §1.

6  Defendant Newsom is sued in his official capacity.

7      20.    Defendant ROB BONTA is the Attorney General of the State of

8  California. He is the "chief law officer" of the state and has the duty to 'see that the

9  laws of the State are uniformly and adequately enforced." Cal. Const. art. 5, § 1.

10  Additionally, Defendant Bonta has "direct supervision over every district attorney"

11  within the State. *Id.* If, at any point a district attorney of the State fails to enforce

12  adequately "any law of the State," Defendant Bonta must "prosecute any violations

13  of the law." *Id.* Finally, Defendant Bonta, as Attorney General of the State of

14  California, "shall assist any district attorney in the discharge" of duties when

15  "required by the public interest or directed by the Governor. . . ." *Id.* Defendant

16  Bonta is sued in his official capacity.

17      21.    Defendant TODD SPITZER is the District Attorney responsible for

18  enforcing the law within the county of Orange. Under the California Government

19  Code, the district attorney must prosecute "all actions for the recovery" of fines and

20  penalties. Cal. Gov't Code § 26521. Defendant Spitzer is sued in his official

21  capacity.

22      22.    Defendant KAREN ROSS is the Secretary of the California Department

23  of Food & Agriculture—the entity responsible for the policy oversight of the

24  network of California fair venues, which includes the Orange County Fair & Event

25  Center. Through the Department, Defendant Ross issues guidance for governance

26  and contracting to all agricultural districts throughout California (including

27  Defendant District) and requires reporting from the districts on operational issues.

28  The Department maintains an office of legal counsel for any actions brought against

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1   Agricultural Association Districts in the state. Defendant Ross is sued in her official
2   capacity.

3       23.   Defendant 32nd DISTRICT AGRICULTURAL ASSOCIATION
4   ("District") is a Governor-appointed Board of Directors that manages the state-
5   owned Orange County Fair & Event Center public venue. The District is governed
6   by a nine-member board, each member serving a four-year term. The District Board
7   of Directors appoints a CEO charged with the daily operations of the facilities but
8   maintains control over activities not delegated to the CEO, including contracting
9   with those seeking to host events, including gun shows, at the Fairgrounds. It is
10  responsible for ensuring that all state laws governing gun shows at the Fairgrounds,
11  including SB 264, are faithfully enforced. Defendant District refused to consider
12  contracts for the gun show by refusing to place the question of contract approval on
13  monthly meeting agendas when considering other similar contracts.

14      24.   The true names and capacities of Defendants named as DOES 1
15  through 10, inclusive, are individual, corporate, associate or otherwise, and are
16  unknown to Plaintiffs. They are, however, believed to be responsible in some way
17  for Plaintiffs' loss and damages. Each Doe Defendant is, and at all times mentioned
18  here was, a partner, agent, principal, co-conspirator, or are otherwise vicariously or
19  directly responsible for the acts or omissions of the other defendants or themselves.
20  They are each sued individually and are joined as party defendants. Plaintiffs thus
21  sue each Doe Defendant under rules 15 and 21 of the Federal Rules of Civil
22  Procedure. Plaintiffs are informed and believed that the Doe Defendants are all
23  California residents. Plaintiffs will amend this complaint to show such true names
24  and capacities of Doe Defendants when they have been ascertained.

25                          **FACTUAL ALLEGATIONS**
26      **[The First Amendment Rights to Free Speech, Association, & Assembly]**
27      25.   The First Amendment provides, in part, that "Congress shall make no
28  law . . . abridging the freedom of speech," U.S. Const. amend. I. It is incorporated

1    and made applicable to the states by the Fourteenth Amendment to the United States
2    Constitution and by 42 U.S.C. § 1983.

3          26.    Political and ideological speech—including speech concerning
4    "politics, nationalism, religion, or other matters of opinion"—has long been
5    considered the core of the First Amendment. *W. Va. State Bd. of Educ. v. Barnette*,
6    319 U.S. 624, 642 (1943).

7          27.    Public property made available for lease by community groups to
8    engage in expressive activity must thus be available without regard to the viewpoint
9    sought to be expressed *Cinevision Corp. v. City of Burbank*, 745 F.2d 560 (9th Cir.
10   1984). Such venues cannot be opened to some and closed to others, suppressing
11   protected expression, absent a compelling government interest. *Id.* at 571.

12         28.    The First Amendment does not tolerate the suppression of speech based
13   on what some may label an unpopular viewpoint of the speaker. *John J. Hurley and*
14   *S. Boston Allied War Vets. Council v. Irish-Am. Gay, Lesbian & Bisexual Group of*
15   *Boston*, 515 U.S. 557 (1995). Indeed, "*above all else*, the First Amendment means
16   that the government has no power to restrict expression because of its message, its
17   ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95 (emphasis added);
18   *see also Ashcroft*, 535 U.S. at 573.

19         29.    A content-based restriction that implicates political or ideological
20   speech must generally survive "strict scrutiny," where the government must show
21   that the law is narrowly tailored to achieve a compelling government interest. *See*
22   *Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see also Lorillard Tobacco Co. v.*
23   *Reilly*, 533 U.S. 525 (2001) (holding that tobacco marketing restrictions – even
24   those purposed to protecting minors -- must be the narrowest means of achieving an
25   asserted state interest); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011)
26   (overturing California law banning sale or rental of "violent video games" to
27   minors); *see also Tracy Rifle & Pistol LLC v. Harris*, 339 F. Supp. 3d 1007, 1018
28   (E.D. Cal. 2018) (holding that a California law prohibiting the display of a handgun,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

an imitation handgun, or a placard advertising the sale of a handgun in a manner that is visible from the outside of a gun dealer's premises is unconstitutional).

30.     Even purely commercial speech—speech that "does no more than propose a commercial transaction" or relates solely to the economic interests of the speaker and audience—receives First Amendment protection if it is not misleading and concerns a lawful activity. *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980).

31.     "An offer to sell firearms or ammunition" is constitutionally protected commercial speech. *Nordyke v. Santa Clara*, 110 F.3d 707, 710 (9th Cir. 2009).

32.     Government restrictions on protected commercial speech are constitutional *only* if they directly advance a substantial government interest and are not broader than necessary to serve that interest. *Cent. Hudson*, 447 U.S. 557.[2]

33.     The First Amendment protects not only the right of free speech, but also "the right of the people peaceably to assemble." U.S. Const., amend. I. The right to assemble often merges with the right to free expression. For "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Patterson*, 357 U.S. 449, 462 (1958). "Governmental action which may have the effect of curtailing the freedom to associate is subject to the *closest* scrutiny." *Id.* at 461-62.

**[The Fourteenth Amendment Right to Equal Protection Under the Law]**

34.     The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall deny to any person

---

[2] Though this is currently the controlling test for so-called "commercial speech," modern case law is trending toward extending ***full*** First Amendment protection to all speech, including "commercial speech." *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (moving toward providing commercial speech the same level of heightened protection long accorded to political speech); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 523 (1996) (Thomas, J., concurring in part and concurring in judgment) ("I do not see a philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech. Indeed, some historical materials suggest to the contrary.").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    within its jurisdiction the equal protection of the laws.

2        35.    Singling out speakers because of the content of their speech also

3    violates their fundamental rights under the Equal Protection Clause. U.S. Const.

4    amend. XIV.

5        36.    If unequal treatment occurs in the context of exercising a fundamental

6    right, or the government is motivated by animus toward a disfavored group, courts

7    apply heighted scrutiny. *See Loving v. Virginia*, 388 U.S. 1, 11 (1967); *see also*

8    *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985); *Romer v. Evans*, 517

9    U.S. 620 (1996). Indeed, "[b]ecause the right to engage in political expression is

10    fundamental to our constitutional system, statutory classifications impinging upon

11    that right must be narrowly tailored to serve a compelling governmental interest."

12    *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 666 (1990), *rev'd on other*

13    *grounds*, *Citzs. United v. Fed. Elec. Comm'n*, 558 U.S. 310, 130 S. Ct. 876 (2010).

14                    **[Regulation of Gun Show Events in California]**

15        37.    The state of California has the most rigorous regulatory regime for

16    commerce in firearms and ammunition in the United States. That regulatory regime

17    applies to the operation of gun show events throughout California. The laws related

18    to the acquisition and sale of firearms are arguably stricter at gun shows than at

19    brick-and-mortar stores or internet sales.

20        38.    Only state approved, licensed gun show producers may operate gun

21    shows in California.

22        39.    All gun show producers, including Plaintiff Crossroads, must have an

23    individual (the "promoter") who holds a valid Certificate of Eligibility issued by the

24    California Department of Justice.

25        40.    Gun show producers must also, among other things:

26            a.    Certify that they are familiar with all California laws regarding

27                gun shows, Cal. Penal Code § 27200;

28            b.    Possess a minimum of $1,000,000 liability insurance, *id.*;

14

1         c.    Provide an annual list of shows or events to be held to the

2               California Department of Justice, *id.*; and

3         d.    Notify the California Department of Justice no later than 30 days

4               prior to the gun show or event of any changes to the above, *id.*

5         e.    Make available to law enforcement a complete and accurate list

6               of all vendors that will participate in the show to sell, lease, or

7               transfer firearms. Cal. Penal Code § 27205.

8     41.    Gun show producers must submit an annual event and security plan and

9 schedule to the California Department of Justice and any local law enforcement

10 agency. The plan must include:

11         a.    Type of show or event;

12         b.    Estimated number of vendors offering for sale or display

13               firearms;

14         c.    Estimated number of attendees;

15         d.    Number of entrances and exits at the event;

16         e.    Location, dates, and times of the event;

17         f.    Contact person and telephone number for both promoter and

18               facility;

19         g.    Number of sworn peace officers employed by the producer or

20               facility who will be present at the event;

21         h.    Number of non-sworn security personnel employed by the

22               producer or the facility who will be present at the event; and

23         i.    Promoters must inform all prospective vendors of all California

24               laws regarding gun shows.

25 Cal. Penal Code §§ 27210, 27215.

26     42.    Gun show producers must also provide a list of all prospective vendors

27 and designated firearm transfer agents who are licensed firearm dealers to the

28 California Department of Justice no later than seven days prior to the event for the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

purpose of determining whether the vendor possess a valid license and are thus eligible to participate in the event. Cal. Penal Code § 27220.

43.    If a vendor is not approved by the California Department of Justice or fails to comply with all applicable California laws, they cannot participate. Cal. Penal Code § 27220.

44.    If a gun show producers fails to inform all prospective vendors of California's state laws or fails to submit a list of all prospective vendors to the California Department of Justice, the event cannot commence. Cal. Penal Code § 27230.

45.    Gun show producers must have written contracts with each vendor selling firearms at the event. Cal. Penal Code § 27235.

46.    Gun show producers must post signs in a readily visible location at each public entrance to the event that includes all of the following notices:

- **"**This gun show follows all federal, state, and local firearms and weapons laws, without exception."

- "Any firearm carried onto the premises by any member of the public will be checked, cleared of any ammunition, and secured in a manner that prevents it from being operated, and an identification tag or sticker will be attached to the firearm before the person is allowed admittance to the show."

- "No member of the public under the age of 18 years shall be admitted to the show unless accompanied by a parent, grandparent, or legal guardian."

- "All firearm transfers between private parties at the show shall be conducted through a licensed dealer in accordance with applicable state and federal laws."

- "Persons possessing firearms in this facility must have in their immediate possession government-issued photo identification and

16

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

display it upon the request to any security officer or any peace officer, as defined in Section 830."

Cal. Penal Code § 27240(a).

47.    Gun show producers must also post signs in a readily visible location at each entrance to the parking lot stating: "The transfer of firearms on the parking lot of this facility is a crime." Cal. Penal Code § 27240(b).

48.    A willful failure of a producer to comply with any of California's applicable laws is a misdemeanor punishable with a fine of up to $2,000 dollars and would render the producer ineligible for a gun show producer license for up to one year, which could cost a producer hundreds of thousands of dollars in lost revenue for a willful infraction. Cal. Penal Code § 272459(c).

49.    Except in very limited exceptions applicable only to law enforcement, actual firearm transfers are already prohibited from taking place at any gun show in California.[3] The firearm sale can be started through an on-site licensed "transfer dealer," but it cannot be completed on site. Instead, purchasers must pick up their purchase at a licensed firearm retailer at a different licensed location--but only after a 10-day waiting period and background check. There is no "Gun Show Loophole" at gun shows operated in accordance with California Law.

50.    The Gun Show Act of 2000, California Penal Code sections 27200-27245, places even more restrictions on the operation of a gun show in California by requiring that:

a.    Vendors do not display, possess, or offer for sale any firearms, knives, or weapons for which possession or sale is prohibited;

---

[3] Cal. Penal Code § 27310 (requiring all firearm transfers at gun shows to comply with state and federal law); *id.* § 26805 (prohibiting the sale and transfer of a firearm by a licensed dealer at any location other than the dealer's premises as listed on their license but allowing dealer to prepare documents at a gun show in preparation for completion of the sale at the dealer's premises); *id.* § 27545 (requiring all firearm transactions to be processed through a licensed dealer when neither party is a licensed firearm dealer).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

b.     Vendors acknowledge that they are responsible for knowing and complying with all applicable federal, state, and local laws dealing with the possession and transfer of firearms;

c.     Vendors will not engage in activities that incite or encourage hate crimes;

d.     Vendors will process all transfers of firearms through licensed firearms dealers as required by state law;

e.     Vendors will verify that all firearms in their possession will be unloaded and that the firearms will be secured in a manner that prevents them from being operated except for brief periods, when the mechanical condition of the firearm is being demonstrated to prospective buyer;

f.     Vendors provide all required information under Penal Code § 27320;

g.     Vendors will not display or possess black powder or offer it for sale;

h.     Ammunition only be displayed in closed original factory boxes or other closed containers, with the only exception for showing the ammunition to a prospective buyer. On July 1, 2019, additional state-law restrictions on the sale of ammunition will become effective and gun shows must comply;

i.     No member of the public under 18 years old may enter a gun show unless accompanied by a parent or legal guardian;

j.     No person other than security personnel or law enforcement possess both a firearm and ammunition for that firearm at the same time, with the exception of vendors who are selling both.

51.    Plaintiff  Crossroads diligently operates all of its gun shows in accordance with state law, and it takes immediate remedial measures if irregularities

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  are discovered.

2      52.    Vendors at Crossroads gun shows are some of the same licensed

3  vendors that have brick and mortar stores in the community or operate legally over

4  the internet and are registered with the state as lawful businesses.

5      53.    Vendors at Crossroads gun shows sell legal products and enjoy being

6  able to attend gun shows so they can better interact with customers in a more

7  meaningful and intimate way.

8      54.    Even with all of the state and federal regulations that promoters and

9  vendors must abide, through the adoption and enforcement of SB 264, Defendants

10 now seek to wholly prohibit constitutionally protected, highly regulated, and

11 otherwise perfectly legal activity.

12                    **[The Gun Show Cultural Experience]**

13     55.    Gun shows are a modern bazaar—a convention of like-minded

14 individuals who meet in this unique public forum that has been set aside by state and

15 local governments for all manner of commerce. This convention-like setting is of

16 incalculable benefit to the gun-buying consumer and promotes public safety.

17     56.    Gun shows, in general, and the Orange County show, in particular, are

18 a celebration of America's "gun culture" that is a natural and essential outgrowth of

19 the constitutional rights that flow from the Second Amendment to the United States

20 Constitution.

21     57.    Gun shows, in general, and the Orange County show, in particular, are

22 a First Amendment forum where literature and information are shared, speakers

23 provide valuable lectures, classes are conducted, political forums are held where gun

24 rights discussions take place, and candidates for political office can meet to discuss

25 political issues, the government, and the constitution with constituents who are part

26 of the California gun culture.

27     58.    Thousands of people attend gun shows on the weekends they are held at

28 the Fairgrounds. Many attend as new gun owners seeking information and

19

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    instruction. With over 1 million new gun owners in California in the past year, gun

2    shows offer the opportunity for these new gun owners to learn about firearms,

3    safety, and speak to expert firearm enthusiasts.

4        59.    Gun shows place a huge emphasis on safety as citizens come together.

5    Gun shows are designed to offer a communal atmosphere of like-minded people that

6    one does not find in a store where people are running in to pick up one or two items.

7    Gun shows are designed so that people will congregate, take their time, engage each

8    other and the vendors, and learn in a way that they do not otherwise engage.

9        60.    Gun shows also happen to include the exchange of products and ideas,

10   knowledge, services, education, entertainment, and recreation related to the lawful

11   uses of firearms. Those lawful uses include (but are not limited to): firearm safety

12   training; defense of self and others; defense community, state, and nation; hunting;

13   target shooting; gunsmithing; admiration of guns as art; appreciation of guns as

14   technological artifacts; and the study of guns as historical objects.

15       61.    Gun shows, in general, and the Orange County show, in particular, are

16   cultural marketplaces for those members of the "gun culture" who attend to

17   celebrate their constitutional rights and to pass their beliefs in patriotism and the

18   rights of the individual on to the next generation. It is a place where parents take

19   their children and grandparents take their grandchildren to share with them, among

20   other things, a love of historic firearms, stories of American war heroes, and their

21   love of hunting.

22       62.    Gun shows, in general, and the Orange County show, in particular, are

23   places where parents can learn to protect their families and their homes, and how to

24   stay in compliance with California's ever-changing gun laws.

25       63.    Gun shows, in general, and the Orange County show, in particular, are

26   places where people can discuss the positions of political candidates and whether

27   those values line up with their own beliefs in protecting the Second Amendment.

28       64.    Gun shows, in general, and the Orange County show, in particular, are

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

held and promoted, and considerable investment is made, precisely to promote and "normalize" the "gun culture" and the constitutional principles that gun show participants hold dear.

65. This forum is vitally important especially in California where government actors at all levels of government (federal, state, and local) are openly hostile to the cultural values of the Second Amendment and where supporters of those cultural values are not considered "mainstream."

66. Participating in "gun culture" is an important reason people attend Crossroads gun shows as vendors, exhibitors, customers, and guests (even if particular vendors or attendees are not in the firearm business or in the market to buy a gun at a particular event).

67. While less than 40% of vendors at Crossroads' events offer firearms or ammunition for sale (the remaining vendors offer accessories, collectibles, home goods, lifestyle products, educational information, food, and other refreshments), the principle draw of gun shows is the availability of firearms, ammunition, and firearm parts and accessories for sale, as well as the ability to handle and inspect firearms while in the presence of knowledgeable vendors.

68. Indeed, many people attend gun shows to learn about the technology and use of various firearms and ammunition when they are considering whether to buy or sell a firearm and to exchange knowledge with experienced dealers and firearm enthusiasts that they cannot get anywhere else. *Teixeira v. County of Alameda*, No. 13-17132 (9th Cir. 2017).[4]

69. Without the ability to buy and sell firearms and ammunition at gun shows at the Fairgrounds, the events will no longer be able to draw many of its vendors and attendees, making the events unprofitable and economically infeasible.

---

[4] The *Teixeira* court did not answer whether the Second Amendment includes a right to purchase a firearm. Plaintiffs allege, in good faith, that the right to keep and bear arms *necessarily* includes the rights to purchase and sell them. Indeed, those rights are a necessary predicate to the exercise of the Second Amendment.

1   When events are no longer profitable, producers and vendors cannot afford to attend
2   and host the shows or maintain the speech components of gun show.

3       70.   Defendants wish to end this celebration of "gun culture" and Second
4   Amendment rights because they do not understand the culture or the people. To that
5   end, Defendants have attempted, through SB 264's ban on sales of firearms,
6   ammunition, and "firearm precursor parts" at the Fairgrounds, to permanently
7   deprive Plaintiffs of their right to engage in constitutionally protected conduct at the
8   Fairgrounds.

9                    **[The Orange County Fair & Event Center]**

10      71.   The Fairgrounds is owned by the state of California and managed by
11  the Board of Directors of Defendant District, which must regularly report its
12  activities to the California Department of Food & Agriculture.

13      72.   Among other things, Defendant District is charged with maintaining the
14  Fairgrounds and ensuring that is used for public purposes.

15      73.   Defendant Ross, as the Secretary of the California Department of Food
16  & Agriculture, oversees the operation of the various agricultural districts in the state,
17  including Defendant District.

18      74.   The California Department of Food & Agriculture, under Secretary
19  Ross, provides policies and guidance for the operation of all agricultural districts in
20  the state, including the use of facilities as directed by Department policy.

21      75.   The California Department of Food & Agriculture maintains a *CDFA*
22  *Contracts Manual for Agricultural Districts* ("Manual"). Section 6.25 of the Manual
23  states that "[w]hether or not a fair rents out their facilities for gun shows is a policy
24  decision to be made by the fair board and their community."

25      76.   The Fairgrounds is a state-owned property maintained and opened for
26  use by the public. By virtue of being opened by the state for use by the public, it is a
27  "public forum," from which the government may not generally exclude expressive
28  activity. *Cinevision*, 745 F.2d at 569 (quoting *Perry Educ. Ass'n v. Perry Local*

1  *Educators' Assn*, 460 U.S. 37, 45-46 (1983)).

2      77.    The Fairgrounds is used by many different groups and is a major event

3  venue for large gatherings of people to engage in expressive activities, including

4  concerts, festivals, and industry shows. Indeed, "OC Fair & Event Center is a 150-

5  acre event venue that hosts over 150 events and attracts approximately 4.3 million

6  visitors annually. [Its] versatile multi-use property can be transformed to fit a variety

7  of events from small private events to large-scale trade shows and festivals." OC

8  Fair & Event Center, Event Space Sales, https://ocfair.com/venue-rentals/venue-

9  options/rental-property-brochure/ (last visited Aug. 4, 2022) (attached as Exhibit 1).

10     78.    The Fairgrounds actively promotes the use of the property by the public

11 through contracting for available space at the Fairgrounds. *Id.*; *see also* OC Fair &

12 Event Center, Venue Rentals, https://ocfair.com/venue-rentals/ (last visited Aug. 4,

13 2022).

14     79.    The Fairgrounds' Board of Directors Governing Manual states that

15 Defendant District's purpose is "(1) to hold fairs, expositions and exhibitions in

16 Orange County to exhibit the industries and industrial enterprises, resources, and

17 products of every kind or nature of the state, with a view toward improving,

18 exploiting, encouraging, and stimulating them; and (2) to construct, maintain, and

19 operate recreational and cultural facilities of general public interest in Orange

20 County. The 32nd DAA has adopted a mission statement to effectuate these

21 purposes, which is the celebration of Orange County's communities, interests,

22 agriculture and heritage." 32nd District Agricultural District, *Board of Directors*

23 *Governing Manual*, Introduction at 1, *available at* https://s3.us-west-

24 1.amazonaws.com/ocfair.com/wp-content/uploads/2021/02/02141413/Policy-

25 Combo-All.pdf  (last visited Aug. 4, 2022).

26     80.    The Fairgrounds has held non-gun-show events in which criminal

27 activity has taken place. These criminal incidents are no more likely to happen at a

28 gun show than at other types of events, but the Defendants have not banned these

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  promoters or their events.

2  **[Contracting for Use of the Fairgrounds]**

3  81.    Defendant District has a process for securing returning contractors who

4  would like to secure specific dates into future years before the contracts can be

5  drafted and executed.

6  82.    Each year, returning and regular contractors, including Plaintiff

7  Crossroads, submit preferred dates for the next calendar year, so Defendant District

8  can confirm availability and so that Plaintiff Crossroads can begin to reserve

9  vendors and materials for the show weekends.

10  83.    Due to the size and extensive planning that goes into producing gun

11  show events, Defendant District has—for decades—provided and held preferred

12  dates for Plaintiff Crossroads, a long-time contractor, until the contracts can fully be

13  executed.

14  84.    Defendant District's "hold" system essentially operates as a right of

15  first refusal to the benefit of returning contractors. For example, if another contractor

16  wanted the same preferred dates as Plaintiff Crossroads, Defendant District would

17  not allow another vendor to come in and take those dates from Plaintiff Crossroads

18  even though there is no official contract in place yet.

19  85.    The "hold" system also provides Defendant District with the security of

20  knowing its venue is booked with experienced and knowledgeable repeat contractors

21  that have a demonstrated record of running safe and profitable events at the

22  Fairgrounds.

23  86.    The "hold" system also permits the promoter to spend advertising

24  dollars to promote its events, but when governments announce plans to ban gun

25  shows at particular venues, vendors and patrons rationally make plans to attend gun

26  show events at other venues or seek other states to conduct their commerce.

27  87.    Defendant District also considers the "hold" dates and shows during

28  budget discussions which are typically held in the year before the contracts are

24

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  commenced.

2      88.    Upon information and belief, Plaintiffs allege that the "hold" system is

3  widely used by similar state fair board venues and is standard industry practice.

4      89.    Plaintiff Crossroads, after doing business in this customary manner for

5  more than 30 years, had no reason to doubt that Defendant District would continue

6  to honor such relationship with Plaintiff Crossroads.

7      **[Ban on Gun Shows at Other Fairgrounds & Resulting Litigation]**

8      90.    Despite the long history that Plaintiff Crossroads has had in California,

9  operating safe and legal events, the political environment has become hostile toward

10  gun show events and (more generally) toward the "gun culture" in recent years.

11      91.    Indeed, gun-show-banning activists are at work throughout the state

12  and the country to ban *all* gun shows *everywhere*, not because they are "dangerous

13  for the community," but because they do not subscribe to the same values as gun

14  show promoters, vendors, and participants.

15      92.    With increasing regularity, the same activists are making appearances

16  on Zoom board meetings held by fair boards across the state, and during each

17  appearance, they make the same claims in order to shut down lawful gun shows.

18      93.    These activists rely on unfounded fears about the security of gun show

19  events, false claims that gun shows are inherently dangerous because they normalize

20  the "gun culture," and peddle in false stereotypes about the people that attend gun

21  shows. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) (striking

22  an ordinance requiring a special permit for a group home for the intellectually

23  disabled and citing direct evidence of negative attitudes toward persons with

24  disabilities expressed by community members and recorded in the legislative

25  history).

26      94.    In 2017, gun-show-banning activists using the same tactics described

27  above began pressuring the 22nd District Agricultural Association ("22nd DAA"),

28  which manages the Del Mar Fairgrounds in San Diego, to prohibit gun show events

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   at the Del Mar Fairgrounds. In response, the 22nd DAA began a series of meetings

2   and comment periods to determine whether it would continue to contract with

3   Plaintiff Crossroads or other gun show producers for the use of the Del Mar

4   Fairgrounds to host gun show events.

5       95.   The 22nd DAA also engaged in communications with other

6   government agencies and with Crossroads to determine whether gun shows at the

7   Fairgrounds were operated in full compliance with state and federal law, and if the

8   events pose any real danger to the community.

9       96.   On April 23, 2018, Defendant Newsom sent a letter to the 22nd DAA,

10  urging the Board to ban gun shows at the Fairgrounds, citing his concerns that

11  "[p]ermitting the sale of firearms and ammunition on state-owned property only

12  perpetuates America's gun culture." Letter from Governor Gavin Newsom to Board

13  Members of 22nd District Agricultural Association (April 23, 2018) (attached as

14  Exhibit 2).

15      97.   On September 10, 2018, Assembly member Todd Gloria (D) sent a

16  letter to the 22nd DAA, stating his "firm belief that the State of California should in

17  no way help to facilitate the sale of firearms." He also expressed his support for the

18  22nd DAA "willingness to consider options for limiting or eliminating these gun

19  shows" and vowed to "act by way of legislation should the 22nd DAA Board be

20  unable to take meaningful action." Letter from Assembly Member Todd Gloria to

21  Board Members of 22nd District Agricultural Association (Sept. 10, 2018) (attached

22  as Exhibit 3).

23      98.   At a public hearing on September 11, 2018, a fair board ad hoc

24  "Contracts Committee" recommended that the 22nd DAA "not consider any

25  contracts with the producers of gun shows beyond December 31st, 2018, until such

26  time as the [22nd DAA] has put into place a more thorough policy regarding the

27  conduct of gun shows."

28      99.   In testimony before the 22nd DAA at the September 11, 2018 hearing,

26

Patrick Kerins, who was then the Public Safety Director for the 22nd DAA, reported on the laws that apply to gun shows in California, as well as Plaintiff Crossroads history of events at the Fairgrounds.

100. During his comments at the September 11, 2018 hearing, Mr. Kerins referenced a memorandum that he prepared for the 22nd DAA's Board of Directors in 2016. In that memorandum, he reported that:

> As Chief of Security for the 22nd DAA, I routinely inspect the gun show and on a regular basis communicate with the San Diego Sheriff's Department re: compliance with all the applicable laws and regulations and the Security Plan required by the California Department of Justice Firearms Division. I recently spoke to Detective Jaime Rodriguez of the Sheriff's North Coastal Station who supervises the four Deputies assigned to the gun show security detail and Detective Stacey Smith who is assigned to the Sheriff's Licensing Division. Both Detectives said the Crossroads of the West Gun Show is in complete compliance with all the local, State and Federal laws that govern gun shows and that there have not been any violations of law. Both Detectives had high praise for the show promoters and the 22 DAA staff.

Memorandum of Patrick Kerins, Public Safety Director, 22nd District Agricultural Association, to Board of Directors, 22nd District Agricultural Association, at 17 (2016) (attached as Exhibit 4).

101. Mr. Kerins' 2016 memorandum continued:

> In my considered opinion, as Chief of Security for the 22 DAA for the last 17 years, the CROSSROADS OF THE WEST GUN SHOWS (5 per year) are in compliance with all the local, state and federal regulatory statutes and have operated without any violations of those laws Under the laws of the State of California you must comply with all the laws of purchasing, selling and/or transferring of firearms at a gun show as you would at licensed gun dealer's store Due to the strict California gun show regulations there are no so called loop holes that you so often hear about in the media.

Ex. 4 at 17.

102. Ultimately, the lengthy process of meetings, public comment, and communications with stakeholders resulted in **no finding** that allowing the (already heavily regulated) gun show events to continue at the Del Mar Fairgrounds posed a definite or unique risk to public safety. Indeed, the 22nd DAA presented *no* evidence of any safety concerns within the community that could be linked to the

27

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    over-30-year-old gun show at the Del Mar Fairgrounds.

2        103.   Nonetheless, relying on contrived possibilities of unknown dangers and

3    unfounded claims that prohibiting gun shows might prevent suicide and violent

4    crime because the "gun culture" would be censored, the 22nd DAA voted to impose

5    a one-year moratorium on gun show events at the Del Mar Fairgrounds.

6        104.   Plaintiffs Crossroads, CRPA, SAF, and others sued the 22nd DAA,

7    Defendant Ross, and others in federal court under to prevent enforcement of the

8    moratorium, alleging violations of various constitutional rights, including the rights

9    to free speech, assembly, and equal protection. *See B&L Prods. v. 22nd Dist. Agric.*

10   *Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2019) ("*B&L I*") (attached as Exhibit 5).

11       105.   Denying the 22nd DAA's motion to dismiss and granting plaintiffs a

12   preliminary injunction—*sua sponte*—on the ground that plaintiffs were exceedingly

13   likely to succeed on the merits of their constitutional claims, the court in *B&L*

14   *Productions* temporarily enjoined the enforcement of the 22nd DAA's gun show

15   moratorium and ordered the 22nd DAA to contract with Crossroads as it would any

16   other similar event promoter at the Fairgrounds. *Id.*

17       106.   Shortly thereafter, the *B&L Productions* plaintiffs negotiated a

18   settlement with the 22nd DAA, represented by attorneys for the California

19   Department of Justice, permanently terminating the gun show moratorium,

20   reinstating Crossroads' right to promote gun show events at the Fairgrounds, and

21   permanently barring the 22nd DAA from unilaterally halting B&L's gun show

22   events at the Del mar Fairgrounds.

23                   **[California's Assembly Bill 893 (Gloria)]**

24       107.   Making good on previous threats, and fully aware of the court's

25   decision in *B&L I*, Assemblymember Gloria introduced Assembly Bill 893 ("AB

26   893") on or about February 20, 2019. Assem. Bill 893, 2019-2020 Reg. Sess. (Cal.

27   2019) (attached as Exhibit 6).

28       108.   AB 893, which added Section 4158 to the California Food &

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Agricultural Code, bars any "officer, employee, operator, lessee, or licensee of the [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds." Violation of the law is a misdemeanor. *Id.*

109.  AB 893 does not bar the possession of firearms or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds. *Id.*

110.  The text of AB 893 expressly identifies the ongoing presence at the Del Mar Fairgrounds of "marketplaces popularly known as 'gun shows,' at which firearms and ammunition and other items are sold to the public approximately five times a year." *Id.*

111.  AB 893 also clearly recognizes that "[p]romoters maintain relationships with a core group of vendors, some selling guns and some selling other merchandise, who travel as the schedule dictates from city to city and state to state and in the West, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona." *Id.*

112.  AB 893 failed to identify, however, any real public safety or security concern specifically related to the existence of gun show events at the Fairgrounds.

113.  To be sure, AB 893 claims, without support, that "[g]un shows bring grave danger to a community" and that "dangerous incidents" have taken place at guns shows at the Fairgrounds, including "an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines." But AB 893 makes no effort to show that these incidents are any more likely to occur at gun shows in California, which are regulated at least as heavily as retailers operating out of brick-and-mortar stores.

114.  Instead, AB 893's legislative history reveals only general concerns about gun violence occurring all over the country and legislators' beliefs that the state should not profit from sales of firearms and ammunition. *See* Matthew

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Fleming, Assem. Comm. Pub. Safety, Bill Analysis Re: AB 893 (Gloria), 2019-2020 Reg. Sess., at 3 (Cal. 2019) (attached as Exhibit 7).

115.   Indeed, AB 893 opens with a list of tragedies, including the horrific mass murders that took place at Columbine High School, Sandy Hook Elementary School, and Marjory Stoneman Douglas High School—none of which were carried out with firearms traced to gun show events at the Fairgrounds. Ex. 6.

116.   What's more, a March 26, 2019, analysis of AB 893 presented to the Assembly Committee on Public Safety quoted claims by Assemblymember Gloria, the bill's sponsor, that "[t]here is an ever-apparent link between the gun violence we see virtually every week and the number of guns in our communities." These statements, however, made no attempt to link gun violence to gun shows, generally, or to gun shows at the Fairgrounds, specifically. Ex. 7 at 2.

117.   The Public Safety Committee's March 26, 2019, analysis also quoted Gloria as lamenting that "the State of California should not be profiting or benefitting from the sale of firearms." He continued, "[f]undamentally, I believe it is wrong for the state of California to profit or to benefit from the sale of firearms and ammunition." Ex. 7 at 2.

118.   The Public Safety Committee's March 26, 2019, analysis also cited a decade-old report from the Violence Prevention Research Program (VPRP) at the UC Davis School of Medicine, identifying gun shows as a source of illegally trafficked firearms. Ex. 7 at 3.

119.   But neither the VPRP report nor AB 893's legislative history links any illegally trafficked firearm or gun used in crime to gun shows at the Fairgrounds (or even to gun shows in California). *See* Garen Wintemute, MD, *Inside Gun Shows: What Goes on When Everybody Thinks Nobody's Watching*, ch. 1 (2009) (attached as Exhibit 8). This is unsurprising because, as the study states, "[m]uch of the concern about gun shows as a source of crime guns focuses on private party gun sales, *since no background checks are conducted and no records are kept*." *Id.* at 32.

1    But such concerns are simply irrelevant in California where private party transfers—
2    *even those initiated at gun shows*—must be processed by a licensed firearm dealer
3    and are subject to background checks and registration under state law.

4         120.   The VPRP report cited by the Public Safety Committee's analysis of
5    AB 893 also attempts to implicate licensed firearm retailers operating at gun shows
6    as sources of crime guns in America, claiming that "30% of dealers with gun show
7    sales, but 22% of all dealers, had previously had a crime gun traced to them." But it
8    expressly recognizes that "in California, where both gun shows themselves and gun
9    commerce generally are regulated, *sales at gun shows are not a risk factor among*
10   *licensed retailers for disproportionate sales of crime guns*." Ex. 8 at 33 (emphasis
11   added).

12        121.   The Public Safety Committee's March 26, 2019, analysis also cited a
13   report from the Government Accountability Office, claiming that a GAO report
14   "regarding gun trafficking to Mexico confirmed that many traffickers buy guns at
15   gun shows." Ex. 7 at 3. But again, neither the BATFE report nor AB 893's
16   legislative history links any illegally trafficked firearm to gun shows at the Del Mar
17   Fairgrounds (or even to gun shows in California). *See* U.S. Gov't Accountability
18   Off., GAO-16-223, *Firearms Trafficking: U.S. Efforts to Combat Firearms*
19   *Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain*
20   (2016) (attached as Exhibit 9). To be sure, the GAO report identifies U.S. Southwest
21   border states, including Texas (41%), California (19%), and Arizona (15%), as the
22   largest sources of firearms illegally trafficked into Mexico from the United States.
23   Ex. 9 at 14. But it does not trace these illegally trafficked guns to licensed dealers,
24   generally, or to those operating at gun shows, specifically. Rather, it says only that
25   "there were about 10,134 licensed dealers and pawnbrokers in the four Southwest
26   border states, many of them along the border," and that "these licensed dealers and
27   pawnbrokers can operate in locations such as gun shops, pawn shops, their own
28   homes, or gun shows." *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

122.   The Public Safety Committee's March 26, 2019, analysis did concede that "less than one percent of inmates incarcerated in state prisons for gun crimes acquired their firearms at a gun show"—though it transparently tries to diminish that fact by citing only a website of the National Rifle Association as the source of the statistic, instead of the U.S. Department of Justice, Bureau of Justice Statistics reports from which the NRA drew it. Ex. 7 at 2-3 (citing NRA-ILA, *Background Checks/NICS*, https://www.nraila.org/get-the-facts/background-checks-nics (last visited Sept. 29, 2021)); *but see* Caroline Wolf Harlow, Ph.D., Bureau of Justice Statistics, *Firearm Use by Offenders* (Nov. 2001) attached as Exhibit 10.

123.   While the Public Safety Committee's March 26, 2019, analysis also concedes that "violent criminals do not appear to regularly purchase their guns directly from gun shows," the analysis immediately shifts to "criticism" (from the partisan Center for American Progress) that gun shows are somehow "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market." Ex. 7 at 3 (citing Arkadi Gerney, Center for American Progress, *The Gun Debate 1 Year After Newtown: Assessing Six Key Claims About Gun Background Checks* (Dec. 2013), *available at* https://www.americanprogress.org/issues/guns-crime/reports/2013/12/13/80795/the-gun-debate-1-year-after-newtown/ (last visited Sept. 29. 2021). Neither the Center for American Progress editorial nor AB 893's bill analysis show how, in California where sales at gun shows are regulated *at least* as heavily as sales at brick-and-mortar retailers, guns originating at gun shows are any more likely to enter the "shadowy, no-questions-asked illegal market" than those sold at gun stores.

**[California's Senate Bill 264 (Min)]**

124.   Not to be outdone and following the encouragement from both Defendant Newsom and Assemblymember Gloria, Senator Dave Min sought early on to rid the state of gun shows on all state fairground properties. Indeed, Senator

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Min promised "in my first 100 days in office, I promise to author legislation for a *ban* on these gun shows at the OC Fair and Events Center once and for all." Anthony Pignataro, *SD-37 Candidate Min: Ban Gun Shows from OC Fair & Event Center*, OC Weekly (Aug. 6, 2019), https://www.ocweekly.com/sd-37-candidate-min-ban-gun-shows-from-oc-fair-event-center/ (emphasis added). And he called on the "governing board of the OC Fair to *end its contract* with Crossroads of the West and other gun show marketers." *Id.*

125.   In response, Board Member Ashleigh Aitken, advocating for the known safety of the Fairgrounds, noted that "[t]he gun show loophole does not exist in California. No citizen can purchase a firearm at the gun show and walk off property with it. The purchases are subject to the same background checks and waiting periods as any other store purchase." Aitken went on to note that "California's legal gun shows are not a priority as our state has the strictest gun laws in the country." Anthony Pignataro, *OC Fair Board Member Responds to Min's Gun Show Ban Idea* (Aug. 7, 2019), *available at* https://www.ocweekly.com/oc-fair-board-member-responds-to-mins-gun-show-ban-idea/.

126.   Nevertheless, Senator Min introduced Senate Bill 264 ("SB 264") on January 27, 2021. Sen. B. 264, 2020-2021 Reg. Sess. (Cal. 2020) (attached as Exhibit 11). SB 264, which added section 27575 to the California Penal Code, bars any "officer, employee, operator, lessee, or licensee of the [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the OC Fair and Events Center." Violation of the law is a misdemeanor. *Id.*

127.   SB 264 does not bar the possession of firearms, ammunition, or firearm precursor parts on the property or in the buildings that comprise the Orange County Fairgrounds. Ex. 10. And it provides exceptions for (1) gun buyback events held by law enforcement, (2) the sale of a firearm by a public administrator, public conservator, or public guardian in the course of their duties, (3) the sale of a firearm,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   firearm precursor part, or ammunition on state property that occurs pursuant to a

2   contract that was entered into before January 1, 2022, and (4) the purchase of

3   ammunition on state property by a law enforcement agency in the course of its

4   regular duties. *Id.*

5       128.   Like AB 893, SB 264 clearly recognizes that "[p]romoters maintain

6   relationships with a core group of vendors, some selling guns and some selling other

7   merchandise, who travel as the schedule dictates from city to city and state to state

8   and in the West, for example, many of the same vendors can be seen at Crossroads

9   of the West Gun Shows from San Francisco, California, to Tucson, Arizona." *Id.*

10      129.   SB 264 failed to identify, however, any real public safety or security

11  concern specifically related to the existence of gun show events at the Fairgrounds.

12  Indeed, without citing specific safety concerns related to the *Orange County*

13  Fairgrounds, the authors of SB 264 literally copied and pasted the same vague

14  "security concerns" related to the *Del Mar* Fairgrounds from the language of AB

15  893 to label the Orange County events a threat to the local community. *Id.*

16      130.   To be sure, SB 264 claims that "[g]un shows bring grave danger to a

17  community" and that "dangerous incidents" have taken place at guns shows at the

18  Fairgrounds, including ***"an official vendor accused of trafficking illegal firearms,***

19  ***sales of firearms to individuals registered in the Department of Justice Bureau of***

20  ***Firearms Armed Prohibited Persons System, and illegal importation of large-***

21  ***capacity magazines***." *Id.*  But SB 264 makes no effort to show that these incidents

22  are any more likely to occur at the Orange County gun show or gun shows in

23  California in general, which are regulated at least as heavily as retailers operating

24  out of brick-and-mortar stores. What's more, these incidents are identical to the

25  crimes alleged to have taken place at the Del Mar Fairgrounds—an odd coincidence

26  to be sure.

27      131.   Instead, SB 264's legislative history reveals only general concerns

28  about gun violence occurring all over the country, unrelated to California gun

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

shows, and legislators' beliefs that the state should not profit from sales of firearms and ammunition.

132.   Indeed, SB 264 opens with a list of tragedies, including the horrific mass murders that took place at Columbine High School, Sandy Hook Elementary School, and Marjory Stoneman Douglas High School—none of which were carried out with firearms traced to gun show events at the Fairgrounds. *Id.*

133.   The Senate Committee on Public Safety's March 15, 2021, analysis cited a report from the Government Accountability Office, claiming that a GAO report "regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows." Sen. Comm. Pub. Safety, Bill Analysis Re: SB 264 (Min), 2021-2022 Reg. Sess., at 4 (Cal. 2021) (attached as Exhibit 12). But again, neither the BATFE report nor SB 264's legislative history links any illegally trafficked firearm to gun shows at the Orange County Fairgrounds (or even to gun shows in California). *See* Ex. 9.

134.   In comments to the Senate Public Safety Committee on March 16, 2021, Senator Min claimed that "SB 264 will ensure that the state is not profiting from the sale of firearms and ammunition on state property or facilitating gun shows that would undermine California's strong firearm regulations." Sen. Pub. Safety Committee Hrg., Mar. 16, 2021, at 3:20:18, *available at* https://www.senate.ca.gov/media-archive/default?title=Public+Safety&startdate=03%2F16%2F2021&enddate=03%2F17%2F2021 (last accessed Aug. 4, 2022).

135.   In his remarks to the Senate Public Safety Committee, Senator Min claimed that the carnival-like atmosphere of gun shows lends itself to "lots of gun sales in the parking lot or by Venmo where the gun is delivered later." No data was presented to support these claims even when asked by Senator Bogh. Senator Min ultimately conceded that he does not know how many firearms from gun shows actually move into the stream of illegal commerce. *Id.* at 4:05:36. He went on to state that even if there have zero unlawful acts at guns shows, "there is a principal

35

that taxpayers should not be utilized, and taxpayer venues should not be utilized to promulgate the distribution of more guns in our communities." *Id.* at 4:09:40.

136.   Senator Min's closing remarks to the Senate Public Safety Committee recognized that SB 264 is "symbolic" and makes a statement that the state does not want to give an endorsement of "our taxpayer venues being used to sell more guns in our communities. *Id.* at 4:12:59.

137.   Similarly, in his remarks to the Assembly Committee on Public Safety on July 13, 2021, Senator Min said that ending gun shows and banning the sale of firearms, ammunition, and precursor parts at state-owned properties is a value statement that the state of California must make. *See* Assem. Pub. Safety Committee Hrg., Mar. 16, 2021, at 4:01:22, *available at* https://www.assembly.ca.gov/media/assembly-public-safety-committee-20210713/video (last accessed Aug. 4, 2022). "Value statements" are made about likes and dislikes, not about issues of public safety. Min's candid remarks about the intention of SB 264 clearly illustrate a commitment to end gun shows not for safety reasons, but to restrict the lawful speech and activities of a culture that he does not understand and does not support.

**[The Impact of SB 264 on the Orange County Gun Show]**

138.   The sale of firearms and ammunition is an essential function of gun shows, and it is one of the main reasons people attend these events; if gun shows are not economically viable because they have been stripped of an essential function, they will cease to exist.

139.   SB 264 thus has the same practical effect as Del Mar's unconstitutional gun show moratorium which was enjoined by federal court—that is, by permanently banning the commercial sale of firearms and ammunition at the Fairgrounds, it has the effect of banning gun shows at the Fairgrounds.

140.   The Legislature was well-aware when it passed SB 264 that a "gunless" gun show would not survive financially. Indeed, the intended purpose of SB 264

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

was to end gun shows at the Fairgrounds as noted by bill sponsor Senator Min in numerous committee testimonies and public comments.

141.   The July 12, 2021, Assembly Committee on Public Safety's bill analysis references other similar legislative attempts to ban gun shows on state agricultural land. Assem. Comm. Pub. Safety, Bill Analysis Re: SB 264 (Min), 2021-2022 Reg. Sess., at 3 (Cal. 2021) (attached as Exhibit 13). The analysis notes that:

> AB 893 (Gloria) Chapter 731, Statutes of 2019, added a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunition at the Del Mar Fairgrounds, **effectively terminating the possibility for future gun shows** at the Del Mar Fairgrounds. AB 893 was signed into law by Governor Newsom. This bill would expand the provisions of AB 893 by including all state property within the prohibition on the sale or transfer of firearms and ammunition.[5]

142.   Senator Min knew that the intended and practical effect of SB 264 was to end gun shows. His official Senate press release notes "[i]f signed into law, SB 264 would effectively put a stop to most gun shows on county fairgrounds." Press Release, *Senator Dave Min's Gun Violence Prevention Bill Advances from Assembly Public Safety Committee* (July 13, 2021), *available at* https://sd37.senate.ca.gov/news/senator-dave-mins-gun-violence-prevention-bill-advances-assembly-public-safety-committee (last accessed Aug. 4, 2022).

143.   And further evidencing the Legislature's intended effect of SB 264, Senator Min wrote to Defendant District, warning members not to stand in the way of his bill that would ban sales of firearms, ammunition, and firearm precursor parts at the Fairgrounds. Letter from Senator Dave Min to Board Members of 32nd District Agricultural Association (on or about Sept. 13, 2021) (attached as Exhibit 14).

---

[5] SB 264 was initially introduced as a bill to end sales of firearms, ammunition, and firearm precursor parts on *all* state-owned property. But Min failed to garner enough support for such a ban and agreed to limit the scope of SB 264 to the OC Fair & Event Center.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

144.   In his letter dated on or about September 13, 2021, Min addressed the District's concerns that its venue was being unfairly and exclusively targeted, responding that SB 264 was no different from earlier attempts to ban gun shows at a single fairground:

> While Item 6A expresses a concern that SB 264 "exclusively targets the 32nd DAA," such action to ban gun shows at a single fairground site has recent precedent. In 2019, Gov. Newsom signed Assembly Bill 893 (Gloria) into law, ending the sale of firearms and ammunition at the Del Mar Fairgrounds, operated by the 22nd District Agricultural Association.

*Id.* (emphasis added).

145.   In that same letter, Senator Min also threatened the District's board members with individual liability lawsuits should they move to approve contracts for the gun shows even before Governor Newsom had signed SB 264 into law. *Id.*

146.   Nonetheless, Plaintiff Crossroads has repeatedly reached out to Defendant District to request dates for events at the Fairground in 2021 and 2022. But Defendant District refused to place the contracts for gun shows on the agenda for October, November, or December 2021, stating instead that they would revisit the issue again in January 2022 after SB 264 would go into effect.

147.   Plaintiff Crossroads was unable to secure dates and enter into new contracts for events at the Fairgrounds in 2022 due to the Defendants' intentional act of adopting and enforcing SB 264 and refusing to consider their contracts in the same way they would any other member of the public seeking to rent the Fairgrounds venue.

148.   Indeed, in compliance with SB 264, Defendant District cannot and will not enter into contracts for gun shows at the Fairgrounds if firearms, ammunition, or firearm precursor parts will be sold.

149.   Even though Plaintiff Crossroads has offered to attempt to hold events without sales of firearms, ammunition, or firearm precursor parts to preserve its longstanding relationship with the District, mitigate damages, and continue planning

and promoting its family-friendly events until its claims can be heard, Defendant District dragged its feet and refused to provide dates for events for 2022.

150.   Because of the time and resources needed to plan and implement its gun show events, Plaintiff Crossroads must plan its shows about one year in advance, but Defendant District has not allowed Plaintiff Crossroads to secure dates in 2023 either.

151.   What's more, Defendant District seems to have stripped Plaintiff Crossroads of its effective right of first refusal under the District's "hold" system described above. Indeed, it failed to give Crossroads first (or any) choice of its dates in 2021 or 2022.

152.   Defendants' adoption and enforcement of SB 264, which has the intended and practical effect of banning gun shows at the Fairgrounds, has and will continue to cause Plaintiff Crossroads significant economic damages, including loss of event revenue, breakdown of relationships and agreements with long-time event vendors and companies used as suppliers for gun show events, relinquishment of future show dates, and loss of business reputation and goodwill that has been built by Plaintiff Crossroads for more than 30 years.

153.   Plaintiff Crossroads has already lost revenue for gun show events at the Fairgrounds in December 2021 and 2022 because the Fair Board will not finalize event dates, citing SB 264 as the reason along with the threats from Senator Min for personal liability should they act. If shows do not return to the Fairgrounds in 2022, Plaintiff Crossroads will lose all revenue for gun show events at the Fairgrounds in 2022.

154.   Even if Plaintiff Crossroads could secure dates, plan, promote, and host gun shows in 2022, SB 264 stands in the way of Crossroads generating the profits the events typically generate because the ban on firearm and ammunition sales will significantly impact paid event attendance and the types and numbers of paid vendors who will do business with Crossroads at the Orange County gun show.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

155.  Plaintiff Crossroads has and will continue to suffer loss of business goodwill resulting from Defendants' adoption and enforcement of SB 264 under the (unsupported) pretense that gun shows, generally, and Crossroads' shows, in particular, threaten public safety. The message this sends to other venues, attendees, and vendors that do business with Crossroads will no doubt affect Crossroads for years.

156.  Defendants' adoption and enforcement of SB 264, which has the intended and practical effect of banning gun shows at the Fairgrounds, prohibits Plaintiffs and all those similarly situated from making use of a state-owned "public assembly facility" to host gun show events, a lawful business activity, in violation of Plaintiffs' rights to engage in free speech and peaceful assembly, and their right to equal protection under the law.

157.  Specifically, Defendants' conduct complained of here strips Plaintiffs Clark, Johnson, Littrell, and Merson, as well as the organizational plaintiffs, CRPA, APAGOA, 2ALC, and SAF, of a vital opportunity to assemble and engage in pure speech about, among other things, the rights and responsibilities of gun owners, the Second Amendment, patriotism, and political activism with like-minded individuals.

158.  Defendants' conduct complained of here also strips Plaintiff Crossroads of the right to promote gun show events, acting as a "clearinghouse" for both political speech and commercial speech.

159.  Defendants' conduct complained of here also strips Plaintiffs Littrell and Merson, as well as business members of CRPA that participate as vendors at gun shows at the Fairgrounds, of a vital opportunity to assemble and engage in lawful commercial speech, including the offer and acceptance of sales of firearms, ammunition, and related accessories.

160.  Furthermore, even if the Court grants injunctive relief, Plaintiff Crossroads will have incurred damages in having to devote extraordinary advertising dollars to inform the public that gun shows will continue to be held and have not

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    been banned at the Fairgrounds.

2         161.   The economic and non-economic harms and injuries to Plaintiffs are of

3    a continuing nature; they continue to compound everyday SB 264 remains the law.

4

5                              **FIRST CAUSE OF ACTION**
     **Violation of Right to Free Speech Under U.S. Const., amend. I**
6                              **42 U.S.C. § 1983**
     (By Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, SAF
7                              Against All Defendants)

8         162.   Plaintiffs incorporate by reference paragraphs 1 through 161 of this

9    Complaint as though fully set forth herein in their entirety.

10        163.   The state of California owns the Fairgrounds, a public venue. It is

11   rented to the public, including community-based organizations and businesses, for

12   its use and enjoyment, including for concerts, festivals, and industry shows.

13        164.   Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC ,

14   and SAF have attended in the past and wish to again attend Crossroads gun shows at

15   the Fairgrounds so they may exchange ideas, information, and knowledge, as well

16   discuss political issues and the importance of protecting and defending the Second

17   Amendment.

18        165.   Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC,

19   and SAF have a right under the First Amendment to use the Fairgrounds for their

20   expressive activity on the same basis as other members of the public without regard

21   to the viewpoints they seek to express.

22        166.   Defendants Newsom, Bonta, and Spitzer, acting under color of state

23   law, are the state and local actors responsible for enforcing SB 264, which deprives

24   Plaintiffs of free speech rights secured by the First Amendment of the United States

25   Constitution in violation of 42 U.S.C. § 1983.

26        167.   Defendants Ross and District interpret, implement, and enforce state

27   laws and policies in regard to the Fairgrounds, including SB 264, which deprives

28   Plaintiffs of free speech rights secured by the First Amendment of the United States

1   Constitution in violation of 42 U.S.C. § 1983.

2       168.   Defendants' enforcement of SB 264, which prohibits the sale of

3   firearms, ammunition, and firearm precursor parts at the Fairgrounds with the

4   purpose and intention (or at least the effect) of banning gun show events at the

5   Fairgrounds, is an impermissible content-based restriction of speech. Such

6   enforcement constitutes a direct violation of the free speech rights of Plaintiffs

7   Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF.

8       169.   Defendants have no compelling (or even legitimate) governmental

9   interest in banning the otherwise lawful (and constitutionally protected) sale of

10  lawful firearms, ammunition, and firearm precursor parts at the Fairgrounds, or in

11  banning gun show events and the unique expression and exchange of ideas related to

12  promoting and preserving the "gun culture" that takes place at those events. Any

13  purported interest in "public safety" is betrayed by the fact that SB 264 does not ban

14  the possession of firearms, ammunition, or firearms precursor parts on Fairgrounds

15  property and state law already governs sales at gun shows *at least* as strictly as it

16  governs sales at "brick-and-mortar" stores.

17      170.   Further, SB 264 is neither narrowly tailored to nor the least restrictive

18  means of achieving the state's dubious interests. Indeed, by intentionally and

19  effectively banning gun shows at the Fairgrounds, it sweeps up *all* forms of speech

20  and expressive conduct that occurs at such events and banishes from a public venue.

21      171.   Similarly, SB 264 is unconstitutionally overbroad because, in an effort

22  to restrict the commercial sale of firearms, ammunition, and firearm precursor parts,

23  the law effectively and intentionally bans gun shows events altogether, seriously and

24  deliberately burdening a vast amount of speech that does not constitute such a

25  communication and is fully protected by the First Amendment.

26      172.   As a direct and proximate result of Defendants' conduct, Plaintiffs

27  Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF have suffered

28  irreparable harm, including the violation of their constitutional right to free speech,

entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

**SECOND CAUSE OF ACTION**
**Violation of Right to Free Speech Under U.S. Const., amend. I**
**Mixed Political - Commercial**
**42 U.S.C. § 1983**
(By Plaintiff Crossroads Against All Defendants)

173.   Plaintiffs incorporate by reference paragraphs 1 through 172 of this Complaint as though fully set forth herein in their entirety.

174.   The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

175.   Plaintiff Crossroads seeks to engage in protected speech at the Fairgrounds, a noted "public assembly facility," through the promotion and production of events for lawful expressive activity, including events that bring together like-minded individuals to engage in pure political and educational speech, as well as commercial speech of vendor and individual participants to communicate offer and acceptance for the sale of legal goods and services.

176.   Event promoters, though they generally promote events for profit, "still enjoy the protections of the First Amendment." *Id.* at 567. For "[t]he role of a promoter in ensuring access to the public is at least as critical as the role of a bookseller or theater owner and . . . is in a far better position than a concert goer or individual performers to vindicate First Amendment rights and ensure public access." *Id*. at 568. The conduct they engage in is protected expression.

177.   Plaintiff Crossroads has a right under the First Amendment to use the Fairgrounds for its expressive activity on the same basis as other members of the public without regard to the content or viewpoint it seeks to express and promote.

178.   Defendants Newsom, Bonta, and Spitzer, acting under color of state law, are the state and local actors responsible for enforcing SB 264, which deprives

43

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    Plaintiffs of free speech rights secured by the First Amendment of the United States

2    Constitution in violation of 42 U.S.C. § 1983.

3        179.    Defendants Ross and District interpret, implement, and enforce state

4    laws and policies in regard to the Fairgrounds, including SB 264, which deprives

5    Plaintiffs of free speech rights secured by the First Amendment of the United States

6    Constitution in violation of 42 U.S.C. § 1983.

7        180.    Defendants' enforcement of SB 264, which prohibits the sale of

8    firearms, ammunition, and precursor parts at the Fairgrounds with the purpose and

9    intention (or at least the effect) of banning gun show events at the Fairgrounds, is an

10    impermissible content-based restriction of speech. Such enforcement constitutes a

11    direct violation of the free speech rights of Plaintiff Crossroads.

12        181.    Defendants have no compelling (or even legitimate) governmental

13    interest in banning the otherwise lawful (and constitutionally protected) sale of

14    lawful firearms, ammunition, and firearm precursor parts at the Fairgrounds, or in

15    banning gun show events and the unique expression and exchange of ideas related to

16    promoting and preserving the "gun culture" that takes place at those events. Any

17    purported interest in "public safety" is betrayed by the fact that SB 264 does not ban

18    the possession of firearms, ammunition, or firearms precursor parts on Fairgrounds

19    property and state law already governs sales at gun shows *at least* as strictly as it

20    governs sales at "brick-and-mortar" stores.

21        182.    Further, SB 264 is neither narrowly tailored to nor the least restrictive

22    means of achieving the state's dubious interests. Indeed, by intentionally and

23    effectively banning gun shows at the Fairgrounds, it sweeps up *all* forms of speech

24    and expressive conduct that occurs at such events and banishes from a public venue.

25        183.    Similarly, SB 264 is unconstitutionally overbroad because, in an effort

26    to restrict the commercial sale of firearms, ammunition, and firearm precursor parts,

27    the law effectively and intentionally bans gun shows events altogether, seriously and

28    deliberately burdening a vast amount of speech that does not constitute such a

44

1    communication and is fully protected by the First Amendment.

2        184.   As a direct and proximate result of Defendants' conduct, Plaintiff

3    Crossroads has suffered irreparable harm, including the violation of its constitutional

4    right to free speech, entitling Crossroads to declaratory and injunctive relief. Absent

5    intervention by this Court, through declaratory and injunctive relief, Plaintiffs will

6    continue to suffer this irreparable harm.

7                        **THIRD CAUSE OF ACTION**
8    **Violation of Right to Commercial Speech Under U.S. Const., amend. I**
     **42 U.S.C. § 1983**
9        (By Plaintiffs Littrell, Merson, and CRPA Against All Defendants)

10       185.   Plaintiffs incorporate by reference paragraphs 1 through 184 of this

11   Complaint as though fully set forth herein in their entirety.

12       186.   The state of California owns the Fairgrounds, a public venue. It is

13   rented to the public, including community-based organizations and businesses, for

14   its use and enjoyment, including for concerts, festivals, and industry shows.

15       187.   Plaintiffs Littrell and Merson, as well as business members of CRPA,

16   have attended in the past and wish to again attend Crossroads gun shows at the

17   Fairgrounds as vendors to engage in lawful commercial speech with individual

18   attendees.

19       188.   Plaintiffs Littrell, Merson, and CRPA members have a right under the

20   First Amendment to use the Fairgrounds for expressive activity on the same basis as

21   other members of the public without regard to the viewpoints they seek to express

22   and promote.

23       189.   Defendants Newsom, Bonta, and Spitzer, acting under color of state

24   law, are the state and local actors responsible for enforcing SB 264, which deprives

25   Plaintiffs of free speech rights secured by the First Amendment of the United States

26   Constitution in violation of 42 U.S.C. § 1983.

27       190.   Defendants Ross and District interpret, implement, and enforce state

28   laws and policies in regard to the Fairgrounds, including SB 264, which deprives

                                    45

Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

191.   Defendants' enforcement of SB 264, which prohibits the sale of firearms, ammunition, and precursor parts at the Fairgrounds with the purpose and intention (or at least the effect) of banning gun show events at the Fairgrounds, is an impermissible content-based restriction of speech. Such enforcement constitutes a direct violation of the First Amendment commercial speech rights of the Plaintiffs.

192.   Further, by directly barring the rights of vendors, like Plaintiffs Littrell, Merson, and CRPA members, to sell firearms and ammunition (which necessarily involves commercial speech), SB 264 defies existing case law in the Ninth Circuit protecting the commercial speech associated with firearm sales on public property. *See Nordyke v. Santa Clara Cty.*, 110 F. 3d 707 (9th Cir. 1997).

193.   Defendants have no substantial (or even legitimate) governmental interest in banning the otherwise lawful (and constitutionally protected) sale of lawful firearms, ammunition, and firearm precursor parts at the Fairgrounds, or in banning gun show events and the unique expression and exchange of ideas related to promoting and preserving the "gun culture" that takes place at those events. Any purported interest in "public safety" is betrayed by the fact that SB 264 does not ban the possession of firearms, ammunition, or firearms precursor parts on Fairgrounds property and state law already governs sales at gun shows *at least* as strictly as it governs sales at "brick-and-mortar" stores.

194.   Even if there were a substantial governmental interest in restricting gun shows and the commercial speech that occurs at such events, it would not be directly served by a ban on sales of firearms, ammunition, and firearm precursor parts at the Fairgrounds.

195.   Even if there were a substantial governmental interest in restricting gun shows and the commercial speech that occurs at such events, banning commercial speech about firearms and ammunition at the Fairgrounds altogether is more

46

extensive than necessary to serve any such interest. *See Nordyke*, 110 F.3d 707 (holding that a ban on the sale of firearms on county-owned land was overbroad as abridging commercial speech associated with the sale of lawful products).

196.   As a direct and proximate result of Defendants' conduct, Plaintiffs Littrell, Merson, and CRPA have suffered irreparable harm, including the violation of their constitutional right to free speech, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

**FOURTH CAUSE OF ACTION**
**Prior Restraint on Right to Free Speech Under U.S. Const., amend. I**
**42 U.S.C. § 1983**
(By All Plaintiffs Against All Defendants)

197.   Plaintiffs incorporate by reference paragraphs 1 through 196 of this Complaint as though fully set forth herein in their entirety.

198.   The First Amendment affords special protection against policies or orders that impose a previous or prior restraint on speech. "[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment Rights." *Ass'n for L.A. Deputy Sheriffs*, 239 Cal. App. 4th at 811 (citing *Neb. Press Ass'n*, 427 U.S. at 559. A prior restraint is particularly egregious when it falls upon the communication of news, commentary, current events, political speech, and association. *N.Y. Times Co.*, 403 U.S. at 715.

199.   Prior restraint also involves the "unbridled discretion doctrine" where a policy, or lack thereof, allows for a single person or body to act at their sole discretion, without regard for any constitutional rights possessed by the person upon which the action is taken, and where there is no remedy for challenging the discretion of the decision makers. *Lakewood*, 486 U.S. at 757.

200.   The Defendants are the state and local actors responsible for enforcing SB 264, which is a content-based restriction of speech that will have a chilling effect on Plaintiffs' First Amendment rights, thus acting as a de facto prior restraint on

47

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    Plaintiffs' rights (including a refusal to place contract approval on board agendas or

2    to offer available dates to begin the process of renting the venue).

3        201.   Under SB 264, Defendant District has unfettered discretion to

4    determine what constitutes a "sale" under the law and is thereby prohibited at the

5    Fairgrounds.

6        202.   Defendants' policies and practices complained of here impose an

7    unconstitutional prior restraint because they vest the District with unbridled

8    discretion to permit or refuse protected expression by members of the public,

9    including Plaintiffs.

10       203.   Defendants' policies and practices complained of here give unbridled

11   discretion to local agricultural district boards and board members to decide what

12   forms of expression members of the public may engage in on at the Fairgrounds and

13   to ban any other expression at the whim of those boards and board members in

14   violation of the First Amendment.

15       204.   As a direct and proximate result of Defendants' conduct, Plaintiffs have

16   suffered and will continue to suffer irreparable harm, including the violation of their

17   constitutional right to freedom of expression, entitling them to declaratory and

18   injunctive relief and nominal damages.

19

20                          **FIFTH CAUSE OF ACTION**
     **Violation of Right to Assembly and Association Under U.S. Const., amend. I**
21                            **42 U.S.C. § 1983**
                       (By All Plaintiffs Against All Defendants)

22       205.   Plaintiffs incorporate by reference paragraphs 1 through 204 of this

23   Complaint as though fully set forth herein in their entirety.

24       206.   The state of California owns the Fairgrounds, a public venue. It is

25   rented to the public, including community-based organizations and businesses, for

26   its use and enjoyment, including for concerts, festivals, and industry shows.

27       207.   Plaintiffs have promoted and/or attended in the past and wish to again

28   promote and/or attend Crossroads gun shows at the Fairgrounds so they may

                                          48

                COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

assemble and associate with one another to engage in lawful commerce, fellowship, and expressive activities, including political and educational speech regarding the lawful ownership, possession, and use of firearms and related products.

208.   Plaintiffs have a right under the First Amendment to use the Fairgrounds to assemble and associate on the same basis as other members of the public without regard to the content or viewpoint it seeks to express and promote.

209.   Defendants Newsom, Bonta, and Spitzer, acting under color of state law, are the state and local actors responsible for enforcing SB 264, which deprives Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

210.   Defendants Ross and District interpret, implement, and enforce state laws and policies in regard to the Fairgrounds, including SB 264, which deprives Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

211.   Defendants' enforcement of SB 264, which prohibits the sale of firearms, ammunition, and precursor parts at the Fairgrounds with the purpose and intention (or at least the effect) of banning gun show events at the Fairgrounds, violates Plaintiffs' rights to assembly and association by denying them the right to use the Fairgrounds, a "public assembly facility," to assemble and engage in political and other types of expression—a right Defendants extend to other members of the public so long as they are not meeting for the purposes of holding a gun show event.

212.   Defendants have no compelling (or even legitimate) governmental interest in banning the otherwise lawful (and constitutionally protected) sale of lawful firearms, ammunition, and firearm precursor parts at the Fairgrounds, or in banning gun show events and, by extension, the rights of Plaintiffs to assemble and associate at the Fairgrounds. Any purported interest in "public safety" is betrayed by the fact that SB 264 does not ban the possession of firearms, ammunition, or

1  firearms precursor parts on Fairgrounds property and state law already governs sales
2  at gun shows *at least* as strictly as it governs sales at "brick-and-mortar" stores.

3      213.   Even if SB 264 served some sufficient government purpose, it is neither
4  narrowly tailored nor the least restrictive means to serve that end.

5      214.   As a direct and proximate result of Defendants' conduct, all Plaintiffs
6  have suffered irreparable harm, including the violation of their constitutional right to
7  free association and assembly, entitling them to declaratory and injunctive relief.
8  Absent intervention by this Court, through declaratory and injunctive relief,
9  Plaintiffs will continue to suffer this irreparable harm.

10
11  **SIXTH CAUSE OF ACTION**
**Violation of the Right to Equal Protection Under U.S. Const., amend. XIV**
**42 U.S.C. § 1983**
12  (By All Plaintiffs Against All Defendants)

13      215.   Plaintiffs incorporate by reference paragraphs 1 through 214 of this
14  Complaint as if fully set forth herein in their entirety.

15      216.   Defendants, acting under color of state law, are enforcing SB 264,
16  which deprives Plaintiffs of right to equal protection under the law secured by the
17  Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. §
18  1983.

19      217.   On its face and as applied, SB 264 is an unconstitutional abridgement
20  of Plaintiffs' right to equal protection under the law guaranteed by the Fourteenth
21  Amendment because it is a viewpoint-discriminatory and/or animus-based
22  restriction on Plaintiffs' protected speech that serves no compelling governmental
23  interest

24      218.   On its face and as evidenced by the legislative history of AB 2571, it is
25  clear that the law's purpose and intention is to make a "symbolic" gesture and a
26  "value statement" about the otherwise lawful sale of firearms and related products
27  and of the proliferation of the "gun culture" in California and elsewhere.

28      219.   Defendants have no compelling (or even legitimate) governmental

interest in banning Plaintiffs' speech. Indeed, any purported interest in "public safety" is betrayed by the fact that SB 264 does not ban the possession of firearms, ammunition, or firearms precursor parts on Fairgrounds property and state law already governs sales at gun shows *at least* as strictly as it governs sales at "brick-and-mortar" stores.

220.   Defendants' refusal to allow Plaintiffs equal use of the public facility while continuing to allow contracts for the use of the facility with other similarly situated legal and legitimate businesses is a violation of Plaintiffs' right to equal protection under the law because it is based on a "bare desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534.

221.   Further, AB 2571 is not narrowly tailored to achieving the state's dubious interests.

222.   As a direct and proximate result of Defendants' conduct, all Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to equal protection under the law, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

1.      A declaration that SB 264, codified at California Penal Code section 27575, violates the free speech rights of Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF under the First Amendment to the United States Constitution, on its face and as applied;

2.      A declaration that SB 264, codified at California Penal Code section 27575, violates the free speech rights of Plaintiff Crossroads under the First Amendment to the United States Constitution, on its face and as applied;

3.      A declaration that SB 264, codified at California Penal Code section 27575, violates the commercial speech rights of Plaintiffs Littrell, Merson, and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

CRPA under the First Amendment to the United States Constitution, on its face and as applied;

4.     A declaration that SB 264, codified at California Penal Code section 27575, violates the free speech rights of all Plaintiffs under the First Amendment to the United States Constitution because it imposes a prior restraint on their speech;

5.     A declaration that SB 264, codified at California Penal Code section 27575, violates Plaintiffs' rights of assembly and association under the First Amendment to the United States Constitution, on its face and as applied;

6.     A declaration that SB 264, codified at California Penal Code section 27575, violates the rights of all Plaintiffs to equal protection under the law per the Fourteenth Amendment to the United States Constitution, on its face and as applied;

7.     Defendants, their employees, agents, successors in office, and all District Attorneys, County Counsel, and City Attorneys holding office in the state of California, as well as their successors in office, from enforcing SB 264, codified at California Penal Code section 27575;

8.     An order for damages, including nominal damages, according to proof;

9.     An award of costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988 or other appropriate state or federal law; and

10.     Any such other relief the Court deems just and equitable.

Dated:  August 12, 2022                    **MICHEL & ASSOCIATES, P.C.**

                                           *s/ Anna M. Barvir*
                                           Anna M. Barvir
                                           Counsel for Plaintiffs B&L Productions, Inc.,
                                           California Rifle & Pistol Association,
                                           Incorporated, Gerald Clark, Eric Johnson, Chad
                                           Littrell, Jan Steven Merson, Asian Pacific
                                           American Gun Owner Association, Second
                                           Amendment Law Center, Inc.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

Dated:  August 12, 2022          **LAW OFFICES OF DONALD KILMER, APC**

2

3          _s/ Donald Kilmer_
Donald Kilmer
4          Counsel for Plaintiff Second Amendment
Foundation

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF