# EXHIBIT 5



Neutral
As of: August 5, 2022 5:10 PM Z

# B & L Prods. v. 22nd Dist. Agric. Ass'n

United States District Court for the Southern District of California

June 25, 2019, Decided; June 25, 2019, Filed

Case No.: 3:19-CV-134-CAB-NLS

**Reporter**

394 F. Supp. 3d 1226 *; 2019 U.S. Dist. LEXIS 106334 **; 2019 WL 2602546

B & L PRODUCTIONS, INC. d/b/a CROSSROADS OF THE WEST et al., Plaintiffs, v. 22ND DISTRICT AGRICULTURAL ASSOCIATION et al., Defendants.

**Subsequent History:** Motion denied by *B & L Prods. v. 22nd Dist. Agric. Ass'n, 2020 U.S. Dist. LEXIS 73950 (S.D. Cal., Apr. 27, 2020)*

## Core Terms

Moratorium, gun show, discovery, Fairgrounds, content-based, regulation, gun, summary judgment, public safety, rights, motion to dismiss, restrictions, content-neutral, viewpoint, strict scrutiny, quotation, marks, governmental interest, public forum, allegations, firearm, preliminary injunction, irreparable, satisfies, immunity, subject to strict scrutiny, compelling state interest, summary judgment motion, constitutional right, narrowly tailored

**Counsel:** **[**1]** For B & L Productions, Inc., doing business as Crossroads of the West, Barry Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Lawrence Walsh, Maximum Wholesale, Inc., doing business as Ammo Bros., California Rifle & Pistol Association, Incorporated, South Bay Rod and Gun Club, Inc., Plaintiffs: Carl D. Michel, Sean Brady, LEAD ATTORNEYS, Tiffany D. Cheuvront, Michel & Associates PC, Long Beach, CA; Anna M. Barvir, Michel & Associates, P. C., Long Beach, CA.

For *Second Amendment* Foundation, Plaintiff: Carl D. Michel, LEAD ATTORNEY, Michel & Associates PC, Long Beach, CA; Donald Edward Kilmer, Jr., LEAD ATTORNEY, Law Offices of Donald Kilmer, A Professional Corporation, San Jose, CA.

For 22nd District Agricultural Association, Defendant: Peiyin Patty Li, LEAD ATTORNEY, California Department of Justice, Office of the Attorney General, San Francisco, CA.

**Judges:** Hon. Cathy Ann Bencivengo, United States District Judge.

**Opinion by:** Cathy Ann Bencivengo

## Opinion

**[*1233] MEMORANDUM OPINION RE JUNE 18, 2019 ORDER**

**[*1234]** At a hearing on June 17, 2019, and in an order dated June 18, 2019, the Court granted in part and denied in part a motion to dismiss filed by Defendants, denied Plaintiffs' request for entry of summary judgment, and issued a preliminary **[**2]** injunction against Defendant 22nd District Agricultural District (the "District"). The purpose of this opinion is to provide the reasoning for the Court's order.

**I. Background**

Plaintiff B&L Productions, Inc. d/b/a Crossroads of the West ("Crossroads") operates gun show events in California, including at the Del Mar Fairgrounds (the "Fairgrounds"). [Doc. No. 1 at ¶ 1.] Plaintiffs California Rifle & Pistol Association, Inc. ("CRPA"); South Bay Rod and Gun Club, Inc. ("SBRGC"); *Second Amendment* Foundation, Inc. ("SAF"); Barry Bardack; Ronald J. Diaz, Sr.; John Dupree; Christopher Irick; Lawrence Michael Walsh; and Maximum Wholesale, Inc. d/b/a Ammo Bros ("MW"), attend and participate in the Crossroads gun show at the Fairgrounds. [*Id.* at ¶ 7.] The Complaint describes gun shows as:

> a modern bazaar—a convention of like-minded individuals who meet in this unique public forum that has been set aside by state local governments for all manner of commerce. Gun shows just happen to include the exchange of products and ideas, knowledge, services, education, entertainment, and recreation, related to the lawful uses of firearms. Those lawful uses include (but are not limited to):
>
> a. Firearm safety training;
>
> b. Self-defense; **[**3]**
> c. Defense of others;
> d. Defense of community;
> e. Defense of state;
> f. Defense of nation;
> g. Hunting;
> h. Target shooting;
> i. Gunsmithing;
> j. Admiration of guns as art;
> k. Appreciation of guns as technological artifacts; and
> l. Study of guns as historical objects.

[*Id.* at ¶ 47.] The complaint further alleges that:

> Gun shows in general, and the Del Mar show in particular, are a celebration of America's "gun culture" that is a natural and essential outgrowth of the constitutional rights that flow from the *Second Amendment to the United States Constitution*. Participating in that culture is one of the primary reasons people attend Crossroads gun shows as vendors, exhibitors, customers, and guests (even if particular vendors/attendees are not in the firearm business or in the market to buy a gun at a particular event.)

[*Id.* at ¶ 49.]

According to the complaint, individuals attending and participating in these gun shows engage in commercial activities [*id.* at ¶ 3], but "[a]ctual firearm transfers are prohibited from taking place at any gun show in California absent very limited exceptions applicable only to law enforcement" [*id.* at ¶ 43]. "Only a small percentage (usually less than 40%) of the vendors actually offer firearms or ammunition for sale. The **[**4]** remaining vendors offer accessories, collectibles, home goods, lifestyle **[*1235]** products, food and other refreshments." [*Id.* at ¶ 48.]

In addition, according to the complaint, these gun show events include activities and discussions related to: "firearms, firearm technology, firearm safety, gun-politics, and gun-law (both pending legislation and proper compliance with existing law.) Other topics include: where to shoot, where and from whom to receive training, gun-lore, gun-repair, gunsmithing, gun-art, and many other topics, that arise from the right to acquire, own, possess, enjoy, and celebrate arms as a quintessentially American artifact with Constitutional significance." [*Id.* at ¶ 3.] The complaint also alleges that at gun shows, "literature and information are shared, speakers provide valuable live lectures, classes are conducted, political forums are held where gun rights discussions take place, and candidates for political office can meet to

discuss political issues, the government, and the Constitution with constituents who are part of the California gun culture." [*Id.* at ¶ 52.]

The Fairgrounds is owned by the state of California and managed by the board of directors of Defendant 22nd **[**5]** District Agricultural Association (the "District"). [*Id.* at ¶¶ 23, 58, 112.] According to the complaint, the Fairgrounds "is used by many different public groups and is a major event venue for large gatherings of people to engage in expressive activities, including concerts, festivals, and industry shows." [*Id.* at ¶ 63.] The Fairgrounds' website allegedly describes its mission as "'[t]o manage and promote a world-class, multi-use, *public assembly facility* with an emphasis on agriculture, education, entertainment, and recreation in a fiscally sound and environmentally conscientious manner *for the benefit of all*.'" [*Id.* at ¶ 66 (*emphasis* originally in complaint); Doc. No. 1-2 at 2-33; Doc. No. 14-5 at 206.][1]

Defendant Karen Ross is the Secretary of the California Department of Food & Agriculture (the "CDFA"), the entity responsible for policy oversight of the Fairgrounds. [Doc. No. 1 at ¶ 24.] According to the complaint, she oversees the operation of the District, and authorized the other Defendants "to interpret, enforce, and implement [the CDFA's] policies for the operation and management of the [Fairgrounds]." [*Id.* at ¶¶ 59, 113.]

Defendants Steve Shewmaker and Richard Valdez **[**6]** are president and vice-president of the District Board of Directors, respectively. [*Id.* at ¶¶ 25, 26.] Shewmaker and Valdez were also the members of an "ad hoc committee responsible for developing the plan, in closed session, to effectively ban gun shows from the [Fairgrounds]." [*Id.; see also* ¶ 84] At a public hearing on September 11, 2018, this committee:

> recommended that the District not consider any contracts with the producers of gun shows beyond December 31, 2018 until such time as the District has put into place a more thorough policy regarding the conduct of gun shows that:
>
> a. Considers the feasibility of conducting gun shows for only educational and safety training purposes and bans the possession of guns and ammunition on state property[;]
>
> b. Aligns gun show contract language with recent changes to state and federal law[;]
>
> c. Details enhanced security plan for the conduct of future shows[;]
>
> d. Proposes a safety plan[;]
>
> e. Considers the age appropriateness of the event[;]
>
> **[*1236]** f. Grants rights for the [District] to perform an audit to ensure full compliance with California Penal Code Sections 171b and 12071.1 and 12071.4.

[*Id.* at ¶ 88.] The District then "voted (8-to-1) to impose a one-year moratorium (for the year 2019) on gun show **[**7]** events at the Venue while they study potential safety concerns." [*Id.* at ¶ 94.] According to the complaint, there was "no finding that allowing the (already heavily regulated) gun show events to continue at the [Fairgrounds] posed a definite or unique risk to public safety." [*Id.* at ¶ 92.] The complaint also alleges that the Fairgrounds "has held other non-gun-show events in which criminal activity has taken place—including theft and a shooting. These criminal incidents are no more likely to happen at a gun show event [than at] the non-gun-show event. The District has taken no actions to ban or impose a moratorium on these promoters or events." [*Id.*

[1] *See also* http://www.delmarfairgrounds.com/index.php?fuseaction=about.home

at ¶ 67.]

## II. Procedural History

On January 21, 2019, Plaintiffs filed the complaint in this action. The complaint asserts several claims for violation of the right to free speech under the *First Amendment to the Constitution* by various combinations of Plaintiffs, as well as claims by all Plaintiffs for violation of the right to assembly and association under the *First Amendment*, violation of the right to equal protection under the *Fourteenth Amendment to the Constitution*, and conspiracy to violate civil rights under *42 U.S.C. § 1985*. The complaint prays for declaratory relief that Defendants' actions in enacting the moratorium on gun shows violated **[**8]** Plaintiffs' *First Amendment* Rights, injunctive relief compelling Defendants to allow Crossroads to hold gun shows at the Fairgrounds in 2019, compensatory damages, and punitive damages.

On March 27, 2019, Defendants moved to dismiss the complaint in its entirety. In their opposition to the motion, Plaintiffs asked the Court to convert the motion to dismiss into cross-motions for summary judgment. Upon review of the briefing, and because in a *First Amendment* case, "plaintiffs have a special interest in obtaining a prompt adjudication of their rights," *Sorrell v. IMS Health Inc., 564 U.S. 552, 563, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011)*, the Court was inclined to adopt Plaintiffs' proposal. The Court then ordered further briefing to give Defendants the opportunity to fully oppose summary judgment in favor of Plaintiffs. After that supplemental briefing was complete, the Court held a hearing on June 17, 2019. As memorialized by a written order the following day, at that hearing the Court informed the parties that it was granting in part and denying in part Defendants' motion to dismiss, denying without prejudice Plaintiffs' motion for summary judgment based on Defendants' claim that they need discovery to adequately oppose the motion, and set a discovery schedule and briefing schedule for motions for **[**9]** summary judgment. The Court also granted a preliminary injunction to Plaintiffs that enjoined Defendants from enforcing the moratorium on gun shows adopted at the September 11, 2018 meeting (the "Moratorium"). This opinion provides the Court's reasoning for the rulings it issued at the June 17, 2019 hearing and memorialized in the June 18, 2019 order.

## III. Defendants' Motion to Dismiss

Although one might think otherwise based on the quantity of outside evidence submitted by Defendants with their motion to dismiss, "evidence outside the pleadings . . . cannot normally be considered in deciding a 12(b)(6) motion." *Cervantes v. City of San Diego, 5 F.3d 1273, 1274 (9th Cir. 1993)* (quoting **[*1237]** *Farr v. United States, 990 F.2d 451, 454 (9th Cir. 1993))*.[2] "The question presented

[2] Defendants ask for judicial notice of various policies, manuals, reports, meeting minutes and transcripts from the District, on the grounds that they are public records. [Doc. 12-2.] "Judicial notice under *Rule 201* permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 999 (9th Cir. 2018)* (quoting *Fed. R. Evid. 201(b)*). Although "a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment, . . . [it] cannot take judicial notice of disputed facts contained in such public records." *Id.* (internal citation and quotation marks omitted). Here, it is not clear from the request for judicial notice which facts from these documents Defendants are asking the Court to notice because the request asks the Court only to take notice of the documents themselves. The accuracy of the documents may not reasonably be questioned, "but accuracy is only part of the inquiry under *Rule 201(b)*." *Id.* "Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.* Regardless, even after considering the documents attached to Defendants' request, the Court finds that the complaint states a claim against the District.

. . . is not whether the plaintiff will ultimately prevail, but whether the plaintiff has alleged sufficient factual grounds to support a plausible claim to relief, thereby entitling the plaintiff to offer evidence in support of its claim." *Mazal Grp., LLC v. Espana, No. 217CV05856RSWLKS, 2017 U.S. Dist. LEXIS 200108, 2017 WL 6001721, at *2 (C.D. Cal. Dec. 4, 2017)*.

Thus, when considering a motion to dismiss the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008)*. To survive the motion, the "complaint must contain sufficient **[**10]** factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. On the other hand, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 555*). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010)*. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009)* (internal quotation marks omitted).

### A. Claims Against the District

In the motion to dismiss, Defendants argue that the free speech claims should be dismissed because the Moratorium does not regulate speech or expressive conduct, is viewpoint and content-neutral, and survives either rational basis review or intermediate scrutiny. As discussed in detail below, the Court disagrees with Defendants and finds that the Moratorium is a content-based restriction of speech on its face. As a result, **[**11]** the Court is satisfied that the complaint states plausible claims against the District for violation of Plaintiffs' *First Amendment* rights and for violation of Plaintiffs' rights under the *Equal Protection Clause of the Fourteenth Amendment*. **[*1238]** It is for this reason that the Court denied the motion to dismiss with respect to the District.[3]

---

Accordingly, the need not address the merits of Defendants' request for judicial notice.

[3] Defendants make a host of objections to evidence submitted by Plaintiffs with their opposition to the motion to dismiss and request for summary judgment. [Doc. No. 15-1.] Because the language of the Moratorium and allegations in the complaint were sufficient for this ruling, the Court did not need to consider any of this evidence to determine that the complaint states a claim against the District and to deny the motion to dismiss as to the District. Nor was this evidence material to the Court's decision to deny Plaintiffs' motion for summary judgment based on Defendants' claimed need for discovery. Regardless, Defendants' formulaic objections to the relevance of Plaintiffs' evidence are generally inappropriate in the context of a motion for summary judgment. Instead of objecting to the relevance of the evidence, Defendants would be better served by *arguing* that the facts are not material. *See Burch v. Regents of Univ. of California, 433 F.Supp. 2d 1110, 1119 (E.D. Cal. 2006)*. As to objections as to the foundation for the evidence, many of the objections are targeted to the exact sort of evidence Defendants submitted in their request for judicial notice. Defendants even object to Plaintiff's submission of some of the exact same documents it included with its motion as also being irrelevant. Compare Exhibit D to Defendants' Request for Judicial Notice [Doc. No. 12-3 at 30] with Exhibit 18 to the Barvir Declaration [Doc. No. 14-6 at 304]. It is unclear what Defendants intend to accomplish with such objections, considering that Defendants believe the evidence is admissible and relevant in some form. Ultimately, the District bears the burden of proof that the gun show moratorium satisfies the requisite level of scrutiny, *see United*

**B. Qualified Immunity as to Shewmaker and Valdez**

The motion to dismiss also argues that Defendants Shewmaker and Valdez are entitled to qualified immunity. "Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). It "protects 'all but the plainly incompetent or those who knowingly violate the law,'" Mueller v. Auker, 576 F.3d 979, 992 (9th Cir. 2009) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)), and it assumes that government actors "do not knowingly violate the law," Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir. 1994). Because "[i]t is 'an *immunity from suit* rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" Mueller, 576 F.3d at 992 (*emphasis* in original) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)). To that end, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in **[**12]** litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991).

To determine whether Shewmaker and Valdez are immune from suit, the court must "evaluate two independent questions: (1) whether [their] conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." Castro, 833 F.3d at 1066. "[A] right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. at 1067 (quoting **[*1239]** Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir. 2003)). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Mueller, 576 F.3d at 994 (internal quotation marks and citation omitted). "[T]he clearly established law must be 'particularized' to the facts of the case." White v. Pauly, 137 S.Ct. 548, 552, 196 L. Ed. 2d 463 (2017) (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "The standard is an objective one that leaves 'ample room for mistaken judgments.'" Mueller, 576 F.3d at 992 (quoting Malley, 475 U.S. at 343).

Here, the Court need not resolve whether Plaintiffs' Shewmaker and Valdez violated Plaintiffs' constitutional rights, because even assuming they did, those rights were not clearly established. Plaintiffs' constitutional rights "would be 'clearly established' if 'controlling authority or a robust consensus of cases of persuasive authority' had previously held that" it is a violation **[**13]** of the First Amendment right to free speech or Fourteenth Amendment right to equal protection to propose or vote for a rule banning gun shows from a public fairground. Hines v. Youseff, 914 F.3d 1218, 1229-30 (9th Cir. 2019) (quoting Dist. of Columbia v. Wesby, __ U.S. __, 138 S.Ct. 577, 589-90, 199 L.Ed.2d 453 (2018)). Plaintiffs point to no such precedent, and the Court has not located any on its own. The absence of such authority means that the rights in question here were not clearly established when Shewmaker and Valdez took actions related to the Moratorium. Accordingly,

States v. Playboy Entmt. Grp., Inc., 529 U.S. 803, 816, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000), and it is the District's complete lack of evidence, rather than Plaintiffs' evidence, that causes the Court to conclude that Plaintiffs have a likelihood of success on the merits and otherwise satisfy the requirements for a preliminary injunction. Accordingly, Defendants' objections to Plaintiffs' evidence [Doc. No. 15-1] are **OVERRULED**.

they are entitled to qualified immunity.

### C. Sovereign Immunity as to Ross

The motion to dismiss argues that the claims against Ross should be dismissed because she has sovereign immunity under the *Eleventh Amendment to the Constitution*. The *Eleventh Amendment* states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

It "enacts a sovereign immunity from suit." *Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997)*. The Supreme Court has "extended a State's protection from suit to suits brought by the State's own citizens . . . [and] suits invoking the federal-question jurisdiction of Article III courts may also be barred by the Amendment." *Id. at 268*. Thus, "*Eleventh Amendment* immunity represents a real limitation on a federal **[**14]** court's federal-question jurisdiction." *Id. at 270*. Sovereign immunity is an affirmative defense, and therefore, "[l]ike any other such defense . . . must be proved by the party that asserts it and would benefit from its acceptance." *ITSI TV Prods., Inc. v. Agric. Associations, 3 F.3d 1289, 1291 (9th Cir. 1993)*.

"Naming state officials as defendants rather than the state itself will not avoid the *eleventh amendment* when the state is the real party in interest. The state is the real party in interest when the judgment would tap the state's treasury or restrain or compel government action." *Almond Hill Sch. v. U.S. Dep't of Agric., 768 F.2d 1030, 1033 (9th Cir. 1985)*. Under the exception created by *Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*, however, "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil **[*1240]** or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." *Ex parte Young, 209 U.S. at 155-56*. Pursuant to this exception, "the *eleventh amendment* does not bar an injunctive action against a state official that is based on a theory that the officer acted unconstitutionally." *Almond Hill Sch., 768 F.2d at 1034*. This exception does not allow suit against officers of the state simply "to enjoin the enforcement of an act alleged to **[**15]** be unconstitutional" unless the officer has "some connection with the enforcement of the act." *Ex parte Young, 209 U.S. at 157*. Otherwise, the suit "is merely making [the officer] a party as a representative of the state, and thereby attempting to make the state a party." *Id.*

Ross does not have a connection with the enforcement of the Moratorium.[4] The only allegations about Ross in the complaint are that she delegated operation and management of the Fairgrounds to the District and left it within the District's discretion to have gun

---

[4] Plaintiffs argue in their opposition that Ross does not have sovereign immunity regardless of *Ex Parte Young* because "when Ross acts as supervisor of and delegates authority to the local District, she is not acting in her capacity as a state actor." [Doc. No. 14 at 24.] Yet, on the previous page of their brief, Plaintiffs state that they are suing Ross "in her official capacity as a state actor only." [*Id.* at 23.] Moreover, the complaint itself identifies Ross as "Secretary of the California Department of Food & Agriculture—the entity responsible for the policy oversight of the network of California fair venues" [Doc. No. 1 at ¶ 24], indicating that she is a party simply because of her title and not because of any specific actions she took with respect to the Moratorium. By suing her in her official capacity as a state actor, the suit can stand only if an exception to sovereign immunity applies. *Almond Hill Sch., 768 F.2d at 1033*.

show events at the Fairgrounds. [*See, e.g.*, Doc. No. 1 at ¶ 127.] There are no allegations that Ross was tasked with enforcing the Moratorium by preventing gun shows at the Fairgrounds. Instead, Ross' alleged wrongdoing amounts to supervision over the District, Shewmaker, and Valdez, who are alleged to have been responsible for the Moratorium. This "general supervisory power over the persons responsible for enforcing" the Moratorium does not subject Ross to suit. *Los Angeles Cty. Bar Ass'n v. Eu, 979 F.2d 697, 704 (9th Cir. 1992)*. Accordingly, Ross is entitled to sovereign immunity.

## IV. Plaintiffs' Motion for Summary Judgment and Defendants' *Rule 56(d)* Declaration

Under *Federal Rule of Civil Procedure 56*, the court shall grant summary judgment "if the movant shows that there is no genuine **[**16]** dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P 56(a)*. To avoid summary judgment, disputes must be both 1) material, meaning concerning facts that are relevant and necessary and that might affect the outcome of the action under governing law, and 2) genuine, meaning the evidence must be such that a reasonable judge or jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." **[*1241]** *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)*.

In opposition to summary judgment here, however, the District's primary argument is that it is entitled to discovery needed to oppose the motion. *Federal Rule of Civil Procedure 56(d)*[5] "provides that if a party opposing summary judgment demonstrates a need for further discovery in order to obtain facts essential to justify the party's opposition, the trial court may deny the motion for summary judgment or continue the hearing to allow for such discovery." *Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998)*. In making a *Rule 56(d)* motion, "a party opposing summary judgment 'must make clear what information is sought and **[**17]** how it would preclude summary judgment.'" *Id.* (quoting *Garrett v. City and County of San Francisco, 818 F.2d 1515, 1518 (9th Cir. 1987)*). "The facts sought must be 'essential' to the party's opposition to summary judgment . . . and it must be 'likely' that those facts will be discovered during further discovery." *Sec. & Exch. Comm'n v. Stein, 906 F.3d 823, 833 (9th Cir. 2018)*. "In other words, there must be a 'basis or factual support for [the] assertions that further discovery would lead to the facts and testimony' described in an affidavit submitted pursuant to *Rule 56(d)*." *Haines v. Home Depot U.S.A., Inc., No. 1:10-CV-01763-SKO, 2012 U.S. Dist. LEXIS 8087, 2012 WL 217767, at *2 (E.D. Cal. Jan. 24, 2012)* (quoting *Margolis, 140 F.3d at 854*)). Evidence that is "the object of mere speculation . . . is insufficient to satisfy the rule." *Stein, 906 F.3d at 833* (citing *Ohno v. Yasuma, 723 F.3d 984, 1013 n.29 (9th Cir. 2013)*).

Although this rule "facially gives judges the discretion to disallow discovery when the non-

---

[5] *Federal Rule of Civil Procedure 56(d)* states: "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

moving party cannot yet submit evidence supporting its opposition, the Supreme Court has restated the rule as requiring, rather than merely permitting, discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'" Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 846 (9th Cir. 2001) (quoting Anderson, 477 U.S. at 250 n.5). Thus, when "a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any [Rule 56(d)] **[**18]** motion fairly freely." Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation, 323 F.3d 767, 773 (9th Cir. 2003).

This right to discovery does not fit well with litigation like this one involving prior restraints on speech. Content-based restrictions on speech, of which the District's moratorium on gun shows is one, "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226, 192 L. Ed. 2d 236 (2015). In other words, as discussed in the next section, the Moratorium is subject to strict scrutiny. This finding is compelled by the language of the Moratorium itself. No discovery is needed from either side to arrive at this conclusion, and no additional discovery would result in a different standard of scrutiny being applied by the Court. *See* id. at 2228 ("A law that is content based on its face is subject to strict scrutiny regardless of the government's **[*1242]** benign motive, content-neutral justification, or lack of 'animus toward the ideas contained'"). Thus, the only question on which discovery could be useful is whether the Moratorium satisfies strict scrutiny.

The District, however, has never taken the position that the Moratorium satisfies strict scrutiny. To the contrary, the District's position is that the Moratorium **[**19]** does not regulate speech at all and that it is subject only to rational basis review. [Doc. No. 12-1 at 20-22.] In the alternative, the District argues that the Moratorium satisfies intermediate scrutiny. It was only when faced with summary judgment in favor of Plaintiffs that the District asserts that it needs discovery to satisfy its burden. Yet, considering that the District has never argued that the Moratorium satisfies strict scrutiny, the discovery it now purports to need necessarily is based merely on speculation that the District will uncover evidence supporting a finding that the Moratorium satisfies strict scrutiny. The Court is not persuaded that the government can enact a facially content-based speech restriction based on a misguided belief that the regulation would have to satisfy only rational basis review, and then when told strict scrutiny applies, be allowed to delay summary judgment in favor of the party whose speech has been restricted in the hopes of finding support for the new position that the restriction satisfies strict scrutiny. Surely, the District's right to discovery to justify a facially content-based speech restriction does not take precedence over the **[**20]** First Amendment rights of Plaintiffs that would be restricted while such discovery takes place.

Moreover, the Court is not convinced that any of the discovery sought by the District will help it overcome summary judgment in favor of Plaintiffs. First, the District contends it needs discovery on whether the Moratorium regulates non-commercial speech that is inextricably intertwined with commercial speech. Yet, if both commercial and noncommercial speech occur at gun shows, the Moratorium restricts both commercial and noncommercial speech. If these types of speech at guns shows are inextricably intertwined, strict scrutiny applies to them both.

*Cf.* *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 795-96, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988)* (holding that strict scrutiny applies where the commercial and non-commercial "component parts of a single speech are inextricably intertwined"). On the other hand, even if the non-commercial and commercial speech at gun shows are not inextricably intertwined, the Moratorium remains subject to strict scrutiny based on its restriction of non-commercial speech. Either way, the discovery the District contends it needs will not result in an easing of the District's burden.

Next, the District claims it needs discovery on whether the Moratorium "targets gun culture." **[**21]** Yet, even if the Moratorium does not target gun culture, it is still subject to strict scrutiny. *See* *Reed, 135 S.Ct. at 2230* (noting that although "discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination . . . the *First Amendment's* hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.") (internal quotation marks and citations omitted). Thus, it is unclear how such discovery would preclude summary judgment here.

Finally, the District contends that it requires discovery on "how the [Moratorium] serves the compelling government interest **[*1243]** of protecting public safety." [Doc. No. 20 at 20.] Yet, despite its arguments to the contrary, an amorphous concern for "public safety" is not the public interest that the District stated was the interest served by the Moratorium. Instead, the interest purportedly served by the Moratorium, based on the language of the Moratorium itself, is the District's ability to "put into place a more thorough policy regarding the conduct of gun shows." **[**22]** In other words, the District does not seek discovery to support its stated interest for the Moratorium; it seeks discovery in the hopes of supporting a new state interest. This speculative discovery does not satisfy *Rule 56(d)*. *Stein, 906 F.3d at 833*.

Notwithstanding the foregoing, there is a middle ground here that would protect both any entitlement to discovery that the District may have before ruling on summary judgment, as well as Plaintiffs' constitutional rights—a preliminary injunction. As discussed below, Plaintiffs satisfy the requirements for a preliminary injunction on enforcement of the Moratorium. Accordingly, although the Court is skeptical that any of the discovery sought by the District would preclude summary judgment for Plaintiffs, Plaintiffs' motion for summary judgment is denied without prejudice based on *Rule 56(d)*. The June 18, 2019 order provides a briefing schedule for a renewed motion for summary judgment by Plaintiffs (and the District if desired) after the discovery period.

## V. Preliminary Injunction

Although Plaintiffs did not expressly move for a preliminary injunction, the briefing demonstrates that such an injunction is warranted while the District pursues the discovery it contends it needs to oppose **[**23]** summary judgment. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. Each of these four requirements is satisfied here.

### A. Likelihood of Success Against the District

#### 1. *First Amendment* Claims

"The *First Amendment*, applicable to the States through the *Fourteenth Amendment*, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Family & Life Advocates v. Becerra, 138 S.Ct. 2361, 2371, 201 L. Ed. 2d 835 (2018)*. Under the *First Amendment*, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed, 135 S.Ct. at 2226* (quoting *Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972))*; *see also* *Texas v. Johnson, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989)* ("If there is a bedrock principle underlying the *First Amendment*, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). "Content-based regulations 'target speech based on its communicative content.'" *Nat'l Inst. of Family & Life Advocates, 138 S.Ct. at 2371* (quoting *Reed, 135 S.Ct. at 2226*). "[T]he *First Amendment's* hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Reed, 135 S.Ct. at 2230*.

Content-based **[**24]** regulations "are presumptively unconstitutional and may be **[*1244]** justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed, 135 S.Ct. at 2226*; *see also* *R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992)* ("Content-based regulations are presumptively invalid."). "It is rare that a regulation restricting speech because of its content will ever be permissible." *Playboy Entm't Grp., Inc., 529 U.S. at 818*; *see also* *Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 230, 107 S. Ct. 1722, 95 L. Ed. 2d 209 (1987)* ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the *First Amendment*.") (quoting *Regan v. Time, Inc., 468 U.S. 641, 648-649, 104 S. Ct. 3262, 82 L. Ed. 2d 487 (1984))*. On the other hand, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)*. "A content-neutral regulation will be sustained under the *First Amendment* if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 189, 117 S. Ct. 1174, 137 L. Ed. 2d 369 (1997)*. Accordingly, the Court first must decide whether the Moratorium is content neutral because resolution of that question determines the appropriate level of scrutiny. *See* *McCullen v. Coakley, 573 U.S. 464, 478, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014)* ("The content-neutrality prong of the *Ward* test is logically antecedent to the narrow-tailoring **[**25]** prong, because it determines the appropriate level of scrutiny.").

##### *a. Is the Moratorium Content-Based or Content-Neutral?*

"Although it is common to place the burden upon the Government to justify impingements on *First Amendment* interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the *First Amendment* even applies." *Clark*

v. Community for Creative Non-Violence, 468 U.S. 288, 293 n.5, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984). Here, there is little question that speech and conduct protected by the First Amendment occurs at Crossroads' gun shows. Moreover, the speech in question is not merely commercial speech, as Defendants attempt to frame it in their motion. Rather, the types of speech alleged to occur at gun shows includes pure speech that warrants full First Amendment protection.

Further, the Moratorium is a restriction on speech based on the "communicative content" of that speech, Reed, 135 S.Ct. at 2226, with the communicative content being guns, gun rights, and gun-related issues. By its plain terms, the Moratorium applies only to gun shows. Put differently, on its face, the Moratorium accords preferential treatment to shows featuring speech on all issues aside from these gun-related subjects. The Moratorium "thus slips from the neutrality of time, place, and circumstance **[**26]** into a concern about content. This is never permitted." Mosley, 408 U.S. at 99 (internal quotation marks and citation omitted). Notwithstanding this seemingly obvious conclusion, Defendants argue that "the fact that the [Moratorium] applies only to gun shows, and not all other types of events, does not transform it into a content-based regulation; otherwise, any legislative or regulatory action taken with respect to a particular type of activity or subject matter would be deemed to be content-based and subject to **[*1245]** strict scrutiny." [Doc. No. 12-1 at 25.] Defendants' reliance on McCullen v. Coakley, 573 U.S. 464, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014), for this argument is misplaced.

In *McCullen*, the regulation in question was a Massachusetts statute making "it a crime to knowingly stand on a 'public way or sidewalk' within 35 feet of an entrance to any place, other than a hospital, where abortions are performed." McCullen, 573 U.S. at 469. In holding that the statute was content-neutral, the Supreme Court noted that the statute "does not draw content-based distinctions on its face," and stated that the statute "would be content based if it required 'enforcement authorities 'to examine the content of the message that is conveyed to determine whether' a violation has occurred." Id. at 479 (quoting FCC v. League of Women Voters of Cal., 468 U.S. 364, 383, 104 S. Ct. 3106, 82 L. Ed. 2d 278 (1984)). Here, in contrast, **[**27]** the content of a show or event, i.e., whether it is a gun show or is not a gun show, is determinative of whether it is eligible to hold an event at the Fairgrounds in 2019. Thus, whereas the buffer zone in *McCullen* may have had the "'*inevitable* effect' of restricting abortion-related speech more than speech on other subjects," id. at 480 (*emphasis* added), the Moratorium here has the *intended* effect of restricting gun-related speech more than speech on other subjects.

Defendants conflate the government interests purportedly served by the Moratorium with the determination of whether the Moratorium is content-based or content-neutral. A court, however, must consider "whether a law is content neutral on its face *before* turning to the law's justification or purpose." Reed, 135 S.Ct at 2228 (*emphasis* in original). Ignoring *Reed*, Defendants argue that because, according to Defendants, the Moratorium is focused on public safety issues, it "'serves purposes unrelated to the content of expression,' and so should be 'deemed neutral.'" [Doc. No. 12-1 at 26 (quoting McCullen, 573 U.S. at 480).]

Defendants' justifications for the Moratorium may be relevant to the determination of whether it satisfies the requisite level of scrutiny, but they do not render **[**28]** a content-based law content neutral. Reed, 135 S.Ct. at 2228 ("[A]n innocuous justification

cannot transform a facially content-based law into one that is content-neutral."). In *McCullen*, because the statute was facially neutral, the Court needed to go beyond the face of the statute to determine whether its purposes were intended to be content-based. *See* Reed, 135 S.Ct. at 2228 ("Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny."). Here, on the other hand, the Moratorium is content-based on its face, the content being gun shows, which include speech related to guns and gun issues. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." Id. at 2228. Defendants' proffered content-neutral justification does not render the Moratorium, a facially content-based policy, content-neutral.

Indeed, because the speech at gun shows is likely to be predominantly, **[**29]** if not exclusively, favorable to guns and gun rights, "[i]n its practical operation," the Moratorium "goes even beyond mere content discrimination, to actual viewpoint discrimination." R.A.V., 505 U.S. at 391. "A regulation engages in viewpoint **[*1246]** discrimination when it regulates speech based on the specific motivating ideology or perspective of the speaker." Interpipe Contracting, Inc. v. Becerra, 898 F.3d 879, 899 (9th Cir. 2018) (internal quotation marks and citation omitted). "The government may not regulate use based on hostility—or favoritism—towards the underlying message expressed." R.A.V., 505 U.S. at 386. "Discrimination against speech because of its message is presumed to be unconstitutional." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 828, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." Id. at 829. "Viewpoint discrimination is the most noxious form of speech suppression." R.A.V., 505 U.S. at 386. Here, it is difficult to conceive of the Moratorium on gun shows as anything other than a restriction of speech with a *pro-gun* or *pro-*second amendment viewpoint. Normally, this conclusion is all but dispositive. Sorrell, 564 U.S. at 571 ("In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory.").

In this context, whether the Fairgrounds is a **[**30]** public forum, as Plaintiffs argue, or a "limited public forum" or nonpublic forum, as Defendants argue, has no impact on the result here. The Supreme Court has "identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 802, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985). Regardless of the type of forum, however, "the fundamental principle that underlies [the Court's] concern about 'content-based' speech regulations [is] that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48-49, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986) (quoting Mosley, 408 U.S. at 95-96). "Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose special benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view

he espouses on an otherwise includible subject." Cornelius, 473 U.S. at 806 (internal citations omitted); *see also* Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 679, 130 S. Ct. 2971, 177 L. Ed. 2d 838 (2010) (holding that any restrictions based on the limited or nonpublic nature of the forum are subject to a "key caveat: Any access **[**31]** barrier must be reasonable and viewpoint neutral.").

"The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983); *see also* Cinevision Corp. v. City of Burbank, 745 F.2d 560, 571 (9th Cir. 1984) ("Although the City was not required to open the Starlight Bowl and is not required to leave it open indefinitely, it cannot, absent a compelling governmental interest, open the forum to some and close it to others solely in order to suppress the content of protected expression."). "Once a forum is **[*1247]** opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." Mosley, 408 U.S. at 96 (internal footnote omitted). "Reasonable time, place and manner regulations are permissible, [but] a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." Perry Educ. Ass'n, 460 U.S. at 46. Here, having opened up the Fairgrounds to shows of all types that are put on by all members of the public, the District cannot restrict use of the Fairgrounds based on the content, **[**32]** let alone viewpoint, expressed by the show and its participants. *See* Martinez, 561 U.S. at 685 ("Once it has opened a limited public forum, . . . the State must respect the lawful boundaries it has itself set.") (internal quotation marks and brackets omitted).

In sum, "[i]t is well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to a public discussion of an entire topic.'" Reed, 135 S.Ct. at 2230 (quoting Consol. Edison Co. v. Pub. Serv. Comm'n of New York, 447 U.S. 530, 537, 100 S. Ct. 2326, 65 L. Ed. 2d 319 (1980)); *cf.* Rosenberger, 515 U.S. at 831 ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint."). At a minimum, based on the allegations in the complaint, the Moratorium is a "content-based" regulation of speech. Because the Moratorium regulates speech based on its content, it is subject to strict scrutiny, meaning "it must be narrowly tailored to promote a compelling Government interest." Playboy Entm't Grp., Inc., 529 U.S. at 813. Further, because the District is a political body, its decision on the Moratorium "must be scrutinized most carefully—if **[**33]** only because such a body is at all times, by its very nature, the object of political pressures." Cinevision Corp., 745 F.2d at 575.

***b. Compelling State Interest***

Having determined that the Moratorium is a content-based restriction of speech, it is presumptively unconstitutional. Reed, 135 S.Ct. at 2226; R.A.V., 505 U.S. at 382. Content based restrictions are rarely upheld. "When the Government restricts speech, the

Government bears the burden of proving the constitutionality of its actions." McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 210, 134 S. Ct. 1434, 188 L. Ed. 2d 468 (2014) (quoting Playboy Entm't Grp., Inc., 529 U.S. at 816). Thus, the District bears the burden of proving that the Moratorium is narrowly tailored to promote a compelling government interest.

In its briefs (and again at the hearing), the District relies vague claims that the Moratorium is based on an interest in "public safety." Both the language of the Moratorium itself and the District's briefs, however, are largely silent as what members of the public are endangered by gun shows or the speech therein. Nor does the District point to any evidence that attendees of gun shows at the Fairgrounds have suffered injuries in the past or are in greater danger than attendees of other events at the Fairgrounds.[6] Indeed, at the **[*1248]** hearing, counsel for the District could not answer why, after years of gun shows at the Fairgrounds, the **[**34]** District decided to enact the Moratorium when it did. The District's "[m]ere speculation of harm does not constitute a compelling state interest." Consol. Edison Co. of New York, 447 U.S. at 543. A general fear that people attending gun shows will violate state and local laws about gun possession or even commit acts of gun violence in the community upon leaving the show cannot justify the Moratorium. *See* Cinevision Corp., 745 F.2d at 572 ("[A] general fear that state or local narcotics or other laws will be broken by people attending the concerts cannot justify a content-based restriction on expression."); *see also* Sorrell, 564 U.S. at 577 ("Those who seek to censor or burden free expression often assert that disfavored speech has adverse effects. But the fear that people would make bad decisions if given truthful information cannot justify content-based burdens on speech.") (internal quotation marks and citation omitted); Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 773, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976) (holding that a State may not "completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients"); Bay Area Peace Navy v. United States, 914 F.2d 1224, 1228 (9th Cir. 1990) ("[The government] is not free to foreclose expressive activity in public areas on mere speculation about danger.").

Although "[t]here is no doubt that **[**35]** the City has a substantial interest in safeguarding its citizens against violence," Edwards v. City of Coeur d'Alene, 262 F.3d 856, 863 (9th Cir. 2001), "even the most legitimate goal may not be advanced in a constitutionally impermissible manner," Carey v. Brown, 447 U.S. 455, 464-65, 100 S. Ct. 2286, 65 L. Ed. 2d 263 (1980). "[M]erely invoking interests . . . is insufficient. The government must also show that the proposed communicative activity endangers those interests." Kuba v. 1-A Agric. Ass'n, 387 F.3d 850, 859 (9th Cir. 2004) (citation omitted). Thus, "the First Amendment demands that municipalities provide tangible evidence that speech-restrictive regulations are necessary to advance the proffered interest in public safety." Edwards, 262 F.3d at 863 (internal quotation marks and citation omitted). That the District enacted the Moratorium without *any* evidence of actual public safety concerns caused by the speech that takes place at gun shows (as opposed to general gun violence in the community) makes it exceedingly likely that the District will not be able to satisfy its burden of demonstrating the existence of a compelling state interest for the Moratorium.

[6] Plaintiffs, on the other hand, submitted records from the San Diego County Sherriff's office indicating that recent gun shows at the Fairgrounds did not result in any major safety incidents. [Doc. No. 14-2 at 13-46.]

*c. Narrowly Tailored*

Regardless, even if the Moratorium serves a compelling governmental interest in "public safety", the Moratorium is not narrowly tailored to serve that interest. "To meet the requirement of narrow tailoring, **[**36]** the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen, 573 U.S. at 495*. Indeed, the complete ban on gun shows effected by the Moratorium would not even survive lesser scrutiny because it unquestionably burdens substantially more **[*1249]** speech than necessary to accomplish the District's alleged goal of ensuring public safety. *Cf. id. at 496-97* (applying lesser scrutiny applicable to content neutral speech restrictions to statute creating buffer zones around abortion clinics and holding that it was not narrowly tailored to the government's claimed interests, one of which was public safety); *Turner Broad. Sys., Inc., 520 U.S. at 213-14* ("Under intermediate scrutiny, the Government may employ the means of its choosing so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further that interest.") (internal quotation marks and ellipses omitted). In reality, the District appears to have taken "the path of least resistance," because of a belief that the gun-related speech that takes place **[**37]** at gun shows "is associated with particular problems," namely gun violence in the community. *See McCullen, 573 U.S. at 485*. Such a path is not narrowly tailored to the District's stated interest in public safety and therefore does not survive scrutiny.

Accordingly, for the foregoing reasons, Plaintiffs have a likelihood of success on their *First Amendment* free speech claims.

**2. Equal Protection Claim Against the District**

Because the Moratorium treats some events (and therefore event promotors, vendors, and attendees) differently from others, it implicates the *Equal Protection Clause of the Fourteenth Amendment* as well. *Mosley, 408 U.S. at 94-95* ("Because Chicago treats some picketing differently from others, we analyze this ordinance in terms of the *Equal Protection Clause of the Fourteenth Amendment*."); *see also Dariano v. Morgan Hill Unif. Sch. Dist., 767 F.3d 764, 779-780 (9th Cir. 2014)* ("Government action that suppresses protected speech in a discriminatory manner may violate both the *First Amendment* and the *Equal Protection Clause*.") The analysis of this claim is "essentially the same" as under the *First Amendment*. *Dariano, 767 F.3d at 780*.

"The *Equal Protection Clause* requires that statutes affecting *First Amendment* interests be narrowly tailored to their legitimate objectives." *Mosley, 408 U.S. at 101*. "When government regulation discriminates among speech-related activities in a public forum, the *Equal Protection Clause* mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully **[**38]** scrutinized." *Carey, 447 U.S. at 461-62*. "Necessarily, then, under the *Equal Protection Clause*, not to mention the *First Amendment* itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Mosley, 408 U.S. at 96*.

As with the *First Amendment*, "under the *Equal Protection Clause*, . . . [o]nce a forum is

opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Id. at 96* (internal footnote omitted). Thus, the District may not maintain that gun shows pose a safety risk unless those shows are clearly more dangerous than the shows and events the District permits at the Fairgrounds. *Id. at 100* ("[U]nder the *Equal Protection Clause*, Chicago may not maintain that other picketing **[*1250]** disrupts the school unless that picketing is clearly more disruptive than the picketing Chicago already permits."). As discussed above, the District, who has the burden of proof, offers no evidence that gun shows pose a greater safety risk to the public than any other shows at the Fairgrounds. General statements about gun violence or dislike **[**39]** of gun culture do not justify the unequal treatment resulting from the Moratorium. "'(I)n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.'" *Id. at 101* (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 508, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969))*. Accordingly, Plaintiffs also have a likelihood of success on their claims under the *Equal Protection Clause of the Fourteenth Amendment*.

### B. Irreparable Harm

"The loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)*; *see also* *Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)* ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.") (internal quotation marks omitted). "Under the law of this circuit, a party seeking preliminary injunctive relief in a *First Amendment* context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable *First Amendment* claim." *Warsoldier v. Woodford, 418 F.3d 989, 1001 (9th Cir. 2005)* (internal brackets and citation omitted). Here, the harm suffered by Plaintiffs is the violation of their *First Amendment* rights. By demonstrating a likelihood of success on the merits of their *First Amendment* claims, Plaintiffs have demonstrated that irreparable harm will result from the continued restriction of their protected speech.

### C. Balance of Equities

Balanced against the irreparable injury **[**40]** faced by Plaintiffs as a result of the continued enforcement of the Moratorium is the District's interest in evaluating the feasibility of gun shows at the Fairgrounds and in determining whether gun shows impact public safety. Considering the complete lack of evidence of any public safety concerns resulting from gun shows at the Fairgrounds (or at least any greater concerns than those resulting from any show at the Fairgrounds), the scales tilt decidedly in favor of Plaintiffs. The District is fully able to revise its policies and procedures for gun shows while gun shows continue to occur at the Fairgrounds. Indeed, the District even allowed a gun show to occur in 2018 after it passed the Moratorium banning gun shows in 2019.

### D. Public Interest

For similar reasons, the public interest favors Plaintiffs' exercise of their *First Amendment* rights. The Ninth Circuit has "consistently recognized the significant public interest in

upholding *First Amendment* principles." *Doe v. Harris, 772 F.3d 563, 583 (9th Cir. 2014)*. Neither the District's speculative general interest in "public safety" nor its specific interest in re-evaluating its gun show policies and procedures outweigh the public interest in ensuring that *First Amendment* free speech rights are upheld.

## VI. Conclusion

For the foregoing **[**41]** reasons, Plaintiffs claims against the individual defendants are dismissed, the motion to dismiss claims against the District is denied, and the District is enjoined from enforcing the Moratorium, **[*1251]** as stated in the Court's June 18, 2019 order.

Dated: June 25, 2019

/s/ Cathy Ann Bencivengo

Hon. Cathy Ann Bencivengo

United States District Judge

---

End of Document