# EXHIBIT 8

# Inside Gun Shows

## What Goes on
## When Everybody Thinks
## Nobody's Watching

### Garen Wintemute, MD, MPH



Violence Prevention Research Program
Department of Emergency Medicine
UC Davis School of Medicine
2315 Stockton Blvd.
Sacramento, CA 95817

© 2009 by Garen Wintemute, MD, MPH
All rights reserved.  Published 2009.

Copies may be downloaded at no charge:
http://www.ucdmc.ucdavis.edu/vprp.

Support for this project was provided by the Eli and Edythe L. Broad Foundation, The Joyce Foundation, and The California Wellness Foundation.

I acknowledge with gratitude the contributions of Jeri Bonavia of the Wisconsin Anti-Violence Effort.  She put gun shows on my radar and is an ace straw-purchase spotter.  Thanks also to Barbara Claire and Vanessa McHenry of the Violence Prevention Research Program for their highly competent technical assistance.

This report and the work on which it is based could not have been completed without the support, made manifest in many ways, of my colleagues in the Department of Emergency Medicine.  Thanks to all.

The project would never have been undertaken but for the uncompromising support given by the University of California to the principle that the pursuit of knowledge is a great privilege and therefore an obligation, come what may.  Stan Glantz once wrote that this behavior is what makes the University of California a great public institution.  He was right.

# Contents

| | |
|---|---|
| Introduction | vii |
| Gun Shows in Context | 1-1 |
| How Gun Shows Work | 2-1 |
| Buying and Selling | 3-1 |
| What's for Sale | 4-1 |
| Culture | 5-1 |
| Politics | 6-1 |
| Interventions | 7-1 |

# Introduction

Gun shows are surrounded by controversy. On the one hand, they are important economic, social and cultural events with clear benefits for those who attend. On the other, they provide the most visible manifestation of a largely unregulated form of commerce in guns and, partly for that reason, are an important source of guns used in criminal violence.

The intent of this report is to document the broad range of what actually takes place at gun shows, with an emphasis on activities that appear to pose problems for the public's health and safety. Its purpose is not to inflame, but to inform. The report embodies its author's belief that objective evidence is beneficial to clear thought and sound action on important public matters.

*Inside Gun Shows* reflects observations made at 78 gun shows in 19 states, most of them during 2005-2008. Structured data on a subset of these shows were published previously.[1] During a period of exploratory work focused on developing methods for data collection, it became evident that descriptive anecdotes and quantitative evidence would never be adequate to the task. A camera was added.

It was important here, as often in field research, to avoid a Hawthorne effect: change in what is being observed introduced by the process of observation itself. For that reason conversation was kept to a minimum; no attempts were made to induce the behaviors that are depicted; criminal activity, when observed, was not reported; the camera was kept hidden.

It was also important to minimize any risk to individual persons, even though the behaviors being documented were occurring at events that were open to the public.  No audio recordings were made, except of the author's own notes.  Faces in the photographs have been obscured.  The project was approved by the university's Institutional Review Board.

Readers should be aware that the author has worked collaboratively for many years with the Bureau of Alcohol, Tobacco, Firearms and Explosives and the California Department of Justice.  The Violence Prevention Research Program receives support from the National Institute of Justice for research on gun tracing data and from the California Department of Justice for work on firearm-related domestic violence.  Material concerning those agencies appears in this report.

## Reading the Report

The following comments on the report's organization may be helpful.  Chapter 1 reviews existing research and other evidence on the structure of gun commerce generally, the sources of guns used in crime, and the place of gun shows in that broader context.  Chapter 2 takes up the ordinary details of gun show operations and presents a photographic overview of a day at a gun show.  Chapters 3 through 6 are largely photo-essays.  Chapter 3 takes up undocumented and illegal gun commerce; its core is a series of photo-narratives of private party gun sales and of what appear to be illegal "straw" purchases of guns.   Chapter 4 focuses on the weaponry and related merchandise available at gun shows.  Chapters 5 and 6 deal briefly with cultural, political, and social aspects of these events, again emphasizing aspects that appear problematic.  Chapter 7 assesses these observations and makes recommendations for intervention.

The following terminology is used.  Gun sellers who have federal firearms licenses are referred to as *licensed retailers*, whether they are gun dealers or pawnbrokers.  Private parties without federal firearms licenses who sell guns are of two types: *unlicensed vendors*, who rent table space and display their guns from a fixed location, and *individual attendees*, who may be at the show primarily as customers but have also brought guns to sell.  The occasional attendee who is both an active seller and buyer of guns is a *gun trader*.  Sales by unlicensed vendors and individual attendees are collectively referred to as *private party gun sales*.

For simplicity's sake, the term *assault weapon* will be used to describe semiautomatic, civilian versions of selective fire or fully automatic military firearms.

## A Final Note

This report will be most useful if it is treated as an introduction to a complex and important subject.  Readers are encouraged to take a weekend—even better, take several—and see for themselves.

References

1.  Wintemute GJ. Gun shows across a multistate American gun market: observational evidence of the effects of regulatory policies. *Injury Prevention*.  2007;13:150-156.

# Gun Shows in Context



**The United States and Gun Violence**

Americans owned between 220 and 280 million guns in 2004, including at least 86 million handguns.[1]  Millions of guns are added to that total each year.  Just ten years earlier, America's gun stockpile was estimated to hold 192 million weapons.[2]  As of 2004, some 38% of households and 26% of all adults had at least one gun; 41% of gun-owning households, and 48% of individual gun owners, had four guns or more.[1]

More than 360,000 violent crimes involving guns, including an estimated 11,512 homicides, were committed in the United States in 2007.[3,4]  After dropping steadily through much of the 1990s,[5] rates of gun-related and other violent crimes have changed little in recent years and have risen rapidly in some areas.[6,7]  Preliminary data for 2008[8] and early 2009[9] suggest a downward trend, which would be very good news, but rates of gun-related violence remain unacceptably high.

*American Exceptionalism*

America's rates of gun ownership are unique.  We account



*Assault rifles for sale, Dayton, Ohio.*

for less than 5% of the world's population but 35% to 50% of all firearms in civilian hands.[10]  Not surprisingly, death rates from gun violence are far higher in the United States than in other high-income countries.[11, 12]

But America is not a uniquely violent society.  As Franklin Zimring and Gordon Hawkins demonstrated some years ago,[13] our rates of violent crime do not exceed those of other high-income countries—though they are above average.  It is our rate of death from violent crime that is unique, and this high mortality rate results from our unique propensity to use firearms to commit violent crimes.

*Exporting Crime Guns*

Sadly, American firearms now also figure prominently in crimes committed elsewhere.  Most crime guns that are recovered by law enforcement agencies in major Canadian cities, and for which a point of origin can be established, are imported illegally from the United States.[14, 15]  The problem has become particularly acute in Mexico, where drug-related gun violence has become so prevalent that the United States Joint Forces Command has warned of a possible "rapid and sudden collapse" with "serious implications for [US] homeland security."[16]  By April 2008, Mexican drug trafficking organizations had established a presence in at least 46 U.S. states.[17]  Of crime guns recovered in Mexico since 2006 for which the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has established a chain of ownership, more than 90% come across the border from the United States, and nearly 70% are American-made.[17, 18]

## Gun Shows and Gun Violence: An Introductory Case

At lunchtime on April 20, 1999, high schoolers Eric Harris and Dylan Klebold shot and killed 12 fellow students and a teacher at Columbine High School in Littleton, Colorado, and wounded 23 others.  After exchanging fire with the police, they shot themselves.

All four guns used in the massacre were purchased at local gun shows, but none of them by Harris and Klebold.[19]  Three guns—two Savage shotguns and a Hi-Point 9mm carbine—were bought for them by an 18-year-old friend, Robyn Anderson, at a Tanner Gun Show near Denver the previous December.

*Mexico and Canada pose very different images when it comes to violent crime.  [They] have one thing in common when it comes to armed violence—the underground gun market in the United States, which is a major source of supply to criminals and gangs in both nations…The USA represents a low-cost supplier of guns both because of lax regulations and of the great number of guns already circulating in private hands.*

*—Researchers Philip Cook, Wendy Cukier, and Keith Krause.[15]*

*There is "no reason why [Mexican] drug cartels would go through the difficulty of acquiring a gun somewhere else in the world and transporting it to Mexico when it is so easy for them to do so from the United States.*

*—U.S. and Mexican government and law enforcement officials interviewed by the Government Accountability Office for its study of cross-border gun trafficking.[17]*

Anderson bought the guns from private parties rather than from licensed gun retailers. "While we were walking around [the show]," she would later testify, "Eric and Dylan kept asking sellers if they were private or licensed. They wanted to buy their guns from someone who was private—and not licensed—because there would be no paperwork or background check."[20] Anderson stressed that "[a]ll I had to do was show my driver's license to prove I was 18. I would not have bought a gun for Eric and Dylan if I had to give any personal information or submit to any kind of check at all."[21]

Just the day before, in fact, Harris and Klebold had tried to buy guns themselves at the show. The boys were 17 years old at the time. No one who would sell to them, but they were told that they could buy the guns if they brought someone with them who was at least 18 years old. Anderson believed it should have been obvious that she was buying the guns for Harris and Klebold; though she was making the payment, "they were handling the guns and asking the questions."[22]

The fourth gun, a semiautomatic TEC-DC9 assault pistol, was bought at a Tanner Gun Show in August 1998 by Mark Manes—again from a private party, not a licensed retailer—and sold to Harris and Klebold the following January.[19] Because the TEC-DC9 is a handgun, Manes was charged with providing a firearm to a minor (Harris and Klebold were still 17 when they bought the gun).

Anderson's rifle and shotgun purchases broke no federal or state laws, and she was not charged with any crime. J. D. Tanner, promoter of the shows, had this to say about her gun purchases: "All I can say is apparently it was all done legally. That makes me have a good feeling."[23]

The first Tanner Gun Show held after the massacre took place the weekend of June 5 and 6; Tanner had canceled a show scheduled for the weekend after the shootings. On June 6, Corey Tucker, age 18, and David Winkler, age 17, used $600 in cash provided by the Colorado Coalition Against Gun Violence to buy a TEC-9 pistol similar to the gun used by Harris and Klebold. They believed they were buying from a private party—there was apparently no evidence to the contrary—and their intent was to demonstrate how easily this could be done. "He didn't ask me my name or my age," Tucker said at a news conference the following week, and there was no identification check.[24] But the seller had been interviewed at the show on June 5 by *Denver*

*While we were walking around, Eric and Dylan kept asking sellers if they were private or licensed. They wanted to buy their guns from someone who was private—and not licensed—because there would be no paperwork or background check.[20]*

*All I had to do was show my driver's license to prove I was 18. I would not have bought a gun for Eric and Dylan if I had to give any personal information or submit to any kind of check at all.[21]*

*—Robyn Anderson, on buying three of the guns used in the Columbine High School shootings.*

*All I can say is apparently it was all done legally. That makes me have a good feeling.*

*—J. D. Tanner of Tanner Gun Shows.[23]*

*Post* reporter David Olinger, who was writing a story on the resumption of the Tanner shows.  He was Terry Kern, a licensed gun retailer and gun store owner.  When Olinger contacted him following Tucker and Winkler's news conference, Kern confirmed that he had sold the gun.  But when told that his failure to document the sale or perform any identification check had become public knowledge, "Kern changed his account.  The sale 'didn't have anything to do with me,' he said."[24]

The sale was investigated by the Bureau of Alcohol, Tobacco and Firearms (ATF) and determined to have been illegal. Kern surrendered his firearms license.[25]

Promoter J. D. Tanner himself sells guns at Tanner Gun Shows as an unlicensed vendor.  A year after the massacre in Littleton, the prospective buyer of a handgun asked him, "You have to do a background check on this?"  "No," he replied, "there's no law says I have to."[26]

## A Paradox

The events surrounding the Columbine massacre exemplify many of the difficult problems posed by gun shows. Prohibited persons are able to acquire guns by using others as their agents.  Guns can be sold anonymously, without background checks or records.  Sellers, including licensed retailers, can be corrupt.

There is solid evidence that gun shows are an important source of crime guns, which we will review later in the chapter. The best of that evidence comes from ATF investigations of illegal gun trafficking—the organized procurement of guns for criminal use.[27-29]

But two highly-regarded surveys conducted under the auspices of the U.S. Bureau of Justice Statistics have found that less than 2% of felons incarcerated for crimes involving guns acquired those guns themselves at gun shows.[30, 31]  This poses a seeming paradox: How can gun shows be an important source of crime guns if criminals get their guns elsewhere?  To clarify this, we need to take a step back and examine American gun commerce generally and the role gun shows play in that larger enterprise.

## America's Two Systems of Gun Commerce

Modern gun commerce operates under the terms of the oft-amended Gun Control Act of 1968 (GCA), which is enforced by ATF.  Congress drew on its authority to regulate interstate commerce in drafting GCA as it had with GCA's predecessor, the Federal Firearms Act of 1938.[32]  Those "engaged in the business" of selling guns, as the law terms it, were required to obtain federal licenses and to buy and sell guns following specified procedures.  Private parties who sold guns infrequently and not in the course of business were exempted, however.  As a result, the United States has two very different systems of gun commerce that operate in parallel.  At gun shows, they can operate literally side by side.

In 1995, Philip Cook and colleagues published a study that has done much to shape and clarify our understanding of how gun commerce operates.[33]  By convention, the two systems mentioned above are referred to as the *primary market* and the *secondary market* for guns.  The primary market comprises all transfers of guns by federally licensed firearms retailers such as gun dealers and pawnbrokers.  These transfers may be of new or used guns.

The secondary market consists of transfers involving unlicensed sellers, such as the unlicensed vendors and individual attendees at gun shows.[33, 34]  This secondary gun market is much larger than is commonly thought.  According to the Police Foundation's National Survey of Private Ownership of Firearms, it accounted for approximately 40% of all gun acquisitions in the mid-1990s.[2, 33]  Thirty years earlier, at the time Congress was debating the Gun Control Act, at least 25% of all gun acquisitions occurred through the private party transfers that were exempted from the terms of the Act.[35]

As with other commodities, there is a *legal market* and an *illegal market* for guns.  The movement of guns from the legal to the illegal market is the illegal market's chief source of supply.  Gun trafficking is the intentional diversion of guns from the legal to the illegal market.

Finally, in considering how guns become available for use in crime, it is useful to consider *point sources* and *diffuse sources* of those guns.[34]  Point sources are the venues linked to many known crime guns, usually licensed retailers.  Diffuse sources are the many small-volume transactions between individuals that are

Inside Gun Shows

dispersed in time and place, such as transfers of single guns between acquaintances or fellow gang members.  Point sources provide the most readily identifiable targets for prevention activity, but diffuse sources, taken together, are the leading proximate source of crime guns.

An overview of America's gun markets is in Figure 1-1.

Figure 1-1.  An overview of gun commerce in the United States.  Activities within the shaded area occur at gun shows.



Gun manufacturers typically sell their products to distributors, who in turn sell them to federally licensed retailers such as gun dealers or pawnbrokers.  Sales by manufacturers, distributors, and retailers make up the primary gun market.  After its first sale by a licensed retailer to a private party, a gun may experience many subsequent sales or other changes of possession between private parties (through trades, for example).  These transactions make up the secondary gun market.  A private party may also sell his gun to a licensed retailer; most retailers sell both new and used guns.  Guns enter the illegal market predominantly through sales to prohibited persons, straw purchasing and other trafficking operations, and theft.  As with the legal market, guns in the illegal market may undergo many subsequent transfers of ownership.  The shaded area of the figure identifies transactions that occur at gun shows.

Modified from Wintemute GJ.  Where guns come from: the gun industry and gun commerce.  *The Future of Children* 2002;12 (2):55-71.

## Regulating Gun Sellers

*Federal Policy*

In order to sell a gun to you, whether at a gun show or elsewhere, a federally licensed retailer such as a gun dealer or pawnbroker must see your identification.  He must have you complete a lengthy Firearms Transaction Record on which you certify, under penalty of perjury, that you are buying the gun for yourself and that you are not prohibited from owning it.  He must submit your identifying information to the National Instant Criminal Background Check System (NICS), administered by the Federal Bureau of Investigation.

Staff at NICS perform a background check on you, comparing your information to the records in a centralized archive of criminal histories and other databases to verify your eligibility to purchase firearms.  In over 90% of cases this background check is completed within minutes,[36] but if important information is missing you may have to wait up to three business days to get your gun.  (In 17 states, the background check can be waived for holders of permits to carry concealed weapons.)

The retailer must keep a permanent record of your purchase.  If you buy more than one handgun from him within five business days, the retailer must file a special report with ATF.  (This requirement does not apply to purchases of rifles or shotguns.)

These procedural safeguards are intended to ensure that you are who you say you are, that you and not someone else will be the actual owner of the gun, and that you are not prohibited from owning it.  They also establish a paper trail that will help law enforcement authorities link the gun to you if it is used in a crime later.

But a private party, such as an unlicensed vendor or individual attendee at a gun show, can sell you that same gun—or as many guns as you want—and none of these federal safeguards will be in place.  Private party gun sellers are not required to ask for your identification.  They *cannot* initiate a background check, except in Delaware, Nevada, and Oregon, where they may do so voluntarily.  There are no forms for you to fill out, and no records need be kept.

Again, the provisions of the Gun Control Act regulating gun sales apply only to those who are engaged in the business of



*Attendee with several guns for sale, Houston, Texas.*

selling guns.  As originally enacted, GCA established that standard but did not define it.  ATF considered the sale of five or more firearms annually to signify engagement in the business,[34] and federal courts upheld convictions for selling guns without a license in cases involving as few as six firearms.[37]

Any clear understanding of what "engaged in the business" might mean was abolished by the 1986 Firearm Owners Protection Act (FOPA).  The new law ambiguously defined a person as "engaged in the business" who "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms."[38]  Muddying the waters further, FOPA defined "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."[38]  It specifically excluded from its definition of engagement in the business a person who makes "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."[28, 38]

The practical result was to make it much more difficult to set an upper limit to the frequency of buying and selling guns that did not require a license and compliance with the procedural safeguards described above.  Today, private parties sometimes sell large numbers of new and used firearms while claiming hobbyist status and exemption from the requirements imposed on licensed retailers.[28]  ATF put it this way in an important study of gun shows in 1999: "Unfortunately, the effect of the 1986 amendments has often been to frustrate the prosecution of unlicensed dealers masquerading as collectors or hobbyists but who are really trafficking firearms to felons or other prohibited persons."[37]

### State Policy

In 33 states, statutes regulating gun sales do not go beyond the ambiguous standards set by Congress.  But 17 states regulate at least some sales by unlicensed private parties (Table 1-1).  Some require that these transactions be routed through a licensed retailer; such transactions are subject to the same procedural safeguards that apply to the licensed retailer's own sales.

*There is no limit to the amount of guns that a private collector can have.  Some have 10, some have 1,000.  If I go to a gun show and state that this is my private collection, I am not required by law to ask you for identification, ask you to fill out any paperwork, or conduct a background check.  It is simply cash and carry.*

*—Tom Mangan, Special Agent, ATF, Phoenix, Arizona.[39]*

*Unfortunately, the effect of the 1986 amendments has often been to frustrate the prosecution of unlicensed dealers masquerading as collectors or hobbyists but who are really trafficking firearms to felons or other prohibited persons.*

*—ATF gun show study, 1999.[37]*

Other states require that purchasers obtain a permit or undergo a background check through a law enforcement agency.[40]  Of these 17 states, six regulate all private party gun sales and nine more regulate all private party sales of handguns.  Two states, Colorado and Oregon, regulate all private party sales at gun shows only.

Table 1-1.  State regulation of private party gun sales*

| State | Handgun Sales | | Long Gun Sales | |
|---|---|---|---|---|
| | All Sales | Gun Shows Only | All Sales | Gun Shows Only |
| California | ● | | ● | |
| Colorado | | ● | | ● |
| Connecticut | ● | | | ● |
| Hawaii | ● | | ● | |
| Illinois | ● | | ● | |
| Iowa | ● | | | |
| Maryland | ● | | | |
| Massachusetts | ● | | ● | |
| Michigan | ● | | | |
| Missouri | ● | | | |
| Nebraska | ● | | | |
| New Jersey | ● | | ● | |
| New York | ● | | | ● |
| North Carolina | ● | | | |
| Oregon | | ● | | ● |
| Pennsylvania | ● | | | |
| Rhode Island | ● | | ● | |

*  In the remaining 33 states, private party gun sales are not regulated.

From *Survey of state procedures related to firearm sales, 2005*.  Washington, DC: Bureau of Justice Statistics; 2006.  NCJ 214645.  See Table 6.

Inside Gun Shows

## Regulating Gun Buyers

### Federal Policy

Federal statutes prohibit several categories of persons from purchasing or otherwise acquiring firearms, whether from a licensed retailer or a private party, and from possessing firearms at any time.[40]  (See Table 1-2.)  Most of the prohibitions arise from criminal convictions.  These were expanded to include convictions for misdemeanor crimes of domestic violence in 1996.  Convictions for other violent and firearm-related misdemeanors, such as battery and brandishing a firearm, do not prohibit firearm ownership under federal law.  A federal prohibition is permanent unless it arises from a domestic violence restraining order, in which case it exists only as long as the restraining order remains in effect.

Persons less than 21 years of age may not purchase handguns from licensed retailers, but persons ages 18 to 20 may purchase handguns from private parties.  Those less than 18 years of age cannot purchase long guns (rifles and shotguns).[40]

Table 1-2.  Categories of persons who are generally prohibited from purchasing or possessing firearms under federal law

| A person is prohibited who: |
|---|
| • Is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year |
| • Is a fugitive from justice |
| • Is an unlawful user of or addicted to any controlled substance |
| • Has been adjudicated as a mental defective or has been committed to any mental institution |
| • Who, being an alien, is illegally or unlawfully in the United States or has been admitted to the United States under a nonimmigrant visa |
| • Who has been discharged from the Armed Forces under dishonorable conditions |
| • Who, having been a citizen of the United States, has renounced his citizenship |
| • Is subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person |
| • Has been convicted in any court of a misdemeanor crime of domestic violence |

From *United States Code*, Title 18, Section 922(d).

Federal law also makes it a felony to purchase a firearm from a licensed retailer for another person while representing oneself to be the intended owner of that firearm. Such transactions are known as surrogate or "straw" purchases. Although illegal, such purchases are common and are an important source of guns for prohibited persons. Straw purchases will be discussed in more detail later in the chapter and in Chapter 3.

### State Policy

Many states have broadened the federal criteria for prohibiting the purchase and possession of firearms. Details for each state are available in the regularly-updated *Survey of State Procedures Related to Firearm Sales*, compiled by the Justice Department's Bureau of Justice Statistics and available at http://www.ojp.usdoj.gov/bjs/. In California, for example, persons convicted of most violent misdemeanors are prohibited from possessing firearms for 10 years following their convictions.

California, Maryland, Virginia, and New Jersey also prohibit individuals from purchasing more than one handgun in any 30-day period. Because California has a centralized record of handgun purchases, this prohibition applies statewide, not just to multiple purchases from an individual retailer. Private party sales are exempted, however.

## Screening and Denial

Since March 1, 1994, the Brady Handgun Violence Prevention Act has required background checks on persons purchasing firearms from federally licensed firearm retailers. Federal and state agencies have conducted 97,080,000 Brady Act background checks as of December 2008. The checks have resulted in 1,778,000 denials, for a denial rate of 1.8%.[41]

In 2008 alone, 9,901,000 background checks were conducted, 147,000 of which led to denials (a denial rate of 1.5%). A large majority of these denials resulted from the fact that the prospective purchasers had been convicted of, or were under indictment for, serious crimes. (See Table 1-3.)

Prior to the Brady Act, in 32 states no background check was required to verify purchasers' statements that they were not prohibited persons. The 18 other states had enacted background check requirements of their own, sometimes many years earlier.[42]

*Okay, I want it, but I just bought a gun June 2. I'll have to wait.*

*—An attendee making a deposit on a Walther pistol on June 6, in Orange County, California. Because of the state's prohibition on the purchase of more than one handgun within 30 days, he will not be able to purchase the gun until July.*

*Vendor: It's my understanding that if you've got a conviction, you can't buy guns forever.*

*Attendee: That's right. You don't ever want to hit the old lady, 'cause then you're through.*

*—Advice given to a man shopping for parts for an AR rifle, Las Vegas, Nevada.*

Inside Gun Shows

When the Brady Act first took effect, states where no background checks had previously been required found that as many as 9.4% of persons who sought to purchase firearms from licensed retailers, and who had just certified under penalty of perjury that they were eligible to own guns, were in fact prohibited from owning them.[43]

Table 1-3.  Reasons for denial of firearm transfer application in 2008

| Reason for Denial | Agency Type | |
|---|---|---|
| | Federal (%) | State (%) |
| Felony indictment/conviction | 55.9 | 45.7 |
| State law prohibition | 6.8 | 10.5 |
| Domestic violence | | |
|     Misdemeanor conviction | 7.3 | 9.9 |
|     Restraining order | 4.1 | 4.0 |
| Fugitive | 13.4 | 8.6 |
| Illegal alien | 1.4 | 0.5 |
| Mental illness or disability | 1.1 | 3.7 |
| Drug user/addict | 9.5 | 3.1 |
| Other | 0.6 | 13.9 |
| Total | 100 | 100 |

From *Background checks for firearm transfers, 2008—statistical tables.*
Washington, DC: Bureau of Justice Statistics, 2008.  NCJ 227471.
See Table 4.  Results for local agencies are omitted.

### Does Denial Work?

The goal of screening and denial programs is to prevent gun-related violence by preventing persons thought to be at high risk of committing such violence from acquiring guns.  There are no systematic data on the intermediate question: How often do people who are denied the purchase of a gun from a licensed retailer go on to acquire a gun from some other source?  There are, however, several studies that collectively describe the effect of these programs on violent crime.

It appears that denial of gun purchase significantly lowers the risk of committing violent and gun-related crimes among the persons who are directly affected.  The best example of this effect

comes from California, which in 1991 expanded its criteria for a prohibition on gun ownership to include prior convictions for almost all violent misdemeanors.  Over three years of follow-up, there was a 23% drop in crimes involving guns or violence among those whose gun purchases were denied in the year after the new policy took effect, as compared to a group of violent misdemeanants who legally purchased handguns under the previous policy.[44]  For persons ages 21 to 24, among whom absolute rates of violent criminal activity were highest, the decrease was 27%.  There was no difference for crimes involving neither guns nor violence.  This specificity of effect supports the inference that the observed results were produced by the change in policy rather than some other factor.

Similarly, denial based on a felony conviction appears to result in a decrease in risk for crimes involving guns or violence of 20% to 25%.[45]  This is a sizeable effect.  Its importance is reinforced by a new research finding concerning risk for new criminal activity among persons who have previously been arrested for serious crimes.[46]  As much as 20 years may need to pass before their risk of re-arrest falls enough to approximate the risk of first arrest among persons their age who have no prior arrest record.  Policies intended to reduce that elevated risk for new criminal activity appear to be well-advised.

However, the federal screening and denial program put in place by the Brady Act may have had little effect on population-wide rates of gun-related violent crime.  Careful researchers studying rates of gun homicide determined that while a decrease occurred in states where Brady led to the institution of screening and denial for the first time, that decrease also occurred in states where similar programs had been in place all along.[42]  They found no effect on rates of gun homicide that could be attributed to the Brady Act itself.

Several explanations have been proposed for these seemingly contradictory findings.  One is that the federal criteria for prohibiting an individual from purchasing a gun are quite narrow.  Most violent misdemeanors are not prohibiting offenses, for example.  As a result, many high-risk persons are still able to purchase guns, and the number of persons denied may be too small for any beneficial effect on them as individuals to be reflected in overall crime rates.[47]

Another, probably more important, is that the Brady Act's mandate applies only to gun sales by federally licensed retailers.

Inside Gun Shows

The secondary market's private party gun sales—accounting, again, for perhaps 40% of all gun transfers every year—are unaffected.  A new evaluation of state-level regulations on gun sales provides evidence in support of this possibility.  Gun trafficking, which facilitates firearm-related violent crime, appears to be significantly reduced in states that regulate private party sales of handguns.[48]

## Summing Up: Why Private Party Gun Sales Matter

*Of course, if I don't ask, nobody knows.*

*— A seller contemplating the sale of a handgun to a possibly prohibited party, Reno, Nevada.*

*Three and a half out the door.  I'm not a dealer so just pay cash for it and you're outta here.*

*— An unlicensed vendor selling a Ruger revolver, tagged at $425, Waukesha, Wisconsin.*

Private party gun sales are quick and convenient.  Even a completely law-abiding gun purchaser might appreciate the absence of paperwork that characterizes private party sales.  And their anonymity will attract those who put privacy at a premium.

But the same attributes of private party sales that make them convenient for legal gun buyers make them the principal option for a felon, fugitive, domestic violence offender, or other prohibited person.  The key is that while it is always illegal for a prohibited person to buy a gun, it is only illegal to sell a gun to a prohibited person if the seller knows or has "reasonable cause to believe" that he is doing so.[49]  Again, a private party seller *cannot* initiate a background check.  He is under no obligation to inquire directly.  The matter is easily finessed.  As one gun seller said while contemplating a possibly illegal handgun sale, "Of course, if I don't ask, nobody knows."

## Where Crime Guns Come From

### *Licensed Retailers: The Primary Gun Market*

In the early 1990s, the United States had more licensed gun retailers than gas stations.[50]  More rigorous licensing and oversight policies led to a large decrease in licensed retailers by 2001.[5, 34, 51]  The sellers of one-third of crime guns traced in 1994 were out of business by 1998.[52]

Licensed retailers remain an important source of crime guns, however.[27, 28, 53-55]  Of persons incarcerated during the 1990s for serious crimes involving guns, 12% to 19% of those in state prisons[31] and 19% of those in federal prisons[30] purchased their guns personally from a retail store or pawnshop.

Others employ surrogate or "straw" purchasers to buy guns from licensed retailers on their behalf.  In a typical straw

purchase, the actual buyer determines which gun is to be bought and provides the funds.  The straw purchaser, acting as the buyer's agent, makes the purchase by falsely representing himself (or, frequently, herself) to be the actual buyer of the gun.  The details can vary.  For example, the actual buyer may make the selection at the time of purchase and transfer the funds to the straw purchaser in full view of the retailer.  Alternatively, the straw purchaser may operate with a shopping list of desirable guns or communicate with the actual buyer by cell phone (sometimes sending pictures of the guns in question).[56]  Straw purchasers may be compensated with cash, drugs, or other currency.

Criminal gang members may be particularly likely to use straw purchasers, even if they themselves are not prohibited persons, for the simple reason that it is unsafe for them to travel outside their territories to a licensed retailer's place of business.[57]  Gun traffickers, needing to mask their gun purchases, may employ whole networks of straw purchasers.  Straw purchases have emerged as a leading source of supply for Mexican drug trafficking organizations.

Consider, for example, the case of John Philip Hernandez of Houston.[58, 59]  Between June 2006 and June 2007, Hernandez spent nearly $25,000 to buy 23 firearms, including 5.7mm FN Herstal Five-seveN "cop killer" pistols and 15 AR rifles, from Houston-area retailers.  The guns were smuggled into Mexico, where several have since been used in homicides and other violent crimes—as soon as two months after Hernandez purchased them.  Hernandez recruited others to buy guns for him; they purchased another approximately 80 guns.  The larger operation of which Hernandez and his confederates were just one segment is believed to have shipped well over 300 guns across the border.  Most of the 22 members of that operation remain at large.

When all this began, Hernandez was 24 years old.  In April 2009, he was sentenced to 97 months in prison by a judge who held that the maximum term recommended by the U.S. Sentencing Guidelines was not a sufficient deterrent to others.

Straw purchasers are often the intimate partners of actual buyers.  Women make up about 10% of gun owners overall,[1, 2] but 18% of straw purchasers working with gun trafficking operations were the girlfriends or spouses of the traffickers.[27]

A straw purchase is a felony under federal law for both the actual buyer and the straw purchaser—and for the retailer, if he

*If she's buying the gun, she's got to act like she's buying the gun. Come on up here.*

*—A licensed retailer in Las Vegas, Nevada, to two young men who are negotiating the purchase of a handgun and have just indicated that one of two women standing well behind them will be the purchaser.  All four leave immediately.*

Inside Gun Shows

sells the gun despite knowledge or reasonable cause for belief that a straw purchase is in progress.  There is clear evidence from criminal investigations that straw purchases are nonetheless an important source of crime guns.[27, 55]  In a 1993 survey, 32% of student-age correctional inmates and, perhaps even more surprisingly, 18% of inner city high school students had asked someone to purchase a gun for them from a retail outlet.[60, 61]  More recently, 53% of licensed retailers telephoned by a sham prospective purchaser indicated that they would sell a handgun to that person because his or her intimate partner "needs it."[62]

The question arises: Why risk a straw purchase from a licensed retailer when private party gun sales offer a convenient and anonymous, if still illegal, alternative?  The answer may be in part that licensed retailers have larger inventories than private party sellers do[63] and in particular are more likely to stock new assault rifles and similar weapons sought after by criminal users.  Buying a new gun also avoids the risk of being linked through the gun to prior crimes in which it was used.  This proposition would be unconvincing if the risk of apprehension during a straw purchase were high, but it is not.[63]

### Tracing Crime Guns

An individual licensed retailer's importance as a source of crime guns is estimated by determining the number of recovered crime guns sold by that retailer.  Linking crime guns to their points of sale is accomplished by a procedure called gun tracing, which ordinarily reconstructs the chain of ownership of a gun from its manufacturer to its first retail purchaser.  Gun traces are conducted by ATF in response to requests from law enforcement agencies all over the world, and annual reports on traced guns for each state in the U.S. are provided by ATF at its web site: http://www.atf.gov/firearms/trace_data/index.htm.  In 2005, ATF received more than 260,000 requests for gun traces.[64]

Some retailers sell more crime guns than others do.  In 1998, of 83,272 licensed retailers nationwide, just 1,020 (1.2%) accounted for 57.4% of all traced guns.[65]  At that time, many licensed retailers sold few guns or none at all, however.  In a later California study of 421 retailers who sold at least 100 handguns a year, just 10 retailers (2.4%) accounted for 29.2% of all handguns sold by the entire group that were traced after use in a violent or firearm-related crime.[66]



*PRIVATE SALES*
*SEE KEVIN.*

*—Multiple signs at this licensed retailer specializing in custom-assembled AR and AK rifles. The signs were seen at a show in Reno, Nevada, but not at subsequent shows in Las Vegas, Nevada; Phoenix, Arizona; or San Francisco, California.  The photograph was taken in San Francisco.*

The National Rifle Association has suggested that the number of traced guns linked to an individual retailer reflects only that retailer's sales volume.[67] This is not the case. Some licensed retailers are linked to crime guns not just frequently, but *disproportionately*: more frequently than would be expected from the overall number of guns they sell. In the California study cited above, the 11.2% of retailers who had disproportionate sales of crime guns accounted for 46.1% of handguns linked to violent or firearm-related crimes.[66]

Perhaps of greatest concern, some licensed retailers are corrupt. Such retailers are the immediate source of nearly half of all guns that are trafficked—diverted intentionally into illegal gun commerce.[27] They account for two-thirds of trafficked guns coming from gun shows.[28]

### Private Parties: The Secondary Gun Market

Far and away, the leading proximate source of crime guns is the secondary gun market. More than 85% of the recovered crime guns traced by ATF are in the possession of someone other than their first retail purchaser when the crime is committed; the percentage is even higher for guns recovered from juveniles and youth.[68-70] These guns have gone through at least one private party gun sale (or some other type of private party transfer of possession, such as a trade). Correspondingly, the great majority of persons who have committed violent crimes with guns report that they acquired their guns through a private party transaction.[31] (See Table 1-4.)

At least two of the reasons for this are clear. As discussed, private party gun sales offer anonymity and are available to those who would be prohibited from buying from licensed retailers. Accessibility is also important. Licensed retailers can be few and far between, at least in some large cities. There are an estimated 57 million adult gun owners in the United States,[1] any one of whom can become a private party gun seller.

The lack of documentation for private party gun sales creates missing links in the chain connecting the first retail purchaser and the criminal from whom the gun has been recovered. Finding those missing links can be impossible, or at best very expensive. In states that require records to be kept for all gun sales, however, investigators seek to identify the most recent purchaser of a crime gun, not just the first.[70] This is of real practical value; it can

*Gun shows, flea markets, hotel rooms, just about anywhere. He's not asking for any identification, he's not asking to have somebody have a record check being done, so he'll sell to anybody for a price.*

*— ATF agent Thomas Stankiewicz describing Kurt Radovich, accused of gun trafficking in Pennsylvania in 2008. More than 500 guns and thousands of rounds of ammunition were taken from Radovich's home at the time of his arrest.[71]*

*I don't fill out any paperwork or anything.*

*—An unlicensed vendor in San Antonio, Texas, buying a Smith & Wesson .357 revolver for $350 from an attendee at the show. The vendor has about 60 guns for sale, including at least 5 AK rifles.*

Inside Gun Shows

convert a crime gun whose first retail purchase was in another state several years earlier into a gun sold just weeks before the crime, just miles from the crime scene.  (Examples are in Table 1-5.)  The same information can be critically important in identifying gun trafficking networks and in linking one crime to another.

Table 1-4.  Sources of guns used in crime by state prison inmates

| Source | Percentage | |
|---|---|---|
| | 1997 | 1991 |
| Purchased or traded from retail outlet | 13.9 | 20.8 |
| Retail store, pawnshop | 12.1 | 18.9 |
| Flea market, gun show | 1.7 | 1.9 |
| Family or friend | 39.6 | 33.8 |
| Purchased or traded | 12.8 | 13.5 |
| Rented or borrowed | 18.5 | 10.1 |
| Other | 8.3 | 10.2 |
| Street, illegal source | 39.2 | 40.8 |
| Theft, burglary | 9.9 | 10.5 |
| Drug dealer, off street | 20.8 | 22.5 |
| Fence, black market | 8.4 | 7.8 |
| Other | 7.4 | 4.6 |

From Harlow CW.  *Firearm use by offenders.*  Washington, DC: Bureau of Justice Statistics; 2001.  NCJ 189369.  See Table 8.

28

Table 1-5.  Results of standard ATF traces and traces incorporating additional California sales records for handguns recovered from young people in California and traced in 1999

| Gun | Date of Recovery by Law Enforcement | ATF Sale Date | ATF Time from Sale to Recovery | California Sale Date | California Time from Sale to Recovery |
|---|---|---|---|---|---|
| GLC 23, .40 | 03/06/99 | Unknown | Unknown | 06/08/96 | 2.7 y |
| | | | | 05/22/98 | 288 d |
| | | | | 06/13/98 | 266 d |
| SW 910, 9mm | 02/01/99 | 02/28/96 | 2.9 y | 02/28/96 | 2.9 y |
| | | | | 09/20/98 | 135 d |
| SW Sigma, 9mm | 09/28/99 | 04/28/95 | 4.4 y | 03/19/97 | 2.5 y |
| | | | | 06/25/99 | 95 d |
| GLC 19, 9mm | 12/22/98 | 04/21/98 | 245 d | 12/01/98 | 22 d |
| CLT .25 | 02/17/99 | Unknown | Unknown | 12/19/98 | 62 d |

Summary of example cases:

In case 1, a Glock Model 23, .40 caliber semiautomatic pistol was recovered on March 6, 1999 in Los Angeles.  The standard trace identified the retailer who first sold the gun, but the date of purchase and time from sale to recovery were unknown.  California sales records identified three transactions, two of which occurred less than a year before the gun's recovery.

In Case 2, a Smith and Wesson Model 910, 9mm semiautomatic pistol was recovered February 1, 1999.  Both the standard trace and the sales records identified a first sale in February, 1996, but the sales records included a subsequent transfer just over four months prior to the gun's recovery.

(Y denotes years; d denotes days.)

From Wintemute GJ.  The life cycle of crime guns: a description based on guns recovered from young people in California.  *Annals of Emergency Medicine* 2004;43:733-742.

## Gun Shows and Gun Commerce

Since the adoption of the Firearm Owner's Protection Act in 1986, federal law has permitted licensed retailers to sell guns of any type at gun shows in their home states.  They can sell long guns at shows elsewhere.[34]  Prior to 1984, retailers could sell only at the premises listed on their license; from 1984 to 1986, they were allowed to conduct business at gun shows under a new ATF

Inside Gun Shows

regulation.[72]  By creating an ambiguous definition of the term "engaged in the business," FOPA also expanded opportunities for private parties to buy and sell guns regularly while claiming to be indulging a hobby.

Although systematic data are lacking, the result appears to have been a rapid increase in both the number and size of gun shows during the 1980s and 1990s.  An informal survey in 1996 by the Violence Policy Center yielded the following impressions, among others.[72]  From a regional ATF official: "Several out of my eight supervisors said we definitely had an increase of more than 50 percent in the last 10 years."  From David Cook, show organizer for the North Texas Gun Club, a promoter of large gun shows in Dallas: "They've become more popular.  I remember the days when there was a show only once every three months.  Now you can go to one just about every weekend."



Today, gun shows continue to play a unique role in gun commerce, stemming from the fact that dozens to hundreds of gun sellers—licensed retailers, unlicensed vendors, and individual attendees—are present and competing with one another for business.  Licensed retailers rent table space from the shows' promoters and display their inventory from a fixed location, but unlicensed vendors do this as well.  ATF, based on interviews with promoters, estimates that 25% to 50% of all gun sellers at gun shows who rent table space are unlicensed vendors.[37]  A separate study, based on observations at gun shows, raises this estimate to 70%.[63]  (The reasons for the discrepancy will be discussed later.)



The same absence of regulation that characterizes private party gun sales generally is also true of sales by unlicensed vendors at gun shows.  Some advertise their unregulated status; at one show, an unlicensed vendor posted this sign: "No background checks required; we only need to know where you live and how old you are."[37]  It is of great concern that some unlicensed vendors are likely to be "corrupt licensed gun dealers who were squeezed out of the primary market by recent...ATF efforts to make it more difficult to obtain and renew a federal firearms license."[28]

Individual attendees who have brought guns to sell probably outnumber licensed retailers and unlicensed vendors put together.  Some are active traders, both buying and selling guns.

*Signs posted by unlicensed vendors, Tucson and Phoenix, Arizona.*

*Economies of Scale*

Major gun shows can usefully be considered the big-box retailers of gun commerce. Some individual licensed retailers at these shows are as large and well-staffed as a good-sized gun store. When dozens or hundreds of gun sellers are together in the same place along with thousands of potential customers, collective effects become important. Competition allows for multiple business strategies to be successful. Larger retailers can stock a wide range of products and maximize their sales volume at the expense of profit per item sold; small vendors may specialize to achieve excellence in a niche market. As a result, these gun shows offer their customers a breadth and depth of weaponry to choose from that can be found nowhere else, at prices that are as low as the market will bear.

This effect may not be particularly important for conventional handguns and long guns—the core of the inventory of a typical gun dealer or pawnshop. On the other hand, a customer might need to visit several retailers scattered across a metropolitan area in order to inspect a single .50 BMG rifle or one of the new semiautomatic pistols based on AR or AK rifle designs (more on these in Chapter 4). At a large gun show, however, he is likely to find at least half a dozen licensed retailers with several of these weapons to sell. Simply by walking back and forth between them he can comparison shop and negotiate a low selling price. Not uncommonly, he can buy them anonymously from an unlicensed vendor or another attendee.

The sheer quantity of weapons for sale at any one time, whether arrayed on tables or carried by attendees, can be eye-opening. A reasonable working estimate of the number of guns per seller renting table space is 25. (In a prior study, the median number of guns per seller was 22 in California and 26 in other states.[63]) At the low end are unlicensed vendors who have just one or two guns on display and are mostly selling something else. At the other extreme, Shoot Straight Sports (see Chapter 2) had an estimated 1,354 guns laid out at a show in Orlando, Florida; some of these were atop stacks of boxes holding additional guns.

At a show with 200 gun vendors, then, an attendee walking the aisles might have about 5,000 guns on display to choose from at any one time. This does not include guns still in their boxes or carried by other attendees.

Inside Gun Shows

## Gun Shows and Crime Guns

*See that guy over there?  He's at every show.  And he sells some of the same guns I do, only he charges more.  Now why do you think some people are willing to pay more at his table than mine?  Because he doesn't have to run them through a background check.*

*—Licensed retailer Merlin Scales at a 2008 gun show in Norfolk, Virginia, describing a nearby unlicensed seller.[73]*

*Seller: I'm not really supposed to sell handguns to…non-Vermont residents.*

*Buyer: I was just hoping I'd be able to find somebody up here and let money do the talking, you know?*

*Seller: Well, you know the old Italian saying: make me an offer I can't refuse.  You know what I mean?  Then we can do something illegal.*

*Buyer: I'm willing to do $2,500 cash.*

*Seller: Twenty-five hundred cash, that's tempting.  I was figuring around the same thing.  You got that kind of money?*

*Buyer: I'll go do what I gotta do.*

*—Conversation between an unlicensed vendor and a reporter, posing as a gun buyer, at a gun show in Vermont in 2008 or late 2007.  The reporter is from Massachusetts.  It is illegal for the vendor to sell a handgun to a buyer from another state.[74]*

Much of the concern about gun shows as a source of crime guns focuses on private party gun sales, since no background checks are conducted and no records are kept.[28, 37, 63]  ATF emphasizes that "[u]nder current law, large numbers of firearms at these public markets are sold anonymously... there is virtually no way to trace them."  As a result, "too often the shows provide a ready supply of firearms to prohibited persons, gangs, violent criminals, and illegal firearms traffickers."[37]  A 2009 Government Accountability Office report identified both the lack of background checks and the lack of records for private party gun purchases, including specifically those at gun shows, as "key challenges" to efforts to interdict gun trafficking across the border to criminal organizations in Mexico.[17]

Licensed retailers have not been silent.  "Many Federal firearms licensees," ATF notes, "have complained to ATF about the conduct of non-licensees at gun shows."[37]  At ATF briefings for licensed retailers attended by the author, licensees have reported flagrantly illegal activity by unlicensed vendors and private party sellers.

Perhaps the most vocal of these licensed retailers was the late Bill Bridgewater, head of the National Association of Stocking Gun Dealers.  In 1993 he wrote to the House Judiciary Committee's Subcommittee on Crime and Criminal Justice:

> The BATF has established rules and regulations for these things they call "gun shows."  The opportunity for the black marketers is that the BATF doesn't enforce those regulations and there isn't anyone else to do so.  Consequently, there are literally hundreds of "gun shows" scattered around the country where you may rent tables, display your wares, sell what you please to whomever you please and once again the sale that is made with no records, no questions and no papers, earns the highest sales price…There are wide open "gun shows" the length and breadth of the United States, wherein anyone may do as he chooses, including buy firearms for children.[72]

But licensed retailers themselves are implicated; there is

evidence that among gun dealers, at least, those who sell at gun shows are more likely to have crime guns traced to them than are those who do not.  ATF's 1998 Operation Snapshot, which compiled data on random samples of 382 gun dealers and 370 pawnbrokers, found that 30% of dealers with gun show sales, but 22% of all dealers, had previously had a crime gun traced to them.  For pawnbrokers the difference was in the opposite direction; 36% of those with sales at gun shows, but 44% overall, had prior gun traces.[75]  And in California, where both gun shows themselves and gun commerce generally are regulated, sales at gun shows are not a risk factor among licensed retailers for disproportionate sales of crime guns.[66]

The best available data on gun shows as a source of crime guns come from ATF investigations of illegal gun trafficking.[27-29]  Example cases are given in Table 1-6.

In 2000, ATF published a detailed study of 1,530 such investigations initiated from July 1996 through December 1998, of which 212 (13.9%) involved gun shows and flea markets.[27]  These cases accounted for 25,862 guns—30.7% of all the guns in the study.[27]  Half the cases involved 40 guns or more.  Nearly half (46%) involved felons either buying or selling guns at the shows.  In more than a third, one or more of the involved guns were known to have been used in subsequent crimes, including homicide, assault, robbery, and drug offenses.[37]

A follow-up study of 314 gun show investigations found that individual cases involved as many as 10,000 guns.[28]  Trafficking at gun shows accounted for 9.9% of all firearms in cases linked to juveniles and youth.[54]

ATF trafficking investigations also suggest that corrupt licensed retailers may preferentially do business at gun shows, as oversight is less stringent.[27, 28]  Nearly 20% of investigations concerning gun shows involved FFLs selling firearms without conducting background checks or retaining records.[37]

### Gun Show Exports

Gun shows are now frequently identified as the source of guns exported to Mexico,[17, 58, 76] Canada,[77] and elsewhere.  A lack of information, most importantly the absence of records for private party sales, has made it impossible to quantify the extent of the problem.[17]  Sales by licensed retailers and by private parties are both involved.

*I use my discretion.  Most people who come to the shows, you see them a lot.  You know who's "right" and who's "wrong."  I don't have to, but I ask everybody to see their driver's license, and if they're not "right," they usually move on at that point.*

*—Unlicensed vendor Jim Caton at a 2008 gun show in Norfolk, Virginia.[73]*

Inside Gun Shows

*They send over a scout on Saturday to see if there's anything they want.  Then they show up on Sunday with a big wad of money and somebody who's got a clean record, who's legal to buy.*

*—A seller of trigger activators— devices that increase the rate of fire of semi-automatic guns—on how Mexican gangs acquire guns at gun shows, Tucson, Arizona.[76]*

*When somebody walks in and says, "I need eight of these," it becomes apparent what's happening.*

*—A licensed retailer in Tucson, Arizona.  As reported by the* New York Times, *"[o]n May 18, 2008, a man bought two military-style rifles from him at a gun show on the Arizona State Fairgrounds.  Two days later, the man showed up at the dealer's home with a friend and bought eight more rifles for more than $5,000 cash.  Despite the dealer's help [to law enforcement], members of the ring managed to smuggle at least 112 weapons, bought at a half dozen locations, into Mexico before they were arrested in February [2009]."[68]*

Table 1-6.  Examples of gun trafficking cases involving gun shows

| Year | Case Description |
|------|------------------|
| 1993 | A licensed retailer in Tennessee "purchased more than 7,000 firearms, altered the serial numbers, and resold them to two unlicensed [vendors] who…sold the firearms at gun shows and flea markets."  The licensed retailer was sentenced to 15 months in prison and the unlicensed vendors to 21 and 25 months, respectively.[37] |
| 1995 | A convicted felon in Michigan "used a false police identification to buy handguns at gun shows and resold them for profit."  The guns included 16 new, inexpensive, 9mm and .380 semiautomatic pistols.  The subject was sentenced to 27 months in prison.[37] |
| 1996 | An unlicensed vendor who was a convicted felon operated a network of straw purchasers and had trafficked more than 1,000 guns, some acquired at gun shows.  He "offered to sell agents an unlimited number of firearms, including fully automatic weapons and silencers."  One gun "was recovered from the scene of a shootout in which two Mexican military officials were killed by drug traffickers."  Another was recovered from the apartment of a Mexican drug czar.  The trafficker was eventually sentenced to 78 months in prison; two licensed retailers who collaborated with him received probation.[27] |
| 2004 | Dorian Bennett Carr, Jr., and Alvin Eugene Edwards were indicted for operating a straw purchasing ring that acquired approximately 240 new semiautomatic pistols from licensed retailers at Oklahoma gun shows and gun stores in six months.  The guns were trafficked to Baltimore.  Seven alleged straw purchasers were also indicted.[81] |
| 2006 | "Operation Flea Collar" began as an investigation of two traffickers who purchased firearms from a licensed retailer in Alabama and sold them at gun shows and flea markets there.  The investigation grew to involve thousands of firearms recovered from at least 12 states; gangs routinely sent buyers to Alabama to purchase the guns in bulk.  Twelve guns were linked to homicides.  Eighteen persons were arrested and convicted, and 556 firearms, including a Streetsweeper shotgun, were seized.[82, 83] |
| 2006 | Between 1994 and 2001, unlicensed vendor Richard Clausen bought and resold 300–400 firearms at gun shows and swap meets in Arizona.  Clausen bought the guns from licensed retailers; the guns were sometimes resold, without background checks or records, within days.  Clausen was sentenced to 27 months in prison.  The judge said this of Clausen's conduct: "It was like spreading poison in the public water supply."[84] |

Table 1-6, continued.

| Year | Case Description |
|------|------------------|
| 2006 | Mark Andrew Nelson of Ohio pleaded guilty to operating a straw purchasing ring that acquired guns from licensed retailers for him to sell at area gun shows and directly to prohibited persons.  The straw purchasers, who also pleaded guilty, were members of his family: Phaedra Ann Nelson, his wife (173 guns); Ricky Frank Nelson, his brother (83 guns); and James Robert Crook, his father-in-law (71 guns).  Licensed retailer Robert L. Cook pleaded guilty of selling a firearm to a prohibited person.[85] |
| 2008 | In October, 2005, Antrinna Collins purchased 3 semi-automatic pistols and 3 AK-47 rifles at the Cuyahoga County gun show in Ohio.  One of the pistols was used by a convicted felon in a shooting 27 days later.  On at least 3 occasions, guns she purchased were found in the possession of convicted felons.  She was sentenced to 4 years in prison.[86] |
| 2008 | During 2006-2007, Ernesto Olvera-Garza directed a trafficking network in San Antonio, Texas, that specialized in "high-powered, high-capacity handguns and assault rifles"[87] acquired at gun shows and elsewhere.  At least 9 straw purchasers were involved.[88]  A woman who straw purchased a gun for him at a San Antonio gun show testified that, when she delivered the gun to him in the parking lot, he showed her 10 more guns that other straw purchasers had bought.[89]  Garza's operation smuggled at least 50 guns into Mexico, one of which was used in a gunfight that killed two Mexican soldiers.  He was sentenced to 12 years in prison.[90] |
| 2008 | During 2007-2008, Jonatan Lopez-Gutierrez and John Avelar operated a straw-purchasing ring in El Paso, Texas, that bought more than 90 firearms from licensed retailers at gun shows and elsewhere.  The guns were smuggled into Mexico.  Twenty-four guns were seized, including .50-caliber and .308-caliber sniper rifles and AR-15 rifles.  The men were sentenced to 48 and 37 months in prison, respectively.[91] |
| 2009 | Marvin Acevedo, a 35-year-old Guatemalan linked to a narcotics cartel in that country, was sentenced to four years in prison in February.  He had purchased "more than ten" FN Five-seveN pistols and several thousand rounds of ammunition at gun shows and gun stores in North Texas and elsewhere.[92] |

*I have had people that failed background checks, and yet they are carrying guns out of here that they bought from someone else.*

*—Licensed retailer Bruce A. Schluderman, at a gun show in Pharr, Texas.[58]*

Referring to the widely-reported increase in gun trafficking from this country to Mexico, ATF's Assistant Director for Field Operations, William Hoover, emphasized the importance of "a readily accessible source of firearms and ammunition originating in mostly the secondary market such as gun shows, flea markets and private sales."[78]  Canada's Criminal Intelligence Service, in its 2005 annual report on organized crime, referred to unregulated gun shows in the United States as a "serious threat."[79] And in 2003, the Congressional Research Service suggested that gun shows may be an attractive source of firearms for foreign terrorists.[80]

## Federal and State Policy on Gun Shows

### Federal Policy

There is no federal regulation of gun shows *per se*.  Existing law sets the terms for legal gun sales by licensed retailers and private parties, whether at a gun show or elsewhere.  ATF regulations define gun shows and specify that the business procedures licensed retailers are required to follow at their usual premises apply at gun shows as well.  Figure 1-2 reproduces an ATF circular outlining "activities permitted at bona fide gun shows."

### State Policy

Eight states regulate gun shows, but the nature and scope of those regulations vary widely.[40, 93]  California "requires a show organizer to obtain a Certificate of Eligibility from the Department of Justice, provide local law enforcement with a list of the show's sellers, and exclude minors unless they are accompanied at all times by a parent or guardian."[40]  Details for each state are in Table 1-7.

Table 1-7.  Summary of state statutes regulating gun shows

| State | Key Provisions of Statutes |
|-------|---------------------------|
| California | Promoters must obtain a certificate of eligibility; provide a list of licensed retailers who will be attending, and of all vendors if requested; provide an approved security plan; and maintain liability insurance.  Vendors must execute written contracts, certify that they will not display prohibited items and will process all gun sales through licensed retailers, and provide a list of all employees in attendance.  All firearms brought by attendees must be tagged with the possessor's name, signature, and identifying information.  Persons under 18 years of age are not admitted unless accompanied by a parent or legal guardian.  (Other requirements have been omitted; see CA Penal Code Sections 12070-12071.4.) |
| Colorado | Records must be kept of all firearm transfers at gun shows, including private party transfers, by licensed retailers.  (A licensed retailer must initiate a background check for a private party transfer at a gun show.) |
| Connecticut | Promoters must provide 30 days' advance notice of gun shows to law enforcement.  (The Department of Public Safety must conduct a background check for a private party transfer at a gun show, which is requested by the seller.) |
| Illinois | Records must be kept of all firearm transfers at gun shows by gun sellers, including private party sellers, for 10 years.  The record must include the buyer's Firearm Owner Identification Card number.  (The Department of State Police must conduct a background check for a private party transfer at a gun show, which is requested by the seller.) |
| Maryland | Private party sellers of handguns and assault weapons at gun shows must obtain a temporary transfer permit for each show they attend, but only if they sell "from a table or fixed display."  The permit requires a background check, and an individual may only be issued five permits per year. |
| New York | Promoters must post signs and provide written notification to vendors that all firearm sales require background checks initiated by licensed retailers and must identify a retailer who will initiate checks for private party sales.  The retailer must retain records of sales at gun shows for 10 years. |
| Oregon | Promoters must post signs stating the requirement for a background check prior to the sale of any firearm at a gun show and must provide forms for requesting background checks.  Records must be kept of all firearm transfers at gun shows by gun sellers, including private party sellers, for 5 years.  (The Department of State Police must conduct a background check for a private party transfer at a gun show, which is requested by the seller.) |
| Virginia | Promoters must provide 30 days' advance notice of gun shows to law enforcement and provide a list of all vendors within five days following the show.  There is an exemption for "shows held in any town with a population of not less than 1,995 and not more than 2,010, according to the 1990 United States census." |

Adapted in part from *Regulating guns in America: an evaluation and comparative analysis of federal, state and selected local gun laws.*  San Francisco, CA: Legal Community Against Violence, 2008.

Inside Gun Shows

Figure 1-2  ATF circular outlining procedures to be followed at gun shows

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Important Notice to Dealers and Other Participants at this Gun Show



This **NOTICE** applies to activities permitted at bona fide gun shows, as defined in Title 27 of the Code of Federal Regulations, Section 478.100.  Federal firearms licensees ("FFLs" or "Dealers") may only sell firearms at gun shows within the State in which their licensed premises is located.

## DEALERS LICENSED IN THIS STATE

- **MUST** display license.
- **MUST** comply with all recordkeeping requirements of ATF regulations concerning acquisitions and dispositions of firearms, including the recording of the place of sale.
- **MAY** dispose of handguns to residents of this State only, provided that the purchaser is at least 21 years of age and all provisions of the Brady law are met.
- **MAY** dispose of long guns to residents of any State, provided that the purchaser is at least 18 years of age, the laws of both States are complied with, and all provisions of the Brady law are met.
- **MAY** dispose of firearms to any FFL.
- **MAY** acquire firearms from any FFL licensed in the State and from any non-licensed individual.
- **MAY** take orders of any firearm from a non-licensee and ship the same to a licensee in the purchaser's State of residence from whom the purchaser can then take possession after the provisions of the Brady law are met.

## DEALERS NOT LICENSED IN THIS STATE

- **MUST** display license.
- **MUST** comply with all ATF recordkeeping requirements concerning the acquisition of firearms.
- **MAY** acquire firearms from any FFL licensed in this State and from any non-licensed individual.
- **MAY** make a sale and deliver curio or relic firearms to any other FFL licensed in any State as long as the laws of both States are complied.
- **MAY** ship curio or relic firearms from this show to any other FFL.
- **MAY** display and take orders.

## NON-LICENSED RESIDENTS OF THIS STATE

- **MAY** acquire long guns or handguns from FFLs licensed in this State, provided all provisions of the Brady law are met.
- **MAY** dispose of personal firearms to any FFL.
- **MAY** acquire from and dispose of personal firearms to non-licensed residents of the State.  However, non-licensed individuals may not be engaged in the business of dealing in firearms without a Federal firearms license.
- **CANNOT** acquire from or dispose of firearms to non-licensed residents of any other State.
- **CANNOT** ship in interstate commerce, except to themselves or an FFL, a firearm that has otherwise been lawfully acquired; must, when shipping to themselves, declare the firearm to the commercial or contract carrier.

## NON-LICENSED RESIDENTS FROM ANOTHER STATE

- **MAY** dispose of firearms to any FFL.
- **MAY** acquire long guns only from FFLs licensed in the State, provided the laws of both States are complied with and all provisions of the Brady law are met.
- **MAY** order firearms from any FFL and have them shipped from the show to an FFL in their State of residence by a commercial or contract carrier in accordance with State and Federal law.
- **CANNOT** acquire handguns.
- **CANNOT** acquire from or dispose of firearms to non-licensed individuals.

ATF 15300.23A
Revised March 2006

## Law Enforcement at Gun Shows

ATF has had no proactive program of gun show enforcement.[94]  Instead, its investigations traditionally have been reactive, originating in information developed from complaints or, more recently, patterns developed in gun tracing data or reports of multiple handgun sales.  For example, of the 314 ATF trafficking investigations involving gun shows in the late 1990s, over 40% began with complaints or tips from informants (including 9% from FFLs or show promoters), and another 23% arose from analysis of trace and multiple sales records.  Only 14% arose from "prior ATF attention to gun shows."[28]

From 2004 to 2006, gun show operations accounted for 3.2% of all trafficking investigations initiated by ATF and affected 3.3% of the gun shows estimated by the Department of Justice to have occurred during those years.[94]  During those years ATF conducted 202 investigative operations at 195 gun shows, resulting in 121 arrests (with at least 83 convictions) and the seizure of 5,345 firearms.[94]  Of the 202 operations, 156 (77%) focused on specific individuals who were suspected of gun trafficking; only 46 (23%) addressed "general illegal activity related to firearms trafficking occurring at gun shows."[94]  Examples of operations directed at firearms trafficking generally at gun shows are in Table 1-8.  These have been covert operations, conducted in some cases without the knowledge of the shows' promoters.  ATF's operations at a series of gun shows in Richmond will be discussed in Chapter 7.

Gun show operations are also part of ATF's recently established Project Gunrunner, intended to disrupt the flow of guns from the United States into Mexico for use by drug trafficking organizations.  The project's gun show component targets "widespread international trafficking by individuals and gangs that cross the U.S. border carrying drugs and then return to Mexico carrying guns that they obtained through straw purchases at gun shows in the southwestern states."[94]  No separate data have been published on Gunrunner's impact on gun shows.  Altogether, from its onset in 2004 through mid-February of 2009, Gunrunner "has referred for prosecution 795 cases involving 1,658 defendants; those cases include 382 firearms trafficking cases involving 1,035 defendants and an estimated 12,835 guns."[18]

The limitations on ATF's enforcement activities stem in

*Alcohol, Tobacco, Firearms should be a convenience store, not a government agency.*

*—T-shirt worn by an attendee, Phoenix, Arizona.*

large part from a lack of resources.  For a sense of how serious a problem the under-resourcing of ATF has been, consider the border states of the Southwest.  ATF estimated in 2008 that there were 6,647 licensed retailers in the area, while their workforce comprised just 100 special agents and 35 industry operations investigators.  Nationwide, ATF at that time employed only about 2,500 investigators and 750 special agents.[78]  When asked by a reporter in 2007 about the possibility of routine patrols at gun shows, William Newell, the head of ATF's office in Phoenix, responded simply, "We don't have enough agents to do that."[95]

Table 1-8.  Examples of ATF enforcement operations at gun shows targeting general firearms trafficking, by ATF field division

| Year | Field Division | Description of Operation |
|---|---|---|
| 2006 | Columbus, OH | Investigations were conducted at 3 gun shows in Cleveland based on intelligence that "many of the guns recovered in high-crime areas of the city had been purchased at local gun shows" and that others were trafficked to other states and to Canada. The operations resulted in the seizure of 5 guns, 1 indictment, and 2 pending indictments. |
| 2005-2006 | Houston, TX | Operations were undertaken at 2 shows in Pharr, a suburb of McAllen on the border with Mexico.  Four Mexican nationals were arrested.  Three had purchased 14 firearms and 3,000 rounds of ammunition; the fourth had coordinated the straw purchases of 10 "high-priced" firearms. |
| 2004-2006 | New Orleans, LA | Gun shows in Kenner, a suburb of New Orleans, were identified through a review of tracing records as "a source used by local gang members and other criminals" for guns acquired through straw purchases or private party transfers.  Operations resulted in 12 arrests, 6 convictions, and the seizure of 4 guns. |
| 2004-2006 | Phoenix, AZ | Gun shows in the Southwest "attracted large numbers of gang members from Mexico and California" who "bought large quantities of assault weapons."  Operations at 8 shows in Phoenix, Yuma, and Tucson, AZ, and in Albuquerque, NM resulted in 13 arrests, 3 convictions, and the seizure of 193 guns. |
| 2004-2005 | San Francisco, CA | Gun shows in Reno are "a gateway for illegal firearms trafficking into California."  In undercover operations at 6 shows, ATF agents identified illegal sales to out-of-state residents, illegal off-paper sales, and cases of dealing in firearms without a license.  The operations resulted in 14 arrests and 11 convictions; 1000 firearms were purchased or seized. |

Adapted from *The Bureau of Alcohol, Tobacco, Firearms and Explosives' investigative operations at gun shows.* Washington, DC: Office of the Inspector General, US Department of Justice; 2007.  The report was published not long after the operations were conducted.  Outcomes for criminal cases arising from the investigations were not always available, and additional filings were expected.

### Public Education

ATF occasionally sets up educational displays at gun shows; staff answer questions and distribute materials covering gun laws and purchase procedures. In collaboration with ATF, the National Shooting Sports Foundation administers a public education program, "Don't Lie for the Other Guy," intended to prevent straw purchases.[96] Begun in 2000, the program is now operational in approximately 15 states or metropolitan areas selected by ATF. Don't Lie is not specific to gun shows; it offers training and display materials to all licensed retailers in the targeted areas. The materials stress the fine (up to $250,000) and long prison term (up to ten years) that await a convicted straw purchaser.

These educational efforts, like ATF's operations generally, receive a mixed reception at gun shows (see pages 42-43).

### Other Federal Efforts

United States Immigration and Customs Enforcement (ICE), now the primary investigative agency of the Department of Homeland Security, has targeted cross-border gun trafficking generally since 2005, if not earlier. Fifteen multi-agency Border Enforcement Security Task Forces have seized more than 2,000 weapons and made high-profile arrests of traffickers.[97] An apparently separate partnership with other agencies and the government of Mexico, Operation Armas Cruzadas, has recovered more than 1,400 firearms and 120,000 rounds of ammunition. No results specific to operations at gun shows are available.

A June 2009 review by the Government Accountability Office of efforts to combat gun trafficking into Mexico criticized both ATF and ICE for a failure to "consistently and effectively coordinate their efforts," which "has resulted in some instances of duplicate initiatives and confusion during operations."[17] By the end of the month, the agencies had signed an agreement intended to clarify their areas of responsibility and facilitate collaborative work.[98]

Inside Gun Shows











# ATF and Its "Don't Lie" Campaign

ATF rents table space at gun shows (1-3). This is not common, and it is a lonely job. The emphasis is on their "Don't Lie" campaign to deter straw purchases. Some licensed retailers display Don't Lie materials prominently; purchasers cannot help but see them. (In the straw purchase on pages 148-149, four piles of cash were counted out on a Don't Lie counter mat.) Some view ATF's work with hostility. Manifestations include displaying Firearms Transaction Records beside a Nazi flag (10) and throwing Don't Lie postcards on the ground (11,12). The photographs were taken in Orlando, FL (1,3,10); Atlanta, GA (2); Dayton, OH (4); Reno, NV (5); Dallas, TX (6); Richmond, VA (7,9); and Phoenix, AZ (8,11,12).















Inside Gun Shows

*State-Level Enforcement*

The California Department of Justice has conducted systematic law enforcement operations at gun shows at least since 2001.  Its Gun Show Enforcement Program (GSEP), which is supported by allocations from the state's general funds, was mandated by the legislature as part of a larger effort to regulate gun shows.  Teams of experienced special agents, working undercover, are at "every single major gun show" in the state—and most of the smaller shows as well—according to agency officials interviewed for this report.  Individual operations are sometimes collaborative efforts involving local law enforcement, agencies from other states (particularly Arizona and Nevada), and ATF. A continuing series of joint operations involving gun shows in Reno, for example, was initiated at the request of chiefs of police in the San Francisco Bay Area after it became clear that the shows were important sources of guns used in crimes in Bay Area cities.  As measured by gun recoveries, investigative operations generally have been "very lucrative" and have "put a dent" in gun trafficking.  Individual cases have involved dozens of guns.

GSEP agents work closely with promoters, both as enforcers of the law and as educators.  Promoters "assume we are always there and know we're not an absentee landlord," said agency officials.  The program makes active use of the materials that gun show promoters must provide in advance of each event: a security plan and a list of all those who are renting table space to sell guns, among others.  The administrative requirements of the law have teeth; a promoter who does not meet them faces the loss of his license.

The program appears to have undergone an important transition.  After some initial resistance, many promoters and individual retailers have become quite supportive.  With them, at least, program operations have entered what might be considered a maintenance phase.  Agency officials report "a sizeable amount" of self-policing and stress the importance of ethical promoters and retailers as sources of leads on criminal activity.

## Some Additional Data and Preliminary Inferences

As the discussion to this point hopefully establishes, the role that gun shows play in gun commerce and gun violence cannot be described simply.  As the Columbine massacre and many

*WARNING.  Undercover law enforcement officers are actively working at this show.  Do not under any circumstances allow yourself to sell a firearm without conducting the sale through a licensed dealer.*

*—Sign posted at a licensed retailer acting as a transfer station for private party gun sales, Orange County, California.*

44

gun trafficking cases demonstrate, gun shows may be particularly important as an indirect source of crime guns—they supply guns to intermediaries who in turn supply active criminals. This point has been most clearly made by Anthony Braga and David Kennedy, two leading experts in the field:

> Assessing any problem presented by gun shows is a difficult analytic task. While an important question is *whether prohibited persons personally buy firearms at gun shows*, which might be answered by surveys, an equally important one is *whether gun shows are sources of firearms that are trafficked to prohibited persons by straw purchasers, street dealers, and the like*. However, this question cannot be answered by surveys.[28] [Italics in original.]

At the same time, the available evidence suggests the following interim conclusions, which are worth considering as additional evidence accumulates.

### *The proportion of all gun sales nationwide that occurs at gun shows is relatively small.*

The best published information we have on where guns come from is in the Police Foundation's 1996 National Survey on Private Ownership of Firearms (NSPOF). In that survey, gun owners were asked a series of questions about the most recent gun they had acquired, including where they had acquired it. Four percent of the guns had been acquired at gun shows; the survey did not ask these gun buyers if they had made their purchases from licensed retailers or private parties.[2] Unpublished data from a second nationwide survey[1] yield a similar result; of 566 gun owners, 9% acquired their most recent guns at a gun show.

Such estimates do not come from surveys alone. California's records of handgun sales identify transactions occurring at gun shows. For the 10 years 1998 through 2007, the archive contains records for more than 1.8 million transactions. Of these, 2.7% were recorded as occurring at gun shows. This figure would include both direct sales by licensed retailers and private party sales that were processed by licensed retailers, as required by state law.

Inside Gun Shows

Survey results can be imprecise, particularly for infrequent events as appears to be the case here. Clearly, a gun most recently purchased by a survey respondent at a location other than a gun show may have passed through a gun show earlier in its lifetime. And it is entirely possible that some gun show sales in the California records were not identified as such. That said, all the available estimates support the general statement that gun shows account for a relatively small proportion of overall gun commerce.

### Most sales at gun shows involve licensed retailers.

ATF estimates that 50% to 75% of gun sellers who rent table space at gun shows are licensed retailers.[37] Our prior study[63] yielded an estimate of only 30%, but this was based on observational data and almost certainly an underestimate. Many licensed retailers at gun shows do not identify themselves as such—at least not until consummating a gun sale—though they are required to do so. The largest and most active vendors at gun shows are almost always licensed retailers.

Given that licensed retailers probably make up a majority of vendors who rent table space, and that they account for essentially all the largest and most active vendors, it is likely that they account for most sales at gun shows. Even allowing for sales by individual attendees who have not rented table space, it is reasonable to estimate that perhaps two-thirds of gun sales are made by licensed retailers. There are, unfortunately, no published data on this point.

### Private party sales at gun shows account for a relatively small percentage of gun sales in the United States.

Taken together, three estimates—that 40% of all gun sales are private party transactions, that 4% to 9% of all gun sales occur at gun shows, and that two thirds of gun show sales are made by licensed retailers—allow for the rough approximations in Table 1-9 of the importance of private party gun sales at gun shows to gun commerce generally. If the 4% estimate is used, then of 1,000 hypothetical gun sales overall, 13 would be private party sales occurring at gun shows. These 13 guns account for 3.3% of private party gun sales and 1.3% of gun sales overall. Using the

9% estimate, 30 of every 1,000 hypothetical gun sales would be private party sales at gun shows.  These 30 guns account for 7.5% of private party gun sales and 3% of gun sales overall.

Table 1-9.  Allocation of 1,000 hypothetical gun sales between licensed retailers and private party gun sellers, and between gun shows and other venues

a.  Assuming that 4% of all gun sales occur at gun shows

| Venue | Private Party | Licensed Retailer | Total |
|---|---|---|---|
| Gun Show | 13 | 27 | 40 |
| Other | 387 | 573 | 960 |
| Total | 400 | 600 | 1,000 |

b.  Assuming that 9% of all gun sales occur at gun shows

| Venue | Private Party | Licensed Retailer | Total |
|---|---|---|---|
| Gun Show | 30 | 60 | 90 |
| Other | 370 | 540 | 910 |
| Total | 400 | 600 | 1,000 |

*Licensed retailers are probably the primary source of crime guns acquired at gun shows.*

The one peer-reviewed study of gun shows as sources of crime guns, discussed previously, developed data from 314 ATF investigations of gun trafficking at gun shows.[28]  Nearly 55,000 guns were involved.  While an unlicensed seller was the main subject in most of the investigations (54.1%), two thirds of the trafficked guns were linked to investigations in which the main suspect was (or had been) a licensed retailer.  These retailer cases involved an average of 452 guns apiece and 33,445 guns in total; those centered on unlicensed sellers involved an average of 112 guns each and 15,551 guns altogether.  Licensed retailers are able to buy guns in large quantities, and an increase in the number of guns linked to trafficking investigations when licensed retailers are involved is not unique to gun shows.[27]

These data are not the whole story, however.  First, trafficking operations that do not involve licensed retailers might be less likely to be brought to ATF's attention and trigger an investigation, precisely because they are smaller than operations in

which retailers participate. This could lead an assessment based just on trafficking investigations to underestimate the importance of private-party trafficking.

Complicating this is the fact that ATF, because of limitations in the data it is allowed to collect, is not able to provide an estimate other than from those trafficking investigations of the number of trafficked guns that are obtained at gun shows, whether from licensed retailers or private parties.[17] Records of trafficking investigations cannot possibly capture all the guns acquired at gun shows with criminal intent—recall that ATF enforcement operations affect a very small percentage of gun shows. This means that the best available evidence we have on the role of gun shows as a source of crime guns probably underestimates their importance.

## References

1. Hepburn LM, Miller M, Azrael D, et al. The U.S. gun stock: results from the 2004 national firearms survey. *Injury Prevention*. 2007;13:15-19.
2. Cook PJ, Ludwig J. *Guns in America: results of a comprehensive national survey on firearms ownership and use*. Washington (DC): The Police Foundation; 1996.
3. Rand MR. *Criminal victimization, 2007*. Washington (DC): Bureau of Justice Statistics; 2008. Report No.: NCJ 224390.
4. Federal Bureau of Investigation. *Crime in the United States, 2007*. Washington (DC): Federal Bureau of Investigation; 2008.
5. Wintemute GJ. Guns and gun violence. In: Blumstein A, Wallman J, editors. *The crime drop in America*. New York: Cambridge University Press; 2000. p. 45-96.
6. Police Executive Research Forum. *Violent crime in America: 24 months of alarming trends*. Washington (DC): Police Executive Research Forum; 2007.
7. Police Executive Research Forum. *Violent crime in America: a tale of two cities*. Washington (DC): Police Executive Research Forum; 2007.
8. Federal Bureau of Investigation. *Preliminary annual Uniform Crime Report*, 2008. 2009 June 1. Available from: http://www.fbi.gov/ucr/08aprelim/index.html
9. Klein A. Major cities' plummeting crime rates mystifying. *The Washington Post*. 2009 Jul 20. Available from: http://www.washingtonpost.com/wp-dyn/content/article/2009/07/19/AR2009071902154_pf.html.
10. Graduate Institute of International Studies. *Small arms survey 2007*. Geneva: Cambridge University Press; 2007.
11. Krug EG, Powell K, Dahlberg L. Firearm-related deaths in the United States and 35 other high- and upper-middle-income countries. *International Journal of Epidemiology*. 1998;27:214-221.
12. Richmond T, Cheney R, Schwab C. The global burden of non-conflict related firearm mortality. *Injury Prevention*. 2005;11(6):348-352.

13. Zimring FE, Hawkins G. *Crime is not the problem: lethal violence in America*. New York: Oxford University Press; 1997.

14. Graduate Institute of International Studies. *Small arms survey 2002: counting the human cost*. Oxford: Oxford University Press; 2002.

15. Cook PJ, Cukier W, Krause K. The illicit firearms trade in North America. *Criminology & Criminal Justice*. 2009;9(3):265-286.

16. United States Joint Forces Command. *The joint operating environment (JOE) 2008*. Suffolk (VA): United States Joint Forces Command; 2008.

17. Government Accountability Office. *Firearms trafficking: U.S. efforts to combat arms trafficking to Mexico face planning and coordination challenges*. Washington (DC): Government Accountability Office; 2009. Report No.: GAO-09-709.

18. Testimony of William Newell before the Committee on Appropriations, Subcommittee on Commerce, Justice, Science and Related Agencies. United States House of Representatives. Washington (DC). March 24, 2009.

19. Olinger D. Following the guns. *The Denver Post*. 1999 Aug 2. Available from: http://extras.denverpost.com/news/shot0801.htm.

20. Testimony of Robyn Anderson before the Judiciary Committee. Colorado House of Representatives. As quoted by Lautenberg F. *Congressional record-Senate*. February 9, 2000. S555.

21. Bartles L. Gun dealers rejected Columbine killers. *Rocky Mountain News*. 2000 Jan 27. Available from: http://rockymountainnews.com/shooting/0127roby1.shtml.

22. Soraghan M. Owens: Columbine gun buyer no victim. *The Denver Post*. 2000 Jan 29. Available from: http://extras.denverpost.com/news/shotarch1.htm.

23. Olinger D. Only the name has changed. Tanner gun show back with a new moniker. *The Denver Post*. 1999 Jun 6.

24. Olinger D. Teen's gun purchase may have been illegal. Licensed dealer claims sale was private. *The Denver Post*. 1999 Jun 11.

25. Olinger D. Gun dealer surrenders firearms license. *The Denver Post*. 1999 Oct 14. Available from: http://extras.denverpost.com/news/shot1014b.htm.

26. Crowder C. A look inside the gun show world. *Rocky Mountain News*. 2000 Mar 22.

27. Bureau of Alcohol, Tobacco and Firearms. *Following the gun: enforcing federal laws against firearms traffickers*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2000.

28. Braga AA, Kennedy DM. Gun shows and the illegal diversion of firearms. *Georgetown Public Policy Review*. 2000;6:7-24.

29. Testimony of Michael Bouchard before the Committee on the Judiciary, Subcommittee on Crime, Terrorism, and Homeland Security. United States House of Representatives. Washington (DC). February 28, 2006.

30. Scalia J. *Federal firearm offenders, 1992-98*. Washington (DC): Bureau of Justice Statistics; 2000. Report No.: NCJ 180795.

31. Harlow CW. *Firearm use by offenders*. Washington (DC): Bureau of Justice Statistics; 2001. Report No.: NCJ 189369.

32. Zimring FE. Firearms and federal law: the Gun Control Act of 1968. *Journal of Legal Studies*. 1975;4:133-198.

33. Cook PJ, Molliconi S, Cole TB. Regulating gun markets. *Journal of Criminal Law and Criminology*. 1995;86:59-92.

34. Braga AA, Cook PJ, Kennedy DM, et al. The illegal supply of firearms. In: Tonry M, editor. *Crime and justice: a review of research*. Chicago: The University of Chicago Press; 2002. p. 319-352.

35. Newton G, Zimring FE. *Firearms and violence in American life: a staff report submitted to the National Commission on the Cause and Prevention of Violence*. Washington (DC): National Commission on the Causes and Prevention of Violence; 1969.

36. Federal Bureau of Investigation. *National Instant Criminal Background Check System (NICS) operation 2006*. Washington (DC): Federal Bureau of Investigation; 2007.

37. Bureau of Alcohol, Tobacco and Firearms. *Gun shows: Brady checks and crime gun traces*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 1999.

38. United States Code. Title 18, Part 1, Chapter 44, Section 921(a)(21)(C).

39. Montini E. Pursuing honor students more than gangsters. *Arizona Republic*. 2007 Sep 16. Available from: http://www.azcentral.com/arizonarepublic/local/articles/0916montini0916.html.

40. Bureau of Justice Statistics. *Survey of state procedures related to firearm sales, 2005*. Washington (DC): Bureau of Justice Statistics; 2006. Report No.: NCJ 214645.

41. Bureau of Justice Statistics. *Background checks for firearm transfers 2008 - statistical tables*. Washington (DC): Bureau of Justice Statistics; 2009. Report No.: NCJ 227471.

42. Ludwig JA, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *Journal of the American Medical Association*. 2000;284:585-591.

43. Manson D, Gilliard D. *Presale handgun checks, 1996: a national estimate*. Washington (DC): Bureau of Justice Statistics; 1997. Report No.: NCJ-165704.

44. Wintemute GJ, Wright MA, Drake CM, et al. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *Journal of the American Medical Association*. 2001;285:1019-1026.

45. Wright MA, Wintemute GJ, Rivara FA. Effectiveness of denial of hand gun purchase to persons believed to be at high risk for firearm violence. *American Journal of Public Health*. 1999;89:88-90.

46. Blumstein A, Nakamura K. Redemption in the presence of widespread criminal background checks. *Criminology*. 2009;47(2):327-359.

47. Wintemute GJ. Impact of the Brady Act on homicide and suicide rates (letter). *Journal of the American Medical Association*. 2000;284:2719-2720.

48. Webster DW, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. *Journal of Urban Health*. 2009;86:525-537.

49. United States Code. Title 18, Part 1, Chapter 44, Section 922(d).

50. Sugarmann J, Rand K. *More gun dealers than gas stations: a study of federally licensed firearm dealers in America*. Washington (DC): Violence Policy Center; 1992.

51. Bureau of Alcohol, Tobacco and Firearms. *Firearms commerce in the United States, 2001/2002*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2002.

52. Koper CS. Federal legislation and gun markets: How much have recent reforms of the federal firearms licensing system reduced criminal gun suppliers? *Criminology and Public Policy*. 2002;1:151-178.

53. Wachtel J. Sources of crime guns in Los Angeles, California. *Policing: An International Journal of Police Strategies & Management*. 1998;21:220-239.

54. Braga AA, Kennedy DM. The illicit acquisition of firearms by youth and juveniles. *Journal of Criminal Justice*. 2001;29:379-388.

55. Cook PJ, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. *Arizona Law Review*. 2001;43:277-309.

56. Hartocollis A. Officials say gunrunners used cellphone pictures to advertise. *The New York Times*. 2007 Mar 22. Available from: http://www.nytimes.com/2007/03/22/nyregion/22guns.html?pagew.

57. Cook PJ, Ludwig JA, Venkatesh SA, et al. *Underground gun markets*. Cambridge: National Bureau of Economic Research; 2005. Working paper No. 11737.

58. McKinley Jr. JC. U.S. stymied as guns flow to Mexican cartels. *The New York Times*. 2009 April 15. Available from: http://www.nytimes.com/2009/04/15/us/15guns.html?_r=1&scp=1&sq=u.s.%20stymied%20as%20guns%20flow%20to%20Mexican%20cartels&st=cse.

59. U.S. Attorney's Office, Southern District of Texas. Houstonian sentenced to prison for lying to buy guns. Houston (TX): U.S. Attorney's Office, Southern District of Texas; April 17, 2009.

60. Sheley JF, Wright JD. *Gun acquisition and possession in selected juvenile samples*. Washington (DC): National Institute of Justice/Office of Juvenile Justice and Delinquency Prevention; 1993. Report No.: NCJ-145326.

61. Smith MD. Sources of firearm acquisition among a sample of inner-city youths: research results and policy implications. *Journal of Criminal Justice*. 1996;24:361-367.

62. Sorenson SB, Vittes K. Buying a handgun for someone else: firearm dealer willingness to sell. *Injury Prevention*. 2003;9:147-150.

63. Wintemute GJ. Gun shows across a multistate American gun market: observational evidence of the effects of regulatory policies. *Injury Prevention*. 2007;13:150-156.

64. Bureau of Alcohol, Tobacco, Firearms and Explosives. *ATF 2005 annual report*. Washington (DC): Bureau of Alcohol, Tobacco, Firearms and Explosives; 2006. Report No.: 1000.4.

65. Bureau of Alcohol, Tobacco and Firearms. *Commerce in firearms in the United States*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2000.

66. Wintemute GJ, Cook P, Wright MA. Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Injury Prevention*. 2005;11:357-363.

67. National Rifle Association. White House plan nothing new, targets licensed, lawful dealers. 2000 Feb 4. Available from: http://www.nraila.org/News/Read/InTheNews.aspx?ID=538.

68. Bureau of Alcohol, Tobacco and Firearms. *Crime gun trace reports (1999)*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2000.

69. Bureau of Alcohol, Tobacco and Firearms. *Crime gun trace reports (2000)*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2002.

70. Wintemute GJ, Romero MP, Wright MA, et al. The life cycle of crime guns: a description based on guns recovered from young people in California. *Annals of Emergency Medicine*. 2004;43:733-742.

71. KDKA-TV. Police, ATF raid Butler home, remove 500 guns. *KDKA-TV*. 2008 Feb 7. Available from: http://kdka.com/local/Butler.Gun.Raid.2.648818.html.

72. Violence Policy Center. *Gun shows in America: Tupperware parties for criminals*. Washington (DC): Violence Policy Center; 1996.

73. Kimberlin J. Gun sale rules can be easy to avoid. Virginia's gun shows offer weapons to almost any buyer—with few questions asked. *The (Norfolk) Virginian-Pilot*. 2008 Mar 3. Available from: http://www.roanoke.com/news/roanoke/wb/152970.

74. Kelly S. Team 5 Investigates exposes underground gun trade. Weapons easy to get; traffickers go unpunished. *WCVB-TV News (Boston)*. 2008 Feb 1. Available from: http://www.thebostonchannel.com/news/15189840/detail.html?rss=bos&psp=news.

75. Bureau of Alcohol, Tobacco and Firearms. *Operation Snapshot: an analysis of the retail regulated firearms industry*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2000.

76. Hawley C, Solache S. U.S. guns pour into Mexico: arms race among drug cartels, end of ban in America result in flood of high-power weapons over border. *The Arizona Republic*. 2007 Jan 16. Available from: www.azcentral. com/ arizonarepublic/news/articles/0116americanguns 0116.html.

77. Montgomery S. Gunrunner gets six years. *The Gazette (Montreal)*. 2006 May 27. Available from: http://www.canada.com/montrealgazette/news/montreal/story.html?id=66aa79c0-190f-4c46-8c6d-d7759ef42baa&k=60047.

78. Testimony of William Hoover before the Committee on Foreign Affairs, Subcommittee on the Western Hemisphere. United States House of Representatives. Washington (DC). February 7, 2008.

79. Criminal Intelligence Service Canada. *Annual report on organized crime in Canada*. Ottawa (Canada): Criminal Intelligence Service Canada; 2005.

80. Krouse W. Memorandum to Senator Frank Lautenberg: Foreign terrorists and the availability of firearms and black powder in the United States. Washington (DC): Congressional Research Service; May 16, 2003.

81. U.S. Department of Justice. Ten individuals charged in interstate firearms trafficking scheme (news release). Tulsa (OK): U.S. Department of Justice; 2004.

82. Testimony of Michael J. Sullivan before the Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies. United States House of Representatives. Washington (DC). March 28, 2007.

83. U.S. Department of Justice. Operation Flea Collar - Alabama ICE strikes illegal suppliers selling guns at area flea markets (press release). Birmingham (AL): U.S. Department of Justice; 2006.

84. Bureau of Alcohol, Tobacco, Firearms and Explosives. Mesa man sentenced to prison for dealing in hundreds of firearms without a license (press release). Phoenix (AZ): Bureau of Alcohol, Tobacco, Firearms and Explosives; 2006.

85. Bureau of Alcohol, Tobacco, Firearms and Explosives. Five plead guilty to illegal gun trafficking (press release). Columbus (OH): Bureau of Alcohol, Tobacco, Firearms and Explosives; 2006.

86. Bureau of Alcohol, Tobacco, Firearms and Explosives. Female firearm trafficker sentenced to 4 years. Cleveland woman bought firearms and provided them to felons and criminals. Columbus (OH): Bureau of Alcohol, Tobacco, Firearms and Explosives; 2008.

87. U.S. Immigration and Customs Enforcement. Mexican national pleads guilty to smuggling firearms to Mexico. San Antonio (TX): U.S. Immigration and Customs Enforcement; 2008.

88. Testimony of Marcy Forman before the Committee on Appropriations, Subcommittee on Homeland Security. United States House of Representatives. Washington (DC). March 10, 2009.

89. Violence Policy Center. *Indicted: types of firearms and methods of gun trafficking from the United States to Mexico as revealed in U.S. court documents*. Washington (DC): Violence Policy Center; 2009.

90. U.S. Immigration and Customs Enforcement. Mexican national sentenced to 12 years in federal prison for firearms smuggling. San Antonio (TX): U.S. Immigration and Customs Enforcement; 2008.

91. U.S. Immigration and Customs Enforcement. Two men sentenced to federal prison for firearms trafficking. Arms traffickers were part of conspiracy to smuggle weapons into Mexico. El Paso (TX): U.S. Immigration and Customs Enforcement; 2008.

92. Solis D. Dallas-Fort Worth cases highlight weapons trafficking problem. *Dallas Morning News*. 2009 Apr 18. Available from: http://www.dallasnews.com/sharedcontent/dws/news/politics/local/stories/DN-gunsside_17int.ART.State.Edition1.4a8f6ec.html.

93. Legal Community Against Violence. *Regulating guns in America: an evaluation and comparative analysis of federal, state and selected local gun laws*. San Francisco (CA): Legal Community Against Violence; 2008.

94. Office of the Inspector General. *The Bureau of Alcohol, Tobacco, Fire arms and Explosives' investigative operations at gun shows*. Washington (DC): Office of the Inspector General, US Department of Justice; 2007. Report No.: I-2007-007.

95. Hawley C. Feds short of agents to patrol U.S. gun shows. *The Arizona Republic* 2007 Jun 15; Sect. A:8.

96. The National Shooting Sports Foundation; Bureau of Alcohol, Tobacco, Firearms & Explosives. *Don't lie for the other guy*. 2000. Available from: http://www.dontlie.org

97. Testimony of John P. Torres before the Committee on the Judiciary, Subcommittee on Immigration, Refugees and Homeland Security. United States Senate. Washington (DC). May 20, 2009.

98. U.S. Immigration and Customs Enforcement. ATF, ICE update partner ship agreement to maximize investigative efforts (news release). Albuquerque (NM): U.S. Immigration and Customs Enforcement; 2009.