C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs B&L Productions, Inc., California Rifle & Pistol Association, Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, Asian Pacific American Gun Owner Association, Second Amendment Law Center, Inc.

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST; GERALD CLARK; ERIC JOHNSON; CHAD LITTRELL; JAN STEVEN MERSON; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; ASIAN PACIIC AMERICAN GUN OWNERS ASSOCIATION; SECOND AMENDMENT LAW CENTER, INC.; and SECOND AMENDMENT FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROB BONTA, in his official capacity as Attorney General of the State of California; KAREN ROSS, in her official capacity as Secretary of California Department of Food & Agriculture and in his personal capacity; TODD SPITZER, in his official capacity as District Attorney of Orange County; 32nd DISTRICT AGRICULTURAL | **CASE NO.:** 8:22-cv-01518 JWH (JDEx) <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF** <br><br> **(1) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH - POLITICAL];** <br><br> **(2) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH-MIXED POLITICAL/ COMMERCIAL];** <br><br> **(3) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH-COMMERCIAL];** <br><br> **(4) VIOLATION OF 42 U.S.C. § 1983 [PRIOR RESTRAINT ON SPEECH];** <br><br> **(5) VIOLATION OF 42 U.S.C. § 1983 [RIGHT TO ASSEMBLY];** <br><br> **(6) VIOLATION OF 42 U.S.C. § 1983 [EQUAL PROTECTION];** <br><br> **(7) VIOLATION OF 42 U.S.C. § 1983 [SECOND AMENDMENT].** |

1

FIRST AMENDED COMPLAINT

1    ASSOCIATION; DOES 1-10;                    **DEMAND FOR JURY TRIAL**

2                              Defendants.       **NOTICE OF**
                                                 **UNCONSTITUTIONALITY OF**
3                                                **STATE STATUTE**

4    _____           **NOTICE OF RELATED CASE**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

**INTRODUCTION**

1.      Plaintiff B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST has operated popular, safe, heavily regulated, legal, and family-friendly gun shows as a business in California for over 30 years, including at the Orange County Fair & Event Center ("the Fairgrounds").

2.      Crossroads produces gun shows at the Fairgrounds where like-minded individuals gather to engage in commerce related to, and necessary for, the lawful and regulated exercise of Second Amendment rights for themselves, their exhibitors, their patrons, their customers, and the general public. This safe and regulated marketplace promotes public safety, even for people who do not attend gun shows because it will tend to reduce the unregulated transfer of firearms within Orange County. Furthermore, by providing a convenient forum for Californians to exercise their right to acquire firearms locally, gun shows at the Fairgrounds will have the tendency to discourage the sale and importation of firearms from other states with less strict gun laws than California.

3.      Plaintiffs Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., Asian Pacific American Gun Owners Association, and Second Amendment Foundation, Inc., attend and participate in the Crossroads gun show to engage in First Amendment activities that are both necessary and essential to the open, robust, and lawful exercise of their Second Amendment rights. CRPA also has members who attend gun shows and sell ammunition, firearms, and precursor parts.

4.      At the gun show, Plaintiffs associate with like-minded people, participate in public discussions, attend informational forums, distribute and collect information, provide training, make offers for sale, make offers to buy, and engage in legal and political discussions related to the Second Amendment, which are all forms of speech protected by the First Amendment. Discussions include, but are not limited to, firearms and ammunition, firearm technology, firearm safety, and firearm

3

law and politics. Participants also exchange information about where to hunt and where to practice shooting, where and from whom to receive training, gunsmithing, gun repair, gun art, and many other topics that arise from the right to acquire, own, possess, enjoy, and celebrate arms as a quintessentially American artifact with constitutional significance.

5.     Defendants are government actors who, through the adoption and enforcement of Senate Bill 264 (Min), codified at California Penal Code section 27575,[1] and Senate Bill 915 (Min), codified at California Penal Code section 27573,[2] which prohibits the sale of firearms, ammunition, and "firearm precursor parts" at the Fairgrounds and all state owned property respectively, with the intention and effect of shuttering gun show events altogether, have engaged in and will continue to engage in action that violates Plaintiffs' constitutional rights to free speech, assembly, and equal protection. Their actions also constitute prior restraint.

6.     This action seeks declaratory and injunctive relief against Defendants for violating the United States Constitution. It also seeks damages for lost profits, lost opportunities, and diminished marketing value, and reimbursement for reasonable attorney's fees, costs, and other expenses in bringing this action.

## JURISDICTION AND VENUE

7.     The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, thus raising federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress

---

[1] Plaintiffs refer to the challenged law, California Penal Code section 27575, as SB 264 throughout this complaint.
[2] Plaintiffs refer to the challenged law, California Penal Code section 27573, as SB 915 throughout this complaint.

FIRST AMENDED COMPLAINT

8.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the 32nd District Agricultural Association is located within this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

### [Plaintiffs]

10.    Plaintiff B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST, is a for-profit event promoter operating in several western states. Crossroads is in the business of promoting and organizing trade shows throughout the state of California and other western states, including their long-running gun show events held at the Orange County Fair & Event Center ("the Fairgrounds") operated under the d/b/a Crossroads of the West ("Crossroads"). Before the adoption and enforcement of SB 264 and SB 915, Crossroads was the largest vendor of gun show events in California and at the Fairgrounds. Typically, thousands of people attend the gun show on each of the weekends they are held. Crossroads provides the space for these like-minded people to assemble. They have successfully produced and operated multiple safe, legal, and family-friendly gun show events in California and at the Fairgrounds every year for over 30 years. But for Defendants' adoption and enforcement of SB 264 and SB 915, Plaintiff Crossroads would immediately resume producing and promoting gun show events at the Fairgrounds.

11.    Plaintiff GERALD CLARK is a resident of Santa Ana, California, and he is an NRA certified instructor. Before the implementation of SB 264 and SB 915, he regularly attended gun shows at the Fairgrounds to purchase firearms, ammunition, parts for firearms already owned, and materials to help him with his training and as a gun owner to be more proficient. He has taught gun safety and

training courses for 12 years and has taught those courses at the Crossroads gun show at the Fairgrounds as a Chief Range Safety Officer and Certified Trainer. During the training courses, he talks to others about their rights, the importance of membership in the CRPA, and the Second Amendment. SB 264 and SB 915 burden his right to engage in otherwise lawful commercial speech in a public forum and restricts his ability to purchase ammunition, firearms, and parts for lawful purposes. And because the ban is intended to make gun shows less profitable and effectively shutter them, it also restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show. But for Defendants' adoption and enforcement of SB 264 and SB 915, Plaintiff Clark would continue attending and participating in the Crossroads gun show events at the Fairgrounds.

12.    Plaintiff ERIC JOHNSON is a resident of Whittier, California, and he is a Certified Trainer, Range Safety Expert, retired coach, and Chief Range Safety Officer. Before the implementation of SB 264 and SB 915, he regularly attended gun shows at the Fairgrounds to purchase firearms, ammunition reloading supplies, ammunition, parts for the firearms he owns, materials for caring for his firearms, and much more. Plaintiff Johnson also attended the Crossroads gun show at the Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting sports, politics, and the Second Amendment. He regularly sets up and works the CRPA booths at gun shows. SB 264 and SB 915 burden his right to engage in otherwise lawful commercial speech in a public forum and restricts his ability to purchase ammunition, firearms, and parts for lawful purposes. And because the ban is intended to make gun shows less profitable and effectively shutter them, it also restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show. But for Defendants' adoption and enforcement of SB 264 and SB 915, Plaintiff Johnson would continue attending

FIRST AMENDED COMPLAINT

and participating in the Crossroads gun show events at the Fairgrounds.

13.   Plaintiff CHAD LITTRELL is a resident of La Habra, CA and owns Vytamenc 22 Tactical. Before the implementation of SB 264 and SB 915, his company was a regular vendor at the Crossroads gun shows at the Fairgrounds. At these events, he would sell uppers, precursor parts and AR-15 rifles and discuss issues regarding firearms, ammunition, and gun safety with customers of the gun show. Plaintiff Littrell also attended the Crossroads gun show at the Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting sports, politics, and the Second Amendment. SB 264 and SB 915 burden his right to engage in otherwise lawful commercial speech in a public forum and restricts his ability to purchase ammunition, firearms, and parts for lawful purposes. And because the ban is intended to make gun shows less profitable and effectively shutter them, it also restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show. Because of the essential shutting down of gun shows at the Fairgrounds, Plaintiff Littrell had to close his business. But for Defendants' adoption and enforcement of SB 264 and SB 915, Plaintiff Clark would re-open his business and continue attending and participating in the Crossroads gun show events at the Fairgrounds.

14.   Plaintiff JAN STEVEN MERSON is a resident of Fullerton, California, and he owns Merson's Machining Tool Making and Gunsmithing. Before the implementation of SB 264 and SB 915, his company (then known as Merson's Custom Tooling & Gunsmith) was a regular vendor at the Crossroads gun shows at the Fairgrounds. At these events, he would sell "firearm precursor parts"—which are legal products in California and are not considered firearms by legal definition. Plaintiff Merson also attended the Crossroads gun show at the Fairgrounds to engage in expressive activities with like-minded people, including discussions related to firearms, ammunition, and firearm accessories, the shooting sports, politics, and the

FIRST AMENDED COMPLAINT

Second Amendment. SB 264 and SB 915 burden his right to engage in otherwise lawful commercial speech in a public forum and restricts his ability to purchase ammunition, firearms, and parts for lawful purposes. And because the ban is intended to make gun shows less profitable and effectively shutter them, it also restricts his right to engage in the unique types of political, educational, and commercial speech that takes place at the gun show. But for Defendants' adoption and enforcement of SB 264 and SB 915, Plaintiff Merson would continue attending and participating in the Crossroads gun show events at the Fairgrounds.

15.     Plaintiff ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION ("APAGOA") is a nonprofit organization incorporated under the laws of Texas and registered with the California Secretary of State to do business in the state of California. APAGOA is a community of gun owners with an Asian Pacific American ("APA") heritage. It's core focus is to promote safe and responsible gun ownership within the APA community by providing educational materials and other resources to its members and other interested parties. APAGOA advocates for firearm safety, education, and community-building initiatives. And it strives to educate and empower the APA gun owner community so they can use their firearms safely and responsibly. It brings this action on behalf of its approximately 270 members and supporters who reside in California and, but for the implementation of SB 264 and SB 915, would attend and participate in the Crossroads gun show events at the Fairgrounds.

16.     Plaintiff CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED ("CRPA") is a nonprofit membership organization incorporated under the laws of California, with headquarters in Fullerton, California. Among its other activities, CRPA works to preserve and expand constitutional and statutory rights of gun ownership, including the right to self-defense and the right to keep and bear arms. CRPA accomplishes this through its educational offerings, publications, member engagement events, and legislative advocacy and initiatives. CRPA has

8

FIRST AMENDED COMPLAINT

1  individual members and business affiliates that attend gun shows. Before the
2  implementation of SB 264 and SB 915, CRPA and many of its members were
3  regular vendors at the Crossroads gun shows at the Fairgrounds, where they engaged
4  the public in discussions about the organization and its purposes, the shooting sports,
5  firearms and firearm safety, and the Second Amendment and other political issues.
6  CRPA and its members also attended gun shows at the Fairgrounds to sell
7  organization memberships, advertise its events, distribute its publications, and sell
8  its merchandise, some of which includes expressly pro-gun messaging. Members of
9  CRPA would attend to advertise events, distribute publications, sell merchandise,
10 ammunition, and firearms, some of which includes expressly pro-gun messaging.
11 CRPA has also hosted political rallies, educational seminars, and range safety
12 officer training at gun shows throughout the state, including those at the
13 Fairgrounds. CRPA members and other gun enthusiasts attended these political
14 rallies.  CRPA has tens of thousands of members and supporters, many of whom
15 attended the Crossroads gun shows at the Fairgrounds to engage in expressive
16 activities with like-minded people, including discussions related to firearms,
17 ammunition, and firearm accessories, the shooting sports, politics, and the Second
18 Amendment. SB 264 and SB 915 directly burden the right of CRPA, its officers,
19 employees, volunteers, members, and supporters, to engage in otherwise lawful
20 commercial speech in a public forum and to access firearms, ammunition, and parts
21 for lawful purposes. And because the ban on sales of firearms, ammunition, and
22 parts is intended to make gun shows less profitable and effectively shutter them, it
23 restricts the right of CRPA, its officers, employees, volunteers, members, and
24 supporters, to engage in the unique types of political, educational, and commercial
25 speech that takes place at the gun show. But for Defendants' adoption and
26 enforcement of SB 264 and SB 915, Plaintiff CRPA would continue attending and
27 participating in the Crossroads gun show events at the Fairgrounds. Through this
28 lawsuit, CRPA represents not only its own interests as a gun show vendor, but also

FIRST AMENDED COMPLAINT

the interests of its members as gun show vendors and attendees and supporters of the right to keep and bear arms for lawful purposes.

17. Plaintiff SECOND AMENDMENT LAW CENTER, INC. ("2ALC"), is a nonprofit organization, incorporated under the laws of Nevada with headquarters in Henderson, Nevada, and registered with the California Secretary of State to do business in the state of California. 2ALC works to advance Second Amendment jurisprudence across the country while educating the public, participating in scholarly research, and providing thought-provoking writings and content to help advance the Second Amendment. 2LC works to support and protect Second Amendment rights across the country, and they distribute materials at gun shows in California to inform the public about their work. Because the ban on sales of firearms and ammunition at the Fairgrounds is intended to make gun shows less profitable and effectively shutter them, it restricts the rights of 2ALC to share education and training materials with gun owners and those that attend gun show events. In this lawsuit, 2ALC represents its interests as a gun show attendee and purveyor of educational materials.

18. Plaintiff SECOND AMENDMENT FOUNDATION, INC. ("SAF") is a non-profit membership organization. It is incorporated under the laws of the state of Washington and was founded in 1974. SAF has over 700,000 members and supporters nationwide, including thousands of members in California. The purposes of SAF include education, research, publishing, and litigation. It is critical to the success of SAF that its promotional material, publications, and messages about the "right to keep and bear arms" reach demographic groups that are saturated with gun owners, gun buyers, and people of the "gun culture." Gun Shows like the one threatened by the Defendants' actions interfere with this effort. SAF is dedicated to promoting a better understanding about our constitutional heritage to privately own and possess firearms through educational and legal action programs designed to better inform the public about gun control issues. SAF has been a pioneer in

10

FIRST AMENDED COMPLAINT

1   innovative defense of the right to keep and bear arms, through its publications and

2   public education programs like the Gun Rights Policy Conference. Those

3   publications and other SAF materials and information are offered at gun show

4   events. Second Amendment Foundation also expends significant sums of money

5   sponsoring public interest litigation to defend its own interests to disseminate

6   information to like-minded individuals, in an individualized setting like a gun show,

7   but SAF also seeks to defend the interests of its member in lawsuits like this present

8   effort.

9   **[Defendants]**

10      19.   Defendant GAVIN NEWSOM is the Governor of the State of

11  California. As Governor, he is vested with "the supreme executive power" of the

12  state and "shall see that the law is faithfully executed." Cal. Const. art. 5, §1.

13  Defendant Newsom is sued in his official capacity.

14      20.   Defendant ROB BONTA is the Attorney General of the State of

15  California. He is the "chief law officer" of the state and has the duty to 'see that the

16  laws of the State are uniformly and adequately enforced." Cal. Const. art. 5, § 1.

17  Additionally, Defendant Bonta has "direct supervision over every district attorney"

18  within the State. *Id.* If, at any point a district attorney of the State fails to enforce

19  adequately "any law of the State," Defendant Bonta must "prosecute any violations

20  of the law." *Id.* Finally, Defendant Bonta, as Attorney General of the State of

21  California, "shall assist any district attorney in the discharge" of duties when

22  "required by the public interest or directed by the Governor. . . ." *Id.* Defendant

23  Bonta is sued in his official capacity.

24      21.   Defendant TODD SPITZER is the District Attorney responsible for

25  enforcing the law within the county of Orange. Under the California Government

26  Code, the district attorney must prosecute "all actions for the recovery" of fines and

27  penalties. Cal. Gov't Code § 26521. Defendant Spitzer is sued in his official

28  capacity.

FIRST AMENDED COMPLAINT

22.     Defendant KAREN ROSS is the Secretary of the California Department of Food & Agriculture—the entity responsible for the policy oversight of the network of California fair venues, which includes the Orange County Fair & Event Center. Through the Department, Defendant Ross issues guidance for governance and contracting to all agricultural districts throughout California (including Defendant District) and requires reporting from the districts on operational issues. The Department maintains an office of legal counsel for any actions brought against Agricultural Association Districts in the state. Defendant Ross is sued in her official capacity.

23.     Defendant 32nd DISTRICT AGRICULTURAL ASSOCIATION ("District") is a Governor-appointed Board of Directors that manages the state-owned Orange County Fair & Event Center public venue. The District is governed by a nine-member board, each member serving a four-year term. The District Board of Directors appoints a CEO charged with the daily operations of the facilities but maintains control over activities not delegated to the CEO, including contracting with those seeking to host events, including gun shows, at the Fairgrounds. It is responsible for ensuring that all state laws governing gun shows at the Fairgrounds, including SB 264 and SB 915, are faithfully enforced. Defendant District refused to consider contracts for the gun show by refusing to place the question of contract approval on monthly meeting agendas when considering other similar contracts.

24.     The true names and capacities of Defendants named as DOES 1 through 10, inclusive, are individual, corporate, associate or otherwise, and are unknown to Plaintiffs. They are, however, believed to be responsible in some way for Plaintiffs' loss and damages. Each Doe Defendant is, and at all times mentioned here was, a partner, agent, principal, co-conspirator, or are otherwise vicariously or directly responsible for the acts or omissions of the other defendants or themselves. They are each sued individually and are joined as party defendants. Plaintiffs thus sue each Doe Defendant under rules 15 and 21 of the Federal Rules of Civil

FIRST AMENDED COMPLAINT

Procedure. Plaintiffs are informed and believed that the Doe Defendants are all California residents. Plaintiffs will amend this complaint to show such true names and capacities of Doe Defendants when they have been ascertained.

**FACTUAL ALLEGATIONS**

**[The First Amendment Rights to Free Speech, Association, & Assembly]**

25.     The First Amendment provides, in part, that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I. It is incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. § 1983.

26.     Political and ideological speech—including speech concerning "politics, nationalism, religion, or other matters of opinion"—has long been considered the core of the First Amendment. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

27.     Public property made available for lease by community groups to engage in expressive activity must thus be available without regard to the viewpoint sought to be expressed *Cinevision Corp. v. City of Burbank*, 745 F.2d 560 (9th Cir. 1984). Such venues cannot be opened to some and closed to others, suppressing protected expression, absent a compelling government interest. *Id.* at 571.

28.     The First Amendment does not tolerate the suppression of speech based on what some may label an unpopular viewpoint of the speaker. *John J. Hurley and S. Boston Allied War Vets. Council v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995). Indeed, "*above all else*, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95 (emphasis added); *see also Ashcroft*, 535 U.S. at 573.

29.     A content-based restriction that implicates political or ideological speech must generally survive "strict scrutiny," where the government must show that the law is narrowly tailored to achieve a compelling government interest. *See*

13

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (holding that tobacco marketing restrictions – even those purposed to protecting minors -- must be the narrowest means of achieving an asserted state interest); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011) (overturing California law banning sale or rental of "violent video games" to minors); *see also Tracy Rifle & Pistol LLC v. Harris*, 339 F. Supp. 3d 1007, 1018 (E.D. Cal. 2018) (holding that a California law prohibiting the display of a handgun, an imitation handgun, or a placard advertising the sale of a handgun in a manner that is visible from the outside of a gun dealer's premises is unconstitutional).

30.     Even purely commercial speech—speech that "does no more than propose a commercial transaction" or relates solely to the economic interests of the speaker and audience—receives First Amendment protection if it is not misleading and concerns a lawful activity. *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980).

31.     "An offer to sell firearms or ammunition" is constitutionally protected commercial speech. *Nordyke v. Santa Clara*, 110 F.3d 707, 710 (9th Cir. 2009).

32.     Government restrictions on protected commercial speech are constitutional *only* if they directly advance a substantial government interest and are not broader than necessary to serve that interest. *Cent. Hudson*, 447 U.S. 557.[3]

33.     The First Amendment protects not only the right of free speech, but also "the right of the people peaceably to assemble." U.S. Const., amend. I. The right to assemble often merges with the right to free expression. For "[e]ffective

---

[3] Though this is currently the controlling test for so-called "commercial speech," modern case law is trending toward extending ***full*** First Amendment protection to all speech, including "commercial speech." *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (moving toward providing commercial speech the same level of heightened protection long accorded to political speech); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 523 (1996) (Thomas, J., concurring in part and concurring in judgment) ("I do not see a philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech. Indeed, some historical materials suggest to the contrary.").

FIRST AMENDED COMPLAINT

advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Patterson*, 357 U.S. 449, 462 (1958). "Governmental action which may have the effect of curtailing the freedom to associate is subject to the *closest* scrutiny." *Id.* at 461-62.

**[The Second Amendment Right to Keep and Bear Arms Under the Law]**

34.     The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II.

35.     The Second Amendment protects a fundamental, individual right that applies against both the federal government and the states. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

36.     The Supreme Court recently confirmed that Second Amendment questions are to be analyzed in light of "text, history, tradition." "Ehen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, --U.S.--, 142 S. Ct. 2111, 2126 (2022) (citing *Heller*, 554 U.S. at 634).

37.     The Second Amendment protects the right to possess and use arms that are "typically possessed by law-abiding citizens for lawful purposes." *See, e.g., Heller*, 554 U.S. at 624-25; *See also Caetano v. Massachusetts*, 577 U.S. 411, 136 S. Ct. 1027, 1027-28 (2016). That protection "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 544 U.S. at 582. It also includes the ammunition necessary to use firearms for their core lawful purposes. *See Jackson v. City & Cnty. of San Francisco*, 746 F.3d at 967-68 (recognizing that "without bullets, the right to bear arms would be meaningless.").

38.    Finally, the Second Amendment protects the corresponding right to obtain protected firearms and ammunition. See id at 967 ("'[T]he right to possess firearms for protection implies a corresponding right' to obtain bullets necessary to use them."); *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (holding that the right to possess firearms implies a corresponding right to access firing ranges to train to be proficient with such firearms).

**[The Fourteenth Amendment Right to Equal Protection Under the Law]**

39.    The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

40.    Singling out speakers because of the content of their speech also violates their fundamental rights under the Equal Protection Clause. U.S. Const. amend. XIV.

41.    If unequal treatment occurs in the context of exercising a fundamental right, or the government is motivated by animus toward a disfavored group, courts apply heighted scrutiny. *See Loving v. Virginia*, 388 U.S. 1, 11 (1967); *see also Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985); *Romer v. Evans*, 517 U.S. 620 (1996). Indeed, "[b]ecause the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest." *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 666 (1990), *rev'd on other grounds*, *Citzs. United v. Fed. Elec. Comm'n*, 558 U.S. 310, 130 S. Ct. 876 (2010).

**[Regulation of Gun Show Events in California]**

42.    The state of California has the most rigorous regulatory regime for commerce in firearms and ammunition in the United States. That regulatory regime applies to the operation of gun show events throughout California. The laws related to the acquisition and sale of firearms are arguably stricter at gun shows than at brick-and-mortar stores or internet sales.

FIRST AMENDED COMPLAINT

43.   Only state approved, licensed gun show producers may operate gun shows in California.

44.   All gun show producers, including Plaintiff Crossroads, must have an individual (the "promoter") who holds a valid Certificate of Eligibility issued by the California Department of Justice.

45.   Gun show producers must also, among other things:

    a.   Certify that they are familiar with all California laws regarding gun shows, Cal. Penal Code § 27200;

    b.   Possess a minimum of $1,000,000 liability insurance, *id.*;

    c.   Provide an annual list of shows or events to be held to the California Department of Justice, *id.*; and

    d.   Notify the California Department of Justice no later than 30 days prior to the gun show or event of any changes to the above, *id.*

    e.   Make available to law enforcement a complete and accurate list of all vendors that will participate in the show to sell, lease, or transfer firearms. Cal. Penal Code § 27205.

46.   Gun show producers must submit an annual event and security plan and schedule to the California Department of Justice and any local law enforcement agency. The plan must include:

    a.   Type of show or event;

    b.   Estimated number of vendors offering for sale or display firearms;

    c.   Estimated number of attendees;

    d.   Number of entrances and exits at the event;

    e.   Location, dates, and times of the event;

    f.   Contact person and telephone number for both promoter and facility;

    g.   Number of sworn peace officers employed by the producer or

17

facility who will be present at the event;

    h.    Number of non-sworn security personnel employed by the producer or the facility who will be present at the event; and

    i.    Promoters must inform all prospective vendors of all California laws regarding gun shows.

Cal. Penal Code §§ 27210, 27215.

47.    Gun show producers must also provide a list of all prospective vendors and designated firearm transfer agents who are licensed firearm dealers to the California Department of Justice no later than seven days prior to the event for the purpose of determining whether the vendor possess a valid license and are thus eligible to participate in the event. Cal. Penal Code § 27220.

48.    If a vendor is not approved by the California Department of Justice or fails to comply with all applicable California laws, they cannot participate. Cal. Penal Code § 27220.

49.    If a gun show producers fails to inform all prospective vendors of California's state laws or fails to submit a list of all prospective vendors to the California Department of Justice, the event cannot commence. Cal. Penal Code § 27230.

50.    Gun show producers must have written contracts with each vendor selling firearms at the event. Cal. Penal Code § 27235.

51.    Gun show producers must post signs in a readily visible location at each public entrance to the event that includes all of the following notices:

- "This gun show follows all federal, state, and local firearms and weapons laws, without exception."
- "Any firearm carried onto the premises by any member of the public will be checked, cleared of any ammunition, and secured in a manner that prevents it from being operated, and an identification tag or sticker will be attached to the firearm before the person is allowed admittance

18

FIRST AMENDED COMPLAINT

to the show."

- "No member of the public under the age of 18 years shall be admitted to the show unless accompanied by a parent, grandparent, or legal guardian."

- "All firearm transfers between private parties at the show shall be conducted through a licensed dealer in accordance with applicable state and federal laws."

- "Persons possessing firearms in this facility must have in their immediate possession government-issued photo identification and display it upon the request to any security officer or any peace officer, as defined in Section 830."

Cal. Penal Code § 27240(a).

52.    Gun show producers must also post signs in a readily visible location at each entrance to the parking lot stating: "The transfer of firearms on the parking lot of this facility is a crime." Cal. Penal Code § 27240(b).

53.    A willful failure of a producer to comply with any of California's applicable laws is a misdemeanor punishable with a fine of up to $2,000 dollars and would render the producer ineligible for a gun show producer license for up to one year, which could cost a producer hundreds of thousands of dollars in lost revenue for a willful infraction. Cal. Penal Code § 272459(c).

54.    Except in very limited exceptions applicable only to law enforcement, actual firearm transfers are already prohibited from taking place at any gun show in California.[4] The firearm sale can be started through an on-site licensed "transfer

---

[4] Cal. Penal Code § 27310 (requiring all firearm transfers at gun shows to comply with state and federal law); *id.* § 26805 (prohibiting the sale and transfer of a firearm by a licensed dealer at any location other than the dealer's premises as listed on their license but allowing dealer to prepare documents at a gun show in preparation for completion of the sale at the dealer's premises); *id.* § 27545 (requiring all firearm transactions to be processed through a licensed dealer when neither party is a licensed firearm dealer).

FIRST AMENDED COMPLAINT

dealer," but it cannot be completed on site. Instead, purchasers must pick up their purchase at a licensed firearm retailer at a different licensed location--but only after a 10-day waiting period and background check. There is no "Gun Show Loophole" at gun shows operated in accordance with California Law.

55.    The Gun Show Act of 2000, California Penal Code sections 27200-27245, places even more restrictions on the operation of a gun show in California by requiring that:

a.    Vendors do not display, possess, or offer for sale any firearms, knives, or weapons for which possession or sale is prohibited;

b.    Vendors acknowledge that they are responsible for knowing and complying with all applicable federal, state, and local laws dealing with the possession and transfer of firearms;

c.    Vendors will not engage in activities that incite or encourage hate crimes;

d.    Vendors will process all transfers of firearms through licensed firearms dealers as required by state law;

e.    Vendors will verify that all firearms in their possession will be unloaded and that the firearms will be secured in a manner that prevents them from being operated except for brief periods, when the mechanical condition of the firearm is being demonstrated to prospective buyer;

f.    Vendors provide all required information under Penal Code § 27320;

g.    Vendors will not display or possess black powder or offer it for sale;

h.    Ammunition only be displayed in closed original factory boxes or other closed containers, with the only exception for showing the ammunition to a prospective buyer. On July 1, 2019,

FIRST AMENDED COMPLAINT

1           additional state-law restrictions on the sale of ammunition will

2           become effective and gun shows must comply;

3       i.    No member of the public under 18 years old may enter a gun

4           show unless accompanied by a parent or legal guardian;

5       j.    No person other than security personnel or law enforcement

6           possess both a firearm and ammunition for that firearm at the

7           same time, with the exception of vendors who are selling both.

8     56.    Plaintiff Crossroads diligently operates all of its gun shows in

9 accordance with state law, and it takes immediate remedial measures if irregularities

10 are discovered.

11     57.    Vendors at Crossroads gun shows are some of the same licensed

12 vendors that have brick and mortar stores in the community or operate legally over

13 the internet and are registered with the state as lawful businesses.

14     58.    Vendors at Crossroads gun shows sell legal products and enjoy being

15 able to attend gun shows so they can better interact with customers in a more

16 meaningful and intimate way.

17     59.    Even with all of the state and federal regulations that promoters and

18 vendors must abide, through the adoption and enforcement of SB 264 and SB 915,

19 Defendants now seek to wholly prohibit constitutionally protected, highly regulated,

20 and otherwise perfectly legal activity.

21                  **[The Gun Show Cultural Experience]**

22     60.    Gun shows are a modern bazaar—a convention of like-minded

23 individuals who meet in this unique public forum that has been set aside by state and

24 local governments for all manner of commerce. This convention-like setting is of

25 incalculable benefit to the gun-buying consumer and promotes public safety.

26     61.    Gun shows, in general, and the Orange County show, in particular, are

27 a celebration of America's "gun culture" that is a natural and essential outgrowth of

28 the constitutional rights that flow from the Second Amendment to the United States

Constitution.

62.     Gun shows, in general, and the Orange County show, in particular, are a First Amendment forum where literature and information are shared, speakers provide valuable lectures, classes are conducted, political forums are held where gun rights discussions take place, and candidates for political office can meet to discuss political issues, the government, and the constitution with constituents who are part of the California gun culture.

63.     Thousands of people attend gun shows on the weekends they are held at the Fairgrounds. Many attend as new gun owners seeking information and instruction. With over 1 million new gun owners in California in the past year, gun shows offer the opportunity for these new gun owners to learn about firearms, safety, and speak to expert firearm enthusiasts.

64.     Gun shows place a huge emphasis on safety as citizens come together. Gun shows are designed to offer a communal atmosphere of like-minded people that one does not find in a store where people are running in to pick up one or two items. Gun shows are designed so that people will congregate, take their time, engage each other and the vendors, and learn in a way that they do not otherwise engage.

65.     Gun shows also happen to include the exchange of products and ideas, knowledge, services, education, entertainment, and recreation related to the lawful uses of firearms. Those lawful uses include (but are not limited to): firearm safety training; defense of self and others; defense community, state, and nation; hunting; target shooting; gunsmithing; admiration of guns as art; appreciation of guns as technological artifacts; and the study of guns as historical objects.

66.     Gun shows, in general, and the Orange County show, in particular, are cultural marketplaces for those members of the "gun culture" who attend to celebrate their constitutional rights and to pass their beliefs in patriotism and the rights of the individual on to the next generation. It is a place where parents take

FIRST AMENDED COMPLAINT

their children and grandparents take their grandchildren to share with them, among other things, a love of historic firearms, stories of American war heroes, and their love of hunting.

67.    Gun shows, in general, and the Orange County show, in particular, are places where parents can learn to protect their families and their homes, and how to stay in compliance with California's ever-changing gun laws.

68.    Gun shows, in general, and the Orange County show, in particular, are places where people can discuss the positions of political candidates and whether those values line up with their own beliefs in protecting the Second Amendment.

69.    Gun shows, in general, and the Orange County show, in particular, are held and promoted, and considerable investment is made, precisely to promote and "normalize" the "gun culture" and the constitutional principles that gun show participants hold dear.

70.    This forum is vitally important especially in California where government actors at all levels of government (federal, state, and local) are openly hostile to the cultural values of the Second Amendment and where supporters of those cultural values are not considered "mainstream."

71.    Participating in "gun culture" is an important reason people attend Crossroads gun shows as vendors, exhibitors, customers, and guests (even if particular vendors or attendees are not in the firearm business or in the market to buy a gun at a particular event).

72.    While less than 40% of vendors at Crossroads' events offer firearms or ammunition for sale (the remaining vendors offer accessories, collectibles, home goods, lifestyle products, educational information, food, and other refreshments), the principle draw of gun shows is the availability of firearms, ammunition, and firearm parts and accessories for sale, as well as the ability to handle and inspect firearms while in the presence of knowledgeable vendors.

73.    Indeed, many people attend gun shows to learn about the technology

23

and use of various firearms and ammunition when they are considering whether to buy or sell a firearm and to exchange knowledge with experienced dealers and firearm enthusiasts that they cannot get anywhere else. *Teixeira v. County of Alameda*, No. 13-17132 (9th Cir. 2017).[5]

74.     Without the ability to buy and sell firearms and ammunition at gun shows at the Fairgrounds, the events will no longer be able to draw many of its vendors and attendees, making the events unprofitable and economically infeasible. When events are no longer profitable, producers and vendors cannot afford to attend and host the shows or maintain the speech components of gun show.

75.     Defendants wish to end this celebration of "gun culture" and Second Amendment rights because they do not understand the culture or the people. To that end, Defendants have attempted, through SB 264 and SB 915's bans on sales of firearms, ammunition, and "firearm precursor parts" at the Fairgrounds, to permanently deprive Plaintiffs of their right to engage in constitutionally protected conduct at the Fairgrounds.

### [The Orange County Fair & Event Center]

76.     The Fairgrounds is owned by the state of California and managed by the Board of Directors of Defendant District, which must regularly report its activities to the California Department of Food & Agriculture.

77.     Among other things, Defendant District is charged with maintaining the Fairgrounds and ensuring that is used for public purposes.

78.     Defendant Ross, as the Secretary of the California Department of Food & Agriculture, oversees the operation of the various agricultural districts in the state, including Defendant District.

79.     The California Department of Food & Agriculture, under Secretary

---

[5] The *Teixeira* court did not answer whether the Second Amendment includes a right to purchase a firearm. Plaintiffs allege, in good faith, that the right to keep and bear arms *necessarily* includes the rights to purchase and sell them. Indeed, those rights are a necessary predicate to the exercise of the Second Amendment.

Ross, provides policies and guidance for the operation of all agricultural districts in the state, including the use of facilities as directed by Department policy.

80.     The California Department of Food & Agriculture maintains a *CDFA Contracts Manual for Agricultural Districts* ("Manual"). Section 6.25 of the Manual states that "[w]hether or not a fair rents out their facilities for gun shows is a policy decision to be made by the fair board and their community."

81.     The Fairgrounds is a state-owned property maintained and opened for use by the public. By virtue of being opened by the state for use by the public, it is a "public forum," from which the government may not generally exclude expressive activity. *Cinevision*, 745 F.2d at 569 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Assn*, 460 U.S. 37, 45-46 (1983)).

82.     The Fairgrounds is used by many different groups and is a major event venue for large gatherings of people to engage in expressive activities, including concerts, festivals, and industry shows. Indeed, "OC Fair & Event Center is a 150-acre event venue that hosts over 150 events and attracts approximately 4.3 million visitors annually. [Its] versatile multi-use property can be transformed to fit a variety of events from small private events to large-scale trade shows and festivals." OC Fair & Event Center, Event Space Sales, https://ocfair.com/venue-rentals/venue-options/rental-property-brochure/ (last visited Aug. 4, 2022) (attached as Exhibit 1).

83.     The Fairgrounds actively promotes the use of the property by the public through contracting for available space at the Fairgrounds. *Id.*; *see also* OC Fair & Event Center, Venue Rentals, https://ocfair.com/venue-rentals/ (last visited Aug. 4, 2022).

84.     The Fairgrounds' Board of Directors Governing Manual states that Defendant District's purpose is "(1) to hold fairs, expositions and exhibitions in Orange County to exhibit the industries and industrial enterprises, resources, and products of every kind or nature of the state, with a view toward improving, exploiting, encouraging, and stimulating them; and (2) to construct, maintain, and

25

1  operate recreational and cultural facilities of general public interest in Orange

2  County. The 32nd DAA has adopted a mission statement to effectuate these

3  purposes, which is the celebration of Orange County's communities, interests,

4  agriculture and heritage." 32nd District Agricultural District, *Board of Directors*

5  *Governing Manual*, Introduction at 1, *available at* https://s3.us-west-

6  1.amazonaws.com/ocfair.com/wp-content/uploads/2021/02/02141413/Policy-

7  Combo-All.pdf  (last visited Aug. 4, 2022).

8        85.    The Fairgrounds has held non-gun-show events in which criminal

9  activity has taken place. These criminal incidents are no more likely to happen at a

10  gun show than at other types of events, but the Defendants have not banned these

11  promoters or their events.

12                    **[Contracting for Use of the Fairgrounds]**

13        86.    Defendant District has a process, as do most of the state fairgrounds,

14  for securing returning contractors who would like to secure specific dates into future

15  years before the contracts can be drafted and executed.

16        87.    Each year, returning and regular contractors, including Plaintiff

17  Crossroads, submit preferred dates for the next calendar year, so Defendant District

18  can confirm availability and so that Plaintiff Crossroads can begin to reserve

19  vendors and materials for the show weekends.

20        88.    Due to the size and extensive planning that goes into producing gun

21  show events, Defendant District has—for decades—provided and held preferred

22  dates for Plaintiff Crossroads, a long-time contractor, until the contracts can fully be

23  executed.

24        89.    Defendant District's "hold" system essentially operates as a right of

25  first refusal to the benefit of returning contractors. For example, if another contractor

26  wanted the same preferred dates as Plaintiff Crossroads, Defendant District would

27  not allow another vendor to come in and take those dates from Plaintiff Crossroads

28  even though there is no official contract in place yet.

FIRST AMENDED COMPLAINT

90.     The "hold" system also provides Defendant District with the security of knowing its venue is booked with experienced and knowledgeable repeat contractors that have a demonstrated record of running safe and profitable events at the Fairgrounds.

91.     The "hold" system also permits the promoter to spend advertising dollars to promote its events, but when governments announce plans to ban gun shows at particular venues, vendors and patrons rationally make plans to attend gun show events at other venues or seek other states to conduct their commerce.

92.     Defendant District also considers the "hold" dates and shows during budget discussions which are typically held in the year before the contracts are commenced.

93.     Upon information and belief, Plaintiffs allege that the "hold" system is widely used by similar state fair board venues and is standard industry practice.

94.     Plaintiff Crossroads, after doing business in this customary manner for more than 30 years, had no reason to doubt that Defendant District would continue to honor such relationship with Plaintiff Crossroads.

**[Ban on Gun Shows at Other Fairgrounds & Resulting Litigation]**

95.      Despite the long history that Plaintiff Crossroads has had in California, operating safe and legal events, the political environment has become hostile toward gun show events and (more generally) toward the "gun culture" in recent years.

96.     Indeed, gun-show-banning activists are at work throughout the state and the country to ban *all* gun shows *everywhere*, not because they are "dangerous for the community," but because they do not subscribe to the same values as gun show promoters, vendors, and participants.

97.     With increasing regularity, the same activists are making appearances on Zoom board meetings held by fair boards across the state, and during each appearance, they make the same claims in order to shut down lawful gun shows.

98.     These activists rely on unfounded fears about the security of gun show

27

FIRST AMENDED COMPLAINT

events, false claims that gun shows are inherently dangerous because they normalize the "gun culture," and peddle in false stereotypes about the people that attend gun shows. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) (striking an ordinance requiring a special permit for a group home for the intellectually disabled and citing direct evidence of negative attitudes toward persons with disabilities expressed by community members and recorded in the legislative history).

99.    In 2017, gun-show-banning activists using the same tactics described above began pressuring the 22nd District Agricultural Association ("22nd DAA"), which manages the Del Mar Fairgrounds in San Diego, to prohibit gun show events at the Del Mar Fairgrounds. In response, the 22nd DAA began a series of meetings and comment periods to determine whether it would continue to contract with Plaintiff Crossroads or other gun show producers for the use of the Del Mar Fairgrounds to host gun show events.

100.    The 22nd DAA also engaged in communications with other government agencies and with Crossroads to determine whether gun shows at the Fairgrounds were operated in full compliance with state and federal law, and if the events pose any real danger to the community.

101.    On April 23, 2018, Defendant Newsom sent a letter to the 22nd DAA, urging the Board to ban gun shows at the Fairgrounds, citing his concerns that "[p]ermitting the sale of firearms and ammunition on state-owned property only perpetuates America's gun culture." Letter from Governor Gavin Newsom to Board Members of 22nd District Agricultural Association (April 23, 2018) (attached as Exhibit 2).

102.    On September 10, 2018, Assemblymember Todd Gloria (D) sent a letter to the 22nd DAA, stating his "firm belief that the State of California should in no way help to facilitate the sale of firearms." He also expressed his support for the 22nd DAA "willingness to consider options for limiting or eliminating these gun

28

FIRST AMENDED COMPLAINT

shows" and vowed to "act by way of legislation should the 22nd DAA Board be unable to take meaningful action." Letter from Assemblymember Todd Gloria to Board Members of 22nd District Agricultural Association (Sept. 10, 2018) (attached as Exhibit 3).

103.   At a public hearing on September 11, 2018, a fair board ad hoc "Contracts Committee" recommended that the 22nd DAA "not consider any contracts with the producers of gun shows beyond December 31st, 2018, until such time as the [22nd DAA] has put into place a more thorough policy regarding the conduct of gun shows."

104.   In testimony before the 22nd DAA at the September 11, 2018 hearing, Patrick Kerins, who was then the Public Safety Director for the 22nd DAA, reported on the laws that apply to gun shows in California, as well as Plaintiff Crossroads history of events at the Fairgrounds.

105.   During his comments at the September 11, 2018 hearing, Mr. Kerins referenced a memorandum that he prepared for the 22nd DAA's Board of Directors in 2016. In that memorandum, he reported that:

> As Chief of Security for the 22nd DAA, I routinely inspect the gun show and on a regular basis communicate with the San Diego Sheriff's Department re: compliance with all the applicable laws and regulations and the Security Plan required by the California Department of Justice Firearms Division. I recently spoke to Detective Jaime Rodriguez of the Sheriff's North Coastal Station who supervises the four Deputies assigned to the gun show security detail and Detective Stacey Smith who is assigned to the Sheriff's Licensing Division. Both Detectives said the Crossroads of the West Gun Show is in complete compliance with all the local, State and Federal laws that govern gun shows and that there have not been any violations of law. Both Detectives had high praise for the show promoters and the 22 DAA staff.

Memorandum of Patrick Kerins, Public Safety Director, 22nd District Agricultural Association, to Board of Directors, 22nd District Agricultural Association, at 17 (2016) (attached as Exhibit 4).

/ / /

/ / /

29

FIRST AMENDED COMPLAINT

106.   Mr. Kerins' 2016 memorandum continued:

> In my considered opinion, as Chief of Security for the 22 DAA for the last 17 years, the CROSSROADS OF THE WEST GUN SHOWS (5 per year) are in compliance with all the local, state and federal regulatory statutes and have operated without any violations of those laws Under the laws of the State of California you must comply with all the laws of purchasing, selling and/or transferring of firearms at a gun show as you would at licensed gun dealer's store Due to the strict California gun show regulations there are no so called loop holes that you so often hear about in the media.

Ex. 4 at 17.

107.   Ultimately, the lengthy process of meetings, public comment, and communications with stakeholders resulted in **no finding** that allowing the (already heavily regulated) gun show events to continue at the Del Mar Fairgrounds posed a definite or unique risk to public safety. Indeed, the 22nd DAA presented *no* evidence of any safety concerns within the community that could be linked to the over-30-year-old gun show at the Del Mar Fairgrounds.

108.   Nonetheless, relying on contrived possibilities of unknown dangers and unfounded claims that prohibiting gun shows might prevent suicide and violent crime because the "gun culture" would be censored, the 22nd DAA voted to impose a one-year moratorium on gun show events at the Del Mar Fairgrounds.

109.   Plaintiffs Crossroads, CRPA, SAF, and others sued the 22nd DAA, Defendant Ross, and others in federal court under to prevent enforcement of the moratorium, alleging violations of various constitutional rights, including the rights to free speech, assembly, and equal protection. *See B&L Prods. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2019) ("*B&L I*") (attached as Exhibit 5).

110.   Denying the 22nd DAA's motion to dismiss and granting plaintiffs a preliminary injunction—*sua sponte*—on the ground that plaintiffs were exceedingly likely to succeed on the merits of their constitutional claims, the court in *B&L Productions* temporarily enjoined the enforcement of the 22nd DAA's gun show moratorium and ordered the 22nd DAA to contract with Crossroads as it would any other similar event promoter at the Fairgrounds. *Id.*

111.   Shortly thereafter, the *B&L Productions* plaintiffs negotiated a settlement with the 22nd DAA, represented by attorneys for the California Department of Justice, permanently terminating the gun show moratorium, reinstating Crossroads' right to promote gun show events at the Fairgrounds, and permanently barring the 22nd DAA from unilaterally halting B&L's gun show events at the Del mar Fairgrounds.

**[California's Assembly Bill 893 (Gloria)]**

112.   Making good on previous threats, and fully aware of the court's decision in *B&L I*, Assemblymember Gloria introduced Assembly Bill 893 ("AB 893") on or about February 20, 2019. Assem. Bill 893, 2019-2020 Reg. Sess. (Cal. 2019) (attached as Exhibit 6).

113.   AB 893, which added Section 4158 to the California Food & Agricultural Code, bars any "officer, employee, operator, lessee, or licensee of the [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds." Violation of the law is a misdemeanor. *Id.*

114.   AB 893 does not bar the possession of firearms or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds. *Id.*

115.   The text of AB 893 expressly identifies the ongoing presence at the Del Mar Fairgrounds of "marketplaces popularly known as 'gun shows,' at which firearms and ammunition and other items are sold to the public approximately five times a year." *Id.*

116.   AB 893 also clearly recognizes that "[p]romoters maintain relationships with a core group of vendors, some selling guns and some selling other merchandise, who travel as the schedule dictates from city to city and state to state and in the West, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona." *Id.*

117.   AB 893 failed to identify, however, any real public safety or security

31

FIRST AMENDED COMPLAINT

concern *specifically* related to the existence of gun show events at the Fairgrounds.

118.   To be sure, AB 893 claims, without support, that "[g]un shows bring grave danger to a community" and that "dangerous incidents" have taken place at guns shows at the Fairgrounds, including "an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines." But AB 893 makes no effort to show that these incidents are any more likely to occur at gun shows in California, which are regulated at least as heavily as retailers operating out of brick-and-mortar stores.

119.   Instead, AB 893's legislative history reveals only general concerns about gun violence occurring all over the country and legislators' beliefs that the state should not profit from sales of firearms and ammunition. *See* Matthew Fleming, Assem. Comm. Pub. Safety, Bill Analysis Re: AB 893 (Gloria), 2019-2020 Reg. Sess., at 3 (Cal. 2019) (attached as Exhibit 7).

120.   Indeed, AB 893 opens with a list of tragedies, including the horrific mass murders that took place at Columbine High School, Sandy Hook Elementary School, and Marjory Stoneman Douglas High School—none of which were carried out with firearms traced to gun show events at the Fairgrounds. Ex. 6.

121.   What's more, a March 26, 2019, analysis of AB 893 presented to the Assembly Committee on Public Safety quoted claims by Assemblymember Gloria, the bill's sponsor, that "[t]here is an ever-apparent link between the gun violence we see virtually every week and the number of guns in our communities." These statements, however, made no attempt to link gun violence to gun shows, generally, or to gun shows at the Fairgrounds, specifically. Ex. 7 at 2.

122.   The Public Safety Committee's March 26, 2019, analysis also quoted Gloria as lamenting that "the State of California should not be profiting or benefitting from the sale of firearms." He continued, "[f]undamentally, I believe it is wrong for the state of California to profit or to benefit from the sale of firearms and

ammunition." Ex. 7 at 2.

123.   The Public Safety Committee's March 26, 2019, analysis also cited a decade-old report from the Violence Prevention Research Program (VPRP) at the UC Davis School of Medicine, identifying gun shows as a source of illegally trafficked firearms. Ex. 7 at 3.

124.   But neither the VPRP report nor AB 893's legislative history links any illegally trafficked firearm or gun used in crime to gun shows at the Fairgrounds (or even to gun shows in California). *See* Garen Wintemute, MD, *Inside Gun Shows: What Goes on When Everybody Thinks Nobody's Watching*, ch. 1 (2009) (attached as Exhibit 8). This is unsurprising because, as the study states, "[m]uch of the concern about gun shows as a source of crime guns focuses on private party gun sales, *since no background checks are conducted and no records are kept*." *Id.* at 32. But such concerns are simply irrelevant in California where private party transfers—*even those initiated at gun shows*—must be processed by a licensed firearm dealer and are subject to background checks and registration under state law.

125.   The VPRP report cited by the Public Safety Committee's analysis of AB 893 also attempts to implicate licensed firearm retailers operating at gun shows as sources of crime guns in America, claiming that "30% of dealers with gun show sales, but 22% of all dealers, had previously had a crime gun traced to them." But it expressly recognizes that "in California, where both gun shows themselves and gun commerce generally are regulated, *sales at gun shows are not a risk factor among licensed retailers for disproportionate sales of crime guns*." Ex. 8 at 33 (emphasis added).

126.   The Public Safety Committee's March 26, 2019, analysis also cited a report from the Government Accountability Office, claiming that a GAO report "regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows." Ex. 7 at 3. But again, neither the BATFE report nor AB 893's legislative history links any illegally trafficked firearm to gun shows at the Del Mar

33

Fairgrounds (or even to gun shows in California). *See* U.S. Gov't Accountability Off., GAO-16-223, *Firearms Trafficking: U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain* (2016) (attached as Exhibit 9). To be sure, the GAO report identifies U.S. Southwest border states, including Texas (41%), California (19%), and Arizona (15%), as the largest sources of firearms illegally trafficked into Mexico from the United States. Ex. 9 at 14. But it does not trace these illegally trafficked guns to licensed dealers, generally, or to those operating at gun shows, specifically. Rather, it says only that "there were about 10,134 licensed dealers and pawnbrokers in the four Southwest border states, many of them along the border," and that "these licensed dealers and pawnbrokers can operate in locations such as gun shops, pawn shops, their own homes, or gun shows." *Id.*

127.   The Public Safety Committee's March 26, 2019, analysis did concede that "less than one percent of inmates incarcerated in state prisons for gun crimes acquired their firearms at a gun show"—though it transparently tries to diminish that fact by citing only a website of the National Rifle Association as the source of the statistic, instead of the U.S. Department of Justice, Bureau of Justice Statistics reports from which the NRA drew it. Ex. 7 at 2-3 (citing NRA-ILA, *Background Checks/NICS*, https://www.nraila.org/get-the-facts/background-checks-nics (last visited Sept. 29, 2021)); *but see* Caroline Wolf Harlow, Ph.D., Bureau of Justice Statistics, *Firearm Use by Offenders* (Nov. 2001) attached as Exhibit 10.

128.   While the Public Safety Committee's March 26, 2019, analysis also concedes that "violent criminals do not appear to regularly purchase their guns directly from gun shows," the analysis immediately shifts to "criticism" (from the partisan Center for American Progress) that gun shows are somehow "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market." Ex. 7 at 3 (citing Arkadi Gerney, Center for American Progress, *The Gun*

34

FIRST AMENDED COMPLAINT

1  *Debate 1 Year After Newtown: Assessing Six Key Claims About Gun Background*

2  *Checks* (Dec. 2013), *available at* https://www.americanprogress.org/issues/guns-

3  crime/reports/2013/12/13/80795/the-gun-debate-1-year-after-newtown/ (last visited

4  Sept. 29. 2021). Neither the Center for American Progress editorial nor AB 893's

5  bill analysis show how, in California where sales at gun shows are regulated *at least*

6  as heavily as sales at brick-and-mortar retailers, guns originating at gun shows are

7  any more likely to enter the "shadowy, no-questions-asked illegal market" than

8  those sold at gun stores.

9  **[California's Senate Bill 264 (Min)]**

10  129.  Not to be outdone and following the encouragement from both

11  Defendant Newsom and Assemblymember Gloria, Senator Dave Min sought early

12  on to rid the state of gun shows on all state fairground properties. Indeed, Senator

13  Min promised "in my first 100 days in office, I promise to author legislation for a

14  *ban* on these gun shows at the OC Fair and Events Center once and for all."

15  Anthony Pignataro, *SD-37 Candidate Min: Ban Gun Shows from OC Fair & Event*

16  *Center*, OC Weekly (Aug. 6, 2019), https://www.ocweekly.com/sd-37-candidate-

17  min-ban-gun-shows-from-oc-fair-event-center/ (emphasis added). And he called on

18  the "governing board of the OC Fair to *end its contract* with Crossroads of the West

19  and other gun show marketers." *Id.*

20  130.  In response, Board Member Ashleigh Aitken, advocating for the known

21  safety of the Fairgrounds, noted that "[t]he gun show loophole does not exist in

22  California. No citizen can purchase a firearm at the gun show and walk off property

23  with it. The purchases are subject to the same background checks and waiting

24  periods as any other store purchase." Aitken went on to note that "California's legal

25  gun shows are not a priority as our state has the strictest gun laws in the country."

26  Anthony Pignataro, *OC Fair Board Member Responds to Min's Gun Show Ban Idea*

27  (Aug. 7, 2019), *available at* https://www.ocweekly.com/oc-fair-board-member-

28  responds-to-mins-gun-show-ban-idea/.

131.   Nevertheless, Senator Min introduced Senate Bill 264 ("SB 264") on January 27, 2021. Sen. B. 264, 2019-2020Reg. Sess. (Cal. 2020) (attached as Exhibit 11). SB 264, which added section 27575 to the California Penal Code, bars any "officer, employee, operator, lessee, or licensee of the [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the OC Fair and Events Center." Violation of the law is a misdemeanor. *Id.*

132.   SB 264 does not bar the possession of firearms, ammunition, or firearm precursor parts on the property or in the buildings that comprise the Orange County Fairgrounds. Ex. 10. And it provides exceptions for (1) gun buyback events held by law enforcement, (2) the sale of a firearm by a public administrator, public conservator, or public guardian in the course of their duties, (3) the sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2022, and (4) the purchase of ammunition on state property by a law enforcement agency in the course of its regular duties. *Id.*

133.   Like AB 893, SB 264 clearly recognizes that "[p]romoters maintain relationships with a core group of vendors, some selling guns and some selling other merchandise, who travel as the schedule dictates from city to city and state to state and in the West, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona." *Id.*

134.   SB 264 failed to identify, however, any real public safety or security concern specifically related to the existence of gun show events at the Fairgrounds. Indeed, without citing specific safety concerns related to the *Orange County* Fairgrounds, the authors of SB 264 literally copied and pasted the same vague "security concerns" related to the *Del Mar* Fairgrounds from the language of AB 893 to label the Orange County events a threat to the local community. *Id.*

135.   To be sure, SB 264 claims that "[g]un shows bring grave danger to a

36

community" and that "dangerous incidents" have taken place at guns shows at the Fairgrounds, including ***"an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines***." *Id.* But SB 264 makes no effort to show that these incidents are any more likely to occur at the Orange County gun show or gun shows in California in general, which are regulated at least as heavily as retailers operating out of brick-and-mortar stores. What's more, these incidents are identical to the crimes alleged to have taken place at the Del Mar Fairgrounds—an odd coincidence to be sure.

136.   Instead, SB 264's legislative history reveals only general concerns about gun violence occurring all over the country, unrelated to California gun shows, and legislators' beliefs that the state should not profit from sales of firearms and ammunition.

137.   Indeed, SB 264 opens with a list of tragedies, including the horrific mass murders that took place at Columbine High School, Sandy Hook Elementary School, and Marjory Stoneman Douglas High School—none of which were carried out with firearms traced to gun show events at the Fairgrounds. *Id.*

138.   The Senate Committee on Public Safety's March 15, 2021, analysis cited a report from the Government Accountability Office, claiming that a GAO report "regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows." Sen. Comm. Pub. Safety, Bill Analysis Re: SB 264 (Min), 2019-2020 Reg. Sess., at 4 (Cal. 2021) (attached as Exhibit 12). But again, neither the BATFE report nor SB 264's legislative history links any illegally trafficked firearm to gun shows at the Orange County Fairgrounds (or even to gun shows in California). *See* Ex. 9.

139.   In comments to the Senate Public Safety Committee on March 16, 2021, Senator Min claimed that "SB 264 will ensure that the state is not profiting

from the sale of firearms and ammunition on state property or facilitating gun shows that would undermine California's strong firearm regulations." Sen. Pub. Safety Committee Hrg., Mar. 16, 2021, at 3:20:18, *available at* https://www.senate.ca.gov/media-archive/default?title=Public+Safety&startdate=03%2F16%2F2021&enddate=03%2F17%2F2021 (last accessed Aug. 4, 2022).

140.    In his remarks to the Senate Public Safety Committee, Senator Min claimed that the carnival-like atmosphere of gun shows lends itself to "lots of gun sales in the parking lot or by Venmo where the gun is delivered later." No data was presented to support these claims even when asked by Senator Bogh. Senator Min ultimately conceded that he does not know how many firearms from gun shows actually move into the stream of illegal commerce. *Id.* at 4:05:36. He went on to state that even if there have zero unlawful acts at guns shows, "there is a principal that taxpayers should not be utilized, and taxpayer venues should not be utilized to promulgate the distribution of more guns in our communities." *Id.* at 4:09:40.

141.    Senator Min's closing remarks to the Senate Public Safety Committee recognized that SB 264 is "symbolic" and makes a statement that the state does not want to give an endorsement of "our taxpayer venues being used to sell more guns in our communities. *Id.* at 4:12:59.

142.    Similarly, in his remarks to the Assembly Committee on Public Safety on July 13, 2021, Senator Min said that ending gun shows and banning the sale of firearms, ammunition, and precursor parts at state-owned properties is a value statement that the state of California must make. *See* Assem. Pub. Safety Committee Hrg., Mar. 16, 2021, at 4:01:22, *available at* https://www.assembly.ca.gov/media/assembly-public-safety-committee-20210713/video (last accessed Aug. 4, 2022). "Value statements" are made about likes and dislikes, not about issues of public safety. Min's candid remarks about the intention of SB 264 clearly illustrate a commitment to end gun shows not for safety reasons, but to restrict the lawful speech and activities of a culture that he does not

understand and does not support.

**[California's Senate Bill 915 (Min)]**

143.   Having failed to made good on his campaign promise pass legislation in 2021 that would ban gun shows from all state property, an undeterred Senator Min introduced Senate Bill 915 ("SB 915") on February 2, 2022. Sen. B. 915, 2021-2022 Reg. Sess. (Cal. 2022) (attached as Exhibit 15).

144.   SB 915, which added section 27573 to the California Penal Code, bars any  "state officer or employee, or operator, lessee, or licensee of any state property" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm, firearm precursor part, or ammunition on state property or in the buildings that sit on state property or property otherwise owned, leased, occupied, or operated by the state." *Id.*

145.   Just like SB 264, Min's SB 915 does not bar the possession of firearms, ammunition, or firearm precursor parts on state property or in the buildings that sit on that property. *Id.*

146.   And it provides exceptions for (1) gun buyback events held by law enforcement, (2) the sale of a firearm by a public administrator, public conservator, or public guardian in the course of their duties, (3) the sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2023, (4) the purchase of ammunition on state property by a law enforcement agency in the course of its regular duties, and (5) sale or purchase of a firearm pursuant to subdivision (b) or (c) of Section 10334 of the Public Contract Code. *Id.*

147.   SB 915 takes effect on January 1, 2023, but because the law prohibits officials have already stopped entering into contracts with gun show promoters, like Plaintiff Crossroads, for events in 2022 and beyond. And while there is an exemption allowing events to take place if contracts for those events were entered into before January 1, 2023, it has not been the practice of state venues to grant these

contracts for gun show events in anticipation of the law's effective date.

148.   The bill's purpose was and it's actual effect is to banish gun shows from state-owned properties—properties that are otherwise open to the public for gathering and expressive activities—throughout California. Indeed, Senator Min, the author of SB 915, has made very clear that banning the events was the bill's intent: "Last year we laid the foundation for this moment with a ban on gun shows at the Orange County Fairgrounds. Today, I am proud to announce that California will become the first nation to enact a total ban statewide." Press Release, *California Becomes the First State to Ban Gun Shows on State Property, Builds on Orange County Fairgrounds Ban* (July 21, 2022), *available at* https://sd37.senate.ca.gov/news/california-becomes-first-state-ban-gun-shows-state-property-builds-orange-county-fairgrounds (last accessed Nov. 7, 2022).

149.   Notably, SB 915 identifies no real public safety concern specifically related to the existence of gun show events at any of the state venues in California. To the contrary, when giving testimony about SB 915, Senator Min only noted issues with criminal activity from outside of California.

150.   Instead, SB 915's legislative history reveals only general concerns about gun violence occurring all over the country, unrelated to California gun shows, and legislators' beliefs that the state should not profit from sales of firearms and ammunition.

151.   In describing the need for the bill, the legislative history of SB 915 cites a 1999 BATFE report "gun shows as a 'major trafficking channel'" and finding "that gun shows were the second largest source of illegally trafficked firearms." *See* Sen. Comm. Pub. Safety, Bill Analysis Re: SB 915 (Min), 2021-2022 Reg. Sess., at 3 (Cal. 2022) (attached as Exhibit 16). Setting aside the fact that the report is nearly a quarter-of-a-century old, the legislature made no effort to link such concerns to gun shows in California, where state law governs sales at gun shows at least as strictly as it governs sales at "brick-and-mortar" stores. Nor did it make any effort to

1  show that gun shows remain "the second largest source of illegally trafficked

2  firearms" 23 years after the BATFE report published its findings.

3  **[The Impact of SB 264 and SB 915 on the Orange County Gun Show]**

4      152.   The sale of firearms and ammunition is an essential function of gun

5  shows, and it is one of the main reasons people attend these events; if gun shows are

6  not economically viable because they have been stripped of an essential function,

7  they will cease to exist.

8      153.   SB 264 and SB 915 thus have the same practical effect as Del Mar's

9  unconstitutional gun show moratorium which was enjoined by federal court—that is,

10  by permanently banning the commercial sale of firearms and ammunition at the

11  Fairgrounds, it has the effect of banning gun shows at the Fairgrounds.

12      154.   The Legislature was well-aware when it passed SB 264 and SB 915 that

13  a "gunless" gun show would not survive financially. Indeed, the intended purpose of

14  SB 264 and SB 915 was to end gun shows at the Fairgrounds as noted by bill

15  sponsor Senator Min in numerous committee testimonies and public comments.

16  155.   The July 12, 2021, Assembly Committee on Public Safety's bill analysis

17  references other similar legislative attempts to ban gun shows on state agricultural

18  land. Assem. Comm. Pub. Safety, Bill Analysis Re: SB 264 (Min), 2021-2022 Reg.

19  Sess., at 3 (Cal. 2021) (attached as Exhibit 13). The analysis notes that:

20

21          AB 893 (Gloria) Chapter 731, Statutes of 2019, added a section to
            the Food and Agricultural Code that prohibits the sale of firearms
22          and ammunition at the Del Mar Fairgrounds, **effectively terminating
            the possibility for future gun shows** at the Del Mar Fairgrounds.
23          AB 893 was signed into law by Governor Newsom. This bill would
            expand the provisions of AB 893 by including all state property
24          within the prohibition on the sale or transfer of firearms and
            ammunition.[6]

25      156.   Senator Min knew that the intended and practical effect of SB 264 (and

26

27  _____

      [6] SB 264 was initially introduced as a bill to end sales of firearms, ammunition,
28  and firearm precursor parts on *all* state-owned property. But Min failed to garner
    enough support for such a ban and agreed to limit the scope of SB 264 to the OC
    Fair & Event Center.

later SB 915) was to end gun shows. His official Senate press release notes "[i]f signed into law, SB 264 would effectively put a stop to most gun shows on county fairgrounds. Press Release, *Senator Dave Min's Gun Violence Prevention Bill Advances from Assembly Public Safety Committee* (July 13, 2021), *available at* https://sd37.senate.ca.gov/news/senator-dave-mins-gun-violence-prevention-bill-advances-assembly-public-safety-committee (last accessed Aug. 4, 2022).

157.   On July 21, 2022, Senator Min reiterated the intent of his gun show bills: "Last year we laid the foundation for this moment with a ban on gun shows at the Orange County Fairgrounds. Today I am proud to announce that California will become the first in the nation to enact a total ban statewide." Press Release, *Senator Dave Min's California Becomes the First State To Ban Gun Shows on State Property, Builds on Orange County Fairgrounds Ban* (July 21, 2022), *available at* https://sd37.senate.ca.gov/news/california-becomes-first-state-ban-gun-shows-state-property-builds-orange-county-fairgrounds (last accessed Nov. 7, 2022).

158.   And further evidencing the Legislature's intended effect of SB 264 and SB 915, Senator Min wrote to Defendant District, warning members not to stand in the way of his bill that would ban sales of firearms, ammunition, and firearm precursor parts at the Fairgrounds. Letter from Senator Dave Min to Board Members of 32nd District Agricultural Association (on or about September 13, 2021) (attached as Exhibit 14).

159.   In his letter dated on or about September 13, 2021, letter, Min addressed the District's concerns that its venue was being unfairly and exclusively targeted, responding that SB 264 was no different from earlier attempts to ban gun shows at a single fairground:

> While Item 6A expresses a concern that SB 264 "exclusively targets the 32nd DAA," such action to ban gun shows at a single fairground site has recent precedent. In 2019, Gov. Newsom signed Assembly Bill 893 (Gloria) into law, ending the sale of firearms and ammunition at the Del Mar Fairgrounds, operated by the 22nd District Agricultural Association.

42

FIRST AMENDED COMPLAINT

1    *Id.* (emphasis added).

2        160.   In that same letter, Senator Min also threatened the District's board

3    members with individual liability lawsuits should they move to approve contracts

4    for the gun shows even before Governor Newsom had signed SB 264 into law. *Id.*

5        161.   Nonetheless, Plaintiff Crossroads has repeatedly reached out to

6    Defendant District to request dates for events at the Fairground in 2021, 2022, and

7    2023. But Defendant District refused to place the contracts for gun shows on the

8    agenda for October, November, or December 2021, stating instead that they would

9    revisit the issue again in January 2022 after SB 264 would go into effect.

10       162.   Defendant District's refusal to enter into contracts with Plaintiff

11   Crossroads before the implementation of AB 264 and SB 915 may have satisfied

12   Senator Min's threats towards individual board members, but in doing so, the

13   District failed in their duty to bring profitable and family-friendly events to the

14   Fairgrounds and caused great losses to Plaintiffs.

15       163.   Plaintiff Crossroads was unable to secure dates and enter into new

16   contracts for events at the Fairgrounds in 2022 and beyond due to the Defendants'

17   intentional act of adopting and enforcing SB 264 and refusing to consider their

18   contracts in the same way they would any other member of the public seeking to

19   rent the Fairgrounds venue, including looking forward to the implementation of SB

20   915 in January of 2023.  Plaintiffs are also unable to enter into new contracts for

21   shows at other state venues before the implementation of SB 915 because those

22   venues also refuse to provide dates before  January 1, 2023.

23       164.   Indeed, in compliance with SB 264 and SB 915, Defendant District

24   cannot and will not enter into contracts for gun shows at the Fairgrounds if firearms,

25   ammunition, or firearm precursor parts will be sold during the shows.

26       165.   Even though Plaintiff Crossroads has offered to attempt to hold events

27   without sales of firearms, ammunition, or firearm precursor parts to preserve its

28   longstanding relationship with the District, mitigate damages, and continue planning

and promoting its family-friendly events until its claims can be heard, Defendant District dragged its feet and refused to provide dates for events for 2022 and beyond.

166.   Because of the time and resources needed to plan and implement its gun show events, Plaintiff Crossroads must plan its shows about one year in advance, but Defendant District has not allowed Plaintiff Crossroads to secure dates in 2023 either.

167.   What's more, Defendant District seems to have stripped Plaintiff Crossroads of its effective right of first refusal under the District's "hold" system described above. Indeed, it failed to give Crossroads first (or any) choice of its dates in 2021 or 2022.

168.   Defendants' adoption and enforcement of SB 264 and SB 915, which has the intended and practical effect of banning gun shows at the Fairgrounds, has and will continue to cause Plaintiff Crossroads significant economic damages, including loss of event revenue, breakdown of relationships and agreements with long-time event vendors and companies used as suppliers for gun show events, relinquishment of future show dates, and loss of business reputation and goodwill that has been built by Plaintiff Crossroads for more than 30 years.

169.   Plaintiff Crossroads has already lost revenue for gun show events at the Fairgrounds in December 2021 and 2022 because Defendant District will not finalize event dates, citing SB 264 as the reason along with the threats from Senator Min for personal liability should they act. If shows do not return to the Fairgrounds in 2022, Plaintiff Crossroads will lose all revenue for gun show events at the Fairgrounds in 2022 and possibly 2023 because of the amount of time it takes to plan large-scale events like the gun shows.

170.   Even if Plaintiff Crossroads could secure dates, plan, promote, and host gun shows in 2022, SB 264 and SB 915 stand in the way of Crossroads generating the profits the events typically generate because the ban on firearm and ammunition sales will significantly impact paid event attendance and the types and numbers of

44

paid vendors who will do business with Crossroads at the Orange County gun show.

171.   Plaintiff Crossroads has and will continue to suffer loss of business goodwill resulting from Defendants' adoption and enforcement of SB 264 and SB 915 under the (unsupported) pretense that gun shows, generally, and Crossroads' shows, in particular, threaten public safety. The message this sends to other venues, attendees, and vendors that do business with Crossroads will no doubt affect Crossroads for years.

172.   Defendants' adoption and enforcement of SB 264 and SB 915, which has the intended and practical effect of banning gun shows at the Fairgrounds, prohibits Plaintiffs and all those similarly situated from making use of a state-owned "public assembly facility" to host gun show events, a lawful business activity, in violation of Plaintiffs' rights to engage in free speech and peaceful assembly, and their right to equal protection under the law.

173.   Specifically, Defendants' conduct complained of here strips Plaintiffs Clark, Johnson, Littrell, and Merson, as well as the organizational plaintiffs, CRPA, APAGOA, 2ALC, and SAF, of a vital opportunity to assemble and engage in pure speech about, among other things, the rights and responsibilities of gun owners, the Second Amendment, patriotism, and political activism with like-minded individuals.

174.   Defendants' conduct complained of here also strips Plaintiff Crossroads of the right to promote gun show events, acting as a "clearinghouse" for both political speech and commercial speech.

175.   Defendants' conduct complained of here also strips Plaintiffs Littrell, and Merson, of a vital opportunity to assemble and engage in lawful commercial speech, including the offer and acceptance of sales of firearms, ammunition, and related accessories.

176.   Furthermore, even if the Court grants injunctive relief, Plaintiff Crossroads will have incurred damages in having to devote extraordinary advertising dollars to inform the public that gun shows will continue to be held and have not

1   been banned at the Fairgrounds.

2      177.   The economic and non-economic harms and injuries to Plaintiffs are of

3   a continuing nature; they continue to compound everyday SB 264 and SB 915

4   remain the law.

### FIRST CAUSE OF ACTION
**Violation of Right to Free Speech Under U.S. Const., amend. I**
**42 U.S.C. § 1983**
(By Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, SAF
Against All Defendants)

8      178.   Plaintiffs incorporate by reference paragraphs 1 through 177 of this

9   Complaint as though fully set forth herein in their entirety.

10      179.   The state of California owns the Fairgrounds, a public venue. It is

11   rented to the public, including community-based organizations and businesses, for

12   its use and enjoyment, including for concerts, festivals, and industry shows.

13      180.   Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC,

14   and SAF have attended in the past and wish to again attend Crossroads gun shows at

15   the Fairgrounds so they may exchange ideas, information, and knowledge, as well

16   discuss political issues and the importance of protecting and defending the Second

17   Amendment.

18      181.   Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC,

19   and SAF have a right under the First Amendment to use the Fairgrounds for their

20   expressive activity on the same basis as other members of the public without regard

21   to the viewpoints they seek to express.

22      182.   Defendants Newsom, Bonta, and Spitzer, acting under color of state

23   law, are the state and local actors responsible for enforcing SB 264 and SB 915,

24   which deprive Plaintiffs of free speech rights secured by the First Amendment of the

25   United States Constitution in violation of 42 U.S.C. § 1983.

26      183.   Defendants Ross and District interpret, implement, and enforce state

27   laws and policies in regard to the Fairgrounds, including SB 264 and SB 915, which

28   deprive Plaintiffs of free speech rights secured by the First Amendment of the

1    United States Constitution in violation of 42 U.S.C. § 1983.

2        184.   Defendants' enforcement of SB 264 and SB 915, which prohibit the

3    sale of firearms, ammunition, and firearm precursor parts at the Fairgrounds with the

4    purpose and intention (or at least the effect) of banning gun show events at the

5    Fairgrounds, is an impermissible content-based restriction of speech. Such

6    enforcement constitutes a direct violation of the free speech rights of Plaintiffs

7    Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF.

8        185.   Defendants have no compelling (or even legitimate) governmental

9    interest in banning the otherwise lawful (and constitutionally protected) sale of

10   lawful firearms, ammunition, and firearm precursor parts at the Fairgrounds and all

11   other state-owned properties, or in banning gun show events and the unique

12   expression and exchange of ideas related to promoting and preserving the "gun

13   culture" that takes place at those events. Any purported interest in "public safety" is

14   betrayed by the fact that SB 264 and SB 915 do not ban the *possession* of firearms,

15   ammunition, or firearms precursor parts on Fairgrounds property and state law

16   already governs sales at gun shows *at least* as strictly as it governs sales at "brick-

17   and-mortar" stores.

18       186.   Further, SB 264 and SB 915 are neither narrowly tailored to nor the

19   least restrictive means of achieving the state's dubious interests. Indeed, by

20   intentionally and effectively banning gun shows at the Fairgrounds and all other

21   state-owned properties, it sweeps up *all* forms of speech and expressive conduct that

22   occurs at such events and banishes from a public venue.

23       187.   Similarly, SB 264 and SB 915 are unconstitutionally overbroad

24   because, in an effort to restrict the commercial sale of firearms, ammunition, and

25   firearm precursor parts, the law effectively and intentionally bans gun shows events

26   altogether, seriously and deliberately burdening a vast amount of speech that does

27   not constitute such a communication and is fully protected by the First Amendment.

28       188.   As a direct and proximate result of Defendants' conduct, Plaintiffs

Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF have suffered irreparable harm, including the violation of their constitutional right to free speech, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

### SECOND CAUSE OF ACTION
### Violation of Right to Free Speech Under U.S. Const., amend. I
### Mixed Political - Commercial
### 42 U.S.C. § 1983
(By Plaintiff Crossroads Against All Defendants)

189.   Plaintiffs incorporate by reference paragraphs 1 through 188 of this Complaint as though fully set forth herein in their entirety.

190.   The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows. Due to the passage of SB 264 and SB 915, state venues like the Fairgrounds are not entering into new contracts for gun shows that have been held at these venues for decades.

191.   Plaintiff Crossroads seeks to engage in protected speech at the Fairgrounds, a noted "public assembly facility," through the promotion and production of events for lawful expressive activity, including events that bring together like-minded individuals to engage in pure political and educational speech, as well as commercial speech of vendor and individual participants to communicate offer and acceptance for the sale of legal goods and services.

192.   Event promoters, though they generally promote events for profit, "still enjoy the protections of the First Amendment." *Id.* at 567. For "[t]he role of a promoter in ensuring access to the public is at least as critical as the role of a bookseller or theater owner and . . . is in a far better position than a concert goer or individual performers to vindicate First Amendment rights and ensure public access." *Id.* at 568. The conduct they engage in is protected expression.

193.    Plaintiff Crossroads has a right under the First Amendment to use the Fairgrounds for its expressive activity on the same basis as other members of the public without regard to the content or viewpoint it seeks to express and promote.

194.    Defendants Newsom, Bonta, and Spitzer, acting under color of state law, are the state and local actors responsible for enforcing SB 264 and SB 915, which deprive Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

195.    Defendants Ross and District interpret, implement, and enforce state laws and policies in regard to the Fairgrounds, including SB 264 and SB 915, which deprive Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

196.    Defendants' enforcement of SB 264 and SB 915, which prohibit the sale of firearms, ammunition, and precursor parts at the Fairgrounds with the purpose and intention (or at least the effect) of banning gun show events at the Fairgrounds, is an impermissible content-based restriction of speech. Such enforcement constitutes a direct violation of the free speech rights of Plaintiff Crossroads.

197.    Defendants have no compelling (or even legitimate) governmental interest in banning the otherwise lawful (and constitutionally protected) sale of lawful firearms, ammunition, and firearm precursor parts at the Fairgrounds and all other state-owned properties, or in banning gun show events and the unique expression and exchange of ideas related to promoting and preserving the "gun culture" that takes place at those events. Any purported interest in "public safety" is betrayed by the fact that SB 264 and SB 915 do not ban the possession of firearms, ammunition, or firearms precursor parts on Fairgrounds property and state law already governs sales at gun shows *at least* as strictly as it governs sales at "brick-and-mortar" stores.

198.    Further, SB 264 and SB 915 are neither narrowly tailored to nor the

49

FIRST AMENDED COMPLAINT

least restrictive means of achieving the state's dubious interests. Indeed, by intentionally and effectively banning gun shows at the Fairgrounds and all other state-owned properties, it sweeps up *all* forms of speech and expressive conduct that occurs at such events and banishes from a public venue.

199.   Similarly, SB 264 and SB 915 are unconstitutionally overbroad because, in an effort to restrict the commercial sale of firearms, ammunition, and firearm precursor parts, the law effectively and intentionally bans gun shows events altogether, seriously and deliberately burdening a vast amount of speech that does not constitute such a communication and is fully protected by the First Amendment.

200.   As a direct and proximate result of Defendants' conduct, Plaintiff Crossroads has suffered irreparable harm, including the violation of its constitutional right to free speech, entitling Crossroads to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

## THIRD CAUSE OF ACTION
### Violation of Right to Commercial Speech Under U.S. Const., amend. I
### 42 U.S.C. § 1983

(By Plaintiffs Littrell, Merson, and CRPA Against All Defendants)

201.   Plaintiffs incorporate by reference paragraphs 1 through 200 of this Complaint as though fully set forth herein in their entirety.

202.   The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

203.   Plaintiffs Littrell, Merson, and CRPA have attended in the past, or represent members who have attended in the past, and wish to again attend Crossroads gun shows at the Fairgrounds to engage in lawful commercial speech with individual attendees.

204.   Plaintiffs Littrell, Merson, and CRPA members have a right under the

First Amendment to use the Fairgrounds for expressive activity on the same basis as other members of the public without regard to the viewpoints they seek to express and promote.

205.   Defendants Newsom, Bonta, and Spitzer, acting under color of state law, are the state and local actors responsible for enforcing SB 264 and SB 915, which deprive Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

206.   Defendants Ross and District interpret, implement, and enforce state laws and policies in regard to the Fairgrounds, including SB 264 and SB 915, which deprive Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

207.   Defendants' enforcement of SB 264 and SB 915, which prohibits the sale of firearms, ammunition, and precursor parts at the Fairgrounds with the purpose and intention (or at least the effect) of banning gun show events at the Fairgrounds, is an impermissible content-based restriction of speech. Such enforcement constitutes a direct violation of the First Amendment commercial speech rights of the Plaintiffs.

208.   Further, by directly barring the rights of vendors, like Plaintiffs Littrell, Merson, and CRPA members, to sell firearms and ammunition (which necessarily involves commercial speech), SB 264 and SB 915 defies existing case law in the Ninth Circuit protecting the commercial speech associated with firearm sales on public property. *See Nordyke v. Santa Clara Cty.*, 110 F. 3d 707 (9th Cir. 1997).

209.   Defendants have no substantial (or even legitimate) governmental interest in banning the otherwise lawful (and constitutionally protected) sale of lawful firearms, ammunition, and firearm precursor parts at the Fairgrounds and all other state-owned properties, or in banning gun show events and the unique expression and exchange of ideas related to promoting and preserving the "gun culture" that takes place at those events. Any purported interest in "public safety" is

51

betrayed by the fact that SB 264  and SB 915 do not ban the possession of firearms, ammunition, or firearms precursor parts on Fairgrounds property and state law already governs sales at gun shows *at least* as strictly as it governs sales at "brick-and-mortar" stores.

210.   Even if there were a substantial governmental interest in restricting gun shows and the commercial speech that occurs at such events, it would not be directly served by a ban on sales of firearms, ammunition, and firearm precursor parts at the Fairgrounds and all other state-owned properties.

211.   Even if there were a substantial governmental interest in restricting gun shows and the commercial speech that occurs at such events, flatly banning commercial speech about firearms and ammunition at the Fairgrounds and other state-owned properties otherwise open to the public is more extensive than necessary to serve any such interest. *See Nordyke*, 110 F.3d 707 (holding that a ban on the sale of firearms on county-owned land was overbroad as abridging commercial speech associated with the sale of lawful products).

212.   As a direct and proximate result of Defendants' conduct, Plaintiffs Littrell, Merson, and CRPA have suffered irreparable harm, including the violation of their constitutional right to free speech, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

**FOURTH CAUSE OF ACTION**
**Prior Restraint on Right to Free Speech Under U.S. Const., amend. I**
**42 U.S.C. § 1983**
(By All Plaintiffs Against All Defendants)

213.   Plaintiffs incorporate by reference paragraphs 1 through 212 of this Complaint as though fully set forth herein in their entirety.

214.   The First Amendment affords special protection against policies or orders that impose a previous or prior restraint on speech. "[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First

52

Amendment Rights." *Ass'n for L.A. Deputy Sheriffs*, 239 Cal. App. 4th at 811 (citing *Neb. Press Ass'n*, 427 U.S. at 559. A prior restraint is particularly egregious when it falls upon the communication of news, commentary, current events, political speech, and association. *N.Y. Times Co.*, 403 U.S. at 715.

215.   Prior restraint also involves the "unbridled discretion doctrine" where a policy, or lack thereof, allows for a single person or body to act at their sole discretion, without regard for any constitutional rights possessed by the person upon which the action is taken, and where there is no remedy for challenging the discretion of the decision makers. *Lakewood*, 486 U.S. at 757.

216.   The Defendants are the state and local actors responsible for enforcing SB 264 and SB 915, which are content-based restrictions of speech that will have a chilling effect on Plaintiffs' First Amendment rights, thus acting  de facto prior restraints on Plaintiffs' rights (including a refusal to place contract approval on board agendas or to offer available dates to begin the process of renting the venue).

217.   Under SB 264 and SB 915, Defendant District has unfettered discretion to determine what constitutes a "sale" under the law and is thereby prohibited at the Fairgrounds.

218.   Defendants' policies and practices complained of here impose an unconstitutional prior restraint because they vest the District with unbridled discretion to permit or refuse protected expression by members of the public, including Plaintiffs.

219.   Defendants' policies and practices complained of here give unbridled discretion to local agricultural district boards and board members to decide what forms of expression members of the public may engage in on at the Fairgrounds and to ban any other expression at the whim of those boards and board members in violation of the First Amendment.

220.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the violation of their

constitutional right to freedom of expression, entitling them to declaratory and

injunctive relief and nominal damages.

**FIFTH CAUSE OF ACTION**
**Violation of Right to Assembly and Association Under U.S. Const., amend. I**
**42 U.S.C. § 1983**
(By All Plaintiffs Against All Defendants)

221.   Plaintiffs incorporate by reference paragraphs 1 through 220 of this

Complaint as though fully set forth herein in their entirety.

222.   The state of California owns the Fairgrounds, a public venue. It is

rented to the public, including community-based organizations and businesses, for

its use and enjoyment, including for concerts, festivals, and industry shows.

223.   Plaintiffs have promoted and/or attended in the past and wish to again

promote and/or attend Crossroads gun shows at the Fairgrounds so they may

assemble and associate with one another to engage in lawful commerce, fellowship,

and expressive activities, including political and educational speech regarding the

lawful ownership, possession, and use of firearms and related products.

224.   Plaintiffs have a right under the First Amendment to use the

Fairgrounds to assemble and associate on the same basis as other members of the

public without regard to the content or viewpoint it seeks to express and promote.

225.   Defendants Newsom, Bonta, and Spitzer, acting under color of state

law, are the state and local actors responsible for enforcing SB 264 and SB 915,

which deprive Plaintiffs of free speech rights secured by the First Amendment of the

United States Constitution in violation of 42 U.S.C. § 1983.

226.   Defendants Ross and District interpret, implement, and enforce state

laws and policies in regard to the Fairgrounds, including SB 264 and SB 915, which

deprive Plaintiffs of free speech rights secured by the First Amendment of the

United States Constitution in violation of 42 U.S.C. § 1983.

227.   Defendants' enforcement of SB 264 and SB 915, which prohibit the

sale of firearms, ammunition, and precursor parts at the Fairgrounds with the

purpose and intention (or at least the effect) of banning gun show events at the Fairgrounds, violates Plaintiffs' rights to assembly and association by denying them the right to use the Fairgrounds, a "public assembly facility," to assemble and engage in political and other types of expression—a right Defendants extend to other members of the public so long as they are not meeting for the purposes of holding a gun show event.

228.   Defendants have no compelling (or even legitimate) governmental interest in banning the otherwise lawful (and constitutionally protected) sale of lawful firearms, ammunition, and firearm precursor parts at the Fairgrounds and all other state-owned properties, or in banning gun show events and, by extension, the rights of Plaintiffs to assemble and associate at the Fairgrounds and other state-owned properties otherwise open to the public. Any purported interest in "public safety" is betrayed by the fact that SB 264 and SB 915 do not ban the possession of firearms, ammunition, or firearms precursor parts on Fairgrounds property and state law already governs sales at gun shows *at least* as strictly as it governs sales at "brick-and-mortar" stores.

229.   Even if SB 264 and SB 915 served some sufficient government purpose, they are neither narrowly tailored nor the least restrictive means to serve that end.

230.   As a direct and proximate result of Defendants' conduct, all Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to free association and assembly, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

### SIXTH CAUSE OF ACTION
**Violation of the Right to Equal Protection Under U.S. Const., amend. XIV**
**42 U.S.C. § 1983**
(By All Plaintiffs Against All Defendants)

231.   Plaintiffs incorporate by reference paragraphs 1 through 231 of this

FIRST AMENDED COMPLAINT

1   Complaint as if fully set forth herein in their entirety.

2       232.   Defendants, acting under color of state law, are enforcing SB 264 and

3   SB 915, which deprive Plaintiffs of right to equal protection under the law secured

4   by the Fourteenth Amendment of the United States Constitution in violation of 42

5   U.S.C. § 1983.

6       233.   On their face and as applied, SB 264 and SB 915 are unconstitutional

7   abridgements of Plaintiffs' right to equal protection under the law guaranteed by the

8   Fourteenth Amendment because they are viewpoint-discriminatory and/or animus-

9   based restrictions on Plaintiffs' protected speech that serve no compelling

10  governmental interest.

11      234.   On their face and as evidenced by the legislative history of both AB

12  264 and SB 915, it is clear that the laws' purpose and intention are to make a

13  "symbolic" gesture and a "value statement" about the otherwise lawful sale of

14  firearms and related products and of the proliferation of the "gun culture" in

15  California and elsewhere.

16      235.   Defendants have no compelling (or even legitimate) governmental

17  interest in banning Plaintiffs' speech. Indeed, any purported interest in "public

18  safety" is betrayed by the fact that SB 264 and SB 915 do not ban the possession of

19  firearms, ammunition, or firearms precursor parts on Fairgrounds property and state

20  law already governs sales at gun shows *at least* as strictly as it governs sales at

21  "brick-and-mortar" stores.

22      236.   Defendants' refusal to allow Plaintiffs equal use of the public facility

23  while continuing to allow contracts for the use of the facility with other similarly

24  situated legal and legitimate businesses is a violation of Plaintiffs' right to equal

25  protection under the law because it is based on a "bare desire to harm a politically

26  unpopular group." *Moreno*, 413 U.S. at 534.

27      237.   Further, SB 264 and SB 915 are not narrowly tailored to achieving the

28  state's dubious interests.

FIRST AMENDED COMPLAINT

232.   As a direct and proximate result of Defendants' conduct, all Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to equal protection under the law, entitling them to declaratory and injunctive relief. Absent intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

### SEVENTH CAUSE OF ACTION
**Violation of Right to Keep and Bear Arms Under U.S. Const., amend. II**
**42 U.S.C. § 1983**
(By Plaintiffs Clark, Johnson, Littrell, Merson, Crossroads, CRPA, APAGOA, 2ALC, and SAF Against Defendants Bonta, Spitzer, and District)

233.   Plaintiffs incorporate by reference paragraphs 1 through 232 of this Complaint as if fully set forth herein in their entirety.

234.   Plaintiffs Clark, Johnson, Littrell, Merson, Crossroads, and members and supporters of Plaintiffs CRPA, 2ALC, APAGOA, and SAF, have sold or bought firearms and/or ammunition at gun show events at the Fairgrounds in the past and, but for the adoption and enforcement of SB 264 and SB 915, they would do so again.

235.   Plaintiffs have a right, under the Second Amendment, to buy and sell firearms and the ammunition necessary for the effective operation of those firearms.

236.    Defendants Bonta and Spitzer, acting under color of state law, are the government actors responsible for enforcing and prosecuting violations of SB 264 and SB 915, which deprive Plaintiffs of their right to access firearms and ammunition secured by the Second Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

237.   Defendant District interprets, implements, and enforces state laws and policies in regard to the Fairgrounds, including SB 264 and SB 915, which deprive Plaintiffs of their right to access firearms and ammunition secured by the Second Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

238.   Defendants' enforcement of SB 264 and SB 915, which prohibit the sale of firearms and ammunition at the Fairgrounds with the purpose and intention (or at least the effect) of banning gun show events at the Fairgrounds, violates Plaintiffs' Second Amendment right to buy and sell firearms and the ammunition necessary to the effective operation of those firearms.

239.   Defendants cannot satisfy their burden to justify their ban on the sale of firearms and ammunition at the Fairgrounds under the history- and tradition-based test applied in *Heller* and recently confirmed in *Bruen*.

240.   As a direct and proximate result of Defendants' conduct, all Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to buy and sell firearms and ammunition, entitling them to declaratory and injunctive relief. Without intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

1.   A declaration that SB 264, codified at California Penal Code section 27575, violates the free speech rights of Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF under the First Amendment to the United States Constitution, on its face and as applied;

2.   A declaration that SB 915, codified at California Penal Code section 27573, violates the free speech rights of Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF under the First Amendment to the United States Constitution, on its face and as applied;

3.   A declaration that SB 264, codified at California Penal Code section 27575, violates the free speech rights of Plaintiff Crossroads under the First Amendment to the United States Constitution, on its face and as applied;

4.   A declaration that SB 915, codified at California Penal Code section 27573, violates the free speech rights of Plaintiff Crossroads under the First

Amendment to the United States Constitution, on its face and as applied;

5.     A declaration that SB 264, codified at California Penal Code section 27575, violates the commercial speech rights of Plaintiffs Littrell, Merson, and CRPA under the First Amendment to the United States Constitution, on its face and as applied;

6.     A declaration that SB 915, codified at California Penal Code section 27573, violates the commercial speech rights of Plaintiffs Littrell, Merson, and CRPA under the First Amendment to the United States Constitution, on its face and as applied;

7.     A declaration that SB 264, codified at California Penal Code section 27575, violates the free speech rights of all Plaintiffs under the First Amendment to the United States Constitution because it imposes a prior restraint on their speech;

8.     A declaration that SB 915, codified at California Penal Code section 27573, violates the free speech rights of all Plaintiffs under the First Amendment to the United States Constitution because it imposes a prior restraint on their speech;

9.     A declaration that SB 264, codified at California Penal Code section 27575, violates Plaintiffs' rights of assembly and association under the First Amendment to the United States Constitution, on its face and as applied;

10.     A declaration that SB 915, codified at California Penal Code section 27573, violates Plaintiffs' rights of assembly and association under the First Amendment to the United States Constitution, on its face and as applied;

11.     A declaration that SB 264, codified at California Penal Code section 27575, violates the rights of all Plaintiffs to equal protection under the law per the Fourteenth Amendment to the United States Constitution, on its face and as applied;

12.     A declaration that SB 915, codified at California Penal Code section 27573, violates the rights of all Plaintiffs to equal protection under the law per the Fourteenth Amendment to the United States Constitution, on its face and as applied;

13.     A declaration that SB 264, codified at California Penal Code section

FIRST AMENDED COMPLAINT

27575, violates the rights of all Plaintiffs to keep and bear arms under the Second Amendment to the United States Constitution, on its face and as applied;

14.     A declaration that SB 915, codified at California Penal Code section 27573, violates the rights of all Plaintiffs to keep and bear arms under the Second Amendment to the United States Constitution, on its face and as applied;

15.     A preliminary and permanent injunction enjoining Defendants, their employees, agents, successors in office, and all District Attorneys, County Counsel, and City Attorneys holding office in the state of California, as well as their successors in office, from enforcing SB 264, codified at California Penal Code section 27575;

16.     A preliminary and permanent injunction enjoining Defendants, their employees, agents, successors in office, and all District Attorneys, County Counsel, and City Attorneys holding office in the state of California, as well as their successors in office, from enforcing SB 915, codified at California Penal Code section 27573;

17.     An order for damages, including nominal damages, according to proof;

18.     An award of costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988 or other appropriate state or federal law; and

19.     Any such other relief the Court deems just and equitable.

Dated:  November 11, 2022          **MICHEL & ASSOCIATES, P.C.**

*s/ Anna M. Barvir*
Anna M. Barvir
Counsel for Plaintiffs B&L Productions, Inc.,
California Rifle & Pistol Association,
Incorporated, Gerald Clark, Eric Johnson, Chad
Littrell, Jan Steven Merson, Asian Pacific
American Gun Owner Association, Second
Amendment Law Center, Inc.

FIRST AMENDED COMPLAINT

Dated:  November 11, 2022                **LAW OFFICES OF DONALD KILMER, APC**

_s/ Donald Kilmer_
Donald Kilmer
Counsel for Plaintiff Second Amendment
Foundation

FIRST AMENDED COMPLAINT