# EXHIBIT 9



**United States Government Accountability Office**

Report to Congressional Requesters

**January 2016**

# FIREARMS TRAFFICKING

## U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain



# GAO Highlights

Highlights of GAO-16-223, a report to congressional requesters

**January 2016**

## FIREARMS TRAFFICKING

### U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain

## Why GAO Did This Study

Violent crimes committed by drug trafficking organizations in Mexico often involve firearms, and a 2009 GAO report found that many of these firearms originated in the United States. ATF and ICE have sought to stem firearms trafficking from the United States to Mexico.

GAO was asked to undertake a follow-up review to its 2009 report (GAO-09-709) addressing these issues. This report examines, among other things, (1) the origin of firearms seized in Mexico that have been traced by ATF, (2) the extent to which collaboration among U.S. agencies combating firearms trafficking has improved, and (3) the extent to which the *National Southwest Border Counternarcotics Strategy* measures progress by U.S. agencies to stem firearms trafficking to Mexico. To address these objectives, GAO analyzed program information and firearms tracing data from 2009 to 2014, and met with U.S. and Mexican officials on both sides of the border.

## What GAO Recommends

GAO recommends that the Secretary of Homeland Security and the Attorney General of the United States take steps to formally monitor implementation of the 2009 MOU between ATF and ICE. GAO also recommends that ONDCP establish comprehensive indicators that more accurately reflect progress made in efforts to stem arms trafficking to Mexico. The Departments of Homeland Security and Justice, and ONDCP agreed with GAO's recommendations.

View GAO-16-223. For more information, contact Jessica Farb at (202) 512-6991 or farbj@gao.gov.

## What GAO Found

According to data from the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), 73,684 firearms (about 70 percent) seized in Mexico and traced from 2009 to 2014 originated in the United States. ATF data also show that these firearms were most often purchased in Southwest border states and that about half of them were long guns (rifles and shotguns). According to Mexican government officials, high caliber rifles are the preferred weapon used by drug trafficking organizations. According to ATF data, most were purchased legally in gun shops and at gun shows in the United States, and then trafficked illegally to Mexico. U.S. and Mexican law enforcement officials also noted a new complicating factor in efforts to fight firearms trafficking is that weapons parts are being transported to Mexico to be later assembled into finished firearms, an activity that is much harder to track.



**Origin of Firearms Seized in Mexico and Traced by ATF, 2009-2014**

- **13%** 13,622 Undetermined origin
- **17%** 17,544 Non-U.S. origin
- **70%** 73,684 of U.S. origin

Source: GAO analysis of Bureau of Alcohol, Tobacco, Firearms and Explosives. | GAO-16-223
Note: These figures reflect firearms seized by Mexican authorities and traced by ATF, not all firearms seized in Mexico.

In 2009, GAO reported duplicative initiatives, and jurisdictional conflicts between ATF and the Department of Homeland Security's Immigration and Customs Enforcement (ICE). That year, in response to GAO's recommendations on these problems, ATF and ICE updated an interagency memorandum of understanding (MOU) to improve collaboration. ATF and ICE have taken several steps since then to improve coordination on efforts to combat firearms trafficking, such as joint training exercises and conferences to ensure that agents are aware of the MOU and its jurisdictional parameters and collaboration requirements. However, GAO found that ATF and ICE do not regularly monitor the implementation of the MOU. In the absence of a mechanism to monitor MOU implementation and ensure that appropriate coordination is taking place between the two agencies, GAO found that gaps in information sharing and misunderstandings related to their roles and responsibilities persist.

The indicator used to track U.S. agencies' efforts to stem firearms trafficking to Mexico in the Office of National Drug Control Policy's (ONDCP) *National Southwest Border Counternarcotics Strategy*, by itself, does not adequately measure progress. ONDCP tracks progress based on the number of arms seized in Mexico and traced to the United States; however, this number does not reflect the total volume of firearms trafficked from the United States, and it does not take into account other key supporting agency actions and activities as measures.

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 3 |
| | Most Firearms Seized in Mexico That Are Traced by ATF Come from the United States, and Most Are Purchased in Southwest Border States | 8 |
| | ATF and ICE Have Taken Steps to Improve Collaboration, but Lack of Monitoring May Contribute to Coordination Challenges | 20 |
| | U.S.-Mexico Collaboration on Firearms Trafficking Was Scaled Back after 2012, but While Challenges Continue, Bilateral Efforts Have Recently Been Gaining Momentum | 25 |
| | The Current Weapons Chapter Indicator in the *National Southwest Border Counternarcotics Strategy* Does Not Adequately Measure the Progress of U.S. Agencies in Stemming Firearms Trafficking to Mexico | 29 |
| | Conclusions | 32 |
| | Recommendations for Executive Action | 32 |
| Appendix I | Scope and Methodology | 35 |
| Appendix II | Comments from the Department of Homeland Security | 38 |
| Appendix III | GAO Contact and Staff Acknowledgments | 40 |

Tables

| Table 1: Key Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Efforts and Resources to Stem Firearms Trafficking to Mexico | 6 |
|---|---|
| Table 2: Key Immigration and Customs Enforcement (ICE) Efforts and Resources to Stem Firearms Trafficking to Mexico | 7 |
| Table 3: Supporting Actions and Activities in the Weapons Chapter of Office of National Drug Control Policy's (ONDCP) 2013 *National Southwest Border Counternarcotics Strategy* | 31 |

Figures

Figure 1: Numbers of Firearms Seized in Mexico and Submitted for Tracing, by U.S. and Non-U.S. Origin, 2009 to 2014 — 9

Figure 2: Examples of Long and Short Guns — 11

Figure 3: Number and Type of Firearms Destined to Mexico Seized in the United States by Immigration and Customs Enforcement, 2009 to 2014 — 12

Figure 4: Number and Type of Firearms Seized in Mexico and Submitted to the Bureau of Alcohol, Tobacco, Firearms and Explosives for Tracing, 2009 to 2014 — 13

Figure 5: Top Source States for Firearms Seized in Mexico of U.S. Origin and Numbers Seized, 2009-2014 — 15

Figure 6: Basic Firearm Components from Firearms Parts Kits — 17

Figure 7: Comparison between a Receiver (Considered a Firearm) and a Casting (Not Considered a Firearm) — 18

Figure 8: A Flat with All of the Required Holes Drilled but That Has Not Been Bent into Shape — 19

**Abbreviations**

| | |
|---|---|
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| CBP | Customs and Border Protection |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| DTO | drug trafficking organization |
| FTE | full-time equivalent |
| ICE | Immigration and Customs Enforcement |
| INL | Bureau of International Narcotics and Law Enforcement Affairs |
| MOU | memorandum of understanding |
| NTC | National Tracing Center |
| ONDCP | Office of National Drug Control Policy |
| State | Department of State |
| *Strategy* | the *National Southwest Border Counternarcotics Strategy* |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

January 11, 2016

The Honorable Eliot L. Engel
Ranking Member
Committee on Foreign Affairs
House of Representatives

The Honorable Jeff Duncan
Chairman
Subcommittee on the Western Hemisphere
Committee on Foreign Affairs
House of Representatives

Violence perpetrated by Mexican drug trafficking organizations (DTO) continues to raise security concerns on both sides of the U.S.-Mexico border. Mexican authorities consider firearms trafficking to be a major factor in these organizations' capacity to resist government efforts to combat organized crime. Similarly, U.S. law enforcement agencies have acknowledged the role firearms smuggling across the Southwest border plays in fueling violent criminal activity in Mexico. As we reported in 2009, trace data[1] on firearms seized from criminals in Mexico confirm that tens of thousands of weapons seized in Mexico came from the U.S. side of the border.[2] Over the past decade, U.S. and Mexican administrations have recognized that addressing firearms trafficking requires bilateral attention, and they have pledged to collaborate in their efforts to combat it.

You requested that we update our 2009 report and review U.S. efforts to stem the flow of firearms trafficking into Mexico. In this report, we examine (1) the origin of firearms seized in Mexico that have been traced by the Department of Justice's (DOJ) Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); (2) the extent to which collaboration among U.S. agencies combating firearms trafficking has improved; (3) the

---

[1]Firearms tracing is the systematic tracking of the movement of a firearm recovered by law enforcement officials from its first sale by the manufacturer or importer through the distribution chain (wholesaler/retailer) to identify the first retail purchaser.

[2]GAO, *Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges*, GAO-09-709 (Washington, D.C.: June 18, 2009).

status of coordination between U.S. agencies and their Mexican counterparts combating firearms trafficking; and (4) the extent to which the *National Southwest Border Counternarcotics Strategy* (*Strategy*) measures progress by U.S. agencies to stem firearms trafficking to Mexico.

To identify the number, source, and types of firearms trafficked to Mexico that have been seized and traced, we relied primarily on ATF's trace data compiled by that agency's National Tracing Center Firearms Tracing System through eTrace.[3] We also reviewed the Department of Homeland Security's (DHS) Immigration and Customs Enforcement (ICE) data on seizures of southbound firearms and cases involving firearms trafficking to Mexico. To address collaboration among U.S. agencies, we reviewed and analyzed documentation and reports on collaborative activities among those agencies responsible for combating firearms. To obtain a better understanding of the scope and progress of various U.S. agencies' activities related to firearms trafficking, we met with officials from ATF, ICE, DHS's Customs and Border Protection (CBP), and the Department of State (State). To examine the status of cooperation between U.S. agencies and their Mexican counterparts, we met with U.S. and Mexican officials to discuss their cooperative activities. To discuss cooperation by U.S. and Mexican law enforcement officials to stem the flow of firearms smuggling across the border, we met with U.S. and Mexican officials at two major Southwest border locations—San Diego/Tijuana and El Paso/Juarez. We traveled to Mexico City and Guadalajara, Mexico, to meet with U.S. embassy and consulate officials responsible for implementing programs to combat firearms trafficking and Mexican government officials responsible for related activities. We also met with the Office of National Drug Control Policy (ONDCP) to discuss the Weapons Chapter of the *Strategy*.[4] We assessed the reliability of data provided by various U.S. agencies by interviewing agency officials knowledgeable about the data and reviewing related supporting documentation about the data and the systems that produced them. We determined that data were sufficiently reliable for the purpose of this

---

[3]ATF has a paperless firearm trace submission system (eTrace) that is accessible through the Internet, through which authorized users can submit, retrieve, query, and store firearms trace information, as applicable.

[4]The *National Southwest Border Counternarcotics Strategy* is issued on a biennial basis by ONDCP consistent with requirements in the Office of National Drug Control Policy Reauthorization Act of 2006, Pub. L. No. 109-469, § 1110, Dec. 29, 2006.

report. Appendix I contains additional details about our scope and methodology.

We conducted this performance audit from December 2014 to January 2016 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## U.S.-Mexico Collaboration to Stem Firearms Trafficking

For almost a decade, the government of Mexico has sought to combat the growing power of criminal groups that initially emerged as DTOs in the 1980s and 1990s. This struggle became a national priority in 2006 when then-President Felipe Calderón mobilized the Mexican military and law enforcement agencies to disrupt DTO operations and target their leadership structures. As the Congressional Research Service reported, while these efforts have continued, under current President Enrique Peña Nieto, who was elected in 2012, there has been a shift in emphasis toward reducing criminal violence that threatens the security of civilians and the business sector.[5] According to a RAND Corporation report, besides trafficking billions of dollars' worth of narcotics into the United States annually, Mexican DTOs' criminal activity now extends to other areas, including human trafficking, kidnapping, money laundering, extortion, bribery, racketeering, and weapons trafficking.[6]

According to the *Strategy* DTOs require a constant supply of firearms and ammunition to assert control over the territory where they operate, eliminate rival criminals, enforce illicit business dealings, and resist government operations. The *Strategy* indicates that firearms that criminal

[5]Congressional Research Service, *U.S.-Mexican Security Cooperation: The Mérida Initiative and Beyond* (Washington, D.C.: April 2014).

[6]RAND Corporation, *Mexico Is Not Colombia: Alternative Historical Analogies for Responding to the Challenge of Violent Drug-Trafficking Organizations* (Santa Monica, Calif.: 2014).

organizations acquire from the United States are primarily transported overland into Mexico using the same routes and methods employed when smuggling bulk cash south and drugs north across the U.S.-Mexico border. The *Strategy* also notes that within the United States, DTOs or their agents typically rely on "straw purchasers." According to ATF, a "straw purchase" occurs when a person who is a convicted felon (or otherwise prohibited by federal law from purchasing a firearm) or who wishes to remain anonymous, uses a third party, the straw purchaser, to execute the paperwork necessary to purchase a firearm from a federally licensed firearms dealer. The straw purchaser is a person who, but for making false statements on the license application, would otherwise be eligible under federal law to purchase a firearm and is therefore able to pass the mandatory background check conducted by the federal firearms licensee.[7] Although straw purchasers may legally purchase firearms for their own possession and use, when they purchase firearms on behalf of criminals or others, they violate federal law by making a false statement to a federal firearms licensee on the required forms.[8] Firearm trafficking organizations also frequently obtain firearms from unlicensed private sellers in secondary markets, particularly at gun shows and flea markets or through classified ads or private-party Internet postings, according to ATF officials.

The surge in criminal activity by DTOs along the U.S.-Mexico border has generated concern among policymakers that this violence is spilling over into the United States. Since 2009, according to the *National Drug Threat Assessment*—which is produced by the U.S. Department of Justice's National Drug Intelligence Center, Mexican-based DTOs have been known to operate in more than a thousand cities in the United States.

---

[7]U.S. federal law requires that a person file for and obtain a license from the U.S. Attorney General before engaging "in the business of importing, manufacturing, or dealing in firearms or importing or manufacturing ammunition" (18 U.S.C. § 923(a)). ATF lists nine separate types of federal firearms licensees on its website: (1) dealers in firearms other than destructive devices, (2) pawnbrokers in firearms other than destructive devices, (3) collectors of curios and relics, (4) manufacturers of ammunition for firearms, (5) manufacturers of firearms other than destructive devices, (6) importers of firearms other than destructive devices, (7) dealers in destructive devices, (8) manufacturers of destructive devices, and (9) importers of destructive devices.

[8]A straw purchase violates 18 U.S.C. § 922(a)(6), which prohibits purchasers from knowingly making false oral or written statements or furnishing false identification intended to deceive licensed importers, manufacturers, or dealers as to the lawfulness of the sale. Straw purchasers are subject to fines or imprisonment up to 5 years under 18 U.S.C. § 924(a)(1)(A).

While the extent of violence seen in Mexico has not been reported in the United States, law enforcement officials in two border cities we visited told us that murders and other criminal activity on the U.S. side are often linked to Mexican DTO activities.

The governments of the United States and Mexico have committed to work together to stem the activities of these criminal organizations, including illicit arms trafficking. From fiscal year 2008 to fiscal year 2015, Congress appropriated about $2.5 billion in assistance for Mexico that has been provided through the Mérida Initiative, including approximately $194 million provided in the Consolidated and Further Continuing Appropriations Act, 2015. For fiscal year 2016, the administration's budget request for the Mérida Initiative is $119 million, from various accounts.[9] The Mérida Initiative is a bilateral security partnership between the United States and Mexico to fight organized crime and build the capacity of Mexico's justice sector and law enforcement institutions to uphold the rule of law. Among the many activities supported under the Mérida Initiative, some assistance is provided to help combat firearms trafficking, such as providing canines trained to detect weapons and ammunition, and non-intrusive inspection equipment to detect the flow of illicit goods, including firearms.

## Principal U.S. Agencies Involved in Combating Firearms Trafficking

DOJ's ATF and DHS's ICE are the two primary agencies combating illicit sales and trafficking of firearms across the Southwest border. ATF combats firearms trafficking within the United States and from the United States to other countries as part of its mission under the Gun Control Act (see table 1).[10] ATF is responsible for investigating criminal and regulatory violations of federal firearms laws, among other responsibilities. In carrying out its responsibilities, ATF licenses and regulates federal firearms licensees to ensure that they comply with applicable laws and regulations. ATF also traces U.S. and foreign manufactured firearms for international, federal, state, and local law enforcement agencies to link a firearm recovered in a criminal

---

[9]Mérida Initiative assistance is allocated from various appropriations accounts, including International Narcotics Control and Law Enforcement; Economic Support Fund; Foreign Military Financing; International Military Education and Training; Nonproliferation, Antiterrorism, Demining, and Related Programs; Global Health and Child Survival; and Development Assistance.

[10]18 U.S.C. § 921 et seq.

investigation to its first retail purchaser. This information can be used to help link a suspect in the criminal investigation to a firearm or identify potential traffickers. ATF is the only entity within the U.S. government with the capacity to trace firearms seized in crimes in Mexico. The agency has conducted investigations to identify and prosecute individuals involved in firearms trafficking schemes and has provided training to Mexican law enforcement officials on firearms identification and tracing techniques, among other efforts.

**Table 1: Key Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Efforts and Resources to Stem Firearms Trafficking to Mexico**

| Key activities | Estimated funding expenditures (fiscal years 2009-2014) | Personnel (fiscal year 2014) |
|---|---|---|
| • Internationally, ATF works with other U.S. agencies to investigate criminal and regulatory violations of federal firearms laws. ATF has primary jurisdiction over firearms and ammunition imports and works with the Departments of Homeland Security and State on illicit firearms exports. ATF also provides training for foreign counterparts on a variety of firearms topics, such as weapons identification, and collaborates on tracing firearms seized abroad.<br><br>• Domestically, ATF identifies, investigates, and arrests individuals and organizations that illegally supply firearms to prohibited individuals. ATF deters the diversion of firearms from lawful commerce into the illegal market with enforcement strategies and technology. | • $55.1 million ($14.8 million for operations within Mexico, and over $40 million for certain domestic operations and operations along the U.S.-Mexico border) | • A total of 423 agents, 157 industry operations investigators, and 88 task force officers.<br><br>• One agent, 4 intelligence research specialists, and 2 investigative analysts assigned to the El Paso Intelligence Center.<br><br>• 4 agents assigned and 1 industry operations investigator to the U.S. Embassy and 6 special agents in Monterrey, Tijuana, and Ciudad Juarez. |

Source: GAO analysis of ATF information. | GAO-16-223

Note: The figures in this table represent what ATF expends on various activities to stem firearms trafficking in Mexico and throughout the Southwest region. According to ATF, this includes funding for border field division offices in Dallas, Houston, Los Angeles, and Phoenix; support for the El Paso Intelligence Center; and staff in Mexico. However, these figures do not fully reflect costs for the agency's domestic efforts to investigate Mexico-related cases.

ICE enforces U.S. export laws, and ICE agents and other staff address a range of issues, including combating the illicit smuggling of money, people, drugs, and firearms (see table 2). As the primary federal law enforcement agency responsible for investigating international smuggling operations and enforcing U.S. export laws, ICE's Homeland Security Investigations division targets the illegal movement of U.S.-origin firearms, ammunition, and explosive weapons with the goal of preventing the procurement of these items by DTOs and other transnational criminal organizations. ICE's investigative strategy includes the identification and

prosecution of criminal networks and individuals responsible for the acquisition and movement of firearms from the United States.

**Table 2: Key Immigration and Customs Enforcement (ICE) Efforts and Resources to Stem Firearms Trafficking to Mexico**

| Key activities | Estimated funding expenditures (fiscal years 2009-2014) | Personnel (fiscal year 2014) |
|---|---|---|
| ICE, under certain legal authorities (specifically, the Arms Export Control Act and International Traffic in Arms Regulation), contributes to the U.S. effort to stem firearms trafficking to Mexico by enforcing U.S. export laws through some of its programs, including its Counter Proliferation Investigations Program and Border Enforcement Security Teams. | $94.8 million (expended for counter-firearms trafficking efforts related to Mexico) | ICE reports its personnel contributions in terms of full-time equivalent (FTE) hours. Thus, for efforts to counter firearms and ammunition trafficking ICE reports that in fiscal year 2014 it expended 102,906 Mexico-related hours with 61 FTEs. |

Source: GAO analysis of ICE information. | GAO-16-223

Other U.S. agencies that contribute to the effort to stem firearms trafficking to Mexico include:

- **CBP.** DHS's CBP is charged with managing, securing, and controlling the nation's borders for both people and cargo entering and leaving the United States. CBP's outbound mission is to facilitate the movement of legitimate cargo, while interdicting the illegal export of weapons and other contraband out of the United States.

- **State.** State's Bureau of International Narcotics and Law Enforcement Affairs (INL) advises the President, Secretary of State, and government agencies on policies and programs to combat international narcotics and crime. INL programs support State's strategic goals to reduce the entry of illegal drugs into the United States and to minimize the impact of international crime on the United States and its citizens. INL oversees funding provided to build the capacity of Mexico to fight organized crime under the Mérida Initiative, including funds to support efforts to combat firearms trafficking.

- **ONDCP.** ONDCP is a White House component whose principal purpose is to establish policies, priorities, and objectives for the nation's drug control program. It produces a number of publications, including the *Strategy*—first issued in 2007. The *Strategy* is intended to serve as an overarching guide for combating criminal activity along the U.S.-Mexico border; since 2009 it has included a Weapons Chapter in recognition of the threat posed by the smuggling of firearms across the Southwest border. Given ATF's and ICE's roles in combating firearms trafficking, these agencies share responsibility for preparing the information presented in the Weapons Chapter of the

*Strategy*. While ONDCP tracks progress by U.S. agencies in meeting these objectives, it is not directly involved in planning or implementing their activities.

# Most Firearms Seized in Mexico That Are Traced by ATF Come from the United States, and Most Are Purchased in Southwest Border States

## Most Firearms Recovered in Mexico That Are Traced by ATF Come from the United States

Data from ATF on firearms seized in Mexico and traced from calendar year 2009 to 2014 indicate that the majority originated in the United States. Because of the illicit nature of the trafficking, the exact number of firearms trafficked from the United States into Mexico is unknown. Similarly, ATF officials noted that since firearms seized in Mexico are not always submitted for tracing the same year they were seized, or are not submitted at all, it is not possible to develop data to track trends on firearms seized. However, ATF uses the number of firearms seized and traced as an indicator to estimate extent of illicit firearms trafficking. While the government of Mexico collects data on the number of firearms its law enforcement entities seize each year, our analysis and findings refer exclusively to the universe of firearms seized in Mexico that were submitted for tracing using eTrace.[11]

According to ATF data, of the 104,850 firearms seized by Mexican authorities and submitted for tracing from 2009 to 2014, there were 73,684, or 70 percent, found to have originated in the United States. About 17 percent of the total, 17,544 firearms, were traced to a country

---

[11]According to data provided by the government of Mexico, Mexican authorities seized 158,560 firearms from 2009 to 2014. However, we were unable to independently verify the reliability of these data. Therefore, we did not compare figures provided by Mexican authorities to ATF tracing data.

other than the United States.[12] ATF could not determine the origin of 13,622 (13 percent) of these firearms because of incomplete information.[13] See figure 1.

**Figure 1: Numbers of Firearms Seized in Mexico and Submitted for Tracing, by U.S. and Non-U.S. Origin, 2009 to 2014**



Source: GAO analysis of Bureau of Alcohol, Tobacco, Firearms and Explosives data.  |  GAO-16-223

Note: U.S. origin includes firearms manufactured in the United States or legally imported into the United States. Non-U.S. origin refers to those firearms for which the trace request indicated a non-U.S. (foreign) manufacturer and for which there is no evidence that they were ever imported to the

---

[12]According to ATF data, from 2009 to 2014, after the United States the top five countries of origin of firearms seized in Mexico and traced were Spain (3,786), China (3,027), Italy (2,186), Germany (1,522), and Romania (1,287).

[13]In 2009, GAO reported data provided by ATF indicating that 87 percent of firearms seized in Mexico and traced from 2004 to 2008 originated in the United States (see GAO-09-709). ATF explained that data provided to GAO for the years 2004 to 2008 for that report are not comparable to the data provided for this report because the agency has established different parameters for analysis and reporting of the data for the period 2009 to 2014. Current ATF standards entail more extensive review of Mexican data submitted in the eTrace system for completeness and accuracy. Additionally, more recent data on traces are reported on a calendar year rather than a fiscal year basis.

United States. Undetermined origin refers to those firearms for which the trace information was unclear as to the manufacturer, country of origin, importer, or a combination of these.

ªFirearms may have been seized in prior years but submitted for tracing from 2009 to 2014.

From 2009 to 2011, numbers of firearms seized by Mexican authorities and submitted for tracing fluctuated significantly, followed by a steady decline after 2011. According to ATF officials, shifts in the number of guns seized and traced do not necessarily reflect fluctuations in the volume of firearms trafficked from the United States to Mexico from one year to the next. ATF staff explained that there are several factors that have influenced the year-to-year variance in the number of firearms traced since 2009. For example, they explained that the high number of firearms traced in 2009 reflects a single submission by the Mexican military to ATF for tracing of a backlog of thousands of firearms.[14] Conversely, ATF officials noted there was a lower number of firearms submitted for tracing in 2010 because that is the year eTrace in Spanish was initially deployed in Mexico, and Mexican law enforcement officials at the local, state, and federal level had to be trained on using the system. In 2011, a much higher number of firearms were traced as Mexican officials became proficient in using the system. Finally, U.S. and Mexican officials suggest the decline since 2011 may reflect a period of adjustment in cooperation under the Peña Nieto administration. This included the centralization of access to eTrace in Mexico's Attorney General's Office and retraction of eTrace accounts from federal, state, and local law enforcement, which resulted in fewer Mexican law enforcement officials able to trace firearms using the system.

## Long Guns Account for about Half of All Firearms Seized in Mexico and Traced

According to Mexican law enforcement officials we interviewed, DTOs prefer high caliber weapons with greater firepower, including high caliber rifles or long guns, and military grade equipment. Officials explained that the firearms of choice for drug traffickers are high caliber assault rifles, such as AK type and AR 15 type, which are available for purchase in the United States and which can be converted to fully automatic fire (i.e., converted into machine guns). Officials also noted that in recent years they have seen DTOs acquire military equipment, such as .50 caliber

---

[14]According to Mexican officials, Mexican law requires that all firearms seized in Mexico must be stored by the Mexican military (Secretaría de Defensa Nacional—SEDENA). Before the deployment of eTrace in Spanish in 2010, the Mexican military had accumulated a sizable collection of seized firearms that were subsequently submitted for tracing using ATF's eTrace system.

machine guns, rocket launchers, and grenade launchers. However, they said that unlike firearms typically used by DTOs, which often can be traced back to the United States, this type of equipment is known to often be trafficked into Mexico from leftover Central American military stockpiles from past conflicts. See figure 2 for examples of long and short guns (also referred to as handguns).

**Figure 2: Examples of Long and Short Guns**

### Short guns

9mm



.38 Cal. (38 Special)



### Long guns

AR Type



12 gauge pump action shotgun



Source: Bureau of Alcohol, Tobacco, Firearms and Explosives.  |  GAO-16-223

According to data provided by ICE, the agency seized 5,951 firearms that were destined for Mexico in the last 6 years.[15] Of firearms seized by ICE from 2009 to 2014, 2,341, or 39 percent, were long guns—including rifles and shotguns. During the same period, ICE seized 3,610 short guns—including revolvers and pistols (see fig. 3).

**Figure 3: Number and Type of Firearms Destined to Mexico Seized in the United States by Immigration and Customs Enforcement, 2009 to 2014**



Source: GAO analysis of Immigration and Customs Enforcement data.  |  GAO-16-223

Note: Pistols and revolvers are considered short guns. Rifles and shotguns are considered long guns.

According to data provided by ATF, almost half of all firearms seized in Mexico and traced in the last 5 years were long guns. From 2009 through 2014, 49,566 long guns—rifles and shotguns—were seized and traced. During that same period, 53,156 short guns—including revolvers and pistols—were seized and traced. The data also show a substantial decline in the number of long guns traced since 2011 (see fig. 4). Mexican law enforcement officials said that in the last 2 years they often

[15]According to ICE, this number includes seizures made that were enabled or assisted by other DHS components.

seized more handguns than rifles, but stated that the use of high caliber rifles by cartels is still widespread.

**Figure 4: Number and Type of Firearms Seized in Mexico and Submitted to the Bureau of Alcohol, Tobacco, Firearms and Explosives for Tracing, 2009 to 2014**



Source: GAO analysis of Bureau of Alcohol, Tobacco, Firearms and Explosives data.  |  GAO-16-223

[a]Firearms may have been seized in prior years but submitted for tracing from 2009 to 2014.

[b]Pistols and revolvers are considered short guns. Rifles and shotguns are considered long guns.

According to ATF officials, steps the bureau has taken to combat firearms trafficking to Mexico have made it more difficult for firearms traffickers to acquire long guns. Specifically, they noted implementation of Demand Letter 3, which requires licensed dealers and pawnbrokers in Arizona, California, New Mexico, and Texas to report multiple sales of certain rifles.[16] According to ATF, information from multiple sales reports on long guns allows the bureau to identify indicators of suspicious or high-volume purchasing by individuals, repetitive purchasing, and purchases by

---

[16]Pursuant to 18 U.S.C. § 923(g)(5), ATF issued *Demand Letter 3* to licensed dealers and pawnbrokers in Arizona, California, New Mexico, and Texas, requiring them to submit information to ATF concerning sales or other dispositions to an unlicensed purchaser, within 5 business days, of two or more rifles that have semiautomatic action, a caliber greater than .22, and the ability to accept a detachable magazine.

associates, as well as geographical trends for such sales. ATF officials reported that this information has helped them identify firearms traffickers and others involved in a timelier manner, which on several occasions has led to arrests and seizures of firearms intended for trafficking to Mexico. From 2011 to 2014, 490 long guns that had been recorded as part of multiple sales transactions under Demand Letter 3 were seized in crime scenes—259 in the United States, 209 in Mexico, and 22 in undetermined locations.

## Most Firearms Seized in Mexico and Traced to the United States Were Purchased in Southwest Border States

Most of the firearms seized in Mexico that were traced and found to be of U.S. origin from 2009 to 2014 came from U.S. Southwest border states. While guns seized in Mexico of U.S. origin were traced to all of the 50 states, most came from Texas, California, and Arizona. As shown in figure 5, of all firearms seized in Mexico that were traced and identified to be of U.S. origin, about 41 percent came from Texas, 19 percent from California, and 15 percent from Arizona. According to ATF, in fiscal year 2014, there were about 10,134 licensed dealers and pawnbrokers in the four Southwest border states, many of them along the border. This represents about 16 percent of the approximately 63,311 licensed dealers and pawnbrokers nationwide. These licensed dealers and pawnbrokers can operate in locations such as gun shops, pawn shops, their own homes, or gun shows.[17]

[17]See discussion of gun shows in GAO-09-709.

**Figure 5: Top Source States for Firearms Seized in Mexico of U.S. Origin and Numbers Seized, 2009-2014**



Sources: GAO analysis of Bureau of Alcohol, Tobacco, Firearms and Explosives data; Map Resources (map).  |  GAO-16-223

Note: Percentages in the pie chart do not add up 100 because of rounding. Actual number of firearms purchased in selected states represented in parenthesis.

According to ATF officials, most firearms seized in Mexico and traced back to the United States are purchased in the United States then transferred illegally to Mexico. ATF has been able to determine the original retail purchaser for about 45 percent of firearms seized in Mexico and traced to the United States from 2009 to 2014. However, ATF was unable to determine a purchaser for 53 percent,[18] because of factors such

---

[18]According to ATF, the other 3 percent of firearms were traced to a purchaser in a foreign country. Percentages do not add up to 100 because of rounding.

as incomplete identifying data on trace request forms, altered serial numbers, no response from the federal firearm licensee to ATF's request for trace information,[19] or incomplete or never received out-of-business licensee records.[20]

## Trafficking in Firearms Parts May Facilitate DTOs' Acquisition of Firearms and Complicates Authorities' Efforts to Prevent Trafficking

ATF and Mexican government officials told us that a new complicating factor in their efforts to fight firearms trafficking is the use of weapons parts transported to Mexico to be later assembled into finished firearms. According to documents provided by ATF, firearm parts include unfinished receivers barrels, triggers and hammers, buttstocks, pistol grips, pins, bolts, springs, and other items. Figure 6 shows some of these firearms parts. None of these firearm parts are classified as firearms under the Gun Control Act.[21] In general, U.S. federal laws and regulations requiring manufacturers and importers of firearms to identify firearms with a serial number do not apply to parts, unless otherwise specified by law.[22] Federal firearms licensees and other retailers are not required to report on the acquisition and disposition of firearm parts as they must for firearms. Furthermore, any individual in the United States may legally acquire and possess certain firearm parts that are not otherwise proscribed by law, including persons prohibited from possessing firearms and ammunition, such as convicted felons.

---

[19]Generally, 18 U.S.C. § 923 (g)(7) requires federal firearms licensees to respond immediately to, and in no event later than 24 hours after, the receipt of a request by the Attorney General for information contained in the records required to be kept.

[20]In accordance with 18 U.S.C. § 923(g)(4), upon discontinuance of business by federal firearms licensees, records shall be delivered within 30 days after the business discontinuance to ATF.

[21]Under the Gun Control Act, the term firearm means (1) any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (2) the frame or receiver of any such weapon; (3) any firearm muffler or firearm silencer; or (4) any destructive device. The definition of firearm does not include antique firearms. 18 U.S.C. § 922(a)(3).

[22]Under the National Firearms Act, firearms include machine gun parts that are designed and intended solely and exclusively for use in converting a weapon into a machine gun and any combination of parts from which a machine gun can be assembled. See 26 U.S.C. § 5812(a); 5845(b). Additionally, the National Firearms Act defines firearms to include silencers, which are subject to the requirement for manufacturers to identify them with serial numbers. See 26 U.S.C. § 5845(a); 5842(a).

**Figure 6: Basic Firearm Components from Firearms Parts Kits**



Source: Bureau of Alcohol, Tobacco, Firearms and Explosives.  |  GAO-16-223

Firearms may be assembled by using parts kits that include all of the components of a fully operable firearm minus the firearm receiver or frame, which may be obtained separately. ATF officials explained that in order to circumvent marking requirements on transactions involving firearms and thus avoid tracing, criminals will sometimes use unfinished receivers, such as "castings" or "flats," rather than fully functional receivers. A frame or receiver by itself is classified as a firearm by definition under the Gun Control Act. The receiver is the part of the firearm that houses the operating parts, typically the bolt or bolt carrier group, the magazine well, and the trigger group. A casting is essentially a piece of metal fabricated with the exterior features and contours of the firearm receiver for which it is intended to substitute, but that without further machining will not function as a firearm. Castings and flats are commonly referred to as 80 percent receivers in marketing materials and advertisements promoting their sale. The "80 percent" label is intended to convey that the product has been cast or fabricated with most of the

features of a finished, functional firearm receiver, but it will require further machining to function as a firearm (see fig. 7).

**Figure 7: Comparison between a Receiver (Considered a Firearm) and a Casting (Not Considered a Firearm)**





Source: Bureau of Alcohol, Tobacco, Firearms and Explosives.  |  GAO-16-223

**138**

A receiver flat is a piece of metal that has the same dimensions as a receiver, but that has not been shaped into a firearm configuration. In this form, it cannot accept any component parts, but with the proper equipment it can be readily bent into shape and molded into a receiver (see fig. 8).

**Figure 8: A Flat with All of the Required Holes Drilled but That Has Not Been Bent into Shape**



Source: Bureau of Alcohol, Tobacco, Firearms and Explosives.  |  GAO-16-223

According to documents provided by ATF, since kits, castings, and flats are not classified as firearms, transfers of those items are not regulated under the Gun Control Act or National Firearms Act. Although ICE officials noted they are subject to export control laws, they have no serial numbers and generally no markings; thus, firearms assembled with them are untraceable.[23] In addition, receivers and firearms parts are small and when transported separately may not be easily identified as items intended for the production of firearms. They are also easy to conceal, making it more challenging for customs authorities to detect illicit shipments of such parts.

---

[23]The Arms Export Control Act, as implemented through the International Traffic in Arms Regulations, regulates the export of defense articles classified on the United States Munitions List. Components, parts, accessories and attachments for certain firearms and receivers are included as items on the U.S. Munitions List and are considered defense articles that are subject to export control laws. See 22 C.F.R. § 121.1 & 120.45.

According to ATF officials, there are no reliable data on the extent of firearm parts trafficking from the United States into Mexico. They noted, however, that recent seizures of firearms parts, firearms made with unmarked parts, and equipment used to assemble or manufacture firearms in Mexico suggest an emerging reliance by criminal organizations on this source of weapons. For example, law enforcement officials in Mexico described to us two high-profile cases in 2014 involving illicit firearm parts assembly of this type. One was in Guadalajara, where Jalisco state police seized hundreds of unfinished receivers and pieces of sophisticated equipment being used to complete high caliber rifles. The second was in Tijuana, where Baja California state police seized 25 rifles in the process of assembly with firearm parts from the United States.[24]

# ATF and ICE Have Taken Steps to Improve Collaboration, but Lack of Monitoring May Contribute to Coordination Challenges

## ATF and ICE Have Taken Steps to Improve Collaboration, but Some Challenges Remain

ATF and ICE have taken several steps to improve coordination on efforts to combat firearms trafficking that we previously identified.[25] In 2009, we reported instances of dysfunctional operations, duplicative initiatives, and jurisdictional conflicts between ATF and ICE.[26] In response to our recommendations on how to address these challenges, ATF and ICE updated and signed an interagency collaboration memorandum of understanding (MOU) in June 2009. In their revised MOU, the agencies

---

[24]Mexican authorities indicated that they could not share more specific information on these cases because they are part of ongoing federal investigations.

[25]GAO-09-709.

[26]GAO-09-709.

committed to a shared goal of keeping the public safe by using the tools given to both agencies and which are vital to the effective control of domestic and international trafficking of firearms, ammunition, explosives, weapons, and munitions. Specifically, the MOU set forth roles and requirements for each agency with respect to (1) intelligence and information sharing, (2) general investigative guidelines, (3) specific investigative guidelines, (4) sources of information, and (5) conflict resolution. This effort to improve coordination and optimize use of the agencies' expertise provided the basis to address the issues that had hampered interagency collaboration prior to the MOU's implementation.

ICE and ATF officials said that after the MOU was signed, they held joint training exercises and conferences to ensure that agents had knowledge of the MOU and its jurisdictional parameters and collaboration requirements. Officials from each agency in headquarters, Mexico, and border locations we visited indicated that personnel working on firearms trafficking to Mexico were generally aware of the MOU's key provisions and collaborated on this basis. Agency officials also highlighted a more recent joint interagency conference in September 2014, which sought to provide participants with a common understanding of collaborative efforts and respective areas of jurisdiction. Additionally, senior agency headquarters officials asserted that there is extensive cooperation between ATF and ICE, at the headquarters and field office levels. ATF and ICE officials in border field offices we visited confirmed that they were familiar with the MOU and that it provides them guidance on interagency collaboration. Similarly, ATF and ICE officials in Mexico stated that since they are co-located physically, they have a greater opportunity to work together closely on firearms trafficking-related cases, and an ICE official said that they rely on the MOU to help define their respective roles.

Nevertheless, we identified persistent challenges in information sharing and some disagreement on the agencies' respective roles in investigations. For example, ATF and ICE disagree on the extent to which trace data on firearms seized in Mexico collected through eTrace should be shared to support ICE firearms trafficking investigations. According to an ICE assistant deputy director, these firearms trace data from Mexico are currently only shared on a limited basis with ICE. Several ICE officials expressed an interest in obtaining access to these data and indicated that this access would enhance their ability to identify methodologies used by firearms traffickers and trends in criminal activity along the Southwest border. ICE officials responsible for investigations said that trace data should be shared in accordance to the MOU, which states "ATF shall report to the appropriate ICE field office in a timely manner any

intelligence received relating to the illegal exportation, attempted exportation, or planned exportation of any item on the United States Munitions List..." However, the MOU does not address how general trafficking information, such as that submitted through eTrace by a third law enforcement agency, may be shared.

ATF officials asserted that their agency shares trace data on firearms seized in Mexico with ICE according to established agency polices, which currently only allow ATF to provide non-case-specific information to other agencies in aggregate form. With respect to the results of individual trace requests, ATF officials explained that they are provided only to the law enforcement agency that submits the trace information; generally, this information is not shared with third parties, including other law enforcement agencies. ATF would have to obtain authorization from the third-party law enforcement agency that submitted the trace information to share it with ICE. Thus, ATF cannot automatically share information with ICE on firearm traces submitted by Mexican law enforcement agencies without their authorization. ATF staff said these policies are set forth in the agreements ATF signs with each law enforcement agency for the use of eTrace. Officials from ATF and ICE said there are joint efforts under way to find a mechanism to share this information.

Additionally, the 2009 MOU sets forth investigative guidelines to define the roles and responsibilities of ATF and ICE pursuant to their respective statutory authorities. For example, the MOU states that "the regulation and inspection of the firearms industry is within the sole purview of ATF" and that "all investigative activities at the port of entry, borders and their functional equivalents must be coordinated through ICE." Notwithstanding these guidelines, we found some confusion among some agency officials about the appropriate roles of their counterparts in conducting investigations. For example, a senior ICE official responsible for investigations questioned the involvement of ATF in firearms trafficking investigations to Mexico, because, according to the official, ATF's jurisdiction focuses on combating domestic firearms violations. ICE officials also expressed concerns that the involvement of ATF's international desk with Mexican agencies may create confusion among Mexican government authorities over the roles that ICE and ATF play in addressing firearms trafficking cases. However, an ICE assistant deputy director explained that pursuant to the Arms Export Control Act, ICE has primary jurisdiction over violations related to the international trafficking of firearms, but many such trafficking investigations begin with domestic criminal activities for which ATF has jurisdiction. Therefore, he stressed that it is essential that the two agencies collaborate to leverage ICE's

international and ATF's domestic legal authorities. He added that ATF's international operations also provide much-needed capacity building regarding forensics and e-Trace activities in Mexico. However, ICE and ATF must work to ensure that confusion is not created among Mexican agencies regarding the responsibilities for the investigation of international firearms trafficking by U.S. authorities.

ATF officials agree that their agency's efforts to combat firearms trafficking are concentrated in the United States, and that they recognize the role of ICE in addressing transnational weapons trafficking. However, some ATF officials said that it is incorrect to suggest that ICE has exclusive jurisdiction with respect to illicit cross-border firearms trafficking to Mexico. According to these officials, most investigations involving the smuggling of firearms from the United States to Mexico implicate ATF jurisdiction, because they typically involve the illegal acquisition of firearms inside the United States. ATF's jurisdiction extends to unlawful acquisition of firearms by prohibited persons, straw purchasing, and other unlawful transfers of firearms. ATF officials added that the bureau's statutory responsibility for tracing firearms includes the deployment of eTrace to Mexican and other foreign law enforcement entities, and noted that eTrace entries from Mexico can result in the opening of firearm trafficking investigations focused on criminal activity in the United States. ATF officials also acknowledge that because of the nature of firearms trafficking to Mexico, many investigations involve overlapping jurisdiction with respect to cross-border offenses squarely within ICE's jurisdiction. They also noted the critical role ATF plays in providing training and capacity building on firearms and explosives identification and tracing for Mexican law enforcement. During our fieldwork, Mexican law enforcement agencies confirmed the benefits they derived from ATF capacity-building efforts, and they said they regarded ATF as their lead U.S. counterpart in investigating firearms trafficking. Thus, although ATF has established productive cooperative relations with Mexican agencies, there may also be some confusion in Mexico over ATF's and ICE's roles in combating firearms trafficking, as expressed by some ICE officials.

## ATF and ICE Do Not Consistently Monitor Implementation of the 2009 MOU, Resulting in Continued Coordination Challenges

In prior work, we have identified several interagency mechanisms that can be used to improve collaboration among agencies working on a shared mission, such as information sharing, agency roles and responsibilities, and oversight and monitoring.[27] We have also reported that written interagency agreements, such as MOUs, are most effective when they are regularly updated and monitored. We observed that when implementation of such agreements is not regularly monitored, there is sporadic and limited collaboration among agencies. We also have found that agencies that create a means to monitor, evaluate, and report the results of collaborative efforts can better identify areas for improvement.

Immediately after the MOU was updated in 2009, the agencies committed to undertake efforts to ensure that its provisions would be implemented accordingly. For example, at that time, ICE informed GAO that headquarters had a process to obtain information from ICE field offices every 60 days to identify coordination issues with ATF that could not be resolved at the field level within the framework of the MOU. In such situations, ICE headquarters would then work with the appropriate ATF component to resolve the issue. ICE officials explained these initial monitoring efforts were designed to ensure that the updated MOU was being effectively followed as it introduced several provisions or guidelines on how ATF and ICE should collaborate on firearms trafficking. However, according to ICE officials, this process was only in place during the initial implementation period of the MOU, and the effort was not sustained.

Currently, officials from both agencies acknowledged that there is no specific mechanism in place to monitor implementation of the MOU. However, each agency's officials referred to different efforts that they said provide an opportunity to monitor interagency collaboration under the MOU. For example, a deputy assistant director for ICE stated that coordination between ICE and ATF on firearms trafficking cases occurs at the Export Enforcement Coordination Center as well as at the field level. ICE's Export Enforcement Coordination Center is intended to serve as the primary forum within the federal government for executive departments

---

[27]Other key features identified include policy development; program implementation; and building organizational capacity, such as staffing and training. For additional information, see GAO, *Managing for Results: Key Considerations for Implementing Interagency Collaborative Mechanisms*, GAO-12-1022 (Washington, D.C.: Sept. 27, 2012), and *Export Promotion: Trade Agencies Should Enhance Collaboration with State and Local Partners*, GAO-14-393 (Washington, D.C.: May 21, 2014).

144

and agencies to coordinate their export control enforcement efforts. The Center seeks to maximize information sharing, consistent with national security and applicable laws. Thus, it is likely that coordination challenges between ICE and ATF on firearms trafficking could potentially be detected at the Center. However, given the Center's broader responsibility to enhance export control enforcement efforts with multiple agencies, it is not directly intended to monitor implementation of the MOU. Moreover, coordination challenges related to the MOU persist even though the Center has been in place for 5 years, indicating that this may not be an effective means to monitor the MOU's implementation.

Senior ATF officials said that although there is no formal arrangement to regularly monitor implementation of the MOU, they consider joint interagency training to be an effective approach to ensure that officials from both agencies are familiar with the provisions of the MOU and are working together effectively. However, only two such training exercises have taken place—one in 2014 and another in September 2015. The training is intended to acquaint officials from both agencies with how the agencies coordinate firearms trafficking efforts, and as part of the training, the MOU provisions are discussed, but these training exercises do not constitute a mechanism for consistent monitoring of implementation of the MOU. By not sustaining a monitoring process for the MOU, the agencies have no assurance that its provisions are being implemented effectively, and challenges we identified are continuing to persist without a process for resolution.

## U.S.-Mexico Collaboration on Firearms Trafficking Was Scaled Back after 2012, but While Challenges Continue, Bilateral Efforts Have Recently Been Gaining Momentum

**Bilateral Firearms Trafficking Efforts Slowed Following Mexican Moves to Consolidate Law Enforcement Collaboration**

Mexican and U.S. officials described how upon coming to power in December 2012, the current administration of Mexican President Enrique Peña Nieto undertook a reevaluation of U.S.-Mexico law enforcement collaboration, including efforts to combat firearms trafficking.[28] According to some officials, the government of Mexico took steps to consolidate law enforcement cooperative activities under an approach termed *Ventanilla Única*—which translates to Single Window. Under *Ventanilla Única*, Mexico's Interior Ministry has become the primary entity through which Mérida Initiative training and equipment are coordinated, including capacity-building activities related to firearms trafficking. The government of Mexico also established a single point of contact within Mexico's Office of the Attorney General to approve joint investigations with U.S. counterparts. Additionally, Mexican officials explained that Mexican law categorizes firearms trafficking as a federal crime and permits only federal authorities to work on such cases. This has led to some notable changes in the way U.S. and Mexican authorities work together on firearms trafficking efforts.

One of these changes stemmed from the decision to centralize access to ATF's eTrace in the Mexican Attorney General's Office. Consistent with our prior recommendations, in 2010, ATF reached an agreement for deployment of eTrace in Spanish in Mexico, with Mexican authorities. According to ATF, this was a significant investment for which ATF provided training to numerous officials from various Mexican federal, state, and local law enforcement agencies on the use of eTrace, while assigning accounts to allow them to access the system. However, by 2013 the Mexican government retracted access to many of these accounts, effectively limiting eTrace in Mexico to certain authorized officials in the office of Mexico's Attorney General. Mexican officials explained that the decision to consolidate access at the Attorney General's office was intended to provide the government of Mexico with more effective control over the information associated with eTrace, and to support a central repository of evidence related to federal crimes such as trafficking of firearms. However, U.S. officials and some Mexican authorities said that limiting access to eTrace to a single governmental entity has restricted opportunities for bilateral collaboration. Some U.S.

---

[28]U.S. law enforcement agencies conduct their work in Mexico in cooperation with Government of Mexico counterparts under the Treaty of Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance. U.S.-Mexico, S. Treaty Doc. No. 100-13 (1988).

officials based in Mexico similarly noted that limiting access to eTrace diminished tracing of total firearms seized by Mexican authorities.

Another significant change following the reassessment of bilateral collaboration, which began in 2012, was the suspension of periodic meetings of a working group known as *GC Armas*, which brought together U.S. and Mexican officials from various agencies involved in combating firearms trafficking. According to ATF officials, prior to 2013, *GC Armas* held periodic meetings annually with the participation of approximately 70 to 100 officials from both governments. These officials shared useful information on firearms trafficking trends, trace data, investigations, collaboration questions, and many other issues. ATF officials said that oftentimes very productive cooperative efforts on firearms trafficking began informally at *GC Armas* meetings and were subsequently formalized. Mexican officials similarly characterized *GC Armas* meetings as contributing in a fundamental manner to reaching significant agreement between law enforcement in both countries on how to combat firearms trafficking. They noted one such bilateral effort that resulted in a comprehensive assessment of firearms and explosives trafficking with recommendations for each country on sharing information and cooperating on cross-border investigations. Officials from both countries explained that while bilateral coordination did not cease after the suspension of *GC Armas* meetings, overall collaboration slowed down with fewer opportunities to promote bilateral firearms trafficking initiatives.

## Corruption and Frequent Turnover Continue to Hamper Bilateral Collaboration on Firearms Trafficking

U.S. and Mexican authorities acknowledge the challenges to law enforcement efforts posed by continuing corruption among some Mexican officials. As we discussed in our 2009 report, concerns about corruption within Mexican government agencies often limit U.S. officials' ability to develop a full partnership with their Mexican counterparts. Officials we met with from ATF, ICE, CBP, and State continued to express such concerns regarding corruption in Mexico. Some Mexico-based ICE officials, for example, stated that they are conscious that their U.S.-based colleagues will not always share with them all of the information they have on firearms trafficking investigations because of concerns about corruption. That is, ICE officials in the United States and along the U.S.-Mexican border are concerned about sharing information with ICE officials based in Mexico, fearing that the information may unintentionally reach corrupt Mexican authorities and compromise their investigations. According to ICE officials, concerns they had about corruption in Mexico were exacerbated early in the Peña Nieto administration when a vetted

unit of Mexican law enforcement officials that they trusted and that ICE had trained and worked with for several years was disbanded.

U.S. officials also highlighted the problems frequent turnover in Mexican law enforcement pose for bilateral efforts to combat criminal activities, including firearms trafficking. Some U.S. officials explained that recurring personnel changes aggravate the issue of corruption. In a country such as Mexico, where there is an underlying concern about government corruption, frequent turnover complicates efforts to develop trust with counterpart officials. Other U.S. officials noted that there are no civil service protections in Mexico, so there can be a virtually complete change in the staff of a government agency when a new administration comes into office, or even when the head of an agency is reassigned. As a result, all of the people who received specialized training, such as firearms recognition, can be removed suddenly leaving no institutional memory, which complicates planning future collaboration and program implementation. Similarly, ATF officials commented that oftentimes Mexican law enforcement personnel in key positions for whom they provided firearms training were subsequently replaced. While turnover has been a recurring challenge for U.S. agencies working in Mexico, various U.S. officials said that it appears to have been particularly frequent in the past few years. For example, the spokesperson for one U.S. agency in Mexico noted that in the past 5 years the division responsible for implementing professional development at a key Mexican law enforcement entity has been replaced seven times.

## Over the Past Year, Bilateral Collaboration on Firearms Trafficking Efforts Has Gained Momentum

While both U.S. and Mexican officials collaborating on firearms trafficking said that bilateral efforts had been scaled back after the Peña Nieto administration came into power, these officials noted that over the past year collaborative activities have been bolstered and are gaining momentum. For example, around the time of our fieldwork in Mexico, CBP was working with Mexican authorities to deploy specially trained canine units able to detect firearms and explosives around the country. Similarly, ATF was providing training on firearms identification for Mexican Customs. A Mexican Customs spokesman stressed the importance of such training in helping front-line customs officers recognize and safely secure not just firearms but also ammunition, firearms' components, and explosives that criminals try to smuggle across the border. He explained that this training has been critical in allowing officers at the border to perform their mission.

**148**

Mexican Attorney General officials also noted their increasing level of cooperation with U.S. authorities on firearms trafficking. They highlighted ATF training on the use of eTrace and the resumption of *GC Armas* meetings in 2015. ICE officials also told us that they have recently reestablished the vetted unit in Mexico, which improves trusted working relationships with Mexican counterparts. Finally, in addition to renewing existing collaborative efforts with Mexican law enforcement counterparts, ATF has also sought to reach out to other Mexican government entities. For example, this year ATF has been collaborating with the Mexican Navy on training for firearms and explosives detection, identification, and seizure. Mexican Navy officers expressed gratitude for this training, noting that they are increasingly confronting real-world situations that require this type of knowledge.

## The Current Weapons Chapter Indicator in the *National Southwest Border Counternarcotics Strategy* Does Not Adequately Measure the Progress of U.S. Agencies in Stemming Firearms Trafficking to Mexico

The indicator used in the *Strategy* to track progress by U.S. agencies to stem firearms trafficking to Mexico does not adequately measure implementation of the strategic objective. The *Strategy* includes strategic objectives and indicators for each of its nine issue chapters to ensure effective implementation. The strategic objective for the Weapons Chapter is to "stem the flow of illegal weapons across the Southwest border into Mexico." ONDCP's indicator for this chapter is the "number of firearms trafficking/smuggling seizures with a nexus to Mexico." The *Strategy* does not further define the indicator, but ONDCP staff explained that it refers to the number of firearms seized in Mexico that are traced by ATF.

While ONDCP's *Strategy* asserts that it is critical to have indicators that enable tracking the implementation of objectives, this indicator for the Weapons Chapter does not effectively track the status of efforts to stem the flow of illegal weapons across the Southwest border. As previously noted in this report, ATF officials readily acknowledge that shifts in the number of guns seized and traced do not necessarily reflect fluctuations in the volume of firearms trafficked from the United States to Mexico in any particular year. There are many factors that could account for the number of firearms traced in a given year beside the number of firearms smuggled from the Unites States. Moreover, as discussed above, for various reasons the number of firearms seized in Mexico and traced back to the United States shifted significantly year to year after 2009 and then declined steadily since 2011. Thus, while the number of firearms seized and traced by ATF is useful to provide an overall indication of firearms of U.S. origin found in Mexico, by itself it is not an adequate measure of progress agencies are making to stem the flow of firearms trafficked from

the United States into Mexico. Additionally, ONDCP has not reported progress made on the strategic objective in the Weapons Chapter in 2011 or 2013. ONDCP staff said they anticipate that the 2015 *Strategy* will include a section to report on the outcomes of the last 2 years, and they plan to report on this indicator.

Beside the strategic objective and indicator, the Weapons Chapter of the *Strategy* also includes five supporting actions, along with associated activities to achieve those actions; see table 3. According to an ONDCP spokesman, while the number of firearms seized in Mexico and traced by ATF may be an indicator of the flow of firearms across the border, these five supporting actions and their associated activities should also be considered to get a full picture of the agencies' progress in combating arms trafficking. ONDCP officials said that they monitor progress in combating arms trafficking by obtaining periodic information from ATF and ICE on their implementation of these and other activities.

**Table 3: Supporting Actions and Activities in the Weapons Chapter of Office of National Drug Control Policy's (ONDCP) 2013** *National Southwest Border Counternarcotics Strategy*

| Supporting actions | Activities |
| --- | --- |
| Improve criminal intelligence and information sharing related to illegal weapons trafficking | • Facilitate U.S. government interagency criminal intelligence sharing<br><br>• Enhance programs at El Paso Intelligence Center targeting illegal weapons smuggling/trafficking<br><br>• Continue to employ programs to rapidly share weapons seizure information among U.S. law enforcement agencies |
| Increase the interdiction of illegal weapons shipments to Mexico | • Expand intelligence-driven interdiction of illicit weapons shipments destined for Mexico through multiagency investigative efforts |
| Enhance cooperation with international partners in weapons smuggling/trafficking investigations | • Engage in international training on border security, postblast investigations, firearms identification, and detection of concealment traps used for smuggling/trafficking of firearms in vehicles<br><br>• Complete and enhance the deployment of Spanish eTrace capabilities among appropriate Mexican law enforcement agencies<br><br>• Continue to monitor the end use of firearms legally exported from the United States to Mexico through the Department of State's Blue Lantern Program<br><br>• Maintain Drug Enforcement Administration; Federal Bureau of Investigation; Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); and Immigration and Customs Enforcement liaison officers in Mexico<br><br>• Modernize, expand, and network ballistics imaging technology with Mexican law enforcement agencies |
| Strengthen domestic coordination on weapons smuggling/trafficking investigations | • Improve support to state and local law enforcement efforts targeting illegal weapons trafficking<br><br>• Increase ATF staffing levels in the Southwest border region<br><br>• Expand the use of the Border Enforcement Security Teams to disrupt cross-border weapons trafficking networks<br><br>• Continue applying standard proviso on export licenses requiring the provision of serial numbers for firearms exported to Mexico<br><br>• Improve U.S. government outreach to and coordination with federal firearms licensees |
| Increase successful federal prosecutions for illegal weapons trafficking | • Assign Organized Crime and Gang Section prosecutors to the Southwest border<br><br>• Target gun trafficking gangs |

Source: GAO analysis of ONDCP's 2013 *National Southwest Border Counternarcotics Strategy.* | GAO-16-233

Our review of the Weapons Chapter in the 2011 and 2013 *Strategies* determined that, generally, accomplishments under each supporting action were discussed. For example, in the 2011 *Strategy*, one supporting action called for ATF to increase staffing at the El Paso Intelligence Center Firearms and Explosives Trafficking Intelligence Unit through the incorporation of partner agencies. In 2013, the *Strategy* included an update that the unit had incorporated a CBP analyst dedicated to weapons-related intelligence. Similarly, in 2011, the agencies said they

had plans under way to train over 200 Mexican law enforcement personnel in how to correctly use eTrace. The 2013 *Strategy* noted that 350 Mexican law enforcement personnel had received training on using eTrace. Nevertheless, the supporting actions described in the *Strategy* are not consistently linked to indicators or regularly measured. Currently, the narrative related to these supporting actions typically covers ongoing efforts by the agencies to address these actions, but it does not include a measure of overall progress. By including these supporting actions and activities in the Weapons Chapter as measures, ONDCP could better assess the agencies' efforts in combating firearms trafficking because this would provide a more comprehensive assessment.

## Conclusions

Although ATF and ICE have pledged, through the 2009 MOU, to collaborate effectively to combat firearms trafficking, these agencies have not set up a mechanism to monitor implementation of the MOU that would allow them to identify and address information sharing and collaboration challenges. Consequently, gaps in information sharing and some disagreement about agency roles in the broader effort to combat firearms trafficking have emerged that weaken the effectiveness of the MOU.

It is unclear to what extent ONDCP's *Strategy* has advanced U.S. government efforts to combat firearms trafficking, since the indicator used to track progress, by itself, is not sufficient to measure progress made by U.S. agencies in stemming arms trafficking to Mexico. Other actions that agencies take to stem the flow of firearms from the United States into Mexico may be worth considering as additional measures of progress, such as the number of interdictions of firearms destined for Mexico, the number of investigations leading to indictments for firearms trafficking related to Mexico, and the number of convictions of firearms traffickers with a nexus to Mexico. By including these types of measures in a comprehensive indicator or set of indicators, ONDCP will be better positioned to monitor progress on stemming firearms trafficking across the Southwest border.

## Recommendations for Executive Action

We recommend that the Attorney General of the United States and the Secretary of Homeland Security convene cognizant officials from ATF and ICE to institute a mechanism to regularly monitor the implementation of the MOU and inform agency management of actions that may be needed to enhance collaboration and ensure effective information sharing.

To ensure effective implementation of the strategic objective of the Weapons Chapter of the *Strategy*, we recommend that the ONDCP Director establish a more comprehensive indicator, or set of indicators, that more accurately reflects progress made by ATF and ICE in meeting the strategic objective.

## Agency Comments

We provided a draft of this report for review and comment to the Departments of Homeland Security, Justice, and State; and the Office of National Drug Control Policy.

DHS agreed with our recommendation regarding monitoring implementation of the MOU and provided written comments in response to the draft, reproduced in appendix II. In comments on the draft report provided via e-mail by a designated ATF Audit Liaison Officer, DOJ also agreed with this recommendation, noting that ATF officials will work with counterparts at DHS to create a mutually acceptable method to further enhance implementation of the MOU. State did not provide comments on the draft report.

In e-mail comments provided by a designated General Counsel official, ONDCP concurred with our recommendation to establish a more comprehensive set of indicators for the Weapons Chapter of the *Strategy*. Accordingly, ONDCP indicated that it would work with ICE and ATF to develop additional indicators to evaluate their progress. The indicators developed through this collaborative process will be used in future iterations of the *Strategy* beginning with the next report in 2017.

ICE and ATF also provided technical comments which we incorporated throughout the report where appropriate.

We are sending copies of this report to the appropriate congressional committees, the Secretary of Homeland Security; the Attorney General of the United States; the Director of the Office of National Drug Control Policy; the Secretary of State; and other interested parties. In addition, the report is available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-6991 or farbj@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix III.

Jessica Farb
Acting Director, International Affairs and Trade

# Appendix I: Scope and Methodology

To identify data available on the origin of firearms trafficked to Mexico that were seized and traced, we relied primarily on the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) data compiled by its National Tracing Center (NTC).The data provided by NTC were obtained from ATF's Firearms Tracing System, most of which is developed through eTrace submissions. We discussed with cognizant NTC officials the methodology used to collect these data and reviewed supporting agency documentation. Based on these discussions, we determined that NTC data were sufficiently reliable to permit an analysis of where the firearms seized in Mexico that were submitted for tracing had been manufactured and whether they had been imported into the United States before arriving in Mexico. For those firearms that were traced to a retail dealer in the United States before being trafficked to Mexico, NTC data also contained information on the states where they had originated. NTC trace data also contained information allowing identification of the types of firearms that were most commonly seized in Mexico and subsequently traced. We corroborated this information in discussions with U.S. and Mexican law enforcement officials.

Since firearms seized in Mexico are not always submitted for tracing within the same year as they were seized, it was not possible for us to develop data to track trends on the types of firearms seized year to year. Similarly, we were unable to obtain quantitative data from U.S. or Mexican government sources on the users of illicit firearms in Mexico. However, there was consensus among U.S. and Mexican law enforcement officials that most illicit firearms seized in Mexico had been in the possession of organized criminal organizations linked to the drug trade. The involvement of criminal organizations with ties to drug trafficking in the trafficking of illicit firearms into Mexico was confirmed by law enforcement intelligence sources. We learned about the use of firearms parts for the assembly of firearms in Mexico through our interviews with cognizant U.S. and Mexican government and law enforcement officials and through review of ATF-provided documents.

To learn more about U.S. government efforts to combat illicit sales of firearms in the United States and to stem the flow of these firearms across the Southwest border into Mexico, we interviewed cognizant officials from the Department of Justice's (DOJ) ATF, the Department of Homeland Security's (DHS) Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP), and the Department of State (State) regarding their relevant efforts. We obtained data from ATF and ICE on funding for their respective efforts to address firearms trafficking to Mexico, and data from ICE on seizures of southbound firearms. To

assess the reliability of the data, we discussed sources and the methodology use to develop the data with agency officials. We determined that the information provided to us was sufficiently reliable to describe agencies' efforts to combat firearms trafficking. We also conducted fieldwork at U.S.-Mexico border crossings at El Paso, Texas, and San Diego, California. In these locations, we interviewed ATF, CBP, and ICE officials responsible for overseeing and implementing efforts to stem the flow of illicit firearms trafficking to Mexico and related law enforcement initiatives.

We reviewed and analyzed DOJ and DHS documents relevant to U.S. government efforts and collaboration to address arms trafficking to Mexico, including funding data provided to us by ATF and ICE, the 2009 memorandum of understanding (MOU) between ICE and ATF, data from ICE on seizures of firearms destined for Mexico, data from ATF and ICE on efforts to investigate and prosecute cases involving arms trafficking to Mexico, and agency reports and assessments related to the issue. We also reviewed relevant prior GAO reports, Congressional Research Service reports and memorandums, and reports from DOJ's Office of Inspector General related to ATF's efforts to enforce federal firearms laws. We reviewed provisions of federal firearms laws relevant to U.S. government efforts to address firearms trafficking to Mexico, including the Gun Control Act of 1968, the National Firearms Act of 1934, and the Arms Export Control Act of 1976. We did not independently review any Mexican laws for this report.

To determine how well agencies collaborated with Mexican authorities to combat illicit firearms trafficking, we conducted fieldwork in Mexico City, Guadalajara, and border locations in Ciudad Juarez and Tijuana, Mexico. In Mexico, we met with ATF, CBP, ICE, and State officials working on law enforcement issues at the U.S. embassy. We interviewed Mexican government officials engaged in efforts to combat firearms trafficking from the Attorney General's Office (Procuraduría General de la República), the Federal Police (Policía Federal); the Ministry of Public Safety (Secretaría de Seguridad Pública); the Ministry of Defense (Secretaría de la Defensa Nacional); the Mexican National Intelligence Agency (Centro de Investigación y Seguridad Nacional, or CISEN); the Mexican Navy (Secretaría de Marina or Armada de Mexico); Customs (Servicio de Administración Tributaria); the Forensic Science Institute of Jalisco (Instituto Jalisciense de Ciencias Forenses); Attorney General Regional Offices, Federal Police, and State Police in Tijuana and Ciudad Juarez; and the State Attorney General in Guadalajara. Because our fieldwork was limited to selected locations along the Southwest border and in the

**Appendix I: Scope and Methodology**

interior of Mexico, our observations in these locations are illustrative but are not generalizable and may not be representative of all efforts to address the issue.

To assess the extent to which the *National Southwest Border Counternarcotics Strategy* (*Strategy*) outlines U.S. goals and progress made in efforts to stem firearms trafficking to Mexico, we reviewed the 2011 and 2013 versions of the *Strategy*'s Weapons Chapter and the 2010 implementation guide. We also met with Office of National Drug Control Policy officials responsible for the implementation and monitoring the *Strategy*, as well as with ATF and ICE officials responsible for writing the Weapons Chapter and overseeing implementation and reporting on activities described within their respective agencies.

# Appendix II: Comments from the Department of Homeland Security



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

December 9, 2015

Jessica Farb
Acting Director, International Affairs & Trade
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Re:   Draft Report GAO-16-223, "FIREARMS TRAFFICKING:  U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain"

Dear Ms. Farb:

Thank you for the opportunity to review and comment on this draft report.  The U.S. Department of Homeland Security (DHS) appreciates the U.S. Government Accountability Office's (GAO) work in planning and conducting its review and issuing this report.

The Department welcomes GAO's positive recognition that the U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) efforts to combat firearms trafficking to Mexico.  As the primary federal law enforcement agency responsible for investigating international smuggling operations and enforcing U.S. export laws, HSI is committed to combating illegal firearms, ammunition and explosives smuggling activities that fuel violence both domestically and abroad.  HSI fulfills this commitment by relying on its extensive legal authorities and unique expertise in conducting illegal export and contraband smuggling investigations.

HSI firearms, ammunition, and explosives smuggling investigations have resulted in unprecedented bi-lateral interdictions, investigations and information-sharing activities that identify, disrupt, and dismantle transnational criminal networks operating within the United States, Mexico, Canada, Central America, the Caribbean, and around the World.

HSI and its law enforcement partners target the illegal movement of U.S. origin firearms, ammunition, and explosive weapons with the ultimate goal of preventing the procurement of these items by drug cartels, terrorists, human rights violators, foreign adversaries, and other transnational criminal organizations and individuals that utilize these weapons to facilitate criminal activity and commit acts of violence.  HSI's investigative strategy includes the identification and prosecution of criminal networks and individuals

responsible for the acquisition and movement of firearms and other dangerous weapons
from the United States, as well as the seizure and forfeiture of money and valuable
property derived from or used to facilitate this criminal activity.

The draft report contained one recommendation to DHS with which the Department
concurs.  Specifically, GAO recommended that the U.S. Attorney General and the
Secretary of Homeland Security:

**Recommendation 1:**  Convene cognizant officials from ATF [Bureau of Alcohol,
Tobacco, Firearms and Explosives] and ICE to institute a mechanism to regularly
monitor the implementation of the MOU [Memorandum of Understanding] and inform
agency management of actions that may be needed to enhance collaboration and ensure
effective information sharing.

**Response:**  Concur.  ICE and ATF will coordinate on efforts to institute an oversight
mechanism to regularly monitor the implementation of the MOU between the two
agencies.  ICE HSI has already begun preliminary discussions with counterparts in ATF
to create such a mechanism.  The goal is to better inform agency management of actions
that may be needed to enhance collaboration and ensure effective information sharing, as
appropriate.  Estimated Completion Date:  December 31, 2016.

Again, thank you for the opportunity to review and comment on this draft report.
Technical comments were previously provided under separate cover.  Please feel free to
contact me if you have any questions.  We look forward to working with you in the
future.

Sincerely,

Jim H. Crumpacker, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

2

# Appendix III: GAO Contact and Staff Acknowledgments

## GAO Contact

Jessica Farb, (202) 202-512-6991 or farbj@gao.gov

## Staff Acknowledgments

In addition to the contact named above, Charles Johnson (Director), Juan Gobel (Assistant Director), Francisco Enriquez (Analyst-in-Charge), Danny Baez, and Julia Jebo-Grant made key contributions to this report. Ashley Alley, Karen Deans, Justin Fisher, and Oziel Trevino provided additional assistance.

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (http://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to http://www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts and read The Watchblog. Visit GAO on the web at www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact: Website: http://www.gao.gov/fraudnet/fraudnet.htm E-mail: fraudnet@gao.gov Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |



Please Print on Recycled Paper.