C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs B&L Productions, Inc., California Rifle & Pistol Association, Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, Asian Pacific American Gun Owner Association, Second Amendment Law Center, Inc.

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

### IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST; GERALD CLARK; ERIC JOHNSON; CHAD LITTRELL; JAN STEVEN MERSON; CALIFORNIA RIFLE & PISTOAL ASSOCIATION, INCORPORATED; ASIAN PACIIC AMERICAN GUN OWNERS ASSOCIATION; SECOND AMENDMENT LAW CENTER, INC.; and SECOND AMENDMENT FOUNDATION,<br><br>                 Plaintiffs,<br><br>            v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROB BONTA, in his official capacity as Attorney General of the State of California; KAREN ROSS, in her official capacity as Secretary of California Department of Food & Agriculture and in his personal capacity; TODD SPITZER, in his official capacity | **CASE NO:** 8:22-cv-01518 JWH (JDEx)<br><br>**FIRST AMENDED** COMPLAINT FOR **DECLARATORY & INJUNCTIVE RELIEF**<br><br>**(1) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH - POLITICAL];**<br><br>**(2) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH-MIXED POLITICAL/ COMMERCIAL];**<br><br>**(3) VIOLATION OF 42 U.S.C. § 1983 [FREE SPEECH-COMMERCIAL];**<br><br>**(4) VIOLATION OF 42 U.S.C. § 1983 [PRIOR RESTRAINT ON SPEECH];**<br><br>**(5) VIOLATION OF 42 U.S.C. § 1983 [RIGHT TO ASSEMBLY];**<br><br>**(6) VIOLATION OF 42 U.S.C. § 1983 [EQUAL PROTECTION];**<br><br>**(7) VIOLATION OF 42 U.S.C. § 1983** |

FIRST AMENDED COMPLAINT

1  as District Attorney of Orange County; 32nd DISTRICT AGRICULTURAL ASSOCIATION; DOES 1-10;

3              Defendants.

**[SECOND AMENDMENT].**

**DEMAND FOR JURY TRIAL**

**NOTICE OF UNCONSTITUTIONALITY OF STATE STATUTE**

**NOTICE OF RELATED CASE**

2

FIRST AMENDED COMPLAINT

**INTRODUCTION**

1.     Plaintiff B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST ("Plaintiff Crossroads") has operated popular, safe, heavily regulated, legal, and family-friendly gun shows as a business in California for over 30 years, including at the Orange County Fair & Event Center ("the Fairgrounds").

2.     Plaintiff Crossroads produces gun shows at the Fairgrounds where like-minded individuals gather to engage in commerce related to, and necessary for, the lawful and regulated exercise of Second Amendment rights for themselves, their exhibitors, their patrons, their customers, and the general public. This safe and regulated marketplace promotes public safety, even for people who do not attend gun shows because it will tend to reduce the unregulated transfer of firearms within Orange County. Furthermore, by providing a convenient forum for Californians to exercise their right to acquire firearms locally, gun shows at the Fairgrounds will have the tendency to discourage the sale and importation of firearms from other states with less strict gun laws than California.

3.     Plaintiffs Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., Asian Pacific American Gun Owners Association, and Second Amendment Foundation, Inc., attend and participate in the Plaintiff Crossroads' gun show events at the Fairgrounds and elsewhere throughout California to engage in First Amendment activities that are both necessary and essential to the open, robust, and lawful exercise of their Second Amendment rights. Plaintiff CRPA also has members who attend gun shows and sell ammunition, firearms, and precursor parts.

4.     At the gun show, Plaintiffs associate with like-minded people, participate in public discussions, attend informational forums, distribute and collect information, provide training, make offers for sale, make offers to buy, and engage in legal and political discussions related to the Second Amendment, which are all

3

FIRST AMENDED COMPLAINT

forms of speech protected by the First Amendment. Discussions include, but are not limited to, firearms and ammunition, firearm technology, firearm safety, and firearm law and politics. Participants also exchange information about where to hunt and where to practice shooting, where and from whom to receive training, gunsmithing, gun repair, gun art, and many other topics that arise from the right to acquire, own, possess, enjoy, and celebrate arms as a quintessentially American artifact with constitutional significance.

5. Defendants are government actors who are responsible for, through the adoption and enforcement of Senate Bill 264 (Min), codified at California Penal Code section 27575,[1] which prohibits the sale of firearms, ammunition, and "firearm precursor parts" at the Fairgrounds, and Senate Bill 915 (Min), codified at California Penal Code section 27573,[2] which prohibits the sale of firearms, ammunition, and "firearm precursor parts" on *all* state-owned property with the intention and effect of shuttering gun show events altogether.

6. Through their enforcement of SB 264 and SB 915, the government Defendants have engaged in and will continue to engage in action that violates Plaintiffs' constitutional rights to free speech, assembly, and equal protection, as well as their Second Amendment right to buy, sell, and acquire firearms and ammunition at a gun show. Their actions also constitute an unconstitutional prior restraint.

7. This action seeks declaratory and injunctive relief against Defendants for violating the United States Constitution. It also seeks damages for lost profits, lost opportunities, and diminished marketing value, and reimbursement for reasonable attorney's fees, costs, and other expenses in bringing this action.

---

[1] Plaintiffs refer to the challenged law, California Penal Code section 27575, as SB 264 throughout this complaint.

[2] Plaintiffs refer to the challenged law, California Penal Code section 27573, as SB 915 throughout this complaint.

4

FIRST AMENDED COMPLAINT

**JURISDICTION AND VENUE**

8.     The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, thus raising federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress

9.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

10.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the 32nd District Agricultural Association is located within this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**PARTIES**

**[Plaintiffs]**

11.    Plaintiff B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST, is a for-profit event promoter operating in several western states. Crossroads is in the business of promoting and organizing trade shows throughout the state of California and other western states, including their long-running gun show events held at the Orange County Fair & Event Center ("the Fairgrounds") operated under the d/b/a Crossroads of the West ("Plaintiff Crossroads"). Before the adoption and enforcement of SB 264 and SB 915, Plaintiff Crossroads was the largest vendor of gun show events in California and at the Fairgrounds. Typically, thousands of people attend Plaintiff Crossroads' the gun shows on each of the weekends they are held. Crossroads provides the space for these like-minded people

1  to assemble. They have successfully produced and operated multiple safe, legal,

2  and family-friendly gun show events in California and at the Fairgrounds every

3  year for over 30 years. But for Defendants' adoption and enforcement of SB 264

4  and SB 915, Plaintiff Crossroads would immediately resume producing and

5  promoting gun show events at the Fairgrounds and at other state-owned fairgrounds

6  throughout California.

7       12.    Plaintiff GERALD CLARK is a resident of Santa Ana, California, and

8  he is an NRA certified instructor. Before the implementation of SB 264 and SB

9  915, he regularly attended Plaintiff Crossroads' gun show events at the Fairgrounds

10  to purchase firearms, ammunition, parts for firearms already owned, and materials

11  to help him with his training and as a gun owner to be more proficient. He has

12  taught gun safety and training courses for 12 years, and he has taught those courses

13  at the Crossroads gun show at the Fairgrounds as a Chief Range Safety Officer and

14  Certified Trainer. During the training courses, he talks to others about their rights,

15  the importance of membership in the CRPA, and the Second Amendment. SB 264

16  and SB 915 directly burdens his right to engage in otherwise lawful commercial

17  speech in a public forum and restricts his ability to purchase ammunition, firearms,

18  and parts for lawful purposes. And because the ban is intended to make gun shows

19  less profitable and has in fact effectively bannedshutter them altogether, it also

20  restricts his right to engage in the unique types of political, educational, and

21  commercial speech that takes place at the gun show. But for Defendants' adoption

22  and enforcement of SB 264 and SB 915, Plaintiff Clark would continue attending

23  and participating in the Crossroads gun show events at the Fairgrounds.

24       13.    Plaintiff ERIC JOHNSON is a resident of Whittier, California, and he

25  is a Certified Trainer, Range Safety Expert, retired coach, and Chief Range Safety

26  Officer. Before the implementation of SB 264 and SB 915, he regularly attended

27  Plaintiff Crossroads' gun show events at the Fairgrounds to purchase firearms,

28  ammunition reloading supplies, ammunition, parts for the firearms he owns,

6

FIRST AMENDED COMPLAINT

1  materials for caring for his firearms, and much more. Plaintiff Johnson also
2  attended the Crossroads gun show at the Fairgrounds to engage in expressive
3  activities with like-minded people, including discussions related to firearms,
4  ammunition, and firearm accessories, the shooting sports, politics, and the Second
5  Amendment. He regularly sets up and works Plaintiffthe CRPA's vendor booths at
6  gun shows at the Fairgrounds. SB 264 and SB 915 directly burdens his right to
7  engage in otherwise lawful commercial speech in a public forum and restricts his
8  ability to purchase ammunition, firearms, and parts for lawful purposes. And
9  because the ban is intended to make gun shows less profitable and has in fact
10 effectively bannedshutter them altogether, it also restricts his right to engage in the
11 unique types of political, educational, and commercial speech that takes place at the
12 gun show. But for Defendants' adoption and enforcement of SB 264 and SB 915,
13 Plaintiff Johnson would continue attending and participating in the Crossroads gun
14 show events at the Fairgrounds.

15      14.    Plaintiff CHAD LITTRELL is a resident of La Habra, CaliforniaA,
16 and owns Vytamenc 22 Tactical. Before the implementation of SB 264 and SB 915,
17 his company was a regular vendor at Plaintiffthe Crossroads' gun show events at
18 the Fairgrounds. At these events, he would lawfully sell "uppers," precursor parts,
19 and AR-15 rifles and discuss issues regarding firearms, ammunition, and gun safety
20 with customers of the gun show. Plaintiff Littrell also attended the Crossroads gun
21 show at the Fairgrounds to engage in expressive activities with like-minded people,
22 including discussions related to firearms, ammunition, and firearm accessories, the
23 shooting sports, politics, and the Second Amendment. SB 264 and SB 915 directly
24 burdens his right to engage in otherwise lawful commercial speech in a public
25 forum and restricts his ability to sell and purchase ammunition, firearms, and parts
26 for lawful purposes. And because the ban is intended to make gun shows less
27 profitable and has in fact effectively banned shutter them altogether, it also restricts
28 his right to engage in the unique types of political, educational, and commercial

FIRST AMENDED COMPLAINT

1   speech that takes place at the gun show. Because of the essential shutting down of

2   gun shows at the Fairgrounds, Plaintiff Littrell had to close his business. But for

3   Defendants' adoption and enforcement of SB 264 and SB 915, Plaintiff Clark

4   would re-open his business and continue attending and participating in the

5   Crossroads gun show events at the Fairgrounds.

6        15.   Plaintiff JAN STEVEN MERSON is a resident of Fullerton,

7   California, and he owns Merson's Machining Tool Making and Gunsmithing.

8   Before the implementation of SB 264 and SB 915, his company (then known as

9   Merson's Custom Tooling & Gunsmith) was a regular vendor at Plaintiffthe

10  Crossroads' gun show events at the Fairgrounds. At these events, he would lawfully

11  sell "firearm precursor parts"—which are legal products in California and are not

12  considered firearms by legal definition. Plaintiff Merson also attended the

13  Crossroads gun show at the Fairgrounds to engage in expressive activities with like-

14  minded people, including discussions related to firearms, ammunition, and firearm

15  accessories, the shooting sports, politics, and the Second Amendment. SB 264 and

16  SB 915 directly burdens his right to engage in otherwise lawful commercial speech

17  in a public forum and restricts his ability to sell and purchase ammunition, firearms,

18  and parts for lawful purposes. And because the ban is intended to make gun shows

19  less profitable and has in fact effectively banned shutter them altogether, it also

20  restricts his right to engage in the unique types of political, educational, and

21  commercial speech that takes place at the gun show. But for Defendants' adoption

22  and enforcement of SB 264 and SB 915, Plaintiff Merson would continue attending

23  and participating in the Crossroads gun show events at the Fairgrounds.

24       16.   Plaintiff ASIAN PACIFIC AMERICAN GUN OWNERS

25  ASSOCIATION ("APAGOA") is a nonprofit organization incorporated under the

26  laws of Texas and registered with the California Secretary of State to do business in

27  the state of California. APAGOA is a community of gun owners with an Asian

28  Pacific American ("APA") heritage. It's core focus is to promote safe and

FIRST AMENDED COMPLAINT

1   responsible gun ownership within the APA community by providing educational
2   materials and other resources to its members and other interested parties. APAGOA
3   advocates for firearm safety, education, and community-building initiatives. And it
4   strives to educate and empower the APA gun owner community so they can use
5   their firearms safely and responsibly. It brings this action on behalf of its
6   approximately 270 members and supporters who reside in California and, but for
7   the implementation of SB 264 and SB 915, would attend and participate in the
8   Crossroads gun show events at the Fairgrounds.

9          17.   Plaintiff CALIFORNIA RIFLE & PISTOL ASSOCIATION,
10  INCORPORATED ("CRPA") is a nonprofit membership organization incorporated
11  under the laws of California, with headquarters in Fullerton, California. Among its
12  other activities, CRPA works to preserve and expand constitutional and statutory
13  rights of gun ownership, including the right to self-defense and the right to keep
14  and bear arms. CRPA accomplishes this through its educational offerings,
15  publications, member engagement events, and legislative advocacy and initiatives.
16  CRPA has individual members and business affiliates that attend gun shows. Before
17  the implementation of SB 264 and SB 915, CRPA and many of its members were
18  regular vendors at Plaintiffthe Crossroads' gun show events at the Fairgrounds,
19  where they engaged the public in discussions about the organization and its
20  purposes, the shooting sports, firearms and firearm safety, and the Second
21  Amendment and other political issues. CRPA and its members also attended gun
22  shows at the Fairgrounds to sell organization memberships, advertise its events,
23  distribute its publications, and sell its merchandise, some of which includes
24  expressly pro-gun messaging. Members of CRPA would attend to advertise events,
25  distribute publications, sell merchandise, ammunition, and firearms, some of which
26  includes expressly pro-gun messaging. CRPA has also hosted political rallies,
27  educational seminars, and range safety officer training at gun shows throughout the
28  state, including those at the Fairgrounds. CRPA members and other gun enthusiasts

FIRST AMENDED COMPLAINT

1  attended these political rallies. CRPA has tens of thousands of members and

2  supporters, many of whom attended the Crossroads gun shows at the Fairgrounds to

3  engage in expressive activities with like-minded people, including discussions

4  related to firearms, ammunition, and firearm accessories, the shooting sports,

5  politics, and the Second Amendment. SB 264 and SB 915 directly burdens the right

6  of CRPA, its officers, employees, volunteers, members, and supporters, to engage

7  in otherwise lawful commercial speech in a public forum and to access buy and sell

8  firearms, ammunition, and parts for lawful purposes. And because the ban on sales

9  of firearms, ammunition, and parts is intended to make gun shows less profitable

10  and has in fact effectively shutter banned them altogether, it restricts the right of

11  CRPA, its officers, employees, volunteers, members, and supporters, to engage in

12  the unique types of political, educational, and commercial speech that takes place at

13  the gun show. But for Defendants' adoption and enforcement of SB 264 and SB

14  915, Plaintiff CRPA, its members, and supporters would continue attending and

15  participating in the Crossroads gun show events at the Fairgrounds. Through this

16  lawsuit, CRPA represents not only its own interests as a gun show vendor, but also

17  the interests of its members as gun show vendors and attendees and supporters of

18  the right to keep and bear arms for lawful purposes.

19      18.    Plaintiff SECOND AMENDMENT LAW CENTER, INC. ("2ALC"),

20  is a nonprofit organization, incorporated under the laws of Nevada with

21  headquarters in Henderson, Nevada, and registered with the California Secretary of

22  State to do business in the state of California. 2ALC works to advance Second

23  Amendment jurisprudence across the country while educating the public,

24  participating in scholarly research, and providing thought-provoking writings and

25  content to help advance the Second Amendment. 2LC works to support and protect

26  Second Amendment rights across the country, and they distribute materials at gun

27  shows in California to inform the public about their work. Because the ban on sales

28  of firearms and ammunition at the Fairgrounds is intended to make gun shows less

10

FIRST AMENDED COMPLAINT

1  profitable and has in fact effectively ~~shutter~~banned them altogether, it restricts the

2  rights of 2ALC to share education and training materials with gun owners and those

3  that attend gun show events. In this lawsuit, 2ALC represents its interests as a gun

4  show attendee and purveyor of educational materials.

5       19.   Plaintiff SECOND AMENDMENT FOUNDATION, INC. ("SAF") is

6  a non-profit membership organization. It is incorporated under the laws of the state

7  of Washington and was founded in 1974. SAF has over 700,000 members and

8  supporters nationwide, including thousands of members in California. The purposes

9  of SAF include education, research, publishing, and litigation. It is critical to the

10  success of SAF that its promotional material, publications, and messages about the

11  "right to keep and bear arms" reach demographic groups that are saturated with gun

12  owners, gun buyers, and people of the "gun culture." Gun Shows like the one

13  threatened by the Defendants' actions interfere with this effort. SAF is dedicated to

14  promoting a better understanding about our constitutional heritage to privately own

15  and possess firearms through educational and legal action programs designed to

16  better inform the public about gun control issues. SAF has been a pioneer in

17  innovative defense of the right to keep and bear arms, through its publications and

18  public education programs like the Gun Rights Policy Conference. Those

19  publications and other SAF materials and information are offered at gun show

20  events. Second Amendment Foundation also expends significant sums of money

21  sponsoring public interest litigation to defend its own interests to disseminate

22  information to like-minded individuals, in an individualized setting like a gun

23  show, but SAF also seeks to defend the interests of its member in lawsuits like this

24  present effort.

25                       **[Defendants]**

26       20.   Defendant GAVIN NEWSOM is the Governor of the State of

27  California. As Governor, he is vested with "the supreme executive power" of the

28  state and "shall see that the law is faithfully executed." Cal. Const. art. 5, §1.

11

FIRST AMENDED COMPLAINT

1  Defendant Newsom has more than an incidental relationship with the enforcement
2  of SB 264 and SB 915. In fact, Defendant Newsom has pressured fairgrounds
3  boards in California to ban safe and lawful gun show events on those properties.
4  And, because he alone is vested with the authority to appoint and terminate fair
5  board members, Defendant Newsom has a unique ability to coerce fair boards
6  responsible for managing state fairgrounds to *not* enter contracts with gun show
7  promoters for use of these public venues–even if those events otherwise comply
8  with the law.  Defendant Newsom is sued in his official capacity.

9       21.    Defendant ROB BONTA is the Attorney General of the State of
10  California. He is the "chief law officer" of the state and has the duty to 'see that the
11  laws of the State are uniformly and adequately enforced." Cal. Const. art. 5, § 1.
12  Additionally, Defendant Bonta has "direct supervision over every district attorney"
13  within the State. *Id.* If, at any point a district attorney of the State fails to enforce
14  adequately "any law of the State," Defendant Bonta must "prosecute any violations
15  of the law." *Id.* Finally, Defendant Bonta, as Attorney General of the State of
16  California, "shall assist any district attorney in the discharge" of duties when
17  "required by the public interest or directed by the Governor. . . ." *Id.* He is thus
18  responsible for the enforcement of SB 264 and SB 915 and for prosecuting
19  violations of these laws. Defendant Bonta is sued in his official capacity.

20       22.    Defendant TODD SPITZER is the District Attorney responsible for
21  enforcing the law within the county of Orange. Under the California Government
22  Code, the district attorney must prosecute "all actions for the recovery" of fines and
23  penalties. Cal. Gov't Code § 26521. He is thus responsible for the enforcement of
24  SB 264 and SB 915 and for prosecuting violations of these laws. Defendant Spitzer
25  is sued in his official capacity.

26       23.    Defendant KAREN ROSS is the Secretary of the California
27  Department of Food & Agriculture—the entity responsible for the policy oversight
28  of the network of California fair venues, which includes the Orange County Fair &

FIRST AMENDED COMPLAINT

1   Event Center. Through the Department, Defendant Ross issues guidance for
2   governance and contracting to all agricultural districts throughout California
3   (including Defendant District) and requires reporting from the districts on
4   operational issues. Because of her direct supervision of all fair boards responsible
5   for managing state fairgrounds, Defendant Ross has the ability to direct fair boards
6   to *not* enter contracts with gun show promoters for use of these public venues–even
7   if those events otherwise comply with the law. The Department maintains an office
8   of legal counsel for any actions brought against Agricultural Association Districts
9   in the state. Defendant Ross is sued in her official capacity.

10          24.    Defendant 32nd DISTRICT AGRICULTURAL ASSOCIATION
11  ("District") is a Governor-appointed Board of Directors that manages the state-
12  owned Orange County Fair & Event Center public venue. The District is governed
13  by a nine-member board, each member serving a four-year term. The District Board
14  of Directors appoints a CEO charged with the daily operations of the facilities but
15  maintains control over activities not delegated to the CEO, including contracting
16  with those seeking to host events, including gun shows, at the Fairgrounds. It is
17  responsible for ensuring that all state laws governing gun shows at the Fairgrounds,
18  including SB 264 and SB 915, are faithfully enforced. Defendant District refused to
19  consider contracts for the gun show by refusing to place the question of contract
20  approval on monthly meeting agendas when considering other similar contracts.

21          25.    The true names and capacities of Defendants named as DOES 1
22  through 10, inclusive, are individual, corporate, associate or otherwise, and are
23  unknown to Plaintiffs. They are, however, believed to be responsible in some way
24  for Plaintiffs' loss and damages. Each Doe Defendant is, and at all times mentioned
25  here was, a partner, agent, principal, co-conspirator, or are otherwise vicariously or
26  directly responsible for the acts or omissions of the other defendants or themselves.
27  They are each sued individually and are joined as party defendants. Plaintiffs thus
28  sue each Doe Defendant under rules 15 and 21 of the Federal Rules of Civil

13

FIRST AMENDED COMPLAINT

1  Procedure. Plaintiffs are informed and believed that the Doe Defendants are all

2  California residents. Plaintiffs will amend this complaint to show such true names

3  and capacities of Doe Defendants when they have been ascertained.

4  **FACTUAL ALLEGATIONS**

5  **[The First Amendment Rights to Free Speech, Association, & Assembly]**

6  26.  The First Amendment provides, in part, that "Congress shall make no

7  law . . . abridging the freedom of speech," U.S. Const. amend. I. It is incorporated

8  and made applicable to the states by the Fourteenth Amendment to the United

9  States Constitution and by 42 U.S.C. § 1983.

10  27.  Political and ideological speech—including speech concerning

11  "politics, nationalism, religion, or other matters of opinion"—has long been

12  considered the core of the First Amendment. *W. Va. State Bd. of Educ. v. Barnette*,

13  319 U.S. 624, 642 (1943).

14  28.  Public property made available for lease by community groups to

15  engage in expressive activity must thus be available without regard to the viewpoint

16  sought to be expressed *Cinevision Corp. v. City of Burbank*, 745 F.2d 560 (9th Cir.

17  1984). Such venues cannot be opened to some and closed to others, suppressing

18  protected expression, absent a compelling government interest. *Id.* at 571.

19  29.  The First Amendment does not tolerate the suppression of speech

20  based on what some may label an unpopular viewpoint of the speaker. *John J.*

21  *Hurley and S. Boston Allied War Vets. Council v. Irish-Am. Gay, Lesbian &*

22  *Bisexual Group of Boston*, 515 U.S. 557 (1995). Indeed, "*above all else*, the First

23  Amendment means that the government has no power to restrict expression because

24  of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95

25  (emphasis added); *see also Ashcroft*, 535 U.S. at 573.

26  30.  A content-based restriction that implicates political or ideological

27  speech must generally survive "strict scrutiny," where the government must show

28  that the law is narrowly tailored to achieve a compelling government interest. *See*

14

FIRST AMENDED COMPLAINT

1   *Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see also Lorillard Tobacco Co. v.*

2   *Reilly*, 533 U.S. 525 (2001) (holding that tobacco marketing restrictions – even

3   those purposed to protecting minors -- must be the narrowest means of achieving an

4   asserted state interest); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011)

5   (overturing California law banning sale or rental of "violent video games" to

6   minors); *see also Tracy Rifle & Pistol LLC v. Harris*, 339 F. Supp. 3d 1007, 1018

7   (E.D. Cal. 2018) (holding that a California law prohibiting the display of a

8   handgun, an imitation handgun, or a placard advertising the sale of a handgun in a

9   manner that is visible from the outside of a gun dealer's premises is

10   unconstitutional).

11       31.    Even purely commercial speech—speech that "does no more than

12   propose a commercial transaction" or relates solely to the economic interests of the

13   speaker and audience—receives First Amendment protection if it is not misleading

14   and concerns a lawful activity. *Cent. Hudson Gas & Elec. Corp. v. Public Serv.*

15   *Comm'n*, 447 U.S. 557 (1980).

16       32.    "An offer to sell firearms or ammunition" is constitutionally protected

17   commercial speech. *Nordyke v. Santa Clara*, 110 F.3d 707, 710 (9th Cir. 2009).

18       33.    Government restrictions on protected commercial speech are

19   constitutional *only* if they directly advance a substantial government interest and are

20   not broader than necessary to serve that interest. *Cent. Hudson*, 447 U.S. 557.[3]

---

[3] Though this is currently the controlling test for so-called "commercial speech," modern case law is trending toward extending **full** First Amendment protection to all speech, including "commercial speech." *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (moving toward providing commercial speech the same level of heightened protection long accorded to political speech); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 523 (1996) (Thomas, J., concurring in part and concurring in judgment) ("I do not see a philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech. Indeed, some historical materials suggest to the contrary.").

Furthermore, *Bruen*'s command that courts conduct an historical/categorical analysis when evaluating the constitutionality of laws that impact Second Amendment rights (the right to buy, sell, and acquire at a gun show at issue here) means that the Defendants bear a heavy burden to produce relevant (non-racist) laws (circa. 1868) that forbid offers to buy and sell firearms on public property.

FIRST AMENDED COMPLAINT

34.     The First Amendment protects not only the right of free speech, but also "the right of the people peaceably to assemble." U.S. Const., amend. I. The right to assemble often merges with the right to free expression. For "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Patterson*, 357 U.S. 449, 462 (1958). "Governmental action which may have the effect of curtailing the freedom to associate is subject to the *closest* scrutiny." *Id.* at 461-62.

**[The Second Amendment Right to Keep and Bear Arms Under the Law]**

35.     The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II.

36.     The Second Amendment protects a fundamental, individual right that applies against both the federal government and the states. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

37.     The Supreme Court recently confirmed that Second Amendment questions are to be analyzed in light of "text, history, tradition." "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, --U.S.--, 142 S. Ct. 2111, 2126 (2022) (citing *Heller*, 554 U.S. at 634).

38.     The Second Amendment protects the right to possess and use arms that are "typically possessed by law-abiding citizens for lawful purposes." *See, e.g.,* *Heller*, 554 U.S. at 624-25; *See also Caetano v. Massachusetts*, 577 U.S. 411, 136 S. Ct. 1027, 1027-28 (2016). That protection "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 544 U.S. at 582. It also includes the ammunition

16

FIRST AMENDED COMPLAINT

1  necessary to use firearms for their core lawful purposes. *See Jackson v. City &*
2  *Cnty. of San Francisco*, 746 F.3d at 967-68 (recognizing that "without bullets, the
3  right to bear arms would be meaningless.").

4  ~~34.~~39. Finally, the Second Amendment protects the corresponding right to
5  obtain protected firearms and ammunition. *See id.* at 967 ("'[T]he right to possess
6  firearms for protection implies a corresponding right' to obtain bullets necessary to
7  use them."); *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)
8  (holding that the right to possess firearms implies a corresponding right to access
9  firing ranges to train to be proficient with such firearms).

10  **[The Fourteenth Amendment Right to Equal Protection Under the Law]**

11  ~~35.~~40. The Fourteenth Amendment to the United States Constitution,
12  enforceable under 42 U.S.C. § 1983, provides that no state shall deny to any person
13  within its jurisdiction the equal protection of the laws.

14  ~~36.~~41. Singling out speakers because of the content of their speech also
15  violates their fundamental rights under the Equal Protection Clause. U.S. Const.
16  amend. XIV.

17  ~~37.~~42. If unequal treatment occurs in the context of exercising a fundamental
18  right, or the government is motivated by animus toward a disfavored group, courts
19  apply heighted scrutiny. *See Loving v. Virginia*, 388 U.S. 1, 11 (1967); *see also*
20  *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985); *Romer v. Evans*,
21  517 U.S. 620 (1996). Indeed, "[b]ecause the right to engage in political expression
22  is fundamental to our constitutional system, statutory classifications impinging
23  upon that right must be narrowly tailored to serve a compelling governmental
24  interest." *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 666 (1990), *rev'd*
25  *on other grounds*, *Citzs. United v. Fed. Elec. Comm'n*, 558 U.S. 310, 130 S. Ct. 876
26  (2010).

27  **[Regulation of Gun Show Events in California]**

28  ~~38.~~43. The state of California has the most rigorous regulatory regime for

17

FIRST AMENDED COMPLAINT

1  commerce in firearms and ammunition in the United States. That regulatory regime

2  applies to the operation of gun show events throughout California. The laws related

3  to the acquisition and sale of firearms are arguably stricter at gun shows than at

4  brick-and-mortar stores or internet sales.

5  ~~39.~~44. Only state-approved, licensed gun show producers may operate gun

6  shows in California.

7  ~~40.~~45. All gun show producers, including Plaintiff Crossroads, must have an

8  individual (the "promoter") who holds a valid Certificate of Eligibility issued by the

9  California Department of Justice.

10  ~~41.~~46. Gun show producers must also, among other things:

11      a.    Certify that they are familiar with all California laws regarding

12            gun shows, Cal. Penal Code § 27200;

13      b.    Possess a minimum of $1,000,000 liability insurance, *id.*;

14      c.    Provide an annual list of shows or events to be held to the

15            California Department of Justice, *id.*; and

16      d.    Notify the California Department of Justice no later than 30

17            days prior to the gun show or event of any changes to the above,

18            *id.*

19      e.    Make available to law enforcement a complete and accurate list

20            of all vendors that will participate in the show to sell, lease, or

21            transfer firearms. Cal. Penal Code § 27205.

22  ~~42.~~47. Gun show producers must submit an annual event and security plan

23  and schedule to the California Department of Justice and any local law enforcement

24  agency. The plan must include:

25      a.    Type of show or event;

26      b.    Estimated number of vendors offering for sale or display

27            firearms;

28      c.    Estimated number of attendees;

FIRST AMENDED COMPLAINT

18

1         d.     Number of entrances and exits at the event;

2         e.     Location, dates, and times of the event;

3         f.     Contact person and telephone number for both promoter and

4               facility;

5         g.     Number of sworn peace officers employed by the producer or

6               facility who will be present at the event;

7         h.     Number of non-sworn security personnel employed by the

8               producer or the facility who will be present at the event; and

9         i.     Promoters must inform all prospective vendors of all California

10              laws regarding gun shows.

11  Cal. Penal Code §§ 27210, 27215.

12      ~~43.~~48. Gun show producers must also provide a list of all prospective vendors

13  and designated firearm transfer agents who are licensed firearm dealers to the

14  California Department of Justice no later than seven days ~~prior to~~before the event

15  ~~for the purpose of determining~~so that the Department of Justice may determine

16  whether each~~the~~ vendor possess~~es~~ a valid license and ~~are~~is thus eligible to

17  participate in the event. Cal. Penal Code § 27220.

18      ~~44.~~49. If a vendor is not approved by the California Department of Justice or

19  fails to comply with all applicable California laws, they cannot participate in the

20  gun show event. Cal. Penal Code § 27220.

21      ~~45.~~50. If a gun show producer~~s~~ fails to inform all prospective vendors of

22  California's state laws or fails to submit a list of all prospective vendors to the

23  California Department of Justice, the event cannot commence. Cal. Penal Code §

24  27230.

25      ~~46.~~51. Gun show producers must have written contracts with each vendor

26  selling firearms at the event. Cal. Penal Code § 27235.

27      ~~47.~~52. Gun show producers must post signs in a readily visible location at

28  each public entrance to the event that includes all of the following notices:

FIRST AMENDED COMPLAINT

- "This gun show follows all federal, state, and local firearms and weapons laws, without exception."
- "Any firearm carried onto the premises by any member of the public will be checked, cleared of any ammunition, and secured in a manner that prevents it from being operated, and an identification tag or sticker will be attached to the firearm before the person is allowed admittance to the show."
- "No member of the public under the age of 18 years shall be admitted to the show unless accompanied by a parent, grandparent, or legal guardian."
- "All firearm transfers between private parties at the show shall be conducted through a licensed dealer in accordance with applicable state and federal laws."
- "Persons possessing firearms in this facility must have in their immediate possession government-issued photo identification and display it upon the request to any security officer or any peace officer, as defined in Section 830."

Cal. Penal Code § 27240(a).

48.53. Gun show producers must also post signs in a readily visible location at each entrance to the parking lot stating: "The transfer of firearms on the parking lot of this facility is a crime." Cal. Penal Code § 27240(b).

49.54. A willful failure of a producer to comply with any of California's applicable laws is a misdemeanor punishable with a fine of up to $2,000 dollars and would render the producer ineligible for a gun show producer license for up to one year, which could cost a producer hundreds of thousands of dollars in lost revenue for a willful infraction. Cal. Penal Code § 272459(c).

50.55. Except in very limited exceptions applicable only to law enforcement, actual firearm transfers are already prohibited from taking place at any gun show in

20

FIRST AMENDED COMPLAINT

California.[4] The firearm sale can be started through an on-site licensed "transfer dealer," but it cannot be completed on site. Instead, purchasers must pick up their purchase at a licensed firearm retailer at a different licensed location— —but only after a 10-day waiting period and background check. There is no "Gun Show Loophole" at gun shows operated in accordance with California Law.

~~51.~~56. The Gun Show Act of 2000, California Penal Code sections 27200-27245, places even more restrictions on the operation of a gun show in California by requiring that:

    a.    Vendors do not display, possess, or offer for sale any firearms, knives, or weapons for which possession or sale is prohibited;

    b.    Vendors acknowledge that they are responsible for knowing and complying with all applicable federal, state, and local laws dealing with the possession and transfer of firearms;

    c.    Vendors will not engage in activities that incite or encourage hate crimes;

    d.    Vendors will process all transfers of firearms through licensed firearms dealers as required by state law;

    e.    Vendors will verify that all firearms in their possession will be unloaded and that the firearms will be secured in a manner that prevents them from being operated except for brief periods, when the mechanical condition of the firearm is being demonstrated to prospective buyer;

---

   [4] Cal. Penal Code § 27310 (requiring all firearm transfers at gun shows to comply with state and federal law); *id.* § 26805 (prohibiting the sale and transfer of a firearm by a licensed dealer at any location other than the dealer's premises as listed on their license but allowing dealer to prepare documents at a gun show in preparation for completion of the sale at the dealer's premises); *id.* § 27545 (requiring all firearm transactions to be processed through a licensed dealer when neither party is a licensed firearm dealer).

21

FIRST AMENDED COMPLAINT

      f.     Vendors provide all required information under Penal Code § 27320;

      g.    Vendors will not display or possess black powder or offer it for sale;

      h.    Ammunition only be displayed in closed original factory boxes or other closed containers, with the only exception for showing the ammunition to a prospective buyer. On July 1, 2019, additional state-law restrictions on the sale of ammunition will become effective and gun shows must comply;

      i.     No member of the public under 18 years old may enter a gun show unless accompanied by a parent or legal guardian;

      j.     No person other than security personnel or law enforcement possess both a firearm and ammunition for that firearm at the same time, with the exception of vendors who are selling both.

~~52.~~57. Plaintiff  Crossroads diligently operates all of its gun shows in accordance with state law, and it takes immediate remedial measures if irregularities are discovered.

~~53.~~58. Vendors at Crossroads gun shows are some of the same licensed vendors that have brick and mortar stores in the community or operate legally over the internet and are registered with the state as lawful businesses.

~~54.~~59. Vendors at Crossroads gun shows sell legal products and enjoy being able to attend gun shows so they can better interact with customers in a more meaningful and intimate way.

~~55.~~60. Even with all of the state and federal regulations that promoters and vendors must abide, through the adoption and enforcement of SB 264 and SB 915, Defendants now seek to wholly prohibit constitutionally protected, highly regulated, and otherwise perfectly legal activity.

**[The Gun Show Cultural Experience]**

22

FIRST AMENDED COMPLAINT

56.61. Gun shows are a modern bazaar—a convention of like-minded individuals who meet in this unique public forum that has been set aside by state and local governments for all manner of commerce. This convention-like setting is of incalculable benefit to the gun-buying consumer and promotes public safety.

57.62. Gun shows, in general, and the Orange County Crossroads show at the Fairgrounds, in particular, are a celebration of America's "gun culture" that is a natural and essential outgrowth of the constitutional rights that flow from the Second Amendment to the United States Constitution.

58.63. Gun shows, in general, and the Orange County Crossroads show at the Fairgrounds, in particular, are a First Amendment forum where literature and information are shared, speakers provide valuable lectures, classes are conducted, political forums are held where gun rights discussions take place, and candidates for political office can meet to discuss political issues, the government, and the constitution with constituents who are part of the California gun culture.

59.64. Thousands of people attend gun shows on the weekends they are held at the Fairgrounds. Many attend as new gun owners seeking information and instruction. With over 1 million new gun owners in California in the past year, gun shows offer the opportunity for these new gun owners to learn about firearms, safety, and speak to expert firearm enthusiasts.

60.65. Gun shows place a huge emphasis on safety as citizens come together. Gun shows are designed to offer a communal atmosphere of like-minded people that one does not find in a store where people are running in to pick up one or two items. Gun shows are designed so that people will congregate, take their time, engage each other and the vendors, and learn in a way that they do not otherwise engage.

61.66. Gun shows also happen to include the exchange of products and ideas, knowledge, services, education, entertainment, and recreation related to the lawful uses of firearms. Those lawful uses include (but are not limited to): firearm safety

23

FIRST AMENDED COMPLAINT

1    training; defense of self and others; defense community, state, and nation; hunting;

2    target shooting; gunsmithing; admiration of guns as art; appreciation of guns as

3    technological artifacts; and the study of guns as historical objects.

4       62.67. Gun shows, in general, and the Orange CountyCrossroads show at the

5    Fairgrounds, in particular, are cultural marketplaces for those members of the "gun

6    culture" who attend to celebrate their constitutional rights and to pass their beliefs

7    in patriotism and the rights of the individual on to the next generation. It is a place

8    where parents take their children and grandparents take their grandchildren to share

9    with them, among other things, a love of historic firearms, stories of American war

10    heroes, and their love of hunting.

11       63.68. Gun shows, in general, and the Orange CountyCrossroads show at the

12    Fairgrounds, in particular, are places where parents can learn to protect their

13    families and their homes, and how to stay in compliance with California's ever-

14    changing gun laws.

15       64.69. Gun shows, in general, and the Orange CountyCrossroads show at the

16    Fairgrounds, in particular, are places where people can discuss the positions of

17    political candidates and whether those values line up with their own beliefs in

18    protecting the Second Amendment.

19       65.70. Gun shows, in general, and the Orange CountyCrossroads show at the

20    Fairgrounds, in particular, are held and promoted, and considerable investment is

21    made, precisely to promote and "normalize" the "gun culture" and the

22    constitutional principles that gun show participants hold dear.

23       66.71. This forum is vitally important especially in California where

24    government actors at all levels of government (federal, state, and local) are openly

25    hostile to the cultural values of the Second Amendment and where supporters of

26    those cultural values are not considered "mainstream."

27       67.72. Participating in "gun culture" is an important reason people attend

28    Crossroads gun shows as vendors, exhibitors, customers, and guests (even if

1  particular vendors or attendees are not in the firearm business or in the market to

2  buy a gun at a particular event).

3  68. 73. While less than 40% of vendors at Crossroads' events offer firearms or

4  ammunition for sale (the remaining vendors offer accessories, collectibles, home

5  goods, lifestyle products, educational information, food, and other refreshments),

6  the principle draw of gun shows is the availability of firearms, ammunition, and

7  firearm parts and accessories for sale, as well as the ability to handle and inspect

8  firearms while in the presence of knowledgeable vendors.

9  69. 74. Indeed, many people attend gun shows to learn about the technology

10  and use of various firearms and ammunition when they are considering whether to

11  buy or sell a firearm and to exchange knowledge with experienced dealers and

12  firearm enthusiasts that they cannot get anywhere else. *Teixeira v. County of*

13  *Alameda*, No. 13-17132 (9th Cir. 2017).[5]

14  70. 75. Without the ability to buy and sell firearms, and ammunition, and parts

15  at gun shows at the Fairgrounds, the events will no longer be able to draw many of

16  its vendors and attendees, making the events unprofitable and economically

17  infeasible. When events are no longer profitable, producers and vendors cannot

18  afford to attend and host the shows or maintain the speech components of gun

19  show.

20  71. 76. The complete economic infeasibility of gun shows is a "feature" of SB

21  264 and SB 915, not a "bug." Indeed, Defendants wish to end this celebration of

22  "gun culture" and Second Amendment rights because they do not understand the

23  culture or the people. To that end, Defendants have attempted, through SB 264 and

24  SB 915's bans on sales of firearms, ammunition, and "firearm precursor parts" at

25

26  _____

[5] The *Teixeira* court did not answer whether the Second Amendment includes
27  a right to purchase a firearm. Plaintiffs allege, in good faith, that the right to keep
and bear arms *necessarily* includes the rights to purchase and sell them. Indeed,
28  those rights are a necessary predicate to the exercise of the Second Amendment.

25

FIRST AMENDED COMPLAINT

1   the Fairgrounds, to permanently deprive Plaintiffs of their right to engage in

2   constitutionally protected conduct at the Fairgrounds.

3                **[The Orange County Fair & Event Center]**

4      72.77. The Fairgrounds is owned by the state of California and managed by

5   the Board of Directors of Defendant District, which must regularly report its

6   activities to the California Department of Food & Agriculture.

7      73.78. Among other things, Defendant District is charged with maintaining

8   the Fairgrounds and ensuring that is used for public purposes.

9      74.79. Defendant Ross, as the Secretary of the California Department of Food

10   & Agriculture, oversees the operation of the various agricultural districts in the

11   state, including Defendant District.

12      75.80. The California Department of Food & Agriculture, under Secretary

13   Ross, provides policies and guidance for the operation of all agricultural districts in

14   the state, including the use of facilities as directed by Department policy.

15      76.81. The California Department of Food & Agriculture maintains a *CDFA*

16   *Contracts Manual for Agricultural Districts* ("Manual"). Section 6.25 of the

17   Manual states that "[w]hether or not a fair rents out their facilities for gun shows is

18   a policy decision to be made by the fair board and their community." That said,

19   Defendant Ross has used her position to influence fair boards' decisions about

20   renting their facilities for gun show events.

21      82.   Similarly, Defendant Ross, as Secretary of the California Department

22   of Food & Agriculture, prohibits the individual fair boards from taking any position

23   on legislation that would effect the ability of fair boards to make decisions about

24   the use of their facilities for gun shows, including SB 264 and SB 915 which

25   restrict their ability to contract to hold events where firearms, ammunition, or

26   precursor parts are sold.

27      77.83. The Fairgrounds is a state-owned property maintained and opened for

28   use by the public. By virtue of being opened by the state for use by the public, it is

FIRST AMENDED COMPLAINT

1  a "public forum," from which the government may not generally exclude

2  expressive activity. *Cinevision*, 745 F.2d at 569 (quoting *Perry Educ. Ass'n v.*

3  *Perry Local Educators' Assn*, 460 U.S. 37, 45-46 (1983)).

4      78.84. The Fairgrounds is used by many different groups and is a major event

5  venue for large gatherings of people to engage in expressive activities, including

6  concerts, festivals, and industry shows. Indeed, "OC Fair & Event Center is a 150-

7  acre event venue that hosts over 150 events and attracts approximately 4.3 million

8  visitors annually. [Its] versatile multi-use property can be transformed to fit a

9  variety of events from small private events to large-scale trade shows and festivals."

10  OC Fair & Event Center, Event Space Sales, https://ocfair.com/venue-

11  rentals/venue-options/rental-property-brochure/ (last visited Aug. 4, 2022) (attached

12  as Exhibit 1).

13      79.85. The Fairgrounds actively promotes the use of the property by the

14  public through contracting for available space at the Fairgrounds. *Id.*; *see also* OC

15  Fair & Event Center, Venue Rentals, https://ocfair.com/venue-rentals/ (last visited

16  Aug. 4, 2022).

17      86.    The Fairgrounds' Board of Directors Governing Manual states that

18  Defendant District's purpose is "(1) to hold fairs, expositions and exhibitions in

19  Orange County to exhibit the industries and industrial enterprises, resources, and

20  products of every kind or nature of the state, with a view toward improving,

21  exploiting, encouraging, and stimulating them; and (2) to construct, maintain, and

22  operate recreational and cultural facilities of general public interest in Orange

23  County.

24      80.87. Defendant District The 32nd DAA  has adopted a mission statement to

25  effectuate these purposes, which is the celebration of Orange County's

26  communities, interests, agriculture and heritage." 32nd District Agricultural

27  District, *Board of Directors Governing Manual*, Introduction at 1, *available at*

28  https://s3.us-west-1.amazonaws.com/ocfair.com/wp-

27

FIRST AMENDED COMPLAINT

1   content/uploads/2021/02/02141413/Policy-Combo-All.pdf  (last visited Aug. 4,

2   2022).

3   ~~81.~~88. The Fairgrounds has held non-gun-show events in which criminal

4   activity has taken place. These criminal incidents are no more likely to happen at a

5   gun show than at other types of events, but the Defendants have not banned these

6   promoters or their events.

7                    **[Contracting for Use of the Fairgrounds]**

8   ~~82.~~89. Defendant District has a process, as do most of the state's fairgrounds,

9   for securing returning contractors who would like to secure specific dates into

10  future years before the contracts can be drafted and executed.

11  ~~83.~~90. Each year, returning and regular contractors, including Plaintiff

12  Crossroads, submit preferred dates for the next calendar year, so Defendant District

13  can confirm availability and so that Plaintiff Crossroads can begin to reserve

14  vendors and materials for the show weekends.

15  ~~84.~~91. Due to the size and extensive planning that goes into producing gun

16  show events, Defendant District has—for decades—provided and held preferred

17  dates for Plaintiff Crossroads, a long-time contractor, until the contracts can fully

18  be executed.

19  ~~85.~~92. Defendant District's "hold" system essentially operates as a right of

20  first refusal to the benefit of returning contractors. For example, if another

21  contractor wanted the same preferred dates as Plaintiff Crossroads, Defendant

22  District would not allow another vendor to come in and take those dates from

23  Plaintiff Crossroads even though there is no official contract in place yet.

24  ~~86.~~93. The "hold" system also provides Defendant District with the security

25  of knowing its venue is booked with experienced and knowledgeable repeat

26  contractors that have a demonstrated record of running safe and profitable events at

27  the Fairgrounds.

28  ~~87.~~94. The "hold" system also permits the promoter to spend advertising

FIRST AMENDED COMPLAINT

1   dollars to promote its events, but when governments announce plans to ban gun

2   shows at particular venues, vendors and patrons rationally make plans to attend gun

3   show events at other venues or seek other states to conduct their commerce.

4       88.95. Defendant District also considers the "hold" dates and shows during

5   budget discussions which are typically held in the year before the contracts are

6   commenced.

7       89.96. Upon information and belief, Plaintiffs allege that the "hold" system is

8   widely used by similar state fair board venues and is standard industry practice.

9       90.   Plaintiff Crossroads, after doing business in this customary manner for

10  more than 30 years, had no reason to doubt that Defendant District would continue

11  to honor such relationship with Plaintiff Crossroads.

12       **[Ban on Gun Shows at Other Fairgrounds & Resulting Litigation]**

13      91.97. Despite the long history that Plaintiff Crossroads has had in

14  California, operating safe and legal events, the political environment has become

15  hostile toward gun show events and (more generally) toward the "gun culture" in

16  recent years.

17      92.98. Indeed, gun-show-banning activists are at work throughout the state

18  and the country to ban *all* gun shows *everywhere*, not because they are "dangerous

19  for the community," but because they do not subscribe to the same values as gun

20  show promoters, vendors, and participants.

21      93.99. With increasing regularity, the same activists are making appearances

22  on Zoom board meetings held by fair boards across the state, and during each

23  appearance, they make the same claims in order to shut down lawful gun shows.

24      94.100.   These activists rely on unfounded fears about the security of gun

25  show events, false claims that gun shows are inherently dangerous because they

26  normalize the "gun culture," and peddle in false stereotypes about the people that

27  attend gun shows. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432

28  (1985) (striking an ordinance requiring a special permit for a group home for the

29

FIRST AMENDED COMPLAINT

1   intellectually disabled and citing direct evidence of negative attitudes toward

2   persons with disabilities expressed by community members and recorded in the

3   legislative history).

4   ~~95.~~101.    In 2017, gun-show-banning activists using the same tactics

5   described above began pressuring the 22nd District Agricultural Association ("22nd

6   DAA"), which manages the Del Mar Fairgrounds in San Diego, to prohibit gun

7   show events at the Del Mar Fairgrounds. In response, the 22nd DAA began a series

8   of meetings and comment periods to determine whether it would continue to

9   contract with Plaintiff Crossroads or other gun show producers for the use of the

10   Del Mar Fairgrounds to host gun show events.

11   ~~96.~~102.    The 22nd DAA also engaged in communications with other

12   government agencies and with Crossroads to determine whether gun shows at the

13   Fairgrounds were operated in full compliance with state and federal law, and if the

14   events pose any real danger to the community.

15   ~~97.~~103.    On April 23, 2018, Defendant Newsom sent a letter to the 22nd

16   DAA, urging the Board to ban gun shows at the Fairgrounds, citing his concerns

17   that "[p]ermitting the sale of firearms and ammunition on state-owned property

18   only perpetuates America's gun culture." Letter from Governor Gavin Newsom to

19   Board Members of 22nd District Agricultural Association (April 23, 2018)

20   (attached as Exhibit 2).

21   ~~98.~~104.    On September 10, 2018, Assemblymember Todd Gloria (D) sent

22   a letter to the 22nd DAA, stating his "firm belief that the State of California should

23   in no way help to facilitate the sale of firearms." He also expressed his support for

24   the 22nd DAA "willingness to consider options for limiting or eliminating these

25   gun shows" and vowed to "act by way of legislation should the 22nd DAA Board

26   be unable to take meaningful action." Letter from Assembly~~m~~ ~~M~~ember Todd Gloria

27   to Board Members of 22nd District Agricultural Association (Sept. 10, 2018)

28   (attached as Exhibit 3).

FIRST AMENDED COMPLAINT

1    99.105.      At a public hearing on September 11, 2018, a fair board ad hoc

2    "Contracts Committee" recommended that the 22nd DAA "not consider any

3    contracts with the producers of gun shows beyond December 31st, 2018, until such

4    time as the [22nd DAA] has put into place a more thorough policy regarding the

5    conduct of gun shows."

6    100.106.      In testimony before the 22nd DAA at the September 11,

7    20182018 hearing, Patrick Kerins, who was then the Public Safety Director for the

8    22nd DAA, reported on the laws that apply to gun shows in California, as well as

9    Plaintiff Crossroads history of events at the Fairgrounds.

10   101.107.      During his comments at the September 11, 2018 hearing, Mr.

11   Kerins referenced a memorandum that he prepared for the 22nd DAA's Board of

12   Directors in 2016. In that memorandum, he reported that:

13           As Chief of Security for the 22nd DAA, I routinely inspect the
14       gun show and on a regular basis communicate with the San Diego
         Sheriff's Department re: compliance with all the applicable laws
15       and regulations and the Security Plan required by the California
         Department of Justice Firearms Division. I recently spoke to
16       Detective Jaime Rodriguez of the Sheriff's North Coastal Station
         who supervises the four Deputies assigned to the gun show security
17       detail and Detective Stacey Smith who is assigned to the Sheriff's
         Licensing Division. Both Detectives said the Crossroads of the West
18       Gun Show is in complete compliance with all the local, State and
         Federal laws and that there have not been
19       any violations of law. Both Detectives had high praise for the show
         promoters and the 22 DAA staff.

20   Memorandum of Patrick Kerins, Public Safety Director, 22nd District Agricultural

21   Association, to Board of Directors, 22nd District Agricultural Association, at 17

22   (2016) (attached as Exhibit 4).

23   102.108.      Mr. Kerins' 2016 memorandum continued:

24       In my considered opinion, as Chief of Security for the 22 DAA for
         the last 17 years, the CROSSROADS OF THE WEST GUN
25       SHOWS (5 per year) are in compliance with all the local, state and
         federal regulatory statutes and have operated without any violations
26       of those laws Under the laws of the State of California you must
         comply with all the laws of purchasing, selling and/or transferring
27       of firearms at a gun show as you would at licensed gun dealer's
         store Due to the strict California gun show regulations there are no
28       so called loop holes that you so often hear about in the media.

1   Ex. 4 at 17.

2   ~~103.~~109.   Ultimately, the lengthy process of meetings, public comment,

3   and communications with stakeholders resulted in **no finding** that allowing the

4   (already heavily regulated) gun show events to continue at the Del Mar Fairgrounds

5   posed a definite or unique risk to public safety. Indeed, the 22nd DAA presented *no*

6   evidence of any safety concerns within the community that could be linked to the

7   over-30-year-old gun show at the Del Mar Fairgrounds.

8   ~~104.~~110.   Nonetheless, relying on contrived possibilities of unknown

9   dangers and unfounded claims that prohibiting gun shows might prevent suicide

10  and violent crime because the "gun culture" would be censored, the 22nd DAA

11  voted to impose a one-year moratorium on gun show events at the Del Mar

12  Fairgrounds.

13  ~~105.~~111.   Plaintiffs Crossroads, CRPA, SAF, and others sued the 22nd

14  DAA, Defendant Ross, and others in federal court ~~under~~ to ~~prevent~~ enjoin the

15  enforcement of the moratorium, alleging violations of various constitutional rights,

16  including the rights to free speech, assembly, and equal protection. *See B&L Prods.*

17  *v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226 (S.D. Cal. 2019) ("*B&L I*")

18  (attached as Exhibit 5).

19  ~~106.~~112.   Denying the 22nd DAA's motion to dismiss and granting

20  plaintiffs a preliminary injunction—*sua sponte*—on the ground that plaintiffs were

21  exceedingly likely to succeed on the merits of their *constitutional* claims, the court

22  in *B&L Productions* temporarily enjoined the enforcement of the 22nd DAA's gun

23  show moratorium and ordered the 22nd DAA to contract with Crossroads as it

24  would any other similar event promoter at the Fairgrounds. *Id.*

25  ~~107.~~113.   Shortly thereafter, the *B&L Productions* plaintiffs negotiated a

26  settlement with the 22nd DAA, represented by attorneys for the California

27  Department of Justice, permanently terminating the gun show moratorium,

28  reinstating Crossroads' right to promote gun show events at the Fairgrounds, and

32

FIRST AMENDED COMPLAINT

**Formatted:** Font: Italic

permanently barring the 22nd DAA from unilaterally halting B&L's gun show events at the Del mar Fairgrounds.

**[California's Assembly Bill 893 (Gloria)]**

108.114.   Making good on previous threats, and fully aware of the court's decision in *B&L I*, Assemblymember Gloria introduced Assembly Bill 893 ("AB 893") on or about February 20, 2019. Assem. Bill 893, 2019-2020 Reg. Sess. (Cal. 2019) (attached as Exhibit 6).

109.115.   AB 893, which added sSection 4158 to the California Food & Agricultural Code, bars any "officer, employee, operator, lessee, or licensee of the [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds." Violation of the law is a misdemeanor. *Id.*

110.116.   AB 893 does not bar the possession of firearms or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds. *Id.*

111.117.   The text of AB 893 expressly identifies the ongoing presence at the Del Mar Fairgrounds of "marketplaces popularly known as 'gun shows,' at which firearms and ammunition and other items are sold to the public approximately five times a year." *Id.*

112.118.   AB 893 also clearly recognizes that "[p]romoters maintain relationships with a core group of vendors, some selling guns and some selling other merchandise, who travel as the schedule dictates from city to city and state to state and in the West, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona." *Id.*

113.119.   AB 893 failed to identify, however, any real public safety or security concern *specifically* related to the existence of gun show events at the Fairgrounds.

114.120.   To be sure, AB 893 claims, without support, that "[g]un shows

33

FIRST AMENDED COMPLAINT

bring grave danger to a community" and that "dangerous incidents" have taken place at guns shows at the Fairgrounds, including "an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines." But AB 893 makes no effort to show that these incidents are any more likely to occur at gun shows in California, which are regulated at least as heavily as retailers operating out of brick-and-mortar stores.

115.121.    Instead, AB 893's legislative history reveals only general concerns about gun violence occurring all over the country and legislators' beliefs that the state should not profit from sales of firearms and ammunition. *See* Matthew Fleming, Assem. Comm. Pub. Safety, Bill Analysis Re: AB 893 (Gloria), 2019-2020 Reg. Sess., at 3 (Cal. 2019) (attached as Exhibit 7).

116.122.    Indeed, AB 893 opens with a list of tragedies, including the horrific mass murders that took place at Columbine High School, Sandy Hook Elementary School, and Marjory Stoneman Douglas High School—none of which were carried out with firearms traced to gun show events at the Fairgrounds. Ex. 6.

117.123.    What's more, a March 26, 2019, analysis of AB 893 presented to the Assembly Committee on Public Safety quoted claims by Assemblymember Gloria, the bill's sponsor, that "[t]here is an ever-apparent link between the gun violence we see virtually every week and the number of guns in our communities." These statements, however, made no attempt to link gun violence to gun shows, generally, or to gun shows at the Fairgrounds, specifically. Ex. 7 at 2.

118.124.    The Public Safety Committee's March 26, 2019, analysis also quoted Gloria as lamenting that "the State of California should not be profiting or benefitting from the sale of firearms." He continued, "[f]undamentally, I believe it is wrong for the state of California to profit or to benefit from the sale of firearms and ammunition." Ex. 7 at 2.

34

FIRST AMENDED COMPLAINT

1    ~~119.~~125.    The Public Safety Committee's March 26, 2019, analysis also

2    cited a decade-old report from the Violence Prevention Research Program (VPRP)

3    at the UC Davis School of Medicine, identifying gun shows as a source of illegally

4    trafficked firearms. Ex. 7 at 3.

5    ~~120.~~126.    But neither the VPRP report nor AB 893's legislative history

6    links any illegally trafficked firearm or gun used in crime to gun shows at the Del

7    Mar Fairgrounds (or even to gun shows in California). *See* Garen Wintemute, MD,

8    *Inside Gun Shows: What Goes on When Everybody Thinks Nobody's Watching*, ch.

9    1 (2009) (attached as Exhibit 8). This is unsurprising because, as the study states,

10   "[m]uch of the concern about gun shows as a source of crime guns focuses on

11   private party gun sales, *since no background checks are conducted and no records*

12   *are kept*." *Id.* at 32. But such concerns are simply irrelevant in California where

13   private party transfers—*even those initiated at gun shows*—must be processed by a

14   licensed firearm dealer and are subject to background checks, 10-day waiting

15   periods, and registration under state law.

16   ~~121.~~127.    The VPRP report cited by the Public Safety Committee's

17   analysis of AB 893 also attempts to implicate licensed firearm retailers operating at

18   gun shows as sources of crime guns in America, claiming that "30% of dealers with

19   gun show sales, but 22% of all dealers, had previously had a crime gun traced to

20   them." But it expressly recognizes that "in California, where both gun shows

21   themselves and gun commerce generally are regulated, *sales at gun shows are not a*

22   *risk factor among licensed retailers for disproportionate sales of crime guns*." Ex. 8

23   at 33 (emphasis added).

24   ~~122.~~128.    The Public Safety Committee's March 26, 2019, analysis also

25   cited a report from the Government Accountability Office, claiming that a GAO

26   report "regarding gun trafficking to Mexico confirmed that many traffickers buy

27   guns at gun shows." Ex. 7 at 3. But again, neither the BATFE report nor AB 893's

28   legislative history links any illegally trafficked firearm to gun shows at the Del Mar

35

FIRST AMENDED COMPLAINT

1  Fairgrounds (or even to gun shows in California). *See* U.S. Gov't Accountability

2  Off., GAO-16-223, *Firearms Trafficking: U.S. Efforts to Combat Firearms*

3  *Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain*

4  (2016) (attached as Exhibit 9). To be sure, the GAO report identifies U.S.

5  Southwest border states, including Texas (41%), California (19%), and Arizona

6  (15%), as the largest sources of firearms illegally trafficked into Mexico from the

7  United States. Ex. 9 at 14. But it does not trace these illegally trafficked guns to

8  licensed dealers, generally, or to those operating at gun shows, specifically. Rather,

9  it says only that "there were about 10,134 licensed dealers and pawnbrokers in the

10  four Southwest border states, many of them along the border," and that "these

11  licensed dealers and pawnbrokers can operate in locations such as gun shops, pawn

12  shops, their own homes, or gun shows." *Id.*

13  ~~123.~~129.   The Public Safety Committee's March 26, 2019, analysis did

14  concede that "less than one percent of inmates incarcerated in state prisons for gun

15  crimes acquired their firearms at a gun show"—though it transparently tries to

16  diminish that fact by citing only a website of the National Rifle Association as the

17  source of the statistic, instead of the U.S. Department of Justice, Bureau of Justice

18  Statistics reports from which the NRA drew it. Ex. 7 at 2-3 (citing NRA-ILA,

19  *Background Checks/NICS*, https://www.nraila.org/get-the-facts/background-checks-

20  nics (last visited Sept. 29, 2021)); *but see* Caroline Wolf Harlow, Ph.D., Bureau of

21  Justice Statistics, *Firearm Use by Offenders* (Nov. 2001) attached as Exhibit 10.

22  ~~124.~~130.   While the Public Safety Committee's March 26, 2019, analysis

23  also concedes that "violent criminals do not appear to regularly purchase their guns

24  directly from gun shows," the analysis immediately shifts to "criticism" (from the

25  partisan Center for American Progress) that gun shows are somehow "the critical

26  moment in the chain of custody for many guns, the point at which they move from

27  the somewhat-regulated legal market to the shadowy, no-questions-asked illegal

28  market." Ex. 7 at 3 (citing Arkadi Gerney, Center for American Progress, *The Gun*

36

FIRST AMENDED COMPLAINT

1  *Debate 1 Year After Newtown: Assessing Six Key Claims About Gun Background*

2  *Checks* (Dec. 2013), *available at* https://www.americanprogress.org/issues/guns-

3  crime/reports/2013/12/13/80795/the-gun-debate-1-year-after-newtown/ (last visited

4  Sept. 29. 2021). Neither the Center for American Progress editorial nor AB 893's

5  bill analysis show how, in California where sales at gun shows are regulated *at*

6  *least* as heavily as sales at brick-and-mortar retailers, guns originating at gun shows

7  are any more likely to enter the "shadowy, no-questions-asked illegal market" than

8  those sold at gun stores.

9  **[California's Senate Bill 264 (Min)]**

10  ~~125.~~131.    Not to be outdone and following the encouragement from both

11  Defendant Newsom and Assemblymember Gloria, Senator Dave Min sought early

12  on to rid the state of gun shows on all state fairground properties. Indeed, Senator

13  Min promised "in my first 100 days in office, I promise to author legislation for a

14  *ban* on these gun shows at the OC Fair and Events Center once and for all."

15  Anthony Pignataro, *SD-37 Candidate Min: Ban Gun Shows from OC Fair & Event*

16  *Center*, OC Weekly (Aug. 6, 2019), https://www.ocweekly.com/sd-37-candidate-

17  min-ban-gun-shows-from-oc-fair-event-center/ (emphasis added). And he called on

18  the "governing board of the OC Fair to *end its contract* with Crossroads of the West

19  and other gun show marketers." *Id.*

20  ~~126.~~132.    In response, Board Member Ashleigh Aitken, advocating for the

21  known safety of the Fairgrounds, noted that "[t]he gun show loophole does not exist

22  in California. No citizen can purchase a firearm at the gun show and walk off

23  property with it. The purchases are subject to the same background checks and

24  waiting periods as any other store purchase." Aitken went on to note that

25  "California's legal gun shows are not a priority as our state has the strictest gun

26  laws in the country." Anthony Pignataro, *OC Fair Board Member Responds to*

27  *Min's Gun Show Ban Idea* (Aug. 7, 2019), *available at*

28  https://www.ocweekly.com/oc-fair-board-member-responds-to-mins-gun-show-

37

FIRST AMENDED COMPLAINT

1    ban-idea/.

2      127.133.    Nevertheless, Senator Min introduced Senate Bill 264 ("SB

3    264") on January 27, 2021. Sen. B. 264, 2019 2020 2021 Reg. Sess. (Cal. 2020)

4    (attached as Exhibit 11). SB 264, which added section 27575 to the California

5    Penal Code, bars any "officer, employee, operator, lessee, or licensee of the

6    [District]" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any

7    firearm, firearm precursor part, or ammunition on the property or in the buildings

8    that comprise the OC Fair and Events Center." Violation of the law is a

9    misdemeanor. *Id.*

10      128.134.    SB 264 does not bar the possession of firearms, ammunition, or

11    firearm precursor parts on the property or in the buildings that comprise the Orange

12    County Fairgrounds. Ex. 10. And it provides exceptions for (1) gun buyback events

13    held by law enforcement, (2) the sale of a firearm by a public administrator, public

14    conservator, or public guardian in the course of their duties, (3) the sale of a

15    firearm, firearm precursor part, or ammunition on state property that occurs

16    pursuant to a contract that was entered into before January 1, 2022, and (4) the

17    purchase of ammunition on state property by a law enforcement agency in the

18    course of its regular duties. *Id.*

19      129.135.    Like AB 893, SB 264 clearly recognizes that "[p]romoters

20    maintain relationships with a core group of vendors, some selling guns and some

21    selling other merchandise, who travel as the schedule dictates from city to city and

22    state to state and in the West, for example, many of the same vendors can be seen at

23    Crossroads of the West Gun Shows from San Francisco, California, to Tucson,

24    Arizona." *Id.*

25      130.136.    SB 264 failed to identify, however, any real public safety or

26    security concern specifically related to the existence of gun show events at the

27    Fairgrounds. Indeed, without citing specific safety concerns related to the *Orange*

28    *County* Fairgrounds, the authors of SB 264 literally copied and pasted the same

1  vague "security concerns" related to the *Del Mar* Fairgrounds from the language of

2  AB 893 to label the Orange County events a threat to the local community. *Id.*

3  ~~131.~~137.   To be sure, SB 264 claims that "[g]un shows bring grave danger

4  to a community" and that "dangerous incidents" have taken place at guns shows at

5  the Fairgrounds, including ***"an official vendor accused of trafficking illegal***

6  ***firearms, sales of firearms to individuals registered in the Department of Justice***

7  ***Bureau of Firearms Armed Prohibited Persons System, and illegal importation of***

8  ***large-capacity magazines***." *Id.*  But SB 264 makes no effort to show that these

9  incidents are any more likely to occur at the Orange County gun show or gun shows

10  in California in general, which are regulated at least as heavily as retailers operating

11  out of brick-and-mortar stores. What's more, these incidents are identical to the

12  crimes alleged to have taken place at the Del Mar Fairgrounds—an odd coincidence

13  to be sure.

14  ~~132.~~138.   Instead, SB 264's legislative history reveals only general

15  concerns about gun violence occurring all over the country, unrelated to California

16  gun shows, and legislators' beliefs that the state should not profit from sales of

17  firearms and ammunition.

18  ~~133.~~139.   Indeed, SB 264 opens with a list of tragedies, including the

19  horrific mass murders that took place at Columbine High School, Sandy Hook

20  Elementary School, and Marjory Stoneman Douglas High School—none of which

21  were carried out with firearms traced to gun show events at the Fairgrounds. *Id.*

22  ~~134.~~140.   The Senate Committee on Public Safety's March 15, 2021,

23  analysis cited a report from the Government Accountability Office, claiming that a

24  GAO report "regarding gun trafficking to Mexico confirmed that many traffickers

25  buy guns at gun shows." Sen. Comm. Pub. Safety, Bill Analysis Re: SB 264 (Min),

26  ~~2021-2022~~2019-2020 Reg. Sess., at 4 (Cal. 2021) (attached as Exhibit 12). But

27  again, neither the BATFE report nor SB 264's legislative history links any illegally

28  trafficked firearm to gun shows at the ~~Orange County~~ Fairgrounds (or even to gun

39

FIRST AMENDED COMPLAINT

1   shows in California). *See* Ex. 9.

2          ~~135.~~141.     In comments to the Senate Public Safety Committee on March

3   16, 2021, Senator Min claimed that "SB 264 will ensure that the state is not

4   profiting from the sale of firearms and ammunition on state property or facilitating

5   gun shows that would undermine California's strong firearm regulations." Sen.

6   Pub. Safety Committee Hrg., Mar. 16, 2021, at 3:20:18, *available at*

7   https://www.senate.ca.gov/media-archive/default?title=Public+Safety&startdate=

8   03%2F16%2F2021&enddate=03%2F17%2F2021 (last accessed Aug. 4, 2022).

9          ~~136.~~142.     In his remarks to the Senate Public Safety Committee, Senator

10  Min claimed that the carnival-like atmosphere of gun shows lends itself to "lots of

11  gun sales in the parking lot or by Venmo where the gun is delivered later." No data

12  was presented to support these claims even when asked by Senator Bogh. Senator

13  Min ultimately conceded that he does not know how many firearms from gun

14  shows actually move into the stream of illegal commerce. *Id.* at 4:05:36. He went

15  on to state that even if there have zero unlawful acts at guns shows, "there is a

16  principal that taxpayers should not be utilized, and taxpayer venues should not be

17  utilized to promulgate the distribution of more guns in our communities." *Id.* at

18  4:09:40.

19         ~~137.~~143.     Senator Min's closing remarks to the Senate Public Safety

20  Committee recognized that SB 264 is "symbolic" and makes a statement that the

21  state does not want to give an endorsement of "our taxpayer venues being used to

22  sell more guns in our communities. *Id.* at 4:12:59.

23         144.   Similarly, in his remarks to the Assembly Committee on Public Safety

24  on July 13, 2021, Senator Min said that ending gun shows and banning the sale of

25  firearms, ammunition, and precursor parts at state-owned properties is a value

26  statement that the state of California must make. *See* Assem. Pub. Safety

27  Committee Hrg., Mar. 16, 2021, at 4:01:22, *available at*

28  https://www.assembly.ca.gov/media/assembly-public-safety-committee-

40

FIRST AMENDED COMPLAINT

1  20210713/video (last accessed Aug. 4, 2022). "Value statements" are made about

2  likes and dislikes, not about issues of public safety. Min's candid remarks about the

3  intention of SB 264 clearly illustrate a commitment to end gun shows not for safety

4  reasons, but to restrict the lawful speech and activities of a culture that he does not

5  understand and does not support.

6  **[California's Senate Bill 915 (Min)]**

7  145.   Having failed in 2021 to made good on his campaign promise to pass

8  legislation that would ban gun shows from all state property, an undeterred Senator

9  Min introduced Senate Bill 915 ("SB 915") on February 2, 2022. Sen. B. 915,

10  2021-2022 Reg. Sess. (Cal. 2022) (attached as Exhibit 15).

11  146.   SB 915, which added section 27573 to the California Penal Code, bars

12  any  "state officer or employee, or operator, lessee, or licensee of any state

13  property" from "contract[ing] for, authoriz[ing], or allow[ing] the sale of any

14  firearm, firearm precursor part, or ammunition on state property or in the buildings

15  that sit on state property or property otherwise owned, leased, occupied, or operated

16  by the state." *Id.*

17  147.   Just like SB 264, Min's SB 915 does not bar the possession of

18  firearms, ammunition, or firearm precursor parts on state property or in the

19  buildings that sit on that property. *Id.* And it provides exceptions for (1) gun

20  buyback events held by law enforcement, (2) the sale of a firearm by a public

21  administrator, public conservator, or public guardian in the course of their duties,

22  (3) the sale of a firearm, firearm precursor part, or ammunition on state property

23  that occurs pursuant to a contract that was entered into before January 1, 2023, (4)

24  the purchase of ammunition on state property by a law enforcement agency in the

25  course of its regular duties, and (5) sale or purchase of a firearm pursuant to

26  subdivision (b) or (c) of Section 10334 of the Public Contract Code. *Id.*

27  148.   SB 915 takes effect on January 1, 2023, but officials have already

28  stopped entering into contracts with gun show promoters, like Plaintiff Crossroads,

41

FIRST AMENDED COMPLAINT

1   for events in 2022 and beyond. And while there is an exemption allowing events to

2   take place if contracts for those events were entered into before January 1, 2023, it

3   has not been the practice of state venues to grant these contracts for gun show

4   events in anticipation of the law's effective date.

5       149.   The bill's purpose was—and its actual effect is—to banish gun shows

6   from state-owned properties—properties that are otherwise open to the public for

7   gathering and expressive activities—throughout California. Indeed, Senator Min,

8   the author of SB 915, has made very clear that banning the events was the bill's

9   intent:  "Last year we laid the foundation for this moment with a ban on gun shows

10  at the Orange County Fairgrounds. Today, I am proud to announce that California

11  will become the first nation to enact a total ban statewide." Press Release,

12  *California Becomes the First State to Ban Gun Shows on State Property, Builds on*

13  *Orange County Fairgrounds Ban* (July 21, 2022), *available at*

14  https://sd37.senate.ca.gov/news/california-becomes-first-state-ban-gun-shows-state-

15  property-builds-orange-county-fairgrounds (last accessed Nov. 7, 2022).

16      150.   Notably, SB 915 identifies no real public safety concern related to the

17  existence of gun show events at any of the state venues in California. To the

18  contrary, when giving testimony about SB 915, Senator Min only noted issues with

19  criminal activity from outside of California.

20      151.   Instead, SB 915's legislative history reveals only general concerns

21  about gun violence occurring all over the country, unrelated to California gun

22  shows, and legislators' beliefs that the state should not profit from sales of firearms

23  and ammunition.

24      152.   In describing the need for the bill, the legislative history of SB 915

25  cites little more than a 1999 BATFE report that identified "gun shows as a 'major

26  trafficking channel'" and found "that gun shows were the second largest source of

27  illegally trafficked firearms." *See* Sen. Comm. Pub. Safety, Bill Analysis Re: SB

28  915 (Min), 2021-2022 Reg. Sess., at 3 (Cal. 2022) (attached as Exhibit 16). Setting

42

FIRST AMENDED COMPLAINT

**Formatted:** Not Highlight

1    aside the fact that the report is nearly a quarter-of-a-century old, the legislature

2    made no effort to link such concerns to gun shows in California, where state law

3    governs sales at gun shows at least as strictly as it governs sales at "brick-and-

4    mortar" stores. Nor did it make any effort to show that gun shows remain "the

5    second largest source of illegally trafficked firearms" 23 years after the BATFE

6    report published its findings.

7    **[The Impact of SB 264 and SB 915 on the Orange County Gun Show]**

8    138.153.    The sale of firearms and ammunition is an essential function of

9    gun shows, and it is one of the main reasons people attend these events; if gun

10    shows are not economically viable because they have been stripped of an essential

11    function, they will cease to exist.

12    139.154.    SB 264 and SB 915 thus hasve the same practical effect as Del

13    Mar's unconstitutional gun show moratorium which was enjoined by federal

14    court—that is, by permanently banning the commercial sale of firearms, and

15    ammunition, and firearm parts at the Fairgrounds, it has the effect of banning gun

16    shows at the Fairgrounds.

17    140.155.    The Legislature was well-aware when it passed SB 264 and SB

18    915 that a "gunless" gun show would not survive financially. Indeed, the intended

19    purpose of SB 264 and SB 915 was to end gun shows at the Fairgrounds as noted

20    by bill sponsor Senator Min in numerous committee testimonies and public

21    comments.

22    141.156.    The July 12, 2021, Assembly Committee on Public Safety's bill

23    analysis references other similar legislative attempts to ban gun shows on state

24    agricultural land. Assem. Comm. Pub. Safety, Bill Analysis Re: SB 264 (Min),

25    2021-2022 Reg. Sess., at 3 (Cal. 2021) (attached as Exhibit 13). The analysis notes

26    that:

27         AB 893 (Gloria) Chapter 731, Statutes of 2019, added a section to the
         Food and Agricultural Code that prohibits the sale of firearms and

28         ammunition at the Del Mar Fairgrounds, effectively terminating the
         possibility for future gun shows at the Del Mar Fairgrounds. AB 893

was signed into law by Governor Newsom. This bill would expand the provisions of AB 893 by including all state property within the prohibition on the sale or transfer of firearms and ammunition.[6]

142.157.    Senator Min knew that the intended and practical effect of SB 264 (and later SB 915) was to end gun shows. His official Senate press release notes that "[i]f signed into law, SB 264 would effectively put a stop to most gun shows on county fairgrounds. Press Release, *Senator Dave Min's Gun Violence Prevention Bill Advances from Assembly Public Safety Committee* (July 13, 2021), *available at* https://sd37.senate.ca.gov/news/senator-dave-mins-gun-violence-prevention-bill-advances-assembly-public-safety-committee (last accessed Aug. 4, 2022).

158.   On July 21, 2022, Senator Min reiterated the intent of his gun show bills: "Last year we laid the foundation for this moment with a ban on gun shows at the Orange County Fairgrounds. Today I am proud to announce that California will become the first in the nation to enact a total ban statewide." Press Release, *Senator Dave Min's California Becomes the First State To Ban Gun Shows on State Property, Builds on Orange County Fairgrounds Ban* (July 21, 2022), *available at* https://sd37.senate.ca.gov/news/california-becomes-first-state-ban-gun-shows-state-property-builds-orange-county-fairgrounds (last accessed Nov. 7, 2022).

143.159.    And further evidencing the Legislature's intended effect of SB 264 and SB 915, Senator Min wrote to Defendant District, warning members not to stand in the way of his bill that would ban sales of firearms, ammunition, and firearm precursor parts at the Fairgrounds. Letter from Senator Dave Min to Board Members of 32nd District Agricultural Association (on or about September 13, 2021) (attached as Exhibit 14).

---

[6] SB 264 was initially introduced as a bill to end sales of firearms, ammunition, and firearm precursor parts on *all* state-owned property. But Min failed to garner enough support for such a ban and agreed to limit the scope of SB 264 to the OC Fair & Event Center.

44

1    144.160.    In his letter dated on or about September 13, 2021, letter, Min

2    addressed the District's concerns that its venue was being unfairly and exclusively

3    targeted, responding that SB 264 was no different from earlier attempts to ban gun

4    shows at a single fairground:

5

6        While Item 6A expresses a concern that SB 264 "exclusively targets
         the 32nd DAA," such action to ban gun shows at a single fairground

7        site has recent precedent. In 2019, Gov. Newsom signed Assembly
         Bill 893 (Gloria) into law, ending the sale of firearms and

8        ammunition at the Del Mar Fairgrounds, operated by the 22nd
         District Agricultural Association.

9    *Id.* (emphasis added).

10    145.161.    In that same letter, Senator Min also threatened the District's

11    board members with individual liability lawsuits should they move to approve

12    contracts for the gun shows even before Governor Newsom had signed SB 264 into

13    law. *Id.*

14        162.   Nonetheless, Plaintiff Crossroads has repeatedly reached out to

15    Defendant District to request dates for events at the Fairground in 2021, 2022, and

16    beyond. But Defendant District refused to place the contracts for gun shows on the

17    agenda for October, November, or December 2021, stating instead that they would

18    revisit the issue again in January 2022 after SB 264 would go into effect.

19        146.163.    Defendant District's refusal to enter into contracts with Plaintiff

20    Crossroads before the implementation of AB 264 and SB 915 may have satisfied

21    Senator Min's threats towards individual board members, but in doing so, the

22    District failed in their duty to bring profitable and family-friendly events to the

23    Fairgrounds and caused great losses to Plaintiffs.

24        147.164.    Plaintiff Crossroads was unable to secure dates and enter into

25    new contracts for events at the Fairgrounds in 2022 and beyond due to the

26    Defendants' intentional act of adopting and enforcing SB 264 and refusing to

27    consider their contracts in the same way they would any other member of the public

28    seeking to rent the Fairgrounds venue.

45

FIRST AMENDED COMPLAINT

1    148.165.    Indeed, in compliance with SB 264 and SB 915, Defendant

2    District cannot and will not enter into contracts for gun shows at the Fairgrounds if

3    firearms, ammunition, or firearm precursor parts will be sold during the shows.

4         149.166.    Even though Plaintiff Crossroads has offered to attempt to hold

5    events without sales of firearms, ammunition, or firearm precursor parts to preserve

6    its longstanding relationship with the District, mitigate damages, and continue

7    planning and promoting its family-friendly events until its claims can be heard,

8    Defendant District dragged its feet and refused to provide dates for events for 2022

9    and beyond. Plaintiffs are also unable to enter into new contracts for shows at other

10   state venues before the implementation of SB 915 because those venues also refuse

11   to provide dates before January 1, 2023.

12        150.167.    Because of the time and resources needed to plan and implement

13   its gun show events, Plaintiff Crossroads must plan its shows about one year in

14   advance, but Defendant District has not allowed Plaintiff Crossroads to secure dates

15   in 2023 either.

16        151.168.    What's more, Defendant District seems to have stripped Plaintiff

17   Crossroads of its effective right of first refusal under the District's "hold" system

18   described above. Indeed, it failed to give Crossroads first (or any) choice of its

19   dates in 2021 or 2022.

20        152.169.    Defendants' adoption and enforcement of SB 264 and SB 915,

21   which haves the intended and practical effect of banning gun shows at the

22   Fairgrounds and other state fairgrounds, has caused and will continue to cause

23   Plaintiff Crossroads significant economic damages, including loss of event revenue,

24   breakdown of relationships and agreements with long-time event vendors and

25   companies used as suppliers for gun show events, relinquishment of future show

26   dates, and loss of business reputation and goodwill that has been built by Plaintiff

27   Crossroads for more than 30 years.

28        153.170.    Plaintiff Crossroads has already lost revenue for gun show

46

FIRST AMENDED COMPLAINT

1  events at the Fairgrounds in December 2021 and all of 2022 because the Fair

2  BoardDefendant District will not finalize event dates, citing SB 264 as the reason

3  along with the threats from Senator Min for personal liability should they act. If

4  shows do not return to the Fairgrounds in 2022, Plaintiff Crossroads will lose all

5  revenue for gun show events at the Fairgrounds in 2022 and possibly 2023 because

6  of the amount of time it takes to plan large-scale events like the gun shows.

7       154.171.    Even if Plaintiff Crossroads could secure dates, plan, promote,

8  and host gun shows in 2022 or 2023, SB 264 and SB 915 stands in the way of

9  Crossroads generating the profits the events typically generate because the ban on

10  firearm and ammunition sales will significantly impact paid event attendance and

11  the types and numbers of paid vendors who will do business with Crossroads at the

12  Orange County gun show.

13       155.172.    Plaintiff Crossroads has and will continue to suffer loss of

14  business goodwill resulting from Defendants' adoption and enforcement of SB 264

15  and SB 915 under the (unsupported) pretense that gun shows, generally, and

16  Crossroads' shows, in particular, threaten public safety. The message this sends to

17  other venues, attendees, and vendors that do business with Crossroads will no doubt

18  affect Crossroads for years.

19       156.173.    Defendants' adoption and enforcement of SB 264 and SB 915,

20  which haves the intended and practical effect of banning gun shows at the

21  Fairgrounds and other state fairgrounds, prohibits Plaintiffs and all those similarly

22  situated from making use of a state-owned "public assembly facility" to host gun

23  show events, a lawful business activity, in violation of Plaintiffs' rights to engage in

24  free speech and peaceful assembly, and their right to equal protection under the law.

25       157.174.    Specifically, Defendants' conduct complained of here strips

26  Plaintiffs Clark, Johnson, Littrell, and Merson, asMerson, as well as the

27  organizational plaintiffs, CRPA, APAGOA, 2ALC, and SAF, of a vital opportunity

28  to assemble and engage in pure speech about, among other things, the rights and

FIRST AMENDED COMPLAINT

1    responsibilities of gun owners, the Second Amendment, patriotism, and political

2    activism with like-minded individuals.

3        158.175.    Defendants' conduct complained of here also strips Plaintiff

4    Crossroads of the right to promote gun show events, acting as a "clearinghouse" for

5    both political speech and commercial speech.

6        159.176.    Defendants' conduct complained of here also strips Plaintiffs

7    Littrell, and Merson, of a vital opportunity to assemble and engage in lawful

8    commercial speech, including the offer and acceptance of sales of firearms,

9    ammunition, and related accessories.

10       160.177.    Furthermore, even if the Court grants injunctive relief, Plaintiff

11   Crossroads will have incurred damages in having to devote extraordinary

12   advertising dollars to inform the public that gun shows will continue to be held and

13   have not  been banned at the Fairgrounds.

14       161.178.    The economic and non-economic harms and injuries to Plaintiffs

15   are of a continuing nature; they continue to compound everyday SB 264 and SB

16   915 remains the law.

17

18                    **FIRST CAUSE OF ACTION**
19         **Violation of Right to Free Speech Under U.S. Const., amend. I**
                               **42 U.S.C. § 1983**
20    (By Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, SAF
                            Against All Defendants)

21       162.179.    Plaintiffs incorporate by reference paragraphs 1 through 162 178

22   of this Complaint as though fully set forth herein in their entirety.

23       163.180.    The state of California owns the Fairgrounds, a public venue. It

24   is rented to the public, including community-based organizations and businesses,

25   for its use and enjoyment, including for concerts, festivals, and industry shows.

26       164.181.    Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA,

27   2ALC, and SAF have attended in the past and wish to again attend Crossroads gun

28   shows at the Fairgrounds so they may exchange ideas, information, and knowledge,

                                      48
                        FIRST AMENDED COMPLAINT

1  as well discuss political issues and the importance of protecting and defending the

2  Second Amendment.

3      ~~165.~~182.    Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA,

4  2ALC, and SAF have a right under the First Amendment to use the Fairgrounds for

5  their expressive activity on the same basis as other members of the public without

6  regard to the viewpoints they seek to express.

7      ~~166.~~183.    Defendants Newsom, Bonta, and Spitzer, acting under color of

8  state law, are the state and local actors responsible for enforcing SB 264 and SB

9  915, which deprive~~s~~ Plaintiffs of free speech rights secured by the First

10  Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

11      ~~167.~~184.    Defendants Ross and District interpret, implement, and enforce

12  state laws and policies in regard to the Fairgrounds, including SB 264 and SB 915,

13  which deprive~~s~~ Plaintiffs of free speech rights secured by the First Amendment of

14  the United States Constitution in violation of 42 U.S.C. § 1983.

15      ~~168.~~185.    Defendants' enforcement of SB 264 and SB 915, which

16  prohibit~~s~~ the sale of firearms, ammunition, and "firearm precursor parts" at the

17  Fairgrounds with the purpose~~, and~~ intention, and effect ~~(or at least the effect)~~ of

18  banning gun show events at the Fairgrounds and all other state-owned properties, is

19  an impermissible content-based restriction of speech. Such enforcement constitutes

20  a direct violation of the free speech rights of Plaintiffs Clark, Johnson, Littrell,

21  Merson, CRPA, APAGOA, 2ALC, and SAF.

22      ~~169.~~186.    Defendants have no compelling (or even legitimate)

23  governmental interest in banning the otherwise lawful (and constitutionally

24  protected) sale of lawful firearms, ammunition, and "firearm precursor parts" at the

25  Fairgrounds and all other state-owned properties, or in banning gun show events

26  and the unique expression and exchange of ideas related to promoting and

27  preserving the "gun culture" that takes place at those events. Any purported interest

28  in "public safety" is betrayed by the fact that SB 264 and SB 915 do~~es~~ not ban the

49

FIRST AMENDED COMPLAINT

1   *possession* of firearms, ammunition, or firearms precursor parts on Fairgrounds

2   property and state law already governs sales at gun shows *at least* as strictly as it

3   governs sales at "brick-and-mortar" stores.

4   ~~170.~~187.    Further, SB 264 and SB 915 ~~is~~are neither narrowly tailored to

5   nor the least restrictive means of achieving the state's dubious interests. Indeed, by

6   intentionally and effectively banning gun shows at the Fairgrounds and all other

7   state-owned properties, it sweeps up *all* forms of speech and expressive conduct

8   that occurs at such events and banishes it from a public venue.

9   ~~171.~~188.    Similarly, SB 264 and SB 915 ~~is~~are unconstitutionally

10  overbroad because, in an effort to restrict the commercial sale of firearms,

11  ammunition, and firearm precursor parts, the laws effectively and intentionally bans

12  gun shows events altogether, seriously and deliberately burdening a vast amount of

13  speech that does not constitute ~~such a~~commercial speech~~communication~~ and is fully

14  protected by the First Amendment.

15  ~~172.~~189.    As a direct and proximate result of Defendants' conduct,

16  Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF

17  have suffered irreparable harm, including the violation of their constitutional right

18  to free speech, entitling them to declaratory and injunctive relief. Absent

19  intervention by this Court, through declaratory and injunctive relief, Plaintiffs will

20  continue to suffer this irreparable harm.

21

22                    **SECOND CAUSE OF ACTION**
23  **Violation of Right to Free Speech Under U.S. Const., amend. I**
     **Mixed Political - Commercial**
24                    **42 U.S.C. § 1983**
                (By Plaintiff Crossroads Against All Defendants)

25  ~~173.~~190.    Plaintiffs incorporate by reference paragraphs 1 through ~~173~~189

26  of this Complaint as though fully set forth herein in their entirety.

27  ~~174.~~191.    The state of California owns the Fairgrounds, a public venue. It

28  is rented to the public, including community-based organizations and businesses,

50

**FIRST AMENDED COMPLAINT**

1    for its use and enjoyment, including for concerts, festivals, and industry shows.

2    175.192.   Plaintiff Crossroads seeks to engage in protected speech at the

3    Fairgrounds, a noted "public assembly facility," through the promotion and

4    production of events for lawful expressive activity, including events that bring

5    together like-minded individuals to engage in pure political and educational speech,

6    as well as commercial speech of vendor and individual participants to communicate

7    offer and acceptance for the sale of legal goods and services.

8    176.193.   Event promoters, though they generally promote events for

9    profit, "still enjoy the protections of the First Amendment." *Id.* at 567. For "[t]he

10   role of a promoter in ensuring access to the public is at least as critical as the role of

11   a bookseller or theater owner and . . . is in a far better position than a concert goer

12   or individual performers to vindicate First Amendment rights and ensure public

13   access." *Id*. at 568. The conduct they engage in is protected expression.

14   177.194.   Plaintiff Crossroads has a right under the First Amendment to

15   use the Fairgrounds for its expressive activity on the same basis as other members

16   of the public without regard to the content or viewpoint it seeks to express and

17   promote.

18   178.195.   Defendants Newsom, Bonta, and Spitzer, acting under color of

19   state law, are the state and local actors responsible for enforcing SB 264 and SB

20   915, which deprives Plaintiffs of free speech rights secured by the First

21   Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

22   196.   Defendants Ross and District interpret, implement, and enforce state

23   laws and policies in regard to the Fairgrounds, including SB 264 and SB 915, which

24   deprives Plaintiffs of free speech rights secured by the First Amendment of the

25   United States Constitution in violation of 42 U.S.C. § 1983.

26   179.197.   Due to the passage of SB 264 and SB 915, Defendant District

27   has not and will not enter into new contracts with Plaintiff Crossroads to hold gun

28   show events at the Fairgrounds, even though Plaintiff Crossroads has safely and

51

FIRST AMENDED COMPLAINT

1  legally held such events at the Fairgrounds for decades.

2  ~~180.~~198.    Defendants' enforcement of SB 264 and SB 915, which

3  prohibit~~s~~ the sale of firearms, ammunition, and "firearm precursor parts" at the

4  Fairgrounds with the purpose, ~~and~~ intention, and ~~(or at least the~~ effect) of banning

5  gun show events at the Fairgrounds and all other state-owned properties, is an

6  impermissible content-based restriction of speech. Such enforcement constitutes a

7  direct violation of the free speech rights of Plaintiff Crossroads.

8  ~~181.~~199.    Defendants have no compelling (or even legitimate)

9  governmental interest in banning the otherwise lawful (and constitutionally

10 protected) sale of lawful firearms, ammunition, and "firearm precursor parts" at the

11 Fairgrounds and all other state-owned properties, or in banning gun show events

12 and the unique expression and exchange of ideas related to promoting and

13 preserving the "gun culture" that takes place at those events. Any purported interest

14 in "public safety" is betrayed by the fact that SB 264 and SB 915 do~~es~~ not ban the

15 possession of firearms, ammunition, or firearms precursor parts on Fairgrounds

16 property and state law already governs sales at gun shows *at least* as strictly as it

17 governs sales at "brick-and-mortar" stores.

18 ~~182.~~200.    Further, SB 264 and SB 915 ~~is~~ are neither narrowly tailored to

19 nor the least restrictive means of achieving the state's dubious interests. Indeed, by

20 intentionally and effectively banning gun shows at the Fairgrounds and all other

21 state-owned properties, it sweeps up *all* forms of speech and expressive conduct

22 that occurs at such events and banishes it from a public venue.

23 ~~183.~~201.    Similarly, SB 264 and SB 915 ~~is~~are unconstitutionally

24 overbroad because, in an effort to restrict the commercial sale of firearms,

25 ammunition, and "firearm precursor parts," the law effectively and intentionally

26 bans gun shows events altogether, seriously and deliberately burdening a vast

27 amount of speech that does not constitute ~~such a communication~~commercial speech

28 and is fully protected by the First Amendment.

52

FIRST AMENDED COMPLAINT

1   184.202.   As a direct and proximate result of Defendants' conduct,

2   Plaintiff Crossroads has suffered irreparable harm, including the violation of its

3   constitutional right to free speech, entitling Crossroads to declaratory and injunctive

4   relief. Absent intervention by this Court, through declaratory and injunctive relief,

5   Plaintiffs will continue to suffer this irreparable harm.

6

7   **THIRD CAUSE OF ACTION**

8   **Violation of Right to Commercial Speech Under U.S. Const., amend. I**
    **42 U.S.C. § 1983**

9   (By Plaintiffs Littrell, Merson, and CRPA Against All Defendants)

10  185.203.   Plaintiffs incorporate by reference paragraphs 1 through 185 202

11  of this Complaint as though fully set forth herein in their entirety.

12  186.204.   The state of California owns the Fairgrounds, a public venue. It

13  is rented to the public, including community-based organizations and businesses,

14  for its use and enjoyment, including for concerts, festivals, and industry shows.

15  187.205.   Plaintiffs Littrell, Merson, and CRPA have attended in the past,

16  or represent members who have attended in the past, and wish to again attend

17  Crossroads gun shows at the Fairgrounds to engage in lawful commercial speech

18  with individual attendees.

19  188.206.   Plaintiffs Littrell, Merson, and CRPA members have a right

20  under the First Amendment to use the Fairgrounds for expressive activity on the

21  same basis as other members of the public without regard to the viewpoints they

22  seek to express and promote.

23  189.207.   Defendants Newsom, Bonta, and Spitzer, acting under color of

24  state law, are the state and local actors responsible for enforcing SB 264 and SB

25  915, which deprives Plaintiffs of free speech rights secured by the First

26  Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

27  190.208.   Defendants Ross and District interpret, implement, and enforce

28  state laws and policies in regard to the Fairgrounds, including SB 264 and SB 915,

53

**FIRST AMENDED COMPLAINT**

1  which deprives Plaintiffs of free speech rights secured by the First Amendment of

2  the United States Constitution in violation of 42 U.S.C. § 1983.

3  191.209.    Defendants' enforcement of SB 264 and SB 915, which

4  prohibits the sale of firearms, ammunition, and " firearm precursor parts" at the

5  Fairgrounds with the purpose and, intention, and (or at least the effect) of banning

6  gun show events at the Fairgrounds and all other state-owned properties, is an

7  impermissible content-based restriction of speech. Such enforcement constitutes a

8  direct violation of the First Amendment commercial speech rights of the Plaintiffs.

9  192.210.    Further, by directly barring the rights of vendors, like Plaintiffs

10  Littrell, Merson, and CRPA members, to sell firearms, and ammunition, and

11  "firearm precursor parts" (which necessarily involves commercial speech), SB 264

12  and SB 915 defies existing case law in the Ninth Circuit protecting the commercial

13  speech associated with firearm sales on public property. *See Nordyke v. Santa*

14  *Clara Cty.*, 110 F. 3d 707 (9th Cir. 1997).

15  193.211.    Defendants have no substantial (or even legitimate)

16  governmental interest in banning the otherwise lawful (and constitutionally

17  protected) sale of lawful firearms, ammunition, and firearm precursor parts at the

18  Fairgrounds and all other state-owned properties, or in banning gun show events

19  and the unique expression and exchange of ideas related to promoting and

20  preserving the "gun culture" that takes place at those events. Any purported interest

21  in "public safety" is betrayed by the fact that SB 264 and SB 915 does not ban the

22  possession of firearms, ammunition, or firearms precursor parts on Fairgrounds

23  property and state law already governs sales at gun shows *at least* as strictly as it

24  governs sales at "brick-and-mortar" stores.

25  194.212.    Even if there were a substantial governmental interest in

26  restricting gun shows and the commercial speech that occurs at such events, it

27  would not be directly served by a ban on sales of firearms, ammunition, and

28  "firearm precursor parts" at the Fairgrounds and all other state-owned properties.

54

FIRST AMENDED COMPLAINT

1    ~~195.~~213.    Even if there were a substantial governmental interest in
2    restricting gun shows and the commercial speech that occurs at such events, flatly
3    banning commercial speech about firearms~~, and~~ ammunition, and "firearm
4    precursor parts" at the Fairgrounds and all other state-owned properties ~~altogether~~
5    is more extensive than necessary to serve any such interest. *See Nordyke*, 110 F.3d
6    707 (holding that a ban on the sale of firearms on county-owned land was
7    overbroad as abridging commercial speech associated with the sale of lawful
8    products).

9    ~~196.~~214.    As a direct and proximate result of Defendants' conduct,
10   Plaintiffs Littrell, Merson, and CRPA have suffered irreparable harm, including the
11   violation of their constitutional right to free speech, entitling them to declaratory
12   and injunctive relief. Absent intervention by this Court, through declaratory and
13   injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

14
15                             **FOURTH CAUSE OF ACTION**
          **Prior Restraint on Right to Free Speech Under U.S. Const., amend. I**
16                               **42 U.S.C. § 1983**
                         (By All Plaintiffs Against All Defendants)

17   ~~197.~~215.    Plaintiffs incorporate by reference paragraphs 1 through ~~197~~214
18   of this Complaint as though fully set forth herein in their entirety.

19   ~~198.~~216.    The First Amendment affords special protection against policies
20   or orders that impose a previous or prior restraint on speech. "[P]rior restraints on
21   speech and publication are the most serious and least tolerable infringement on First
22   Amendment Rights." *Ass'n for L.A. Deputy Sheriffs*, 239 Cal. App. 4th at 811
23   (citing *Neb. Press Ass'n*, 427 U.S. at 559. A prior restraint is particularly egregious
24   when it falls upon the communication of news, commentary, current events,
25   political speech, and association. *N.Y. Times Co.*, 403 U.S. at 715.

26   ~~199.~~217.    Prior restraint also involves the "unbridled discretion doctrine"
27   where a policy, or lack thereof, allows for a single person or body to act at their sole
28   discretion, without regard for any constitutional rights possessed by the person

                                        55

1  upon which the action is taken, and where there is no remedy for challenging the

2  discretion of the decision makers. *Lakewood*, 486 U.S. at 757.

3      200.218.    The Defendants are the state and local actors responsible for

4  enforcing SB 264 and SB 915, which areis a content-based restrictions of speech

5  that will have a chilling effect on Plaintiffs' First Amendment rights, thus acting as

6  a de facto prior restraints on Plaintiffs' rights (including a refusal to place contract

7  approval on board agendas or to offer available dates to begin the process of renting

8  the venue).

9      201.219.    Under SB 264 and SB 915, Defendant District has unfettered

10 discretion to determine what constitutes a "sale" under the law and is thereby

11 prohibited at the Fairgrounds. For instance, some fair boards or their employees

12 may determine that a gun raffle does not constitute a sale and allow fundraising

13 events with such raffles to take place on the property, while others might determine

14 that it does constitute a sale and thus ban such events from the property.

15     202.220.    Defendants' policies and practices complained of here impose

16 an unconstitutional prior restraint because they vest the District with unbridled

17 discretion to permit or refuse protected expression by members of the public,

18 including Plaintiffs.

19     203.221.    Defendants' policies and practices complained of here give

20 unbridled discretion to local agricultural district boards, and board members, and

21 their employees to decide what forms of expression members of the public may

22 engage in on at the Fairgrounds and to ban any other expression at the whim of

23 those boards and board members in violation of the First Amendment.

24     204.222.    As a direct and proximate result of Defendants' conduct,

25 Plaintiffs have suffered and will continue to suffer irreparable harm, including the

26 violation of their constitutional right to freedom of expression, entitling them to

27 declaratory and injunctive relief and nominal damages.

28

**FIFTH CAUSE OF ACTION**
**Violation of Right to Assembly and Association Under U.S. Const., amend. I**
**42 U.S.C. § 1983**
(By All Plaintiffs Against All Defendants)

205. 223.    Plaintiffs incorporate by reference paragraphs 1 through 205 222 of this Complaint as though fully set forth herein in their entirety.

206. 224.    The state of California owns the Fairgrounds, a public venue. It is rented to the public, including community-based organizations and businesses, for its use and enjoyment, including for concerts, festivals, and industry shows.

207. 225.    Plaintiffs have promoted and/or attended in the past and wish to again promote and/or attend Crossroads gun shows at the Fairgrounds so they may assemble and associate with one another to engage in lawful commerce, fellowship, and expressive activities, including political and educational speech regarding the lawful ownership, possession, and use of firearms and related products.

208. 226.    Plaintiffs have a right under the First Amendment to use the Fairgrounds to assemble and associate on the same basis as other members of the public without regard to the content or viewpoint it seeks to express and promote.

209. 227.    Defendants Newsom, Bonta, and Spitzer, acting under color of state law, are the state and local actors responsible for enforcing SB 264 and SB 915, which deprives Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

210. 228.    Defendants Ross and District interpret, implement, and enforce state laws and policies in regard to the Fairgrounds, including SB 264 and SB 915, which deprives Plaintiffs of free speech rights secured by the First Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

211. 229.    Defendants' enforcement of SB 264 and SB 915, which prohibits the sale of firearms, ammunition, and "firearm precursor parts" at the Fairgrounds with the purpose, and intention, and (or at least the effect) of banning gun show events at the Fairgrounds and all other state-owned properties, violates

57

1  Plaintiffs' rights to assembly and association by denying them the right to use the

2  Fairgrounds and all other state-owned properties otherwise open to the public for

3  expressive uses, a "public assembly facilitiesy," to assemble and engage in political

4  and other types of expression—a right Defendants extend to other members of the

5  public so long as they are not meeting for the purposes of holding a gun show

6  event.

7       212.230.    Defendants have no compelling (or even legitimate)

8  governmental interest in banning the otherwise lawful (and constitutionally

9  protected) sale of lawful firearms, ammunition, and "firearm precursor parts" at the

10  Fairgrounds and all other state-owned properties, or in banning gun show events

11  and, by extension, the rights of Plaintiffs to assemble and associate at the

12  Fairgrounds and other state-owned properties otherwise open to the public. Any

13  purported interest in "public safety" is betrayed by the fact that SB 264 and SB 915

14  does not ban the possession of firearms, ammunition, or firearms precursor parts on

15  Fairgrounds property and state law already governs sales at gun shows *at least* as

16  strictly as it governs sales at "brick-and-mortar" stores.

17       213.231.    Even if SB 264 and SB 915 served some sufficient government

18  purpose, they areit is neither narrowly tailored nor the least restrictive means to

19  serve that end.

20       214.232.    As a direct and proximate result of Defendants' conduct, all

21  Plaintiffs have suffered irreparable harm, including the violation of their

22  constitutional right to free association and assembly, entitling them to declaratory

23  and injunctive relief. Absent intervention by this Court, through declaratory and

24  injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

25

26              **SIXTH CAUSE OF ACTION**
    **Violation of the Right to Equal Protection Under U.S. Const., amend. XIV**
                      **42 U.S.C. § 1983**
27         (By All Plaintiffs Against All Defendants)

28       215.233.    Plaintiffs incorporate by reference paragraphs 1 through 215

58

1    232 of this Complaint as if fully set forth herein in their entirety.

2         216.234.    Defendants, acting under color of state law, are enforcing SB

3    264 and SB 915, which deprives Plaintiffs of right to equal protection under the law

4    secured by the Fourteenth Amendment of the United States Constitution in

5    violation of 42 U.S.C. § 1983.

6         217.235.    On theirits face and as applied, SB 264 and SB 915 areis an

7    unconstitutional abridgements of Plaintiffs' right to equal protection under the law

8    guaranteed by the Fourteenth Amendment because they areit is a viewpoint-

9    discriminatory and/or animus-based restrictions on Plaintiffs' protected speech that

10   serves no compelling governmental interest.

11        218.236.    On theirits face and as evidenced by the legislative history of

12   both AB 264 and SB 9152571, it is clear that the law's' purpose and intention areis

13   to make a "symbolic" gesture and a "value statement" about the otherwise lawful

14   sale of firearms and related products and of the proliferation of the "gun culture" in

15   California and elsewhere.

16        219.237.    Defendants have no compelling (or even legitimate)

17   governmental interest in banning Plaintiffs' speech. Indeed, any purported interest

18   in "public safety" is betrayed by the fact that SB 264 and SB 915 does not ban the

19   possession of firearms, ammunition, or firearms precursor parts on Fairgrounds

20   property and state law already governs sales at gun shows *at least* as strictly as it

21   governs sales at "brick-and-mortar" stores.

22        220.238.    Defendants' refusal to allow Plaintiffs equal use of the public

23   facilityies while continuing to allow contracts for the use of these facilityies with

24   other similarly situated legal and legitimate businesses is a violation of Plaintiffs'

25   right to equal protection under the law because it is based on a "bare desire to harm

26   a politically unpopular group." *Moreno*, 413 U.S. at 534.

27        221.239.    Further, SB 264 and SB 915 areAB 2571 is not narrowly

28   tailored to achieving the state's dubious interests.

59

FIRST AMENDED COMPLAINT

1  232.  As a direct and proximate result of Defendants' conduct, all Plaintiffs

2  have suffered irreparable harm, including the violation of their constitutional right to

3  equal protection under the law, entitling them to declaratory and injunctive relief.

4  Absent intervention by this Court, through declaratory and injunctive relief,

5  Plaintiffs will continue to suffer this irreparable harm.

6

7  **SEVENTH CAUSE OF ACTION**

8  **Violation of Right to Keep and Bear Arms Under U.S. Const., amend. II 42 U.S.C. § 1983**

9  (By All Plaintiffs Against All Defendants)

10  233.  Plaintiffs incorporate by reference paragraphs 1 through 232 of this

11  Complaint as if fully set forth herein in their entirety.

12  232. 234.  Plaintiffs Clark, Johnson, Littrell, Merson, Crossroads, and

13  members and supporters of Plaintiffs CRPA, 2ALC, APAGOA, and SAF, have sold

14  or bought firearms, ammunition, and/or "firearm precursor parts" at gun show

15  events at the Fairgrounds in the past and, but for the adoption and enforcement of

16  SB 264 and SB 915, they would do so again.

17  233. 235.  Plaintiffs have a right, under the Second Amendment, to buy

18  and sell firearms and the ammunition and parts necessary for the effective operation

19  of those firearms.

20  236.  Defendants Bonta and Spitzer, acting under color of state law, are the

21  government actors responsible for enforcing and prosecuting violations of SB 264

22  and SB 915, which deprive Plaintiffs of their right to access firearms and

23  ammunition secured by the Second Amendment of the United States Constitution in

24  violation of 42 U.S.C. § 1983.

25  237.  Defendants District and Ross interpret, implement, and enforce state

26  laws and policies in regard to the Fairgrounds, including SB 264 and SB 915, which

27  deprive Plaintiffs of their right to access firearms, ammunition, and firearm parts

28

60

FIRST AMENDED COMPLAINT

secured by the Second Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

238.   Defendants' enforcement of SB 264 and SB 915, which prohibit the sale of firearms, ammunition, and "firearm precursor parts" at the Fairgrounds and all other state-owned venues with the purpose, intention, and effect of banning gun show events at the Fairgrounds and all state-owned fairgrounds, violates Plaintiffs' Second Amendment right to buy and sell firearms and the ammunition and parts necessary to the effective operation of those firearms.

239.   Defendants cannot satisfy their burden to justify their ban on the sale of firearms and ammunition at the Fairgrounds under the history- and tradition-based test applied in *Heller* and recently confirmed in *Bruen*.

234.240.   As a direct and proximate result of Defendants' conduct, all Plaintiffs have suffered irreparable harm, including the violation of their constitutional right to buy and sell firearms and ammunition, entitling them to declaratory and injunctive relief. Without intervention by this Court, through declaratory and injunctive relief, Plaintiffs will continue to suffer this irreparable harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

1.   A declaration that SB 264, codified at California Penal Code section 27575, violates the free speech rights of Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF under the First Amendment to the United States Constitution, on its face and as applied;

1.2.   A declaration that SB 915, codified at California Penal Code section 27573, violates the free speech rights of Plaintiffs Clark, Johnson, Littrell, Merson, CRPA, APAGOA, 2ALC, and SAF under the First Amendment to the United States Constitution, on its face and as applied;

3.   A declaration that SB 264, codified at California Penal Code section

61

FIRST AMENDED COMPLAINT

1  27575, violates the free speech rights of Plaintiff Crossroads under the First

2  Amendment to the United States Constitution, on its face and as applied;

3  ~~2.~~4.    A declaration that SB 915, codified at California Penal Code section

4  27573, violates the free speech rights of Plaintiff Crossroads under the First

5  Amendment to the United States Constitution, on its face and as applied;

6      5.    A declaration that SB 264, codified at California Penal Code section

7  27575, violates the commercial speech rights of Plaintiffs Littrell, Merson, and

8  CRPA under the First Amendment to the United States Constitution, on its face and

9  as applied;

10  ~~3.~~6.    A declaration that SB 915, codified at California Penal Code section

11  27573, violates the commercial speech rights of Plaintiffs Littrell, Merson, and

12  CRPA under the First Amendment to the United States Constitution, on its face and

13  as applied;

14      ~~4.~~7.    A declaration that SB 264, codified at California Penal Code section

15  27575, violates the free speech rights of all Plaintiffs under the First Amendment to

16  the United States Constitution because it imposes a prior restraint on their speech;

17      8.    A declaration that SB 915, codified at California Penal Code section

18  27573, violates the free speech rights of all Plaintiffs under the First Amendment to

19  the United States Constitution because it imposes a prior restraint on their speech;

20      9.    A declaration that SB 264, codified at California Penal Code section

21  27575, violates Plaintiffs' rights of assembly and association under the First

22  Amendment to the United States Constitution, on its face and as applied;

23      ~~5.~~10.  A declaration that SB 915, codified at California Penal Code section

24  27573, violates Plaintiffs' rights of assembly and association under the First

25  Amendment to the United States Constitution, on its face and as applied;

26      11.    A declaration that SB 264, codified at California Penal Code section

27  27575, violates the rights of all Plaintiffs to equal protection under the law per the

28  Fourteenth Amendment to the United States Constitution, on its face and as

FIRST AMENDED COMPLAINT

1  applied;

2      12.    A declaration that SB 915, codified at California Penal Code section

3  27573, violates the rights of all Plaintiffs to equal protection under the law per the

4  Fourteenth Amendment to the United States Constitution, on its face and as

5  applied;

6      13.    A declaration that SB 264, codified at California Penal Code section

7  27575, violates the rights of all Plaintiffs to keep and bear arms under the Second

8  Amendment to the United States Constitution, on its face and as applied;

9      14.    A declaration that SB 915, codified at California Penal Code section

10  27573, violates the rights of all Plaintiffs to keep and bear arms under the Second

11  Amendment to the United States Constitution, on its face and as applied;

12      15.    A preliminary and permanent injunction enjoining Defendants, their

13  employees, agents, successors in office, and all District Attorneys, County Counsel,

14  and City Attorneys holding office in the state of California, as well as their

15  successors in office, from enforcing SB 264, codified at California Penal Code

16  section 27575;

17      6.16.  A preliminary and permanent injunction enjoining Defendants, their

18  employees, agents, successors in office, and all District Attorneys, County Counsel,

19  and City Attorneys holding office in the state of California, as well as their

20  successors in office, from enforcing SB 915, codified at California Penal Code

21  section 27573;

22      7.17.  An order for damages, including nominal damages, according to proof;

23      8.18.  An award of costs and expenses, including attorney's fees, pursuant to

24  42 U.S.C. § 1988 or other appropriate state or federal law; and

25      9.19.  Any such other relief the Court deems just and equitable.

26

27

28

FIRST AMENDED COMPLAINT

Dated: November 11, 2022~~November 11, 2022~~~~November 11, 2022~~

**MICHEL & ASSOCIATES, P.C.**

*s/ Anna M. Barvir*
Anna M. Barvir
Counsel for Plaintiffs B&L Productions, Inc., California Rifle & Pistol Association, Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, Asian Pacific American Gun Owner Association, Second Amendment Law Center, Inc.

Dated: November 11, 2022~~November 11, 2022~~~~November 11, 2022~~

**LAW OFFICES OF DONALD KILMER, APC**

*s/ Donald Kilmer*
Donald Kilmer
Counsel for Plaintiff Second Amendment Foundation

FIRST AMENDED COMPLAINT