1  C.D. Michel-SBN 144258
   Anna M. Barvir-SBN 268728
2  Tiffany D. Cheuvront-SBN 317144
   MICHEL & ASSOCIATES, P.C.
3  180 East Ocean Blvd., Suite 200
   Long Beach, CA 90802
4  Telephone: (562) 216-4444
   Email: cmichel@michellawyers.com

5  Attorneys for Plaintiffs B&L Productions, Inc., California Rifle & Pistol
   Association, Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven
6  Merson, Asian Pacific American Gun Owner Association, Second Amendment Law
   Center, Inc.
7
8  Donald Kilmer-SBN 179986
   Law Offices of Donald Kilmer, APC
9  14085 Silver Ridge Road
   Caldwell, Idaho 83607
10 Telephone: (408) 264-8489
   Email: Don@DKLawOffice.com

11 Attorney for Plaintiff Second Amendment Foundation

12              IN THE UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 B&L PRODUCTIONS, INC., d/b/a          CASE NO.: 8:22-cv-01518 JWH (JDEx)
   CROSSROADS OF THE WEST;
15 GERALD CLARK; ERIC JOHNSON;           REQUEST FOR JUDICIAL NOTICE
   CHAD LITTRELL; JAN STEVEN             IN SUPPORT OF PLAINTIFFS'
16 MERSON; CALIFORNIA RIFLE &            MOTION FOR PRELIMINARY
   PISTOL ASSOCIATION,                   INJUNCTION
17 INCORPORATED; ASIAN PACIFIC
   AMERICAN GUN OWNERS                   Hearing Date:    January 6, 2023
18 ASSOCIATION; SECOND                   Hearing Time:    9:00 a.m.
   AMENDMENT LAW CENTER, INC.;           Courtroom:       9D
19 and SECOND AMENDMENT                  Judge:           John W. Holcomb
   FOUNDATION,
20              Plaintiffs,              Action Filed:    August 12, 2022

21         v.

22 GAVIN NEWSOM, in his official
   capacity as Governor of the State of
23 California; ROB BONTA, in his official
   capacity as Attorney General of the
24 State of California; KAREN ROSS, in
   her official capacity as Secretary of
25 California Department of Food &
   Agriculture and in his personal capacity;
26 TODD SPITZER, in his official capacity
   as District Attorney of Orange County;
27 32nd DISTRICT AGRICULTURAL
   ASSOCIATION; DOES 1-10;
28
                Defendants.

                          1
            REQUEST FOR JUDICIAL NOTICE

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

Under Federal Rule of Evidence 201, Plaintiffs B&L Productions, Inc., California Rifle & Pistol Association, Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, Asian Pacific American Gun Owner Association, Second Amendment Law Center, Inc., and Second Amendment Foundation (collectively, "Plaintiffs") respectfully request that the Court take judicial notice of the following documents in support of Plaintiffs' motion for preliminary injunction:

1. **Assembly Bill 893, 2019-2020 Reg. Sess. (Cal. 20219)**. A true and correct copy of this document is attached as **Exhibit 1**. Exhibit 1 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient.xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

2. **Assembly Public Safety Comm., Bill Analysis Re: AB 893 (Gloria) – As Introduced Feb. 20, 2019, 2019-2020 Reg. Sess. (Cal. 2019).** A true and correct copy of this document is attached as **Exhibit 2**. Exhibit 2 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient.xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

3. **Assembly, Assembly Floor Analysis Re: AB 893 (Gloria) – As Introduced Feb. 20, 2019, 2019-2020 Reg. Sess. (Cal. 2019).** A true and correct copy of this document is attached as **Exhibit 3**. Exhibit 3 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

4. **Senate Public Safety Comm., Bill Analysis Re: AB 893 (Gloria) –**

1  **2019-2020 Reg. Sess. (Cal. 2019).** A true and correct copy of this document is

2  attached as **Exhibit 4**. Exhibit 4 is a public record of the California State

3  Legislature that I accessed on or about November 11, 2022, from

4  https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official

5  California Legislative Information website, which publishes official legal history

6  and government documents saved in a fully searchable, image-based format.

7       5.     **Senate Appropriations Comm., Bill Analysis Re: AB 893 (Gloria)**

8  **2019-2020 Reg. Sess. (Cal. 2019).** A true and correct copy of this document is

9  attached as **Exhibit 5**. Exhibit 5 is a public record of the California State

10  Legislature that I accessed on or about November 11, 2022, from

11  https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official

12  California Legislative Information website, which publishes official legal history

13  and government documents saved in a fully searchable, image-based format.

14       6.     **Senate Rules Comm., Senate Floor Analysis Re: AB 893 (Gloria) –**

15  **As Amended Aug. 30, 2019, 2019-2020 Reg. Sess. (Cal. 2019).** A true and correct

16  copy of this document is attached as **Exhibit 6**. Exhibit 6 is a public record of the

17  California State Legislature that I accessed on or about November 11, 2022, from

18  https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official

19  California Legislative Information website, which publishes official legal history

20  and government documents saved in a fully searchable, image-based format.

21       7.     **Senate Rules Comm., Senate Floor Analysis Re: AB 893 (Gloria) –**

22  **As Amended Sept. 9, 2019, 2019-2020 Reg. Sess. (Cal. 2019).** A true and correct

23  copy of this document is attached as **Exhibit 7**. Exhibit 7 is a public record of the

24  California State Legislature that I accessed on or about November 11, 2022, from

25  https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official

26  California Legislative Information website, which publishes official legal history

27  and government documents saved in a fully searchable, image-based format.

28       8.     **Assembly, Assembly Floor Analysis Re: AB 893 (Gloria) – As**

REQUEST FOR JUDICIAL NOTICE

1   **Amended Sept. 9, 2019, 2019-2020 Reg. Sess. (Cal. 2019).** A true and correct

2   copy of this document is attached as **Exhibit 8**. Exhibit 8 is a public record of the

3   California State Legislature that I accessed on or about November 11, 2022, from

4   https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official

5   California Legislative Information website, which publishes official legal history

6   and government documents saved in a fully searchable, image-based format.

7       9.      **Senate Bill 264, 2021-2022 Reg. Sess. (Cal. 2021).** A true and correct

8   copy of this document is attached as **Exhibit 9**. Exhibit 9 is a public record of the

9   California State Legislature that I accessed on or about November 11, 2022, from

10  https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official

11  California Legislative Information website, which publishes official legal history

12  and government documents saved in a fully searchable, image-based format.

13      10.     **Senate Public Safety Comm., Bill Analysis Re: SB 264 (Min) – As**

14  **Introduced Feb. 24, 2021, 2021-2022 Reg. Sess. (Cal. 2021).** A true and correct

15  copy of this document is attached as **Exhibit 10**. Exhibit 10 is a public record of the

16  California State Legislature that I accessed on or about November 11, 2022, from

17  https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official

18  California Legislative Information website, which publishes official legal history

19  and government documents saved in a fully searchable, image-based format.

20      11.     **Senate Rules Comm., Senate Floor Analysis Re: SB 264 (Min) – As**

21  **Amended April 19, 2021, 2021-2022 Reg. Sess. (Cal. 2021).** A true and correct

22  copy of this document is attached as **Exhibit 11**. Exhibit 11 is a public record of the

23  California State Legislature that I accessed on or about November 11, 2022, from

24  https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official

25  California Legislative Information website, which publishes official legal history

26  and government documents saved in a fully searchable, image-based format.

27      12.     **Assembly Public Safety Comm., Bill Analysis Re: SB 264 (Min) –**

28  **As Amended June 15, 2021, 2021-2022 Reg. Sess. (Cal. 2021).** A true and correct

copy of this document is attached as **Exhibit 12**. Exhibit 12 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

13. **Assembly Appropriations Comm., Bill Analysis Re: SB 264 (Min) – As Amended June 15, 2021, 2021-2022 Reg. Sess. (Cal. 2021).** A true and correct copy of this document is attached as **Exhibit 13**. Exhibit 13 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

14. **Assembly, Assembly Floor Analysis Re: SB 264 (Min) – As Amended Aug. 30, 2021, 2021-2022 Reg. Sess. (Cal. 2021).** A true and correct copy of this document is attached as **Exhibit 14**. Exhibit 14 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

15. **Senate Rules Comm., Senate Floor Analysis Re: SB 264 (Min) – As Amended Aug. 30, 2021, 2021-2022 Reg. Sess. (Cal. 2021).** A true and correct copy of this document is attached as **Exhibit 15**. Exhibit 15 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

16. **Senate Bill 915, 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this document is attached as **Exhibit 16**. Exhibit 16 is a public record of the

5

California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

17. **Senate Public Safety Comm., Bill Analysis Re: SB 915 (Min) – As Introduced Feb. 2, 2022, 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this document is attached as **Exhibit 17**. Exhibit 17 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

18. **Senate Rules Comm., Senate Floor Analysis Re: SB 915 (Min) – As Introduced Feb. 2, 2022, 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this document is attached as **Exhibit 18**. Exhibit 18 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

19. **Assembly Public Safety Comm., Bill Analysis Re: SB 915 (Min) – As Amended June 6, 2022, 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this document is attached as **Exhibit 19**. Exhibit 19 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

20. **Assembly Appropriations Comm., Bill Analysis Re: SB 915 (Min) – As Amended June 6, 2022, 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this document is attached as **Exhibit 20**. Exhibit 20 is a public

record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

21. **Assembly, Assembly Floor Analysis Re: SB 915 (Min) – As Amended June 6, 2022, 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this document is attached as **Exhibit 21**. Exhibit 21 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

22. **Senate Rules Comm., Senate Floor Analysis Re: SB 915 (Min) – As Amended June 6, 2022, 2021-2022 Reg. Sess. (Cal. 2022).** A true and correct copy of this document is attached as **Exhibit 22**. Exhibit 22 is a public record of the California State Legislature that I accessed on or about November 11, 2022, from https://leginfo.legislature.ca.gov/faces/billSearchClient. xhtml., the official California Legislative Information website, which publishes official legal history and government documents saved in a fully searchable, image-based format.

23. **United States Department of Justice, Office of Justice Programs, Bureau of Statistics,** *Bureau of Justice Statistics Report on Sources of Criminal Guns*. A true and correct copy of this document is attached as **Exhibit 23.** Exhibit 23 is a public record of the United States Department of Justice that I accessed on or about November 14, 2022, from https://bjs.gov/content/pub/pdf/suficspi16.pdf, the official website of the Department of Justice, Bureau of Statistics.

24. **California Department of Justice, Office of the Attorney General, "Gun Sales in California."** A true and correct copy of this document is attached as **Exhibit 24.** Exhibit 24 is a web-page containing data about gun transactions in California, that was once published on https://openjustice.doj.ca.gov/firearms/

1  overview, an official website of the California Department of Justice, Office of the
2  Attorney General. I was last able to access this web-page on April 17, 2019, when I
3  saved the web-page as a PDF document, saved it to my law firm's electronic filing
4  system, and filed it as part of a Request for Judicial Notice in *B&L Productions,*
5  *Inc., v. 22nd District Agricultural District*, S.D. Cal. Case No. 3:19-cv-00134-
6  CAB-NLS.

7  　　　25.　　**Centers for Disease Control and Prevention, National Center for**
8  **Health Statistics. Underlying Cause of Death 1999-2017.** A true and correct copy
9  of this document is attached as **Exhibit 25.** Exhibit 25 is a public record from the
10 CDC WONDER Online Database that I accessed on or about April 17, 2019, from
11 https://wonder.cdc.gov/ucd-icd10.html. Data are from the Multiple Cause of Death
12 Files, 1999-2017, as compiled from data provided by the 57 vital statistics
13 jurisdictions through Vital Statistics Cooperative Program.

14 　　　A court shall take judicial notice of such a fact if requested by a party and
15 supplied with the necessary information. Fed. R. Evid. 201(d). Judicial notice of
16 Exhibits 1 through 25 is proper because the documents for which this request is
17 made are "capable of accurate and ready determination by resort to sources who
18 accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Indeed, "[a]
19 trial court may presume that public records are authentic and trustworthy."
20 *Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999) (taking judicial
21 notice of agency report).

22 　　　What's more, "[l]egislative history is properly a subject of judicial notice."
23 *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012); *Chaker v. Crogan*,
24 428 F.3d 1215, 1223 n.8 (9th Cir. 2005) (discussing legislative history of California
25 statute). Further, "a federal court must take judicial notice of state statutes 'without
26 plea or proof.'" *Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312,
27 323 (1st Cir. 2004) (citing *Lamar v. Micou*, 114 U.S. 218, 223 (1885)).
28 　　　Here, the accuracy of all the public records subject to Plaintiffs' Request for

1    Judicial Notice, consisting of enacted legislation and legislative history, as well as

2    the records of public agencies, cannot reasonably be questioned. Judicial notice of

3    these records is therefore appropriate.

4

5    Dated:  November 16, 2022          **MICHEL & ASSOCIATES, P.C.**

6                                          */s/ Anna M. Barvir*
                                          Anna M. Barvir
7                                          Counsel for Plaintiffs B&L Productions, Inc.,
                                          California Rifle & Pistol Association,
8                                          Incorporated, Gerald Clark, Eric Johnson,
                                          Chad Littrell, Jan Steven Merson, Asian
9                                          Pacific American Gun Owner Association,
                                          Second Amendment Law Center, Inc.

10   Dated:  November 16, 2022          **LAW OFFICES OF DONALD KILMER, APC**

11                                         */s/ Donald Kilmer*
12                                         Donald Kilmer
                                          Counsel for Plaintiff Second Amendment
13                                         Foundation

14

15                     **ATTESTATION OF E-FILED SIGNATURES**

16        I, Anna M. Barvir, am the ECF User whose ID and password are being used

17   to file this REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS'

18   MOTION FOR PRELIMINARY INJUNCTION. In compliance with Central

19   District of California L.R. 5-4.3.4, I attest that all signatories are registered

20   CM/ECF filers and have concurred in this filing.

21
     Dated: November 16, 2022            */s/ Anna M. Barvir*
22                                         Anna M. Barvir

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE

# EXHIBIT 1

STATE OF CALIFORNIA
LEGISLATIVE COUNSEL BUREAU
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

## Assembly Bill No. 893

## CHAPTER 731

An act to add Section 4158 to the Food and Agricultural Code, relating to agricultural districts.

[Approved by Governor October 11, 2019. Filed with Secretary
of State October 11, 2019.]

### LEGISLATIVE COUNSEL'S DIGEST

AB 893, Gloria. 22nd District Agricultural Association: firearm and ammunition sales at the Del Mar Fairgrounds.

Existing law generally regulates the transfer of firearms and divides the state into agricultural districts. The 22nd District Agricultural Association is comprised of the County of San Diego and includes the Cities of Del Mar and San Diego. A violation of the statutes governing agricultural districts is generally a misdemeanor.

This bill would, on and after January 1, 2021, prohibit the sale of firearms and ammunition at the Del Mar Fairgrounds property located in the 22nd District Agricultural Association, as specified, and would thereby make a violation of that prohibition a misdemeanor. The bill would exclude from its provisions a gun buyback event held by a law enforcement agency.

By creating a new crime, this bill would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.   The Legislature finds and declares all of the following:

(a)   The property known as the Del Mar Fairgrounds (DMFG) is owned by the State of California and managed by the Board of Directors of the 22nd District Agricultural Association (22nd DAA). The 22nd DAA has leased a portion of the DMFG to entities that sponsor marketplaces popularly known as "gun shows," at which firearms and ammunition and other items are sold to the public approximately five times a year.

(b)   The United States has experienced many gun-related tragedies with increasing severity and frequency in the last 30 years, including mass murders at Columbine High School, Sandy Hook Elementary School, and

94

Marjory Stoneman Douglas High School, and an increasing rate of suicide by gun among all levels of society.

(c) The Cities of Del Mar, Solana Beach, and Encinitas have adopted resolutions requesting that the DMFG Board discontinue leasing any portion of its property for use as a gun show. A committee appointed by the Board of Directors of the 22nd DAA to study gun shows conducted research, including inspection tours of the Del Mar Gun Show by members of the committee as well as by several other members of the DMFG Board.

(d) On September 11, 2018, the DMFG Board, by a vote of eight in favor and one against, adopted a recommendation to consider the feasibility of conducting gun shows for only educational and safety training purposes and to prohibit the possession of guns and ammunition on state property.

(e) Gun shows bring grave danger to a community, and the following dangerous incidents, among others, have occurred at gun shows, including, but not limited to, an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines.

(f) Each of the foregoing arrests was based on gun show enforcement efforts under the Armed Prohibited Persons System, and the department announced in late 2018 that these gun show enforcement efforts had been discontinued and, between the years 2013 and 2017, the San Diego County Sheriff recorded 14 crimes at the Crossroads of the West Gun Shows at the DMFG.

(g) Promoters maintain relationships with a core group of vendors, some selling guns and some selling other merchandise, who travel as the schedule dictates from city to city and state to state and in the West, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona.

SEC. 2.  Section 4158 is added to the Food and Agricultural Code, to read:

4158.  (a)  Notwithstanding any other law, an officer, employee, operator, lessee, or licensee of the 22nd District Agricultural Association, as defined in Section 3873, shall not contract for, authorize, or allow the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds in the County of San Diego, the City of Del Mar, the City of San Diego, or any successor or additional property owned, leased, or otherwise occupied or operated by the district.

(b)  For purposes of this section:

(1)  The definition of "firearm" means the term as included in Section 12001 of the Penal Code.

(2)  The term "ammunition" includes assembled ammunition for use in a firearm and components of ammunition, including smokeless and black powder, and any projectile capable of being fired from a firearm with deadly consequence.

(c)  This section does not apply to a gun buyback event held by a law enforcement agency.

94

**0003**

Case 8:22-cv-01518-JWH-JDE   Document 21-2   Filed 11/16/22   Page 13 of 177   Page ID #:1081

(d)  This section shall become operative on January 1, 2021.

SEC. 3.   No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

0004

# EXHIBIT 2

Date of Hearing:  March 26, 2019
Counsel:              Matthew Fleming

ASSEMBLY  COMMITTEE  ON PUBLIC SAFETY
Reginald  Byron Jones-Sawyer, Sr., Chair

AB 893 (Gloria)  – As Introduced  February 20, 2019

**SUMMARY**:  Prohibits,  as of January 1, 2021, the sale of firearms  and ammunitions  at the Del
Mar Fairgrounds  in the County of San Diego and the City of Del Mar and thereby creates a
misdemeanor  offense  for a violation  of that prohibition.   Specifically,  **this bill**:

1) Prohibits any officer, employee, operator, or lessee of the 22nd District  Agricultural
   Association, as defined, from authorizing, or allowing the sale of any firearm or ammunition
   on the property or in the buildings  that comprise the Del Mar Fairgrounds  in the County of
   San Diego and the City of Del Mar or any successor or additional property owned, leased, or
   otherwise occupied  or operated by the district.

2) Provides that the term "ammunition"  includes  assembled ammunition  for use in a firearm and
   components of ammunition, including smokeless and black powder, and any projectile
   capable of being fired from a firearm with deadly consequence.

3) Provides that the prohibition  on firearms  and ammunitions  sales at the Del Mar Fairgrounds
   does not apply to gun buy-back events held by a law enforcement agency.

4) States that this section will become operative on January 1, 2021.

**EXISTING  LAW**:

1) Divides the state in agricultural districts and designates District  22 as San Diego County.
   (Food and Agr.,§§ 3851, 3873.)

2) Allows for the establishment of District Agricultural Associations within each agricultural
   district, for the purposes of holding fairs, expositions and exhibitions, and constructing,
   maintaining, and operating recreational and cultural facilities  of general public interest.
   (Food & Agr. Code, § 3951.)

3) Provides that bringing or possessing a firearm within any state or local public building is
   punishable by imprisonment  in a county jail for not more than one year, or in the state prison,
   unless a person brings any weapon that may be lawfully transferred into a gun show for the
   purpose of sale or trade. (Pen. Code §§ 171b subd. (a), 171b subd. (b)(7)(A).)

4) Prohibits the sale, lease, or transfer of firearms without a license, unless the sale, lease, or
   transfer is pursuant to operation of law or a court order, made by a person who obtains the
   firearm by intestate succession or bequest, or is an infrequent sale, transfer, or transfer, as
   defined. (Pen. Code § 26500, 26505, 26520.)

**0006**

5) Excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

6) Permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

7) States that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

8) States that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the Department of Justice. (Pen. Code § 27200.)

9) Specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the Department of Justice, as specified. (Pen. Code §§ 27200, 27245.)

10) Specifies that unless a different penalty is expressly provided, a violation of any provision of the Food and Agricultural code is a misdemeanor. (Food and Agr. Code, § 9.)

**FISCAL EFFECT**: Unknown

**COMMENTS**:

1) **Author's Statement**: According to the author, "There is an ever apparent link between the gun violence we see virtually every week and the number of guns in our communities. Additionally, the State of California should not be profiting or benefitting from the sale of firearms. This bill demonstrates that we value people over guns and public safety above all

"Fundamentally, I believe it is wrong for the State of California to profit or to benefit from the sale of firearms and ammunition. I acknowledge that gun ownership is a Constitutional right in the United States, and I know that there are plenty of responsible gun owners out there. However, the fact remains that widespread accessibility to these deadly weapons produces a public safety threat that we must address."

2) **Gun Shows**: A "gun show" is a trade show for firearms. At gun shows, individuals may buy, sale, and trade firearms and firearms-related accessories. These events typically attract several thousand people, and a single gun show can have sales of over 1,000 firearms over the course of one weekend. (Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), *Gun Shows: Brady Checks and Crime Gun Traces*, January 1999, available at: https://www.atf.gov/file/57506/download, [as of March 18, 2019].)

According to the NRA's Institute for Legislative Action (NRA-ILA), less than one percent of inmates incarcerated in state prisons for gun crimes acquired their firearms at a gun show.

**0007**

(NRA-ILA, https://www.nraila.org/get-the-facts/background-checks-nics.)   However, according to a report published by Uc Davis, gun shows have been identified as a source for illegally trafficked firearms.   (https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf, [as of March 20, 2019].)  Though violent criminals do not appear to regularly purchase their guns directly from gun shows, gun shows have received criticism as being "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market." (Gerney, *The Gun Debate 1 Year After Newtown*, Center for American Progress, December 13, 2013, available at: http://www.americanprogress.org/issues/guns-crime/report/2013/12/13/80795/the-gun-debate-1-year-after-newtown/, [as of March 18, 2019].)

A report by the Government Accountability Office regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows. (https://www.gao.gov/assets/680/674570.pdf, [as of March 15].)  87 percent of firearms seized by Mexican authorities and traced in the last 5 years originated in the United States, according to data from Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives. According to United States and Mexican government officials, these firearms have been increasingly more powerful and lethal in recent years. Many of these firearms come from gun shops and gun shows in south-west border states. (https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf, [as of March 15].)

3) **Gun Show Regulations in California**: In 1999, California enacted the nation's broadest legislation to increase oversight at gun shows. AB 295 (Corbett), Chapter 247, Statutes of 1999, the Gun Show Enforcement and Security Act of 2000, added a plethora of requirements for gun shows.  To obtain a certificate of eligibility from the DOJ, a promoter must certify that he or she is familiar with existing law regarding gun shows; obtain at least $1,000,000 of liability insurance; provide an annual list of gun shows the applicant plans to promote; pay an annual fee; make available to local law enforcement a complete list of all entities that have rented any space at the show; submit not later than 15 days before the start of the show an event and security plan; submit a list to DOJ of prospective vendors and designated firearms transfer agents who are licensed dealers; provide photo identification of each vendor and vendor's employee; prepare an annual event and security plan; and require all firearms carried onto the premises of a show to be checked, cleared of ammunition, secured in a way that they cannot be operated, and have an identification tag or sticker attached.  AB 295 also provided for a number of penalties for a gun show producer's willful failure to comply with the specified requirements.

In California, gun transactions at gun shows are treated no differently than any other private party transaction.  This means that such transfers must be completed through a licensed California dealer.  Such a transfer requires a background check and is subject to the mandatory ten day waiting period prior to delivering the firearm to the purchaser.

California's strict gun show regulations may help to prevent increases in firearm deaths and injuries following gun shows. (*See* Elliott C. Matthay, et al., "In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries," Annals of Internal Medicine (2017) Vol. 1 Iss. 8.)

4) **Current State of Gun Shows at the Del Mar Fairgrounds**:  According to a Fairgrounds press release, last year the 22nd District Agricultural Association's Board of Directors voted 8 to 1 to not consider any contracts with producers of gun shows beyond Dec. 31, 2018, until it has adopted a more thorough policy regarding the conduct of gun shows. (Available at: http://www.delmarfairgrounds.com/index.php?fuseaction=about.press_details&newsid=1396 [as of March 20, 2019].) The policy is to be presented to the Board no later than December, 2019 and would:

- Consider the feasibility of conducting gun shows for only educational and safety training purposes and bans the possession of guns and ammunition on state property,

- Align gun show contract language with recent changes in state and federal law

- Detail an enhanced security plan for the conduct of future shows

- Propose a safety plan

- Consider the age appropriateness of such an event

- Grant rights for the DAA to perform an audit to ensure full compliance with California Penal Code Sections 171b and 12071.1 and 12071.4. These audit rights may be delegated at the discretion of the 22nd DAA. (*Id.*)

According to local reporting, the operator of the Del Mar Fairgrounds gun show has filed a lawsuit challenging the Board of Directors' decision on the grounds that it violates the U.S. Constitution's First Amendment guarantee to free expression. (Williams, *Lawsuit to hang up Del Mar Fairgrounds gun show policy recommendations*, Del Mar Times, March 15, 2019, available at: https://www.delmartimes.net/news/sd-cm-nc-gun-show-20190315-htmlstory.html, [as of March 20, 2019].)

This bill would add a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified. Therefore, this bill would effectively terminate the possibility for future gun shows at the Del Mar Fairgrounds.

5) **Veto Messages on Previous Attempts to Ban Gun Shows in Agricultural Districts**: There have been several legislative attempts to regulate gun shows in Agricultural District 1A in San Mateo and San Francisco Counties at a location commonly known as the "Cow Palace." The Cow Palace is substantially similar to the Del Mar Fairgrounds inasmuch as it is a state-owned property located within the jurisdiction of a county. SB 221 (Wiener), of 2018, SB 475 (Leno) of 2013, SB 585 (Leno) of 2009, and others, all attempted to either ban gun shows at the Cow Palace altogether, or require prior approval from the county Board Supervisors prior to entering into a contract for holding a gun show there. All three attempts were vetoed by the Governor.

In regards to SB 221, Governor Brown stated: "This bill would prohibit the sale of firearms and ammunition at the District Agricultural Association 1A, commonly known as the Cow

Palace. This bill has been vetoed twice over the last ten years, once by myself, and once by Governor Schwarzenegger.  The decision on what kind of shows occur at the Cow Palace rests with the local board of directors which, incidentally, represents a broad cross section of the community.  They are in the best position to make these decisions."

SB 475 was also vetoed by Governor Brown with the following message: "This bill requires the District Agricultural Association 1-A (Cow Palace) to obtain approval from the County of San Mateo and the City and County of San Francisco prior to entering into a contract for a gun show on state property. I encourage all District Agricultural Associations to work with their local communities when determining their operations and events. This bill, however, totally pre-empts the Board of Directors of the Cow Palace from exercising its contracting authority whenever a gun show is involved.  I prefer to leave these decisions to the sound discretion of the Board."

SB 585 was vetoed by Governor Schwarzenegger, who stated: "This bill would prohibit the sale of firearms and ammunition at the Cow Palace. This bill would set a confusing precedent at the state level by statutorily prohibiting one District Agricultural Association (DAA) from selling firearms and ammunition, a legal and regulated activity, while allowing other DAAs to continue to do so. In addition, this bill would result in decreased state and local tax revenues by restricting events at the Cow Palace."

6) **Argument in Support**:  According to the *NeverAgainCA*: "NeverAgainCA organized large, peaceful protests at every gun show at the Del Mar Fairgrounds. attended and spoke at every meeting of the 22nd District Agricultural Association Board, and joined students protesting gun violence and gun shows at many area schools. NeverAgainCA presented resolutions calling for the elimination of the gun shows at the Del Mar Fairgrounds to the City Councils of the adjacent cities of Del Mar, Solana Beach and Encinitas; these resolutions were adopted and are part of the record of this hearing.  Candidate and now Congressman Mike Levin addressed several of our rallies against the gun shows. At the request of NeverAGainCA, then Lt. Governor, now Governor, Gavin Newsom, called on the Fair Board to end gun shows and put an end to valuing the sale of firearms above the value of lives.

"NeverAgainCA is proud to support AB 893. The residents of the 78th AD and adjacent districts, and their elected representatives, have demonstrated the broad public support for ending gun shows at the Del Mar Fair Grounds on a permanent basis."

7) **Argument in Opposition**:  According to the *California Rifle and Pistol Association, Inc.*: "Promoters and operators of gun shows in California must comply with no less than twenty-six sections of the penal code. Gun sales are highly-regulated in California and the rules are no less stringent for those vendors at gun shows (Refer Exhibit #2 attached). Vendors that participate in gun shows may not do so unless all their licenses have been submitted to the California Department of Justice before the event for the purposes of determining whether the vendors possess the proper valid licenses. If they do not pass the review of the California DOJ, they are prohibited from participating.

…

"Gun shows are very much a family event. Many of them have training and education, guest speakers, lifestyle vendors, safety training, and more. Ever hear of a shooting spree at a gun

**0010**

show? No, because people that attend gun shows are the law-abiding citizens that attend for
the educational value and to stay up on new products that are available. It is no different than
any other trade show that occurs in other industries across the state. Criminals would never
subject themselves to this much scrutiny and regulation in the hopes of getting their hands on
a firearm. These types of false and scare-tactic narratives have no place in modern
discourse."

8) **Related Legislation**: SB 281 (Wiener), among other things, would prohibit the sale of
firearms and ammunitions at the Cow Palace located in San Mateo County and San Francisco
County.

9) **Prior Legislation**:

a) SB 221 (Wiener) of the 2017-18 Legislative Session, would have prohibited the sale of
firearms and ammunitions at the Cow Palace located in San Mateo County and San
Francisco County. SB 221 was vetoed by Governor Brown.

b) SB 475 (Leno), of the 2013-14 Legislative Session, would have required gun shows at the
Cow Palace to have prior approval of both the Board of Supervisors of the County of San
Mateo and the City and County of San Francisco, as specified. SB 475 was vetoed by
Governor Brown.

c) SB 585 (Leno), of the 2009-10 Legislative Session, would have prohibited events at
which any firearm or ammunition is sold at the Cow Palace, as specified. SB 585 was
vetoed by Governor Schwarzenegger.

d) AB 2948 (Leno), of the 2007-08 Legislative Session, would have prohibited the sale of
firearms or ammunition at the Cow Palace. AB 2948 failed passage on the Senate Floor.

e) SB 1733 (Speier), of the 2003-04 Legislative Session, would have required gun shows at
the Cow Palace to have prior approval of both the Board of Supervisors of the County of
San Mateo and the City and County of San Francisco, as specified. SB 1733 failed
passage on the Assembly Floor.

f) AB 295 (Corbett), Chapter 247, Statutes of 1999, established the Gun Show Enforcement
and Security Act of 2000, which includes a number of requirements for producers that
promote gun shows.

g) AB 1107 (Ortiz), of the 1997-98 Legislative Session, would have authorized any city,
county or agricultural association to prohibit gun sales at gun shows or events. AB 1107
failed in the Assembly Appropriations Committee.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

Bay Area Student Activists
City of Del Mar
City of Encinitas

City of Solana Beach
NeverAgainCA

**Oppose**

B & L Productions, d.b.a. Crossroads of the West Gun Shows
California Rifle and Pistol Association, Inc.
California Sportsman's Lobby, Inc.
Gun Owners of California, Inc.
National Rifle Association - Institute For Legislative Action
National Shooting Sports Foundation, Inc.
Outdoor Sportsmen's Coalition of California
Safari Club International - California Chapters
Western Fairs Association

**Analysis Prepared by**:   Matthew Fleming / PUB. S. / (916) 319-3744

# EXHIBIT 3

AB 893
Page 1

ASSEMBLY THIRD READING
AB 893 (Gloria)
As Introduced February 20, 2019
Majority vote

## SUMMARY:

Prohibits, as of January 1, 2021, the sale of firearms and ammunitions at the Del Mar Fairgrounds in the County of San Diego and the City of Del Mar and thereby creates a misdemeanor offense for a violation of that prohibition.

**Major Provisions**

1) Prohibits any officer, employee, operator, or lessee of the 22nd District Agricultural Association, as defined, from authorizing, or allowing the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds in the County of San Diego and the City of Del Mar or any successor or additional property owned, leased, or otherwise occupied or operated by the district.

2) Provides that the term "ammunition" includes assembled ammunition for use in a firearm and components of ammunition, including smokeless and black powder, and any projectile capable of being fired from a firearm with deadly consequence.

3) Provides that the prohibition on firearms and ammunitions sales at the Del Mar Fairgrounds does not apply to gun buy-back events held by a law enforcement agency.

4) States that this section will become operative on January 1, 2021.

## COMMENTS:

**According to the Author:**

"There is an ever apparent link between the gun violence we see virtually every week and the number of guns in our communities. Additionally, the State of California should not be profiting or benefitting from the sale of firearms. This bill demonstrates that we value people over guns and public safety above all

"Fundamentally, I believe it is wrong for the State of California to profit or to benefit from the sale of firearms and ammunition. I acknowledge that gun ownership is a Constitutional right in the United States, and I know that there are plenty of responsible gun owners out there. However, the fact remains that widespread accessibility to these deadly weapons produces a public safety threat that we must address."

**Arguments in Support:**

According to the *NeverAgainCA*: "NeverAgainCA organized large, peaceful protests at every gun show at the Del Mar Fairgrounds, attended and spoke at every meeting of the 22nd District Agricultural Association Board, and joined students protesting gun violence and gun shows at many area schools. NeverAgainCA presented resolutions calling for the elimination of the gun shows at the Del Mar Fairgrounds to the City Councils of the adjacent cities of Del Mar, Solana Beach and Encinitas; these resolutions were adopted and are part of the record of this hearing. Candidate and now Congressman Mike Levin addressed several of our rallies against the gun shows. At the request of NeverAgainCA, then Lt. Governor, now Governor, Gavin Newsom,

**0014**

called on the Fair Board to end gun shows and put an end to valuing the sale of firearms above the value of lives.

"NeverAgainCA is proud to support AB 893. The residents of the 78th AD and adjacent districts, and their elected representatives, have demonstrated the broad public support for ending gun shows at the Del Mar Fair Grounds on a permanent basis."

**Arguments in Opposition:**

According to the *California Rifle and Pistol Association, Inc.*: "Promoters and operators of gun shows in California must comply with no less than 26 sections of the penal code. Gun sales are highly-regulated in California and the rules are no less stringent for those vendors at gun shows (Refer Exhibit #2 attached). Vendors that participate in gun shows may not do so unless all their licenses have been submitted to the California Department of Justice before the event for the purposes of determining whether the vendors possess the proper valid licenses. If they do not pass the review of the California DOJ, they are prohibited from participating.

"Gun shows are very much a family event. Many of them have training and education, guest speakers, lifestyle vendors, safety training, and more. Ever hear of a shooting spree at a gun show? No, because people that attend gun shows are the law-abiding citizens that attend for the educational value and to stay up on new products that are available. It is no different than any other trade show that occurs in other industries across the state. Criminals would never subject themselves to this much scrutiny and regulation in the hopes of getting their hands on a firearm. These types of false and scare-tactic narratives have no place in modern discourse."

## FISCAL COMMENTS:

According to the Assembly Appropriations Committee:

1) Minor costs (general fund) for the Department of Justice to update its records to reflect the criminal penalty for sales of firearms and ammunition at the Del Mar Fairgrounds, since it is a violation of the Food and Agricultural Code.

2) No direct cost to the California Department of Food and Agriculture (CDFA).

Please see the policy committee analysis for a full discussion of this bill.

## VOTES:

**ASM PUBLIC SAFETY: 5-2-1**
**YES:** Jones-Sawyer, Bauer-Kahan, Kamlager-Dove, Santiago, Wicks
**NO:** Lackey, Diep
**ABS, ABST OR NV:** Quirk

**ASM APPROPRIATIONS: 12-5-1**
**YES:** Gonzalez, Bloom, Bonta, Calderon, Carrillo, Chau, Eggman, Gabriel, Friedman, Petrie-Norris, Quirk, Robert Rivas
**NO:** Bigelow, Brough, Diep, Fong, Obernolte
**ABS, ABST OR NV:** Maienschein

**AB 893**
Page  3

**UPDATED:**

VERSION: February 20, 2019

CONSULTANT:  Matthew  Fleming (Counsel) / PUB. S. / (916) 319-3744          FN: 0000097

**0016**

# EXHIBIT 4

# SENATE COMMITTEE ON PUBLIC SAFETY
### Senator Nancy Skinner, Chair
### 2019 - 2020 Regular

| | | | | | |
|---|---|---|---|---|---|
| **Bill No:** | AB 893 | **Hearing Date:** | June 11, 2019 | | |
| **Author:** | Gloria | | | | |
| **Version:** | May 15, 2019 | | | | |
| **Urgency:** | No | | **Fiscal:** | | Yes |
| **Consultant:** | GC | | | | |

**Subject:** *22nd District Agricultural Association:  Firearm and Ammunition Sales at the Del Mar Fairgrounds*

## HISTORY

Source:          NeverAgainCA

Prior Legislation:     SB 221 (Wiener), 2017, vetoed
                       SB 475 (Leno), 2013, vetoed
                       SB 585 (Leno), 2009, vetoed
                       AB 2948 (Leno), 2008, failed passage on the Senate Floor
                       SB 1733 (Speier), 2004, failed passage on the Assembly Floor
                       AB 295 (Corbett), Ch. 247, Stats. of 1999
                       AB 1107 (Ortiz), 1997, failed passage in Assembly Appropriations

Support:      Bay Area Student Activists;  City of Del Mar; City of Encinitas;  City of Solana Beach;  League of Women Voters; San Diegans for Gun Violence Prevention

Opposition:      California Rifle and Pistol Association;  California Sportsman's Lobby; Crossroads of the West;  Firearms Policy Coalition;  Gun Owners of California; National Rifle Association;  National Shooting Sports Foundation;  Outdoor Sportsmen's Coalition of California;  Safari Club International;  Safari Club International Foundation;  Western Fairs Association

Assembly Floor Vote:                          52 - 22

## PURPOSE

*This bill prohibits, as of January 1, 2021, the sale of firearms and ammunitions at the Del Mar Fairgrounds in the County of San Diego, the City of Del Mar, the City of San Diego and thereby creates a misdemeanor offense for a violation of that prohibition.*

*Existing law* divides the state in agricultural districts and designates District 22 as San Diego County.  (Food and Agr.,§§ 3851, 3873.)

*Existing law* allows for the establishment of District Agricultural Associations within each agricultural district, for the purposes of holding fairs, expositions and exhibitions, and constructing, maintaining, and operating recreational and cultural facilities of general public interest.  (Food & Agr. Code, § 3951.)

0018

**AB 893  (Gloria )**                                                                                 Page **2** of **7**

*Existing law* provides that bringing or possessing a firearm within any state or local public building is punishable by imprisonment in a county jail for not more than one year, or in the state prison, unless a person brings any weapon that may be lawfully transferred into a gun show for the purpose of sale or trade. (Pen. Code §§ 171b subd. (a), 171b subd. (b)(7)(A).)

*Existing law* prohibits the sale, lease, or transfer of firearms without a license, unless the sale, lease, or transfer is pursuant to operation of law or a court order, made by a person who obtains the firearm by intestate succession or bequest, or is an infrequent sale, transfer, or transfer, as defined. (Pen. Code § 26500, 26505, 26520.)

*Existing law* excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

*Existing law* permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

*Existing law* states that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

*Existing law* states that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the Department of Justice. (Pen. Code § 27200.)

*Existing law* specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the Department of Justice, as specified.  (Pen. Code §§ 27200, 27245.)

*Existing law* specifies that unless a different penalty is expressly provided, a violation of any provision of the Food and Agricultural code is a misdemeanor.  (Food and Agr. Code, § 9.)

*This bill* prohibits any officer, employee, operator, or lessee of the 22nd District Agricultural Association, as defined, from authorizing, or allowing the sale of any firearm or ammunition on the property or in the buildings that comprise the Del Mar Fairgrounds in the County of San Diego the City of Del Mar, the City of San Diego; or any successor or additional property owned, leased, or otherwise occupied or operated by the district.

*This bill* provides that the term "ammunition" includes assembled ammunition for use in a firearm and components of ammunition, including smokeless and black powder, and any projectile capable of being fired from a firearm with deadly consequence.

*This bill* provides that the prohibition on firearms and ammunitions sales at the Del Mar Fairgrounds does not apply to gun buy-back events held by a law enforcement agency.

*This bill* states that this section will become operative on January 1, 2021.

**0019**

## COMMENTS

### 1.  Need for This Bill

According  to the author:

> Gun shows rank second to corrupt dealers as a source for illegally  trafficked
> firearms.  (https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf.)  Though
> violent  criminals  do not buy most of their guns  directly  from gun shows, gun
> shows are "the critical  moment  in the chain of custody for many guns, the point at
> which  they move from the somewhat  regulated  legal  market  to the shadowy,  no-
> questions-asked  illegal  market." (Center for American  Progress,
> http://www.americanprogress.org/issues/gunscrime/report/2013/12/13/80795/the-
> gun-debate-1-year-after-newtown/.)  A report by the Government  Accountability
> Office  regarding  gun trafficking  to Mexico  confirmed  that many traffickers  buy
> guns at gun shows.
> (https://www.gao.gov/assets/680/674570.pdf  ). 87 percent of firearms  seized by
> Mexican  authorities  and traced in the last 5 years originated  in the United  States,
> according  to data from Department  of Justice's  Bureau of Alcohol,  Tobacco,
> Firearms and Explosives.  According  to United  States and Mexican  government
> officials,  these firearms  have been increasingly  more powerful  and lethal  in recent
> years. Many of these firearms  come from gun shops and gun shows in south-west
> border states. (https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf  )
> In September,  the 22nd District  Agricultural  Board of Directors  (fair board),
> which  oversees  the fairgrounds,  voted to temporarily  stop the gun shows until
> staff members  develop  a policy  that could ban the sale and possession  of firearms
> on the property.
>
> Crossroads of West holds its shows at more than a dozen large locations  in four
> western  states, all on public  or city-owned  property.  It stages the two-day gun
> show at the Del Mar Fairgrounds  five times annually.
>
> In January,  Crossroads  filed  a lawsuit  against  the fair board for its decision.  This
> bill should  provide  additional  legal  protection  to the fair board for taking  this
> important  action to protect public  safety.

### 3.  Gun Shows

Gun shows are essentially  a flea market for firearms.  At gun shows, individuals  may buy, sale,
and trade firearms  and fire-arms  related accessories.  These events typically  attract several
thousand  people,  and a single  gun show can have sales of over 1,000 firearms  over the course of
one weekend.[1]

According  to the NRA's Institute  for Legislative  Action,  less than one percent of inmates
incarcerated  in state prisons for gun crimes acquired  their firearms  at a gun show.[2]  However, gun
shows rank second to corrupt dealers as a source for illegally  trafficked  firearms.  Though violent
criminals  do not buy most of their guns directly  from gun shows, gun shows are "the critical

---

[1]  Bureau of Alcohol, Tobacco, Firearms  and Explosives,  https://www.atf.gov/file/57506/download.
[2]  NRA-ILA,  https://www.nraila.org/get-the-facts/background-checks-nics.

moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market."[3]

Concerns about gun shows extend beyond the state. A report by the Government Accountability Office regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows.[4] 87 percent of firearms seized by Mexican authorities and traced in the last 5 years originated in the United States, according to data from DOJ's Bureau of Alcohol, Tobacco, Firearms and Explosives. According to United States and Mexican government officials, these firearms have been increasingly more powerful and lethal in recent years. Many of these firearms come from gun shops and gun shows in south-west border-states.[5]

## 4. Gun Show Regulations in California

AB 295 (Corbett, Chapter 247, Statutes of 1999), the Gun Show Enforcement and Security Act of 2000, added a number of requirements for gun shows. To obtain a certificate of eligibility from the DOJ, a promoter must certify that he or she is familiar with existing law regarding gun shows; obtain at least $1 million of liability insurance; provide an annual list of gun shows the applicant plans to promote; pay an annual fee; make available to local law enforcement a complete list of all entities that have rented any space at the show; submit not later than 15 days before the start of the show an event and security plan; submit a list to DOJ of prospective vendors and designated firearms transfer agents who are licensed dealers; provide photo identification of each vendor and vendor's employee; prepare an annual event and security plan; and require all firearms carried onto the premises of a show to be checked, cleared of ammunition, secured in a way that they cannot be operated, and have an identification tag or sticker attached. AB 295 also provided for a number of penalties for a gun show producer's willful failure to comply with the specified requirements. California's strict gun show regulations may help to prevent increases in firearm deaths and injuries following gun shows. (See Ellicott C. Matthay, et al., "*In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries,*" Annals of Internal Medicine (2017) Vol. 1 Iss. 8.)

In addition to state laws regulating gun shows, a total ban on gun shows on county property is within the scope of a county's authority. "Under California Government Code section 23004(d), a county is given substantial authority to manage its property, including the most fundamental decision as to how the property will be used and that nothing in the gun show statutes evince intent to override that authority. The gun show statutes do not mandate that counties use their property for such shows. If the county does allow such shows, it may impose more stringent restrictions on the sale of firearms than state law prescribes." (*Nordyke v. Santa Clara County* (9th Cir. Cal. 1997) 110 F.3d 707, 766.) However, counties do not have authority to prohibit gun shows on state property such as Cow Palace.

## 5. Prior Attempts to Ban Gun Shows at the Cow Palace in the San Francisco Bay Area

There have been several legislative attempts to regulate gun shows at Cow Palace—most notably, SB 475 (Leno, 2014) and SB 585 (Leno, 2010), which were both vetoed.

---

[3] Center for American Progress, http://www.americanprogress.org/issues/guns-crime/report/2013/12/13/80795/the-gun-debate-1-year-after-newtown/.
[4] https://www.gao.gov/assets/680/674570.pdf.
[5] https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf.

**AB 893** (Gloria )                                                                    Page **5** of **7**

Like this bill, SB 585 would have prohibited gun shows at Cow Palace. SB 585 would have
additionally required the Cow Palace DAA to replace gun show events with non-firearm or non-
ammunition related events. In his veto message, Governor Schwarzenegger stated that SB 585
would "set a confusing precedent at the state level by statutorily prohibiting one [DAA] from
selling firearms and ammunition, a legal and regulated activity, while allowing other DAAs to
continue to do so. In addition, [SB 585] would result in decreased state and local tax revenues by
restricting events at the Cow Palace." Unlike SB 585, this bill will not impair any of Cow
Palace's ongoing contracts because, if chaptered, it will not become operative until January 1,
2020.

Another attempt to prohibit gun sales at Cow Palace was similarly vetoed by Governor Brown.
SB 475 would have permitted gun shows at Cow Palace only upon prior approval by resolution
adopted by both the Board of Supervisors of the County of San Mateo and the Board of
Supervisors of the City and County of San Francisco. SB 475 was vetoed by because it required
the Cow Palace DAA to obtain approval from the County of San Mateo and the City and County
of San Francisco prior to entering into a contract for a gun show on state property. In his veto
message, Governor Brown stated, "I encourage all [DAAs] to work with their local communities
when determining their operations and events. [SB 475], however, totally pre-empts the Board of
Directors of the Cow Palace from exercising its contracting authority whenever a gun show is
involved. I prefer to leave these decisions to the sound discretion of the Board." Under SB 475,
the Cow Palace DAA would have been permitted to host gun shows, but only at the discretion of
San Francisco and San Mateo counties. In practice, SB 475 would have allowed the Board of
Cow Palace to permit some approved gun shows, and required it to prohibit other non-county-
approved gun shows. In comparison, this bill instead completely prohibits all gun shows at Cow
Palace.

Last session, SB 221 (Wiener) contained very similar provisions to this bill. SB 221 would have
prohibited any officer, employee, operator, or lessee of Agriculture District 1-A, from
contracting for, authorizing, or allowing the sale of any firearm or ammunition at the Cow Palace
property in San Mateo County and San Francisco County. Like this bill, SB 221 had an
implementation date in 2020 and exempted law enforcement firearm buy-back events. Unlike
this bill, SB 221 failed to exempt existing contracts to host firearms events. SB 221 was vetoed
by Governor Brown with the following veto message:

> This bill would prohibit the sale of firearms and ammunition at the District
> Agricultural Association 1A, commonly known as the Cow Palace.
>
> This bill has been vetoed twice over the last ten years, once by myself, and once
> by Governor Schwarzenegger.
>
> The decision on what kind of shows occur at the Cow Palace rests with the local
> board of directors which, incidentally, represents a broad cross section of the
> community. They are in the best position to make these decisions.

## 6. Current State of Gun Shows at the Del Mar Fairgrounds

According to a Fairgrounds press release, last year the 22nd District Agricultural Association's
Board of Directors voted 8 to 1 to not consider any contracts with producers of gun shows
beyond Dec. 31, 2018, until it has adopted a more thorough policy regarding the conduct of gun

**0022**

**AB 893  (Gloria )**                                                          Page **6** of **7**

shows.[6] The policy is to be presented to the Board no later than December, 2019 and would:

- Consider the feasibility of conducting gun shows for only educational and safety training purposes and bans the possession of guns and ammunition on state property,

- Align gun show contract language with recent changes in state and federal law

- Detail an enhanced security plan for the conduct of future shows

- Propose a safety plan

- Consider the age appropriateness of such an event

- Grant rights for the DAA to perform an audit to ensure full compliance with California Penal Code Sections 171b and 12071.1 and 12071.4. These audit rights may be delegated at the discretion of the 22nd DAA. (*Id.*)

According to local reporting, the operator of the Del Mar Fairgrounds gun show has filed a lawsuit challenging the Board of Directors' decision on the grounds that it violates the U.S. Constitution's First Amendment guarantee to free expression.[7]

This bill would add a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified. Therefore, this bill would effectively terminate the possibility for future gun shows at the Del Mar Fairgrounds.

## 7. Argument in Support

According to the *NeverAgainCA*:

> NeverAgainCA organized large, peaceful protests at every gun show at the Del Mar Fairgrounds. attended and spoke at every meeting of the 22nd District Agricultural Association Board, and joined students protesting gun violence and gun shows at many area schools. NeverAgainCA presented resolutions calling for the elimination of the gun shows at the Del Mar Fairgrounds to the City Councils of the adjacent cities of Del Mar, Solana Beach and Encinitas; these resolutions were adopted and are part of the record of this hearing. Candidate and now Congressman Mike Levin addressed several of our rallies against the gun shows. At the request of NeverAGainCA, then Lt. Governor, now Governor, Gavin Newsom, called on the Fair Board to end gun shows and put an end to valuing the sale of firearms above the value of lives.

---

[6] (Available at: http://www.delmarfairgrounds.com/index.php?fuseaction=about.press_details&newsid=1396 [as of March 20, 2019].)

[7] (Williams, *Lawsuit to hang up Del Mar Fairgrounds gun show policy recommendations*, Del Mar Times, March 15, 2019, available at: https://www.delmartimes.net/news/sd-cm-nc-gun-show-20190315-htmlstory.html, [as of March 20, 2019].)

**AB 893 (Gloria )**                                                                 Page **7** of **7**

> NeverAgainCA is proud to support AB 893. The residents of the 78th AD and
> adjacent districts, and their elected representatives, have demonstrated the broad
> public support for ending gun shows at the Del Mar Fair Grounds on a permanent
> basis.

## 8. Argument in Opposition

According to the *California Rifle and Pistol Association, Inc.*:

> Promoters and operators of gun shows in California must comply with no less
> than twenty-six sections of the penal code. Gun sales are highly-regulated in
> California and the rules are no less stringent for those vendors at gun shows
> (Refer Exhibit #2 attached). Vendors that participate in gun shows may not do so
> unless all their licenses have been submitted to the California Department of
> Justice before the event for the purposes of determining whether the vendors
> possess the proper valid licenses. If they do not pass the review of the California
> DOJ, they are prohibited from participating.

**-- END –**

# EXHIBIT 5

0025

# SENATE COMMITTEE ON APPROPRIATIONS
### Senator Anthony Portantino, Chair
### 2019 - 2020  Regular  Session

**AB 893 (Gloria) - 22nd District Agricultural Association:  firearm and ammunition sales at the Del Mar Fairgrounds**

| | |
|---|---|
| **Version:** May 15, 2019 | **Policy Vote:** PUB. S. 5 - 2 |
| **Urgency:** No | **Mandate:** Yes |
| **Hearing Date:** June 24, 2019 | **Consultant:** Shaun Naidu |

**Bill Summary:**  AB 893 would prohibit the sale of firearms and ammunition at the Del Mar Fairgrounds.

**Fiscal Impact:**

- Annual revenue loss in the low hundreds of thousands of dollars to the extent that the 22nd District Agricultural Association is unable to secure alternative events to gun shows (that would not have taken place at the fairgrounds already) that could generate similar levels of revenue.  (Special fund)

- Unknown loss of sales tax revenue if firearm and ammunition sales that would have taken place at the Del Mar Fairgrounds do not occur at another location within the state.  (General Fund, local funds)

**Background:**  On September 11, 2018, the 22nd District Agricultural Association's Board of Directors voted to refuse considering any contracts with producers of gun shows beyond December 31, 2018 until it adopts a more thorough policy regarding the conduct of gun shows.  Consequently, B&L Productions, Inc., the operator of Crossroads of the West Gun Shows, filed a lawsuit challenging the board's decision on the grounds that it violates the U.S. Constitution's First Amendment guarantee to free expression.  On June 18, 2019, the U.S. District Court for the Southern District of California issued a preliminary injunction prohibiting the district from enforcing the policy adopted in September 2018 of refusing to allow any gun show events at the fairgrounds for the 2019 calendar year.  The court ordered the district, upon the request of B&L Productions, Inc., to "make available the next available date for a gun show and allow B&L to reserve dates for gun show events (and to hold such events) at the Fairgrounds as the District would any other show promoters who have previously held events at the Fairgrounds."

**Proposed Law:**  This bill would prohibit, as of January 1, 2021, an officer, employee, lessee, or licensee of the 22nd District Agricultural Association from contracting for, or allowing the sale of firearms and ammunitions at the Del Mar Fairgrounds in the County of San Diego, the City of Del Mar, the City of San Diego.  This measure would exclude gun buyback events held by a law enforcement agency.

**Related Legislation:**  A number of bills in a number of legislative sessions have sought to prohibit firearms and ammunition sales at the Cow Palace.  These bills are SB 281 (Wiener, 2019); SB 221 (Wiener, 2017); SB 475 (Leno, 2013); and SB 585 (Leno, 2009).  SB 281 is pending in this Committee.  Senate bills 221, 475, and 585 were vetoed by previous governors.

**0026**

**AB 893 (Gloria)**                                                                 Page **2** of **2**

**Staff Comments:** The 22nd District Agricultural Association collects a number of fees associated with gun shows held at the Del Mar Fairgrounds. Namely, it collects rental fees, food concessions, parking fees, and ancillary revenue. Gun show revenue generated at the fairgrounds varies annually depending on the number of events held and the number of people in attendance. For example, it appears that there were five gun shows held at the fairgrounds in 2017 that resulted in net revenue of approximately $304,000. In 2018, there were three gun shows held at the fairgrounds that generated a total net revenue of roughly $146,000.

**-- END --**

# EXHIBIT 6

**SENATE RULES COMMITTEE**                                      AB 893
Office of Senate Floor Analyses
(916) 651-1520    Fax: (916) 327-4478

---

### THIRD READING

---

Bill No:     AB 893
Author:      Gloria (D), et al.
Amended:     8/30/19 in Senate
Vote:        21

---

SENATE PUBLIC SAFETY COMMITTEE:  5-2, 6/11/19
AYES:  Skinner, Bradford, Jackson, Mitchell,  Wiener
NOES:  Moorlach, Morrell

SENATE APPROPRIATIONS COMMITTEE:  5-2, 8/30/19
AYES:  Portantino, Bradford, Durazo, Hill,  Wieckowski
NOES:  Bates, Jones

ASSEMBLY FLOOR:  52-22, 4/25/19 - See last page for vote

---

**SUBJECT:**  22nd District Agricultural Association: firearm and ammunition
sales at the Del Mar Fairgrounds

**SOURCE:**  NeverAgainCA

---

**DIGEST:**   This bill prohibits, as of January 1, 2021, the sale of firearms and
ammunitions  at the Del Mar Fairgrounds in the County of San Diego, the City of
Del Mar, the City of San Diego  and thereby creates a misdemeanor offense for a
violation of that prohibition.

**ANALYSIS:**

Existing  law:

1)  Divides the state in agricultural  districts and designates District 22 as San
    Diego County. (Food and Agr. Code, §§ 3851, 3873.)

2)  Allows for the establishment of District Agricultural  Associations within each
    agricultural  district, for the purposes of holding fairs, expositions and

**0029**

exhibitions, and constructing, maintaining, and operating recreational and cultural facilities of general public interest. (Food & Agr. Code, § 3951.)

3) Provides that bringing or possessing a firearm within any state or local public building is punishable by imprisonment in a county jail for not more than one year, or in the state prison, unless a person brings any weapon that may be lawfully transferred into a gun show for the purpose of sale or trade. (Pen. Code §§ 171b subd. (a), 171b subd. (b)(7)(A).)

4) Prohibits the sale, lease, or transfer of firearms without a license, unless the sale, lease, or transfer is pursuant to operation of law or a court order, made by a person who obtains the firearm by intestate succession or bequest, or is an infrequent sale, transfer, or transfer, as defined. (Pen. Code § 26500, 26505, 26520.)

5) Excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

6) Permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

7) States that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

8) States that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the Department of Justice. (Pen. Code § 27200.)

9) Specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the Department of Justice, as specified. (Pen. Code §§ 27200, 27245.)

AB 893
Page 3

10) Specifies that unless a different penalty is expressly provided, a violation of
any provision of the Food and Agricultural Code is a misdemeanor. (Food and
Agr. Code, § 9.)

This bill:

1) Prohibits any officer, employee, operator, or lessee of the 22nd District
Agricultural Association, as defined, from authorizing, or allowing the sale of
any firearm or ammunition on the property or in the buildings that comprise
the Del Mar Fairgrounds in the County of San Diego the City of Del Mar, the
City of San Diego; or any successor or additional property owned, leased, or
otherwise occupied or operated by the district.

2) Provides that the term "ammunition" includes assembled ammunition for use
in a firearm and components of ammunition, including smokeless and black
powder, and any projectile capable of being fired from a firearm with deadly
consequence.

3) Provides that the prohibition on firearms and ammunitions sales at the Del Mar
Fairgrounds does not apply to gun buy-back events held by a law enforcement
agency.

4) States that this section will become operative on January 1, 2021.

5) Finds and declares the following:

   a) The Del Mar Fairgrounds is owned by the State of California.
   b) The United States has experienced increased gun-related tragedies over the
   last 30 years.
   c) The Cities of Del Mar, Solana Beach, and Encinitas have adopted
   resolutions asking the Del Mar Fairgrounds to discontinue gun shows.
   d) The Del Mar Fairgrounds Board of Directors voted on September 11, 2018,
   to continue hosting gun shows.
   e) Gun shows bring grave danger to the community, and arrests have resulted
   from the activities of the gun shows, as specified.

**FISCAL EFFECT:**  Appropriation:  No   Fiscal Com.:  Yes   Local:  Yes

0031

AB 893
Page 4

According to the Senate Appropriations Committee:

- Annual revenue loss in the low hundreds of thousands of dollars to the extent that the 22nd District Agricultural Association is unable to secure alternative events to gun shows (that would not have taken place at the fairgrounds already) that could generate similar levels of revenue. (Special fund)

- Unknown loss of sales tax revenue if firearm and ammunition sales that would have taken place at the Del Mar Fairgrounds do not occur at another location within the state. (General Fund, local funds)

**SUPPORT:** (Verified  8/30/19)

NeverAgainCA  (source)
Bay Area Student Activists
Brady United  Against Gun Violence
City of Del Mar
City of Encinitas
City of Solana Beach
League of Women Voters
San Diegans  for Gun Violence  Prevention

**OPPOSITION:** (Verified  8/30/19)

California  Rifle and Pistol Association, Inc.
California  Sportsman's Lobby
Crossroads of the West
Firearms  Policy Coalition
Gun Owners of California
National  Rifle Association
National  Shooting Sports Foundation
Outdoor Sportsmen's Coalition of California
Safari Club International
Safari Club International  Foundation
Western Fairs Association

**ARGUMENTS IN SUPPORT:**  According to NeverAgainCA,  "NeverAgainCA organized large, peaceful protests at every gun show at the Del Mar Fairgrounds attended and spoke at every meeting  of the 22nd District Agricultural  Association Board, and joined students protesting gun violence and gun shows at many area schools. NeverAgainCA presented resolutions calling  for the elimination  of the gun shows at the Del Mar Fairgrounds to the City Councils of the adjacent cities of

0032

AB 893
Page 5

Del Mar, Solana Beach and Encinitas; these resolutions were adopted and are part of the record of this hearing. Candidate and now Congressman Mike Levin addressed several of our rallies against the gun shows. At the request of NeverAGainCA, then Lt. Governor, now Governor, Gavin Newsom, called on the Fair Board to end gun shows and put an end to valuing the sale of firearms above the value of lives.

"NeverAgainCA is proud to support AB 893. The residents of the 78th AD and adjacent districts, and their elected representatives, have demonstrated the broad public support for ending gun shows at the Del Mar Fair Grounds on a permanent basis."

**ARGUMENTS IN OPPOSITION:** According to the California Rifle and Pistol Association, Inc., "Promoters and operators of gun shows in California must comply with no less than twenty-six sections of the penal code. Gun sales are highly-regulated in California and the rules are no less stringent for those vendors at gun shows (Refer Exhibit #2 attached). Vendors that participate in gun shows may not do so unless all their licenses have been submitted to the California Department of Justice before the event for the purposes of determining whether the vendors possess the proper valid licenses. If they do not pass the review of the California DOJ, they are prohibited from participating."

ASSEMBLY FLOOR: 52-22, 4/25/19
AYES: Aguiar-Curry, Bauer-Kahan, Berman, Bloom, Boerner Horvath, Bonta, Burke, Calderon, Carrillo, Chau, Chiu, Chu, Daly, Eggman, Friedman, Gabriel, Cristina Garcia, Gipson, Gloria, Gonzalez, Grayson, Holden, Irwin, Jones-Sawyer, Kalra, Kamlager-Dove, Levine, Limón, Low, Maienschein, McCarty, Medina, Mullin, Muratsuchi, Nazarian, O'Donnell, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Blanca Rubio, Santiago, Smith, Mark Stone, Ting, Weber, Wicks, Wood, Rendon
NOES: Bigelow, Brough, Cervantes, Choi, Cooley, Cunningham, Dahle, Diep, Flora, Fong, Frazier, Gallagher, Kiley, Lackey, Mathis, Mayes, Melendez, Obernolte, Patterson, Salas, Voepel, Waldron
NO VOTE RECORDED: Arambula, Chen, Cooper, Eduardo Garcia, Gray, Rodriguez

Prepared by: Gabe Caswell / PUB. S. /
9/3/19 11:05:18

**\*\*\*\* END \*\*\*\***

0033

# EXHIBIT 7

**SENATE RULES COMMITTEE**                                          AB 893
Office of Senate Floor Analyses
(916) 651-1520    Fax: (916) 327-4478

---

## THIRD READING

---

Bill No:     AB 893
Author:      Gloria (D), et al.
Amended:     9/6/19 in Senate
Vote:        21

---

SENATE PUBLIC SAFETY COMMITTEE:  5-2, 6/11/19
AYES:  Skinner, Bradford, Jackson, Mitchell,  Wiener
NOES:  Moorlach, Morrell

SENATE APPROPRIATIONS COMMITTEE:  5-2, 8/30/19
AYES:  Portantino, Bradford, Durazo, Hill,  Wieckowski
NOES:  Bates, Jones

ASSEMBLY FLOOR:  52-22, 4/25/19 - See last page for vote

---

**SUBJECT:**  22nd District Agricultural  Association:  firearm and ammunition
sales at the Del Mar Fairgrounds

**SOURCE:**  NeverAgainCA

---

**DIGEST:**   This bill prohibits, as of January 1, 2021, the sale of firearms  and
ammunitions  at the Del Mar Fairgrounds  in the County of San Diego, the City of
Del Mar, the City of San Diego  and thereby creates a misdemeanor offense for a
violation  of that prohibition.

*Senate Floor Amendments* of 9/6/19 delete a finding and declaration related to a
specific group of firearms  dealers.

**0035**

**ANALYSIS:**

Existing law:

1) Divides the state in agricultural districts and designates District 22 as San Diego County. (Food and Agr. Code, §§ 3851, 3873.)

2) Allows for the establishment of District Agricultural Associations within each agricultural district, for the purposes of holding fairs, expositions and exhibitions, and constructing, maintaining, and operating recreational and cultural facilities of general public interest. (Food & Agr. Code, § 3951.)

3) Provides that bringing or possessing a firearm within any state or local public building is punishable by imprisonment in a county jail for not more than one year, or in the state prison, unless a person brings any weapon that may be lawfully transferred into a gun show for the purpose of sale or trade. (Pen. Code §§ 171b subd. (a), 171b subd. (b)(7)(A).)

4) Prohibits the sale, lease, or transfer of firearms without a license, unless the sale, lease, or transfer is pursuant to operation of law or a court order, made by a person who obtains the firearm by intestate succession or bequest, or is an infrequent sale, transfer, or transfer, as defined. (Pen. Code § 26500, 26505, 26520.)

5) Excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

6) Permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

7) States that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

8) States that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the Department of Justice. (Pen. Code § 27200.)

AB 893
Page 3

9)  Specifies the requirements that gun show operators must comply with at gun
    shows, including entering into a written contract with each gun show vendor
    selling firearms at the show, ensuring that liability insurance is in effect for the
    duration of a gun show, posting visible signs pertaining to gun show laws at
    the entrances of the event, and submitting a list of all prospective vendors and
    designated firearms transfer agents who are licensed firearms dealers to the
    Department of Justice, as specified.  (Pen. Code §§ 27200, 27245.)

10) Specifies that unless a different penalty is expressly provided, a violation of
    any provision of the Food and Agricultural Code is a misdemeanor. (Food and
    Agr. Code, § 9.)

This bill:

1)  Prohibits any officer, employee, operator, or lessee of the 22nd District
    Agricultural Association, as defined, from authorizing, or allowing the sale of
    any firearm or ammunition on the property or in the buildings that comprise
    the Del Mar Fairgrounds in the County of San Diego the City of Del Mar, the
    City of San Diego; or any successor or additional property owned, leased, or
    otherwise occupied or operated by the district.

2)  Provides that the term "ammunition" includes assembled ammunition for use
    in a firearm and components of ammunition, including smokeless and black
    powder, and any projectile capable of being fired from a firearm with deadly
    consequence.

3)  Provides that the prohibition on firearms and ammunitions sales at the Del Mar
    Fairgrounds does not apply to gun buy-back events held by a law enforcement
    agency.

4)  States that this section will become operative on January 1, 2021.

5)  Finds and declares the following:

    a) The Del Mar Fairgrounds is owned by the State of California.
    b) The United States has experienced increased gun-related tragedies over the
       last 30 years.
    c) The Cities of Del Mar, Solana Beach, and Encinitas have adopted
       resolutions asking the Del Mar Fairgrounds to discontinue gun shows.

0037

AB 893
Page 4

    d) The Del Mar Fairgrounds Board of Directors voted on September 11, 2018,
       to continue hosting gun shows.
    e) Gun shows bring grave danger to the community, and arrests have resulted
       from the activities of the gun shows, as specified.

**FISCAL EFFECT:** Appropriation:  No   Fiscal Com.:  Yes   Local:  Yes

According to the Senate Appropriations Committee:

- Annual revenue loss in the low hundreds of thousands of dollars to the extent
  that the 22nd District Agricultural Association is unable to secure alternative
  events to gun shows (that would not have taken place at the fairgrounds
  already) that could generate similar levels of revenue. (Special fund)

- Unknown loss of sales tax revenue if firearm and ammunition sales that would
  have taken place at the Del Mar Fairgrounds do not occur at another location
  within the state. (General Fund, local funds)

**SUPPORT:** (Verified  9/6/19)

NeverAgainCA (source)
Bay Area Student Activists
Brady United Against Gun Violence
City of Del Mar
City of Encinitas
City of Solana Beach
League of Women Voters
San Diegans for Gun Violence Prevention

**OPPOSITION:** (Verified  9/6/19)

California Rifle and Pistol Association, Inc.
California Sportsman's Lobby
Crossroads of the West
Firearms Policy Coalition
Gun Owners of California
National Rifle Association
National Shooting Sports Foundation
Outdoor Sportsmen's Coalition of California
Safari Club International
Safari Club International Foundation
Western Fairs Association

0038

AB 893
Page 5

**ARGUMENTS IN SUPPORT:** According to NeverAgainCA, "NeverAgainCA organized large, peaceful protests at every gun show at the Del Mar Fairgrounds attended and spoke at every meeting of the 22nd District Agricultural Association Board, and joined students protesting gun violence and gun shows at many area schools. NeverAgainCA presented resolutions calling for the elimination of the gun shows at the Del Mar Fairgrounds to the City Councils of the adjacent cities of Del Mar, Solana Beach and Encinitas; these resolutions were adopted and are part of the record of this hearing. Candidate and now Congressman Mike Levin addressed several of our rallies against the gun shows. At the request of NeverAGainCA, then Lt. Governor, now Governor, Gavin Newsom, called on the Fair Board to end gun shows and put an end to valuing the sale of firearms above the value of lives.

"NeverAgainCA is proud to support AB 893. The residents of the 78th AD and adjacent districts, and their elected representatives, have demonstrated the broad public support for ending gun shows at the Del Mar Fair Grounds on a permanent basis."

**ARGUMENTS IN OPPOSITION:** According to the California Rifle and Pistol Association, Inc., "Promoters and operators of gun shows in California must comply with no less than twenty-six sections of the penal code. Gun sales are highly-regulated in California and the rules are no less stringent for those vendors at gun shows (Refer Exhibit #2 attached). Vendors that participate in gun shows may not do so unless all their licenses have been submitted to the California Department of Justice before the event for the purposes of determining whether the vendors possess the proper valid licenses. If they do not pass the review of the California DOJ, they are prohibited from participating."

ASSEMBLY FLOOR: 52-22, 4/25/19
AYES: Aguiar-Curry, Bauer-Kahan, Berman, Bloom, Boerner Horvath, Bonta, Burke, Calderon, Carrillo, Chau, Chiu, Chu, Daly, Eggman, Friedman, Gabriel, Cristina Garcia, Gipson, Gloria, Gonzalez, Grayson, Holden, Irwin, Jones-Sawyer, Kalra, Kamlager-Dove, Levine, Limón, Low, Maienschein, McCarty, Medina, Mullin, Muratsuchi, Nazarian, O'Donnell, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Blanca Rubio, Santiago, Smith, Mark Stone, Ting, Weber, Wicks, Wood, Rendon
NOES: Bigelow, Brough, Cervantes, Choi, Cooley, Cunningham, Dahle, Diep, Flora, Fong, Frazier, Gallagher, Kiley, Lackey, Mathis, Mayes, Melendez, Obernolte, Patterson, Salas, Voepel, Waldron

0039

AB 893
Page 6

NO VOTE RECORDED:  Arambula,  Chen,  Cooper, Eduardo Garcia, Gray,
   Rodriguez

Prepared by:   Gabe Caswell / PUB. S. /
9/9/19 18:24:01

**** **END** ****

# EXHIBIT 8

CONCURRENCE IN SENATE AMENDMENTS
AB 893 (Gloria)
As Amended  September 6, 2019
Majority  vote

## SUMMARY:

Prohibits,  as of January  1, 2021, the sale of firearms  and ammunitions  at the Del Mar
Fairgrounds  property  in the County  of San Diego  and the cities  of San Diego  and Del Mar and
thereby creates a misdemeanor  offense  for a violation  of that prohibition.

**The Senate Amendments:**
1)  Make minor  clarifying  changes  to this bill.

2)  Add legislative  findings  and declarations.

## COMMENTS:

**According  to the Author:**
"There  is an ever apparent link  between  the gun violence  we see virtually  every week and the
number  of guns in our communities.  Additionally,  the State of California  should not be profiting
or benefitting  from the sale of firearms.  This bill  demonstrates  that we value people over guns
and public  safety above all

"Fundamentally,  I believe  it is wrong for the State of California  to profit or to benefit from the
sale of firearms  and ammunition.  I acknowledge  that gun ownership  is a Constitutional  right  in
the United  States, and I know that there are plenty of responsible  gun owners out there.
However,  the fact remains  that widespread accessibility  to these deadly weapons produces  a
public  safety threat that we must address."

**Arguments in Support:**
According  to the *NeverAgainCA*: "NeverAgainCA  organized  large,  peaceful protests at every
gun show at the Del Mar Fairgrounds.  attended  and spoke at every meeting  of the 22nd District
Agricultural  Association  Board, and joined students  protesting  gun violence and gun shows at
many area schools.  NeverAgainCA  presented  resolutions  calling  for the elimination  of the gun
shows at the Del Mar Fairgrounds  to the City Councils  of the adjacent cities  of Del Mar, Solana
Beach and Encinitas;  these resolutions  were adopted and are part of the record of this hearing.
Candidate  and now Congressman  Mike Levin addressed  several of our rallies  against the gun
shows. At the request of NeverAGainCA,  then Lt. Governor,  now Governor,  Gavin Newsom,
called  on the Fair Board to end gun shows and put an end to valuing  the sale of firearms  above
the value of lives.

"NeverAgainCA  is proud to support AB 893. The residents  of the 78th AD and adjacent districts,
and their elected  representatives,  have demonstrated  the broad public  support for ending  gun
shows at the Del Mar Fair Grounds  on a permanent  basis."

**0042**

**Arguments in Opposition:**

According to the *California Rifle and Pistol Association, Inc.*: "Promoters and operators of gun shows in California must comply with no less than twenty-six sections of the penal code. Gun sales are highly-regulated in California and the rules are no less stringent for those vendors at gun shows (Refer Exhibit #2 attached). Vendors that participate in gun shows may not do so unless all their licenses have been submitted to the California Department of Justice before the event for the purposes of determining whether the vendors possess the proper valid licenses. If they do not pass the review of the California DOJ, they are prohibited from participating.

…

"Gun shows are very much a family event. Many of them have training and education, guest speakers, lifestyle vendors, safety training, and more. Ever hear of a shooting spree at a gun show? No, because people that attend gun shows are the law-abiding citizens that attend for the educational value and to stay up on new products that are available. It is no different than any other trade show that occurs in other industries across the state. Criminals would never subject themselves to this much scrutiny and regulation in the hopes of getting their hands on a firearm. These types of false and scare-tactic narratives have no place in modern discourse."

## FISCAL COMMENTS:

According to the Senate Appropriations Committee:

1) Annual revenue loss in the low hundreds of thousands of dollars to the extent that the 22nd District Agricultural Association is unable to secure alternative events to gun shows (that would not have taken place at the fairgrounds already) that could generate similar levels of revenue. (Special fund)

2) Unknown loss of sales tax revenue if firearm and ammunition sales that would have taken place at the Del Mar Fairgrounds do not occur at another location within the state. (General Fund, local funds)

## VOTES:

**ASM PUBLIC SAFETY: 5-2-1**
**YES:** Jones-Sawyer, Bauer-Kahan, Kamlager-Dove, Santiago, Wicks
**NO:** Lackey, Diep
**ABS, ABST OR NV:** Quirk

**ASM APPROPRIATIONS: 12-5-1**
**YES:** Gonzalez, Bloom, Bonta, Calderon, Carrillo, Chau, Eggman, Gabriel, Friedman, Petrie-Norris, Quirk, Robert Rivas
**NO:** Bigelow, Brough, Diep, Fong, Obernolte
**ABS, ABST OR NV:** Maienschein

**ASSEMBLY FLOOR: 52-22-6**
**YES:** Aguiar-Curry, Bauer-Kahan, Berman, Bloom, Boerner Horvath, Bonta, Burke, Calderon, Carrillo, Chau, Chiu, Chu, Daly, Eggman, Friedman, Gabriel, Cristina Garcia, Gipson, Gloria, Gonzalez, Grayson, Holden, Irwin, Jones-Sawyer, Kalra, Kamlager-Dove, Levine, Limón, Low, Maienschein, McCarty, Medina, Mullin, Muratsuchi, Nazarian, O'Donnell, Petrie-Norris, Quirk,

**AB 893**
Page 3

Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Blanca Rubio, Santiago, Smith, Mark Stone, Ting, Weber, Wicks, Wood, Rendon

**NO:** Bigelow, Brough, Cervantes, Choi, Cooley, Cunningham, Dahle, Diep, Flora, Fong, Frazier, Gallagher, Kiley, Lackey, Mathis, Mayes, Melendez, Obernolte, Patterson, Salas, Voepel, Waldron

**ABS, ABST OR NV:** Arambula, Chen, Cooper, Eduardo Garcia, Gray, Rodriguez

**SENATE FLOOR:  27-11-2**
**YES:** Allen, Archuleta, Atkins, Beall, Bradford, Caballero, Dodd, Durazo, Galgiani, Glazer, Lena Gonzalez, Hertzberg, Hill, Hueso, Jackson, Leyva, McGuire, Mitchell, Monning, Pan, Portantino, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener

**NO:** Bates, Borgeas, Chang, Dahle, Grove, Jones, Moorlach, Morrell, Nielsen, Stone, Wilk

**ABS, ABST OR NV:** Hurtado, Roth

**UPDATED:**

VERSION: September 6, 2019

CONSULTANT: Matthew Fleming (Counsel) / PUB. S. / (916) 319-3744          FN: 0002324

# EXHIBIT 9

## Senate Bill No. 264

### CHAPTER 684

An act to add Section 27575 to the Penal Code, relating to firearms.

[Approved by Governor October 8, 2021. Filed with Secretary
of State October 8, 2021.]

LEGISLATIVE COUNSEL'S DIGEST

SB 264, Min. Firearms: the OC Fair and Event Center.

Existing law generally regulates the sale and transfer of firearms, including, among other things, requiring transactions of firearms to be completed through a licensed firearms dealer. Existing law generally makes a violation of the requirements relating to the sale, lease, or transfer of a firearm a misdemeanor.

This bill would prohibit an officer, employee, operator, lessee, or licensee of the 32nd District Agricultural Association, as defined, from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the OC Fair and Event Center, as specified. The bill would exempt from its provisions a gun buyback event held by a law enforcement agency, the sale of a firearm by a public administrator, public guardian, or public conservator within the course of their duties, a sale that occurs pursuant to a contract that was entered into before January 1, 2022, and the purchase of ammunition on state property by a law enforcement agency in the course of its regular duties. Because a violation of this prohibition would be a crime, this bill would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.   The Legislature finds and declares all of the following:

(a)  Some state properties, such as fairgrounds in District Agricultural Associations (DAAs), lease a portion of their fairgrounds to entities that sponsor marketplaces popularly known as "gun shows," at which firearms and ammunition and other items are sold to the public approximately five times a year on average among state fairgrounds.

(b)  The United States has experienced many gun-related tragedies with increasing severity and frequency in the last 30 years, including mass

93

murders at Columbine High School, Sandy Hook Elementary School, and Marjory Stoneman Douglas High School, and an increasing rate of suicide by gun among all levels of society.

(c)  Various California cities, such as the Cities of Del Mar, Solana Beach, and Encinitas have adopted resolutions requesting that their local Del Mar Fairgrounds (DMFG) Board discontinue leasing any portion of its property for use as a gun show. A committee appointed by the Board of Directors of the 22nd DAA to study gun shows conducted research, including inspection tours of the Del Mar Gun Show by members of the committee as well as by several other members of the DMFG Board.

(d)  In direct response to this community concern, Assembly Member Todd Gloria passed AB 893 into law, banning gun shows from the DMFG, setting a precedent for gun show legislation in California.

(e)  Gun shows bring grave danger to a community, and the following dangerous incidents, among others, have occurred at gun shows, including, but not limited to, an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines.

(f)  Promoters maintain relationships with a core group of vendors, some selling guns and some selling other merchandise, who travel as the schedule dictates from city to city and state to state and in the west, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona.

SEC. 2.  Section 27575 is added to the Penal Code, to read:

27575.  (a)  Notwithstanding any other law, an officer, employee, operator, lessee, or licensee of the 32nd District Agricultural Association, as defined in Section 3884 of the Food and Agricultural Code, shall not contract for, authorize, or allow the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the OC Fair and Event Center, in the County of Orange, the City of Costa Mesa, or any successor or additional property owned, leased, or otherwise occupied or operated by the district.

(b)  This section does not apply to any of the following:

(1)  A gun buyback event held by a law enforcement agency.

(2)  The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties.

(3)  The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2022.

(4)  The purchase of ammunition on state property by a law enforcement agency in the course of its regular duties.

SEC. 3.  No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of

93

**Ch. 684**

Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

93

**0048**

# EXHIBIT 10

# SENATE COMMITTEE ON PUBLIC SAFETY
## Senator Steven Bradford, Chair
### 2021 - 2022  Regular

| | | | | |
|---|---|---|---|---|
| **Bill No:** | SB 264 | **Hearing Date:** | March 16, 2021 | |
| **Author:** | Min | | | |
| **Version:** | February 24, 2021 | | | |
| **Urgency:** | No | | **Fiscal:** | Yes |
| **Consultant:** | GC | | | |

**Subject:**   *Firearms:  state and county property*

## HISTORY

Source:          Author

Prior Legislation:       AB 893 (Gloria),  Ch. 731, Stats. of 2019
SB 221 (Wiener),  2017, vetoed
SB 475 (Leno), 2013, vetoed
SB 585 (Leno), 2009, vetoed
AB 2948 (Leno), 2008, failed  passage on the Senate Floor
SB 1733 (Speier), 2004, failed  passage on the Assembly  Floor
AB 295 (Corbett),  Ch. 247, Stats. of 1999
AB 1107 (Ortiz),  1997, failed  passage in Assembly  Appropriations

Support:          American  Academy of Pediatrics, California;  Brady Orange County;  Canyon Democrats;  Democrats of Greater Irvine;  HB Huddle;  Laguna Beach Democratic Club; Laguna  Woods Democratic  Club; NeverAgainCA;  Office of Chair Nathan Fletcher, San Diego County Board of Supervisors;  San Diegans  for Gun Violence Prevention;  City of San Diego;  Santa Barbara Women's Political  Committee; Women for American  Values and Ethics Action  Fund; Women For: Orange County

Opposition:       California  Rifle and Pistol Association;  California  Sportsman's Lobby, Inc.; National  Rifle  Association – Institute  for Legislative  Action;  National Shooting Sports Foundation,  INC.; Outdoor Sportsman's  Coalition  of California;  Safari Club International  - California  Chapter; Western  Fairs Association

## PURPOSE

***The purpose of this legislation is to prohibit the sale of firearms on state or county property.***

*Existing law* provides that bringing  or possessing  a firearm  within  any state or local public building  is punishable  by imprisonment  in a county jail for not more than one year, or in the state prison, unless a person brings any weapon that may be lawfully  transferred  into a gun show for the purpose of sale or trade. (Pen. Code §§ 171b subd. (a), 171b subd. (b)(7)(A).)

*Existing law* prohibits the sale, lease, or transfer of firearms without a license, unless the sale, lease, or transfer is pursuant to operation of law or a court order, made by a person who obtains the firearm by intestate succession or bequest, or is an infrequent sale, transfer, or transfer, as defined. (Pen. Code § 26500, 26505, 26520.)

*Existing law* excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

*Existing law* permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

*Existing law* states that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

*Existing law* states that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the Department of Justice. (Pen. Code § 27200.)

*Existing law* specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the Department of Justice, as specified. (Pen. Code §§ 27200, 27245.)

*Existing law* specifies that unless a different penalty is expressly provided, a violation of any provision of the Food and Agricultural code is a misdemeanor. (Food and Agr. Code, § 9.)

*This bill* prohibits a state or county officer or employee, or operator, lessee, or licensee of any state or county property, from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on state or county property or in the buildings that sit on state or county property or property otherwise owned, leased, occupied, or operated by the state or county.

*This bill* makes the following findings and declarations:

- Some state properties, such as fairgrounds in District Agricultural Associations (DAAs), lease a portion of their fairgrounds to entities that sponsor marketplaces popularly known as "gun shows," at which firearms and ammunition and other items are sold to the public approximately five times a year on average among state fairgrounds.

- The United States has experienced many gun-related tragedies with increasing severity and frequency in the last 30 years, including mass murders at Columbine High School, Sandy Hook Elementary School, and Marjory Stoneman Douglas High School, and an increasing rate of suicide by gun among all levels of society.

- Various California cities, such as the Cities of Del Mar, Solana Beach, and Encinitas have adopted resolutions requesting that their local Del Mar Fairgrounds (DMFG) Board

discontinue leasing any portion of its property for use as a gun show. A committee appointed by the Board of Directors of the 22nd DAA to study gun shows conducted research, including inspection tours of the Del Mar Gun Show by members of the committee as well as by several other members of the DMFG Board.

- In direct response to this community concern, Assembly Member Todd Gloria passed AB 893 into law, banning gun shows from the DMFG, setting a precedent for gun show legislation in California.

- Gun shows bring grave danger to a community, and the following dangerous incidents, among others, have occurred at gun shows, including, but not limited to, an official vendor accused of trafficking illegal firearms, sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Armed Prohibited Persons System, and illegal importation of large-capacity magazines.

- Promoters maintain relationships with a core group of vendors, some selling guns and some selling other merchandise, who travel as the schedule dictates from city to city and state to state and in the west, for example, many of the same vendors can be seen at Crossroads of the West Gun Shows from San Francisco, California, to Tucson, Arizona.

## COMMENTS

### 1. Need for This Bill

According to the author:

The urgency for common-sense gun safety remains prevalent during the COVID-19 pandemic, as 2020 saw a record high in gun-related deaths. Over 19,000 individuals died of gun violence in 2020, up nearly 25% from 2019.[1] According to the Giffords Law Center to Prevent Gun Violence, gun shows often create the opportunity to "circumvent gun safety laws" and are a common venue for straw purchases and illegal gun transfers.[2] Additionally, a Bureau of Alcohol, Tobacco, and Firearms report described gun shows as a "major trafficking channel" and found that gun shows were the second largest source of illegally trafficked firearms.[3]

SB 264 would prohibit the sale of firearms and ammunition on state and county property. The bill ensures California is not profiting of the sale of firearms and that taxpayer dollars are not being used to promote the distribution of firearms.

---

[1] Garcia-Navarro, L. (2021, January 3). 2020 Was A Record-Breaking Year For Gun-Related Deaths In The U.S. *NPR*. https://www.npr.org/2021/01/03/952969760/2020-was-a-record-breaking-year-for-gun-related-deaths-in-the-u-s#:~:text=According%20to%20the%20Gun%20Violence,jump%20from%20the%20year%20before
[2] Gun Shows. (2020, December 01). *Giffords Law* Center. https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/gun-shows/
[3] "Following the Gun: Enforcing Federal Laws Against Firearms Traffickers," Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, June 2000. http://www.nfaoa.org/documents/ATF-%20Following%20the%20Gun,%20Enforcing%20Federal%20Laws%20Against%20Firearms%20Traffickers.pdf

## 2. Gun Shows

Gun shows are essentially a flea market for firearms. At gun shows, individuals may buy, sale, and trade firearms and fire-arms related accessories. These events typically attract several thousand people, and a single gun show can have sales of over 1,000 firearms over the course of one weekend.[4]

According to the NRA's Institute for Legislative Action, less than one percent of inmates incarcerated in state prisons for gun crimes acquired their firearms at a gun show.[5] However, gun shows rank second to corrupt dealers as a source for illegally trafficked firearms. Though violent criminals do not buy most of their guns directly from gun shows, gun shows are "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market."[6]

Concerns about gun shows extend beyond the state. A report by the Government Accountability Office regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows.[7] 87 percent of firearms seized by Mexican authorities and traced in the last 5 years originated in the United States, according to data from DOJ's Bureau of Alcohol, Tobacco, Firearms and Explosives. According to United States and Mexican government officials, these firearms have been increasingly more powerful and lethal in recent years. Many of these firearms come from gun shops and gun shows in south-west border-states.[8]

## 3. Gun Show Regulations in California

AB 295 (Corbett, Chapter 247, Statutes of 1999), the Gun Show Enforcement and Security Act of 2000, added a number of requirements for gun shows. To obtain a certificate of eligibility from the DOJ, a promoter must certify that he or she is familiar with existing law regarding gun shows; obtain at least $1 million of liability insurance; provide an annual list of gun shows the applicant plans to promote; pay an annual fee; make available to local law enforcement a complete list of all entities that have rented any space at the show; submit not later than 15 days before the start of the show an event and security plan; submit a list to DOJ of prospective vendors and designated firearms transfer agents who are licensed dealers; provide photo identification of each vendor and vendor's employee; prepare an annual event and security plan; and require all firearms carried onto the premises of a show to be checked, cleared of ammunition, secured in a way that they cannot be operated, and have an identification tag or sticker attached. AB 295 also provided for a number of penalties for a gun show producer's willful failure to comply with the specified requirements. California's strict gun show regulations may help to prevent increases in firearm deaths and injuries following gun shows. (See Ellicott C. Matthay, et al., "*In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries,*" Annals of Internal Medicine (2017) Vol. 1 Iss. 8.)

In addition to state laws regulating gun shows, a total ban on gun shows on county property is within the scope of a county's authority. "Under California Government Code section 23004(d), a county is given substantial authority to manage its property, including the most fundamental decision as to how the property will be used and that nothing in the gun show statutes evince

---

[4] Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/file/57506/download.
[5] NRA-ILA, https://www.nraila.org/get-the-facts/background-checks-nics.
[6] Center for American Progress, http://www.americanprogress.org/issues/guns-crime/report/2013/12/13/80795/the-gun-debate-1-year-after-newtown/.
[7] https://www.gao.gov/assets/680/674570.pdf.
[8] https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf.

intent to override that authority. The gun show statutes do not mandate that counties use their property for such shows. If the county does allow such shows, it may impose more stringent restrictions on the sale of firearms than state law prescribes." (*Nordyke v. Santa Clara County* (9th Cir. Cal. 1997) 110 F.3d 707, 766.) However, counties do not have authority to prohibit gun shows on state property such as Cow Palace.

## 4. Banning of Gun Shows on State Agricultural Land

There have been several legislative attempts to regulate gun shows on State Agricultural Land— most notably, SB 475 (Leno, 2014) and SB 585 (Leno, 2010), which were both vetoed.

SB 585 would have prohibited gun shows at Cow Palace. SB 585 would have additionally required the Cow Palace DAA to replace gun show events with non-firearm or non-ammunition related events. In his veto message, Governor Schwarzenegger stated that SB 585 would "set a confusing precedent at the state level by statutorily prohibiting one [DAA] from selling firearms and ammunition, a legal and regulated activity, while allowing other DAAs to continue to do so. In addition, [SB 585] would result in decreased state and local tax revenues by restricting events at the Cow Palace." Unlike SB 585, this bill will not impair any of Cow Palace's ongoing contracts because, if chaptered, it will not become operative until January 1, 2020.

Another attempt to prohibit gun sales at Cow Palace was similarly vetoed by Governor Brown. SB 475 would have permitted gun shows at Cow Palace only upon prior approval by resolution adopted by both the Board of Supervisors of the County of San Mateo and the Board of Supervisors of the City and County of San Francisco. SB 475 was vetoed by because it required the Cow Palace DAA to obtain approval from the County of San Mateo and the City and County of San Francisco prior to entering into a contract for a gun show on state property. In his veto message, Governor Brown stated, "I encourage all [DAAs] to work with their local communities when determining their operations and events. [SB 475], however, totally pre-empts the Board of Directors of the Cow Palace from exercising its contracting authority whenever a gun show is involved. I prefer to leave these decisions to the sound discretion of the Board." Under SB 475, the Cow Palace DAA would have been permitted to host gun shows, but only at the discretion of San Francisco and San Mateo counties. In practice, SB 475 would have allowed the Board of Cow Palace to permit some approved gun shows, and required it to prohibit other non-county-approved gun shows. In comparison, this bill instead completely prohibits all gun shows at Cow Palace.

In 2018, SB 221 (Wiener) contained very similar provisions to this bill. SB 221 would have prohibited any officer, employee, operator, or lessee of Agriculture District 1-A, from contracting for, authorizing, or allowing the sale of any firearm or ammunition at the Cow Palace property in San Mateo County and San Francisco County. Like this bill, SB 221 had an implementation date in 2020 and exempted law enforcement firearm buy-back events. Unlike this bill, SB 221 failed to exempt existing contracts to host firearms events. SB 221 was vetoed by Governor Brown with the following veto message:

> This bill would prohibit the sale of firearms and ammunition at the District Agricultural Association 1A, commonly known as the Cow Palace.

> This bill has been vetoed twice over the last ten years, once by myself, and once by Governor Schwarzenegger.

> The decision on what kind of shows occur at the Cow Palace rests with the local

board of directors which, incidentally, represents a broad cross section of the
community. They are in the best position to make these decisions.

Then, in 2019 AB 893 (Gloria) added a section to the Food and Agricultural Code that prohibits
the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any
provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified.
Therefore, this bill would effectively terminate the possibility for future gun shows at the Del
Mar Fairgrounds. This bill was signed into law by Governor Newsom and Chaptered as 731 in
the Statutes of 2019.

This bill would add county and state property to the provisions of SB 893 (Gloria).

## 5.  Argument in Support

According to the Santa Barbara Women's Political Committee:

> We support legislation that promotes community safety and are aware that under
> current law gun shows have brought dangerous incidents to our community.
> These include but are not limited to the following: an official vendor being
> accused of trafficking illegal firearms, sales of firearms to individuals registered
> in the Department of Justice Bureau of Firearms Prohibited Persons System, and
> illegal importation of large-capacity magazines. Recent years have seen an
> alarming increase of gun violence including mass murders that have devastated
> communities at large. By prohibiting gun shows on state properties, SB 264
> would open these properties to more family-friendly venues and avoid the use of
> taxpayer dollars to facilitate placing more guns on our streets.

## 6.  Argument in Opposition

According to the Western Fairs Association

> SB 264 would prohibit all sales of firearms and ammunition at events held at all
> District Agricultural Associations and county fairgrounds beginning in 2022.
> This prohibition will not enhance public safety as current law already requires all
> firearm transactions at events hosted at fairgrounds to be subject to the same
> stringent standards as required in a dealer's store. All firearms transactions that
> take place on a fairground are subject to the ten-day waiting period while
> requiring the firearm to remain in the possession of the transacting dealer until
> that period ends and the Department of Justice has completed the required
> background check. District Agricultural Associations (DAAs) and county fairs
> receive minimal support annually from the State Budget. Fairs are expected to
> generate their own revenues from trade shows, livestock auctions, concerts, etc.
> Each fair hosts events of interest to the communities they serve. Prohibiting gun
> shows on state and county property not only eliminates a legal venue for the sale
> of firearms and ammunition under the watchful eye of law enforcement and in
> full compliance with state law, but it also harms the finances of California's Fair
> Network.

-- END –

# EXHIBIT 11

**SENATE RULES COMMITTEE**                                        SB 264
Office of Senate Floor Analyses
(916) 651-1520    Fax: (916) 327-4478

### THIRD READING

| | |
|---|---|
| Bill  No: | SB 264 |
| Author: | Min (D), et al. |
| Amended: | 4/19/21 |
| Vote: | 21 |

SENATE PUBLIC SAFETY COMMITTEE: 4-1, 3/16/21
AYES: Bradford, Kamlager, Skinner, Wiener
NOES: Ochoa Bogh

SENATE APPROPRIATIONS COMMITTEE: 5-2, 5/20/21
AYES: Portantino, Bradford, Kamlager, Laird, Wieckowski
NOES: Bates, Jones

**SUBJECT:** Firearms:  state and county property

**SOURCE:**  Author

**DIGEST:**  This bill prohibits the sale of firearms on state property.

**ANALYSIS:**

Existing law:

1) Provides that bringing or possessing a firearm within any state or local public
   building is punishable by imprisonment in a county jail for not more than one
   year, or in the state prison, unless a person brings any weapon that may be
   lawfully  transferred into a gun show for the purpose of sale or trade. (Pen. Code
   §§ 171b subd. (a), 171b subd. (b)(7)(A).)

2) Prohibits the sale, lease, or transfer of firearms without a license, unless the
   sale, lease, or transfer is pursuant to operation of law or a court order, made by
   a person who obtains the firearm by intestate succession or bequest, or is an
   infrequent sale, transfer, or transfer, as defined. (Pen. Code § 26500, 26505,
   26520.)

0057

SB 264
Page 2

3) Excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice (DOJ) from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

4) Permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

5) States that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

6) States that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the DOJ. (Pen. Code § 27200.)

7) Specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the DOJ, as specified. (Pen. Code §§ 27200, 27245.)

8) Specifies that unless a different penalty is expressly provided, a violation of any provision of the Food and Agricultural code is a misdemeanor. (Food and Agr. Code, § 9.)

This bill:

1) Prohibits a state officer or employee, or operator, lessee, or licensee of any state or county property, from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on state property or in the buildings that sit on state property or property otherwise owned, leased, occupied, or operated by the state.

2) Makes findings and declarations.

**Background**

Gun shows are essentially a flea market for firearms. At gun shows, individuals may buy, sale, and trade firearms and fire-arms related accessories. These events

SB 264
Page 3

typically attract several thousand people, and a single gun show can have sales of over 1,000 firearms over the course of one weekend.[1]

According to the NRA's Institute for Legislative Action, less than one percent of inmates incarcerated in state prisons for gun crimes acquired their firearms at a gun show.[2] However, gun shows rank second to corrupt dealers as a source for illegally trafficked firearms. Though violent criminals do not buy most of their guns directly from gun shows, gun shows are "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market."[3]

Concerns about gun shows extend beyond the state. A report by the Government Accountability Office regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows.[4] 87 percent of firearms seized by Mexican authorities and traced in the last five years originated in the United States, according to data from DOJ's Bureau of Alcohol, Tobacco, Firearms and Explosives. According to United States and Mexican government officials, these firearms have been increasingly more powerful and lethal in recent years. Many of these firearms come from gun shops and gun shows in south-west border-states.[5]

AB 295 (Corbett, Chapter 247, Statutes of 1999), the Gun Show Enforcement and Security Act of 2000, added a number of requirements for gun shows. To obtain a certificate of eligibility from the DOJ, a promoter must certify that he or she is familiar with existing law regarding gun shows; obtain at least $1 million of liability insurance; provide an annual list of gun shows the applicant plans to promote; pay an annual fee; make available to local law enforcement a complete list of all entities that have rented any space at the show; submit not later than 15 days before the start of the show an event and security plan; submit a list to DOJ of prospective vendors and designated firearms transfer agents who are licensed dealers; provide photo identification of each vendor and vendor's employee; prepare an annual event and security plan; and require all firearms carried onto the premises of a show to be checked, cleared of ammunition, secured in a way that they cannot be operated, and have an identification tag or sticker attached. AB 295 also provided for a number of penalties for a gun show producer's willful failure to comply with the specified requirements. California's strict gun show regulations may help to prevent increases in firearm deaths and injuries following gun shows.

---

[1] Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/file/57506/download.
[2] NRA-ILA, https://www.nraila.org/get-the-facts/background-checks-nics.
[3] Center for American Progress, http://www.americanprogress.org/issues/guns-crime/report/2013/12/13/80795/the-gun-debate-1-year-after-newtown/.
[4] https://www.gao.gov/assets/680/674570.pdf.
[5] https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf.

SB 264
Page 4

(See Ellicott C. Matthay, et al., "*In-State and Interstate Associations Between Gun
Shows and Firearm Deaths and Injuries*," Annals of Internal Medicine (2017) Vol.
1 Iss. 8.)

In addition to state laws regulating gun shows, a total ban on gun shows on county
property is within the scope of a county's authority. "Under California
Government Code section 23004(d), a county is given substantial authority to
manage its property, including the most fundamental decision as to how the
property will be used and that nothing in the gun show statutes evince intent to
override that authority. The gun show statutes do not mandate that counties use
their property for such shows. If the county does allow such shows, it may impose
more stringent restrictions on the sale of firearms than state law prescribes."
(*Nordyke v. Santa Clara County* (9th Cir. Cal. 1997) 110 F.3d 707, 766.)
However, counties do not have authority to prohibit gun shows on state property
such as Cow Palace.

There have been several legislative attempts to regulate gun shows on State
Agricultural Land—most notably, SB 475 (Leno, 2014) and SB 585 (Leno, 2010),
which were both vetoed.

SB 585 would have prohibited gun shows at Cow Palace. SB 585 would have
additionally required the Cow Palace DAA to replace gun show events with non-
firearm or non-ammunition related events. In his veto message, Governor
Schwarzenegger stated that SB 585 would "set a confusing precedent at the state
level by statutorily prohibiting one [DAA] from selling firearms and ammunition, a
legal and regulated activity, while allowing other DAAs to continue to do so. In
addition, [SB 585] would result in decreased state and local tax revenues by
restricting events at the Cow Palace." Unlike SB 585, this bill will not impair any
of Cow Palace's ongoing contracts because, if chaptered, it will not become
operative until January 1, 2020.

Another attempt to prohibit gun sales at Cow Palace was similarly vetoed by
Governor Brown. SB 475 would have permitted gun shows at Cow Palace only
upon prior approval by resolution adopted by both the Board of Supervisors of the
County of San Mateo and the Board of Supervisors of the City and County of San
Francisco. SB 475 was vetoed by because it required the Cow Palace DAA to
obtain approval from the County of San Mateo and the City and County of San
Francisco prior to entering into a contract for a gun show on state property. In his
veto message, Governor Brown stated, "I encourage all [DAAs] to work with their
local communities when determining their operations and events. [SB 475],
however, totally pre-empts the Board of Directors of the Cow Palace from

0060

exercising its contracting authority whenever a gun show is involved. I prefer to leave these decisions to the sound discretion of the Board." Under SB 475, the Cow Palace DAA would have been permitted to host gun shows, but only at the discretion of San Francisco and San Mateo counties. In practice, SB 475 would have allowed the Board of Cow Palace to permit some approved gun shows, and required it to prohibit other non-county-approved gun shows. In comparison, this bill instead completely prohibits all gun shows at Cow Palace.

In 2018, SB 221 (Wiener) contained very similar provisions to this bill. SB 221 would have prohibited any officer, employee, operator, or lessee of Agriculture District 1-A, from contracting for, authorizing, or allowing the sale of any firearm or ammunition at the Cow Palace property in San Mateo County and San Francisco County. Like this bill, SB 221 had an implementation date in 2020 and exempted law enforcement firearm buy-back events. Unlike this bill, SB 221 failed to exempt existing contracts to host firearms events. SB 221 was vetoed by Governor Brown with the following veto message:

> This bill would prohibit the sale of firearms and ammunition at the District Agricultural Association 1A, commonly known as the Cow Palace.

> This bill has been vetoed twice over the last ten years, once by myself, and once by Governor Schwarzenegger.

> The decision on what kind of shows occur at the Cow Palace rests with the local board of directors which, incidentally, represents a broad cross section of the community. They are in the best position to make these decisions.

Then, in 2019 AB 893 (Gloria) added a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural Code is a misdemeanor, unless otherwise specified. Therefore, the bill would effectively terminate the possibility for future gun shows at the Del Mar Fairgrounds. The bill was signed into law by Governor Newsom and Chaptered as 731 in the Statutes of 2019.

This bill adds state property to the provisions of SB 893 (Gloria).

**FISCAL EFFECT:** Appropriation:  No   Fiscal Com.:   Yes   Local:  Yes

According to the Senate Appropriations Committee:

- Annual revenue loss, potentially in the low millions of dollars in the aggregate to the extent that the 13 District Agricultural Associations that currently allow

gun shows at their fairgrounds are unable to secure alternative events (that
would not have taken place at the fairgrounds already) that could generate
similar levels of revenue. For illustrative purposes, before the prohibition on
the sale of firearms and ammunition at the Del Mar Fairgrounds, there were five
gun shows on the property in 2017 that resulted in approximately $304,000 in
net revenue and there were three gun shows in 2018 that collected $146,000 in
gross revenue. (Special funds)

- Unknown loss of sales tax revenue if firearm, firearm precursor parts, and
  ammunition sales that would have taken place on state property do not occur at
  other locations within the state. (General Fund, local funds)

- Additionally, this bill could result in the loss of tax revenue for use by state-
  designated fairs that meet specified working conditions to the extent that gun
  shows are not replaced by other events that bring in similar amounts of revenue
  that would not take place on fair property already. (Special fund*)

*Fair and Exposition Fund

**SUPPORT:** (Verified  5/20/21)

American Academy of Pediatrics, California
Brady Orange County
Canyon Democrats
City of San Diego
City of Solana Beach
Democrats of Greater Irvine
Hb Huddle
Laguna Beach Democratic Club
Laguna Woods Democratic Club
League of Women Voters of California
Neveragainca
Office of Chair Nathan Fletcher, San Diego County Board of Supervisors
Peace and Justice Commission from St Mark Presbyterian Church in Newport Beach
San Diegans for Gun Violence Prevention
Santa Barbara Women's Political Committee
The Violence Prevention Coalition of Orange County
Women for American Values and Ethics Action Fund
Women For: Orange County

SB 264
Page 7

**OPPOSITION:** (Verified   5/20/21)

Black Brant Group
California Bowmen Hunters/State Archery Association
California Deer Association
California Houndsmen for Conservation
California Rifle and Pistol Association, INC.
California Sportsman's Lobby, INC.
California Statewide Law Enforcement Association
California Waterfowl Association
Cal-Ore Wetlands and Waterfowl Council
Gun Owners of California, INC.
National Rifle Association - Institute for Legislative Action
National Shooting Sports Foundation, INC.
Nor-Cal Guides and Sportsmen's Association
Outdoor Sportsmen's Coalition of California
Peace Officers Research Association of California
Rural County Representatives of California
Safari Club International - California Chapters
Safari Club International, California Coalition
San Diego County Wildlife Federation
San Francisco Bay Area Chapter - Safari Club International
Tulare Basin Wetlands Association
Western Fairs Association
Wild Sheep Foundation, California Chapter

**ARGUMENTS IN SUPPORT:** According to the Santa Barbara Women's
Political Committee:

> We support legislation that promotes community safety and are aware that
> under current law gun shows have brought dangerous incidents to our
> community. These include but are not limited to the following: an official
> vendor being accused of trafficking illegal firearms, sales of firearms to
> individuals registered in the Department of Justice Bureau of Firearms
> Prohibited Persons System, and illegal importation of large-capacity magazines.
> Recent years have seen an alarming increase of gun violence including mass
> murders that have devastated communities at large. By prohibiting gun shows
> on state properties, SB 264 would open these properties to more family-friendly
> venues and avoid the use of taxpayer dollars to facilitate placing more guns on
> our streets.

0063

SB 264
Page 8

**ARGUMENTS IN OPPOSITION:** According to the Western Fairs Association:

SB 264 would prohibit all sales of firearms and ammunition at events held at all District Agricultural Associations and county fairgrounds beginning in 2022. This prohibition will not enhance public safety as current law already requires all firearm transactions at events hosted at fairgrounds to be subject to the same stringent standards as required in a dealer's store. All firearms transactions that take place on a fairground are subject to the ten-day waiting period while requiring the firearm to remain in the possession of the transacting dealer until that period ends and the Department of Justice has completed the required background check. District Agricultural Associations (DAAs) and county fairs receive minimal support annually from the State Budget. Fairs are expected to generate their own revenues from trade shows, livestock auctions, concerts, etc. Each fair hosts events of interest to the communities they serve. Prohibiting gun shows on state and county property not only eliminates a legal venue for the sale of firearms and ammunition under the watchful eye of law enforcement and in full compliance with state law, but it also harms the finances of California's Fair Network.

Prepared by:  Gabe Caswell / PUB. S. /
5/22/21 12:55:14

**\*\*\*\*  END  \*\*\*\***

**0064**

# EXHIBIT 12

Date of Hearing:   July 13, 2021
Counsel:                Matthew  Fleming


ASSEMBLY  COMMITTEE  ON  PUBLIC  SAFETY
Reginald  Byron Jones-Sawyer,  Sr., Chair

SB 264 (Min) – As Amended June 15, 2021


**SUMMARY:**  Prohibits  the sale of any firearm,  firearm  precursor  part, or ammunition  on state
property.  Specifically,  **this bill**:

1)  Prohibits  a state officer  or employee,  or operator, lessee,  or licensee  of any state property,
shall  not contract  for, authorize,  or allow  the sale of any firearm,  firearm  precursor  part, or
ammunition  on state property or in the buildings  that sit on state property or property
otherwise  owned, leased, occupied,  or operated  by the state.

2)  Provides  that the prohibition  does not apply to any of the following:

a)  A gun buyback  event held by a law enforcement  agency;

b)  The sale of a firearm  by a public  administrator,  public  conservator,  or public  guardian
within  the course of their duties;

c)  The sale of a firearm,  firearm  precursor  part, or ammunition  on state property that occurs
pursuant  to a contract  that was entered  into before January 1, 2022; and,

d)  The purchase  of ammunition  on state property by a law enforcement  agency in the course
of its regular  duties.

3)  Makes Legislative  findings  and declarations.

**EXISTING  LAW**:

1)  Prohibits  the sale, lease, or transfer  of firearms  without  a license,  unless  the sale, lease, or
transfer  is pursuant  to operation  of law or a court order, made by a person who obtains the
firearm  by intestate  succession  or bequest,  or is an infrequent  sale, transfer,  or transfer,  as
defined.  (Pen. Code, §§ 26500, 26505, & 26520.)

2)  Excludes  persons with a valid federal firearms  license  and a current certificate  of eligibility
issued by the Department  of Justice  (DOJ) from the prohibitions  on the sale, lease, or transfer
of used firearms,  other than handguns,  at gun shows or events. (Pen. Code, § 26525.)

3)  Permits  licensed  dealers  to sell firearms  only from their licensed  premises  and at gun shows.
(Pen. Code, § 26805.)

4)  States that a dealer operating  at a gun show must comply  with all applicable  laws, including
California's  waiting  period  law, laws governing  the transfer  of firearms  by dealers,  and all

local ordinances, regulations, and fees. (Pen. Code, § 26805.)

5) Specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the Department of Justice, as specified. (Pen. Code, §§ 27200, 27245.)

6) States that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the DOJ. (Pen. Code, § 27200.)

**FISCAL EFFECT**: Unknown.

**COMMENTS**:

1) **Author's Statement**: According to the author, "County fairgrounds are intended to be family friendly venues. Instead, they've become known for hosting gun shows. While the Second Amendment protects the rights of individuals to bear arms, it does not require our great State of California to use taxpayer-owned property to disseminate more deadly firearms into our communities. Given the clear linkage between the sale of guns and the likelihood of gun violence in a community, our state must stop being in the business of selling guns. Unfortunately, all too often this year, we've seen headline after headline of terrible tragedies throughout the nation and California — two shootings in my district and in San Jose in May. Enough is enough."

2) **Gun Shows**: A "gun show" is a trade show for firearms. At gun shows, individuals may buy, sell, and trade firearms and firearms-related accessories. These events typically attract several thousand people, and a single gun show can have sales of over 1,000 firearms over the course of one weekend. (Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), *Gun Shows: Brady Checks and Crime Gun Traces*, January 1999, available at: https://www.atf.gov/file/57506/download, [as of March 18, 2019].)

According to the NRA's Institute for Legislative Action (NRA-ILA), less than one percent of persons incarcerated in state prisons for gun crimes acquired their firearms at a gun show. (NRA-ILA, https://www.nraila.org/get-the-facts/background-checks-nics.) However, according to a report published by UC Davis, gun shows have been identified as a source for illegally trafficked firearms. (https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf, [as of March 20, 2019].) Though violent criminals do not appear to regularly purchase their guns directly from gun shows, gun shows have received criticism as being "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market." (Gerney, *The Gun Debate 1 Year After Newtown*, Center for American Progress, December 13, 2013, available at: http://www.americanprogress.org/issues/guns-crime/report/2013/12/13/80795/the-gun-debate-1-year-after-newtown/, [as of March 18, 2019].)

**0067**

In 1999, California enacted the nation's broadest legislation to increase oversight at gun shows. AB 295 (Corbett), Chapter 247, Statutes of 1999, the Gun Show Enforcement and Security Act of 2000, added a plethora of requirements for gun shows. To obtain a certificate of eligibility from the DOJ, a promoter must certify that he or she is familiar with existing law regarding gun shows; obtain at least $1,000,000 of liability insurance; provide an annual list of gun shows the applicant plans to promote; pay an annual fee; make available to local law enforcement a complete list of all entities that have rented any space at the show; submit not later than 15 days before the start of the show an event and security plan; submit a list to DOJ of prospective vendors and designated firearms transfer agents who are licensed dealers; provide photo identification of each vendor and vendor's employee; prepare an annual event and security plan; and require all firearms carried onto the premises of a show to be checked, cleared of ammunition, secured in a way that they cannot be operated, and have an identification tag or sticker attached. AB 295 also provided for a number of penalties for a gun show producer's willful failure to comply with the specified requirements.

In California, gun transactions at gun shows are treated no differently than any other private party transaction. This means that such transfers must be completed through a licensed California dealer. Such a transfer requires a background check and is subject to the mandatory ten day waiting period prior to delivering the firearm to the purchaser. California's strict gun show regulations may help to prevent increases in firearm deaths and injuries following gun shows. (See Ellicott C. Matthay, et al., "In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries," Annals of Internal Medicine (2017) Vol. 1 Iss. 8.)

3) **Banning Gun Shows on State Agricultural Land**: There have been several legislative attempts to regulate gun shows in Agricultural District 1A in San Mateo and San Francisco Counties at a location commonly known as the "Cow Palace." SB 221 (Wiener) of 2018, SB 475 (Leno) of 2013, SB 585 (Leno) of 2009, and others, all attempted to either ban gun shows at the Cow Palace altogether, or require prior approval from the county Board Supervisors prior to entering into a contract for holding a gun show there. All three attempts were vetoed by then-Governors Schwarzenegger and Brown.

Then, in 2019, AB 893 (Gloria) Chapter 731, Statutes of 2019, added a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunition at the Del Mar Fairgrounds, effectively terminating the possibility for future gun shows at the Del Mar Fairgrounds. AB 893 was signed into law by Governor Newsom. This bill would expand the provisions of AB 893 by including all state property within the prohibition on the sale or transfer of firearms and ammunition.

4) **Constitutional Implications**: A federal judge recently ruled that California's ban on the AR-15 assault rifle is unconstitutional. (*See Miller v. Bonta,* (June 4, 2021) U.S. Dist. LEXIS 105640.) *Miller* becomes the third federal district court decision to find a California firearms regulation unconstitutional under the Second Amendment to the United States Constitution, joining *Rhode v. Becerra* (S.D. Cal., 2020) 445 F. Supp. 3d 902 (ammunition background checks), and *Duncan v. Becerra* (9th Cir., 2020) 970 F.3d 1133 (high-capacity magazines). All three of these decisions were made by the same federal judge. *Duncan* was upheld by the Ninth Circuit Court of Appeals, but is now pending a rehearing *en banc*. *Rhode* and *Miller* have been stayed pending further proceedings.

This bill is also likely to generate constitutional challenges. Opponents to the bill have cited to the Ninth Circuit Court of Appeals, which has held that "an offer to sell firearms or ammunition" is constitutionally protected commercial speech under the First Amendment to the United States Constitution. (*Nordyke v. Santa Clara County* (2009) 110 F.3d 707, 710.) This bill does not specifically prohibit "an offer" to sell guns or ammunition, but it does prohibit contracting for such a transaction. Opponents assert that such a prohibition constitutes impermissible viewpoint discrimination. They also state that this bill unduly burdens rights guaranteed by the Second Amendment.

5) **Argument in Support**: According to >

6) **Argument in Opposition**: According to >

7) **Related Legislation**: AB 311 (Ward) would prohibit a vendor at a gun show or event from possessing, displaying, offering to sell, selling, or transferring a firearm precursor part. AB 311 was held in the Assembly Appropriations Committee suspense file.

8) **Prior Legislation**:

a) AB 893 (Gloria) Chapter 731, Statutes of 2019, prohibited the sale of firearms and ammunitions at the Del Mar Fairgrounds in the County of San Diego and the City of Del Mar.

b) SB 221 (Wiener) of the 2017-18 Legislative Session, would have prohibited the sale of firearms and ammunitions at the Cow Palace located in San Mateo County and San Francisco County. SB 221 was vetoed by Governor Brown.

c) SB 475 (Leno), of the 2013-14 Legislative Session, would have required gun shows at the Cow Palace to have prior approval of both the Board of Supervisors of the County of San Mateo and the City and County of San Francisco, as specified. SB 475 was vetoed by Governor Brown.

d) SB 585 (Leno), of the 2009-10 Legislative Session, would have prohibited events at which any firearm or ammunition is sold at the Cow Palace, as specified. SB 585 was vetoed by Governor Schwarzenegger.

e) AB 2948 (Leno), of the 2007-08 Legislative Session, would have prohibited the sale of firearms or ammunition at the Cow Palace. AB 2948 failed passage on the Senate Floor.

f) SB 1733 (Speier), of the 2003-04 Legislative Session, would have required gun shows at the Cow Palace to have prior approval of both the Board of Supervisors of the County of San Mateo and the City and County of San Francisco, as specified. SB 1733 failed passage on the Assembly Floor.

g) AB 295 (Corbett), Chapter 247, Statutes of 1999, established the Gun Show Enforcement and Security Act of 2000, which includes a number of requirements for producers that promote gun shows.

0069

h)  AB 1107 (Ortiz), of the 1997-98 Legislative Session, would have authorized any city, county or agricultural association to prohibit gun sales at gun shows or events. AB 1107 failed in the Assembly Appropriations Committee.

**REGISTERED SUPPORT / OPPOSITION**:


**Support**

American Academy of Pediatrics, California
Brady Orange County
Canyon Democrats
City of Solana Beach
Democrats of Greater Irvine
Hb Huddle
Laguna Beach Democratic Club
Laguna Woods Democratic Club
League of Women Voters of California
Neveragainca
Office of Chair Nathan Fletcher, San Diego County Board of Supervisors
Peace and Justice Commission From St Mark Presbyterian Church in Newport Beach
San Diegans for Gun Violence Prevention
San Diego; City of
Santa Barbara Women's Political Committee
The Violence Prevention Coalition of Orange County
Women for American Values and Ethics Action Fund
Women For: Orange County

**Oppose**

Black Brant Group, the
Cal-ore Wetlands and Waterfowl Council
California Bowmen Hunters/state Archery Association
California Deer Association
California Houndsmen for Conservation
California Rifle and Pistol Association, INC.
California Sportsman's Lobby, INC.
California Statewide Law Enforcement Association
California Waterfowl Association
Gun Owners of California, INC.
National Rifle Association - Institute for Legislative Action
National Shooting Sports Foundation, INC.
Nor-cal Guides and Sportsmen's Association
Outdoor Sportsmen's Coalition of California
Peace Officers Research Association of California (PORAC)
Rural County Representatives of California
Safari Club International - California Chapters
San Diego County Wildlife Federation
San Francisco Bay Area Chapter - Safari Club International

**0070**

Tulare Basin Wetlands Association
Western Fairs Association

1 private individual

**Analysis Prepared by**: Matthew Fleming / PUB. S. / (916) 319-3744

# EXHIBIT 13

SB 264
Page 1

Date of Hearing:  August 19, 2021

ASSEMBLY COMMITTEE ON APPROPRIATIONS
Lorena Gonzalez, Chair
SB 264 (Min) – As Amended June 15, 2021

Policy Committee:    Public Safety                                       Vote:    5 - 2

Urgency:  No          State Mandated Local Program:  Yes          Reimbursable:  Yes

**SUMMARY**:

This bill prohibits the sale of any firearm, firearm precursor part or ammunition on state
property, except as specified.

**FISCAL EFFECT**:

Possible loss of revenue (Fair and Exposition Fund) in the millions of dollars across all district
agricultural associations that currently allow gun shows on their property, to the extent  they are
unable to secure alternative events that could generate similar levels of revenue. The District of
Agricultural Association is a part of California Department of Food and Agriculture. Before the
enactment of AB 893 (Chiu), Chapter 731, Statutes of 2020, which prohibited the sale of
firearms and ammunition at the Del Mar Fairgrounds, there were five gun shows on the Del Mar
property in 2017 that resulted in approximately $304,000 in net revenue and three gun shows in
2018 that collected $146,000 in gross revenue. The Fair and Exposition Fund is funded by a
portion of state sales taxes generated at state fairs and events and is used to improve facilities at
fairgrounds. This bill may result in General Fund costs to the extent the state is required to
backfill any revenue lost as a result of this bill.

**COMMENTS**:

1) **Purpose.** According to the author:

>       While the Second Amendment protects the rights of individuals to
>       bear arms, it does not require our great State of California to use
>       taxpayer-owned property to disseminate more deadly firearms into
>       our communities. Given the clear linkage between the sale of guns
>       and the likelihood of gun violence in a community, our state must
>       stop being in the business of selling guns.

2) **Gun Shows.**  AB 295 (Corbett), Chapter 247, Statutes of 1999 requires gun shows to obtain
   a certificate of eligibility to operate from the Department of Justice (DOJ).  To obtain a
   certificate of eligibility from the DOJ, a promoter must certify that they are familiar with
   existing law regarding gun shows; obtain at least $1 million of liability insurance; provide an
   annual list of gun shows the applicant plans to promote; pay an annual fee; make available to
   local law enforcement a complete list of all entities that have rented any space at the show;
   submit not later than 15 days before the start of the show an event and security plan; submit a
   list to DOJ of prospective vendors and designated firearms transfer agents who are licensed

0073

dealers; provide photo identification of each vendor and vendor's employee; prepare an
annual event and security plan; and require every firearm carried onto the premises of a show
to be checked, cleared of ammunition, secured in a way that it cannot be operated, and have
an identification tag or sticker attached.  Gun show certificates of eligibility must be
requested online via the DOJ Firearms Application Reporting System.  Fees associated with
obtaining a certificate of eligibility include the cost of the initial COE Application ($71).
Renewal applications cost $22. DOJ does not anticipate any costs as a result of this bill,
however, prohibiting gun shows at state fairgrounds may result in loss of application
revenue.

There have been several legislative attempts to regulate gun shows in San Mateo and San
Francisco counties at a location commonly known as the "Cow Palace."  SB 221 (Wiener) of
the 2017-18 Legislative Session, SB 475 (Leno) of the 2013-14 Legislative Session, SB 585
(Leno) of the 2009-10 Legislative Session and others, all attempted to either ban gun shows
at the Cow Palace altogether, or require prior approval from the county San Mateo and San
Francisco boards of supervisors prior to entering into a contract for holding a gun show there.
All three attempts were vetoed by then-Governors Schwarzenegger and Brown.

3) **Argument in Support.** According to American Academy of Pediatrics California:

> Gun violence is among the greatest public health crises facing
> children and youth. Nearly 7,000 children younger than 18 are
> killed or wounded by gunshots each year. Firearm-related deaths
> are the third leading cause of death for children ages 1 to 17,
> outpaced only by death from car crashes and drownings and
> illnesses like cancer. …SB 264 is one more step in protecting
> California's children from gun violence.

4) **Argument in Opposition.** According to the Rural County Representatives of California:

> Over the past two decades, District Agriculture Association
> (DAA)/county fairs have been financially struggling and are at a
> near breaking point. California's fairgrounds play a major role in
> the economies of the communities/counties where they are located.
> Beyond the annual "fair" event filled with corndogs and Ferris
> wheels, fair facilities host hundreds of events year-round. These
> facilities are home to various events such as gun shows, dog
> shows, RV shows, bridal shows, and other retail opportunities. SB
> 264 would prohibit these fairs from holding gun shows and as a
> result erode the revenue stream that would be derived from legal
> gun shows on these premises.

**Analysis Prepared by**: Kimberly Horiuchi / APPR. / (916) 319-2081

# EXHIBIT 14

SENATE THIRD READING
SB 264 (Min)
As Amended  August 30, 2021
Majority vote

## SUMMARY

Prohibits the sale of any firearm, firearm precursor part, or ammunition on the property of the 32nd District Agricultural Association.

**Major Provisions**

1) Prohibits a an officer, employee, operator, lessee, or licensee of the 32nd District Agricultural Association, as defined, from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the Orange County Fair and Event Center, as specified..

2) Provides that the prohibition does not apply to any of the following:

   a) A gun buyback event held by a law enforcement agency;

   b) The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties;

   c) The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2022; and,

   d) The purchase of ammunition on state property by a law enforcement agency in the course of its regular duties.

2) Makes Legislative findings and declarations.

## COMMENTS

**According to the Author**

"County fairgrounds are intended to be family friendly venues. Instead, they've become known for hosting gun shows. While the Second Amendment protects the rights of individuals to bear arms, it does not require our great State of California to use taxpayer-owned property to disseminate more deadly firearms into our communities. Given the clear linkage between the sale of guns and the likelihood of gun violence in a community, our state must stop being in the business of selling guns. Unfortunately, all too often this year, we've seen headline after headline of terrible tragedies throughout the nation and California – two shootings in my district and in San Jose in May. Enough is enough."

**Arguments in Support**

According to the *American Academy of Pediatrics California*:  "Gun violence is among the greatest public health crises facing children and youth. Nearly 7,000 children younger than 18 are killed or wounded by gunshots each year. Firearm-related deaths are the third leading cause

**0076**

of death for children ages 1 to 17, outpaced only by death from car crashes and drownings and illnesses like cancer.

"In 2018, Governor Gavin Newsom (then Lt. Governor) supported AB 893 (Gloria) [Chapter 731], a bill which ended gun shows at the Del Mar State Fairground. At that time, Newsom stated, "permitting the sale of firearms and ammunition on state-owned property only perpetuates America's gun culture at a time when 73 percent of Californians support gun reform measures." AB 893 was signed into law on October 11, 2019. SB 264 seeks to extend the prohibition of firearm and ammunition sales to all state-owned and county-owned properties.

"The American Academy of Pediatrics (AAP) policy states, "the absence of guns from children's homes and communities is the most reliable and effective measure to prevent firearm-related injuries to children and adolescents."  SB 264 is one more step in protecting California's children from gun violence. AAP-CA strongly supports SB 264. Thank you for your public service and leadership on behalf of the health and wellbeing of children, youth, and families in California."

**Arguments in Opposition**
According the National Rifle Association:  "California has stringent laws when it comes to the purchase, possession, and transfer of all firearms. In order for a person to purchase any firearm in California, they must possess a firearm safety certificate, pass a criminal background check and wait 10 days prior to receipt. The involvement of a licensed dealer is generally required for all firearms sales/transfers in addition to the sale or transfer of firearm precursor parts or ammunition, absent very narrow and limited circumstances. The restrictions on the sale and transfer of firearms, firearm precursor parts and ammunition applies to gun shows as well. Transactions at these events require strict adherence to the law and the process for completing the transfer is no different than if it had occurred at a nearby brick and mortar shop.

"Studies have shown that firearms acquired at gun shows are not any more likely to be used in crime. This legislation fails to adequately balance the need to prohibit all gun shows at state controlled property versus the interests of the gun shows' promoters, vendors and attendees – individuals who will now be left with limited venues to convene to share in their mutual interest in the shooting sports in a commercial setting.

"We encourage the author to explore proposals that go after the criminal misuse of firearms instead of putting forward proposals that place further restrictions on the rights of law-abiding citizens."

## FISCAL COMMENTS

According to the Assembly Appropriations Committee, possible loss of revenue (Fair and Exposition Fund) in the low hundreds of thousands of dollars to the 32nd Agricultural District, to the extent its facilities are unable to secure alternative events that could generate similar levels of revenue as gun shows.

SB 264
Page 3

## VOTES

**SENATE FLOOR: 29-9-2**
**YES:** Allen, Archuleta, Atkins, Becker, Bradford, Caballero, Cortese, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hertzberg, Hueso, Kamlager, Laird, Leyva, Limón, McGuire, Min, Newman, Pan, Portantino, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**NO:** Bates, Borgeas, Dahle, Grove, Jones, Melendez, Nielsen, Ochoa Bogh, Wilk
**ABS, ABST OR NV:** Hurtado, Roth

**ASM PUBLIC SAFETY: 5-2-1**
**YES:** Jones-Sawyer, Bauer-Kahan, Lee, Santiago, Wicks
**NO:** Lackey, Seyarto
**ABS, ABST OR NV:** Quirk

**ASM APPROPRIATIONS: 12-4-0**
**YES:** Lorena Gonzalez, Bryan, Calderon, Carrillo, Chau, Gabriel, Eduardo Garcia, Levine, Quirk, Robert Rivas, Akilah Weber, Kalra
**NO:** Bigelow, Megan Dahle, Davies, Fong

## UPDATED

VERSION: August 30, 2021

CONSULTANT:  Matthew  Fleming / PUB. S. / (916) 319-3744          FN: 0001299

**0078**

# EXHIBIT 15

**SENATE RULES COMMITTEE**                                        SB 264
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

## UNFINISHED BUSINESS

---

Bill No:   SB 264
Author:    Min (D), et al.
Amended:   8/30/21
Vote:      21

---

SENATE PUBLIC SAFETY COMMITTEE:  4-1, 3/16/21
AYES:  Bradford, Kamlager, Skinner, Wiener
NOES:  Ochoa Bogh

SENATE APPROPRIATIONS COMMITTEE:  5-2, 5/20/21
AYES:  Portantino, Bradford, Kamlager, Laird, Wieckowski
NOES:  Bates, Jones

SENATE FLOOR:  29-9, 6/1/21
AYES:  Allen, Archuleta, Atkins, Becker, Bradford, Caballero, Cortese, Dodd,
   Durazo, Eggman, Glazer, Gonzalez, Hertzberg, Hueso, Kamlager, Laird, Leyva,
   Limón, McGuire, Min, Newman, Pan, Portantino, Rubio, Skinner, Stern,
   Umberg, Wieckowski, Wiener
NOES:  Bates, Borgeas, Dahle, Grove, Jones, Melendez, Nielsen, Ochoa Bogh,
   Wilk
NO VOTE RECORDED:  Hurtado, Roth

ASSEMBLY FLOOR:  51-21, 9/2/21 - See last page for vote

---

**SUBJECT:**  Firearms:  state and county property

**SOURCE:**    Author

---

**DIGEST:**  This bill prohibits the sale of firearms, firearm precursor parts, or
ammunition on the property of the 32nd District Agricultural Association (Orange
County Fair and Event Center).

*Assembly Amendments* limit the provisions of the bill to the Orange County Fair
and Event Center.  The version that was voted off of the Senate Floor covered all
state property.

**0080**

**ANALYSIS:**

Existing law:

1) Provides that bringing or possessing a firearm within any state or local public building is punishable by imprisonment in a county jail for not more than one year, or in the state prison, unless a person brings any weapon that may be lawfully transferred into a gun show for the purpose of sale or trade. (Pen. Code §§ 171b subd. (a), 171b subd. (b)(7)(A).)

2) Prohibits the sale, lease, or transfer of firearms without a license, unless the sale, lease, or transfer is pursuant to operation of law or a court order, made by a person who obtains the firearm by intestate succession or bequest, or is an infrequent sale, transfer, or transfer, as defined. (Pen. Code § 26500, 26505, 26520.)

3) Excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice (DOJ) from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

4) Permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

5) States that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

6) States that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from DOJ. (Pen. Code § 27200.)

7) Specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the DOJ, as specified.  (Pen. Code §§ 27200, 27245.)

8) Specifies that unless a different penalty is expressly provided, a violation of any provision of the Food and Agricultural code is a misdemeanor.  (Food and Agr. Code, § 9.)

This bill:

1) Prohibits an officer, employee, operator, lessee, or licensee of the 32nd District Agricultural Association, as defined, from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the Orange County Fair and Event Center, as specified.

2) Exempts from its provisions a gun buyback event held by a law enforcement agency, the sale of a firearm by a public administrator, public guardian, or public conservator within the course of their duties, a sale that occurs pursuant to a contract that was entered into before January 1, 2022, and the purchase of ammunition on state property by a law enforcement agency in the course of its regular duties. Because a violation of this prohibition would be a crime, this bill imposes a state-mandated local program.

3) Makes findings and declarations.

**Background**

Gun shows are essentially a flea market for firearms. At gun shows, individuals may buy, sale, and trade firearms and fire-arms related accessories. These events typically attract several thousand people, and a single gun show can have sales of over 1,000 firearms over the course of one weekend.[1]

According to the NRA's Institute for Legislative Action, less than one percent of inmates incarcerated in state prisons for gun crimes acquired their firearms at a gun show.[2] However, gun shows rank second to corrupt dealers as a source for illegally trafficked firearms. Though violent criminals do not buy most of their guns directly from gun shows, gun shows are "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market."[3]

Concerns about gun shows extend beyond the state. A report by the Government Accountability Office regarding gun trafficking to Mexico confirmed that many

---

[1] Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/file/57506/download.
[2] NRA-ILA, https://www.nraila.org/get-the-facts/background-checks-nics.
[3] Center for American Progress, http://www.americanprogress.org/issues/guns-crime/report/2013/12/13/80795/the-gun-debate-1-year-after-newtown/.

SB 264
Page  4

traffickers buy guns at gun shows.[4] 87 percent of firearms seized by Mexican
authorities and traced in the last five years originated in the United States,
according to data from DOJ's Bureau of Alcohol, Tobacco, Firearms and
Explosives. According to United States and Mexican government officials, these
firearms have been increasingly more powerful and lethal in recent years. Many of
these firearms come from gun shops and gun shows in south-west border-states.[5]

AB 295 (Corbett, Chapter 247, Statutes of 1999), the Gun Show Enforcement and
Security Act of 2000, added a number of requirements for gun shows. To obtain a
certificate of eligibility from the DOJ, a promoter must certify that he or she is
familiar with existing law regarding gun shows; obtain at least $1 million of
liability insurance; provide an annual list of gun shows the applicant plans to
promote; pay an annual fee; make available to local law enforcement a complete
list of all entities that have rented any space at the show; submit not later than 15
days before the start of the show an event and security plan; submit a list to DOJ of
prospective vendors and designated firearms transfer agents who are licensed
dealers; provide photo identification of each vendor and vendor's employee;
prepare an annual event and security plan; and require all firearms carried onto the
premises of a show to be checked, cleared of ammunition, secured in a way that
they cannot be operated, and have an identification tag or sticker attached. AB 295
also provided for a number of penalties for a gun show producer's willful failure to
comply with the specified requirements. California's strict gun show regulations
may help to prevent increases in firearm deaths and injuries following gun shows.
(See Ellicott C. Matthay, et al., "*In-State and Interstate Associations Between Gun
Shows and Firearm Deaths and Injuries*," Annals of Internal Medicine (2017) Vol.
1 Iss. 8.)

In addition to state laws regulating gun shows, a total ban on gun shows on county
property is within the scope of a county's authority. "Under California
Government Code section 23004(d), a county is given substantial authority to
manage its property, including the most fundamental decision as to how the
property will be used and that nothing in the gun show statutes evince intent to
override that authority. The gun show statutes do not mandate that counties use
their property for such shows. If the county does allow such shows, it may impose
more stringent restrictions on the sale of firearms than state law prescribes."
(*Nordyke v. Santa Clara County* (9th Cir. Cal. 1997) 110 F.3d 707, 766.)
However, counties do not have authority to prohibit gun shows on state property
such as Cow Palace.

---

[4] https://www.gao.gov/assets/680/674570.pdf.
[5] https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf.

0083

There have been several legislative attempts to regulate gun shows on State
Agricultural Land—most notably, SB 475 (Leno, 2014) and SB 585 (Leno, 2010),
which were both vetoed.

SB 585 would have prohibited gun shows at Cow Palace. SB 585 would have
additionally required the Cow Palace DAA to replace gun show events with non-
firearm or non-ammunition related events. In his veto message, Governor
Schwarzenegger stated that SB 585 would "set a confusing precedent at the state
level by statutorily prohibiting one [DAA] from selling firearms and ammunition, a
legal and regulated activity, while allowing other DAAs to continue to do so. In
addition, [SB 585] would result in decreased state and local tax revenues by
restricting events at the Cow Palace." Unlike SB 585, this bill will not impair any
of Cow Palace's ongoing contracts because, if chaptered, it will not become
operative until January 1, 2020.

Another attempt to prohibit gun sales at Cow Palace was similarly vetoed by
Governor Brown. SB 475 would have permitted gun shows at Cow Palace only
upon prior approval by resolution adopted by both the Board of Supervisors of the
County of San Mateo and the Board of Supervisors of the City and County of San
Francisco. SB 475 was vetoed by because it required the Cow Palace DAA to
obtain approval from the County of San Mateo and the City and County of San
Francisco prior to entering into a contract for a gun show on state property. In his
veto message, Governor Brown stated, "I encourage all [DAAs] to work with their
local communities when determining their operations and events. [SB 475],
however, totally pre-empts the Board of Directors of the Cow Palace from
exercising its contracting authority whenever a gun show is involved. I prefer to
leave these decisions to the sound discretion of the Board." Under SB 475, the
Cow Palace DAA would have been permitted to host gun shows, but only at the
discretion of San Francisco and San Mateo counties. In practice, SB 475 would
have allowed the Board of Cow Palace to permit some approved gun shows, and
required it to prohibit other non-county-approved gun shows. In comparison, this
bill instead completely prohibits all gun shows at Cow Palace.

In 2018, SB 221 (Wiener) contained very similar provisions to this bill. SB 221
would have prohibited any officer, employee, operator, or lessee of Agriculture
District 1-A, from contracting for, authorizing, or allowing the sale of any firearm
or ammunition at the Cow Palace property in San Mateo County and San Francisco
County. Like this bill, SB 221 had an implementation date in 2020 and exempted
law enforcement firearm buy-back events. Unlike this bill, SB 221 failed to exempt
existing contracts to host firearms events. SB 221 was vetoed by Governor Brown
with the following veto message:

0084

This bill would prohibit the sale of firearms and ammunition at the District Agricultural Association 1A, commonly known as the Cow Palace.

This bill has been vetoed twice over the last ten years, once by myself, and once by Governor Schwarzenegger.

The decision on what kind of shows occur at the Cow Palace rests with the local board of directors which, incidentally, represents a broad cross section of the community. They are in the best position to make these decisions.

Then, in 2019, AB 893 (Gloria) added a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified. Therefore, the bill effectively terminated the possibility for future gun shows at the Del Mar Fairgrounds. The bill was signed into law by Governor Newsom and Chaptered as 731 in the Statutes of 2019.

This bill adds the property of the 32nd District Agricultural Association to the provisions of SB 893 (Gloria).

**FISCAL EFFECT:**  Appropriation:  No    Fiscal Com.:   Yes    Local:  Yes

According to the Assembly Appropriations Committee, possible loss of revenue (Fair and Exposition Fund) in the millions of dollars across all district agricultural associations that currently allow gun shows on their property, to the extent they are unable to secure alternative events that could generate similar levels of revenue. The District of Agricultural Association is a part of California Department of Food and Agriculture. Before the enactment of AB 893 (Gloria, Chapter 731, Statutes of 2020), which prohibited the sale of firearms and ammunition at the Del Mar Fairgrounds, there were five gun shows on the Del Mar property in 2017 that resulted in approximately $304,000 in net revenue and three gun shows in 2018 that collected $146,000 in gross revenue. The Fair and Exposition Fund is funded by a portion of state sales taxes generated at state fairs and events and is used to improve facilities at fairgrounds. This bill may result in General Fund costs to the extent the state is required to backfill any revenue lost as a result of this bill.

**SUPPORT:**  (Verified  9/2/21)

American Academy of Pediatrics, California
Brady Orange County
Canyon Democrats
City of San Diego

SB 264
Page  7

City of Solana Beach
Democrats of Greater Irvine
HB Huddle
Laguna Beach Democratic Club
Laguna Woods Democratic Club
League of Women Voters of California
NeverAgainCA
Office of Chair Nathan Fletcher, San Diego County Board of Supervisors
Peace and Justice Commission - St Mark Presbyterian Church in Newport Beach
San Diegans for Gun Violence Prevention
Santa Barbara Women's Political Committee
The Violence Prevention Coalition of Orange County
Women for American Values and Ethics Action Fund
Women For: Orange County

**OPPOSITION:**  (Verified  9/2/21)

Black Brant Group
California Bowmen Hunters/State Archery Association
California Deer Association
California Houndsmen for Conservation
California Rifle and Pistol Association, INC.
California Sportsman's Lobby
California Statewide Law Enforcement Association
California Waterfowl Association
Cal-Ore Wetlands and Waterfowl Council
Gun Owners of California, INC.
National Rifle Association - Institute for Legislative Action
National Shooting Sports Foundation, INC.
Nor-Cal Guides and Sportsmen's Association
Outdoor Sportsmen's Coalition of California
Peace Officers Research Association of California
Rural County Representatives of California
Safari Club International - California Chapters
Safari Club International, California Coalition
San Diego County Wildlife Federation
San Francisco Bay Area Chapter - Safari Club International
Tulare Basin Wetlands Association
Western Fairs Association
Wild Sheep Foundation, California Chapter

**0086**

SB 264
Page 8

ASSEMBLY FLOOR:  51-21, 9/2/21
AYES:  Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Berman, Bloom, Boerner
  Horvath, Bryan, Burke, Calderon, Carrillo, Cervantes, Chau, Chiu, Daly,
  Friedman, Gabriel, Cristina Garcia, Eduardo Garcia, Gipson, Lorena Gonzalez,
  Grayson, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Levine, Maienschein,
  McCarty, Medina, Mullin, Muratsuchi, Nazarian, O'Donnell, Petrie-Norris,
  Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Blanca Rubio,
  Santiago, Stone, Ting, Villapudua, Ward, Akilah Weber, Wicks, Wood
NOES:  Bigelow, Chen, Choi, Cooley, Cunningham, Megan Dahle, Davies, Flora,
  Fong, Gallagher, Gray, Kiley, Lackey, Mathis, Patterson, Salas, Seyarto, Smith,
  Valladares, Voepel, Waldron
NO VOTE RECORDED:  Cooper, Frazier, Low, Mayes, Nguyen, Rodriguez,
  Rendon


Prepared by:   Gabe Caswell / PUB. S. /
9/2/21 18:49:46

**\*\*\*\*  END  \*\*\*\***

**0087**

# EXHIBIT 16

## Senate Bill No. 915

### CHAPTER 145

An act to add Section 27573 to the Penal Code, relating to firearms.

[Approved by Governor July 21, 2022. Filed with Secretary of State July 21, 2022.]

LEGISLATIVE COUNSEL'S DIGEST

SB 915, Min. Firearms: state property.

Existing law generally regulates the sale and transfer of firearms, including, among other things, requiring transactions of firearms to be completed through a licensed firearms dealer. Existing law generally makes a violation of the requirements relating to the sale, lease, or transfer of a firearm a misdemeanor.

Existing law, except as specifically exempted, prohibits an officer, employee, operator, lessee, or licensee of the 32nd District Agricultural Association, as defined, from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the OC Fair and Event Center, as specified.

This bill would, except as exempted, prohibit a state officer or employee, or operator, lessee, or licensee of any state-owned property, from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on state property, as specified. Because a violation of this prohibition would be a crime, this bill would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.   Section 27573 is added to the Penal Code, to read:

27573.   (a)  A state officer or employee, or operator, lessee, or licensee of any state property, shall not contract for, authorize, or allow the sale of any firearm, firearm precursor part, or ammunition on state property or in the buildings that sit on state property or property otherwise owned, leased, occupied, or operated by the state.

(b)  This section does not apply to any of the following:

(1)  A gun buyback event held by a law enforcement agency.

95

(2)  The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties.

(3)  The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2023.

(4)  The purchase of firearms, firearm precursor parts, or ammunition on state property by a law enforcement agency in the course of its regular duties.

(5)  The sale or purchase of a firearm pursuant to subdivision (b) or (c) of Section 10334 of the Public Contract Code.

SEC. 2.   No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

# EXHIBIT 17

## SENATE COMMITTEE ON PUBLIC SAFETY
### Senator Steven Bradford, Chair
### 2021 - 2022  Regular

| | | | | |
|---|---|---|---|---|
| **Bill No:** | SB 915 | **Hearing Date:** | March 8, 2022 | |
| **Author:** | Min | | | |
| **Version:** | February 2, 2022 | | | |
| **Urgency:** | No | **Fiscal:** | Yes | |
| **Consultant:** | AB | | | |

**Subject:**  *Firearms:  state property*

## HISTORY

Source:        Author

Prior Legislation:        SB 264 (Min), Ch. 684, Stats. of 2021
AB 893 (Gloria), Ch. 731, Stats. of 2019
SB 221 (Wiener), 2017, vetoed
SB 475 (Leno), 2013, vetoed
SB 585 (Leno), 2009, vetoed
AB 2948 (Leno), 2008, failed passage on the Senate Floor
SB 1733 (Speier), 2004, failed passage on the Assembly Floor
AB 295 (Corbett), Ch. 247, Stats. of 1999
AB 1107 (Ortiz), 1997, failed passage in Assembly Appropriations

Support:        Brady Orange County; Brady United Against Gun Violence, Ventura County Chapter; Democratic Club of Cornejo Valley; Friends Committee on Legislation of California; Laguna Woods Democratic Club; NeverAgainCA; San Diego County Board of Supervisors; Santa Barbara Women's Political Committee; Ventura County; Violence Prevention Coalition of Orange County

Opposition:        Black Brant Group; Cal-ore Wetlands and Waterfowl Council; California Bowmen Hunters/State Archery Association; California Chapter Wild Sheep Foundation; California Deer Association; California Houndsmen for Conservation; California Rifle and Pistol Association; California Sportsman's Lobby, INC.; California Waterfowl Association; Gun Owners of California; National Rifle Association – Institute for Legislative Action; Nor-cal Guides and Sportsmen's Association; Outdoor Sportsmen's Coalition of California; Peace Officers Research Association of California; Rocky Mountain Elk Foundation; Safari Club International – California Chapters; San Diego County Wildlife Federation; San Francisco Bay Area Chapter - Safari Club International; Tulare Basin Wetlands Association

## PURPOSE

***The purpose of this legislation is to prohibit the sale of firearms, firearm precursor parts and ammunition on state property.***

*Existing law* provides that bringing or possessing a firearm within any state or local public building is punishable by imprisonment in a county jail for not more than one year, or in the state

**0092**

prison, unless a person brings any weapon that may be lawfully transferred into a gun show for the purpose of sale or trade. (Pen. Code §§ 171b subd. (a), 171b subd. (b)(7)(A).)

*Existing law* prohibits the sale, lease, or transfer of firearms without a license, unless the sale, lease, or transfer is pursuant to operation of law or a court order, made by a person who obtains the firearm by intestate succession or bequest, or is an infrequent sale, transfer, or transfer, as defined. (Pen. Code § 26500, 26505, 26520.)

*Existing law* excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

*Existing law* permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

*Existing law* states that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

*Existing law* states that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the Department of Justice. (Pen. Code § 27200.)

*Existing law* specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the Department of Justice, as specified.  (Pen. Code §§ 27200, 27245.)

*Existing law* provides that an officer, employee, operator, lessee or licensee of the 32nd District Agricultural Association shall not contract for, authorize, or allow the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the Orange County (OC) Fair and Event Center, in the County of Orange, the City of Costa Mesa, or any successor or additional property owned, leased or otherwise occupied or operated by the district. (Pen. Code §27575(a).)

*Existing law* exempts the following from the prohibition in Penal Code § 27575(a):

- A gun buyback event held by a law enforcement agency.
- The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties
- The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2022.
- The purchase of ammunition on state property by a law enforcement agency in the course of its regular duties. (Pen. Code §27575(b).)

*Existing law* specifies that unless a different penalty is expressly provided, a violation of any provision of the Food and Agricultural code is a misdemeanor.  (Food and Agr. Code, § 9.)

*This bill* prohibits a state officer or employee, or operator, lessee, or licensee of any state property from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on state property or property otherwise owned, leased, occupied, or operated by the state.

*This bill* exempts the following from the prohibition above:
- A gun buyback event held by a law enforcement agency.
- The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties
- The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2023.
- The purchase of ammunition on state property by a law enforcement agency in the course of its regular duties.

## COMMENTS

### 1.  Need for This Bill

According to the author:

> "County fairgrounds are meant to be a safe and welcome space for community gatherings. Instead, these tax-payer owned properties are used to facilitate the sales of guns and ammunition. According to the Giffords Law Center to Prevent Gun Violence, gun shows often create the opportunity to "circumvent gun safety laws" and are a common venue for straw purchases and illegal gun transfers.

> Additionally, a Bureau of Alcohol, Tobacco, and Firearms report described gun shows as a "major trafficking channel" and found that gun shows were the second largest source of illegally trafficked firearms.  The state should not play a role in facilitating or profiting off of the sales of these deadly weapons.  Instead, the creation of statewide safeguards is necessary to ensure fairgrounds remain safe, family-friendly venues."

### 2.  Gun Shows Generally

Gun shows are essentially a flea market for firearms. At gun shows, individuals may buy, sale, and trade firearms and related accessories. These events typically attract several thousand people, and a single gun show can have sales of over 1,000 firearms over the course of one weekend.[1]

According to the NRA's Institute for Legislative Action, less than one percent of inmates incarcerated in state prisons for gun crimes acquired their firearms at a gun show.[2] However, gun shows rank second to corrupt dealers as a source for illegally trafficked firearms. Though violent criminals do not buy most of their guns directly from gun shows, gun shows are "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market."[3]

---

[1] Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/file/57506/download.
[2] NRA-ILA, https://www.nraila.org/get-the-facts/background-checks-nics.
[3] Center for American Progress, http://www.americanprogress.org/issues/guns-crime/report/2013/12/13/80795/the-gun-debate-1-year-after-newtown/.

Concerns about gun shows extend beyond the state. A report by the Government Accountability Office regarding gun trafficking to Mexico confirmed that many traffickers buy guns at gun shows.[4] In fact, 87% of firearms seized by Mexican authorities and traced in the last 5 years originated in the United States, according to data from DOJ's Bureau of Alcohol, Tobacco, Firearms and Explosives. According to United States and Mexican government officials, these firearms have been increasingly more powerful and lethal in recent years. Many of these firearms come from gun shops and gun shows in south-west border-states.[5]

### 3.   Gun Show Regulations in California

AB 295 (Corbett, Chapter 247, Statutes of 1999), the Gun Show Enforcement and Security Act of 2000, added a number of requirements for gun shows. To obtain a certificate of eligibility from the DOJ, a promoter must certify that he or she is familiar with existing law regarding gun shows; obtain at least $1 million of liability insurance; provide an annual list of gun shows the applicant plans to promote; pay an annual fee; make available to local law enforcement a complete list of all entities that have rented any space at the show; submit not later than 15 days before the start of the show an event and security plan; submit a list to DOJ of prospective vendors and designated firearms transfer agents who are licensed dealers; provide photo identification of each vendor and vendor's employee; prepare an annual event and security plan; and require all firearms carried onto the premises of a show to be checked, cleared of ammunition, secured in a way that they cannot be operated, and have an identification tag or sticker attached. AB 295 also provided for a number of penalties for a gun show producer's willful failure to comply with the specified requirements. California's strict gun show regulations may help to prevent increases in firearm deaths and injuries following gun shows. (See Ellicott C. Matthay, et al., "*In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries*," Annals of Internal Medicine (2017) Vol. 1 Iss. 8.)

In addition to state laws regulating gun shows, a total ban on gun shows on county property is within the scope of a county's authority. "Under California Government Code section 23004(d), a county is given substantial authority to manage its property, including the most fundamental decision as to how the property will be used and that nothing in the gun show statutes evince intent to override that authority. The gun show statutes do not mandate that counties use their property for such shows. If the county does allow such shows, it may impose more stringent restrictions on the sale of firearms than state law prescribes." (*Nordyke v. Santa Clara County* (9th Cir. Cal. 1997) 110 F.3d 707, 766.) However, counties do not have authority to prohibit gun shows on state property such as the Cow Palace in Daly City.

### 4.   Banning of Gun Shows on State Agricultural Land

There have been several legislative attempts to regulate gun shows on State Agricultural Land— most notably, SB 475 (Leno, 2014) and SB 585 (Leno, 2010), which were both vetoed.

SB 585 would have prohibited gun shows at Cow Palace. SB 585 would have additionally required the Cow Palace District Agricultural Association (DAA) to replace gun show events with non-firearm or non-ammunition related events. In his veto message, Governor Schwarzenegger stated that SB 585 would "set a confusing precedent at the state level by statutorily prohibiting one [DAA] from selling firearms and ammunition, a legal and regulated activity, while allowing

---

[4] https://www.gao.gov/assets/680/674570.pdf.
[5] https://www.ucdmc.ucdavis.edu/vprp/pdf/IGS/IGS1web.pdf.

other DAAs to continue to do so. In addition, [SB 585] would result in decreased state and local tax revenues by restricting events at the Cow Palace." This bill would apply to all DAAs equally.

Another attempt to prohibit gun sales at Cow Palace was similarly vetoed by Governor Brown. SB 475 would have permitted gun shows at Cow Palace only upon prior approval by resolution adopted by both the Board of Supervisors of the County of San Mateo and the Board of Supervisors of the City and County of San Francisco. SB 475 was vetoed by because it required the Cow Palace DAA to obtain approval from the County of San Mateo and the City and County of San Francisco prior to entering into a contract for a gun show on state property. In his veto message, Governor Brown stated, "I encourage all [DAAs] to work with their local communities when determining their operations and events. [SB 475], however, totally pre-empts the Board of Directors of the Cow Palace from exercising its contracting authority whenever a gun show is involved. I prefer to leave these decisions to the sound discretion of the Board." Under SB 475, the Cow Palace DAA would have been permitted to host gun shows, but only at the discretion of San Francisco and San Mateo counties. In practice, SB 475 would have allowed the Board of Cow Palace to permit some approved gun shows, and required it to prohibit other non-county-approved gun shows. In comparison, this bill instead completely prohibits all gun shows at Cow Palace.

In 2018, SB 221 (Wiener) contained very similar provisions to this bill. SB 221 would have prohibited any officer, employee, operator, or lessee of Agriculture District 1-A, from contracting for, authorizing, or allowing the sale of any firearm or ammunition at the Cow Palace property in San Mateo County and San Francisco County. Like this bill, SB 221 exempted law enforcement firearm buy-back events. Unlike this bill, SB 221 failed to exempt existing contracts to host firearms events. SB 221 was vetoed by Governor Brown with the following veto message:

> This bill would prohibit the sale of firearms and ammunition at the District Agricultural Association 1A, commonly known as the Cow Palace.
>
> This bill has been vetoed twice over the last ten years, once by myself, and once by Governor Schwarzenegger.
>
> The decision on what kind of shows occur at the Cow Palace rests with the local board of directors which, incidentally, represents a broad cross section of the community. They are in the best position to make these decisions.

Then, in 2019 AB 893 (Gloria) added a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds.  By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified. Therefore, this bill effectively terminated the possibility for future gun shows at the Del Mar Fairgrounds.  AB 893 was signed into law by Governor Newsom and Chaptered as 731 in the Statutes of 2019.

5.   **SB 264 (Min, 2021)**

SB 264 (Min, Ch. 684, Stats. of 2021) as initially introduced was almost identical to this bill, and would have enacted a similar statewide ban on firearm and ammunition sales on state property. That measure was subsequently amended to include precursor parts – which can be assembled into so-called "ghost guns" – in the prohibition on sales, and to exempt several governmental

functions and contractual obligations from the prohibition. The scope of SB 264 was ultimately limited by amendments taken in Assembly Appropriations Committee, confining the measure's applicability to firearm, precursor part and ammunition sales in Orange County. This bill renews the author's efforts to enact a statewide ban, and retains the exemptions and ban on precursor part sales from the final version of SB 264.

## 6.  Related Legislation

AB 1769 (Bennett) establishes a ban similar to that created by this bill, but limited to sales of firearms, precursor parts and ammunition in Ventura County. AB 1769 awaits a hearing in the Assembly Committee on Public Safety.

## 7.  Argument in Support

According to the Santa Barbara Women's Political Committee:

> "[…] Under current law gun shows have brought dangerous incidents to our community, including such incidents as sales of firearms to individuals registered in the Department of Justice Bureau of Firearms Prohibited Persons System, illegal importation of large-capacity magazines, and more. Our nation continues to endure an alarming increase of gun violence including mass murders that have devastated communities. By prohibiting gun shows on state properties, SB 915 would help to restore these properties to more family-friendly venues. It would also curtail the use of taxpayer dollars to facilitate placing more guns on our streets."

## 8.  Argument in Opposition

According to the National Rifle Association Institute for Legislative Action:

> "In order for a person to purchase any firearm in California, they must possess a firearm safety certificate, pass a criminal background check and wait 10 days prior to receipt. The involvement of a licensed dealer is generally required for all firearms sales/transfers in addition to the sale or transfer of firearm precursor parts or ammunition, absent very narrow and limited circumstances. The restrictions on the sale and transfer of firearms, firearm precursor parts and ammunition applies to gun shows as well. Transactions at these events require strict adherence to the law and the process for completing the transfer is no different than if it had occurred at a nearby brick and mortar shop.

> Studies have shown that firearms acquired at gun shows are not any more likely to be used in crime. This legislation fails to adequately balance the need to prohibit all gun shows at state controlled property versus the interests of the gun shows' promoters, vendors and attendees – individuals who will now be left with limited venues to convene to share in their mutual interest in the shooting sports in a commercial setting."

**-- END –**

# EXHIBIT 18

**SENATE RULES COMMITTEE**                                              SB 915
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

### THIRD READING

---

Bill No:      SB 915
Author:       Min (D), et al.
Introduced:   2/2/22
Vote:         21

---

SENATE PUBLIC SAFETY COMMITTEE:  4-1, 3/8/22
AYES:  Bradford, Kamlager, Skinner, Wiener
NOES:  Ochoa Bogh

SENATE APPROPRIATIONS COMMITTEE:  5-2, 5/19/22
AYES:  Portantino, Bradford, Kamlager, Laird, Wieckowski
NOES:  Bates, Jones

---

**SUBJECT:**  Firearms:  state property

**SOURCE:**   Author

---

**DIGEST:**  This bill prohibits the sale of firearms, firearm precursor parts and
ammunition on state property.

**ANALYSIS:**

Existing law:

1) Provides that bringing or possessing a firearm within any state or local public
   building is punishable by imprisonment in a county jail for not more than one
   year, or in the state prison, unless a person brings any weapon that may be
   lawfully transferred into a gun show for the purpose of sale or trade. (Pen.
   Code §§ 171b subd. (a), 171b subd. (b)(7)(A).)

2) Prohibits the sale, lease, or transfer of firearms without a license, unless the
   sale, lease, or transfer is pursuant to operation of law or a court order, made by
   a person who obtains the firearm by intestate succession or bequest, or is an
   infrequent sale, transfer, or transfer, as defined. (Pen. Code § 26500, 26505,
   26520.)

**0099**

SB 915
Page 2

3) Excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

4) Permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

5) States that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

6) States that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the Department of Justice. (Pen. Code § 27200.)

7) Specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the Department of Justice, as specified.  (Pen. Code §§ 27200, 27245.)

8) Provides that an officer, employee, operator, lessee or licensee of the 32nd District Agricultural Association shall not contract for, authorize, or allow the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the Orange County Fair and Event Center, in the County of Orange, the City of Costa Mesa, or any successor or additional property owned, leased or otherwise occupied or operated by the district. (Pen. Code §27575(a).)

9) Exempts the following from the prohibition in Penal Code § 27575(a):

   a) A gun buyback event held by a law enforcement agency.
   b) The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties.
   c) The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2022.

**0100**

SB 915
Page 3

d) The purchase of ammunition on state property by a law enforcement agency
in the course of its regular duties. (Pen. Code §27575(b).)

10) Specifies that unless a different penalty is expressly provided, a violation of
any provision of the Food and Agricultural Code is a misdemeanor.  (Food and
Ag. Code, § 9.)

This bill:

1) Prohibits a state officer or employee, or operator, lessee, or licensee of any
state property from contracting for, authorizing, or allowing the sale of any
firearm, firearm precursor part, or ammunition on state property or property
otherwise owned, leased, occupied, or operated by the state.

2) Exempts the following from the prohibition above:

a) A gun buyback event held by a law enforcement agency.
b) The sale of a firearm by a public administrator, public conservator, or
public guardian within the course of their duties.
c) The sale of a firearm, firearm precursor part, or ammunition on state
property that occurs pursuant to a contract that was entered into before
January 1, 2023.
d) The purchase of ammunition on state property by a law enforcement agency
in the course of its regular duties.

**Comments**

According to the author, "County fairgrounds are meant to be a safe and
welcome space for community gatherings. Instead, these tax-payer owned
properties are used to facilitate the sales of guns and ammunition.
According to the Giffords Law Center to Prevent Gun Violence, gun shows
often create the opportunity to "circumvent gun safety laws" and are a
common venue for straw purchases and illegal gun transfers.

"Additionally, a Bureau of Alcohol, Tobacco, and Firearms report described
gun shows as a "major trafficking channel" and found that gun shows were
the second largest source of illegally trafficked firearms.  The state should
not play a role in facilitating or profiting off of the sales of these deadly
weapons.  Instead, the creation of statewide safeguards is necessary to
ensure fairgrounds remain safe, family-friendly venues."

0101

AB 295 (Corbett, Chapter 247, Statutes of 1999), the Gun Show Enforcement and
Security Act of 2000, added a number of requirements for gun shows. To obtain a
certificate of eligibility from the DOJ, a promoter must certify that he or she is
familiar with existing law regarding gun shows; obtain at least $1 million of
liability insurance; provide an annual list of gun shows the applicant plans to
promote; pay an annual fee; make available to local law enforcement a complete
list of all entities that have rented any space at the show; submit not later than 15
days before the start of the show an event and security plan; submit a list to DOJ of
prospective vendors and designated firearms transfer agents who are licensed
dealers; provide photo identification of each vendor and vendor's employee;
prepare an annual event and security plan; and require all firearms carried onto the
premises of a show to be checked, cleared of ammunition, secured in a way that
they cannot be operated, and have an identification tag or sticker attached. AB 295
also provided for a number of penalties for a gun show producer's willful failure to
comply with the specified requirements. California's strict gun show regulations
may help to prevent increases in firearm deaths and injuries following gun shows.
(See Ellicott C. Matthay, et al., "*In-State and Interstate Associations Between Gun
Shows and Firearm Deaths and Injuries*," Annals of Internal Medicine (2017) Vol.
1 Iss. 8.)

In addition to state laws regulating gun shows, a total ban on gun shows on county
property is within the scope of a county's authority. "Under California
Government Code section 23004(d), a county is given substantial authority to
manage its property, including the most fundamental decision as to how the
property will be used and that nothing in the gun show statutes evince intent to
override that authority. The gun show statutes do not mandate that counties use
their property for such shows. If the county does allow such shows, it may impose
more stringent restrictions on the sale of firearms than state law prescribes."
(*Nordyke v. Santa Clara County* (9th Cir. Cal. 1997) 110 F.3d 707, 766.)
However, counties do not have authority to prohibit gun shows on state property
such as the Cow Palace in Daly City.

There have been several legislative attempts to regulate gun shows on State
Agricultural Land—most notably, SB 475 (Leno, 2014) and SB 585 (Leno, 2010),
which were both vetoed. In 2018, SB 221 (Wiener) contained very similar
provisions to this bill. SB 221 would have prohibited any officer, employee,
operator, or lessee of Agriculture District 1-A, from contracting for, authorizing, or
allowing the sale of any firearm or ammunition at the Cow Palace property in San
Mateo County and San Francisco County. Like this bill, SB 221 exempted law
enforcement firearm buy-back events. Unlike this bill, SB 221 failed to exempt

existing contracts to host firearms events. SB 221 was vetoed by Governor Brown with the following veto message:

> This bill would prohibit the sale of firearms and ammunition at the District Agricultural Association 1A, commonly known as the Cow Palace.
>
> This bill has been vetoed twice over the last ten years, once by myself, and once by Governor Schwarzenegger.
>
> The decision on what kind of shows occur at the Cow Palace rests with the local board of directors which, incidentally, represents a broad cross section of the community. They are in the best position to make these decisions.

Then, in 2019 AB 893 (Gloria) added a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds. By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified.  Therefore, this bill effectively terminated the possibility for future gun shows at the Del Mar Fairgrounds. AB 893 was signed into law by Governor Newsom and Chaptered as 731 in the Statutes of 2019.

SB 264 (Min, Chapter 684, Statutes of 2021) as initially introduced was almost identical to this bill, and would have enacted a similar statewide ban on firearm and ammunition sales on state property. That measure was subsequently amended to include precursor parts – which can be assembled into so-called "ghost guns" – in the prohibition on sales, and to exempt several governmental functions and contractual obligations from the prohibition. The scope of SB 264 was ultimately limited by amendments taken in Assembly Appropriations Committee, confining the measure's applicability to firearm, precursor part and ammunition sales in Orange County. This bill renews the author's efforts to enact a statewide ban, and retains the exemptions and ban on precursor part sales from the final version of SB 264.

**FISCAL EFFECT:**   Appropriation:  No   Fiscal Com.:  Yes   Local:  Yes

According to the Senate Appropriations Committee:

- Annual revenue loss, potentially in the low millions of dollars across all District Agricultural Associations that currently allow gun shows at their fairgrounds that currently allow gun shows on their property, to the extent  they are unable to secure additional, alternative events that could generate similar levels of revenue. For illustrative purposes, before the prohibition on the sale of firearms and ammunition at the Del Mar Fairgrounds (AB 893 (Gloria, Chapter 731,

SB 915
Page 6

Statutes of 2019), there were five gun shows on the property in 2017 that
resulted in approximately $304,000 in net revenue and there were three gun
shows in 2018 that collected $146,000 in gross revenue (Fair and Exposition
Fund).

- Unknown loss of sales tax revenue if firearm, firearm precursor parts, and
  ammunition sales that would have taken place on state property do not occur at
  other locations within the state (General Fund, local funds).

**SUPPORT:**  (Verified  5/19/22)

Brady Orange County
Brady United Against Gun Violence, Ventura County Chapter
City of San Jose
Democratic Club of Cornejo Valley
Friends Committee on Legislation of California
Laguna Woods Democratic Club
Nathan Fletcher, San Diego County Supervisor
NeverAgainCA
Peace and Justice Commission, St. Mark Presbyterian Church Newport Beach
San Diego County Board of Supervisors
Santa Barbara Women's Political Committee
Ventura County
Violence Prevention Coalition of Orange County

**OPPOSITION:**  (Verified  5/19/22)

Black Brant Group
Cal-Ore Wetlands and Waterfowl Council
California Bowmen Hunters/State Archery Association
California Chapter Wild Sheep Foundation
California Deer Association
California Houndsmen for Conservation
California Rifle and Pistol Association
California Sportsman's Lobby, Inc.
California Waterfowl Association
Gun Owners of California
National Rifle Association – Institute for Legislative Action
Nor-Cal Guides and Sportsmen's Association
Outdoor Sportsmen's Coalition of California
Peace Officers Research Association of California
Rocky Mountain Elk Foundation

**0104**

SB 915
Page  7

Safari Club International – California Chapters
Safari Club International – San Francisco Bay Area Chapter
San Diego County Wildlife Federation
Tulare Basin Wetlands Association
Western Fairs Association


Prepared by:   Alex Barnett / PUB. S. /
5/21/22 15:43:03

****  **END**  ****

# EXHIBIT 19

Date of Hearing:  June 8, 2022
Chief Counsel:     Sandy Uribe

ASSEMBLY COMMITTEE ON PUBLIC SAFETY
Reginald Byron Jones-Sawyer, Sr., Chair

SB 915 (Min) – As Amended June 6, 2022

**SUMMARY:**  Prohibits the sale of firearms, firearm precursor parts and ammunition on state property.  Specifically, **this bill**:

1) Prohibits a state officer or employee, or operator, lessee, or licensee of any state property, from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on state property or in the buildings that sit on state property or property otherwise owned, leased, occupied, or operated by the state.

2) Exempts the following from this prohibition:

   a) A gun buyback event held by a law enforcement agency;

   b) The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties;

   c) The sale of a firearm, firearm precursor part, or ammunition that occurs pursuant to a contract that was entered into before January 1, 2023;

   d) The purchase of a firearm, firearm precursor part, or ammunition on state property by a law enforcement agency in the course of its regular duties;

   e) The purchase of a state-issued firearm by a retiring peace officer, as specified; and,

   f) The purchase of a state-issued firearm by a peace officer if the person's department changes its state-issued weapon system, as specified.

**EXISTING LAW**:

1) Provides that bringing or possessing a firearm within any state or local public building is punishable by imprisonment in a county jail for not more than one year, or in the state prison, unless a person brings any weapon that may be lawfully transferred into a gun show for the purpose of sale or trade. (Pen. Code, §§ 171b subds. (a) & (b)(7)(A).)

2) Prohibits the sale, lease, or transfer of firearms without a license, unless the sale, lease, or transfer is pursuant to operation of law or a court order, made by a person acting pursuant to the Enforcement of Judgments Law, as specified, made by a person liquidating a personal firearm collection to satisfy a court judgment, or is an infrequent sale, lease, or transfer, as defined. Makes a violation of these provisions a misdemeanor. (Pen. Code, §§ 26500, 26505,

26520.)

3) Excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice (DOJ) from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code, § 26525.)

4) Permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code, § 26805.)

5) States that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code, § 26805.)

6) States that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the DOJ. (Pen. Code, § 27200.)

7) Specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the DOJ, as specified.  (Pen. Code, § 27200.)

8) Makes a willful failure to comply with any of the gun show requirements a misdemeanor and renders the producer ineligible for a gun show producer license for one year from the date of the conviction. Multiple violations arising from more than one gun show or event are grounds to suspend a producer's certificate of eligibility pending adjudication of the violations. (Pen. Code, § 27245.)

9) Divides the state in agricultural districts and designates District 31 as Ventura County. (Food & Agr. Code, §§ 3851, 3883.)

10) Allows for the establishment of District Agricultural Associations within each agricultural district, for the purposes of holding fairs, expositions and exhibitions, and constructing, maintaining, and operating recreational and cultural facilities of general public interest. (Food & Agr. Code, § 3951.)

11) Prohibits the sale of firearms, firearm precursor parts, or ammunition on the property or in the buildings that comprise the 32nd District Agricultural Association (Orange County Fair and Event Center). (Pen. Code, § 27575.)

12) Prohibits the sale of firearms and ammunitions on the property or in the buildings that comprise the 22nd District Agricultural Association (Del Mar Fairgrounds). (Food & Agr. Code, § 4158.)

13) Specifies that unless a different penalty is expressly provided, a violation of any provision of the Food and Agricultural Code is a misdemeanor.  (Food & Agr. Code, § 9.)

**FISCAL EFFECT**:

**COMMENTS**:

1) **Author's Statement**:  According to the author, "Within existing law, the sale and transfer of guns and ammunitions is generally regulated, requiring transactions of guns to be done through a licensed gun dealer, and requiring individuals who wish to purchase guns to undergo a background check, among other requirements.  However, gun shows are often a venue for straw purchases.  According to the Center for American Progress, gun shows are often "the critical moment in the chain of custody for many guns, the point at which they move from the somewhat-regulated legal market to the shadowy, no-questions-asked illegal market.""

2) **Banning Gun Shows on State Land**:  There have been several legislative attempts to regulate gun shows in Agricultural District 1A in San Mateo and San Francisco Counties at a location commonly known as the "Cow Palace." SB 221 (Wiener), of the 2017-2018 Legislative Session, SB 475 (Leno), of the 2013-2014 Legislative Session, SB 585 (Leno), of the 2009-2010 Legislative Session, and others, all attempted to either ban gun shows at the Cow Palace altogether, or require prior approval from the county Board Supervisors prior to entering into a contract for holding a gun show there. All three attempts were vetoed by then-Governors Schwarzenegger and Brown.

Then, in 2019, AB 893 (Gloria), Chapter 731, Statutes of 2019, added a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunition at the Del Mar Fairgrounds, effectively terminating the possibility for future gun shows at the Del Mar Fairgrounds. SB 264 (Min), Chapter 684, Statutes of 2021, built upon the provisions of AB 893 by prohibiting the sale of firearms, firearm precursor parts, and ammunition at the Orange County Fair and Event Center.

As initially introduced, SB 264, was substantially similar to this bill, and would have enacted a statewide ban on firearm and ammunition sales on state property. The scope of SB 264 was ultimately limited by amendments taken in Assembly Appropriations Committee, confining the measure's applicability to sales in on the Orange County Fairgrounds.

This bill would further expand upon these provisions by prohibiting the sale of firearms, firearm precursor parts, and ammunition on all state property, with specified exceptions, most of which deal with purchases by law enforcement or gun buy back events held by law enforcement.

3) **Gun Shows**:  A "gun show" is a trade show for firearms.  At gun shows, individuals may buy, sell, and trade firearms and firearms-related accessories.  These events typically attract several thousand people, and a single gun show can have sales of over 1,000 firearms over the course of one weekend. (Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), *Gun Shows: Brady Checks and Crime Gun Traces*, January 1999, available at: https://www.atf.gov/file/57506/download, [as of June 2, 2022].)

In California, gun transactions at gun shows are treated no differently than any other private party transaction.  This means that such transfers must be completed through a licensed California dealer.  Such a transfer requires a background check and is subject to the

**0109**

mandatory ten day waiting period prior to delivering the firearm to the purchaser.
California's strict gun show regulations may help to prevent increases in firearm deaths and
injuries following gun shows. (See Ellicott C. Matthay, et al., "In-State and Interstate
Associations Between Gun Shows and Firearm Deaths and Injuries," Annals of Internal
Medicine (2017) Vol. 1 Iss. 8.)

4) **Argument in Support**:  According to the *Ventura County Chapter of Brady United Against
Gun Violence,* "County fairgrounds are supposed to be family-friendly venues and have long
been associated with events like county fairs, 4-H events, rodeos and music festivals.
However, they have become equally well-known for gun shows. This needs to change, and
this bill will finally get California out of the business of government-sponsored gun shows.
While the Second Amendment allows for the well-regulated sales and purchase of firearms,
the Constitution does not require that taxpayer-owned properties be used to facilitate those
transactions!

"Further, we have studied the amount of income Fairgrounds derive from the Gun Shows.  In
normal (non-pandemic) years, it is an insignificant portion of the total, especially if one
considers the increased exposure to litigation hosting Gun Shows entails.  The shows could
be easily replaced with some common-sense planning and marketing."

5) **Argument in Opposition**:  According to the *Rural County Representatives of California*
(RCRC), "While RCRC generally does not engage on legislation dealing with firearms, we
believe our involvement on this particular bill is warranted. RCRC is an association of thirty-
eight rural California counties, and the RCRC Board of Directors is comprised of elected
supervisors from each member county.

"In California's rural counties, fairgrounds play a major role in the economies of the
communities/counties where they are located. Beyond the annual "fair" event filled with
corndogs and Ferris wheels, fair facilities host hundreds of events year-round. These
facilities are home to various events such as gun shows, dog shows, RV shows, bridal
shows, and other retail opportunities. SB 915 would prohibit these fairs from holding gun
shows and, as a result, erode the revenue stream that would be derived from legal gun shows
on these premises.

"The health and viability of each county's local fair and fairgrounds – whether state-
owned/operated or county-owned – is a high priority of our member counties. These fairs
and fairgrounds are an integral asset to many counties throughout the state, particularly in
rural California. They effectively serve as community centers for extreme weather events,
emergency operations sites and similar critical community needs as well as event centers and
for show events. Together these various revenue streams help in keeping operations of these
facilities viable.

"It should also be noted that over the past two decades, District Agriculture Association
(DAA)/county fairs have been financially struggling and are near a breaking point. These
state-owned facilities have been under-invested in for years, if not decades, thus forcing the
DAA's to look at creative ways to create revenue streams. Further aggravating the situation
for the past two years are the effects of a COVID environment,depressing revenues at fair
facilities.

SB 915
Page 5

"Given the above, and that firearms and firearm components are legal products that are already heavily regulated at both the federal and state level, further limiting the use of fair facilities for guns shows is a needlessly restrictive burden on these facilities. Throughout the nation, there has been no evidence of firearms being obtained improperly at a county fairground property. SB 915 simply creates winners and losers in the retail firearm industry, and would drive firearm consumers to other retailers, including those that operate out-of-state.

"Finally, we do not believe that a statewide approach is warranted. We believe each DAA operated fair should be able to make the decision on when, what, and how retail formats occur at each property. The inclusion of a prohibition on the sale of an otherwise legal product on county-owned property, primarily on county fairgrounds, discounts local authority, whether it the locally elected or state appointed body (responsible for state-owned fair facilities) that is making the decisions."

6) **Related Legislation**:

   a)  AB 311 (Ward) prohibits a vendor at a gun show or event on the property of the 22nd District Agricultural Association (Del Mar Fairgrounds) from selling firearm precursor parts. AB 311 is pending in the Senate Public Safety Committee.

   b)  AB 1769 (Bennett) prohibits the sale of any firearm, firearm precursor part, or ammunition on the property of the 31st District Agricultural Association (Ventura County Fair and Event Center in Ventura County).  AB 1769 is pending in the Senate Public Safety Committee.

7) **Prior Legislation**:

   a)  SB 264 (Min) Chapter 684, Statutes of 2021, prohibited the sale of any firearm, firearm precursor part, or ammunition on the property of the 32nd District Agricultural Association (Orange County Fair and Event Center).

   b)  AB 893 (Gloria) Chapter 731, Statutes of 2019, prohibited the sale of firearms and ammunitions on the property of the 22nd District Agricultural Association (Del Mar Fairgrounds) and created a misdemeanor offense for a violation of that prohibition.

   c)  SB 221 (Wiener), of the 2017-2018 Legislative Session, would have prohibited the sale of firearms and ammunitions at the Cow Palace. SB 221 was vetoed by Governor Brown.

   d)  SB 475 (Leno), of the 2013-2014 Legislative Session, would have required gun shows at the Cow Palace to have prior approval of both the Board of Supervisors of the County of San Mateo and the City and County of San Francisco, as specified.  SB 475 was vetoed by Governor Brown.

   e)  SB 585 (Leno), of the 2009-2010 Legislative Session, would have prohibited events at which any firearm or ammunition is sold at the Cow Palace, as specified. SB 585 was vetoed by Governor Schwarzenegger.

f)  AB 2948 (Leno), of the 2007-08 Legislative Session, would have prohibited the sale of
firearms or ammunition at the Cow Palace. AB 2948 failed passage on the Senate Floor.

g)  SB 1733 (Speier), of the 2003-04 Legislative Session, would have required gun shows at
the Cow Palace to have prior approval of both the Board of Supervisors of the County of
San Mateo and the City and County of San Francisco, as specified. SB 1733 failed
passage on the Assembly Floor.

h)  AB 295 (Corbett), Chapter 247, Statutes of 1999, established the Gun Show Enforcement
and Security Act of 2000, which includes a number of requirements for producers that
promote gun shows.

i)  AB 1107 (Ortiz), of the 1997-1998 Legislative Session, would have authorized any city,
county or agricultural association to prohibit gun sales at gun shows or events. AB 1107
failed in the Assembly Appropriations Committee.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

Brady Orange County
Brady United Against Gun Violence, Ventura County Chapter
City of San Jose
County of Ventura
Democratic Club of The Conejo Valley
Friends Committee on Legislation of California
Laguna Woods Democratic Club
Neveragainca
Office of Chair Nathan Fletcher, San Diego County Board of Supervisors
Peace and Justice Commission From St Mark Presbyterian Church in Newport Beach
Santa Barbara Women's Political Committee
The Violence Prevention Coalition of Orange County

**Opposition**

Black Brant Group, the
Cal-ore Wetlands and Waterfowl Council
California Bowmen Hunters/state Archery Association
California Chapter Wild Sheep Foundation
California Deer Association
California Houndsmen for Conservation
California Rifle and Pistol Association, INC.
California Sportsman's Lobby, INC.
California Waterfowl Association
Gun Owners of California, INC.
National Rifle Association - Institute for Legislative Action
Nor-cal Guides and Sportsmen's Association
Outdoor Sportsmen's Coalition of California
Peace Officers Research Association of California (PORAC)

Rocky Mountain Elk Foundation
Rural County Representatives of California
Safari Club International - California Chapters
Safari Club International - San Francisco Bay Area Chapter
San Diego County Wildlife Federation
Tulare Basin Wetlands Association

**Analysis Prepared by**: Sandy Uribe / PUB. S. / (916) 319-3744

# EXHIBIT 20

SB 915
Page 1

Date of Hearing:  June 22, 2022

ASSEMBLY COMMITTEE ON APPROPRIATIONS
Chris Holden, Chair
SB 915 (Min) – As Amended June 6, 2022

Policy Committee:   Public Safety                                    Vote:   5 - 2


Urgency:  No            State Mandated Local Program:  Yes            Reimbursable:  Yes

**SUMMARY**:

This bill prohibits the sale of any firearm, firearm precursor part or ammunition on state property, except as specified.

**FISCAL EFFECT**:

1)  Costs (General Fund (GF)) of $229,000 in fiscal year (FY) 2022-23, $396,000 in FY 2023-24, $396,000 in FY 2024-25, $216,000 in FY  2025-26, and $8,000 annually thereafter to the Department of Justice (DOJ) in additional staff to handle increased litigation. Although litigation costs are speculative, DOJ is currently litigating the gun show prohibition in AB 893 (*B&L Productions v. 22nd District Agricultural Assoc.* (2019) 394 F.Supp.3d 1226).

2)  Possible loss of revenue (Fair and Exposition Fund) in the millions of dollars annually across all district agricultural associations that currently allow gun shows on their property, to the extent  they are unable to secure alternative events that could generate similar levels of revenue. The District of Agricultural Association is a part of California Department of Food and Agriculture. Before the enactment of AB 893 (Chiu), Chapter 731, Statutes of 2020, which prohibited the sale of firearms and ammunition at the Del Mar Fairgrounds, there were five gun shows on the Del Mar property in 2017 that resulted in approximately $304,000 in net revenue and three gun shows in 2018 that collected $146,000 in gross revenue. The Fair and Exposition Fund is funded by a portion of state sales taxes generated at state fairs and events and is used to improve facilities at fairgrounds. This bill may result in General Fund costs to the extent the state is required to backfill any revenue lost as a result of this bill.

3)  Unknown loss of sales tax revenue (GF and local funds) if firearm, firearm precursor parts, and ammunition sales that would have taken place on state property do not occur at other locations within the state.

**COMMENTS**:

1)  **Gun Shows.**  AB 295 (Corbett), Chapter 247, Statutes of 1999 requires gun shows to obtain a certificate of eligibility to operate from the Department of Justice (DOJ).  To obtain a certificate of eligibility from the DOJ, a promoter must certify that they are familiar with existing law regarding gun shows; obtain at least $1 million of liability insurance; provide an annual list of gun shows the applicant plans to promote; pay an annual fee; make available to local law enforcement a complete list of all entities that have rented any space at the show;

**0115**

submit not later than 15 days before the start of the show an event and security plan; submit a
list to DOJ of prospective vendors and designated firearms transfer agents who are licensed
dealers; provide photo identification of each vendor and vendor's employee; prepare an
annual event and security plan; and require every firearm carried onto the premises of a show
to be checked, cleared of ammunition, secured in a way that it cannot be operated, and have
an identification tag or sticker attached.  Gun show certificates of eligibility must be
requested online via the DOJ Firearms Application Reporting System.  Fees associated with
obtaining a certificate of eligibility include the cost of the initial COE Application ($71).
Renewal applications cost $22. DOJ does not anticipate any costs as a result of this bill,
however, prohibiting gun shows at state fairgrounds may result in loss of application
revenue.

There have been several legislative attempts to regulate gun shows in San Mateo and San
Francisco counties at a location commonly known as the "Cow Palace."  SB 221 (Wiener) of
the 2017-18 Legislative Session, SB 475 (Leno), of the 2013-14 Legislative Session, SB 585
(Leno), of the 2009-10 Legislative Session, and others, all attempted to either ban gun shows
at the Cow Palace altogether, or require prior approval from the county San Mateo and San
Francisco boards of supervisors prior to entering into a contract for holding a gun show there.
All three attempts were vetoed by then-Governors Schwarzenegger or Brown.

As noted above, any person who seeks to purchase a firearm at a gun show must still clear a
DOJ background check and wait any statutory period before accepting the firearm. Gun show
visitors are not generally allowed to just walk off with a firearm purchased at a gun show.
California has numerous regulations and statutes in place to avoid straw purchases in
California even at gun shows.  Finally, there are multiple lawsuits pending against the state
for prior legislation to ban the sale of firearms at the Del Mar and the Orange County
fairgrounds. Plaintiffs in those lawsuits allege that prohibiting the sale of firearms at
agricultural district violates both the First and Second amendments of U.S. Constitution.

2)  **Argument in Support.** According to the Orange County Chapter of the Brady Campaign:

> With surges in gun violence during the pandemic, California needs
> to take swift action. While the sale and transfer of guns and
> ammunitions is generally regulated, the policy does not go far
> enough to protect the safety of Californians against gun violence
> and ghost guns. California needs to continue to lead the nation in
> gun legislation by passing SB 915 to further regulate the sale of
> guns and ammunition on state-owned property.

3)  **Argument in Opposition.** According to the Tulare Basin Wetlands Association:

> Proponents of similar legislation in the past have tried to falsely
> argue that gun shows enjoy a "loophole" that allows them to sell
> firearms and ammunition without complying with the countless
> laws and regulations which overwhelmingly govern their sale and
> transfer. However, that claim is untrue. First, promoters and
> operators of gun shows in California must comply with twenty-six
> sections of the Penal Code. Second, gun sales are heavily regulated

in California and the rules are no less stringent for vendors at gun shows. Vendors that participate in gun shows may not do so unless all their licenses have been submitted to the California Department of Justice (DOJ) before the event for the purposes of determining whether the vendors possess the proper valid licenses and comply with all relevant laws. If they do not pass the review of the DOJ, they are prohibited from participating.

4) **Related Legislation.**

   a) AB 264 (Min), Chapter 684, Statutes of 2021, prohibits the sale of firearms, firearm precursor parts, or ammunition on the property of the 32nd District Agricultural Association (Orange County Fair and Event Center).

   b) AB 1769 (Bennett) prohibits the sale of firearms, ammunition or precursor parts on any property within the 31st District Agricultural Association. AB 1769 is pending on the Senate floor.

**Analysis Prepared by**: Kimberly Horiuchi / APPR. / (916) 319-2081

# EXHIBIT 21

0118

SENATE THIRD READING
SB 915 (Min)
As Amended  June 6, 2022
Majority vote

## SUMMARY

Prohibits the sale of firearms, firearm precursor parts and ammunition on state property.

**Major Provisions**

1) Prohibits a state officer or employee, or operator, lessee, or licensee of any state property, from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on state property or in the buildings that sit on state property or property otherwise owned, leased, occupied, or operated by the state.

2) Exempts the following from this prohibition:

   a) A gun buyback event held by a law enforcement agency;

   b) The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties;

   c) The sale of a firearm, firearm precursor part, or ammunition that occurs pursuant to a contract that was entered into before January 1, 2023;

   d) The purchase of a firearm, firearm precursor part, or ammunition on state property by a law enforcement agency in the course of its regular duties;

   e) The purchase of a state-issued firearm by a retiring peace officer, as specified; and,

   f) The purchase of a state-issued firearm by a peace officer if the person's department changes its state-issued weapon system, as specified.

## COMMENTS

*Banning Gun Shows on State Land:*  There have been several legislative attempts to regulate gun shows in Agricultural District 1A in San Mateo and San Francisco Counties at a location commonly known as the "Cow Palace." SB 221 (Wiener) of the 2017-18 Legislative Session, SB 475 (Leno) of the 2013-14 Legislative Session, SB 585 (Leno) of the 2009-10 Legislative Session, and others, all attempted to either ban gun shows at the Cow Palace altogether, or require prior approval from the county Board Supervisors prior to entering into a contract for holding a gun show there. All three attempts were vetoed by then-Governors Schwarzenegger and Brown.

Then, in 2019, AB 893 (Gloria), Chapter 731, Statutes of 2019, added a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunition at the Del Mar Fairgrounds, effectively terminating the possibility for future gun shows at the Del Mar Fairgrounds. SB 264 (Min), Chapter 684, Statutes of 2021, built upon the provisions of AB 893 by prohibiting the sale of firearms, firearm precursor parts, and ammunition at the Orange County Fair and Event Center.

**0119**

As initially introduced, SB 264, was substantially similar to this bill, and would have enacted a
statewide ban on firearm and ammunition sales on state property. The scope of SB 264 was
ultimately limited by amendments taken in Assembly Appropriations Committee, confining the
measure's applicability to sales in on the Orange County Fairgrounds.

This bill would further expand upon these provisions by prohibiting the sale of firearms, firearm
precursor parts, and ammunition on all state property, with specified exceptions, most of which
deal with purchases by law enforcement or gun buy back events held by law enforcement.

**According to the Author**
"Within existing law, the sale and transfer of guns and ammunitions is generally regulated,
requiring transactions of guns to be done through a licensed gun dealer, and requiring individuals
who wish to purchase guns to undergo a background check, among other requirements.
However, gun shows are often a venue for straw purchases.  According to the Center for
American Progress, gun shows are often "the critical moment in the chain of custody for many
guns, the point at which they move from the somewhat-regulated legal market to the shadowy,
no-questions-asked illegal market."

**Arguments in Support**
According to the *Ventura County Chapter of Brady United Against Gun Violence,* "County
fairgrounds are supposed to be family-friendly venues and have long been associated with events
like county fairs, 4-H events, rodeos and music festivals.  However, they have become equally
well-known for gun shows. This needs to change, and this bill will finally get California out of
the business of government-sponsored gun shows.   While the Second Amendment allows for the
well-regulated sales and purchase of firearms, the Constitution does not require that taxpayer-
owned properties be used to facilitate those transactions!

"Further, we have studied the amount of income Fairgrounds derive from the Gun Shows.  In
normal (non-pandemic) years, it is an insignificant portion of the total, especially if one
considers the increased exposure to litigation hosting Gun Shows entails.  The shows could be
easily replaced with some common-sense planning and marketing."

**Arguments in Opposition**
According to the *Rural County Representatives of California* (RCRC), "While RCRC generally
does not engage on legislation dealing with firearms, we believe our involvement on this
particular bill is warranted. RCRC is an association of thirty-eight rural California counties, and
the RCRC Board of Directors is comprised of elected supervisors from each member county.

"In California's rural counties, fairgrounds play a major role in the economies of the
communities/counties where they are located. Beyond the annual "fair" event filled with
corndogs and Ferris wheels, fair facilities host hundreds of events year-round. These facilities are
home to various events such as gun shows, dog shows, RV shows, bridal shows, and other retail
opportunities. SB 915 would prohibit these fairs from holding gun shows and, as a result, erode
the revenue stream that would be derived from legal gun shows on these premises.

"The health and viability of each county's local fair and fairgrounds – whether state-
owned/operated or county-owned – is a high priority of our member counties. These fairs and
fairgrounds are an integral asset to many counties throughout the state, particularly in rural
California. They effectively serve as community centers for extreme weather events, emergency
operations sites and similar critical community needs as well as event centers and for show

events. Together these various revenue streams help in keeping operations of these facilities
viable.

"It should also be noted that over the past two decades, District Agriculture Association
(DAA)/county fairs have been financially struggling and are near a breaking point. These state-
owned facilities have been under-invested in for years, if not decades, thus forcing the DAA's to
look at creative ways to create revenue streams. Further aggravating the situation for the past two
years are the effects of a COVID environment,depressing revenues at fair facilities.

"Given the above, and that firearms and firearm components are legal products that are already
heavily regulated at both the federal and state level, further limiting the use of fair facilities for
guns shows is a needlessly restrictive burden on these facilities. Throughout the nation, there has
been no evidence of firearms being obtained improperly at a county fairground property. SB 915
simply creates winners and losers in the retail firearm industry, and would drive firearm
consumers to other retailers, including those that operate out-of-state.

"Finally, we do not believe that a statewide approach is warranted. We believe each DAA
operated fair should be able to make the decision on when, what, and how retail formats occur at
each property. The inclusion of a prohibition on the sale of an otherwise legal product on county-
owned property, primarily on county fairgrounds, discounts local authority, whether it the locally
elected or state appointed body (responsible for stateowned fair facilities) that is making the
decisions."

## FISCAL COMMENTS

According to the Assembly Appropriations Committee:

1)  Costs (General Fund (GF)) of $229,000 in fiscal year (FY) 2022-23, $396,000 in FY 2023-
    24, $396,000 in FY 2024-25, $216,000 in FY  2025-26, and $8,000 annually thereafter to the
    Department of Justice (DOJ) in additional staff to handle increased litigation. Although
    litigation costs are speculative, DOJ is currently litigating the gun show prohibition in AB
    893 (*B&L Productions v. 22nd District Agricultural Assoc.* (2019) 394 F.Supp.3d 1226).

2)  Possible loss of revenue (Fair and Exposition Fund) in the millions of dollars annually across
    all district agricultural associations that currently allow gun shows on their property, to the
    extent  they are unable to secure alternative events that could generate similar levels of
    revenue. The District of Agricultural Association is a part of California Department of Food
    and Agriculture. Before the enactment of AB 893 (Chiu), Chapter 731, Statutes of 2020,
    which prohibited the sale of firearms and ammunition at the Del Mar Fairgrounds, there were
    five gun shows on the Del Mar property in 2017 that resulted in approximately $304,000 in
    net revenue and three gun shows in 2018 that collected $146,000 in gross revenue. The Fair
    and Exposition Fund is funded by a portion of state sales taxes generated at state fairs and
    events and is used to improve facilities at fairgrounds. This bill may result in General Fund
    costs to the extent the state is required to backfill any revenue lost as a result of this bill.

3)  Unknown loss of sales tax revenue (GF and local funds) if firearm, firearm precursor parts,
    and ammunition sales that would have taken place on state property do not occur at other
    locations within the state.

SB 915
Page  4

## VOTES

**SENATE FLOOR:  25-9-6**
**YES:**  Allen, Atkins, Becker, Cortese, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hueso, Kamlager, Laird, Leyva, Limón, McGuire, Min, Newman, Pan, Portantino, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**NO:**  Bates, Borgeas, Dahle, Grove, Jones, Melendez, Nielsen, Ochoa Bogh, Wilk
**ABS, ABST OR NV:**  Archuleta, Bradford, Caballero, Hertzberg, Hurtado, Roth

**ASM PUBLIC SAFETY:  5-2-0**
**YES:**  Jones-Sawyer, Mia Bonta, Bryan, Quirk, Santiago
**NO:**  Lackey, Seyarto

**ASM APPROPRIATIONS:  10-4-2**
**YES:**  Holden, Bryan, Calderon, Carrillo, Mike Fong, Gabriel, Levine, Robert Rivas, Akilah Weber, Wilson
**NO:**  Bigelow, Megan Dahle, Davies, Fong
**ABS, ABST OR NV:**  Eduardo Garcia, Quirk

## UPDATED

VERSION: June 6, 2022

CONSULTANT:  Sandy Uribe / PUB. S. / (916) 319-3744                    FN: 0003024

**0122**

# EXHIBIT 22

**SENATE RULES COMMITTEE**                                              SB 915
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

## UNFINISHED BUSINESS

---

Bill No:    SB 915
Author:     Min (D), et al.
Amended:    6/6/22
Vote:       21

---

SENATE PUBLIC SAFETY COMMITTEE:  4-1, 3/8/22
AYES:  Bradford, Kamlager, Skinner, Wiener
NOES:  Ochoa Bogh

SENATE APPROPRIATIONS COMMITTEE:  5-2, 5/19/22
AYES:  Portantino, Bradford, Kamlager, Laird, Wieckowski
NOES:  Bates, Jones

SENATE FLOOR:  25-9, 5/24/22
AYES:  Allen, Atkins, Becker, Cortese, Dodd, Durazo, Eggman, Glazer, Gonzalez,
  Hueso, Kamlager, Laird, Leyva, Limón, McGuire, Min, Newman, Pan,
  Portantino, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
NOES:  Bates, Borgeas, Dahle, Grove, Jones, Melendez, Nielsen, Ochoa Bogh,
  Wilk
NO VOTE RECORDED:  Archuleta, Bradford, Caballero, Hertzberg, Hurtado,
  Roth

ASSEMBLY FLOOR:  50-22, 6/27/22 - See last page for vote

---

**SUBJECT:**  Firearms:  state property

**SOURCE:**   Author

---

**DIGEST:**   This bill prohibits the sale of firearms, firearm precursor parts and
ammunition on state property.

*Assembly Amendments* create exemptions for the purchase of firearms or firearm
precursor parts by a law enforcement agency and related purchases by qualified
law-enforcement personnel or their spouses.

**ANALYSIS:**

Existing law:

1) Provides that bringing or possessing a firearm within any state or local public building is punishable by imprisonment in a county jail for not more than one year, or in the state prison, unless a person brings any weapon that may be lawfully transferred into a gun show for the purpose of sale or trade. (Pen. Code §§ 171b subd. (a), 171b subd. (b)(7)(A).)

2) Prohibits the sale, lease, or transfer of firearms without a license, unless the sale, lease, or transfer is pursuant to operation of law or a court order, made by a person who obtains the firearm by intestate succession or bequest, or is an infrequent sale, transfer, or transfer, as defined. (Pen. Code § 26500, 26505, 26520.)

3) Excludes persons with a valid federal firearms license and a current certificate of eligibility issued by the Department of Justice from the prohibitions on the sale, lease, or transfer of used firearms, other than handguns, at gun shows or events. (Pen. Code § 26525.)

4) Permits licensed dealers to sell firearms only from their licensed premises and at gun shows. (Pen. Code § 26805.)

5) States that a dealer operating at a gun show must comply with all applicable laws, including California's waiting period law, laws governing the transfer of firearms by dealers, and all local ordinances, regulations, and fees. (Pen. Code § 26805.)

6) States that no person shall produce, promote, sponsor, operate, or otherwise organize a gun show, unless that person possesses a valid certificate of eligibility from the Department of Justice. (Pen. Code § 27200.)

7) Specifies the requirements that gun show operators must comply with at gun shows, including entering into a written contract with each gun show vendor selling firearms at the show, ensuring that liability insurance is in effect for the duration of a gun show, posting visible signs pertaining to gun show laws at the entrances of the event, and submitting a list of all prospective vendors and designated firearms transfer agents who are licensed firearms dealers to the Department of Justice, as specified.  (Pen. Code §§ 27200, 27245.)

8) Provides that an officer, employee, operator, lessee or licensee of the 32nd District Agricultural Association shall not contract for, authorize, or allow the sale of any firearm, firearm precursor part, or ammunition on the property or in the buildings that comprise the Orange County Fair and Event Center, in the County of Orange, the City of Costa Mesa, or any successor or additional property owned, leased or otherwise occupied or operated by the district. (Pen. Code §27575(a).)

9) Exempts the following from the prohibition in Penal Code § 27575(a):

   a) A gun buyback event held by a law enforcement agency.
   b) The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties.
   c) The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2022.
   d) The purchase of ammunition on state property by a law enforcement agency in the course of its regular duties. (Pen. Code §27575(b).)

10) Specifies that unless a different penalty is expressly provided, a violation of any provision of the Food and Agricultural Code is a misdemeanor.  (Food and Ag. Code, § 9.)

This bill:

1) Prohibits a state officer or employee, or operator, lessee, or licensee of any state property from contracting for, authorizing, or allowing the sale of any firearm, firearm precursor part, or ammunition on state property or property otherwise owned, leased, occupied, or operated by the state.

2) Exempts the following from the prohibition above:

   a) A gun buyback event held by a law enforcement agency.
   b) The sale of a firearm by a public administrator, public conservator, or public guardian within the course of their duties.
   c) The sale of a firearm, firearm precursor part, or ammunition on state property that occurs pursuant to a contract that was entered into before January 1, 2023.
   d) The purchase of firearms, firearm precursor parts, or ammunition on state property by a law enforcement agency in the course of its regular duties.

**0126**

e)  The purchase of a firearm pursuant to subdivision (b), (c), or (d) of Section 10334 of the Public Contracts Code, relating to the purchase of firearms by active and retired law enforcement officers and their spouses.

**Comments**

According to the author, "County fairgrounds are meant to be a safe and welcome space for community gatherings. Instead, these tax-payer owned properties are used to facilitate the sales of guns and ammunition. According to the Giffords Law Center to Prevent Gun Violence, gun shows often create the opportunity to "circumvent gun safety laws" and are a common venue for straw purchases and illegal gun transfers.

"Additionally, a Bureau of Alcohol, Tobacco, and Firearms report described gun shows as a "major trafficking channel" and found that gun shows were the second largest source of illegally trafficked firearms.  The state should not play a role in facilitating or profiting off of the sales of these deadly weapons.  Instead, the creation of statewide safeguards is necessary to ensure fairgrounds remain safe, family-friendly venues."

AB 295 (Corbett, Chapter 247, Statutes of 1999), the Gun Show Enforcement and Security Act of 2000, added a number of requirements for gun shows. To obtain a certificate of eligibility from the DOJ, a promoter must certify that he or she is familiar with existing law regarding gun shows; obtain at least $1 million of liability insurance; provide an annual list of gun shows the applicant plans to promote; pay an annual fee; make available to local law enforcement a complete list of all entities that have rented any space at the show; submit not later than 15 days before the start of the show an event and security plan; submit a list to DOJ of prospective vendors and designated firearms transfer agents who are licensed dealers; provide photo identification of each vendor and vendor's employee; prepare an annual event and security plan; and require all firearms carried onto the premises of a show to be checked, cleared of ammunition, secured in a way that they cannot be operated, and have an identification tag or sticker attached. AB 295 also provided for a number of penalties for a gun show producer's willful failure to comply with the specified requirements. California's strict gun show regulations may help to prevent increases in firearm deaths and injuries following gun shows. (See Ellicott C. Matthay, et al., *"In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries,"* Annals of Internal Medicine (2017) Vol. 1 Iss. 8.)

In addition to state laws regulating gun shows, a total ban on gun shows on county property is within the scope of a county's authority. "Under California

Government Code section 23004(d), a county is given substantial authority to manage its property, including the most fundamental decision as to how the property will be used and that nothing in the gun show statutes evince intent to override that authority. The gun show statutes do not mandate that counties use their property for such shows. If the county does allow such shows, it may impose more stringent restrictions on the sale of firearms than state law prescribes." (*Nordyke v. Santa Clara County* (9th Cir. Cal. 1997) 110 F.3d 707, 766.) However, counties do not have authority to prohibit gun shows on state property such as the Cow Palace in Daly City.

There have been several legislative attempts to regulate gun shows on State Agricultural Land—most notably, SB 475 (Leno, 2014) and SB 585 (Leno, 2010), which were both vetoed. In 2018, SB 221 (Wiener) contained very similar provisions to this bill. SB 221 would have prohibited any officer, employee, operator, or lessee of Agriculture District 1-A, from contracting for, authorizing, or allowing the sale of any firearm or ammunition at the Cow Palace property in San Mateo County and San Francisco County. Like this bill, SB 221 exempted law enforcement firearm buy-back events. Unlike this bill, SB 221 failed to exempt existing contracts to host firearms events. SB 221 was vetoed by Governor Brown with the following veto message:

> This bill would prohibit the sale of firearms and ammunition at the District Agricultural Association 1A, commonly known as the Cow Palace.

> This bill has been vetoed twice over the last ten years, once by myself, and once by Governor Schwarzenegger.

> The decision on what kind of shows occur at the Cow Palace rests with the local board of directors which, incidentally, represents a broad cross section of the community. They are in the best position to make these decisions.

Then, in 2019, AB 893 (Gloria, Chapter 731, Statutes of 2019) added a section to the Food and Agricultural Code that prohibits the sale of firearms and ammunitions at the Del Mar Fairgrounds.  By default, a violation of any provision of the Food and Agricultural code is a misdemeanor, unless otherwise specified.  Therefore, this bill effectively terminated the possibility for future gun shows at the Del Mar Fairgrounds.

SB 264 (Min, Chapter 684, Statutes of 2021) as initially introduced was almost identical to this bill, and would have enacted a similar statewide ban on firearm

and ammunition sales on state property. That measure was subsequently amended
to include precursor parts – which can be assembled into so-called "ghost guns" –
in the prohibition on sales, and to exempt several governmental functions and
contractual obligations from the prohibition. The scope of SB 264 was ultimately
limited by amendments taken in Assembly Appropriations Committee, confining
the measure's applicability to firearm, precursor part and ammunition sales in
Orange County. This bill renews the author's efforts to enact a statewide ban, and
retains the exemptions and ban on precursor part sales from the final version of
SB 264.

**FISCAL EFFECT:**  Appropriation:  No   Fiscal Com.:   Yes   Local:  Yes

According to the Assembly Appropriations Committee:

- Costs (General Fund (GF)) of $229,000 in fiscal year (FY) 2022-23, $396,000
  in FY 2023-24, $396,000 in FY 2024-25, $216,000 in FY  2025-26, and $8,000
  annually thereafter to the Department of Justice (DOJ) in additional staff to
  handle increased litigation. Although litigation costs are speculative, DOJ is
  currently litigating the gun show prohibition in AB 893 (*B&L Productions v.
  22nd District Agricultural Assoc.* (2019) 394 F.Supp.3d 1226).

- Possible loss of revenue (Fair and Exposition Fund) in the millions of dollars
  annually across all district agricultural associations that currently allow gun
  shows on their property, to the extent  they are unable to secure alternative
  events that could generate similar levels of revenue. The District of Agricultural
  Association is a part of California Department of Food and Agriculture. Before
  the enactment of AB 893 (Chiu), Chapter 731, Statutes of 2020, which
  prohibited the sale of firearms and ammunition at the Del Mar Fairgrounds,
  there were five gun shows on the Del Mar property in 2017 that resulted in
  approximately $304,000 in net revenue and three gun shows in 2018 that
  collected $146,000 in gross revenue. The Fair and Exposition Fund is funded by
  a portion of state sales taxes generated at state fairs and events and is used to
  improve facilities at fairgrounds. This bill may result in General Fund costs to
  the extent the state is required to backfill any revenue lost as a result of this bill.

- Unknown loss of sales tax revenue (GF and local funds) if firearm, firearm
  precursor parts, and ammunition sales that would have taken place on state
  property do not occur at other locations within the state.

**SUPPORT:**  (Verified  6/27/22)

Brady Orange County

SB 915
Page  7

Brady United Against Gun Violence, Ventura County Chapter
City of San Jose
Democratic Club of Cornejo Valley
Friends Committee on Legislation of California
Laguna Woods Democratic Club
Nathan Fletcher, San Diego County Supervisor
NeverAgainCA
Peace and Justice Commission, St. Mark Presbyterian Church Newport Beach
Santa Barbara Women's Political Committee
Ventura County
Violence Prevention Coalition of Orange County
Women for American Values and Ethics Action Fund

**OPPOSITION:**  (Verified  6/27/22)

Black Brant Group
Cal-Ore Wetlands and Waterfowl Council
California Bowmen Hunters/State Archery Association
California Chapter Wild Sheep Foundation
California Deer Association
California Houndsmen for Conservation
California Rifle and Pistol Association
California Sportsman's Lobby, Inc.
California Waterfowl Association
Gun Owners of California
National Rifle Association – Institute for Legislative Action
Nor-Cal Guides and Sportsmen's Association
Outdoor Sportsmen's Coalition of California
Peace Officers Research Association of California
Rocky Mountain Elk Foundation
Safari Club International – California Chapters
Safari Club International – San Francisco Bay Area Chapter
San Diego County Wildlife Federation
Tulare Basin Wetlands Association
Western Fairs Association


ASSEMBLY FLOOR:  50-22, 6/27/22
AYES:  Aguiar-Curry, Alvarez, Arambula, Bauer-Kahan, Bennett, Berman,
   Bloom, Boerner Horvath, Mia Bonta, Bryan, Calderon, Carrillo, Cervantes,
   Daly, Mike Fong, Friedman, Gabriel, Cristina Garcia, Eduardo Garcia, Gipson,

**0130**

SB 915
Page 8

    Haney, Irwin, Jones-Sawyer, Kalra, Lee, Levine, Low, Maienschein, McKinnor,
    Medina, Mullin, Muratsuchi, Nazarian, O'Donnell, Petrie-Norris, Quirk-Silva,
    Ramos, Reyes, Luz Rivas, Blanca Rubio, Santiago, Stone, Ting, Villapudua,
    Ward, Akilah Weber, Wicks, Wilson, Wood, Rendon

NOES:  Bigelow, Choi, Cunningham, Megan Dahle, Davies, Flora, Fong,
    Gallagher, Gray, Kiley, Lackey, Mathis, Mayes, Nguyen, Patterson, Quirk,
    Salas, Seyarto, Smith, Valladares, Voepel, Waldron

NO VOTE RECORDED:  Chen, Cooley, Cooper, Grayson, Holden, McCarty,
    Robert Rivas, Rodriguez

Prepared by:   Alex Barnett / PUB. S. /
6/28/22 14:22:54

                   **\*\*\*\*  END  \*\*\*\***

**0131**

# EXHIBIT 23

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

**SPECIAL REPORT**

JANUARY 2019

NCJ 251776

# Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016

Mariel Alper, Ph.D., and Lauren Glaze, *BJS Statisticians*

Based on the 2016 Survey of Prison Inmates (SPI), about 1 in 5 (21%) of all state and federal prisoners reported that they had possessed or carried a firearm when they committed the offense for which they were serving time in prison (**figure 1**). More than 1 in 8 (13%) of all prisoners had used a firearm by showing, pointing, or discharging it during the offense for which they were imprisoned. Fewer than 1 in 50 (less than 2%) of all prisoners had obtained a firearm from a retail source and possessed, carried, or used it during the offense for which they were imprisoned.

An estimated 287,400 prisoners had possessed a firearm during their offense. Among these, more than half (56%) had either stolen it (6%), found it at the scene of the crime (7%), or obtained it off the street or from the underground market (43%). Most of the remainder (25%) had obtained it from a family member or friend, or as a gift. Seven percent had purchased it under their own name from a licensed firearm dealer.



**FIGURE 1**
**Percent of all state and federal prisoners who had possessed or used a firearm during their offense, 2016**

Note: See appendix table 1 for standard errors.
[a]Includes prisoners who carried or possessed a firearm during the offense.
[b]Includes prisoners who showed, pointed, or discharged a firearm during the offense.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## HIGHLIGHTS

- About 21% of state and 20% of federal prisoners said they possessed a gun during their offense, while 79% of state and 80% of federal prisoners did not.

- About 29% of state and 36% of federal prisoners serving time for a violent offense possessed a gun during the offense.

- About 1.3% of prisoners obtained a gun from a retail source and used it during their offense.

- Handguns were the most common type of firearm possessed by state and federal prisoners (18% each); 11% of all prisoners used a handgun.

- Among prisoners who possessed a gun during their offense, 90% did not obtain it from a retail source.

- Among prisoners who possessed a firearm during their offense, 0.8% obtained it at a gun show.

- About 1 in 5 state and federal prisoners who possessed a firearm during their offense obtained it with the intent to use it during the crime.

- Among state prisoners who possessed a gun during their offense, 27% killed someone with it, another 12% injured someone, 7% fired the gun but did not injure anyone, and 54% did not fire it.

- State prisoners with no military service were more likely to possess a gun during their offense (21%) than prisoners who had served in the military (16%).



0133

Statistics in this report are based on self-reported data collected through face-to-face interviews with a national sample of state and federal prisoners in the 2016 SPI. (See *Methodology*.)

The 2016 SPI data collection was conducted from January through October 2016. The SPI was formerly known as the Survey of Inmates in State and Federal Correctional Facilities (SISFCF). The Bureau of Justice Statistics (BJS) has periodically conducted the survey since the 1970s, with the most recent iteration fielded in 2004. The survey collects information from prisoners on a variety of topics, including firearm possession during the crime for which a prisoner was serving time and how the firearm was used during the crime. It also collects information on the method, source, and process that prisoners used to obtain the firearm. (See appendix 1, *Questions related to firearms in the Survey of Prison Inmates, 2016*.)

## Terms and definitions

■ **Firearm** – a weapon that uses gunpowder to shoot a bullet. Primary types are handguns, rifles, and shotguns:[1]

  ○ *Handgun* – a firearm which has a short stock and is designed to be held and fired by the use of a single hand.

  ○ *Rifle* – a firearm intended to be fired from the shoulder and designed to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

  ○ *Shotgun* – a firearm intended to be fired from the shoulder and designed to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each pull of the trigger.

■ **Firearm possession** – carrying or possessing at least one firearm when the offense for which prisoners were serving a sentence was committed.

■ **Firearm use** – showing a firearm to or pointing a firearm at anyone or discharging a firearm during the offense for which a prisoner was serving time.

■ **Source of the firearm** – from where and how prisoners reported obtaining the firearm they possessed during the crime for which they were imprisoned—

  ○ *Purchased or traded from a retail source* – includes a gun shop or store, pawn shop, flea market, or gun show.

    — **Gun shop or store** – a business establishment that sells firearms in an open shopping format.

    — **Pawn shop** – a business that offers secured loans to customers, with personal property used as collateral. This personal property is sold to the public if the loan is not repaid.

    — **Flea market** – a market that rents space to individuals to sell or barter merchandise.

    — **Gun show** – a temporary market where licensed dealers and unlicensed sellers can rent tables or booths to sell firearms.

  ○ *Obtained from an individual* – includes purchasing, trading, renting, or borrowing from a family or friend. Also includes when the firearm was gifted to or purchased for the person.

  ○ *Off the street or underground market* – illegal sources of firearms that include markets for stolen goods, middlemen for stolen goods, criminals or criminal enterprises, or individuals or groups involved in sales of illegal drugs.

  ○ *Theft* – includes stealing the firearm during a burglary or from a retail source, family member, friend, or another source.

  ○ *Other sources* – includes a firearm that a prisoner obtained or found at the location of the crime, including one that belonged to a victim or that someone else brought to the location of the crime. This category also includes sources for which there were few responses, such as for guns bought online, and other sources that did not fit into one of the existing categories. This also includes instances where there was not enough information to categorize the source, such as when a firearm was purchased from an unknown source or obtained from another person by an unknown method.

---

[1]The definitions of types of firearms in this section were taken from 18 U.S.C. § 921 (2009). They have been edited for length.

### Controlling-offense characteristics

About 29% of state and 36% of federal prisoners serving a sentence for a violent offense in 2016 possessed a firearm during the crime (table 1). About a quarter of state (23%) and federal (25%) prisoners serving time for a violent offense used a firearm during the crime. "Firearm use" is defined in this report as showing, pointing, or discharging a firearm during the offense for which a prisoner was serving a sentence.

Among prisoners serving time for homicide, more than 2 in 5 (44%) state prisoners and more than 1 in 3 (36%) federal prisoners had possessed a firearm during the crime. About 37% of state and 28% of federal prisoners serving time for homicide used a firearm during the homicide.

Among those serving time for robbery, more than 2 in 5 state prisoners (43%) and federal prisoners (46%) possessed a firearm during the offense, and nearly a third of state (31%) and federal (32%) prisoners used a firearm during the robbery. Firearm possession was less common among state prisoners serving a sentence for rape or sexual assault (2%). Less than 1% of state prisoners serving time for rape or sexual assault used a firearm in the commission of their crime.

## TABLE 1
**Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of controlling offense, 2016**

| Controlling offense[a] | Estimated number of state prisoners[b] | Percent of state prisoners who— | | Estimated number of federal prisoners[b] | Percent of federal prisoners who— | |
|---|---|---|---|---|---|---|
| | | Possessed a firearm[b] | Used a firearm[c] | | Possessed a firearm[b] | Used a firearm[c] |
| Total | 1,211,200 | 20.9% | 13.9% | 170,400 | 20.0% | 5.0% |
| Violent* | 667,300 | 29.1% | 23.0% | 20,900 | 36.2% | 25.3% |
| Homicide[d] | 191,400 | 43.6 | 37.2 | 3,800 | 35.9 | 28.4 |
| Rape/sexual assault | 144,800 | 2.0 | 0.8 | 2,400 | : | : |
| Robbery | 149,600 | 43.3 | 31.5 | 10,700 | 46.3 | 32.1 |
| Assault | 149,400 | 25.0 | 20.6 | 2,900 | 29.0 | 18.1 |
| Other violent[e] | 32,200 | 17.0 | 12.6 | 1,200 | 34.1 | : |
| Property | 186,100 | 4.9% † | 2.0% † | 12,000 | 2.6% † | : |
| Burglary | 88,100 | 6.7 | 3.2 | 300 | : | : |
| Other property[f] | 98,000 | 3.3 | 1.0 | 11,800 | 2.4 | : |
| Drug | 180,800 | 8.4% † | 0.8% † | 80,500 | 12.3% † | 0.6% † |
| Trafficking[g] | 130,500 | 9.4 | 0.9 | 72,300 | 12.9 | 0.7 |
| Possession | 45,900 | 6.1 | : | 3,500 | : | : |
| Other/unspecified drug | 4,300 | : | : | 4,700 | : | : |
| Public order | 158,300 | 21.5% † | 5.6% † | 52,900 | 30.2% | 5.3% † |
| Weapons[h] | 43,800 | 67.2 | 15.7 | 22,200 | 66.9 | 11.3 |
| Other public order[i] | 114,400 | 4.0 | 1.7 | 30,700 | 3.6 | : |
| Other | 3,900 | : | : | 1,800 | : | : |
| Unknown | 14,900 | 4.3% † | : | 2,200 | : | : |

Note: See appendix table 2 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level across main categories, and no testing was done on subcategories (e.g., homicide).
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]See *Methodology* for information on how controlling offense was measured.
[b]Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession. Includes prisoners who were missing responses on firearm use.
[c]Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession, and an additional 0.6% of state prisoners and 0.7% of federal prisoners who were missing responses on firearm use.
[d]Includes murder and both negligent and non-negligent manslaughter.
[e]Includes kidnapping, blackmail, extortion, hit-and-run driving with bodily injury, child abuse, and criminal endangerment.
[f]Includes larceny, theft, motor vehicle theft, arson, fraud, stolen property, destruction of property, vandalism, hit-and-run driving with no bodily injury, criminal tampering, trespassing, entering without breaking, and possession of burglary tools.
[g]Includes possession with intent to distribute.
[h]Includes being armed while commiting a crime; possession of ammunition, concealed weapons, firearms and explosive devices; selling or trafficking weapons; and other weapons offenses. Among federal prisoners, weapons offense include violations of federal firearms and explosives.
[i]Includes commercialized vice, immigration crimes, DUI, violations of probation/parole, and other public-order offenses.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

State and federal prisoners serving time for a violent offense were much more likely to have possessed a firearm during the offense (29% state, 36% federal) than prisoners serving time for a property (5% state, 3% federal) or drug (8% state, 12% federal) offense. Among prisoners serving time for a public-order offense, about 1 in 5 (21%) state prisoners and nearly 1 in 3 (30%) federal prisoners reported that they possessed a firearm during the crime, and about 1 in 20 reported they had used it. About two-thirds of state and federal prisoners sentenced for a weapons offense said they possessed a firearm during the crime.[2]

---

[2]In addition to prisoners serving a sentence in state or federal prison in 2016 who possessed a firearm during the offense, weapons offenses include prisoners who were convicted of trafficking firearms but did not possess them at the time of the offense and prisoners who were convicted of a weapons offense that did not involve a firearm.

### Extent of firearm use among prisoners during the crime

State and federal prisoners in 2016 who had possessed a firearm during their offense were about equally likely to report that they had obtained the firearm with the intent to use it during the offense (19% state, 20% federal) **(table 2)**. However, state prisoners (68%) who possessed a firearm were more than 2.5 times as likely as federal prisoners (26%) who possessed a firearm to have used it during the crime.

Nearly half of state prisoners (46%) serving a sentence for a crime during which they possessed a firearm discharged the firearm when they committed the crime, compared to 12% of federal prisoners. Among state prisoners who possessed a firearm during their offense, 27% killed a victim with the firearm and another 12% injured or shot a victim but did not kill him or her. Federal prisoners who possessed a firearm when they committed their offense were much less likely to have killed (4%) or injured (2%) a victim with the firearm than state prisoners.

---

## TABLE 2

**Among state and federal prisoners who possessed a firearm during the offense for which they were serving time, extent of firearm use, 2016**

| Firearm use | State prisoners* | Federal prisoners | State prisoners Violent offense* | State prisoners Non-violent offense[a] | Federal prisoners Violent offense* | Federal prisoners Non-violent offense[a] |
|---|---|---|---|---|---|---|
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Obtained firearm because planned to use in controlling offense[b] | | | | | | |
| Yes | 19.3% | 19.7% | 17.7% | 24.6% † | 26.4% | 18.0% |
| No | 80.7 | 80.3 | 82.3 | 75.4 † | 73.6 | 82.1 |
| Used firearm[c] | 68.0% | 25.9% † | 81.0% | 24.8% † | 72.5% | 12.9% † |
| Discharged | 46.5% | 11.9% † | 55.9% | 15.4% † | 27.3% | 7.5% † |
| Killed victim | 27.1 | 4.1 † | 35.0 | : | 16.5 | : |
| Injured/shot victim but did not kill victim | 12.4 | 2.2 † | 14.5 | 5.3 † | : | : |
| Discharged firearm but did not shoot anyone | 7.0 | 5.6 | 6.4 | 9.0 | 5.7 | 5.4 |
| Did not discharge[d] | 21.5% | 14.0% † | 25.2% | 9.4% † | 45.3% | 5.4% † |
| Did not use firearm | 32.0% | 74.1% † | 19.0% | 75.2% † | 27.5% | 87.1% † |
| Estimated number of prisoners who possessed a firearm (with valid data)[e] | 245,400 | 32,900 | 187,800 | 57,000 | 7,200 | 25,600 |

Note: Percentages are based on data reported on firearm possession, use, and controlling offense. Excludes 3.1% of state prisoners and 3.5% of federal prisoners who possessed a firearm during the offense and were missing responses on firearm use and 0.3% of state prisoners and 0.7% of federal prisoners who possessed a firearm and were missing a controlling offense. The sum of violent offense and non-violent offense does not equal the total number of state and federal prisoners who possessed a firearm in this table due to an estimated 600 state and 100 federal prisoners whose offense type was unknown. See appendix table 3 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Includes property, drug, public order, and other non-violent offenses.
[b]Percentages are based on the 246,200 state and 32,600 federal prisoners who reported they carried or possessed a firearm and whether they obtained a firearm to use during the offense.
[c]Includes prisoners who showed a firearm to anyone, pointed a firearm at anyone, or discharged the firearm during the offense.
[d]Includes prisoners who showed or pointed at anyone during the offense but did not discharge it.
[e]Includes prisoners who reported they carried or possessed a firearm. Excludes prisoners who were missing responses on firearm possession or use. For violent offense and non-violent offense, also excludes prisoners who were missing a controlling offense.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**0136**

Among prisoners who possessed a firearm during a violent offense, a large majority of both state (81%) and federal (73%) prisoners used the firearm during the offense, far more than the percentages for non-violent offenders (25% state, 13% federal). More than half (56%) of state prisoners serving time for a violent offense who possessed a firearm during the crime discharged it, compared to fewer than a sixth (15%) of non-violent offenders in state prison who possessed a firearm. Violent offenders (27%) in federal prison who possessed a firearm during the crime were about 3.5 times as likely to discharge it as non-violent offenders (8%). Among state prisoners who had possessed a firearm during their offense, however, non-violent offenders (25%) were more likely than violent offenders (18%) to have planned to use the firearm during the offense.

## Type of firearm possessed by prisoners during offense

Handguns were by far the most common type of firearm possessed or used by prisoners during the crime for which they were sentenced. About 18% of all state and federal prisoners in 2016 reported that they had possessed a handgun during the crime for which they were serving a sentence (table 3). Two percent or fewer possessed a rifle or a shotgun. Twelve percent of state and 5% of federal prisoners used a handgun during their offense. Most state (79%) and federal (80%) prisoners did not possess any type of firearm during the crime for which they were imprisoned.

## TABLE 3

**Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of firearm, 2016**

| Type of firearm | Percent of prisoners who possessed a firearm | | | Percent of prisoners who used a firearm[a] | | |
|---|---|---|---|---|---|---|
| | All prisoners | State* | Federal | All prisoners | State* | Federal |
| **Total** | 100% | 100% | 100% | 100% | 100% | 100% |
| Firearm[b] | 20.8% | 20.9% | 20.0% | 12.8% | 13.9% | 5.0% † |
| Handgun | 18.4 | 18.4 | 18.3 | 11.2 | 12.2 | 4.6 |
| Rifle | 1.5 | 1.4 | 2.0 † | 0.8 | 0.8 | 0.4 † |
| Shotgun | 1.6 | 1.6 | 1.7 | 1.1 | 1.2 | 0.4 † |
| **No firearm** | 79.2% | 79.1% | 80.0% | 87.2% | 86.1% | 95.0% |
| **Estimated number of prisoners (with valid data)[c]** | 1,378,200 | 1,208,100 | 170,100 | 1,378,200 | 1,208,100 | 170,100 |

Note: Details on type of firearm may not sum to totals because prisoners could report more than one type of firearm. Percentages exclude missing data. Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession during the offense and an additional 0.3% of state prisoners and 0.2% of federal prisoners who were missing responses on type of firearm. See appendix table 4 for standard errors.

*Comparison group.

†Difference with comparison group is significant at the 95% confidence level.

[a]Percentages exclude 0.6% of state prisoners and 0.7% of federal prisoners who were missing responses on firearm use.

[b]Includes prisoners who reported a type of firearm that did not fit into one of the existing categories and those who did not provide enough information to categorize the type of firearm. About 0.1% of state prisoners and 0.2% of federal prisoners reported another type of firearm or did not report enough information to specify the type of firearm.

[c]Excludes prisoners who were missing responses on firearm possession or type of firearm. Counts are weighted to totals from the 2015 National Prisoner Statistics Program; see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, forthcoming).

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## Demographic characteristics

Male prisoners were more likely than female prisoners to have possessed a firearm during their crime. About a fifth of male state and federal prisoners serving a sentence in 2016 possessed a firearm during the crime (table 4). Males in state prisons in 2016 were about 2.5 times as likely (22%) as females in state prisons (9%) to have possessed a firearm during the crime for which they were imprisoned. In federal prisons, males (21%) were about three times as likely as females (7%) to have possessed a firearm during their crime. Almost 3 in 10 (29%) black prisoners serving a sentence in state prison in 2016 possessed a firearm during their crime. White (12%) and Hispanic (21%) state prisoners were less likely to have possessed a firearm during their crime. Similarly, white (17%) and Hispanic (13%) federal prisoners serving a sentence in 2016 were less likely to have possessed a firearm during the crime than black (29%) federal prisoners. State prisoners who served in the military were less likely to have possessed a firearm during their crime (16%) than state prisoners who had not served in the military (21%).

## TABLE 4

**Firearm possession among state and federal prisoners during the offense for which they were serving time, by demographic characteristics, 2016**

| Demographic characteristic | State | | Federal | |
|---|---|---|---|---|
| | Number of prisoners | Percent of prisoners who possessed a firearm during the offense | Number of prisoners | Percent of prisoners who possessed a firearm during the offense |
| **Sex** | | | | |
| Male* | 1,124,200 | 21.8% | 159,800 | 20.9% |
| Female | 87,000 | 9.5 † | 10,600 | 6.6 † |
| **Race/Hispanic origin[a]** | | | | |
| White | 383,300 | 12.4% † | 35,400 | 16.6% † |
| Black* | 401,500 | 29.4 | 53,800 | 29.2 |
| Hispanic | 247,200 | 21.5 † | 62,600 | 12.6 † |
| American Indian/Alaska Native | 17,200 | 14.8 † | 2,800 | 23.8 |
| Asian/Native Hawaiian/Other Pacific Islander | 10,700 | 22.8 | 2,600 | : |
| Two or more races | 133,100 | 19.1 † | 10,900 | 29.3 |
| **Age at time of survey** | | | | |
| 18–24* | 123,800 | 31.7% | 8,200 | 30.1% |
| 25–34 | 389,100 | 24.4 † | 47,700 | 27.4 |
| 35–44 | 318,800 | 19.3 † | 58,800 | 19.0 † |
| 45–54 | 224,800 | 14.6 † | 36,700 | 14.1 † |
| 55 or older | 154,800 | 16.0 † | 19,000 | 12.2 † |
| **Marital status** | | | | |
| Married* | 168,500 | 16.7% | 36,800 | 14.4% |
| Widowed/widowered | 34,300 | 18.3 | 3,100 | 21.7 |
| Separated | 58,300 | 12.7 † | 9,600 | 12.8 |
| Divorced | 233,300 | 14.5 | 30,900 | 15.2 |
| Never married | 715,900 | 24.8 † | 90,000 | 24.6 † |
| **Education[b]** | | | | |
| Less than high school* | 750,500 | 23.1% | 94,900 | 22.7% |
| High school graduate | 273,700 | 19.6 † | 36,500 | 19.4 |
| Some college | 133,900 | 14.7 † | 23,100 | 18.8 |
| College degree or more | 43,600 | 11.0 † | 12,700 | 6.3 † |
| **Citizenship** | | | | |
| U.S. citizen* | 1,156,800 | 21.0% | 127,500 | 24.2% |
| Non-U.S. citizen | 53,100 | 18.5 | 42,400 | 7.2 † |
| **Military service** | | | | |
| Yes* | 95,200 | 15.6% | 9,200 | 15.9% |
| No | 1,115,900 | 21.4 † | 161,200 | 20.3 |

Note: Percentages and counts exclude missing data. Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession during the offense. Details for counts may not sum to totals due to missing data. See appendix table 5 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic/Latino origin, unless specified.
[b]Based on highest year of education completed.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

In general, the likelihood of state and federal prisoners having possessed a firearm during their crime decreased with age. Firearm possession among state prisoners ages 18 to 24 (32%) in 2016 was more common than among older prisoners. Federal prisoners ages 18 to 24 (30%) were more likely to possess a firearm than those age 35 or older (16%, not shown in table).

The difference in firearm possession between U.S. citizens (21%) and non-citizens (18%) in state prisons in 2016 was not statistically significant. Among federal prisoners serving a sentence in 2016, firearm possession was more than three times as high among U.S. citizens (24%) as non-citizens (7%).

## Method, source, and process used to obtain the firearm

Among prisoners who possessed a firearm when they committed the offense for which they were imprisoned and who reported the source from which they obtained it, the most common source (43%) was off-the-street or the underground market (table 5). Another 7% of state and 5% of federal prisoners stole the firearm, and 7% of state and 8% of federal prisoners reported that they obtained the firearm at the location of the crime.

## TABLE 5

**Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, sources and methods used to obtain a firearm, 2016**

| Source and method to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Purchased/traded at retail source | 10.1% | 9.7% | 13.7% |
| Gun shop/store | 7.5 | 7.2 | 9.6 |
| Pawn shop | 1.6 | 1.5 | 2.2 |
| Flea market | 0.4 | : | : |
| Gun show | 0.8 | 0.8 | 1.4 |
| Obtained from individual | 25.3% | 26.0% | 20.5% |
| Purchased/traded from family/friend | 8.0 | 7.9 | 9.1 |
| Rented/borrowed from family/friend | 6.5 | 7.0 | 3.0 |
| Gift/purchased for prisoner | 10.8 | 11.2 | 8.4 |
| Off the street/underground market[a] | 43.2% | 43.2% | 42.9% |
| Theft[b] | 6.4% | 6.6% | 4.7% |
| From burglary | 1.5 | 1.5 | : |
| From retail source | 0.2 | : | : |
| From family/friend | 1.6 | 1.8 | : |
| Unspecified theft[c] | 3.1 | 3.3 | 1.8 |
| Other source | 17.4% | 17.1% | 20.1% |
| Found at location of crime/victim | 6.9 | 6.7 | 7.9 |
| Brought by someone else | 4.6 | 4.7 | 3.6 |
| Other[d] | 5.9 | 5.6 | 8.5 |
| Multiple sources[e] | 2.5% | 2.6% | 2.0% |
| Estimated number of prisoners who possessed a firearm, excluding prisoners who did not report source[f] | 256,400 | 227,100 | 29,300 |

Note: Prisoners were asked to report all sources and methods of obtaining any firearm they possessed during the offense, so details may not sum to totals. Each source is included in this table when multiple sources were reported. See *Methodology*. Percentages exclude missing data. Excludes 10.3% of state prisoners and 14.1% of federal prisoners who possessed a firearm during the offense and were missing responses on either source or method of obtaining the firearm. These prisoners were excluded either because they did not provide a valid response or they did not receive the questions due to providing an open-ended response to the previous question about type of weapon. See appendix table 6 for standard errors.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Illegal sources of firearms that include markets for stolen goods, middlemen for stolen goods, criminals or criminal enterprises, or individuals or groups involved in sales of illegal drugs.
[b]Excludes theft from victim.
[c]Includes theft where the source could not be identified and theft other than from a burglary, retail location, family, or friend.
[d]Included if no source specified in the table was reported. Includes sources that did not fit into one of the existing categories, sources for which there were few responses such as bought online, or if there was not enough information to categorize the source. Examples of other sources include bought from an unknown source or obtained from a friend by an unknown method.
[e]Includes prisoners who reported multiple sources or methods that fit into more than one of the categories. Each reported source is included in the categories above.
[f]Includes prisoners who reported they carried or possessed a firearm and prisoners who reported a source or method.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Among prisoners who possessed a firearm during the offense for which they were imprisoned, 7% of state and 10% of federal prisoners serving a sentence in 2016 bought or traded for the firearm from a gun shop or gun store. About 1% bought or traded for the firearm at a gun show. About a quarter (26%) of state prisoners and about a fifth (21%) of federal prisoners obtained a firearm that they possessed during their offense from an individual in a non-retail setting, such as a friend or family member.

Prisoners who reported that they had purchased or traded a firearm at a retail source were asked if they had obtained the firearm from a licensed dealer or private seller. Among prisoners who had possessed a firearm during the offense for which they were serving time, 8% of state and 11% of federal prisoners had purchased it from or traded with a licensed firearm dealer at a retail source (table 6).

Prisoners who reported that they had purchased a firearm from a licensed firearm dealer at a retail source were further asked whether they bought the firearm under their own name and whether they knew a background check was conducted. Among those who had possessed a firearm during the offense for which they were imprisoned, 7% of state and 8% of federal prisoners had purchased it under their own name from a licensed firearm dealer at a retail source, while approximately 1% of state and 2% of federal prisoners had purchased a firearm from a licensed dealer at a retail source but did not purchase it under their own name (not shown in table).

Among all prisoners who purchased or traded a firearm from a licensed firearm dealer at a retail source (8.2%), the majority reported that a background check was conducted (6.7%).

**TABLE 6**
**Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, processes used to obtain a firearm, 2016**

| Process to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Total | 100% | 100% | 100% |
| Not purchased or traded at retail source | 89.9% | 90.3% | 86.3% |
| Purchased or traded at retail source[a] | 10.1% | 9.7% | 13.7% |
| Licensed firearm dealer at retail source | 8.2 | 7.9 | 10.9 |
| Purchased under own name[b] | 6.9 | 6.8 | 8.4 |
| Background check was reportedly conducted[c] | 6.7 | 6.3 | 9.4 |
| Private seller at retail source[d] | 1.2 | 1.1 | 2.3 |
| Unknown[e] | 0.7 | 0.8 | : |
| Estimated number of prisoners who possessed a firearm (with valid data)[f] | 256,400 | 227,100 | 29,300 |

Note: Percentages exclude missing data. Excludes 10.3% of state prisoners and 14.1% of federal prisoners who possessed a firearm during the offense and were missing responses on source or method of obtaining the firearm. See appendix table 7 for standard errors.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Includes prisoners who purchased or traded from a retail source, including a retail store, pawn shop, flea market, or gun show.
[b]Includes prisoners who purchased from a retail source, including a retail store, pawn shop, flea market, or gun show. Excludes prisoners who traded for a firearm from a retail source.
[c]Includes prisoners who purchased from a retail source, including a retail store, pawn shop, flea market, or gun show. Excludes prisoners who traded for a firearm from a retail source and prisoners who reported that a background check was not conducted or who were unaware as to whether one was conducted.
[d]Excludes private sellers other than at a retail source.
[e]Includes prisoners who purchased or traded a firearm from a retail source and were missing responses on whether a firearm was purchased or traded from a licensed firearm dealer or a private seller at a retail source.
[f]Includes prisoners who reported they carried or possessed a firearm and prisoners who reported a source or method.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

### Use and source of firearms among all state and federal prisoners

About 1% of all state and federal prisoners used a firearm during the offense that they obtained from a retail source (table 7). About 2% of prisoners possessed a firearm that they obtained from a retail source, including a retail store, pawn shop, flea market, or gun show.

Thirteen percent of all state and federal prisoners used a firearm during the offense for which they were serving time in 2016.

---

**TABLE 7**

**Firearm possession and use among all state and federal prisoners during the offense for which they were serving time, by type of controlling offense and source, 2016**

| Controlling offense[a] | Percent of state and federal prisoners who— | | Percent of state and federal prisoners who— | |
|---|---|---|---|---|
| | Possessed a firearm[b] | Possessed a firearm that they obtained from a retail source[c] | Used a firearm[d] | Used a firearm that they obtained from a retail source[e] |
| Total | 20.8% | 1.9% | 12.8% | 1.3% |
| Violent* | 29.3% | 2.8% | 23.1% | 2.3% |
| Homicide[f] | 43.5 | 5.9 | 37.0 | 5.2 |
| Robbery | 43.5 | 1.8 | 31.5 | 1.3 |
| Property | 4.8% † | 0.5% † | 1.9% † | : |
| Drug | 9.6% † | 1.0% † | 0.8% † | 0.1% † |
| Public order | 23.6% † | 1.7% † | 5.5% † | 0.6% † |

Note: Percentages exclude missing data. Excludes 2.8% of prisoners who were missing responses on firearm possession during the offense and 1.2% of prisoners who had a valid response to firearm possession but were missing a controlling offense. Retail source includes purchasing or trading the firearm from a retail store, pawn shop, flea market, or gun show. Use includes prisoners who showed a firearm to anyone, pointed a firearm at anyone, or discharged a firearm during the controlling offense. See appendix table 8 for standard errors.

*Comparison group.

† Difference with comparison group is significant at the 95% confidence level across main categories, and no testing was done on subcategories (e.g., homicide).

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.

[a]See *Methodology* for more information on how controlling offense was measured.

[b]Includes state and federal prisoners who reported a valid response to firearm possession.

[c]Includes state and federal prisoners who reported a valid response to firearm possession and source.

[d]Includes state and federal prisoners who reported a valid response to firearm possession and use.

[e]Includes state and federal prisoners who reported a valid response to firearm possession, source, and use.

[f]Includes murder and both non-negligent and negligent manslaughter.

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

# Methodology

## Survey of Prison Inmates

The findings in this report are primarily based on data collected through the 2016 Survey of Prison Inmates (SPI). The SPI is a periodic, cross-sectional survey of the state and sentenced federal prison populations. Its primary objective is to produce national statistics of the state and sentenced federal prison populations across a variety of domains, including—but not limited to—demographic characteristics, current offense and sentence, incident characteristics, firearm possession and sources, criminal history, socioeconomic characteristics, family background, drug and alcohol use and treatment, mental and physical health and treatment, and facility programs and rule violations. RTI International served as BJS's data collection agent for the 2016 SPI under a cooperative agreement (award no. 2011-MU-MU-K070). From January through October 2016, data were collected through face-to-face interviews with prisoners using computer-assisted personal interviewing (CAPI).

Prior iterations of the SPI were known as the Survey of Inmates in State and Federal Correctional Facilities (SISFCF), which was renamed with the 2016 implementation. The first survey of state prisoners was fielded in 1974 and thereafter in 1979, 1986, 1991, 1997, and 2004. The first survey of federal prisoners was fielded in 1991, along with the survey of state prisoners, and since then both surveys have been conducted at the same time using the same questionnaire and administration.

The target population for the 2016 SPI was prisoners ages 18 and older who were held in a state prison or had a sentence to federal prison in the United States during 2016. Similar to prior iterations, the 2016 survey was a stratified two-stage sample design in which prisons were selected in the first stage and prisoners within sampled facilities were selected in the second stage. The SPI sample was selected from a universe of 2,001 unique prisons (1,808 state and 193 federal) that were either enumerated in the 2012 Census of State and Federal Adult Correctional Facilities or had opened between the completion of the census and July 2014 when the SPI sample of prisons was selected. A total of 364 prisons (306 state and 58 federal) participated in the 2016 survey out of the 385 selected (324 state and 61 federal) for interviewing. The first-stage response rate (i.e., the response rate among selected prisons) was 98.4% (98.1% among

state prisons and 100% among federal prisons).[3] A total of 24,848 prisoners participated (20,064 state and 4,784 federal) in the 2016 SPI based on a sample of 37,058 prisoners (30,348 state and 6,710 federal). The second-stage response rate (i.e., the response rate among selected prisoners) was 70.0% (69.3% among state prisoners and 72.8% among federal prisoners).[4]

Responses from interviewed prisoners in the 2016 SPI were weighted to provide national estimates. Each interviewed prisoner was assigned an initial weight corresponding to the inverse of the probability of selection within each sampled prison. A series of adjustment factors were applied to the initial weight to minimize potential bias due to non-response and to provide national estimates.

For more information on the 2016 SPI methodology, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, forthcoming).

## Standard errors and tests of significance

When national estimates are derived from a sample, as with the SPI, caution must be used when comparing one estimate to another or when comparing estimates between years. Although one estimate may be larger than another, estimates based on a sample rather than a complete enumeration of the population have some degree of sampling error. The sampling error of an estimate depends on several factors, including the size of the estimate, the number of completed interviews, and the intracluster correlation of the outcome within prisons. When the sampling error around an estimate is taken into account, estimates that appear different may not be statistically different. One measure of the sampling error associated with an estimate is the standard error. The standard error may vary from one estimate to the next. Standard errors in this report were estimated using Taylor Series Linearization to account for the complex design of the SPI in producing the variance estimate.

---

[3]A total of 15 prisons (12 state and 3 federal) that were sampled were deemed ineligible for the 2016 SPI. For more information, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, forthcoming).

[4]There were 10,661 sampled prisoners who were eligible for the survey but did not participate. Another 1,549 sampled prisoners were deemed ineligible for the survey. For more information, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, forthcoming).

Readers may use the estimates and standard errors of the estimates provided in this report to generate a 95% confidence interval around the estimates as a measure of the margin of error. Typically, multiplying the standard error by 1.96 and then adding or subtracting the result from the estimate produces the confidence interval. This interval expresses the range of values with which the true population parameter is expected to fall 95% of the time if the same method is used to select different samples.

For small samples and estimates close to 0%, the use of the standard error to construct the 95% confidence interval may not be reliable. Therefore, caution should be used when interpreting the estimates. Caution should also be used if constructing a 95% confidence interval, which would include zero in these cases, because the estimate may not be distinguishable from zero.

The standard errors have been used to compare estimates of firearm possession during the offense, firearm use during the crime, and type of firearm possessed. They have also been used to compare firearm possession among selected groups of prisoners that have been defined by demographic characteristics and controlling offense. To facilitate the analysis, rather than provide the detailed estimates for every standard error, differences in the estimates for subgroups in the relevant tables in this report have been tested and noted for significance at the 95% level of confidence. Readers should reference the tables for testing on specific findings. Unless otherwise noted, findings described in this report as higher, lower, or different passed a test at the 0.05 level of statistical significance (95% confidence level).

### Measurement of firearm possession and source

The 2016 SPI was restricted to prisoners age 18 or older at the time of the survey. Firearms analyses in this report were restricted to state and federal prisoners who were sentenced or state prisoners who were convicted but were awaiting sentencing. This report excludes prisoners who were awaiting trial (i.e., unconvicted) or a revocation hearing or who were held for other reasons. Unconvicted prisoners, such as those awaiting trial or being held for other reasons like safekeeping or a civil commitment, were excluded from this report because they were not asked questions about firearm possession to protect against self-incrimination. (See appendix 1, *Questions related to firearms in the Survey of Prison Inmates, 2016.*) Of

the estimated 1,421,700 state and federal prisoners in 2016, an estimated 287,400 were armed with a firearm, 1,094,200 were not armed with a firearm, 23,800 did not know or refused to answer the question, and 16,300 were not asked the question because they were not convicted or they stopped the interview before responding to the question.[5]

To determine whether prisoners possessed a firearm at the time of the offense for which they were serving time in prison, respondents were first asked whether they had carried, possessed, or used a weapon when the controlling offense occurred. Respondents could report that they carried, possessed, or used a firearm or another weapon such as a toy or BB gun, knife, other sharp object, or blunt object. Weapons other than firearms, including toy and BB guns, were excluded from this report. Multiple weapons and firearms could be reported by respondents.

Of the respondents who were asked about possessing a firearm during the offense for which they were imprisoned, about 3.0% of state and 1.7% of federal prisoners in 2016 were missing responses on firearm possession. These prisoners were excluded from the analyses in this report. All prisoners who reported they carried, possessed, or used a firearm during the offense were asked whether they had obtained the firearm because they were planning to carry, possess, or use it during the offense. They were also asked whether they showed, pointed, or fired the firearm during the offense. Respondents who reported that they fired the firearm were also asked whether they shot anyone and, if so, whether anyone they shot had died. Of the respondents who possessed a firearm during the offense, about 3.1% of state and 3.5% of federal prisoners in 2016 were missing responses on how they used the firearm. These prisoners were excluded from the analyses in figure 1, tables 1 through 3, and table 7.

To measure the type of firearm possessed by prisoners, respondents were asked whether they had carried, possessed, or used a handgun, rifle, shotgun, or some other type of firearm during the offense for which they were imprisoned. About 0.3% of state prisoners and 0.2% of federal prisoners in 2016 were missing responses on the type of firearm that they possessed. These prisoners, along with prisoners who were missing a response on firearm possession, were excluded from the analyses in table 3.

---

[5]The SPI sample was weighted to the state and federal prison populations that were eligible to be sampled in the survey. See *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, forthcoming).

To measure the source and method of obtaining the firearm possessed by prisoners during their crime, two separate questions were asked in the survey. The first question asked how the prisoners obtained the firearm, and multiple responses could be reported in the 2016 SPI. Possible responses included stole it, rented it, borrowed it from or were holding it for somebody, traded something for it, bought it, someone bought it for them, someone gave it as a gift, found it or it was at the location where the offense occurred, it was brought by someone else, or other. If respondents specified an "other" method of obtaining the firearm, then the field interviewers entered the respondents' answers into a text field. These responses originally reported as "other" were coded to one of the existing response categories if possible.

The second question asked where prisoners obtained the firearm, and multiple responses could be reported in the 2016 SPI. Respondents received this question if they reported that they stole, rented, borrowed from or were holding for somebody, traded something for, or bought the firearm. Possible responses included gun shop or gun store; pawn shop; flea market; gun show; from a victim, family member, or friend; from a fence (a middleman for stolen goods) or underground market; off the street or from a drug dealer; in a burglary; online or the internet; or other. Fewer than 1% of state and federal prisoners reported obtaining a firearm online. These responses were included in table 5 in the "other" category due to the small number of sample cases. If respondents specified an "other" source of obtaining a firearm, then the field interviewers entered the respondents' answers into a text field. Responses originally reported as "other" were coded to one of the existing response categories if possible.

The responses from these two questions were used to create the source and method categories in figure 1 and tables 5 through 7. Approximately 10.3% of state and 14.1% of federal prisoners in 2016 who possessed a firearm during the offense for which they were serving a sentence were missing responses on source or method of obtaining the firearm. These prisoners were excluded from figure 1 and tables 5 through 7.

Prisoners who reported purchasing or trading a firearm from a retail source (gun shop or gun store, pawn shop, flea market, or gun show) were asked if they purchased or traded it from a licensed firearm dealer or a private seller. Prisoners who reported they purchased a firearm from a retail source were further asked whether they bought the firearm under their own name and whether the seller did a firearm purchase background check before selling them the firearm. About 1% of the respondents who possessed a firearm during the offense purchased or traded it from a retail source and were missing responses on whether they bought the firearm from a licensed dealer or private seller. About 1% of respondents who possessed a firearm during the offense purchased it from a retail source and were missing responses on whether the firearm was purchased under their own name or whether a background check was conducted.

## Measurement of controlling offense

The way controlling offense was measured through the 2016 SPI, and reflected in this report, varies by sentence status and the number of offenses of prisoners:

- For sentenced prisoners and those awaiting sentencing with one offense, that offense is the controlling offense.

- For sentenced prisoners with multiple offenses and sentences, the controlling offense is the one with the longest sentence.

- For sentenced prisoners with multiple offenses and one sentence and those awaiting sentencing with multiple offenses, the controlling offense is the most serious offense. For this report, violent offenses are considered most serious, followed by property, drug, public-order, and all other offenses.

For prisoners who were convicted but awaiting sentencing, the controlling offense is the most serious offense.

## Appendix 1. Questions related to firearms in the Survey of Prison Inmates, 2016

This appendix includes the questions from the 2016 SPI that were used to measure the firearms' constructs in this report. Text that appears in capital letters in the questions was not read out loud to respondents. That text reflects programming instructions for the CAPI instrument, instructions to field interviewers who conducted the interviews, or response options that were not read out loud to respondents but were coded by the field interviewers during the interviews.

**Questions**

**CJ39.** (ASK IF RESPONDENT REPORTED BEING SENTENCED IN CJ1 OR CJ3 OR IF RESPONDENT REPORTED HE/SHE WAS AWAITING SENTENCING IN CJH2A.) Did you carry, possess, or use a weapon when the (INSERT CONTROLLING OFFENSE) occurred?

- YES
- NO (SKIP TO NEXT SECTION)

**CJH1.** How many weapons did you carry, possess, or use when the (INSERT CONTROLLING OFFENSE) occurred?

- ONE
- TWO OR MORE

**CJH2.** What (INSERT "kind of weapon was it?" OR "kinds of weapons were they?") CHECK ALL THAT APPLY.

- FIREARM
- TOY OR BB GUN (INCLUDE FAKE OR REPLICA GUNS)
- KNIFE
- OTHER SHARP OBJECT (SCISSORS, ICE PICK, AX, ETC.)
- BLUNT OBJECT (ROCK, CLUB, BLACKJACK, ETC.)
- ANOTHER WEAPON
  - What kinds of weapons were they?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH3.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2.) How many firearms did you carry, possess, or use when the (INSERT CONTROLLING OFFENSE) occurred?

- ENTER NUMBER OF FIREARMS

**CJH4.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2.) What (INSERT "type of firearm was it?" OR "types of firearms were they?") CHECK ALL THAT APPLY.

- A HANDGUN
- A RIFLE
- A SHOTGUN
- SOME OTHER TYPE OF FIREARM
  - What type of firearm?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH5.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2.) How did you obtain the (INSERT "firearm" OR "firearms") that you carried, possessed, or used during the (INSERT CONTROLLING OFFENSE)? Any others? CHECK ALL THAT APPLY.

- STOLE IT (GO TO CJH6)
- RENTED IT (GO TO CJH6)
- BORROWED FROM OR WAS HOLDING FOR SOMEBODY (GO TO CJH6)
- TRADED SOMETHING FOR IT (GO TO CJH6)
- BOUGHT IT (GO TO CJH6)
- SOMEONE BOUGHT IT FOR ME (GO TO CJH7)
- SOMEONE GAVE IT TO ME AS A GIFT (GO TO CJH9)
- FOUND IT/WAS AT LOCATION WHERE OFFENSE OCCURRED (GO TO CJH9)
- WAS BROUGHT BY SOMEONE ELSE (GO TO CJH9)
- OTHER
  - How did you obtain the firearm that you carried, possessed, or used during the offense?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH6.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2 AND REPORTED IN CJH5 HE/SHE "STOLE IT", "RENTED IT", "BORROWED FROM OR WAS HOLDING FOR SOMEBODY", "TRADED SOMETHING FOR IT", OR "BOUGHT IT".) Where did you obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)? CHECK ALL THAT APPLY.

- GUN SHOP OR GUN STORE (GO TO CJH6A)
- PAWN SHOP (GO TO CJH6A)
- FLEA MARKET (GO TO CJH6A)
- GUN SHOW (GO TO CJH6A)
- FROM THE VICTIM(S) (GO TO CJH9)
- FROM A FAMILY MEMBER (GO TO CJH9)
- FROM A FRIEND (GO TO CJH9)
- FROM A FENCE/BLACK MARKET SOURCE (GO TO CJH9)
- OFF THE STREET/FROM A DRUG DEALER (GO TO CJH9)
- IN A BURGLARY (GO TO CJH9)
- ONLINE/THE INTERNET (GO TO CJH9)
- OTHER
  - Where did you obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

*Continued on next page*

## Appendix 1. Questions related to firearms in the Survey of Prison Inmates, 2016 (continued)

**CJH6a.** (ASK IF RESPONDENT REPORTED IN CJH6 THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) When you obtained the (INSERT TYPE OF FIREARM REPORTED IN CJH4) was it from a licensed firearm dealer or a private seller?

- LICENSED FIREARM DEALER
- PRIVATE SELLER

**CJH6b.** (ASK IF RESPONDENT REPORTED IN CJH5 THAT HE/SHE "BOUGHT IT" AND IN CJH6 REPORTED THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) Did you buy the (INSERT TYPE OF FIREARM REPORTED IN CJH4) under your own name?

- YES
- NO
- NO PAPERWORK WAS REQUIRED

**CJH6c.** (ASK IF RESPONDENT REPORTED IN CJH5 THAT HE/SHE "BOUGHT IT" AND REPORTED IN CJH6 THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) Did the seller do a firearm purchase background check before selling you the gun?

- YES
- NO

**CJH6d.** (ASK IF RESPONDENT REPORTED IN CJH5 THAT HE/SHE "BOUGHT IT" AND REPORTED IN CJH6 THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) Did you buy the (INSERT TYPE OF FIREARM REPORTED IN CJH4) directly or did someone else buy it for you?

- INMATE BOUGHT
- SOMEONE ELSE BOUGHT

**CJH7.** (ASK IF RESPONDENT REPORTED "SOMEONE ELSE BOUGHT IT FOR ME" IN CJH5.) Where did that person obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)?

- GUN SHOP OR GUN STORE
- PAWN SHOP
- FLEA MARKET
- GUN SHOW
- FROM THE VICTIM(S)
- FROM A FAMILY MEMBER
- FROM A FRIEND
- FROM A FENCE/BLACK MARKET SOURCE

- OFF THE STREET/FROM A DRUG DEALER
- IN A BURGLARY
- ONLINE/THE INTERNET
- OTHER
  - Where did that person obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH8.** (ASK IF RESPONDENT REPORTED "SOMEONE ELSE BOUGHT IT FOR ME" IN CJH5.) Why did someone else obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4) for you? CHECK ALL THAT APPLY.

- COULD NOT TRAVEL TO WHERE THE SELLER WAS
- NOT ALLOWED BECAUSE TOO YOUNG
- NOT ALLOWED BECAUSE OF CRIMINAL RECORD
- THEY COULD GET IT MORE QUICKLY OR EASILY
- DID NOT WANT TO BE LINKED TO FIREARM PURCHASE
- OTHER
  - Why did someone else obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4) for you?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH9.** Did you get the (INSERT TYPE OF FIREARM REPORTED IN CJH4) because you were **planning** to carry, possess, or use it during the (INSERT CONTROLLING OFFENSE)?

- YES
- NO

**CJH10.** Did you show or point (INSERT "the firearm" OR "any of the firearms") at anyone during the (INSERT CONTROLLING OFFENSE)?

- YES
- NO

**CJH11.** Did you fire (INSERT "the firearm" OR "any of the firearms") during the (INSERT CONTROLLING OFFENSE)?

- YES
- NO (SKIP TO NEXT SECTION)

**CJH12.** Did you shoot anyone?

- YES
- NO (SKIP TO NEXT SECTION)

**CJH13.** Did anyone you shot die?

- YES
- NO

## APPENDIX TABLE 1

**Standard errors for figure 1: Percent of all state and federal inmates who had possessed or used a firearm during their offense, 2016**

| Characteristic | Possessed | Used |
|---|---|---|
| Any gun | 0.64% | 0.51% |
| Handgun | 0.59 | 0.46 |
| Gun they obtained from retail source | 0.13 | 0.12 |

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## APPENDIX TABLE 2

**Standard errors for table 1: Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of controlling offense, 2016**

| Controlling offense | Estimated number of state prisoners | Percent of state prisoners who— | | Estimated number of federal prisoners | Percent of federal prisoners who— | |
|---|---|---|---|---|---|---|
| | | Possessed a firearm | Used a firearm | | Possessed a firearm | Used a firearm |
| Total | 31,100 | 0.69% | 0.57% | 8,300 | 1.76% | 0.71% |
| Violent | 22,400 | 0.90% | 0.73% | 2,700 | 2.87% | 2.83% |
| Homicide | 10,900 | 1.16 | 1.12 | 700 | 6.53 | 4.75 |
| Rape/sexual assault | 9,900 | 0.36 | 0.22 | 600 | : | : |
| Robbery | 6,700 | 1.32 | 1.28 | 1,600 | 3.73 | 3.80 |
| Assault | 5,900 | 1.34 | 1.24 | 700 | 5.15 | 4.52 |
| Other violent | 2,100 | 2.03 | 1.73 | 300 | 8.42 | : |
| Property | 7,800 | 0.53% | 0.32% | 2,000 | 0.83% | : |
| Burglary | 3,900 | 0.80 | 0.54 | 100 | : | : |
| Other property | 5,800 | 0.58 | 0.33 | 2,000 | 0.81 | : |
| Drug | 11,400 | 0.68% | 0.20% | 5,400 | 0.87% | 0.21% |
| Trafficking | 9,700 | 0.83 | 0.24 | 5,000 | 0.88 | 0.21 |
| Possession | 3,400 | 1.06 | : | 600 | : | : |
| Other/unspecified drug | 700 | : | : | 600 | : | : |
| Public order | 8,400 | 1.35% | 0.58% | 3,600 | 3.55% | 0.88% |
| Weapons | 3,000 | 2.02 | 1.70 | 2,700 | 2.02 | 1.60 |
| Other public order | 7,200 | 0.70 | 0.42 | 3,800 | 0.89 | : |
| Other | 600 | : | : | 300 | : | : |
| Unknown | 1,400 | 1.61% | : | 400 | : | : |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**APPENDIX TABLE 3**

**Standard errors for table 2: Among state and federal prisoners who possessed a firearm during the offense for which they were serving time, extent of firearm use, 2016**

| Firearm use | State prisoners | Federal prisoners | State prisoners Violent offense | State prisoners Non-violent offense | Federal prisoners Violent offense | Federal prisoners Non-violent offense |
|---|---|---|---|---|---|---|
| Obtained firearm because planned to use in controlling offense | | | | | | |
| Yes | 0.81% | 1.57% | 0.81% | 2.00% | 4.01% | 1.88% |
| No | 0.81 | 1.57 | 0.81 | 2.00 | 4.01 | 1.88 |
| Used firearm | 1.11% | 1.92% | 0.85% | 1.83% | 3.86% | 1.57% |
| Discharged | 1.34% | 1.17% | 1.36% | 1.47% | 3.58% | 1.14% |
| Killed victim | 1.28 | 0.75 | 1.40 | : | 2.49 | : |
| Injured/shot victim but did not kill victim | 0.73 | 0.55 | 0.86 | 0.89 | : | : |
| Discharged firearm but did not shoot anyone | 0.47 | 0.98 | 0.51 | 1.17 | 2.16 | 1.02 |
| Did not discharge | 0.97% | 1.60% | 1.21% | 1.24% | 4.99% | 0.87% |
| Did not use firearm | 1.11% | 1.92% | 0.85% | 1.83% | 3.86% | 1.57% |
| Estimated number of prisoners who possessed a firearm (with valid data) | 10,100 | 3,100 | 9,200 | 3,400 | 1,200 | 2,200 |

: Not calculated. Too few cases to provide a reliable estimate or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**APPENDIX TABLE 4**

**Standard errors for table 3: Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of firearm, 2016**

| Type of firearm | Percent of prisoners who possessed a firearm All prisoners | State | Federal | Percent of prisoners who used a firearm All prisoners | State | Federal |
|---|---|---|---|---|---|---|
| Firearm | 0.64 | 0.69% | 1.76% | 0.51 | 0.57% | 0.71% |
| Handgun | 0.59 | 0.64 | 1.63 | 0.46 | 0.51 | 0.67 |
| Rifle | 0.10 | 0.10 | 0.28 | 0.07 | 0.08 | 0.13 |
| Shotgun | 0.11 | 0.12 | 0.22 | 0.09 | 0.10 | 0.09 |
| No firearm | 0.64 | 0.69 | 1.76 | 0.51 | 0.57 | 0.71 |
| Estimated number of prisoners (with valid data) | 32,100 | 31,000 | 8,300 | 32,100 | 31,000 | 8,300 |

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**APPENDIX TABLE 5**

**Standard errors for table 4: Firearm possession among state and federal prisoners during the offense for which they were serving time, by demographic characteristics, 2016**

| Demographic characteristic | State | | Federal | |
|---|---|---|---|---|
| | Number of prisoners | Percent of prisoners who possessed a firearm during the offense | Number of prisoners | Percent of prisoners who possessed a firearm during the offense |
| **Sex** | | | | |
| Male | 30,700 | 0.74% | 8,200 | 1.88% |
| Female | 5,200 | 0.96 | 1,300 | 1.00 |
| **Race/Hispanic origin** | | | | |
| White | 16,500 | 0.64% | 3,900 | 2.28% |
| Black | 16,200 | 0.91 | 5,600 | 2.02 |
| Hispanic | 12,400 | 1.26 | 8,000 | 1.70 |
| American Indian/Alaska Native | 2,500 | 2.94 | 800 | 5.18 |
| Asian/Native Hawaiian/Other Pacific Islander | 1,600 | 4.69 | 600 | : |
| Two or more races | 5,000 | 1.19 | 1,200 | 3.50 |
| **Age at time of survey** | | | | |
| 18–24 | 8,200 | 1.71% | 1,000 | 5.69% |
| 25–34 | 13,700 | 1.00 | 3,200 | 2.57 |
| 35–44 | 9,500 | 0.94 | 3,400 | 1.68 |
| 45–54 | 9,100 | 0.76 | 2,400 | 1.68 |
| 55 or older | 7,700 | 1.02 | 2,200 | 2.02 |
| **Marital status** | | | | |
| Married | 6,300 | 1.06% | 3,100 | 1.77% |
| Widowed/widowered | 2,000 | 2.10 | 400 | 5.93 |
| Separated | 2,700 | 1.34 | 1,200 | 3.11 |
| Divorced | 10,600 | 0.97 | 2,200 | 1.58 |
| Never married | 20,100 | 0.81 | 5,800 | 2.10 |
| **Education** | | | | |
| Less than high school | 21,500 | 0.83% | 6,000 | 2.18% |
| High school graduate | 8,500 | 0.88 | 2,100 | 1.69 |
| Some college | 5,000 | 0.96 | 2,000 | 2.08 |
| College degree or more | 2,500 | 1.43 | 2,000 | 1.83 |
| **Citizenship** | | | | |
| U.S. citizen | 30,000 | 0.69% | 10,700 | 1.87% |
| Non-U.S. citizen | 3,700 | 2.04 | 9,500 | 1.09 |
| **Military service** | | | | |
| Yes | 4,800 | 1.07% | 1,200 | 2.98% |
| No | 28,700 | 0.72 | 8,200 | 1.80 |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## APPENDIX TABLE 6
**Standard errors for table 5: Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, sources and methods used to obtain a firearm, 2016**

| Source and method to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Purchased/traded at retail source | 0.66% | 0.70% | 2.07% |
|   Gun shop/store | 0.54 | 0.56 | 1.87 |
|   Pawn shop | 0.27 | 0.29 | 0.62 |
|   Flea market | 0.13 | : | : |
|   Gun show | 0.16 | 0.17 | 0.44 |
| Obtained from individual | 0.87% | 0.94% | 2.02% |
|   Purchased/traded from family/friend | 0.59 | 0.65 | 1.27 |
|   Rented/borrowed from family/friend | 0.47 | 0.52 | 0.54 |
|   Gift/purchased for prisoner | 0.69 | 0.75 | 1.40 |
| Off the street/underground market | 1.07% | 1.13% | 3.26% |
| Theft | 0.48% | 0.53% | 0.79% |
|   From burglary | 0.22 | 0.24 | : |
|   From retail source | 0.07 | : | : |
|   From family/friend | 0.26 | 0.29 | : |
|   Unspecified theft | 0.31 | 0.34 | 0.53 |
| Other source | 0.78% | 0.85% | 1.80% |
|   Found at location of crime/victim | 0.50 | 0.53 | 1.31 |
|   Brought by someone else | 0.45 | 0.49 | 0.87 |
|   Other | 0.51 | 0.55 | 1.40 |
| Multiple sources | 0.27% | 0.29% | 0.50% |
| Estimated number of prisoners who possessed a firearm, excluding prisoners who did not report source | 9,900 | 9,500 | 2,800 |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## APPENDIX TABLE 7
**Standard errors for table 6: Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, processes used to obtain a firearm, 2016**

| Process to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Not purchased or traded at retail source | 0.66% | 0.70% | 2.07% |
| Purchased or traded at retail source | 0.66% | 0.70% | 2.07% |
|   Licensed firearm dealer at retail source | 0.60 | 0.63 | 2.08 |
|     Purchased under own name | 0.54 | 0.57 | 1.89 |
|     Background check was reportedly conducted | 0.54 | 0.56 | 1.93 |
|   Private seller at retail source | 0.19 | 0.20 | 0.63 |
|   Unknown | 0.21 | 0.24 | : |
| Estimated number of prisoners who possessed a firearm (with valid data) | 9,900 | 9,500 | 2,800 |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**APPENDIX TABLE 8**

**Standard errors for table 7: Firearm possession and use among all state and federal prisoners during the offense for which they were serving time, by type of controlling offense and source, 2016**

| Controlling offense | Percent of state and federal prisoners who— | | Percent of state and federal prisoners who— | |
|---|---|---|---|---|
| | Possessed a firearm | Possessed a firearm that they obtained from a retail source | Used a firearm | Used a firearm that they obtained from a retail source |
| Total | 0.64% | 0.13% | 0.51% | 0.12% |
| Violent | 0.88% | 0.23% | 0.72% | 0.21% |
| Homicide | 1.14 | 0.63 | 1.10 | 0.62 |
| Robbery | 1.25 | 0.29 | 1.22 | 0.25 |
| Property | 0.50% | 0.15% | 0.30% | : |
| Drug | 0.52% | 0.17% | 0.15% | 0.04% |
| Public order | 1.35% | 0.27% | 0.48% | 0.17% |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.



The Bureau of Justice Statistics of the U.S. Department of Justice is the principal federal agency responsible for measuring crime, criminal victimization, criminal offenders, victims of crime, correlates of crime, and the operation of criminal and civil justice systems at the federal, state, tribal, and local levels. BJS collects, analyzes, and disseminates reliable statistics on crime and justice systems in the United States, supports improvements to state and local criminal justice information systems, and participates with national and international organizations to develop and recommend national standards for justice statistics. Jeffrey H. Anderson is the director.

This report was written by Mariel Alper and Lauren Glaze of BJS. Mariel Alper conducted statistical analyses. Marcus Berzofsky and John Bunker of RTI International provided statistical review. Danielle Kaeble, Laura Maruschak, Todd Minton, and Stephanie Mueller verified the report. Lauren Glaze was the BJS project manager for the 2016 Survey of Prison Inmates.

Eric Hendrixson and Jill Thomas edited the report. Tina Dorsey and Morgan Young produced the report.

January 2019, NCJ 251776





NCJ251776

**Office of Justice Programs**
**Building Solutions • Supporting Communities • Advancing Justice**
**www.ojp.gov**

# EXHIBIT 24

Home (/)  /  Firearms  /  Overview (/firearms/overview)

# GUN SALES IN CALIFORNIA

This post examines firearms transactions in California. It looks at how firearms sales changed over the last two decades, where individuals are most likely to purchase guns, what types of guns they buy, and whom they buy from.

**Highlights:**

- Gun transactions have been growing in recent years, increasing 2.5 times between 2007 and 2017
- New guns have steadily become a larger percentage of transactions (~75%) compared to used guns
- Most guns are sold by dealers (65% of handguns, 82% of long guns), followed by private parties (16% of handguns, 10% of long guns)

## HOW HAVE GUN SALES CHANGED OVER TIME?

Gun sales have surged in recent years, driven by sales of both handguns and long guns. From 1996 to 2007, sales were relatively flat except for a spike in 1999, where long gun sales increased 75% and handgun sales increased 30% (probably in anticipation of the passage of several California gun regulation (http://articles.latimes.com/1999/sep/29/news/mn-15301) laws). The rise in 2013 likely again reflected purchases in anticipation of gun-related legislation. In 2011 a law was passed that would require record-keeping on who purchases long guns (a longstanding requirement for handguns). Sales of long guns increased 75% in the two years prior to the law going into effect in 2014. In 2016 more than 1.3 million guns were sold in California, reaching an all-time peak.

### TOTAL GUN SALES SPLIT BY HANDGUNS AND LONG GUNS

**0154**



Over the course of a typical year, gun sales tend to peak in December. This surge may be following seasonal shopping trends starting on Black Friday and continuing through Christmas. There is a smaller rise around March, which may be due to tax refunds being used towards purchases. Month-by-month data also highlight gun sales that may be related to specific events. The big spike in January 2013 may have been a response to President Obama's proposals for gun regulations (http://www.nytimes.com/interactive/2013/01/16/us/obama-gun-control-proposal.html?_r=0) after the Newtown shootings in December 2012. The highest monthly sales in the last 20 years was December 2016, which may have been a combination of holiday sales and a reaction to the Pulse shooting in Orlando, FL.

## GUN SALES BY YEAR AND MONTH



## WHAT SHARE OF GUNS SOLD ARE NEW VERSUS USED?

Total gun transactions includes both new guns sold, and the transfer of previously purchased weapons (used). In 2007, new handguns accounted for just over 60% of all handgun sales. In 2016 and 2017, about 75% of handguns sold were new. In other words, not only are more guns being sold, more new guns are being sold. This suggests that the total number of guns in the state is quickly rising. ❶

**0155**



**NEW VS. USED HANDGUN SALES**

## WHAT GUNS ARE BEING BOUGHT?

Californians purchase firearms made by hundreds of different manufacturers. The top three manufacturers in terms of guns sold in 2017 were Glock (13.1%), Smith and Wesson (12.5%), and Ruger (8.9%). The top ten manufacturers accounted for over 60% of guns sold in 2017.



**SALES OF TOP 10 GUN MAKERS IN 2017**

## HOW ARE GUNS TRANSACTED?

About 65% of all handgun transactions are dealer sales. 15-20% are private party transfers, 5-10% are out of state registration, almost 10% are curios/relics. 80% of long gun sales are through dealers, with the remaining transactions primarily split between private party transfer and out of state registration. Unlike most states where private party transfers are unregulated, in California they still require a background check and registration of the sale via a dealer. Also unlike many other states, California requires background checks for sales at gun shows. Nationwide, an estimated 20-40% of sales occur at gun shows, allowing many purchasers to avoid a background check (see here (http://www.bradycampaign.org/sites/default/files/Brady-20-years-report.pdf) and here (https://www.thetrace.org/2015/10/private-sale-loophole-background-check-harvard-research/)). In California, less than 2% of recorded gun transactions take place at gun shows.

## PERCENTAGE OF HANDGUN AND LONG GUN SALES BY TRANSACTION TYPE IN 2017



# HOW HAS THE NUMBER OF GUN DEALERSHIPS CHANGED OVER TIME?

From 1996 to 2007, the number of gun dealerships dropped by almost two-thirds while gun sales stayed relatively flat. The dramatic growth (240%) in gun transactions from 2008 to 2017 has not been accompanied by similar growth in the number of licensed gun dealerships, which only increased by 40%. The concentration of sales among gun dealers has increased in the past two decades.

## GUN SALES AND GUN DEALERSHIPS OVER TIME



# JOIN OUR COMMUNITY

✉ Sign up for updates

| Email Address |
|---|

SIGN UP

📊 New dataset ideas

| Share Your Data Set |
|---|

SUBMIT SUGGESTION

🚩 Technical issues

| Report Bug |
|---|

REPORT BUG

**DATA STORIES (/STORIES)**

Arrest Rates (/arrests/overview)

Clearance Rates (/clearances/overview)

Crime Rates (/crimes/overview)

**0158**

Death in Custody (/death-in-custody/overview)

Firearms (/firearms/overview)

Law Enforcement Officers (/agencies/overview)

## DATA EXPLORATION (/EXPLORATION)

County Map (/agencies/county-map)

Charts (/agencies/charts)

Trends (/agencies/time-trends)

Crime Statistics (/crime-statistics)

Agency & County Profile (/agencies/agency-profile)

## DATA PORTAL (/DATA)

## RESOURCES (/RESOURCES/)

About (/resources/about)

Publications (/resources/publications)

Glossary (/resources/glossary)

FAQs (/resources/faqs)

Contact (/resources/contact)

## COMMUNITY (/COMMUNITY)

# EXHIBIT 25

# Underlying Cause of Death, 1999-2017 Results

## Numbers of Non-Suicide Youth Deaths in CA (2017)

| State | Ten-Year Age Groups | Cause of death | Deaths | Population | Crude Rate Per 100,000 |
|---|---|---|---|---|---|
| California (06) | < 1 year | A41.9 (Septicaemia, unspecified) | 11 | 488,479 | Unreliable |
| California (06) | < 1 year | P00.0 (Newborn affected by maternal hypertensive disorders) | 11 | 488,479 | Unreliable |
| California (06) | < 1 year | P01.0 (Newborn affected by incompetent cervix) | 53 | 488,479 | 10.9 |
| California (06) | < 1 year | P01.1 (Newborn affected by premature rupture of membranes) | 99 | 488,479 | 20.3 |
| California (06) | < 1 year | P01.5 (Newborn affected by multiple pregnancy) | 12 | 488,479 | Unreliable |
| California (06) | < 1 year | P02.1 (Newborn affected by other forms of placental separation and haemorrhage) | 32 | 488,479 | 6.6 |
| California (06) | < 1 year | P02.7 (Newborn affected by chorioamnionitis) | 36 | 488,479 | 7.4 |
| California (06) | < 1 year | P07.2 (Extreme immaturity) | 213 | 488,479 | 43.6 |
| California (06) | < 1 year | P07.3 (Other preterm infants) | 28 | 488,479 | 5.7 |
| California (06) | < 1 year | P21.9 (Birth asphyxia, unspecified) | 19 | 488,479 | Unreliable |
| California (06) | < 1 year | P22.0 (Respiratory distress syndrome of newborn) | 34 | 488,479 | 7.0 |
| California (06) | < 1 year | P26.9 (Unspecified pulmonary haemorrhage originating in the perinatal period) | 14 | 488,479 | Unreliable |
| California (06) | < 1 year | P28.0 (Primary atelectasis of newborn) | 21 | 488,479 | 4.3 |
| California (06) | < 1 year | P29.0 (Neonatal cardiac failure) | 50 | 488,479 | 10.2 |
| California (06) | < 1 year | P29.1 (Neonatal cardiac dysrhythmia) | 53 | 488,479 | 10.9 |
| California (06) | < 1 year | P36.9 (Bacterial sepsis of newborn, unspecified) | 40 | 488,479 | 8.2 |
| California (06) | < 1 year | P52.3 (Unspecified intraventricular (nontraumatic) haemorrhage of newborn) | 32 | 488,479 | 6.6 |
| California (06) | < 1 year | P60 (Disseminated intravascular coagulation of newborn) | 10 | 488,479 | Unreliable |

0161

| | Ten-Year Age Groups | Cause of death | | | |
|---|---|---|---|---|---|
| California (06) | < 1 year | P77 (Necrotizing enterocolitis of newborn) | 29 | 488,479 | 5.9 |
| California (06) | < 1 year | P83.2 (Hydrops fetalis not due to haemolytic disease) | 28 | 488,479 | 5.7 |
| California (06) | < 1 year | P91.6 (Hypoxic ischemic encephalopathy of newborn) | 21 | 488,479 | 4.3 |
| California (06) | < 1 year | Q00.0 (Anencephaly) | 36 | 488,479 | 7.4 |
| California (06) | < 1 year | Q21.2 (Atrioventricular septal defect) | 11 | 488,479 | Unreliable |
| California (06) | < 1 year | Q23.4 (Hypoplastic left heart syndrome) | 16 | 488,479 | Unreliable |
| California (06) | < 1 year | Q24.9 (Congenital malformation of heart, unspecified) | 37 | 488,479 | 7.6 |
| California (06) | < 1 year | Q33.6 (Hypoplasia and dysplasia of lung) | 22 | 488,479 | 4.5 |
| California (06) | < 1 year | Q60.2 (Renal agenesis, unspecified) | 11 | 488,479 | Unreliable |
| California (06) | < 1 year | Q79.0 (Congenital diaphragmatic hernia) | 15 | 488,479 | Unreliable |
| California (06) | < 1 year | Q89.7 (Multiple congenital malformations, not elsewhere classified) | 17 | 488,479 | Unreliable |
| California (06) | < 1 year | Q89.9 (Congenital malformation, unspecified) | 14 | 488,479 | Unreliable |
| California (06) | < 1 year | Q90.9 (Down syndrome, unspecified) | 10 | 488,479 | Unreliable |
| California (06) | < 1 year | Q91.3 (Edwards syndrome, unspecified) | 41 | 488,479 | 8.4 |
| California (06) | < 1 year | Q91.7 (Patau syndrome, unspecified) | 19 | 488,479 | Unreliable |
| California (06) | < 1 year | R95 (Sudden infant death syndrome - SIDS) | 114 | 488,479 | 23.3 |
| California (06) | < 1 year | R99 (Other ill-defined and unspecified causes of mortality) | 94 | 488,479 | 19.2 |
| California (06) | < 1 year | W75 (Accidental suffocation and strangulation in bed) | 33 | 488,479 | 6.8 |
| California (06) | < 1 year | W84 (Unspecified threat to breathing) | 11 | 488,479 | Unreliable |
| California (06) | < 1 year | **Total** | **1,973** | **488,479** | **403.9** |
| California (06) **State** | 1-4 years | C91.0 (Acute lymphoblastic leukaemia - Malignant neoplasms) | 10 **Deaths** | 1,983,034 **Population** | Unreliable **Crude Rate per 100,000** |
| California (06) | 1-4 years | C92.0 (Acute myeloid leukaemia - Malignant neoplasms) | 11 | 1,983,034 | Unreliable |
| California (06) | 1-4 years | R99 (Other ill-defined and unspecified causes of mortality) | 15 | 1,983,034 | Unreliable |

0162

| | Ten-Year Age Groups | Cause of death | | | |
|---|---|---|---|---|---|
| California (06) | 1-4 years | V87.7 (Person injured in collision between other specified motor vehicles (traffic)) | 10 | 1,983,034 | Unreliable |
| California (06) | 1-4 years | W67 (Drowning and submersion while in swimming-pool) | 24 | 1,983,034 | 1.2 |
| California (06) | 1-4 years | **Total** | **333** | **1,983,034** | **16.8** |
| California (06) | 5-14 years | C71.9 (Brain, unspecified - Malignant neoplasms) | 23 | 5,057,132 | 0.5 |
| California (06) | 5-14 years | C91.0 (Acute lymphoblastic leukaemia - Malignant neoplasms) | 11 | 5,057,132 | Unreliable |
| California (06) | 5-14 years | G80.9 (Infantile cerebral palsy, unspecified) | 20 | 5,057,132 | 0.4 |
| California (06) | 5-14 years | R99 (Other ill-defined and unspecified causes of mortality) | 13 | 5,057,132 | Unreliable |
| California (06) | 5-14 years | V43.6 (Car occupant injured in collision with car, pick-up truck or van, passenger injured in traffic accident) | 11 | 5,057,132 | Unreliable |
| California (06) | 5-14 years | V87.7 (Person injured in collision between other specified motor vehicles (traffic)) | 25 | 5,057,132 | 0.5 |
| California (06) | 5-14 years | V89.2 (Person injured in unspecified motor-vehicle accident, traffic) | 16 | 5,057,132 | Unreliable |
| California (06) | 5-14 years | **Total** | **508** | **5,057,132** | **10.0** |
| California (06) | 15-24 years | C41.9 (Bone and articular cartilage, unspecified - Malignant neoplasms) | 26 | 5,330,443 | 0.5 |
| California (06) | 15-24 years | C49.9 (Connective and soft tissue, unspecified - Malignant neoplasms) | 12 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | C62.9 (Testis, unspecified - Malignant neoplasms) | 14 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | C71.9 (Brain, unspecified - Malignant neoplasms) | 17 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | C91.0 (Acute lymphoblastic leukaemia - Malignant neoplasms) | 32 | 5,330,443 | 0.6 |
| California (06) | 15-24 years | C92.0 (Acute myeloid leukaemia - Malignant neoplasms) | 18 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | E14.1 (Unspecified diabetes mellitus, with ketoacidosis) | 10 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | G40.9 (Epilepsy, unspecified) | 27 | 5,330,443 | 0.5 |

| | Ten-Year Age Groups | Cause of death | | | |
|---|---|---|---|---|---|
| California (06) | 15-24 years | G71.0 (Muscular dystrophy) | 10 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | G80.9 (Infantile cerebral palsy, unspecified) | 34 | 5,330,443 | 0.6 |
| California (06) | 15-24 years | I42.0 (Dilated cardiomyopathy) | 14 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | Q24.9 (Congenital malformation of heart, unspecified) | 15 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | R99 (Other ill-defined and unspecified causes of mortality) | 48 | 5,330,443 | 0.9 |
| California (06) | 15-24 years | V03.1 (Pedestrian injured in collision with car, pick-up truck or van, traffic accident) | 41 | 5,330,443 | 0.8 |
| California (06) | 15-24 years | V05.9 (Unspecified whether traffic or nontraffic accident) | 11 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | V09.2 (Pedestrian injured in traffic accident involving other and unspecified motor vehicles) | 52 | 5,330,443 | 1.0 |
| California (06) | 15-24 years | V23.4 (Motorcycle rider injured in collision with car, pick-up truck or van, driver injured in traffic accident) | 20 | 5,330,443 | 0.4 |
| California (06) | 15-24 years | V27.4 (Motorcycle rider injured in collision with fixed or stationary object, driver injured in traffic accident) | 20 | 5,330,443 | 0.4 |
| California (06) | 15-24 years | V29.4 (Driver injured in collision with other and unspecified motor vehicles in traffic accident) | 24 | 5,330,443 | 0.5 |
| California (06) | 15-24 years | V43.5 (Car occupant injured in collision with car, pick-up truck or van, driver injured in traffic accident) | 42 | 5,330,443 | 0.8 |
| California (06) | 15-24 years | V43.6 (Car occupant injured in collision with car, pick-up truck or van, passenger injured in traffic accident) | 28 | 5,330,443 | 0.5 |
| California (06) | 15-24 years | V44.5 (Car occupant injured in collision with heavy transport vehicle or bus, driver injured in traffic accident) | 12 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | V47.5 (Car occupant injured in collision with fixed or stationary object, driver injured in traffic accident) | 34 | 5,330,443 | 0.6 |

| | Ten-Year Age Groups | Cause of death | | | |
|---|---|---|---|---|---|
| California (06) | 15-24 years | V47.6 (Car occupant injured in collision with fixed or stationary object, passenger injured in traffic accident) | 19 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | V87.7 (Person injured in collision between other specified motor vehicles (traffic)) | 94 | 5,330,443 | 1.8 |
| California (06) | 15-24 years | V89.2 (Person injured in unspecified motor-vehicle accident, traffic) | 244 | 5,330,443 | 4.6 |
| California (06) | 15-24 years | W69 (Drowning and submersion while in natural water) | 39 | 5,330,443 | 0.7 |
| California (06) | 15-24 years | X41 (Accidental poisoning by and exposure to antiepileptic, sedative-hypnotic, antiparkinsonism and psychotropic drugs, not elsewhere classified) | 37 | 5,330,443 | 0.7 |
| California (06) | 15-24 years | X42 (Accidental poisoning by and exposure to narcotics and psychodysleptics [hallucinogens], not elsewhere classified) | 102 | 5,330,443 | 1.9 |
| California (06) | 15-24 years | X44 (Accidental poisoning by and exposure to other and unspecified drugs, medicaments and biological substances) | 157 | 5,330,443 | 2.9 |
| California (06) | 15-24 years | X45 (Accidental poisoning by and exposure to alcohol) | 10 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | X93 (Assault by handgun discharge) | 66 | 5,330,443 | 1.2 |
| California (06) | 15-24 years | X94 (Assault by rifle, shotgun and larger firearm discharge) | 14 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | X95 (Assault by other and unspecified firearm discharge) | 351 | 5,330,443 | 6.6 |
| California (06) | 15-24 years | X99 (Assault by sharp object) | 45 | 5,330,443 | 0.8 |
| California (06) | 15-24 years | Y09 (Assault by unspecified means) | 14 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | Y35.0 (Legal intervention involving firearm discharge) | 18 | 5,330,443 | Unreliable |
| California (06) | 15-24 years | **Total** | **2,562** | **5,330,443** | **48.1** |
| California (06) | | **Total** | **5,376** | **12,859,088** | **41.8** |
| | | **Total** | **5,376** | **12,859,088** | **41.8** |

**Notes:**

**Caveats:** Data are Suppressed when the data meet the criteria for confidentiality constraints. More information.

Death rates are flagged as Unreliable when the rate is calculated with a numerator of 20 or less. More information.

Deaths of persons with Age "Not Stated" are included in "All" counts and rates, but are not distributed among age groups, so are not included in age-specific counts, age-specific rates or in any age-adjusted rates. More information.

The population figures for year 2017 are bridged-race estimates of the July 1 resident population, from the Vintage 2017 postcensal series released by NCHS on June 27, 2018. The population figures for year 2016 are bridged-race estimates of the July 1 resident population, from the Vintage 2016 postcensal series released by NCHS on June 26, 2017. The population figures for year 2015 are bridged-race estimates of the July 1 resident population, from the Vintage 2015 postcensal series released by NCHS on June 28, 2016. The population figures for year 2014 are bridged-race estimates of the July 1 resident population, from the Vintage 2014 postcensal series released by NCHS on June 30, 2015. The population figures for year 2013 are bridged-race estimates of the July 1 resident population, from the Vintage 2013 postcensal series released by NCHS on June 26, 2014. The population figures for year 2012 are bridged-race estimates of the July 1 resident population, from the Vintage 2012 postcensal series released by NCHS on June 13, 2013. The population figures for year 2011 are bridged-race estimates of the July 1 resident population, from the Vintage 2011 postcensal series released by NCHS on July 18, 2012. Population figures for 2010 are April 1 Census counts. The population figures for years 2001 - 2009 are bridged-race estimates of the July 1 resident population, from the revised intercensal county-level 2000 - 2009 series released by NCHS on October 26, 2012. Population figures for 2000 are April 1 Census counts. Population figures for 1999 are from the 1990-1999 intercensal series of July 1 estimates. Population figures for the infant age groups are the number of live births. **Note:** Rates and population figures for years 2001 - 2009 differ slightly from previously published reports, due to use of the population estimates which were available at the time of release.

The population figures used in the calculation of death rates for the age group 'under 1 year' are the estimates of the resident population that is under one year of age. More information.

Changes to cause of death classification affect reporting trends. More information.

**Help:** See Underlying Cause of Death, 1999-2017 Documentation for more information.

**Query Date:** Feb 14, 2019 3:22:25 PM

## Suggested Citation:

Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2017 on CDC WONDER Online Database, released December, 2018. Data are from the Multiple Cause of Death Files, 1999-2017, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at http://wonder.cdc.gov/ucd-icd10.html on Feb 14, 2019 3:22:25 PM

## Query Criteria:

| | |
|---|---|
| **Title:** | Numbers of Non-Suicide Youth Deaths in CA (2017) |
| **Injury Intent:** | Unintentional; Homicide; Undetermined ; Legal Intervention / Operations of War; Non-Injury, no intent classified |
| **States:** | California (06) |
| **Ten-Year Age Groups:** | < 1 year; 1-4 years; 5-14 years; 15-24 years |
| **Year/Month:** | 2017 |
| **Group By:** | State; Ten-Year Age Groups; Cause of death |
| **Show Totals:** | True |
| **Show Zero Values:** | False |

0166

**Show Suppressed:**   False
**Calculate Rates Per:**   100,000
**Rate Options:**   Default intercensal populations for years 2001-2009 (except Infant Age Groups)

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *B & L Productions, Inc., et al. v. Gavin Newsom, et al.*
Case No.: 21CV1718 AJB KSC

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Nicole J. Kau, Deputy Attorney General
nicole.kau@doj.ca.gov
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
   *Attorney for Defendants*

I declare under penalty of perjury that the foregoing is true and correct.

Executed November 16, 2022.

_____
Laura Palmerin