1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
NICOLE J. KAU
Deputy Attorney General
State Bar No. 292026
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6220
 Fax:  (916) 731-2125
 E-mail:  Nicole.Kau@doj.ca.gov
*Attorneys for Defendants Governor Gavin Newsom,
Attorney General Rob Bonta, Secretary Karen Ross,
and 32nd District Agricultural Association*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 8:22-cv-01518 JWH (JDEx)<br><br>**STATE DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:            February 10, 2023<br>Time:           9:00 a.m.<br>Courtroom:   9D<br>Judge:          The Honorable John W. Holcomb<br><br>Action Filed: August 12, 2022 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................... 1

ARGUMENT ............................................................................................ 2

I. *Bruen* Does Not Prohibit Reasonable Gun Safety Regulations ........... 2

II. The Second Amendment Does Not Protect a Right to Sell Firearms at a Particular Location .............................................. 3

III. SB 264 and SB 915 Are Consistent with the Nation's Historical Tradition of Firearm Regulation ........................................ 6

    A. The Second Amendment Does Not Limit the States' Police Powers to Address Public Safety Threats as They Arise ............................................................................ 6

    B. There Is a Well-Established Tradition of Regulating Firearms for the Purpose of Promoting Public Safety ............... 7

        1. Laws Regulating the Commercial Sale of Firearms ........ 7

        2. Laws Preventing the Sale of Firearms to Persons Considered Not to Be Law-Abiding .............................. 10

        3. Laws Prohibiting Firearms in Sensitive Places, Including on Public Property and at Large Gatherings ................................................................. 11

    C. The Historical Analogues Are Relevantly Similar to SB 264 and SB 915 .......................................................... 13

CONCLUSION ......................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**                                                                         **Page(s)**

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ................................................................*passim*

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) .........................................................2, 3, 6, 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   142 S. Ct. 2111 (2022) ............................................................*passim*

*Range v. Attorney General,*
   53 F.4th 262 (3rd Cir. 2022), *rehearing en banc granted, vacated*
   *by* 56 F.4th 992 (3d Cir. 2023) ......................................................11

*Second Amendment Arms v. City of Chicago,*
   135 F. Supp. 3d 743 (N.D. Ill. 2015)...............................................5

*Teixeira v. Cty. of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ...................................................*passim*

*United States v. Holton,*
   No. 3:21-CR-0482-B, 2022 WL 16701935 (N.D. Tex. Nov. 3,
   2022)...............................................................................8, 15

*United States v. Tilotta,*
   No. 3:19-CR-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30,
   2022)...................................................................................3

**Constitutional Provisions**

Second Amendment.................................................................*passim*

Fourteenth Amendment ..........................................................9, 12

**Statutes and Ordinances**

1779 Pa. Laws 193 § 4............................................................10

1814 Mass. Acts 464, ch. 192, § 2.............................................9

State Defendants' Supp. Br. in Opp'n to Mot.
for Prelim. Inj. (8:22-cv-01518 JWH (JdEx))

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3   1821 Laws of the State of Maine 685-86, vol. 2, § 3 ...............................................9

4   1825 N.H. Laws 74, ch. 61 § 5 ..............................................................................9

5
    1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 ...................................................9
6

7   1844 Mo. Laws 577, ch. 80 § 4 ............................................................................10

8   1845 Iowa Laws 119, chap 123, § 12 ....................................................................9

9   1847 Ind. Acts 93, chap. 61, § 8, pt. 4 ..................................................................9

10  1852 N.M. Laws 67 § 3 ........................................................................................11

11  1859 Ky. Acts 245 § 23 .......................................................................................10

12
    1860 Ga. Laws 56 § 1 ..........................................................................................10
13

14  1869-70 Tenn. Pub. Acts 23-24, ch. 22, § 2 .........................................................12

15  1870 Ga. Laws 421, title XVI...............................................................................12

16  1870 La. Acts 159-160 .........................................................................................12

17  1870 Tex. Gen. Laws 63, ch. 46 § 1 .....................................................................12

18  1883 Mo. Laws 76 § 1 ..........................................................................................12

19
    1889 Ariz. Sess. Laws 17 .....................................................................................12
20

21  1891 N.H. Laws 332 § 7........................................................................................10

22  An Ordinance to Provide for the Regulation and Government of the
        Avenue and Public Parks in the City and County of San Francisco,
23      in Charge of the Park Commissioners, Ordinance No. 2, § 2 (1872) ...............12

24  An Ordinance to Provide for the Regulation and Government of the
        Avenue and Public Parks in the City and County of San Francisco,
25      in Charge of the Park Commissioners, Ordinance No. 2, § 2 (1872) ...............12

26

27  *Fourth Annual Report of the Board of Commissioners of the Central
        Park*, 106 (1861)..............................................................................................12

28

iii

**TABLE OF AUTHORITIES**
(continued)

**Page**

Jerome Bayon, *General Digest of the Ordinances and Resolutions of the Corporation of New Orleans* 371 (1831) (art. 1) (enacted 1817) ............... 11

Michael John Sullivan, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, Constitution of the State of Missouri, the Scheme for the Separation of the Governments of the City and County of St. Louis, the Charter of the City, and a Digest of the Laws Applicable to the City 635 (1881) (§ 3) ................................................................................................. 13

*The Minutes of the Senatus Academicus 1799–1842* ............................................. 12

Or. Rev. Stat. 257, § 1 ................................................................. 10

Will T. Little et al., *Statutes of Oklahoma, 1890*, art. 47, § 7 (1890) ..................... 12

**Other Authorities**

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 76 (2017) ........................... 8, 9

Senate Bill 264 ...................................................................................................*passim*

Senate Bill 915 ...................................................................................................*passim*

**INTRODUCTION**

As set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the threshold question for any Second Amendment challenge is whether the plain text of the Second Amendment covers the regulated conduct at issue.  If the answer is no, then the regulation does not violate the Second Amendment.  That is the case here.  SB 264 and SB 915 prohibit only the *sale* of firearms, ammunition, and precursor parts on state property.  And Plaintiffs have identified no authority suggesting that the Second Amendment guarantees a right to sell firearms at a certain location.  That is because the conduct regulated by the challenged laws is not protected by the Second Amendment; rather, those laws are "presumptively lawful regulatory measures," *Bruen*, 142 S. Ct. at 2162, that do not "meaningfully constrain[]" the right of the public to acquire firearms, *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017).  Indeed, as of January 11, 2023, the public can purchase firearms and ammunition from approximately 1,610 dealers in 56 of California's 58 counties.  McGee Decl., ¶¶ 5-6.  In the city of Costa Mesa alone, where the Orange County Fair & Event Center (Fairgrounds) is located, there are eight dealers that sell firearms and ammunition—and six are in the same zip code as the Fairgrounds.  *Id*., ¶ 7.

But even if Plaintiffs' Second Amendment rights were implicated by SB 264 and SB 915, those laws would survive the second stage of the Second Amendment inquiry because they are "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126—specifically, the long tradition of regulating commercial sales of firearms and ammunition, including in certain sensitive locations.  Like the challenged laws here, these historical regulations were designed primarily to prevent illegal weapons trafficking and to ensure that dangerous individuals do not obtain such weapons.  In addition, there is a longstanding tradition of regulating firearms in sensitive places, including in public spaces and at large gatherings.  For this reason, as well, Plaintiffs are unlikely to prevail on the

State Defendants' Supp. Br. in Opp'n to Mot. for Prelim. Inj. (8:22-cv-01518 JWH (JdEx))

1   merits of their Second Amendment claim, and the preliminary injunction motion

2   should be denied.

3   **ARGUMENT**

4   **I.    *BRUEN* DOES NOT PROHIBIT REASONABLE GUN SAFETY REGULATIONS**

5       *Bruen* articulated the analytical framework that governs the Second

6   Amendment claim here.  Courts must first determine whether "the Second

7   Amendment's plain text covers [the] individual's [regulated] conduct."  *Bruen*, 142

8   S. Ct. at 2129-30.  If it does not, then the analysis stops there and the regulation is

9   constitutional under the Second Amendment.  *See id.*  Only if the plain text covers

10   the proposed conduct must the government "justify its regulation by demonstrating

11   that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.*

12       The Supreme Court also made clear in *Bruen*, as it did in *District of Columbia*

13   *v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742

14   (2010), that governments may continue to adopt reasonable gun safety regulations.

15   *Heller* established that the government may enact a "variety" of regulations for

16   combating the "problem of handgun violence in this country."  *Heller*, 554 U.S. at

17   636.  It identified a non-exhaustive list of "presumptively lawful" measures

18   including "longstanding prohibitions on the possession of firearms by felons and

19   the mentally ill," laws "forbidding the carrying of firearms in sensitive places," and

20   laws prohibiting the keeping and carrying of "dangerous and unusual weapons."  *Id.*

21   at 626-27, n.26; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

22   Similarly, in *McDonald*, the Court observed that the Second Amendment "by no

23   means eliminates" state and local governments' "ability to devise solutions to social

24   problems that suit local needs and values."  *McDonald*, 561 U.S. at 785 ("'[S]tate

25   and local experimentation with reasonable firearms regulations will continue under

26   the Second Amendment.'").  Consistent with these principles, the Supreme Court

27   recognized in *Bruen* that the Second Amendment is not a "regulatory

28   straightjacket."  *Bruen*, 142 S. Ct. at 2133.  Accordingly, the Supreme Court's

Second Amendment opinions "should not be taken to cast doubt . . . on laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27; *McDonald*, 561 U.S. at 787; *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

## II.   THE SECOND AMENDMENT DOES NOT PROTECT A RIGHT TO SELL FIREARMS AT A PARTICULAR LOCATION

The Second Amendment states:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  This guarantees an "individual [the] right to possess and carry weapons in case of confrontation[.]"  *Bruen*, 142 S. Ct. at 2119 (citation omitted); *see also Heller*, 554 U.S. at 635 (Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home").  But this right is not "absolute" or "unfettered."  *United States v. Tilotta*, No. 3:19-CR-04768-GPC, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022).

In particular, there is no "freestanding right . . . to sell firearms."  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 673 (9th Cir. 2017) (en banc); *Tilotta*, 2022 WL 3924282, at *5 ("The plain text of the Second Amendment does not cover [the] proposed course of conduct to commercially sell and transfer firearms, because the plain text of the Second Amendment protects an individual's right to '"possess and carry weapons in case of confrontation."'").  And relatedly, "restrictions on a commercial actor's ability to enter the firearms market may [] have little or no impact on the ability of individuals to exercise their Second Amendment right to keep and bear arms."  *Teixeira*, 873 F.3d at 687.[1]  Plaintiffs cannot establish a

---

[1] Although the Court finds in its Order for Supplemental Briefing Regarding Plaintiffs' Motion for Preliminary Injunction that *Teixeira* is "distinguishable on the facts because it involved a single business partnership seeking a permit from Alameda County to open a gun store in an unincorporated portion of the county," ECF No. 25 at 2, *Teixeira* remains relevant to the analysis required under *Bruen* for at least two reasons:  (1) *Teixeira* considered the same type of historical evidence called for by *Bruen*, and (2) *Teixeria* held that restricting the places where firearms may be sold does not impede consumers' ability to purchase firearms when numerous alternative sales venues are available.  *Teixeira*, 873 F.3d at 678.

State Defendants' Supp. Br. in Opp'n to Mot. for Prelim. Inj. (8:22-cv-01518 JWH (JdEx))

1    Second Amendment right to sell firearms, let alone a right to sell firearms on

2    government property.

3         Of course, if a restriction on sale of firearms is so draconian as to limit the

4    ability of individuals to "keep and bear Arms" it may impact Second Amendment

5    rights.  Thus, in order to establish a cognizable Second Amendment right, a plaintiff

6    challenging a regulation on commercial sales has the burden of showing that the

7    regulation "meaningfully inhibits residents from acquiring firearms within their

8    jurisdiction." *Teixeira*, 873 F.3d at 680.  In *Teixeira*, the plaintiff's challenge to a

9    county ordinance restricting locations of gun stores failed because local residents

10   were not "meaningfully restricted in their ability to acquire firearms," given the

11   availability of gun stores in the area.  *Teixeira*, 873 F.3d at 687; *see also id.* at 686-

12   87 ("[N]o historical authority suggests that the Second Amendment protects an

13   individual's right to *sell* a firearm, unconnected to the rights of citizens to "keep

14   and bear" arms.") (emphasis in original).  SB 264 and SB 915 similarly do not

15   prohibit the keeping and bearing of arms.  As in *Teixeira*, Plaintiffs have not shown

16   and cannot show that the public's right to acquire firearms is "meaningfully

17   constrained" by the challenged laws.  *Teixeira*, 873 F.3d at 680.

18        Aside from Plaintiffs' failure to provide evidence of such constraints, which

19   should be dispositive here because they bear the burden on this preliminary

20   injunction motion, this is apparent from the sheer number of licensed firearms and

21   ammunition dealers in California—1,610 to be exact, located in 456 cities, 680 zip

22   codes, and 56 counties.  McGee Decl., ¶ 5.  In addition, there are 165 licensed

23   dealers that sell ammunition, located in 129 cities, 148 zip codes, and 41 counties.

24   *Id.*, ¶ 6.

25        And in the localities where state venues have hosted gun shows on a handful

26   of weekends a year, brick-and-mortar firearms and ammunition dealers are readily

27   accessible.  Take, for example, the city of Costa Mesa, where the OC Fair & Event

28   Center (covered by SB 264) is located.  *Eight firearms and ammunition dealers are*

*within city limits—and a total of 150 firearms and ammunition dealers are located in Orange County.*  McGee Decl., ¶ 7.  Circumstances are similar in San Diego County, home of the Del Mar Fairgrounds, which has also hosted gun shows in the past.  San Diego County has 77 dealers that sell firearms and ammunition.  *Id.*, ¶ 7.  In light of the prevalence—throughout California and in the particular jurisdictions at issue here—of dealers from which Plaintiffs can purchase firearms and ammunition, there is no plausible argument that prohibiting sales on state property generally or at the OC Fair & Event Center in particular will "meaningfully constrain" Plaintiffs' ability to "keep and bear" arms.  Indeed, Plaintiffs have offered no evidence to that effect, nor have they even alleged as much.

The laws struck down in *Heller* and *Bruen* either completely banned handgun possession in the home (*Heller*, 554 U.S. at 635) or categorically prevented individuals with ordinary self-defense needs from carrying a concealed firearm in public (*Bruen*, 142 S. Ct. at 211).  In contrast, SB 264 and SB 915 do not prohibit individuals from keeping or bearing arms at all.  Nor do they restrict firearm sales at existing brick-and-mortar stores near state property.  Even if plaintiffs were to show that some members of the public might prefer to purchase firearms at gun shows, "gun buyers have no right to have a gun store in a particular location[.]" *Teixeira*, 873 F.3d at 680 ("[T]he Second Amendment does not elevate convenience and preference over all other considerations."); *Second Amendment Arms v. City of Chicago*, 135 F. Supp. 3d 743, 754 (N.D. Ill. 2015) (observing that "a slight diversion off the beaten path is no affront to . . . Second Amendment rights" where Plaintiffs alleged that zoning restrictions infringed on their Second Amendment rights without specific facts that their right to possess firearms was abridged).

And as explained in Defendants' Opposition Brief, at pages 23-24, SB 264 and SB 915 are also the sort of "presumptively lawful" regulations on the conditions of commercial sales cited approvingly by the Supreme Court.  *See Heller,* 554 U.S. at

State Defendants' Supp. Br. in Opp'n to Mot.
for Prelim. Inj. (8:22-cv-01518 JWH (JdEx))

626-27, n.26; *McDonald*, 561 U.S. at 787; *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

### III. SB 264 AND SB 915 ARE CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF FIREARM REGULATION

Even if SB 264 and SB 915 implicated the Second Amendment right to "keep and bear Arms," they are consistent with the nation's historical tradition of regulating the commercial sale of weapons, including restrictions based on location of sale. They are thus constitutional under the second stage of the *Bruen* analysis. The closest historical analogues to SB 264 and SB 915 share the same purpose as the laws challenged here: they guard against illegal trafficking of firearms and ammunition, and aim to keep such weapons out of the hands of individuals who are not law-abiding. There is also a longstanding tradition of restricting firearms in sensitive places—in particular, in public spaces and at large gatherings—comparable to the fairgrounds and other state property at issue here. These historical analogues are grounded in a long tradition—dating back to the Founding and even earlier—of governments exercising broad police powers to regulate firearms for the purpose of promoting public safety.

### A. The Second Amendment Does Not Limit the States' Police Powers to Address Public Safety Threats as They Arise

The Second Amendment is not absolute. Government regulation is permitted, even though the text of the Second Amendment may be read literally as an "unqualified command" that the right to keep and bear arms "shall not be infringed." *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961).

Courts have only just begun to explore the historical origins of the right to keep and bear arms and to define its precise scope and exceptions. *See Heller*, 554 U.S. at 625–26 (noting that it should not be surprising that it took the Court so long to decide a Second Amendment case, given that the Court first decided a First Amendment case in 1931). For purposes of the analysis here, *Bruen* requires only

that the government "identify a well-established and representative historical *analogue*, not a historical *twin*.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.  As shown below, the history of the Second Amendment reflects that governments have exercised robust police powers to regulate weapons, including by prohibiting the commercial sale of firearms and ammunition in certain locations, preventing the sale of firearms to persons considered to be not law-abiding, and banning firearms in crowded locations—for comparable reasons and imposing comparable burdens to the laws challenged here.

**B.   There Is a Well-Established Tradition of Regulating Firearms for the Purpose of Promoting Public Safety[2]**

**1.   Laws Regulating the Commercial Sale of Firearms**

There is ample historical evidence that the Second Amendment "did not encompass a freestanding right to engage in firearms commerce divorced from the citizenry's ability to obtain and use guns." *Teixeira*, 874 F.3d at 684.  Because the Second Amendment "'codified a *pre-existing* right'" inherited from England, English legal tradition "dating from the late 1600s"—including the published work of Sir William Blackstone and St. George Tucker—"demark[s] the limits on the exercise of that right." *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 592).  While "Blackstone's and Tucker's commentaries indicate that both recognized the right to bear arms in England to have been held by individual British subjects as a means to provide for the preservation of personal liberties," "[n]either of these historic accounts states or implies that the English Bill of Rights

---

[2] Many of the cited historical analogues can be found at the Duke Center for Firearms Law, at https://firearmslaw.duke.edu/repository/search-the-repository/, or in *Firearms and Weapons Legislation Up to the Early Twentieth Century*, by Mark Frassetto, at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991.

State Defendants' Supp. Br. in Opp'n to Mot.
for Prelim. Inj. (8:22-cv-01518 JWH (JdEx))

encompassed an independent right to engage in firearms commerce." *Teixeira*, 874 F.3d at 684.

Consistent with these trends, the American colonies both (1) relied on firearms to "protect vulnerable colonial settlements, especially from Indian tribes resisting colonial conquest, and from foreign forces," and (2) "substantially controlled the firearms trade." *Teixeira*, 874 F.3d at 684-85 (citing Saul Cornell*, The Early American Origins of the Modern Gun Control Debate:  The Right to Bear Arms, Firearms Regulation, and the Lessons of History*, 17 Stan. L. & Pol'y Rev. 571, 579 (2006)).  This government control "included some restrictions on the commercial sale of firearms."  *Id.* at 685.  Several colonies "ma[de] it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians," and "at least two colonies controlled where colonial settlers could transport or sell guns."  *Id.* Connecticut prohibited the sale of firearms by its residents outside the colony, *id.* (citing 1 Trumbull, *Public Records of the Colony of Connecticut*, 138-139, 145-146), and Virginia prohibited any persons from carrying arms or ammunition beyond what was needed for personal use into "Indian town or more than three miles from an English plantation," *id.* (citing Acts of Assembly, Mar. 1675-76, 2 William Waller Henning, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 336–37 (1823)).

Colonial governments also adopted laws targeting "the illegal trading and trafficking of arms and ammunition."  *United States v. Holton*, No. 3:21-CR-0482-B, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022); *see also* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 76 (2017) ("Arms and ammunition trafficking was also a concern as early as the seventeenth century, just as it is today.").  For example, Virginia required the recording "'of arms and munitions'" accompanying new arrivals to the colony, and later confiscated "'all ammunition, powder and arms,

other than for private use.'"  Spitzer, at 76 (citing Virginia Act of Feb. 27, 1631, Act LVI, 1 Henning 174-75; Articles at the Surrender of the Countrie of Virginia, Mar. 22, 1651, 1 Henning 365).  New York similarly prohibited private individuals from "illegally trading guns, gunpowder, and lead." *Id.* (citing 1652 N.Y. Laws 128).

Thus, the Second Amendment, as understood by "[e]arly American legislators and commentators," was meant to "protect[] Americans against tyranny and oppression." *Teixeira*, 873 F.3d at 686.  But at the same time, "no contemporary commentary suggests that the right codified in the Second Amendment independently created a commercial entitlement to sell guns if the right of the people to obtain and bear arms was not compromised." *Id.*

During the Founding era and the ensuing decades, governments heavily regulated firearms and ammunition, both to ensure the readiness of the militia and to protect the public from harm.  Spitzer, at 74.  Both Massachusetts and Maine prohibited the sale of any musket or pistol unless it was approved, marked, and stamped.  1814 Mass. Acts 464, ch. 192, § 2; 1821 Laws of the State of Maine 685-86, vol. 2, § 3.  And in particular, governments regulated the storage and sale of gunpowder.  *Id.*  New Hampshire, for example, enacted a law in 1825 penalizing the sale or offer to sell "by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common."  1825 N.H. Laws 74, ch. 61, § 5.[3]

---

[3] State laws delegating authority to local governments to regulate the sale of gunpowder for public safety reasons were commonplace.  *See e.g.,* 1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12 (delegating authority to cities "to regulate by ordinance the keeping and sale of gunpowder within the city"); An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 (delegating authority to "prohibit[] and regulat[e] the bringing in, and conveying out" of gunpowder); An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93, chap 61, § 8,  pt. 4 (delegating authority "[t]o regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder").

1  Laws regulating the commercial sale of firearms by location were also

2  prevalent after the ratification of the Fourteenth Amendment.  For example,

3  Oklahoma restricted the sale of firearms "within the Indian country."  Indian

4  Territory, § 4345 (1899).  New Hampshire renewed its law penalizing the sale of

5  gunpowder in any "highway or street" or "wharf, parade, or common," and added

6  that sales of gunpowder could not occur between sunset and sunrise.  1891 N.H.

7  Laws 332, § 7.  And New York City enacted strict laws regulating the sale of

8  gunpowder within the corporate limits of the city, and prohibited the sale of

9  gunpowder in any building that was used in part as a "dwelling."  Ordinances of the

10  City of New York, § 455 (1890).

11  **2.   Laws Preventing the Sale of Firearms to Persons Considered Not to Be Law-Abiding[4]**

12

13  There is also a well-established historical tradition of prohibiting the sale of

14  firearms to persons considered to be untrustworthy—an obvious aim of SB 264 and

15  SB 915, which prevent individuals from evading background check and other

16  licensing requirements.  Pennsylvania empowered its militia to disarm those who

17  had not taken an oath or affirmation of allegiance to Pennsylvania.  1779 Pa. Laws

18  193, § 4.  Missouri and Oregon regulated the sale of firearms to Native Americans.

19  1844 Mo. Laws 577, ch. 80, § 4; 1853 Or. Rev. Stat. 257, § 1.  Alabama prohibited

20  the sale, transfer, or loan of a pistol to minors, and Kentucky prohibited the same to

21  minors and slaves.  1856 Pamphlet Acts of 1855-6, p. 17; § 23, 1859 Ky. Acts 245.

22  Similarly, Georgia prohibited the sale of firearms and dangerous weapons to slaves

23

_____

24  [4] Given the historical inquiry mandated by *Bruen*, this brief cites many
relevant firearms laws, some of which were drafted well before the Thirteenth
25  Amendment's abolition of slavery and the Fourteenth Amendment's Equal
Protection Clause. While these laws are pertinent to the discussion, Defendants
26  emphasize their strong disagreement with racial and other improper discrimination
that existed in some such laws, and which stand in stark contrast to California's
27  commonsense firearm laws, which are designed to justly and equitably protect all
Californians. The listing of such racist and discriminatory statutes in this brief
28  should in no way be construed as an endorsement of such laws by Defendants or
their counsel in this matter.

or "free person[s] of color."  1860 Ga. Laws 56 § 1.  While the "status-based regulations of this period are repugnant (not to mention unconstitutional)," they demonstrate that governments have long exercised broad authority to restrict the sale of firearms to persons considered to be law-abiding.  *Range v. Attorney General*, 53 F.4th 262, 276 n.18 (3rd Cir. 2022), *rehearing en banc granted, vacated by* 56 F.4th 992 (3d Cir. 2023).  Such laws were precursors to modern efforts to prohibit the unregulated sale of firearms to dangerous persons.  As discussed in the Defendants' Opposition Brief, at pages 24-25, a primary purpose of SB 264 and SB 915 is to thwart the trafficking of firearms and prevent non-law-abiding individuals from acquiring arms, as reflected in the legislative findings concerning the prevalence of illegal transactions at gun shows.  MPI, RJN, Ex. 2 at 3, Ex. 10 at 2, Ex. 17 at 2.

### 3. Laws Prohibiting Firearms in Sensitive Places, Including on Public Property and at Large Gatherings

The Supreme Court has thrice recognized that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful" and outside the "scope of the Second Amendment."  *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 142 S. Ct. at 2133; *id*. at 2162 (Kavanaugh, J., concurring); *McDonald*, 561 U.S. at 786. The tradition of prohibiting firearms in public spaces where large gatherings are held dates back to medieval England.  Indeed, the most well-known law of that period regulating weapons, the Statute of Northampton of 1328, 2 Edw. 3, c. 3 (1328), provided that Englishmen were generally not permitted to bring "force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers … upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure."

It was common in early America for governments to prohibit firearms altogether in public spaces and at large gatherings.  New Orleans and New Mexico prohibited the carrying of weapons into ballrooms.  Jerome Bayon, *General Digest*

*of the Ordinances and Resolutions of the Corporation of New Orleans* 371 (1831) (art. 1) (enacted 1817); 1852 N.M. Laws 67, § 3.  And firearms were also prohibited in parks.  *E.g.*, *Fourth Annual Report of the Board of Commissioners of the Central Park*, 106 (1861) ("All persons are forbidden … [t]o carry firearms or to throw stones or other missiles within [Central Park].").  Public universities such as the University of Virginia, University of Georgia, and the University of North Carolina also prohibited firearms on their property.  *University of Virginia Board of Visitors Minutes* 6-7 (October 4–5, 1824) ("No Student shall, within the precincts of the University, … keep or use weapons or arms of any kind[.]"; *The Minutes of the Senatus Academicus 1799–1842*, at 86; *Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina* 15 (1838).

Such laws continued to be enacted after the Fourteenth Amendment was ratified.  Many states, including Georgia, Texas, and Missouri, prohibited weapons at large gatherings.  1870 Ga. Laws 421, title XVI, no. 285, § 1 (prohibiting carrying "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or *any other public gathering in this State*, except militia muster-grounds") (emphasis added); 1870 Tex. Gen. Laws 63, ch. 46, § 1 (prohibiting firearms "where persons are assembled . . . into a ball room, social party or other social gathering composed of ladies and gentlemen"); 1883 Mo. Laws 76, § 1 (prohibiting firearms in any "public assemblage of persons); *see also* 1869-70 Tenn. Pub. Acts 23-24, ch. 22, § 2; 1870 La. Acts 159-160, no. 100, § 73; 1889 Ariz. Sess. Laws 17, no. 13, § 3; Will T. Little et al., *Statutes of Oklahoma, 1890*, at 496, art. 47, § 7 (1890).

Parks were considered sensitive places, as well.  San Francisco prohibited firearms on the grounds of Golden Gate Park and Buena Vista Park.  "An Ordinance to Provide for the Regulation and Government of the Avenue and Public

Parks in the City and County of San Francisco, in Charge of the Park Commissioners," Ordinance No. 2, § 2 (1872).  Philadelphia, St. Louis, St. Paul, and Williamsport, among other cities, similarly prohibited dangerous weapons, including firearms, in their parks.   Acts of Assembly Relating to Fairmount Park 18, § 21 (1870); Michael John Sullivan, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, Constitution of the State of Missouri, the Scheme for the Separation of the Governments of the City and County of St. Louis, the Charter of the City, and a Digest of the Laws Applicable to the City 635 (1881) (§ 3); Annual Reports of the City Officers and City Boards of the City of Saint Paul 689, No. 6 (1889); Laws and Ordinances for the Government of the Municipal Corporation of the City of Williamsport, Pennsylvania 141, § 1, 21 (1891).

To be sure, these historical analogues regulated the carrying, not the sale, of firearms in sensitive places.  But if anything, that means that such laws were more, not less, restrictive than SB 264 and SB 915, which prohibit the sale of firearms on state property, such as the Fairgrounds.  And the laws challenged here, like the analogues identified, share the same purpose of minimizing the risk of deadly conflict in crowded areas.

## C.   The Historical Analogues Are Relevantly Similar to SB 264 and SB 915

*Bruen* explained that a modern law is relevantly similar to a historical analogue if they are comparable in two respects:  "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Bruen*, 142 S. Ct. 2133.  As explained above, SB 264 and SB 915 do not burden the right to self-defense at all, *see supra* at Argument, Section II, but if they did, that burden would be comparable to the historical analogues described above, and they would be comparably justified by the public safety goals they promote.

1      First, any burden imposed by SB 264 and SB 915 is minimal because neither

2  law meaningfully constrains the public from acquiring firearms, given the ready

3  access to nearby alternative sites where firearms and ammunition can be purchased.

4  *See supra* at Argument II.  SB 264 and SB 915 merely prohibit firearm and

5  ammunition sales on state property, and do not meaningfully restrict the public

6  from acquiring firearms and bearing them for self-defense.  The challenged laws are

7  thus, at worst, comparable with historical analogues regulating the commercial

8  sales of firearms and ammunition—and in most instances, are significantly less

9  restrictive than historical restrictions that banned the sale of weapons across

10  geographic regions or jurisdictions (and not just on state-owned property), or that

11  prohibited not only the sale but the carrying of weapons on public property or at

12  large gatherings.

13      Second, when evaluated alongside their historical analogues, SB 264 and SB

14  915 are comparably justified.  The California Legislature enacted SB 264 and SB

15  915 to address gun trafficking and prevent dangerous or prohibited persons from

16  acquiring firearms—and more specifically, because of its concern that gun shows

17  are "'the critical moment in the chain of custody for many guns, the point at which

18  they move from the somewhat-regulated legal market to the shadowy, no questions-

19  asked illegal market."  MPI, RJN, Ex. 2 at 3, Ex. 10 at 2, Ex. 17 at 2.  These laws

20  reflect the Legislature's judgment that, for public safety reasons, state-owned

21  property should not be used as a venue for the sale of firearms or ammunition,

22  particularly with respect to sales that can evade regulation.  In England, before the

23  founding of America, there was no freestanding right to sell firearms, and certainly

24  not on property owned by the State.  And the historical record, as described above,

25  reflects consistent regulation of the sale of firearms—including the places of sale—

26  for the purpose of promoting public safety.  In short, the historical analogues

27  described above and the challenged laws, "while [in some instances] effected by

28  different means, address similar goals:  (1) controlling and tracing the sale of

firearms and (2) ensuring dangerous individuals did not obtain firearms." *Holton*, 2022 WL 16701935, at *5; *see* Defs.' MPI Opp'n at 3-5, 24-25.[5]

## CONCLUSION

For the reasons set forth above and in Defendants' Opposition Brief, ECF No. 22, the Court should deny the motion for preliminary injunction.

Dated:  January 27, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General

/s/ Nicole J. Kau
NICOLE J. KAU
Deputy Attorney General
*Attorneys for Defendants Governor Gavin Newsom, Attorney General Rob Bonta, Secretary Karen Ross, and 32nd District Agricultural Association*

SA2022303648
65708999.docx

---

[5] If the Court is not prepared to find, based on the existing record, that Plaintiffs have failed to establish a likelihood of success on the merits, and that SB 264 and SB 915 comport with the Second Amendment, Defendants respectfully request additional time to supplement the record.  The Court's Order for Supplemental Briefing Regarding Plaintiffs' Motion for Preliminary Injunction (ECF No. 25) gave the parties three weeks to file simultaneous supplemental briefing.  However, the historical research and analysis required to answer the difficult historical questions posed by *Bruen* calls for a labor-intensive and time-consuming process.  Despite working diligently since receiving the Court's supplemental briefing order, there remain areas of inquiry relevant to *Bruen*'s text-and-history standard that Defendants have not yet been able to explore fully, including a deeper canvass of historical state and municipal laws and additional primary-source research to further understand and contextualize the Nation's traditions of firearms regulation and the regulation of other weapons.  In the time allotted to prepare this supplemental brief, Defendants have been able to consult a limited number of primary sources to develop evidence, but this work could be expanded to include additional archival and unpublished sources, for example.  In addition, because *Bruen* requires that the government show that the challenged regulations are consistent with the American historical tradition of firearm regulation, Defendants respectfully request an opportunity to respond to evidence put forth by Plaintiffs in their supplemental brief.

State Defendants' Supp. Br. in Opp'n to Mot. for Prelim. Inj. (8:22-cv-01518 JWH (JdEx))

1  **CERTIFICATE OF COMPLIANCE**

2          The undersigned, counsel of record for the State Defendants, certifies that this

3  brief contains 5,161 words, which complies with the word limit of L.R. 11-6.1.

4  Dated:  January 27, 2023                    Respectfully submitted,

5                                              ROB BONTA
                                               Attorney General of California
6

7                                              /s/ Nicole J. Kau
                                               NICOLE J. KAU
8                                              Deputy Attorney General
                                               *Attorneys for Defendants Governor*
9                                              *Gavin Newsom, Attorney General Rob*
                                               *Bonta, Secretary Karen Ross, and*
10                                             *32nd District Agricultural Association*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

State Defendants' Supp. Br. in Opp'n to Mot.
for Prelim. Inj. (8:22-cv-01518 JWH (JdEx))

## CERTIFICATE OF SERVICE

Case Name: **B&L Productions, Inc., et al. v. Gavin Newsom, et al.**     No. **8:22-cv-01518 JWH (JDEx)**

I hereby certify that on <u>January 27, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## STATE DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>January 27, 2023</u>, at Los Angeles, California.

|  |  |
|---|---|
| Carol Chow | */s/Carol Chow* |
| Declarant | Signature |

SA2022303648