1  C.D. Michel-SBN 144258
   Anna M. Barvir-SBN 268728
2  Tiffany D. Cheuvront-SBN 317144
   MICHEL & ASSOCIATES, P.C.
3  180 East Ocean Blvd., Suite 200
   Long Beach, CA 90802
4  Telephone: (562) 216-4444
   Email: cmichel@michellawyers.com

5  Attorneys for Plaintiffs B&L Productions, Inc., California Rifle & Pistol
   Association, Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven
6  Merson, Asian Pacific American Gun Owner Association, Second Amendment Law
   Center, Inc.

7
8  Donald Kilmer-SBN 179986
   Law Offices of Donald Kilmer, APC
9  14085 Silver Ridge Road
   Caldwell, Idaho 83607
   Telephone: (408) 264-8489
10 Email: Don@DKLawOffice.com

11 Attorney for Plaintiff Second Amendment Foundation

12            IN THE UNITED STATES DISTRICT COURT

13         FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 B&L PRODUCTIONS, INC., d/b/a          CASE NO.: 8:22-cv-01518 JWH (JDEx)
   CROSSROADS OF THE WEST;
15 GERALD CLARK; ERIC JOHNSON;          **PLAINTIFFS' COURT-ORDERED**
   CHAD LITTRELL; JAN STEVEN            **SUPPLEMENTAL BRIEF IN**
16 MERSON; CALIFORNIA RIFLE &           **SUPPORT OF PLAINTIFFS'**
   PISTOL ASSOCIATION,                  **MOTION FOR PRELIMINARY**
17 INCORPORATED; ASIAN PACIFIC          **INJUNCTION**
   AMERICAN GUN OWNERS
18 ASSOCIATION; SECOND                  Hearing Date:   February 10, 2023
   AMENDMENT LAW CENTER, INC.;          Hearing Time:   9:00 a.m.
19 and SECOND AMENDMENT                 Courtroom:      9D
   FOUNDATION,                          Judge:          John W. Holcomb
20
              Plaintiffs,
21                                      Action Filed:   August 12, 2022
              v.
22
   GAVIN NEWSOM, in his official
23 capacity as Governor of the State of
   California; ROB BONTA, in his official
24 capacity as Attorney General of the
   State of California; KAREN ROSS, in
25 her official capacity as Secretary of
   California Department of Food &
26 Agriculture and in her personal
   capacity; TODD SPITZER, in his
27 official capacity as District Attorney of
   Orange County; 32nd DISTRICT
28 AGRICULTURAL ASSOCIATION;
   DOES 1-10;

              Defendants.

              PLAINTIFFS' COURT-ORDERED SUPPLEMENTAL BRIEF

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................. 1

I.   The Proper Standard for Analyzing Second Amendment Claims ......... 2

II.  The State's Modern Gun Show Ban Implicates the Second
     Amendment ....................................................................................... 4

III. The State Cannot Prove That Its Modern Gun Show Ban Is
     Consistent with an Enduring American Tradition of Regulation ........ 10

Conclusion ................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. State*,
  50 Tenn. 165 (1871)................................................................. 7

*Antonyuk v. Hochul*,
  No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7,
  2022) ............................................................................. 14

*B&L Prods., Inc. v. 22nd Dist. Agric. Ass'n*,
  394 F. Supp. 3d 1226 (S.D. Cal. 2019)................................... 11

*Bd. of Educ. v. Pico*,
  457 U.S. 853 (1982)................................................................ 7

*Bridenbaugh v. Freeman-Wilson*,
  227 F.3d 848 (7th Cir. 2000) ................................................. 6

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002) ................................................. 7

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................................ 7, 9, 12, 13

*Duncan v. Becerra*,
  742 F. App'x 218 (9th Cir. 2018) ........................................... 7

*Duncan v. Bonta*,
  Case No. 17-cv-1017 (S.D. Cal. Nov. 10, 2022).............. 11, 12

*Ezell v. Chicago*,
  651 F.3d 684 (7th Cir. 2011) ................................................. 7

*Firearms Pol'y Coal., Inc. v. McCraw*,
  No. 21-cv-1245, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug.
  25, 2022) ......................................................................... 14

*Gamble v. United States*,
  587 U.S. __, 139 S. Ct. 1960 (2019)............................... 12, 13

ii

*Hardaway v. Nigrelli*,
  No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813 (W.D.N.Y. Nov. 3,
  2022) ................................................................................................. 14

*Hill v. Colorado*,
  530 U.S. 703 (2000)........................................................................... 7

*Jackson v. City & Cnty. of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ............................................................. 7

*Jones v. Bonta*,
  34 F.4th 704 (9th Cir. 2022) .............................................................. 7

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)........................................................................... 7

*Konigsberg v. State Bar of Cal.*,
  366 U.S. 36 (1961)............................................................................. 3

*Luis v. United States*,
  578 U.S. 5 (2016)............................................................................... 7

*Miller v. Bonta*,
  Case No. 19-cv-1537 (S.D. Cal. Oct. 13, 2022) ......................... 11, 12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)............................................................... *passim*

*Nordyke v. King*,
  681 F.3d 1041 (9th Cir. 2012) ......................................................... 10

*Nordyke v. Santa Clara Cnty.*,
  110 F.3d 707 (9th Cir. 1997) ........................................................... 10

*Rhode v. Bonta*,
  Case No. 18-cv-802 (S.D. Cal. Jan. 11, 2023) ................................ 12

*Teixeira v. Cnty. of Alameda*,
  822 F.3d 1047 (9th Cir. 2016) ................................................ 6, 14, 15

*Teixeira v. Cnty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ...................................................*passim*

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010) ................................................................ 9

iii

*United States v. Miller*,
307 U.S. 174 (1939) ........................................................................... 7

*United States v. Nutter*,
No. 21-cr-00142, 2022 U.S. Dist. LEXIS 155038 (S.D. W. Va. Aug.
29, 2022) ......................................................................................... 14

*Va. State Bd. of Pharm. v. Va. Citzs. Consumer Council*,
425 U.S. 738 (1976) ........................................................................... 7

**Other Authorities**

5 Acts Privy Council 401, *Connecticut Courant*, Dec. 19, 1774 .............................. 13

David B. Kopel, *Does the Second Amendment Protect Firearms
Commerce?*, 127 Harv. L. Rev. F. 230 (2014) ........................................ 9

Fed. R. Evid. 301 ............................................................................... 2

1 Herbert L. Osgood, *The American Colonies in the 17th Century* 499
(1904) ............................................................................................. 7

1 John Drayton, *Memoirs of the American Revolution as Relating to the
State of South Carolina* 166 (Applewood Books 1969) (1821) ................ 8

Laws of Va., Feb., 1676-77, Va. Stat. at Large, 2 Hening 403 ................................ 13

Leland J. Bellot ed., *William Knox Asks What is Fit to be Done with
America?*, *in* Sources of American Independence 140 (Howard H.
Peckham ed., 1978) ......................................................................... 8

Press Release, *California Becomes the First State to Ban Gun Shows on
State Property, Builds on Orange County Fairgrounds Ban* (July 21,
2022), https://sd37.senate.ca.gov/news/california-becomes-first-
state-ban-gun-shows-state-property-builds-orange-county-
fairgrounds (last accessed Jan. 27, 2023) ........................................ 11

Thomas Jefferson, 3 *Writings* 558 (H.A. Washington ed., 1853) ............................ 14

Thomas M. Cooley, *General Principles of Constitutional Law* 271 (2d
ed. 1891) ......................................................................................... 7

U.S. Const. amend. I ...................................................................... 7, 8, 9

U.S. Const. amend. II ...................................................................... *passim*

U.S. Const. amend. XIV ............................................................................. 14

TABLE OF AUTHORITIES

**INTRODUCTION**

This Court noted that both sides discussed *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc) in their Second Amendment arguments to this Court on Plaintiffs' motion for a preliminary injunction. Having reviewed the parties' arguments, the Court (1) observed that the facts here are distinguishable from those in *Teixeira*; and (2) concluded that the two-step test that the *Teixeira* court claimed to use, while never conducting a valid historical analysis at step-one, must be supplanted by the correct historical analysis and one-step test outlined in *Bruen.* Order for Suppl. Br. Re: Pls.' Mot. Prelim. Inj. [ECF No. 21] (In Chambers) ("Order") (Jan. 6, 2023) (citing *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)). The Court then "tentatively conclude[d] that it cannot rely on *Teixeira*" to dispose of Plaintiffs' Second Amendment claim here and "that it must turn to *Bruen*'s textual and historical analysis of the laws in question. *Id.* at 2.

The Court also noted that, under *Bruen*, "the government must demonstrate that [its] regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 3 (citing *Bruen*, 143 S. Ct. at 2126). Implicit in the Court's tentative conclusions that *Teixeira* is inapt and that the State must justify its gun show ban by reference to the *Bruen* history-and-tradition analysis is that this Court has also been persuaded that "the Second Amendment's plain text covers [Plaintiffs'] conduct, [and that] the Constitution *presumptively* protects that conduct." *Bruen*, 142 S. Ct. at 2126. (emphasis added). That presumption carries procedural safeguards that are just as important as the substantive law the Supreme Court reaffirmed in *Bruen*.

In its opposition to Plaintiffs' motion for a preliminary injunction, however, the State did not even try to meet its burden. Defs.' Opp'n Pls.' Mot. Prelim. ("Opp'n") 24, n.12 (Dec. 9, 2022). But this Court, persuaded by the State's request for "an opportunity to compile the relevant historical record to supplement the historical evidence examined in *Teixeira*," ordered the parties to file supplemental briefs addressing the issue simultaneously. Order 3 (citing Opp'n 24, n.12).

1    Plaintiffs thus submit this brief in response to the Court's request. But in a civil

2    case, "unless a federal statute or [the Federal Rules of Evidence] provide otherwise,

3    the party against whom a presumption is directed has the burden of producing

4    evidence to rebut the presumption." Fed. R. Evid. 301. As this Court already

5    recognized, under *Bruen*, the State must first prove that its modern gun show ban is

6    consistent with this country's historical tradition of firearm regulation. *Id.* at 3 (citing

7    *Bruen*, 143 S. Ct. at 2126). But submitting *simultaneous* briefing on the issue, after the

8    State opted not to present any such evidence at all in support of its opposition,

9    requires Plaintiffs to do the impossible—anticipate what historical evidence the State

10    might present and blindly respond to it without an opportunity to rebut the State's

11    submission. It also puts Plaintiffs in the untenable position of presenting evidence to

12    prove a negative (the lack of relevant historical statutes or regulations). This burden is

13    not theirs under *Bruen*.

14    In any event, Plaintiffs contend that there is no enduring historical tradition of

15    banning the sale of arms while on public property (or anywhere else, for that matter)

16    and that the State cannot prove otherwise. So, under *Bruen*'s history-and-tradition test,

17    California's gun show ban is out of step with this country's tradition of firearm

18    regulation and is unconstitutional. That said, Plaintiffs cannot predict what historical

19    evidence the State might present. They thus request, much like the State did in its

20    opposition, that if the Court is inclined to hold that the State has submitted sufficient

21    historical justification for its modern gun show ban, Plaintiffs seek leave to file a

22    supplemental reply brief.

23    **I.    THE PROPER STANDARD FOR ANALYZING SECOND AMENDMENT CLAIMS**

24    In *Bruen*, the Supreme Court recognized that, in the years since *Heller*, the

25    lower courts "coalesced around a 'two-step' framework for analyzing Second

26    Amendment challenges." *Bruen*, 142 S. Ct. at 2125. The first step, the Court

27    explained, asked if the government could justify a given restriction by showing that

28    "the original scope of the [Second Amendment] based on its historical meaning"

tolerated such a restriction on the right. *Id.* at 2126. If it could, the analysis would "stop there." *Id.* But if history suggested that such a restriction was not "originally understood" as consistent with the right, or if the record was inconclusive, courts moved to a second step at which they typically subjected the law to intermediate scrutiny. *Id.*

The *Bruen* Court jettisoned that analysis, clarifying that "[d]espite the popularity of this two-step approach, *it is one step too many*." *Id.* at 2127 (emphasis added). The correct analysis begins—and ends—with consideration of text and history. *Id.* So, when faced with a Second Amendment challenge, courts must begin by asking whether the conduct in which an individual seeks to engage is within the ambit of the Second Amendment's "plain text." *Id.* at 2126, 2129-30. If it is, "the Constitution presumptively protects that conduct," *id.* at 2127, and "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* Only if the government can "identify a well-established and representative historical analogue," *id.* at 2133, "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command,'" *id.* at 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

*Bruen* also reaffirmed critical principles that govern (and constrain) the historical analysis. For one thing, the Court explained that the type of historical tradition the government may rely on is "an enduring American tradition of state regulation" and not just a handful of laws in "outlier jurisdictions." *Id.* at 2155-56. The Court also emphatically clarified that the *government* shoulders the burden of justifying a restriction on Second Amendment rights by proving that a longstanding American tradition supports that restriction. The burden is not assigned to the plaintiff. Indeed, the Court said so over and over:

- "[T]he *government must demonstrate* that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at

PLAINTIFFS' COURT-ORDERED SUPPLEMENTAL BRIEF

2126 (emphasis added).

- "[T]he *government must affirmatively prove* that its firearms regulation is part of the historical tradition." *Id.* at 2127 (emphasis added).

- "The *government must then justify its regulation* by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130 (emphasis added).

- "[A]nalogical reasoning requires … that the *government identify* a well-established and representative historical analogue." *Id.* at 2133 (emphasis added).

- "Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. *That is respondent's burden*." *Id.* at 2150 (emphasis added).

Here, in weighing the State's proffered historical analogues, this Court should consider whether such laws are "relevantly similar," *see id.* at 2132, to the law at issue (a ban on sales of arms at gun shows on public property). Plaintiffs contend that this inquiry is necessarily simple and narrow: Has the State presented evidence of laws from the relevant historical periods banning law-abiding people from forming a contract to buy and sell arms while standing on public property? If it has, the Court should also consider whether such laws are constitutionally relevant: Do they evidence an "enduring American tradition" of banning public sales of arms? Or are they outliers that existed for only a short time or in a handful of outlier jurisdictions?

## II.   THE STATE'S MODERN GUN SHOW BAN IMPLICATES THE SECOND AMENDMENT

The first question under *Bruen* is whether the Second Amendment protects the conduct in which an individual seeks to engage. 142 S. Ct. at 2129-30. The answer here is obviously "yes." Plaintiffs are law-abiding citizens seeking to buy and sell lawful "firearm-related products" at gun shows at the state-owned Fairgrounds—as they have done (safely and lawfully) for over three decades. The individual plaintiffs

4

and Plaintiff CRPA's members attend gun shows, engage in speech with vendors and other attendees, and purchase "firearm-related products." Clark Decl. ¶¶ 4-9, 13-14; Johnson Decl. ¶¶ 4-9, 13-14; Littrell Decl. ¶¶ 3-7, 14-15; Merson Decl. ¶¶ 4-8, 14-15; Minnich Decl. ¶ 5. Plaintiffs Littrell and Merson, as well as Plaintiff CRPA's members, participate in gun shows to buy and sell "firearm-related products." Littrell Decl. ¶¶ 4, 8, 12, 14-15; Merson Decl. ¶¶ 5, 9, 14-15; Minnich Decl. ¶¶ 5, 10, 14. And the promoter plaintiff produces gun show events at the Fairgrounds and other state-owned venues, where vendors and attendees can come together to buy and sell "firearm-related products." Olcott Decl. ¶¶ 2-23. All this conduct comes within the "plain text" of the Second Amendment—a conclusion this Court implicitly made when it tentatively concluded that *Teixeira* does not apply and identified the State's burden to prove that its law is consistent with this country's history and tradition.

Even so, the State argues that California's gun show ban does not "*meaningfully restrict* Plaintiffs' access to firearms" because the laws only ban the sales of "firearm-related products" at state-owned properties and because Plaintiffs have not shown that they cannot acquire such products elsewhere. Opp'n 21 (emphasis added). To support its position, the State relies on *Teixeira*, a pre-*Bruen* challenge to a county zoning ordinance that effectively barred a gun store from opening in the county. Opp'n 22-24. The *Teixeira* court upheld the law, holding that (1) there is no "freestanding right" "to sell a firearm unconnected to the rights of citizens to 'keep and bear' arms," 873 F.3d at 686-87, and (2) the plaintiffs had not shown that the law "meaningfully restricted" the ability to acquire firearms, *id.* at 687. But a balancing test, pitting a narrowly drawn "freestanding right" against judicially concocted "meaningful restrictions" without metric or measure is exactly the kind of standardless adjudication of Second Amendment rights that the *Bruen* Court took pains to condemn. *Id.* at 2127.

Despite the State's mere assertion that "*Teixeira*'s reasoning remains sound after *Bruen*," Opp'n 23, this Court tentatively concluded that *Teixeira*'s Second Amendment precedent is no longer good law, Order 2. The Court is on the right track

1  and should ultimately affirm that ruling. Indeed, it is likely (despite the Supreme

2  Court's denial of certiorari, *Teixeira*, 138 S. Ct. 1988 (2018)) that the *Teixeira*

3  majority opinion's reasoning was legally spurious—even before *Bruen*.[1] And, in light

4  of *Bruen*, the *Teixeira* dissent by Judges Tallman and Bea (and the original three-

5  judge panel's decision in *Teixeira v. Cnty. of Alameda*, 822 F.3d 1047 (9th Cir. 2016))

6  now clearly provide the analysis that aligns with *Heller* and *Bruen*. *See Teixeira*, 873

7  F.3d at 691-99. (Tallman & Bea, JJ., dissenting).

8        The *Teixeira* en banc majority conceded that "the core Second Amendment

9  right to keep and bear arms for self-defense wouldn't mean much without the ability

10  to acquire arms." 873 F.3d at 677 (internal quotation marks omitted). It also

11  recognized that "the would-be operator of a gun store ... has derivative standing to

12  assert the subsidiary right to acquire arms on behalf of his potential customers." *Id.* at

13  678 (citations omitted). But incongruently, the court then denied the existence of an

14  "independent" right to sell firearms, holding that there is no "free-standing" right to

15  sell firearms detached from any customer's ability to acquire them. *Id.* at 683-84. So if

16  firearms are available for sale elsewhere within the jurisdiction (without defining the

17  scope of that jurisdiction), no person is denied the right to acquire them, and no

18  retailer is denied any right to sell them. *Id.* But the bifurcation of the right to firearms

19  commerce into a "right to buy" (which the *Teixeira* en banc court recognized) and a

20  "right to sell" (which it rejected) is both artificial and arbitrary.

21        As a logical matter, commerce inherently involves *both* buyers *and* sellers, who

22  may have equal constitutional rights in the transaction *Cf. Bridenbaugh v. Freeman-*

23  *Wilson*, 227 F.3d 848, 850 (7th Cir. 2000). It was as if the *Teixeira* en banc panel was

24  making a finding that the "free-standing" right to free speech or free press is

25  dependent on the existence of listeners and readers; and that if the speech or press can

26

27

28

---

[1] *Teixeira* did not address the abandoned Equal Protection claim, 873 F.3d at 676, n.7, which is still a live controversy here, Compl. for Decl. & Inj. Relief ¶¶ 215-22 (Aug. 12, 2022).

be experienced at some other time or place, the government can engage in censorship. That has never been the law under the First Amendment, which protects a "marketplace" of ideas that contemplates buyers and sellers. *See, e.g.*, *Bd. of Educ. v. Pico*, 457 U.S. 853 (1982); *Va. State Bd. of Pharm. v. Va. Citzs. Consumer Council,* 425 U.S. 738 (1976); *Kleindienst v. Mandel*, 408 U.S. 753 (1972); *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002).

The notion that the Second Amendment does not protect the right sell firearms is unsound. To be sure, the Second Amendment's text does not explicitly refer to a right to *sell* arms. But it does not expressly refer to a right to *acquire* them either. Yet even the *Teixeira* court acknowledged this aspect of the right. 873 F.3d at 677. "Constitutional rights implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring). Indeed, "'[t]here comes a point . . . at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself.'" *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 745 (2000) (Scalia, J., dissenting)).[2] For that reason, even pre-*Bruen* precedent confirms that the Second Amendment protects those predicate acts necessary to use a firearm for lawful purposes. For example, "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them," *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), and "to acquire and maintain proficiency in their use," *Ezell v. Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).[3] "Without protection for these closely related rights, the Second Amendment would be toothless." *Luis*, 578 U.S. at 27

---

[2]  *See also Heller*, 554 U.S. at 617-618 (citing Thomas M. Cooley, *General Principles of Constitutional Law* 271 (2d ed. 1891)) (discussing the implicit right to train with weapons)); *United States v. Miller*, 307 U.S. 174, 180 (1939) (citing 1 Herbert L. Osgood, *The American Colonies in the 17th Century* 499 (1904)) (discussing the implicit right to possess ammunition)); *Andrews v. State*, 50 Tenn. 165, 178 (1871) (discussing both rights).

[3]  *See also Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022), *vacated on reh'g*, 2022 WL 4090307; *Duncan v. Becerra*, 742 F. App'x 218, 221 (9th Cir. 2018); *Teixeira*, 873 F.3d at 677.

PLAINTIFFS' COURT-ORDERED SUPPLEMENTAL BRIEF

1    (Thomas, J., concurring).

2        In terms of the original meaning of the Second Amendment, "the historical

3    evidence demonstrates that the right to sell firearms is part and parcel of the

4    historically recognized right to keep and bear arms." *Teixeira*, 873 F.3d at 698 (Bea,

5    J., dissenting); *see also id.* at 693-94 (Tallman, J., dissenting) ("Throughout history

6    and to this day the sale of arms is ancillary to the right to bear arms."). As David B.

7    Kopel, a firearms-law historian and expert, explains, "the right to engage in firearms

8    commerce" played a significant role in advancing the Americans' dispute with Great

9    Britain to armed revolution:

10           In the fall of 1774, King George III embargoed all
             imports of firearms and ammunition into the thirteen
11           colonies. [5 Acts Privy Council 401, *reprinted
             in* Connecticut Courant, Dec. 19, 1774, at 3.] The Americans
12           treated the embargo on firearms commerce as evidence of
             plain intent to enslave America, and the Americans
13           redoubled their efforts to engage in firearms commerce. For
             example, the Patriots in South Carolina were led by the
14           "General Committee," which declared: "[B]y the late
             prohibition of exporting arms and ammunition from
15           England, it too clearly appears a design of disarming the
             people of America, in order the more speedily to dragoon
16           and enslave them."[1 John Drayton, *Memoirs of the
             American Revolution as Relating to the State of South
17           Carolina* 166 (Applewood Books 1969) (1821), *available
             at* https://archive.org/details/memoirsofamerica12moul].....
18

19           The British and the Americans agreed that the
             reimposition of London's rule in the United States required
20           the prohibition of the firearms business. In 1777, with
             British victory seemingly within grasp, Colonial
21           Undersecretary William Knox drafted a plan entitled *What
             Is Fit to Be Done with America?* To prevent any future
22           rebellions, Knox planned that … "the Arms of all the People
             should be taken away ... nor should any Foundery or
23           manufactury of Arms, Gunpowder, or Warlike Stores, be
             ever suffered in America, nor should any Gunpowder, Lead,
24           Arms or Ordnance be imported into it without Licence."
             [Leland J. Bellot ed., *William Knox Asks What is Fit to be
25           Done with America?*, *in* Sources of American Independence
             140, 176 (Howard H. Peckham ed., 1978).]

26           The opposite of *What Is Fit to Be Done with
             America?* is the Constitution of the United States of
27           America. No national religion. [U.S. Const. amend. I.] The
             tax power solely in the hands of a representative
28

Congress. [*Id.* art. I, § 7, cl. 1; id. § 8, cl. 1.] No titles of nobility. [*Id.* art. I, § 9, cl. 8; id. § 10, cl. 1.] ***And a guarantee of the right to buy, sell, and manufacture arms.*** [*Id.* amend. II.]

David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230, 234-35 (2014).

The *Teixeira* en banc panel veered away from Supreme Court precedent when it disregarded *Heller*'s rejection of the notion that "various restrictive law[s] in the colonial period" could be read broadly to negate the right they regulated. *Heller*, 554 U.S. at 631. Just as historical gunpowder storage laws and laws restricting the public discharge of firearms were not inconsistent with a right to keep and use guns for self-defense. *Id. at* 631-34. The mere regulation of firearms commerce does not suggest that this activity is categorically unprotected. *Bruen* validated this interpretation and expanded on it. *Id.* at 2128, 2131.

In short, as much as *Teixeira* relied on "history and tradition" to find that there is no independent right to sell arms, it was simply wrong. "The right to commerce in firearms was one of the rights at issue during the American Revolution, and it is a right guaranteed by the Second Amendment…." Kopel, *supra*, at 237. That is not to say, however, that no regulation on such conduct can survive judicial scrutiny. To be sure, *Heller* did acknowledge the presumptive validity of at least some "laws imposing conditions and qualifications on the commercial sale of firearms." 554 U.S. at 626-27. But, "to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition." *United States v. Marzzarella*, 614 F.3d 85, 92 n. 8 (3d Cir. 2010). If commercial regulations on the sale of firearms fell outside the scope of the Second Amendment, "it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." *Id.*

By prohibiting the sale (and, by extension, the purchase) of lawful "firearm-

related products" at the Fairgrounds and other state-owned venues, the State's gun show ban implicates the "plain text" of the Second Amendment.

### III.   THE STATE CANNOT PROVE THAT ITS MODERN GUN SHOW BAN IS CONSISTENT WITH AN ENDURING AMERICAN TRADITION OF REGULATION

Because the State's gun show ban restricts Second Amendment conduct, the State "must affirmatively prove that its firearms regulation is part of the historical tradition." *Bruen*, 142 S. Ct. at 2127. Under a faithful application of *Bruen*, the State cannot come close to meeting its burden here. By shifting the burden to the government when its laws implicate the Second Amendment "bundle of rights," *Bruen* undermined the flawed historical analysis employed in *Teixeira*. Courts can no longer cherry-pick or weigh the evidence with their thumb on the scale to favor the government. So unless there is a "well-established and representative" sampling of "relevantly similar" laws that ban the formation of contracts for the "sale" (offer, acceptance, and consideration[4]) of "firearm-related products" on public land, then Plaintiffs' Motion for Preliminary Injunction must be granted.

The Court should reject any shotgun attempt by the State to show that a ban on sales (but not possession) of "firearm-related products" on state property has a relevant historical analogue dating to the founding era. Indeed, it was not until the late 1990s that a handful of California cities and counties began to experiment with bans on gun shows on publicly owned property by trying to ban first the sale, then possession, of firearms at gun shows (without banning the shows themselves) and even trying to impose a moratorium. *See, e.g.*, *Nordyke v. Santa Clara Cnty.*, 110 F.3d 707, 713 (9th Cir. 1997) (overturning a 1995 county gun show ban on First Amendment grounds); *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012) (county's "reinterpretation" of its ordinance banning possession of guns at gun shows—the

---

[4]  With the transfer of the firearms taking place at a brick-and-mortar gun store, and only after a 10-day waiting period and background check. *See* Pls.' Mem. Supp. Mot. Prelim. Inj. ("Mot.") 2, 13 (Nov. 16, 2022).

1   concession made during the second en banc hearing in that case—meant that gun

2   shows could resume at fairground); *B&L Prods., Inc. v. 22nd Dist. Agric. Ass'n*, 394

3   F. Supp. 3d 1226 (S.D. Cal. 2019) (overturning a 2018 moratorium on gun shows at

4   the Del Mar Fairgrounds on First Amendment grounds).

5          California's 2022 statewide ban on gun shows is the very first of its kind—and

6   it remains the only law of its type in that nation. As the bill's sponsor boasted, "Last

7   year, we laid the foundation for this moment with a ban on gun shows at the Orange

8   County Fairgrounds. Today, I am proud to announce that California will become the

9   first in the nation to enact a total ban statewide." Press Release, *California Becomes*

10  *the First State to Ban Gun Shows on State Property, Builds on Orange County*

11  *Fairgrounds Ban* (July 21, 2022), [https://sd37.senate.ca.gov/news/california-becomes-](https://sd37.senate.ca.gov/news/california-becomes-first-state-ban-gun-shows-state-property-builds-orange-county-fairgrounds)

12  [first-state-ban-gun-shows-state-property-builds-orange-county-fairgrounds](https://sd37.senate.ca.gov/news/california-becomes-first-state-ban-gun-shows-state-property-builds-orange-county-fairgrounds) (last

13  accessed Jan. 27, 2023). It is hard to see how such an admittedly novel law could align

14  with an enduring American tradition of regulating firearms commerce reaching back

15  to the founding era.

16          But that is what the State must prove. In *Bruen*, the respondents offered four

17  categories of historical sources to justify their ban on public carry of firearms: "(1)

18  medieval to early modern England; (2) the American Colonies and the early Republic;

19  (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th

20  centuries." 142 S. Ct. at 2135-36. Since the *Bruen* decision came down, California

21  has, in other cases, looked to those same periods to justify its modern laws.

22  Defendants' Supplemental Brief in Response to the Court's Order of August 9, 2022

23  at 50-66, *Miller v. Bonta*, Case No. 19-cv-1537 (S.D. Cal. Oct. 13, 2022) (ECF No.

24  137); Defendants' Supplemental Brief in Response to the Court's Order of September

25  26, 2022, at 26-48, *Duncan v. Bonta*, Case No. 17-cv-1017 (S.D. Cal. Nov. 10, 2022)

26  (ECF No. 118).[5] It will conceivably do the same here. But, as *Bruen* held, "not all

27

28          [5] The State has also relied heavily on racist slave codes and Jim Crow laws, as
    well as restrictions on the rights of Native Americans and other groups, to support its

history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' … The Second Amendment was adopted in 1791; the Fourteenth in 1868." 142 U.S. at 2136 (citing *Heller*, 554 U.S. at 634-35).

Historical laws that "long predate[] either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. When it came to pre-founding and English history, for example, the *Bruen* Court gave evidence from that period very little weight because "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (citing *Heller*, 554 U.S. at 634). English history is ambiguous at best, and the Court saw "little reason to think that the Framers would have thought it applicable in the New World." *Id*. at 2139. That is not to say that pre-founding history is *never* relevant, but the bar for when it may be relevant is high. As the Court explained, a "long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice." *Id.* at 2136.

Relatedly, the *Bruen* Court cautioned against "giving postenactment history more weight than it can rightly bear." *Id.* "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 2137 (citing *Gamble v. United States*, 587 U.S. __, 139 S. Ct. 1960, 1987 (2019) (Thomas, J., concurring)). As for antebellum and Reconstruction-era evidence, specifically, *Bruen* held that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the

---

gun control laws in other cases. *See, e.g.*, Defendants' Survey of Relevant Statutes (Pre-Founding – 1888), at 1, 3-7, 13, 18 & n.2, *Duncan v. Bonta*, Case No. 17-cv-1017 (S.D. Cal. Jan. 11, 2023) (ECF No. 139-1); Defendants' Survey of Relevant Statutes (Pre-Founding – 1888), at 1, 4-7, 13, 17-18 & n.2, *Miller v. Bonta*, Case No. 19-cv-1537 (S.D. Cal. Jan. 11, 2023) (ECF No. 163-1); Defendants' Survey of Relevant Statutes (Pre-Founding – 1888), at 1-22 & n.2., *Rhode v. Bonta*, Case No. 18-cv-802 (S.D. Cal. Jan. 11, 2023) (ECF No. 79-1). It should go without saying that racist laws enacted to disarm classes of marginalized people provide no legitimate analogue for modern gun laws. If they did, certainly *Bruen* would have mentioned them even once.

PLAINTIFFS' COURT-ORDERED SUPPLEMENTAL BRIEF

1  ratification of the Second Amendment, they do not provide as much insight into its

2  original meaning as earlier sources.'" 142 S. Ct. at 2137 (citing *Heller*, 554 U.S. at

3  614). To the extent that the *Heller* Court considered such evidence, it did so to help

4  explain the public understanding of the Second Amendment in 1791. In other words,

5  "[t]he 19th-century treatises were treated as mere confirmation of what the Court had

6  already been established." *Id.* (citing *Gamble*, 139 S. Ct. at 1976).

7      Finally, any attempt by the State to rely on late 19th-century or 20th-century

8  historical evidence should be met with the greatest skepticism. Giving such evidence

9  the least weight, the *Bruen* Court referenced 20th-century history only in a footnote,

10  stating that it would not even "address any of the 20th-century historical evidence

11  brought to bear by respondents or their *amici*. As with their late-19th-century

12  evidence, the 20th-century evidence presented by respondents and their *amici* does not

13  provide insight into the meaning of the Second Amendment when it contradicts earlier

14  evidence." *Id.* at 2154, n.28.

15      Any 20th-century law prohibiting the sale of common arms contradicts the

16  public understanding of the right in the American Colonies and the early Republic. As

17  the original three-judge panel in *Teixeira* recognized:

18          [C]olonial Americans believed that they shared
            equally in the enjoyment of this guarantee [to keep and
19          bear arms for defense], ***and that the right necessarily
            extended to commerce in firearms***. Colonial law
20          reflected such an understanding. For instance, in
            Virginia, all persons had "liberty to sell armes and
21          ammunition to any of his majesties loyall subjects
            inhabiting this colony." Laws of Va., Feb., 1676-77, Va.
22          Stat. at Large, 2 Hening 403. It came as a shock,
            therefore, when the Crown sought to embargo all
23          imports of firearms and ammunition into the colonies. 5
            Acts Privy Council 401, *reprinted in Connecticut
24          Courant*, Dec. 19, 1774, at 3.

25                       ....

26          ***The historical record indicates that Americans
            continued to believe that such right included the
            freedom to purchase and to sell weapons***. In 1793,
27          Thomas Jefferson noted that "[o]ur citizens have always
            been free to make, vend, and export arms. It is the
28          constant occupation and livelihood of some of them."

1    Thomas Jefferson, 3 *Writings* 558 (H.A. Washington ed.,
2    1853).

3    822 F.3d at 1054-55 (double emphasis added). Twentieth-century bans on the sale of

4    common firearms thus provide no meaningful insight into the original meaning of the

5    Second Amendment. This Court should follow the *Bruen* Court's lead and ignore

6    evidence of such laws.

7    Indeed, based on *Bruen*'s clear guidance, the first wave of post-*Bruen* Second

8    Amendment decisions have rebuked calls to rely on evidence of 20th-century

9    regulations. As the Northern District of New York recently observed, "to the extent

10   these laws were from the 17th or 20th centuries, the [c]ourt has trouble finding them

11   to be 'historical analogues' that are able to shed light on the public understanding of

12   the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868."

13   *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944, at *127

14   (N.D.N.Y. Nov. 7, 2022). And the Western District of New York likewise observed

15   that:

16   > *Bruen* itself invalidated a century-old New York proper-
17   > cause requirement similarly in effect in five other states
     > as well as the District of Columbia. That seven
     > jurisdictions enacted similar restrictions
18   > was *insufficient* in the face of a much broader and much
     > older public-carry tradition. *If such was a failure of*
19   > *analogs or tradition in Bruen, the State's argument must*
     > *also fail here.*
20

21   *Hardaway v. Nigrelli*, No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813, at *37, n.16

22   (W.D.N.Y. Nov. 3, 2022) (emphasis added); *see also United States v. Nutter*, No. 21-

23   cr-00142, 2022 U.S. Dist. LEXIS 155038, at *9 (S.D. W. Va. Aug. 29, 2022) (holding

24   that laws originating in the 20th century alone cannot uphold a law unless similar laws

25   existed in the Founding era); *Firearms Pol'y Coal., Inc. v. McCraw*, No. 21-cv-1245,

26   2022 U.S. Dist. LEXIS 152834, at *29 (N.D. Tex. Aug. 25, 2022) (holding that 22

27   state laws adopted in the 20th century were insufficient historical justification for a

28   ban on firearms purchases for those under the age of 21).

* * * * *

Again, the State bears the burden of proving that its modern ban on gun shows (through the ban on sales of common, lawful "firearm-related products") is consistent with "an enduring American tradition of state regulation" dating to the founding era. *Bruen*, 142 S. Ct. at 2155-56. Plaintiffs contend there is no such tradition, as evidenced by the colonial and early American understanding that the right to keep and bear arms "included the freedom to purchase and to sell weapons," *Teixeira*, 822 F.3d at 1054-55, and the absence of founding-era bans on the commercial sale of common arms. But if the Court believes that the State has made its historical case, Plaintiffs request leave to file a supplemental reply to respond to the State's newly filed material.

## CONCLUSION

The State cannot present a "well-established and representative" history of relevant analogues to its modern-day ban on selling arms at gun shows held on public property. *Bruen*, 142 S. Ct. at 2133. Thus California cannot overcome the presumption and meet its burden to  "demonstrate that [its ban] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. The law thus violates the Second Amendment. For these reasons, the Court should hold that Plaintiffs are likely to succeed on their claim that Senate Bill 264 and Senate Bill 915 violate the Second Amendment and enjoin the laws' enforcement while this case proceeds on the merits.

Dated: January 27, 2023          **MICHEL & ASSOCIATES, P.C.**

                              */s/ Anna M. Barvir*
                              Anna M. Barvir
                              Counsel for Plaintiffs B&L Productions, Inc., California Rifle & Pistol Association, Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, Asian Pacific American Gun Owner Association, Second Amendment Law Center, Inc

1    Dated: January 27, 2023          **LAW OFFICES OF DONALD KILMER, APC**

2                                      */s/ Donald Kilmer*
                                       Donald Kilmer
3                                      Counsel for Plaintiff Second Amendment
                                       Foundation
4

5

6                    **ATTESTATION OF E-FILED SIGNATURES**

7         I, Anna M. Barvir, am the ECF User whose ID and password are being used to

8    file this PLAINTIFFS' COURT-ORDERED SUPPLEMENTAL BRIEF IN

9    SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION. In

10   compliance with Central District of California L.R. 5-4.3.4, I attest that all signatories

11   are registered CM/ECF filers and have concurred in this filing.

12   Dated: January 27, 2023          */s/ Anna M. Barvir*
13                                     Anna M. Barvir

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *B & L Productions, Inc., et al. v. Gavin Newsom, et al.*
Case No.: 21CV1718 AJB KSC

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFFS' COURT-ORDERED SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Nicole J. Kau, Deputy Attorney General
nicole.kau@doj.ca.gov
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
    *Attorney for Defendants*

I declare under penalty of perjury that the foregoing is true and correct. Executed January 27, 2023.

_____
Laura Palmerin