ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
NICOLE J. KAU
Deputy Attorney General
State Bar No. 292026
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6220
 Fax:  (916) 731-2125
 E-mail:  Nicole.Kau@doj.ca.gov
*Attorneys for Defendants Governor Gavin Newsom,*
*Attorney General Rob Bonta, Secretary Karen Ross,*
*and 32nd District Agricultural Association*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 8:22-cv-01518 JWH (JDEx)<br><br>**STATE DEFENDANTS' SECOND SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        April 6, 2023<br>Time:        9:00 a.m.<br>Courtroom:  9D<br>Judge:       The Honorable John W. Holcomb<br>Action Filed: August 12, 2022 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

    I.    The Government Has Historically Enjoyed Broad Authority to
        Regulate Conduct on Its Own Property ................................................ 2

    II.   The Government Has Historically Enjoyed Broad Authority To
        Regulate the Commercial Sale of Products, Including Firearms,
        to Promote Public Safety ...................................................................... 6

    III.  The Government Has Historically Enjoyed Broad Authority to
        Regulate Firearms in Sensitive Places, Particularly in Public
        Spaces ................................................................................................. 11

CONCLUSION ................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Bonidy v. U.S. Postal Serv.,*
   790 F.3d 1121 (10th Cir. 2015) ............................................................. 4

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ........................................................................... 11

*English v. State,*
   35 Tex. 473 (1872) ........................................................................ 11, 16

*GeorgiaCarry.Org, Inc. v. Georgia,*
   687 F.3d 1244 (11th Cir. 2012) ............................................................. 3

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs,*
   212 F. Supp. 3d 1348 (N.D. Ga. 2016) ................................................... 4

*Hill v. State,*
   53 Ga. 472 (1874)........................................................................ 12, 16

*New York State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ............................................................. 2, 11, 12

*Oakland Tactical Supply, LLC v. Howell Township,*
   No. 2:18-cv-13443 (E.D. Mich. Feb. 17, 2023) ...................................... 1

*Teixeira v. Cty. of Alameda,*
   873 F.3d 670 (9th Cir. 2017) .............................................................. 10

*United States v. Class,*
   930 F.3d 460 (D.C. Cir. 2019) ............................................................. 4

*United States v. Holton,*
   No. 3:21-CR-0482-B, 2022 WL 16701935 (N.D. Tex. Nov. 3,
   2022)....................................................................................... 10, 11

*United States v. Tilotta,*
   No. 3:19-CR-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30,
   2022)............................................................................................. 1

**TABLE OF AUTHORITIES**
(continued)

Page

**Constitutional Provisions**

Second Amendment..........................................................................*passim*

Texas Constitution of 1868, Art. I, § 13 ....................................................8

**Statutes and Ordinances**

2 Edw. 3, c. 3 (1328) (Eng.) .................................................................12

4 Hen 4, c. 29 (1403) (Eng.)..................................................................12

63 Proceedings and Acts of the General Assembly 338, § 5 (June 15-
    July 3, 1773) ...........................................................4 BA_Cite_0658BA_000095

1647 Md. Laws 216 ..............................................................................13

1650 Md. Laws 273 ...........................................................................4, 13

1851 R.I. Pub. Laws 9, An Act in Amendment of an Act Entitled an
    Act Relating to Theatrical Exhibitions and Places of Amusement,
    §§ 1-2, in *The Revised Statutes of the State of Rhode Island and
    Providence Plantations: To Which are Prefixed, The Constitutions
    of the United States and of the State*, chp. 80, section 2 (January
    Session 1857), at 204-205 (Samuel Ames, Chairman, Sayles, Miller
    and Simons 1857)...............................................................................9

1870 Ga. Laws 421 ................................................................................5

1889 Ariz. Sess. Laws 16-17, No. 13, § 3 ..............................................15

An Act for the Prevention of Damage by Fire, and the Safe Keeping of
    Gun Powder, 1821 Me. Laws 98; chap. 25, §5 ....................................8

An Act in Addition to an Act, entitled "An Act to Provide for the Proof
    of Fire Arms, Manufactured within this Commonwealth," 1814
    Mass. Acts 464, ch. 192, § 2..............................................................8

An Act Incorporating the Cities of Hartford, New Haven, New
    London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg.
    Sess.), chap. 1, § 20 ..........................................................................9

**TABLE OF AUTHORITIES**
**(continued)**

Page

An Act Regulating the Right to Keep and Bear Arms, Aug. 12, 1870,
*reprinted in* 2 *A Digest of the Laws of Texas: Containing the Laws
in Force, and the Repealed Laws on Which Rights Rest from 1864
TO 1872*, at 1322 (George W. Paschal 1873) ..................................... 14

An Act to Amend an Act Entitled "An Act to Incorporate the Village
of Rutland" 1865 Vt. Acts & Resolves 213 § 10 (November 15,
1847).............................................................................................................. 9

An Act to Incorporate and Establish the City of Dubuque, 1845 Iowa
Laws 119, chap 123, § 12 ........................................................................ 9

An Act to Prevent the Carrying of Weapons in Public Assemblies of
the People, Acts of the . . . General Assembly of the State of
Missouri 43 (1874) ................................................................................. 14

An Act to Provide for the Appointment of Inspectors and Regulating
the Manufacture of Gunpowder, 1820 N.H. Laws 274, chap XXV,
§§ 1-9.......................................................................................................... 8

An Act to Regulate Gun Powder Manufactories and Magazines within
this State, 1811 N.J. Laws 300, § 1 ........................................................ 8

An Act to Reduce the Law Incorporating the City of Madison, and the
Several Acts Amendatory thereto into One Act, and to Amend the
Same, 1847 Ind. Acts 93, chap 61, § 8,  pt. 4........................................ 9

An Act to Regulate the Keeping and Selling, and Transporting of
Gunpowder, 1825 N.H. Laws 74............................................................ 8

Code of the State of Georgia 818 (§ 4528) (1873)......................................... 5

Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols,
Fire Crackers, Etc., May 22, 1890, *reprinted in General
Ordinances of the Town of Columbia, in Boone County, Missouri*,
at 34, 35 (Lewis M. Switzler ed., 1890) ............................................. 15

Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons, July 1,
1887, *reprinted in Stockton Review and Rooks County Record* (KS)
1 (July 1, 1887)...................................................................................... 14

**TABLE OF AUTHORITIES**
(continued)

Page

Tex. Act of April 12, 1871, Art. 320 ......................................................................14

**Other Authorities**

*A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, from 1804 to Jan. 1, 1897, with References to Decision Thereon*, 496, § 5 (July 27, 1893) (W.W. Thomson, W. T. Nicholson Sons, Printers and Binders 2d ed. 1897) ......................................................................16

*A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887*, A.14 ap. 1868 § 21 P.L. 10851 VII. 57, 2, at 513 (Frank F. Brightley, Kay & Brother, 1887). ......................................................................16

*Alabama Acts of the General Assembly* 329-35 (1868) ......................................................................7 BA_Cite_0658BA_000049

*Annual Report of the Park Commissioners of the City of Lynn for the Year Ending December 20, 1892*, at 45 (United States: Whitten & Cass 1893 ......................................................................16

*Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page*, Chp. 5, Art. VI., at 147-148 (October 7, 1863) (WM. H. Bridges, Argus Book and Job Office 1863) ......................................................................10

*Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish*, sec. 1. (September session, 1847), at 80 (John C. White, Whig Office, September 1, 1848) ......................................................................9

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443 (2009) ......................................................................3

*First Annual Report of the Improvement of the Central Park, New York* (January 1, 1857) Appendix A, 106 (Chas. W. Baker 1857) ......................................................................15

*Fourth Annual Report of the Board of Commissioners of the Central Park* 106 (1861) ......................................................................15

**TABLE OF AUTHORITIES**
(continued)

Page

*Laws and Ordinances Governing the City of Chicago*, Part I, Chp. 31, § 6, 88-89 (Murray F. Tuley, Bulletin Printing Company 1873) ...................... 16

*Laws of Missouri Passed at the Session of the Thirty-Second General Assembly* 76 (1883) ............................................................................ 14

*Laws of Waterville College, Maine* 11 (1832) ........................................ 13

John Locke, *The Second Treatise of Government*, chp. V. (1689) ........................ 3

Joseph Blocher & Reva B. Siegel, *Second-Amendment Sensitive Places: Protecting Democratic Community and Commerce*, 98 NYU L. Rev. (forthcoming 2023) ..................................................... 3

Nathan Dane, *A General Abridgment and Digest of American Law* vol. VI 749 (Cummings, Hillard & Co. 1823) ...................................... 6

*The Laws and General Ordinances of the City of New Orleans: Together with the Acts of the Legislature, Decisions of the Supreme Court, and Constitutional Provisions Relating to the City Government: Revised and Digested, Pursuant to an Order of the Common Council*, Section 1, art. 636 (5), 257 (Henry Jefferson Leovy, Simmons & Co. New Ed. 1870) ........................................ 10

*Ordinances and Joint Resolutions of the City of San Francisco: Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council 220,* Ordinance No. 498, section 13 (December 29, 1853), at 220 (Monson & Valentine 1854)) ............................................................................. 10

*Ordinances of the City of Burlington, with Head Notes and an Analytic Index*, § 1 (1841), at 149-150 (Chas. Ben. Darwin, Thompson & Co. Printers, 1856) ................................................................ 10

Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 Geo. J.L. & Pub. Pol'y 323 (2011) ............................ 12

**TABLE OF AUTHORITIES**
**(continued)**

Page

Patrick J. Charles, *The Faces of the Second Amendment outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1 (2012) ........................................................................ 12

*Public Statutes of the State of Tennessee since the Year* 1858, at 108 (James H. Shankland ed., 1871) ........................................... 14

*Proceedings of the Common Council of the City of Saint Paul, June 2, 1891* (St. Paul: The Herald Print 1892) ............................... 16

*Revised Statutes of the State of Missouri 1879*, at 224 (§ 1274) ............................ 5

*Statutes of Oklahoma 1890*, Article 47: Concealed Weapons, undated (Will T. Little, L.G. Pitman, & R.J. Barker eds., 1891). .................. 15

*The Minutes of the Senate Academicus of the State of Georgia*, 1799-1842, at 86 (1810) ...................................................... 13

*The Supreme Court: On Carrying Concealed Weapons,* STATE JOURNAL (Jefferson City, MO), Apr. 12, 1873 ................................ 14

*University of Virginia Board of Visitors Minutes* 6-7 (October 4-5, 1824). ........................................................................ 13

2 William Blackstone, *Commentaries on the Laws of England* (1765) .................... 3

William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* (University of North Carolina Press 1996) ........................................................................ 6, 7

**INTRODUCTION**

SB 264 and SB 915 prohibit the sale of firearms, ammunition, and precursor parts on state property.  Plaintiffs allege that these laws "violate[] [their] Second Amendment right to buy and sell firearms and the ammunition and parts necessary to the effective operation of those firearms."  First Amended Complaint (FAC) ¶ 238.  In their supplemental brief, they argue that "[b]y prohibiting the sale (and, by extension, the purchase) of lawful 'firearm-related products' at the Fairgrounds and other state venues, the State's gun show ban implicates the 'plain text' of the Second Amendment."  Pls.' Supplemental Br., ECF No. 27 at 8-9.  Yet under SB 264 and SB 915, the purchase or sale of firearms or ammunition is prohibited *only* on state property—and such items may be sold and are readily accessible in ample alternative locations.  *See* Defs.' Supplemental Br., ECF No. 26 at 1, 4-5.[1] Plaintiffs have never identified the source of any right to sell firearms on state property, and there is none.  The challenged laws thus do not regulate conduct that is protected by the Second Amendment.  *Cf. Oakland Tactical Supply, LLC v. Howell Township*, No. 2:18-cv-13443 (E.D. Mich. Feb. 17, 2023), ECF No. 117 at 10 (holding that township's zoning ordinance, which did not prohibit "'training with firearms,'" but rather "the construction and use of an outdoor, open-air 1,000-yard shooting range," did not bar a "proposed course of conduct . . . covered by the plain text of the Second Amendment"); *United States v. Tilotta*, No. 3:19-CR-04768-GPC, 2022 WL 3924282, at \*6 (S.D. Cal. Aug. 30, 2022) ("[S]imply because a law involves firearms does not mean that the Second Amendment is necessarily implicated.").

While Plaintiffs' failure to allege proposed conduct covered by the Second Amendment is dispositive, this brief addresses "'the difficult historical questions posed by *Bruen*.'"  Order for Additional Supplemental Briefing, ECF No. 28 at 2

---

[1] Nor do the laws enact a "gun show ban," Pls.' Supplemental Br., ECF No. 27 at 8-9, as Defendants previously explained.  *See* Defs.' Opp'n to Mot. for Prelim. Inj., ECF No. 22 at 10-11.

1

(quoting Defs.' Supplemental Br., ECF No. 26 at 15 n.5).  In conducting this analysis, the brief discusses three relevant historical traditions.  First, over many centuries, Anglo-American law has recognized that the government, like any property owner, has the right to control activities on its property—and specifically, the right to impose conditions on the use of its land—when it is acting as a proprietor.  Second, dating back to the Founding and earlier, state and local governments commonly enacted laws regulating commercial products—including firearms and ammunition—for the purpose of promoting public safety.  Third, as detailed in Defendants' first supplemental brief, the government has long regulated firearms in sensitive places, including in public spaces and at large gatherings.  This brief provides additional examples of such regulations.  The historical analogues discussed below, like SB 264 and 915, are representative of these well-worn American traditions, and they served a comparable legislative purpose:  to preserve the peace and welfare of the community, particularly for activities and events held on government property.  Because SB 264 and SB 915 are "consistent with the Nation's historical tradition of firearm regulation," *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022), Plaintiffs are unlikely to prevail on their Second Amendment claim, and their motion for preliminary injunction should be denied.[2]

## ARGUMENT

### I.   THE GOVERNMENT HAS HISTORICALLY ENJOYED BROAD AUTHORITY TO REGULATE CONDUCT ON ITS OWN PROPERTY

The right of landowners to control and exercise domain over their own property is a well-established American legal principle deeply rooted in English tradition.  In the seventeenth century, the English philosopher John Locke considered at length the right to property, and in particular the right to appropriate

---

[2] This brief incorporates the arguments made in Defendants' two prior briefs opposing Plaintiffs' motion for a preliminary injunction.  *See* ECF Nos. 22 and 26.

and exercise control over land and other material resources.  *See, e.g.*, John Locke, *The Second Treatise of Government*, chp. V. (1689).  In the same vein, Sir William Blackstone later observed that "[t]here is nothing which . . . engages the affections of mankind, as the right of property; or that sole despotic dominion which one man claims and exercise over the external things of the world, in total exclusion of the right of any other individual[.]"  2 William Blackstone, *Commentaries on the Laws of England*, chp. 1 (1765).  In particular, Blackstone recognized that a license holder who enters private property does not have the same right as a property owner, and a guest remains on the property only at the owner's permission.  *See id.* The Founding Fathers adopted these tenets, and "through the Constitution and the Bill of Rights, sought to *protect* the fundamental right of private property, not to eviscerate it."  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1265 (11th Cir. 2012), *abrogated by Bruen*, 142 S. Ct. 2111.  Because "[t]he Founding Fathers placed the right to private property upon the highest pedestals, standing side by side with the right to personal security that underscores the Second Amendment," "[a]n individual's right to bear arms as enshrined in the Second Amendment, whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land."  *Id.*

    This right of a property owner to control conduct on its own land applies to the government when it operates as a proprietor.  "[T]here is both precedent and reason for allowing the government acting as proprietor extra power to restrict the exercise of many constitutional rights on its property."  Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1474 (2009); *see also* Joseph Blocher & Reva B. Siegel, *Second-Amendment Sensitive Places:  Protecting Democratic Community and Commerce*, 98 NYU L. Rev. *5 (forthcoming 2023).  This "separate government-as-proprietor standard[]" may apply in government buildings, government-owned parks, and other government-owned property.  *See* Volokh, at 1475.

Courts have regularly recognized this principle.  In *Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015), the court held that it was constitutional to prohibit the carrying of firearms in a postal parking lot because the government "often has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office) than when it is acting as a sovereign (such as when it regulates private activity unconnected to a government service)." *Id.* at 1126.  In such situations, the government "has broad discretion to govern its business operations according to the rules it deems appropriate." *Id.*  In *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019), *abrogated by Bruen*, 142 S. Ct. 2111, the court held that it was permissible to prohibit firearms on the government-owned parking lot on United States Capitol Grounds.  *Id.* at 464 ("[A]s the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property.").  And in *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*, 212 F. Supp. 3d 1348 (N.D. Ga. 2016), the court upheld a regulation restricting the use of firearms on United States Army Corps of Engineers property.  *Id.* at 1363 (principle that private property owners may exclude guns from their property is relevant to the analysis, as "[i]t would be an awkward holding to find that, though Defendant Army Corps may exclude civilians from its property altogether, if it chooses to allow them access, it must also allow them to carry firearms").

History confirms numerous laws dating back to the seventeenth century regulating firearms on government-owned property.  Some examples include:

- In 1650, Maryland barred "any gun[s] or weapon[s]" from the state legislatures.  1650 Md. Laws 273.

- In 1773, Maryland prohibited bringing any weapon into the House of Assembly.  63 Proceedings and Acts of the General Assembly 338, § 5 (June 15-July 3, 1773).

- In 1870, Georgia provided that "no person in said State of Georgia be permitted or allowed to carry about his or her person any . . . pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State . . . ." 1870 Ga. Laws 421.[3]

- In 1873, Georgia prohibited carrying weapons "to any court of justice or any election ground or precinct, or any place of public worship, or any other public gathering in this state, except militia muster grounds." Code of the State of Georgia 818 (§ 4528) (1873).

- In 1879, Missouri prohibited carrying concealed weapons "into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose." *Revised Statutes of the State of Missouri 1879*, at 224 (§ 1274).

Similar laws demonstrating the government's authority to regulate not only on government property, but in a range of sensitive places where people gather, are discussed later in this brief. *See infra*, Argument III.

Here, the State acts as a proprietor when it allows private parties to host certain events on its land, including gun shows at the Orange County Fair & Event Center (Fairgrounds). Consistent with centuries of English and American legal tradition, the State has the right to place certain conditions on the use of its property—including by prohibiting the commercial sale of firearms, ammunition, and precursor parts. In short, there is no Second Amendment right to enter onto another's private property, including government property, to sell firearms and ammunition without permission of the landowner.

---

[3] This law, among others referenced here, was also cited in Defendants' first supplemental brief.

## II. THE GOVERNMENT HAS HISTORICALLY ENJOYED BROAD AUTHORITY TO REGULATE THE COMMERCIAL SALE OF PRODUCTS, INCLUDING FIREARMS, TO PROMOTE PUBLIC SAFETY

The government has also preserved the peace and welfare of the community by exercising its sovereign power to regulate the commercial sale of products, including firearms and ammunition.  "[D]espite historical depictions of free trade, 'laggard' regulation, and the opening of American society, the early nineteenth century was home to a deluge of formal economic regulations and vigorous defenses of the power of the state over trade and commerce."  William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* 87 (University of North Carolina Press 1996); *see also id.* at 85 (contrasting the "'myth of laissez-faire'" with "the myriad ways that law and active state governments furnished the necessary conditions for early American economic development").  Thus, "early Americans understood the economy as simply another part of their well-regulated society, intertwined with public safety, morals, health, and welfare and subject to the same kinds of legal controls."  *Id.* at 84.

Consistent with these principles, "[n]early all state legislatures in the early nineteenth century passed laws directing 'trades to be conducted, and wares and goods to be fabricated, and put up for market in a certain manner.'"  Novak, at 88 (citing Nathan Dane, *A General Abridgment and Digest of American Law* vol. VI 749 (Cummings, Hillard & Co. 1823)).  Between 1780 and 1835, the Massachusetts legislature passed regulations that closely specified and controlled the way numerous products were manufactured and sold, including gunpowder and firearms.  *Id.* (citation omitted) (listing a total of 49 regulated products, from boards and shingles to beef and pork).  Maryland, South Carolina, Michigan, and Ohio enacted similar legal schemes.  *Id.*  Aside from such product and inspection laws, nineteenth-century legislators also used licensing "to regulate and control a host of economic activities, trades, callings, and professions . . . for the public good and the people's welfare."  *Id.* at 90.  In 1827, Maryland enacted a series of statutes

requiring a "license to trade," and Tennessee, Missouri, Pennsylvania, and California passed similar statutes in the midcentury "requiring the licensing of merchants, retailers, and wholesalers." *Id.* at 90-91.  And in 1868, Alabama required licenses for over thirty occupations and businesses, including for "dealers in firearms." *Id.* at 91 (citing *Alabama Acts of the General Assembly* 329-35 (1868)).

Regulation of commerce was strict on government property, as well.  In local public marketplaces where foods were sold, such as Philadelphia's High Street Market and Boston's Faneuil Hall, "states and municipalities used their police powers to . . . protect their populations from high prices, unhealthy goods, unsanitary conditions, fraud and cheating, and the adverse effects of simple profiteering by hucksters, forestallers, middlemen, and other second hand sellers." *Id.* at 96.  Lawmakers recognized that leaving such products unregulated would be "an abdication of public responsibility," *id.*, and "a chorus of judicial opinion support[ed] urban market regulations," *id.* at 101.

Firearms and ammunition were no exception; they have been regulated "from the dawn of American history."  Declaration of Saul Cornell (Cornell Decl.), ¶ 21.  Of course, "the Founding generation did not confront a gun violence problem similar in nature or scope to the ills that plague modern America." *Id.* ¶ 28.  Indeed, "[t]he pressing problem Americans faced at the time of the Second Amendment" was "reluctance to purchase the type of weapons needed to effectively arm their militias." *Id.* ¶¶ 25, 29.  Because local gunsmiths had close ties to the community, as they were both responsible for selling firearms and keeping these dangerous products in good working order, "much of the supervision of this market was achieved through [] informal means." *Id.* ¶ 31.

Nonetheless, it was well understood that state and local governments possessed the inherent police power to regulate firearms commerce to address both "longstanding issues and novel problems created by firearms in American

society." *Id.* ¶ 11.  Indeed, no less than seventeen state constitutions adopted during the Reconstruction era employed "expansive language" providing that the right to keep and bear arms was subject to state regulation.  *Id.* ¶ 41 (citing, e.g., Texas Constitution of 1868, Art. I, § 13, which stated, "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, *under such regulations as the Legislature may prescribe*" (emphasis added)).

In accordance with technological and social norms and the needs of the day, gunpowder—which was inherently dangerous (especially in urban areas with wooden infrastructure) and was manufactured by a rapidly growing industry—was highly regulated in early America.  *See generally* Novak, at 60-67.  States regularly enacted laws regulating gunpowder, including prohibitions of where one may sell gunpowder:

- An Act to Regulate the Keeping and Selling, and Transporting of Gunpowder, 1825 N.H. Laws 74, chap. 61, § 5 (penalizing the selling or offer for sale of gunpowder in any highway, street, lane, alley, wharf, parade, or common)

- An Act in Addition to an Act, entitled "An Act to Provide for the Proof of Fire Arms, Manufactured within this Commonwealth," 1814 Mass. Acts 464, ch. 192, § 2 (January Session) (requiring inspection of musket barrels and pistol barrels)

- An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, 1821 Me. Laws 98, chap. 25, § 5 (power to inspect storage of gunpowder);

- An Act to Regulate Gun Powder Manufactories and Magazines within this State, 1811 N.J. Laws 300, § 1 (limitations on gunpowder factory locations);

- An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, 1820 N.H. Laws 274, chap XXV, §§ 1-9 (duty of inspectors, quality control, storage specifications);

- An Act to Amend an Act Entitled "An Act to Incorporate the Village of Rutland" 1865 Vt. Acts & Resolves 213 § 10 (November 15, 1847) (fire wardens' authority to inspect manufacturing and storage).

8

States also enacted laws delegating to cities the authority to regulate gunpowder, including:

- An Act to Incorporate and Establish the City of Dubuque, 1845 Iowa Laws 119, chap 123, § 12 (delegating authority to cities "to regulate by ordinance the keeping and sale of gunpowder within the city");

- An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20, (delegating authority to "prohibit[] and regulat[e] the bringing in, and conveying out" of gunpowder); and

- An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93, chap 61, § 8,  pt. 4 (delegating authority "[t]o regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder").

In the mid-nineteenth century, as firearms became more common, state and local governments began to regulate shooting galleries, again to protect the public from danger.  Cornell Decl., ¶ 37.  Such regulations required licensure to open a shooting gallery, and oftentimes set limitations on the location of galleries. Examples of such laws include:

- In 1847, the East Feliciana Parish, Louisiana forbid "shooting of guns, pistols, or any other fire arms within the limits of the town of Clinton . . . ." *Id.* citing *Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish*, sec. 1. (September session, 1847), at 80 (John C. White, Whig Office, September 1, 1848);

- In 1851, Rhode Island barred any pistol or rifle gallery in the "compact part of the town of Newport . . . ." *Id.* citing 1851 R.I. Pub. Laws 9, An Act in Amendment of an Act Entitled an Act Relating to Theatrical Exhibitions and Places of Amusement, §§ 1-2, in *The Revised Statutes of the State of Rhode Island and Providence Plantations: To Which are Prefixed, The Constitutions of the United States and of the State*, chp. 80, section 2 (January Session 1857), at 204-205 (Samuel Ames, Chairman, Sayles, Miller and Simons 1857) (same).

- In 1853, San Francisco required a license to operate a pistol or rifle shooting gallery. *Id.* (citing *Ordinances and Joint Resolutions of the City of San Francisco: Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council 220,* Ordinance No. 498, section 13 (December 29, 1853), at 220 (Monson & Valentine 1854)).

- In 1841, Burlington, Iowa required an application for erecting a shooting battery. *Id.* (citing *Ordinances of the City of Burlington, with Head Notes and an Analytic Index*, § 1 (1841), at 149-150 (Chas. Ben. Darwin, Thompson & Co. Printers, 1856) (listing other conditions)).

- In 1863, Memphis, Tennessee required a license to set up a pistol gallery, and prohibited such galleries "in the first story of any building in [the] city[.]" *Id.* (citing *Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page*, Chp. 5, Art. VI., at 147-148 (October 7, 1863) (WM. H. Bridges, Argus Book and Job Office 1863)).

- In 1870, New Orleans, Louisiana prohibited anyone from operating "any pistol or shooting gallery within the limits of the city of New Orleans without having first obtained the consent of" residents and common council. *Id.* (citing *The Laws and General Ordinances of the City of New Orleans: Together with the Acts of the Legislature, Decisions of the Supreme Court, and Constitutional Provisions Relating to the City Government: Revised and Digested, Pursuant to an Order of the Common Council*, Section 1, art. 636 (5), at 257 (Henry Jefferson Leovy, Simmons & Co. New Ed. 1870)).

Thus, from the Founding era through the nineteenth century, state and local governments fully exercised their police powers to enact commercial firearms regulations based on the needs at the time. Cornell Decl., ¶ 11; *see also United States v. Holton*, No. 3:21-CR-0482-B, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022) (relying in part on "commercial firearms regulations" dating back to colonial times to reject Second Amendment challenge, and favorably citing the historical discussion of such regulations in *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017)).[4]  Those analogues are representative of a broader

---

[4] As the court observed in *Holton*, several commercial regulations of this era were enacted "to address the illegal trading and trafficking of arms and

tradition of regulating commercial sales of a host of products more generally.  The

challenged laws here fit well within this historical tradition.  SB 264 and SB 915,

like early American laws restricting where gunpowder could be sold and where

shooting galleries could be located, regulate firearms-related commercial activity in

specific locations to promote public safety—and in doing so, they are no more

burdensome than their predecessors.  *See* Defs.' Supplemental Br., ECF No. 26 at

14.

### III.  THE GOVERNMENT HAS HISTORICALLY ENJOYED BROAD AUTHORITY TO REGULATE FIREARMS IN SENSITIVE PLACES, PARTICULARLY IN PUBLIC SPACES

The Supreme Court has "assume[d] it settled" that certain areas are "'sensitive

places' where arms carrying could be prohibited consistent with the Second

Amendment."  *Bruen*, 142 S. Ct. at 2133; *District of Columbia v. Heller*, 554 U.S.

570, 626 (2008) ("[N]othing in our opinion should be taken to cast doubt on

longstanding prohibitions on . . . laws forbidding the carrying of firearms in

sensitive places such as schools and government buildings.").  Indeed, courts have

affirmed the validity of sensitive places laws for well over a century.  *E.g.*, *English

v. State*, 35 Tex. 473, 478–79 (1872), *abrogated by Bruen*, 142 S. Ct. 2111 ("We

confess it appears to us little short of ridiculous, that any one should claim the right

to carry upon his person any of the mischievous devices [i.e., deadly weapons]

inhibited by the statute, into a peaceable public assembly, as, for instance into a

church, a lecture room, a ball room, or any other place where ladies and gentlemen

are congregated together."); *Hill v. State*, 53 Ga. 472, 475 (1874) (upholding state

ban on the carrying of firearms in any court of justice).

The sensitive places doctrine is grounded in English tradition.  In England

from the thirteenth to eighteenth centuries, "what constituted a 'sensitive place' in

_____

ammunition."  *Holton*, 2022 WL 16701935, at *5; *see also* Defs.' Supplemental Br., ECF No. 26 at 8-9, 10-11.  These historical analogues thus have comparable justifications to SB 264 and SB 915—"(1) controlling and tracing the sale of firearms and (2) ensuring dangerous individuals d[o] not obtain firearms."  *Id.* at 14-15 (citing *Holton*, at *5).

which arms bearing could be prohibited was rather broad, encompass[ing] densely populated areas, as well as areas where people regularly congregated or conducted commerce." Declaration of Patrick Charles (Charles Decl.), ¶ 9. In addition to the Statute of Northampton, which regulated firearms in "fairs" and "markets" (2 Edw. 3, c. 3 (1328) (Eng.)), English laws of that era prohibited the carrying of firearms throughout London, among other locations. *Id.* Because "English prohibitions on going armed in "sensitive places" were worded quite broadly," "there was no need for the law to carve out individual locations." *Id.* ¶ 11.[5]

It is "unequivocal" "that armed carriage restrictions and the English common law against 'going armed' indeed made their way into the American Colonies and subsequent United States." Charles Decl., ¶ 13 (citing Patrick J. Charles, *The Faces of the Second Amendment outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 31-32 (2012)). "Additionally, historians can state with certainty that state and local governments were well within their authority to prohibit armed assemblies circa the late eighteenth century, no matter whether said assemblies were deemed the militia or not." *Id.* (citing Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 Geo. J.L. & Pub. Pol'y 323, 326-27, 374-90 (2011)). "This is because it had long been understood that any armed assemblage required the consent of government officials." *Id.*[6]

"In America, . . . laws expressly prohibiting dangerous weapons at specific locations date back to the mid-seventeenth century[,]" such as two Maryland laws that prohibited dangerous weapons within legislative assemblies (1647 Md. Laws 216; 1650 Md. Laws 273). Charles Decl., ¶ 14 & n.2. An example from the

---

[5] Churches or places of worship were "the one notable exception." Charles Decl. ¶ 11 (citing 4 Hen 4, c. 29 (1403) (Eng.)) ("no Man be armed nor bear defensible armor to Merchant Towns Churches nor Congregations in the same, nor in the Highways, in affray of the Peace or the King's Liege people").

[6] As the Supreme Court noted in *Bruen*, "there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry." *Bruen*, 142 S. Ct. at 2145.

eighteenth century is a 1786 Virginia law that prohibited "rid[ing] armed by night nor by day in fairs or markets."  1786 Va. Laws 25.

In the early to mid-nineteenth century, many sensitive places laws regulated institutions of higher learning.  *Id.* ¶ 14.  Examples include:

- In 1810, the University of Georgia prohibited all students from "keep[ing] any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere[.]" *The Minutes of the Senate Academicus of the State of Georgia*, 1799-1842, at 86 (1810).

- In 1824, the University of Virginia prohibited all students "within the precincts of the University, [from] introduce[ing], keep[ing] or us[ing] any…weapons or arms of any kind[.]" *University of Virginia Board of Visitors Minutes* 6-7 (October 4-5, 1824).

- In 1832, Waterville College prohibited all students from "keep[ing] firearms, or any deadly weapon whatever" and "bring[ing] [] gunpowder upon the College premises[.]" *Laws of Waterville College, Maine* 11 (1832).

As local and state government regulations of sensitive places became more commonplace in the mid-to-late nineteenth century, *see id.* ¶ 15, the categories of sensitive places expanded to include (1) places where large public assemblies generally took place (parks, town squares, and the like); (2) places where events of amusement (large planned events) were held; (3) churches and places of worship; (4) polling places and other buildings where political activity generally took place; (5) schools and institutions of higher learning; and (6) bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood altering drugs were purchased or consumed.  *Id.* ¶ 22.  Examples include:

- In 1869, Tennessee prohibited the carrying of dangerous weapons into "any election . . . fair, race course, or other public assembly of the people." *Id.* ¶ 15 (citing *Public Statutes of the State of Tennessee since the Year* 1858, at 108 (James H. Shankland ed., 1871)).

- In 1870, Texas prohibited the carrying of dangerous weapons "into any . . . religious assembly, any school-room or other place where persons assembled for educational, literary, or scientific purposes, or into a ball room, social

party, or other social gathering, composed of ladies and gentlemen, or to any election precinct on the day or days of any election, . . . or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly . . . ." *Id.* ¶ 16 (citing An Act Regulating the Right to Keep and Bear Arms, Aug. 12, 1870, *reprinted in* 2 *A Digest of the Laws of Texas: Containing the Laws in Force, and the Repealed Laws on Which Rights Rest from 1864 TO 1872*, at 1322 (George W. Paschal 1873)).

- In 1871, Texas further prohibited firearms in any "place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind." Art. 320, Tex. Act of April 12, 1871.

- In 1874, Missouri prohibited persons from "go[ing] into any church or place where people have assembled for religious worship" with "any kind of fire-arms" or "deadly weapon". Charles Decl., ¶ 20 n. 6 (citing An Act to Prevent the Carrying of Weapons in Public Assemblies of the People, Acts of the . . . General Assembly of the State of Missouri 43 (1874)).[7]

- In 1887, Stockton, Kansas prohibited the carrying of dangerous weapons "into any church . . . , or into any school room or place where people have assembled for educational, literary or social purposes, or to any election on any election day, or into any court room . . . , or into any other public assemblage of persons … or shall go upon the public streets or public places of the city[.]" *Id.* ¶ 21 (citing Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons, July 1, 1887, *reprinted in Stockton Review and Rooks County Record* (KS) 1 (July 1, 1887)).

- In 1889, Arizona provided that "[i]f any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, … or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm . . . he shall be

---

[7] In 1883, the Missouri state law was amended to increase the fine. Charles Decl., ¶ 20 n. 6 (citing *Laws of Missouri Passed at the Session of the Thirty-Second General Assembly* 76 (1883)); *see also The Supreme Court: On Carrying Concealed* Weapons, STATE JOURNAL (Jefferson City, MO), Apr. 12, 1878, at 2 regarding State *v. Reando* (Mo. 1878) (upholding 1874 law as constitutional, describing it as "nothing more than a police regulation, made in the interest of peace and good order, perfectly within the power of the legislature to make").

punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person." *Id.* ¶ 18 (citing 1889 Ariz. Sess. Laws 16-17, No. 13, § 3).

- In 1890, Oklahoma prohibited the carrying of dangerous weapons "into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly . . . ." *Id.* ¶ 19 (citing Article 47: Concealed Weapons, undated, *Statutes of Oklahoma 1890*, at 495-96 (Will T. Little, L.G. Pitman, & R.J. Barker eds., 1891)).

- In 1890, Columbia, Missouri prohibited the carrying of dangerous weapons "into any church . . . ; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, . . . or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose . . . ." *Id.* ¶ 19 (citing Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, reprinted in *General Ordinances of the Town of Columbia, in Boone County, Missouri*, at 34, 35 (Lewis M. Switzler ed., 1890)).

And many cities passed ordinances that regulated firearms in parks:

- In 1857, the Board of Commissioners of the Central Park in New York City prohibited all persons from "carry[ing] firearms" within Central Park. *First Annual Report of the Improvement of the Central Park, New York* (January 1, 1857) Appendix A, 106 (Chas. W. Baker 1857).[8]

- In 1873, Chicago forbid all persons "to carry firearms or to throw stones or other missiles within any one of the public parks[.]" *Laws and Ordinances Governing the City of Chicago*, Part I, Chp. 31, § 6, 88-89 (Murray F. Tuley, Bulletin Printing Company 1873).

- In 1868, Philadelphia required that "No persons shall carry firearms, or shoot birds, in the park, or within fifty yards thereof, or throw stones or other

---

[8] Defendants' first supplemental brief provides a later example for Central Park, in the *Fourth Annual Report of the Board of Commissioners of the Central Park*, 106 (1861). *See* Defs.' Supplemental Br., ECF No 26, at Argument III.B.3.

missiles therein." *A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887*, A.14 ap. 1868 § 21 P.L. 10851 VII. 57, 2, at 513 (Frank F. Brightley, Kay & Brother, 1887).

- In 1891, Saint Paul required that "No person shall carry firearms or shoot birds in any park, or within fifty yards thereof, or throw stones or other missiles therein." *Proceedings of the Common Council of the City of Saint Paul, June 2, 1891*, at 133 (St. Paul: The Herald Print 1892).

- In 1892, Lynn, Massachusetts prohibited the "discharge or carry[ing] [of] firearms" "within the limits of Lynn Woods and Meadow Park . . . ." *Annual Report of the Park Commissioners of the City of Lynn for the Year Ending December 20, 1892*, at 45 (United States: Whitten & Cass 1893**)**.

- In 1893, Pittsburgh, Pennsylvania provided that "No person shall be allowed to carry firearms, or to shoot or throw stones at or to set snares for birds, . . . within the limits of the parks or within one hundred yards thereof." *A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, from 1804 to Jan. 1, 1897, with References to Decision Thereon*, 496, § 5 (July 27, 1893) (W.W. Thomson, W. T. Nicholson Sons, Printers and Binders 2d ed. 1897).

These and other sensitive places laws regulating the carrying of firearms have been historically accepted as constitutional. *See, e.g.*, *Eng. v. State*, 35 Tex. at 478-79; *Hill v. State*, 53 Ga. at 475; *see also* Charles Decl., ¶ 23. And there should be no dispute that they are no less restrictive than SB 264 and SB 915, which merely prohibit the *sale* of firearms, ammunition and precursor parts on state property. The challenged laws here also share a similar purpose to the analogues identified—protecting the public welfare in locations where a large group of people gather—and thus are comparably justified.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

16

1    Dated:  February 24, 2023              Respectfully submitted,

2                                          ROB BONTA
                                           Attorney General of California
3                                          R. MATTHEW WISE
                                           Supervising Deputy Attorney General
4

5                                          /s/Nicole J. Kau
                                           Nicole J. Kau
6                                          Deputy Attorney General
                                           *Attorneys for Defendants Governor*
7                                          *Gavin Newsom, Attorney General*
                                           *Rob Bonta, Secretary Karen Ross,*
8                                          *and 32nd District Agricultural*
                                           *Association*
9
     SA2022303648
10   65773790.docx

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for the State Defendants certifies that this brief contains 5,730 words, which:

_x_ complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated [date].

Dated:  February 24, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General

*/s/Nicole J. Kau*
Nicole J. Kau
Deputy Attorney General
*Attorneys for Defendants Governor Gavin Newsom, Attorney General Rob Bonta, Secretary Karen Ross, and 32nd District Agricultural Association*

# CERTIFICATE OF SERVICE

Case Name: **B&L Productions, Inc., et al. v. Gavin Newsom, et al.**

No. **8:22-cv-01518 JWH (JDEx)**

I hereby certify that on <u>February 24, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## STATE DEFENDANTS' SECOND SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 24, 2023</u>, at Los Angeles, California.

| Carol Chow | */s/Carol Chow* |
|:---:|:---:|
| Declarant | Signature |

SA2022303648