ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
NICOLE J. KAU
Deputy Attorney General
State Bar No. 292026
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6220
  Fax: (916) 731-2125
  E-mail: Nicole.Kau@doj.ca.gov
*Attorneys for Defendants Governor Gavin Newsom,
Attorney General Rob Bonta, Secretary Karen Ross,
and 32nd District Agricultural Association*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 8:22-cv-01518 JWH (JDEx)<br><br>**DECLARATION OF PATRICK J. CHARLES IN SUPPORT OF STATE DEFENDANTS' SECOND SUPPLEMENTAL BRIEF**<br><br>Date: February 24, 2023<br>Time: 9:00 a.m.<br>Courtroom: 9D<br>Judge: The Honorable John W. Holcomb<br>Action Filed: August 12, 2022 |

I, Patrick J. Charles, declare under the penalty of perjury that the following is true and correct:

1. I have been retained by the California Department of Justice as a historical expert on Second Amendment matters, including the regulation of firearms on "sensitive places."

1

2. I have been compensated for my work on this declaration at a rate of $100 per hour.

**BACKGROUND AND QUALIFICATIONS**

3. I am a historian, legal scholar, and author of dozens of articles and books on the Constitution (including the Second Amendment), legal history, and standards of review. I received my L.L.M. in Legal Theory and History with distinction from Queen Mary University of London in 2014, J.D. from Cleveland-Marshall College of Law in 2009, and B.A. in History and International Affairs with honors from George Washington University in 2005. My writings on the history of the law have been cited by the Supreme Court of the United States, federal Circuit Courts of Appeal, federal District Courts, and State supreme courts. A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

4. For the past 12 years I have served as a historian for the United States Air Force (USAF) in several capacities, including deploying several times with Special Operations Forces (SOF) for contingency operations in Afghanistan and the Middle East. I currently serve as the Research Division Supervisor for the Air Force Historical Research Agency (AFHRA) located at Maxwell Air Force Base, Alabama, where I oversee all historical information requests and archival research for the USAF.

5. This declaration was compiled and completed outside my official duties for the USAF. Moreover, the contents and opinions expressed in this declaration are solely my own, and not those of the USAF, AFHRA, Department of Defense, or the federal government.

**I. *BRUEN* AND THE "SENSITIVE PLACES" DOCTRINE**

6. *Bruen* established a general test for the lower courts when examining the constitutionality of modern firearm regulations. First, the challenger must show that "the Second Amendment's plain text covers an individual's conduct." 142 S.

1  Ct. at 2129-30.  If the challenger succeeds in this pursuit, the "government must
2  then justify its regulation by demonstrating that it is consistent with the Nation's
3  tradition of firearm regulation." *Id*. at 2130.  At this second step, the government is
4  required to provide historical laws analogous—not identical—to the modern
5  regulation. *Id*. at 2133.  The *Bruen* Court went on to note that "even if a modern-
6  day regulation is not a dead ringer for historical precursors, it still may be
7  analogous enough to pass constitutional muster." *Id*.

8      7.    One regulatory area that the *Bruen* Court expounded upon was that of
9  "sensitive places," *i.e.*, locations "where arms carrying could be prohibited with the
10 Second Amendment." *Id*. (citations omitted).  And in expounding upon this rule,
11 the Court singled out prohibitions on carrying in "schools and government
12 buildings" as two constitutionally permissive examples.  *Id*. (quoting *District of*
13 *Columbia v. Heller*, 554 U.S. 570, 626 (2008)).  The Court upheld arms carrying
14 prohibitions at these two locations despite "the historical record yield[ing]
15 relatively few" examples.  *Id*.  In other words, the Court found it "settled" that
16 "these locations were [indeed] 'sensitive places'" because it was not made "aware
17 of [any] disputes regarding the lawfulness of such prohibitions." *Id*.

18     8.    In support of its conclusion, the *Bruen* Court cited two sources.  Both
19 provided relatively few historical laws that *expressly* prohibited the carrying of
20 firearms in school and government buildings by the mid-nineteenth century.  *See*
21 David. B. Kopel & Joseph S. Greenlee, *The "Sensitive Places" Doctrine: Location*
22 *Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 229-36, 244-47
23 (2018); Brief of Amicus Curiae the Independent Institute in Support of Petitioners,
24 *New York State Rifle & Pistol Association, Inc. v. City of New York, New York*, No.
25 18-280, at 11-17.  This historical research is consistent with my own and is
26 expounded upon in Part II.

27
28

## II. THE HISTORY OF "SENSITIVE PLACES" PREDATING THE FOUNDING OF AMERICA TO THE NINETEENTH CENTURY, FROM ENGLAND TO AMERICA

9. For nearly five centuries in England, from the late thirteenth century through the late eighteenth century, what constituted a "sensitive place" in which arms bearing could be prohibited was rather broad. It encompassed densely populated areas, as well as areas where people regularly congregated or conducted commerce. The "fairs" and "markets" language contained within the 1328 Statute of Northampton makes this abundantly clear. 2 Edw. 3, c. 3 (1328) (Eng.). So too do several other English legal sources. For instance, in 1351, Edward III issued a proclamation declaring it was unlawful to "go armed" with dangerous weapons "within the City of London, or within the Suburbs, or any other places between the said city and the Palace of Westminster…except the officers of the King…" *Royal Proclamation as to the Wearing of Arms in the City, and at Westminster; and as to Playing at Games in the Palace at Westminster*, MEMORIALS OF LONDON AND LIFE 268-69, 273 (H.T. Riley ed., 1868).

10. Similarly, in John Carpenter's 1419 treatise *Liber Albus*, it stipulates that "no one, of whatever condition he be, go armed in the said *city [of London] or in the suburbs*, or carry arms, by day or by night, except the va[]lets of the great lords of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms of his lordship the King, of my lady the Queen, the Prince, and the other children of his lordship the King, and the officers of the City, and such persons as shall come in their company in aid of them, at their command, for saving and maintaining the said peace; under the penalty aforesaid, and the loss of their arms and armour." JOHN CARPENTER, LIBER ALBUS: THE WHITE BOOK OF THE CITY OF LONDON (Henry Thomas Riley ed., 1861); *see also id.* at 229, 555, 556, 558, 560, 580 (providing other examples denoting that going armed in densely populated public places was unlawful).

4

11. English prohibitions on going armed in "sensitive places" were worded quite broadly, and therefore there was no need for the law to carve out individual locations. Churches or places of worship is the one notable exception. *See* 4 Hen 4, c. 29 (1403) ("no Man be armed nor bear defensible armor to Merchant Towns Churches nor Congregations in the same, nor in the Highways, in affray of the Peace or the King's Liege people").

12. The extent to which this English understanding of what constituted a "sensitive place"—that is where arms bearing could be prohibited—traveled across the Atlantic is difficult to determine. Local enforcement records did not survive for historical posterity, and therefore it is impossible for historians or anyone to reconstruct exactly how often, when, and where armed carriage restrictions were enforced. Most instances of legal enforcement were done at the local level, and, as a result, the records of said enforcement have been lost to time. And those records of enforcement that have miraculously survived often require time consuming, archival research, not ad hoc, keyword digital searches. *See, e.g.,* Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

13. What the historical record does unequivocally inform is that armed carriage restrictions and the English common law against 'going armed' indeed made their way into the American Colonies and subsequent United States. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 31-32 (2012). Additionally, historians can state with certainty that state and local governments were well within their authority to prohibit armed assemblies circa the late eighteenth century, no matter whether said assemblies were deemed the militia or not. *See* Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 GEO. J.L. & PUB. POL'Y 323, 326,-27, 374-90 (2011); *An Act to Prevent Routs, Riots, and*

*Tumultuous Assemblies, and the Evil Consequences Thereof*, September Session, Chapter VIII (Mass. 1786); *An Act for the More Speedy and Effectual Suppression of Tumults and Insurrections in the Commonwealth*, September Session, Chapter IX (Mass. 1787); *An Act to Prevent Routs, Riots, and Tumultuous Assemblies* (N.J. 1797); *An Act to Prevent Hunting with Fire-Arms in the City of New-York, and the Liberties Thereof* (NY 1763); *An Act Against Riots and Rioters* (Pa. 1705); *see also* William Rawle, *A View of the Constitution of the United States* 126 (2d ed., 1829) (noting that the Second Amendment "ought not . . .in any government . . . be abused to the disturbance of the public peace," which included the assembling "of persons with arms, for an unlawful purpose"). This is because it had long been understood that any armed assemblage required the consent of government officials.[1]

14. In America, examples of laws expressly prohibiting dangerous weapons at specific locations date back to the mid-seventeenth century.[2] From the ratification of the Constitution through the Antebellum Era, such express, location-specific armed carriage prohibitions were largely adopted by institutions of higher learning.[3] Not one of these laws was ever challenged or professed to be inviolate of the right to keep and bear arms.

---

[1] This understanding of the law goes all the way back to the 1328 Statute of Northampton. *See* 2 Edw. 3, c. 3 (1328) (Eng.); *see also* 3 CALENDAR OF CLOSE ROLLS, RICHARD II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914); 1 CALENDAR OF CLOSE ROLLS, RICHARD II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914).

[2] For instance, two Maryland laws prohibited dangerous weapons within legislative assemblies. 1647 Md. Laws 216; 1650 Md. Laws 273.

[3] *See, e.g.,* THE MINUTES OF THE SENATE ACADEMICUS OF THE STATE OF GEORGIA, 1799-1842, at 86 (1810) ("no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere…"); UNIVERSITY OF VIRGINIA BOARD OF VISITORS MINUTES 6-7 (October 4-5, 1824) ("No Student shall, within the precincts of the University, introduce, keep or use any…weapons or arms of any kind…"); LAWS OF WATERVILLE COLLEGE, MAINE (1832) ("No Student shall keep firearms, or any deadly weapon whatever. He shall bring no gunpowder upon the College premises…"

15. It is not until the mid-to-late nineteenth century that one can really begin to see some historical consistency when it comes to local and state governments enacting express, location-specific armed carriage prohibitions.[4] For instance, an 1869 Tennessee law prohibited the carrying of dangerous weapons into "any election…fair, race course, or other public assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE SINCE THE YEAR 1858, at 108 (James H. Shankland ed., 1871).

16. Not long thereafter, Texas prohibited the carrying of dangerous weapons "into any church or religious assembly, any school-room or other place where persons assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly…" *An Act Regulating the Right to Keep and Bear Arms*, Aug. 12, 1870, *reprinted in* 2 GEORGE W. PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1864 TO 1872, at 1322 (1873).

17. That same year, Georgia provided that "no person in said State of Georgia be permitted or allowed to carry about his or her person any . . . pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State…" 1870 Ga. Laws 421.

---

[4] There are, of course, a few exceptions, such as two mid-seventeenth century Maryland laws that prohibited dangerous weapons within legislative assemblies. 1647 Md. Laws 216; 1650 Md. Laws 273. But other than these two Maryland laws, the historical record until the mid-to-late nineteenth century provides very little in the way of express "sensitive" locations where armed carriage could be prohibited.

18. In 1889, Arizona law provided that "[i]f any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm . . . he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person." 1889 Ariz. Sess. Laws 16.

19. Then there was the state of Oklahoma, which in 1890 prohibited the carrying of dangerous weapons "into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly…" *Article 47: Concealed Weapons*, undated, STATUTES OF OKLAHOMA 1890, at 495-96 (Will T. Little, L.G. Pitman, & R.J. Barker eds., 1891).

20. In addition to these state laws, localities also enacted laws that expressly defined so-called "sensitive places" where armed carriage could be prohibited. One example of a local mid-to-late nineteenth century "sensitive places" law is that of Columbia, Missouri, which in 1890 passed an ordinance prohibiting the carrying of dangerous weapons "into any church, or place where people have assembled for religious worship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election

8

day; or into any other public assemblage of persons met for any lawful purpose…" *Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc.*, May 22, 1890, *reprinted in* GENERAL ORDINANCES OF THE TOWN OF COLUMBIA, IN BOONE COUNTY, MISSOURI 34, 35 (Lewis M. Switzler ed., 1890).[5] The Columbia ordinance mirrored Missouri state law.[6]

21. Stockton, Kansas provides another example. In 1887, Stockton prohibited the carrying of dangerous weapons "into any church or place where the people have assembled for public worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons …or shall go upon the public streets or public places of the city…" *Ordinance No. 76: An Ordinance Prohibiting Deadly*

---

[5] *See* LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE TWENTY-EIGHTH GENERAL ASSEMBLY 158, 166 (1877), *available at* https://catalog.hathitrust.org/Record/000534559 (1877 Missouri state law empowering city and town councils, such as Columbia, with the authority to "prohibit and punish the carrying of firearms and other deadly weapons, concealed or otherwise"). Like Columbia, Webb City, Missouri and Huntsville, Missouri enacted similar laws. *See Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor*, May 15, 1905, *reprinted in* REVISED ORDINANCES OF THE CITY OF WEBB CITY, MISSOURI, 1905, at 99, 100 (1905), *available at* https://catalog.hathitrust.org/Record/008604358; *An Ordinance in Relation to Carrying Deadly Weapons*, July 17, 1894, THE REVISED ORDINANCES OF THE CITY OF HUNTSVILLE, MISSOURI OF 1894, at 58-59 (1894), *available at* https://everytownlaw.org/documents/2022/12/huntsville-mo-1894.pdf/.

[6] The ordinance mirrored an 1874 Missouri state law titled "An Act to Prevent the Carrying of Weapons in Public Assemblies of the People." *See* ACTS OF THE…GENERAL ASSEMBLY OF THE STATE OF MISSOURI 43 (1874), *available at* https://catalog.hathitrust.org/Record/000534559 (prohibiting persons from "go[ing] into any church or place where people have assembled for religious worship" with "any kind of fire-arms" or "deadly weapon"); LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE TWENTY-EIGHTH GENERAL ASSEMBLY 50-51 (1875), *available at* https://catalog.hathitrust.org/Record/000534559 (same). In 1883, the Missouri state law was amended to increase the fine. *See* LAWS OF MISSOURI PASSED AT THE SESSION OF THE THIRTY-SECOND GENERAL ASSEMBLY 76 (1883); *State v. Reando* (Mo. 1878) (Missouri Supreme Court decision upholding 1874 law as constitutional, describing the law as "nothing more than a police regulation, made in the interest of peace and good order, perfectly within the power of the legislature to make.").

9

*Weapons*, July 1, 1887, *reprinted in* STOCKTON REVIEW AND ROOKS COUNTY RECORD (KS), July 1, 1887, at 1.

22. Looking at these "sensitive places" laws from a macro level, it is safe to conclude that come mid-to-late nineteenth century state and local governments maintained the authority to prohibit the carrying of dangerous weapons in a variety of "sensitive places" where people were known to congregate.[7] Such "sensitive

---

[7] It worth noting that several localities viewed the "sensitive places" doctrine as extending across their respective corporate or commercial limits. *See, e.g.,* A DIGEST OF THE LAWS AND ORDINANCES FOR THE GOVERNMENT OF THE CITY OF HARRISBURG, PENNSYLVANIA IN FORCE JANUARY 1, A.D. 1906, at 557-58 (1906), *available at* https://catalog.hathitrust.org/Record/100565572 (1873 ordinance prohibiting the open or concealed carrying of "any pistol, dirk-knife, slung-shot or deadly weapon, within the city limits…except police officers…"); THE REVISED ORDINANCES OF PROVO CITY, UTAH 96 (1893) ("Every person who shall wear, or carry upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon within the city limits of this city is guilty of an offence, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both fine and imprisonment."); THE REVISED ORDINANCES OF PAYSON CITY, UTAH 84 (1893) ("Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon within the limits of this city is guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both fine and imprisonment."); THE REVISED ORDINANCES OF TOOELE CITY, UTAH 87 (1893) ("Every person who shall wear, or carry upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon, is guilty of an offence, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both such fine and imprisonment."); *An Ordinance to Prohibit Intoxication, Breach of Peace, Carrying Deadly Weapons, the Use of Obscene Language, the Discharge of Fire-Arms, and to Close Places of Amusement on Sunday in the City of Wallace*, Kansas, Jan. 31, 1889, *reprinted in* WALLACE COUNTY REGISTER (KS), Feb. 9, 1889, at 2 ("Any person who shall be found carrying on his person a pistol, bowie knife, dirk or other deadly weapon shall upon conviction be fined in any sum not exceeding $25 or by imprisonment in the city jail not exceeding 30 days; Provided however that this section shall not apply to any peace officer of the state, counties or cities of this state and provided further that if it shall appear to the court trying the offense that the accused was engaged in any legitimate business or calling that would necessitate the carrying of any such weapons, such persons shall be acquitted."); *Ordinance No. 97: Ordinance Related to Carrying Deadly Weapons*, May 17, 1882, *reprinted in* BURLINGTON DEMOCRAT (KS), May 26, 1882, at 2 ("That is shall be unlawful for any person hereafter to carry on his or her person a pistol, bowie-knife, dirk or other deadly weapon, concealed or otherwise, within the corporate limits of sad City of Burlington, *Provided*: This Section shall not apply to any person carrying a deadly weapon while in the performance of his or her legitimate business, wherein the law

places" categories included 1) places where large public assemblies generally took place, *i.e.*, parks, town squares, and the like; 2) places where events of amusement took place, *i.e.*, places where people congregate for large planned events; 3) churches and places of worship; 4) polling places and other buildings where political activity generally took place; 5) schools and institutions of higher learning; and 6) bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood altering drugs were purchased or consumed.

23. What historically buttresses that each of these categories were generally understood to be "sensitive places" is the fact that there is no historical evidence that informs otherwise. As far as I am aware, not one nineteenth-century court of law found any of these "sensitive places" categories to be unconstitutional. The same is true for nineteenth-century legal commentary—not one calls these sensitive places categories into constitutional question.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 22 February 2023

_____
PATRICK J. CHARLES

SA2022303648
65728638.docx

---

commands such person to carry a deadly weapon."); *Miscellaneous Ordinance*, Jun. 24, 1871, *reprinted in* ABILENE WEEKLY CHRONICLE (KS), Jun. 29, 1871, at 3 ("That any person who shall carry within the corporate limits of the city of Abilene or commons, a pistol, revolver, gun, musket, dirk, bowie knife, or other dangerous weapon upon his person, either openly or concealed, except to bring the same and forthwith [to] deposit it or them at their house, store room, or residence, shall be fined seventy-five dollars.").

# EXHIBIT A

## PATRICK J. CHARLES
www.patrickjcharles.com

**EDUCATION**

**Queen Mary-University of London School of Law**, LLM Legal Theory and History with Distinction, Dec 2014.
Legal Theory and History Full Scholarship Recipient
Peer Review Editor, Queen Mary Law Journal

**Cleveland-Marshall School of Law**, Juris Doctor, May 2009.
2008 Judge John R. Brown Award for Legal Writing ($10,000 award given annually to best student article, note, comment or paper in the United States)

**George Washington University**, B.A. History with Honors, International Affairs Conflict & Security, International Affairs European Affairs, Jun 2005.

**EXPERIENCE**

**Air Force Historical Research Agency, USAF**, Maxwell AFB, AL   *Lead Research Team Archivist*   04/22 – Pres

**U.S. Special Operations Command, Legislative Affairs, USAF**, Washington, DC   *Legislative Liaison*   01/21 – 4/22

**U.S. Senate, Office of U.S. Senator Martin Heinrich**, Washington, DC   *Legislative Fellow*   01/20 – 01/21

**Dept of State, Office of U.S. Foreign Assistance Resources**, Washington, DC   *Legislative Analyst*   07/19 - 01/20

**U.S. Special Operations Command, USAF**, MacDill AFB, FL   *Senior Historian*   07/16 - 07/19

**Journal of Immigration, Asylum, and Nationality Law**, London, UK   *Peer Review Editor*   09/15 - 09/18

**24th Special Operations Wing, USAF**, Hurlburt Field, FL   *Historian*   08-14 - 07/16

**352nd Special Operations Group, USAF**, Mildenhall, UK   *Historian*   12/10 - 08/14

**Immigration Reform Law Institute**, Washington, DC   *Legal Analyst/Legal Historian*   5/09 - 12/10

**United States Marine Corps**, Shanghai, China   *Sergeant/Assistant Detachment Commander*   8/97 - 8/02

**FELLOWSHIPS AND GRANTS**

United States Air Force, Air Force Legislative Fellows Program, July 2019-April 2022.

Eisenhower Foundation Research Travel Grant 2019, Dwight D. Eisenhower Presidential Library, Abilene, KS.

Carl Albert Congressional Research Center Visiting Scholars Grant 2018, University of Oklahoma, Norman, OK.

Bordin-Gillette Research Fellowship 2018, University of Michigan Bentley Historical Library, Ann Arbor, MI.

Clark-Yudkin Research Fellowship 2013-14, United States Air Force Academy Library, Colorado Springs, CO.

**BOOK PUBLICATIONS AND BOOK CHAPTERS**

*Vote Gun: How Gun Rights Became Politicized in the United States* (Columbia University Press, 2023).

13

"The 'Reasonable Regulation' Right to Arms: The Gun Rights Second Amendment Before the Standard Model," *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment*, Jennifer Tucker, Barton C. Hacker, and Margaret Vining eds. (Smithsonian Institution Press, 2019).

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (Prometheus Books, 2019) (paperback edition with new foreword).

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (Prometheus Books, 2018).

*United States Special Operations History, 1987-2017* (7th edition, USSOCOM History and Research Office, 2017) (contributor).

*Historicism, Originalism and the Constitution: The Use and Abuse of History in American Jurisprudence* (McFarland, 2014).

*The Second Amendment: The Intent and its Interpretation by the States and the Supreme Court* (McFarland, 2009).

*Irreconcilable Grievances: The Events that Shaped the Declaration of Independence* (Heritage Books, 2008).

## ARTICLES AND OTHER PRINT PUBLICATIONS

"The Fugazi Second Amendment: *Bruen*'s Test, History, and Tradition Problem and How to Fix It," 71 *Cleveland State Law Review* _ (forthcoming 2023).

"Racist History and the Second Amendment: A Critical Commentary," 43 *Cardozo Law Review* 1343 (2022).

"The Invention of the Right to 'Peaceable Carry' in Modern Second Amendment Scholarship," 2021 *Illinois Law Review Online* 195 (2021).

"The Faces of the Second Amendment Outside the Home, Take Three: Critiquing the Circuit Courts Use of History-in-Law," 67 *Cleveland State Law Review* 197 (2019).

"The Second Amendment and the Basic Right to Transport Firearms for Lawful Purposes, 13 *Charleston Law Review* 125 (2018) (invited).

"The Forgotten Emblems of the World War II Air Commandos," 6 *Air Commando Journal*, Issue 3, 2018: 42-47.

"The Difficulties in Changing an Air Force Emblem," 6 *Air Commando Journal*, Issue 3, 2018: 48.

"Dissecting the Origins of Air-Centric Special Operations Theory," 81 *Journal of Military History*, Issue 3, July 2017: 803-28.

"The Call to Embrace Immigration Federalism in the United States," 30 *Journal of Immigration, Asylum, and Nationality Law* 353 (2016).

"The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why it Matters," 64 *Cleveland State Law Review* 373 (2016) (lead article).

"The Sudden Embrace of Executive Discretion in Immigration Law," 55 *Washburn Law Journal* 59 (2015) (invited).

"The Second Amendment in the Twenty-First Century: What Hath *Heller* Wrought?" 23 *William & Mary Bill of Rights Journal* 1143 (2015).

"The 'Originalism is Not History' Disclaimer: A Historian's Rebuttal," 63 *Cleveland State Law Review Et Cetera* 1 (2015).

"Finding History: How Captain Cortez Enloe's Journal Sheds New Light on the History of the World War II Air Commandos and Operation THURSDAY," 3 *Air Commando Journal*, Issue 4, 2015: 11-17.

"Weighing the Constitutionality of State Immigration Verification Laws in the Wake of *Arizona v. United States*," 27 *Journal of Civil Rights & Economic Development* 441 (2014) (invited) (lead article).

"History in Law, Mythmaking, and Constitutional Legitimacy," 63 *Cleveland State Law Review* 23 (2014) (invited).

"The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy," 40 *Fordham Urban Law Journal City Square* 10 (2013).

"The Second Amendment and Militia Rights: Distinguishing Standard Model Legal Theory from the Historical Record," 40 *Fordham Urban Law Journal City Square* 1 (2013).

"Historical Reflections on the Beginnings of an Air Commando Theory," 2 *Air Commando Journal*, Issue 3, 2013: 9-13.

"The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing 'Standard Model' Moving Forward," 39 *Fordham Urban Law Journal* 1727 (2012) (invited).

"Saving the Press Clause from Ruin: The Customary Origins of a 'Free Press' as Interface to the Present and Future," 2012 *Utah Law Review* 1691 (2012).

"Recentering Foreign Affairs Preemption in *Arizona v. United States*," 60 *Cleveland State Law Review* 133 (2012).

"The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review," 60 *Cleveland State Law Review* 1 (2012) (lead article).

"Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law," 51 *Washburn Law Journal* 211 (2012) (invited and lead article).

"Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Reply to Lawrence Rosenthal and Joyce Lee Malcolm," 105 *Northwestern University Law Review* 1821 (2011) (selected for print from Colloquy).

"Restoring 'Life, Liberty, and the Pursuit of Happiness' in Our Constitutional Jurisprudence: An Exercise in Legal History," 20 *William & Mary Bill of Rights Journal* 457 (2011).

"The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective," 9 *Georgetown Journal of Law & Public Policy* 323 (2011).

"The Second Amendment Standard of Review After *McDonald*: Historical Guideposts and the Missing Arguments in *McDonald v. City of Chicago*," 2 *Akron Law Journal of Constitutional Law & Policy* 7 (2011) (invited).

"The Constitutional Significance of a 'Well-Regulated' Militia Asserted and Proven with Commentary on the Future of Second Amendment Jurisprudence," 3 *Northeastern Law Journal* 1 (2011) (invited and lead article).

"Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Reply to Lawrence Rosenthal and Joyce Lee Malcolm," 105 *Northwestern University Law Review Colloquy* 227 (2011).

"Representation Without Documentation?: Unlawfully Present Aliens, Apportionment, the Doctrine of Allegiance, and the Law," 25 *BYU Journal of Public Law* 35 (2011).

"Originalism, John Marshall, and the Necessary and Proper Clause: Resurrecting the Jurisprudence of Alexander Addison," 58 *Cleveland State Law Review* 529 (2010) (lead article).

"The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: A Historical Perspective," 15 *Texas Review of Law & Politics* 61 (2010).

"The Right of Self-Preservation and Resistance: A True Legal and Historical Understanding of the Anglo-American Right to Arms," 2010 *Cardozo Law Review De Novo* 18 (2010) (invited).

"'Arms for Their Defence'?: A Historical, Legal and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in *McDonald v. City of Chicago*," 57 *Cleveland State Law Review* 351 (2009) (lead article).

## NEWSPAPER AND ONLINE MEDIA PUBLICATIONS

"The Long Fight to Achieving Military Integration," *Air Force Historical Research Agency* (Feb. 2023).

"The History of the Air Force Song," *Air Force Historical Research Agency* (Sep. 2022).

"NRA Convention Protests Highlight US Gun Reform Divide," *Deutsche Welle*, May 30, 2022.

Q&A with Frank Wilkinson, "America's Long History of Gun Regulation," *Bloomberg News* and *Washington Post*, November 3, 2021.

"A Historian's Assessment of the Anti-Immigrant Narrative in *NYSRPA v. Bruen*," Second Thoughts: A Blog from the Center for Firearms Law at Duke University, August 4, 2021.

"Judging the Ninth Circuits Use of History in *Young v. Hawaii*," Second Thoughts: A Blog from the Center for Firearms Law at Duke University, April 16, 2021.

"The Black Panthers, NRA, Ronald Reagan, Armed Extremists, and the Second Amendment," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, April 8, 2019.

"The 90th Anniversary of NRA's First Guiding Legislative Policies and the Implications for NYSRPA v. City of New York," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, December 1, 2019.

"The Untold, Somewhat Embarrassing Story Behind the NRA's Laudatory Messages from Presidents Roosevelt, Truman, and Eisenhower," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, September 23, 2019.

"The NRA is Blaming Journalists for Gun Violence," *Slate*, May 25, 2018.

"Why Does the NRA Almost Always Win?" *Buzzfeed News*, March 23, 2018.

"Conceal-Carrying the Day: We Debated Arming More People in the 1920s as a Solution to Gun Violence. The Idea Lost then, But It's Winning Now," *Slate*, March 6, 2018.

"Propaganda Machinery: How the NRA Pioneered the Right-Wing Art of Demonizing the Media," *Slate*, February 28, 2018.

"How the Gun Lobby Came to Be So Powerful," *Newsweek*, February 16, 2018.

"Justice Thomas Needs a History Lesson in the History of the 2nd Amendment," *History News Network*, December 11, 2015.

"The Hollow Impact of *Moore v. Madigan* on Gun Control?" *Huffington Post*, December 12, 2012.

"The Tale of Two Second Amendments," *Huffington Post*, September 7, 2012.

"Placing the Declaration of Independence in Historical Context: Thoughts on Educating Current and Future Generations About America's Founding Document," *ConSource Blog*, August 4, 2012.

Encyclopedia Entries "Second Amendment" and "Gun Control," *Encyclopedia Britannica*, December 2010.

## PUBLISHED BOOK REVIEWS

"Governing Immigration Through Crime: A Reader," 28 *Journal of Immigration, Asylum, and Nationality Law* 409 (2014).

"The Latino Threat: Constructing Immigrants, Citizens, and the Nation," 28 *Journal of Immigration, Asylum, and Nationality Law* 193 (2014).

## PRESENTATIONS, PANELS, AND DEBATES

"Race and Guns in America," Duke University Academic Roundtable, November 19, 2021.

"Debate with Stephen P. Halbrook: What Rights Does the Second Amendment Guarantee Outside the Home," Federalist Society, November 17, 2021 (available online).

"Militias Challenge Gun Laws in Virginia: 'It's About Shooting Tyrants in the Face'," *CBS News*, November 12, 2020 (available online).

"NRA Origins and 1930s Politics," C-SPAN 3 American History TV, Washington, DC, January 3, 2020 (available online).

"A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment," 2020 American Historical Association Meeting, January 3, 2020.

"Jim Bohannon Show: *Armed in America* Book Talk," *Westwood One Affiliates*, April 19, 2019 (available online).

"Law and Society Series: The Second Amendment 228 Years Later," Riley Institute and Charleston Law Review, Charleston, SC, February 2019.

"Book Talk: History of Gun Rights in America," National Constitution Center, Philadelphia, PA, February 2018 (available online).

"Guns in American Society," Wesleyan University, Middletown, CT, October 2017.

"Firearms and the Common Law Tradition," Aspen Institute, Washington, DC, September 2016.

"Fifty Years of 7th Special Operations Squadron History," Duxford Imperial War Museum, Cambridge, UK, May 2014.

"History and the Meaning of the Constitution," Cleveland-Marshall School of Law, Cleveland, Ohio, April 2014.

"How Much Do We Really Know About Our Gun Laws?" *NPR WBEZ 91.5 Afternoon Shift*, Chicago, IL, January 14, 2013 (available online).

"The Second Amendment is First on Our Minds," *NPR WBEZ 91.5 Morning Shift*, Chicago, IL, January 14, 2013 (available online).

"The Second Amendment Steps Outside," *Huffington Post Live*, New York, NY, December 12, 2012 (available online).

"The Objective Dilemma Facing State Immigration Enforcement," Indiana University School of Law—Indianapolis Junior Faculty Workshop, Indianapolis, Indiana, March 2012.

"Does the Second Amendment Extend Outside the Home?" Cleveland-Marshall School of Law, Cleveland, Ohio, March 2012.

"Foreign Affairs Preemption and the Federal-State Spheres of Government," St. John's University School of Law Immigration Symposium, New York, New York, March 2012.

"The History and Evolving Conceptions of the Right to Bear Arms," Fordham School of Law Second Amendment Symposium, New York, New York, March 2012 (available online).

"State Policy Potpourri: Some Comparative Assessments," and "Curtailing Birthright Citizenship," Washburn School of Law Breaching Borders Symposium, Topeka, Kansas, October 2011 (available online).

"Law Enforcement Authority to Verify Immigration Status: *Estrada v. Rhode Island*," Law Enforcement and Public Safety Channel, Washington, District of Columbia, April 2010.

"*McDonald v. City of Chicago*: An Anglo-American Right to Arms?" Cleveland-Marshall School of Law, Cleveland, Ohio, April 2010.

"Debate with Clark M. Neilly on *McDonald v. City of Chicago*," Akron University School of Law Federalist Society, Akron, Ohio, April 2010.

"Keynote Speaker for 'Chamber to Chambers: Second Amendment Symposium'," and "Panelist for 'Who's Right to Bear Arms?'" Northeastern University School of Law, Boston, Massachusetts, March 2010.

"Bearing Arms in the Ohio Constitution," Cleveland-Marshall School of Law, Cleveland, Ohio, April 2008.

"Washington's Decision: George Washington's Decision to Reaccept Black Enlistments," Trenton Chamber of Commerce Patriot Week, Trenton, New Jersey, December 2006.

## AWARDS

Joint Civilian Service Commendation Award, July 2019.

Allan S. Major Award for Air Force History Program Excellence, July 2016 (Air Force Level Award).

24th Special Operations Wing Supervisory Civilian of the Quarter, Civilian Category IV, July 2015.

Allan S. Major Award for Air Force History Program Excellence, July 2014 (Air Force Level Award).

352d Special Operations Group Supervisory Civilian of the Quarter, Civilian Category II, March 2013.

352d Special Operations Group Supervisory Civilian of the Quarter, Civilian Category II, March 2012.

Air Force Special Operations Command Excellence in Periodic History Award, February 2012.

Judge John R. Brown Award for Excellence in Legal Writing, August 2008 (National Award).

Certificate of Commendation, Commanding Officer, Marine Security Guard Battalion, May 2002.

Meritorious Mast, United States Marine Corps, April 2000.

Meritorious Mast, United States Marine Corps, August 1999.

Navy and Marine Corps Achievement Medal, United States Marine Corps, July 1999.

Certificate of Commendation, Commanding Officer, Marine Aviation Support Group, April 1998.

# CERTIFICATE OF SERVICE

| | | | |
|---|---|---|---|
| Case Name: | **B&L Productions, Inc., et al. v. Gavin Newsom, et al.** | No. | **8:22-cv-01518 JWH (JDEx)** |

I hereby certify that on <u>February 24, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DECLARATION OF PATRICK J. CHARLES IN SUPPORT OF STATE DEFENDANTS' SECOND SUPPLEMENTAL BRIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 24, 2023</u>, at Los Angeles, California.

|  |  |
|:---:|:---:|
| Carol Chow | /s/Carol Chow |
| Declarant | Signature |

SA2022303648