1  C.D. Michel-SBN 144258
2  Anna M. Barvir-SBN 268728
   Tiffany D. Cheuvront-SBN 317144
   MICHEL & ASSOCIATES, P.C.
3  180 East Ocean Blvd., Suite 200
   Long Beach, CA 90802
4  Telephone: (562) 216-4444
   Email: cmichel@michellawyers.com

5
   Attorneys for Plaintiffs B&L Productions, Inc., California Rifle & Pistol Association,
6  Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, Asian
   Pacific American Gun Owner Association, Second Amendment Law Center, Inc.

7
   Donald Kilmer-SBN 179986
8  Law Offices of Donald Kilmer, APC
   14085 Silver Ridge Road
9  Caldwell, Idaho 83607
   Telephone: (408) 264-8489
10 Email: Don@DKLawOffice.com

11 Attorney for Plaintiff Second Amendment Foundation

                 IN THE UNITED STATES DISTRICT COURT
12
               FOR THE CENTRAL DISTRICT OF CALIFORNIA
13

14 B&L PRODUCTIONS, INC., d/b/a          CASE NO: 8:22-cv-01518 JWH (JDEx)
   CROSSROADS OF THE WEST;
   GERALD CLARK; ERIC JOHNSON;          **PLAINTIFFS' RESPONSE TO STATE**
15 CHAD LITTRELL; JAN STEVEN            **DEFENDANTS' SECOND**
   MERSON; CALIFORNIA RIFLE &           **SUPPLEMENTAL BRIEF RE:**
16 PISTOAL ASSOCIATION,                 **MOTION FOR PRELIMINARY**
   INCORPORATED; ASIAN PACIFIC          **INJUNCTION**
17 AMERICAN GUN OWNERS
   ASSOCIATION; SECOND                  Date:      April 6, 2023
18 AMENDMENT LAW CENTER, INC.;          Time:      9:00 a.m.
   and SECOND AMENDMENT                 Courtroom: 9D
19 FOUNDATION,                          Judge:     Honorable John D. Holcomb

20              Plaintiffs,
                                        Action Filed: August 12, 2022
21      v.

22 GAVIN NEWSOM, in his official
   capacity as Governor of the State of
23 California; ROB BONTA, in his official
   capacity as Attorney General of the
24 State of California; KAREN ROSS, in
   her official capacity as Secretary of
25 California Department of Food &
   Agriculture and in his personal capacity;
26 TODD SPITZER, in his official capacity
   as District Attorney of Orange County;
27 32nd DISTRICT AGRICULTURAL
   ASSOCIATION; DOES 1-10;

28              Defendants.

_____

                  PLAINTIFF' SUPPLEMENTAL BRIEF

# TABLE OF CONTENTS

**Page**

Table of Contents...........................................................................................ii

Table of Authorities......................................................................................iii

Introduction.................................................................................................. 1

Argument ...................................................................................................... 2

I.      The Proper Analysis for Second Amendment Claims Under *Bruen* ................ 2

II.     The State Has Not Identified an Enduring Historical Tradition of Relevant
        Firearm Regulation................................................................................ 4

        A.      For Purposes of *Bruen*'s Historical Analysis, the Founding Era Is the
                Relevant Period, and the State Identifies Only a Single Law From That
                Time ....................................................................................... 5

        B.      The State's Status As a Landlord of a Public Marketplace Does Not
                Confer the Power to Ban Otherwise Lawful Activities ......................... 9

        C.      Not One of the State's Proposed Historical Analogues Is "Relevantly
                Similar" to the Challenged Statutes ...................................... 13

                1.      Regulations on the commercial sale of arms.............................. 13

                2.      Restrictions on arms in "sensitive places" and other places where
                        people gather............................................................. 17

Conclusion .................................................................................. 20

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. Hochul*,
No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965 (N.D.N.Y. Oct. 6, 2022) .................................................................................................. 4

*B&L Prods., Inc. v. 22nd Dist. Agric. Ass'n*,
394 F. Supp. 3d 1226 (S.D. Cal. 2019) ............................................. 10

*Bonidy v. U.S. Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015) ................................................. 12, 13

*GeorgiaCarry.org, Inc. v. Georgia*,
687 F.3d 1244 (11th Cir. 2012) ................................................ 11, 12

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*,
212 F. Supp. 3d 1348 (N.D. Ga. 2016) ............................................. 12

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936) ........................................................................ 11

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .......................................................................... 8

*Minn. Star & Trib. Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983) ........................................................................ 11

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
__ U.S. __, 142 S. Ct. 2111 (2022) ..........................................*passim*

*Nordyke v. King*,
681 F.3d 1041 (9th Cir. 2012) ......................................................... 10

*Nordyke v. Santa Clara Cnty.*,
110 F.3d 707 (9th Cir. 1997) ........................................................... 10

*Police Dep't of Chic. v. Mosley*,
408 U.S. 92 (1972) .......................................................................... 10

*Romer v. Evans*,
517 U.S. 620 (1996) ........................................................................ 10

iii

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
  411 U.S. 1 (1973) ....................................................................... 11

*Solomon v. Cook Cnty. Bd. of Comm'rs,*
  559 F. Supp. 3d 675 (N.D. Ill. 2021) ...................................... 12

*United States v. Class,*
  930 F.3d 460 (D.C. Cir. 2019), *abrogated by Bruen*, 142 S. Ct. 2111 ............. 12

**Statutes**

18 U.S.C. 922 (a)(2)(A) ............................................................. 13

18 U.S.C. 922(a)(5) .................................................................... 13

18 U.S.C. 1715 ........................................................................... 13

1968 Gun Control Act ............................................................... 19

An Act for the Prevention of Damage by Fire, and the Safe Keeping of
  Gun Powder, 1821 Me. Laws 98-99, ch. 25, § 5 ..................... 16

An Act in Addition to an Act ..................................................... 16

An Act in Amendment of an Act Entitled an Act Relating to Theatrical
  Exhibitions and Places of Amusement, §§ 1-2 ....................... 14

An Act Incorporating the Cities of Hartford, New Haven, New London,
  Norwich and Middletown, 1836 .............................................. 16

An Act to Provide for the Appointment of Inspectors and Regulating
  the Manufacture of Gunpowder, 1820 N.H. Laws 274, ch. XXV, §§
  1-9 (repealed by act of Dec. 23, 1842) .................................... 16

An Act to Provide for the Proof of Fire Arms, Manufactured ............... 16

An Act to Regulate Gun Powder Manufactories and Magazines ........... 14

An Act to Regulate the Keeping and Selling, and Transporting of
  Gunpowder, 1825 N.H. Laws 74, §§ 1-2 ................................ 16

Cal. Penal Code § 16510 ........................................................... 15

Cal. Penal Code § 27305 ........................................................... 15

iv

Cal. Penal Code § 27330 ......................................................................... 12

Cal. Penal Code § 27340 ......................................................................... 12

Firearm Owners' Protection Act, 100 Stat. 449, 455-56 (May 19, 1986).............. 19

1814 Mass. Acts 464, ch. 192, § 2 .......................................................... 16

1650 Md. Laws 273, § 5 12-13.................................................................. 6

1811 N.J. Laws 300, § 1 .......................................................................... 14

Ordinance No. 498, sec. 13 (Dec. 29, 1853) ........................................... 15

**Other Authorities**

27 CFR 478.31 ........................................................................................ 13

Alcohol, Tobacco, Firearms, and Explosives, *Gun Shows: Brady Checks and Crime Gun Traces* 4 (Jan. 1999), *available at* https://www.atf.gov/file/57506/download (last visited Mar. 10, 2023)...................................................................................................... 19

District Agricultural District, *Board of Directors Governing Manual,* Introduction 1, *available at* https://s3.us-west-1.amazonaws.com/ocfair.com/wp-content/uploads/2021/02/02141413/Policy-Combo-All.pdf (last visited Mar. 10, 2023) ................................................................... 12

*The Laws and General Ordinances of the City of New Orleans: Together with the Acts of the Legislature, Decisions of the Supreme Court, and Constitutional Provisions Relating to the City Government: Revised and Digested, Pursuant to an Order of the Common Council*, Sec. 1, art. 636 (5), 257 (Henry Jefferson Leovy, Simmons & Co. New Ed. 1870)......................................................... 14

*The Revised Statutes of the State of Rhode Island and Providence Plantations: To Which are Prefixed, The Constitutions of the United States and of the State*, ch. 80, § 2(Jan. Sess. 1857), at 204-05 (1857)........................................................................................................ 14

Senate Bill 264........................................................................................ 1

Senate Bill 915........................................................................................ 1

1

U.S. Const., amend. I ................................................................ 10

U.S. Const., amend. II ......................................................... *passim*

U.S. Const., amend. XIV ............................................................ 8

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF AUTHORITIES

**INTRODUCTION**

Underwhelmed with the parties' earlier supplemental briefing, this Court ordered another round of briefing on whether Senate Bill 264 and Senate Bill 915 ("the Challenged Statutes") are "consistent with this Nation's historical tradition of firearm regulation." Order (Feb. 1, 2023) (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111, 2126 (2022). The Court warned the State that it was not seeking "a rearguard defense of the Ninth Circuit's pre-*Bruen* legal authorities," but was graciously providing the State with one more opportunity to find any laws it considered proper analogues to the challenged law. *Id.* Yet again, however, the State squandered that opportunity. First, by arguing *again* that the conduct in which Plaintiffs seek to engage is not protected by the Second Amendment at all. And, second, by failing to present *any* constitutionally relevant historical analogue to its modern-day ban on selling lawful firearms, ammunition, and firearm parts on state-owned property—let alone a "well-established and representative" one. *Bruen*, 142 S. Ct. at 2133.

Instead, the State cites all manner of irrelevant laws, including English laws that pre-date Shakespeare, oft-criticized fire-safety ordinances, laws regulating arms in "sensitive places," license requirements, and rules preventing college kids from keeping guns on campus.[1] Then, it introduces the opinions of a historian who provides little more than improper legal opinion and a legal scholar who inexplicably devotes his entire declaration to the historical pedigree of restrictions on carrying or possessing arms in "sensitive places"—something the California Legislature took pains *not* to restrict when it adopted the Challenged Statutes.

What it did *not* include was a single law dating to the ratification of the

---

[1] The State did not provide copies of or links to any of the primary historical sources it cited throughout its brief, requiring Plaintiffs to spend countless hours of legal research to verify the State's citations and summaries of the historical texts. To assist the Court and prevent duplication of efforts, Plaintiffs have compiled a spreadsheet of website links to primary and secondary sources for these laws. The spreadsheet is attached as Appendix A.

1

Second Amendment that, like the Challenged Statutes, banned the sale of legal, protected arms on state-owned property. It has not—and cannot—"demonstrate that [its modern ban] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. The laws violate the Second Amendment.

## ARGUMENT

### I.   THE PROPER ANALYSIS FOR SECOND AMENDMENT CLAIMS UNDER *BRUEN*

As Plaintiffs have explained, under the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, __ U.S. __, 142 S. Ct. 2111, 2127 (2022), it is no longer appropriate for courts to subject Second Amendment claims to multi-step, interest-balancing tests, like intermediate scrutiny. Pls.' Mot. Prelim. Inj. ("Mot.") 21-22; Pls.' Suppl Br. Supp. Mot. Prelim. Inj. ("Pls. Suppl. Br.") 2-3. Instead, the correct analysis begins and ends with an analysis of text and history. *Bruen*, 142 S. Ct. at 2127. So, when faced with a Second Amendment challenge, courts begin by asking if the restricted conduct is within the Second Amendment's "plain text." *Id.* at 2126, 2129-30. If it is, "the Constitution presumptively protects that conduct," *id.* at 2127, and "the *government* must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* (emphasis added).

Because the Challenged Statutes restrict the sale of all lawful firearms, ammunition, and firearm parts—conduct within the Second Amendment's "plain text" that "the Constitution presumptively protects"—the State must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of *firearm* regulation." *Bruen*, 142 S. Ct. at 2126, 2130 (emphasis added). This requires the State to "identify a *well-established and representative* historical analogue" to the laws it seeks to defend. *Id.* at 2133 (emphasis added). It is not enough for the State to present a handful of laws from "outlier jurisdictions." *Id.* at 2155-56. It must instead present evidence of "an *enduring* American tradition of state regulation." *Id.* (emphasis added). "Only then may [this C]ourt conclude that"

2

the conduct Plaintiffs wish to engage in "falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). The State has not—because it cannot—meet this heavy burden.

Here, because the State does not even claim the Challenged Statutes address an "unprecedented societal concern" or a "dramatic technological change" that might justify a "more nuanced approach" to analogical reasoning, *id.* at 2123, the inquiry is necessarily simple. This is because, as *Bruen* instructs, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131 (emphasis added). So this Court need only ask whether the State has presented evidence of distinctly similar laws from the relevant historical period—that is, Founding-era laws banning law-abiding people from contracting for the sale of lawful arms on public property. If it has, the Court should also consider whether such laws are constitutionally relevant: Do they evidence an "enduring American tradition" of banning public sales of arms? Or are they merely outliers that existed for only a short time or in a handful of jurisdictions? At best, the State has provided evidence of only the latter.

Even if the State were entitled to a "more nuanced approach" under *Bruen*, the State must still present a genuine analogue that is "relevantly similar" to the modern restrictions it seeks to defend. *Id.* at 2122. The *Bruen* Court did not establish all the ways a proposed analogue may be "relevantly similar," but it did "point toward at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). When looking at the "how," courts should ask whether a proposed analogue imposes a "comparable burden." *Id.* To prevent this analysis from devolving into just another way to balance burdens and benefits—a test *Bruen* explicitly rejected—this Court should ask whether the challenged modern laws and the proposed historical analogue impose a similar *type*

3

of burden (not just a similarly *severe* burden). When looking at the "why," this Court should consider "whether th[e] burden is comparably justified," mindful that historical laws enacted for one purpose cannot be used as a pretext to justify a modern law that was enacted for different reasons. *Id*.

In short, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *20 (N.D.N.Y. Oct. 6, 2022). As discussed below, this is the sort of strained comparison-making that all of the State's proposed historical analogues rely on.

## II.   THE STATE HAS NOT IDENTIFIED AN ENDURING HISTORICAL TRADITION OF RELEVANT FIREARM REGULATION

Again, the State has not shown that it should be allowed to proceed to the "more nuanced approach" of analogical inquiry. But even if it had, it has not proven that there is an American tradition dating to the Founding Era of "relevantly similar" laws banning the sale of protected arms, including ammunition and firearm parts, on public property. Nor has it presented evidence of a well-established tradition of laws banning the sale of firearms or firearm components in general (the absolute minimal requirement for an analogous historical law).

Instead, the State focuses on largely irrelevant laws from medieval England, colonial America, and the Nineteenth Century to try (but ultimately fail) to establish that the government has historically enjoyed broad authority to (1) restrict activities on its own property, State's 2d Suppl. Br. 2-4, (2) regulate the commercial sale of arms, *id.* at 6-11, and (3) regulate arms in "sensitive places," *id.* at 11-16. But even if the historical laws the State relies on are sufficient under *Bruen* to justify *some* types of laws within these broad categories of regulation, they are not from the relevant historical period for determining the original understanding of the Second Amendment, nor are they genuine historical analogues that are "relevantly similar" to the Challenged Statutes.

4

A.   **For Purposes of *Bruen*'s Historical Analysis, the Founding Era Is the Relevant Period, and the State Identifies Only a Single Law From That Time**

First, a word about the period this Court should consider when reviewing the State's historical record. The State relies almost exclusively on Nineteenth Century laws from antebellum and Reconstruction Era America, as well as a smattering of laws from the Middle Ages and the colonial period. But laws from these periods, *Bruen* instructs, are of limited analytical value if they do not have some historical relative from the post-Revolution, Founding Era. And even if they did take hold during the founding, a proposed historical analogue is not constitutionally relevant if it is not "relevantly similar" (in kind and in justification) to the laws the State seeks to defend. *See supra* Part I.

Pre-Founding English and American Law: In describing the Second Amendment's history-and-tradition-based analysis, the *Bruen* Court cautioned that not all history is created equal. Indeed, because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," the *Bruen* Court gave very little weight to evidence of medieval English and Colonial American restrictions that did not take hold in post-Revolution America. *Id.* (citing *Heller*, 554 U.S. at 634). As the Court explained, "[s]ometimes, in interpreting our own Constitution, 'it [is] better not to go too far back into antiquity for the best securities of our liberties,' [citation omitted] *unless evidence shows that medieval law survived to become our Founders' law*." *Id*. (citing *Funk v. United States*, 290 U.S. 371, 382 (1933)) (emphasis added).

Even still, the State cites two medieval English laws and two colonial laws pre-dating the Founding by at least 100 years. State's Suppl. Br. 12-13 (citing *The Statute of Northampton*, 2 Edw. 3, c. 3 (1328) (Eng.) (forbidding the carry of arms in a manner that terrified the people); 4 Hen 4, c. 29 (1403) (Eng.) (restricted the carry of arms or use of armor in churches and on highways "in affray of the Peace or the King's Liege people); *id.* at 4 (citing 1647 Md. Laws 216, § 6 (banning the carry of

5

arms into the Maryland House of Assembly while the body was in session); 1650 Md. Laws 273, § 5 12-13 (same).

The first of the State's two English laws is the Statute of Northampton. It restricted Englishmen from "com[ing] before the King's Justices, or other of the King's Ministers doing their office, with force and arms," from bringing "force in affray of the peace," and from going or riding "armed by night nor by day, in Fairs, Markets, []or in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. 3 c. 3 (1328). The use of this ancient law to illuminate the original understanding of the Second Amendment, however, has been so roundly rejected by the Supreme Court, it is almost not worth mentioning. But because the State insists on citing it as proof of a long tradition of regulating arms in "sensitive places" that would eventually take hold in America, Plaintiffs note that the *Bruen* Court rejected the relevance of the Statute of Northampton in no uncertain terms:

> [T]he Statute of Northampton—at least as it was understood during the Middle Ages—*has little bearing on the Second Amendment adopted in 1791*. The Statute of Northampton was enacted nearly 20 years before the Black Death, more than 200 years before the birth of Shakespeare, more than 350 years before the Salem Witch Trials, more than 450 years before the ratification of the Constitution, and nearly 550 years before the adoption of the Fourteenth Amendment.
>
> The Statute's prohibition on going or riding "armed" obviously did not contemplate handguns, given they did not appear in Europe until about the mid-1500s. [Citation.] Rather, it appears to have been centrally concerned with the wearing of armor. [Citations.] If it did apply beyond armor, it applied to such weapons as the "launcegay," a 10- to 12-foot-long lightweight lance. [Citations.]
>
> The Statute's apparent focus on armor and, perhaps, weapons like launcegays makes sense given that armor and lances were generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace. [Citations.]

*Bruen*, 142 S. Ct. at 2139-40 (emphasis added).

While marginally more relevant than medieval laws restricting the carry of arms to terrify the people and breach the peace, the State's citation to Maryland's

PLS.' RESPONSE TO THE STATE'S SECOND SUPPLEMENTAL BRIEF

colonial laws barring the possession of arms in the House of Assembly while that body was in session are also of little value to this Court. State's 2d Suppl. Br. 4, 13 (citing 1647 Md. Laws 216, § 6; 1650 Md. Laws 273, § 5). When read in context, it is clear that the lower house of the colonial Maryland Legislature was making rules for its legislative sessions and not statutes applicable to the public at large. *See* App'x A at 1-2. What's more, these rules are not "relevantly similar" to California's modern ban on sales of lawful arms at publicly owned marketplaces in either kind or justification. They do not restrict sales of firearms or firearm components at all, and they were adopted for the very specific purpose of preventing potentially violent interference with the legislative process, and not because the government opposed profiting from the sale of guns or an interest in promoting public safety generally.

Nineteenth Century America: The State also relies heavily on Nineteenth Century laws restricting the carry or possession of arms in "sensitive places" (like courthouses and polling places) and places where people regularly gather (like churches, schools, and dance halls). As described in section II.C., *infra*, these laws are not "relevantly similar" to California's modern ban on sales (but not possession) of lawful arms at the fairgrounds. But, more than that, the Court should give these laws (like the laws of medieval England) little weight because they were simply adopted far too late to provide valuable insight into the original understanding of the Second Amendment.

Indeed, *Heller* expressly stated that the Founding Era was the relevant time for determining the original public understanding, noting that the "Constitution was written to be understood by the voters," and that "[n]ormal meaning … excludes secret or technical meanings that would not have been known to ordinary citizens *in the founding generation*." 554 U.S. at 576-77 (emphasis added). *Bruen* affirmed this holding, reasoning that the Constitution's "meaning is fixed according to the understandings of those who ratified it," although it "can, and must, apply to circumstances beyond those *the Founders* specifically anticipated." 142 S. Ct. 2132

7

1   (citing *United States v. Jones*, 565 U.S. 400, 404-05 (2012)). In short, the Second

2   Amendment had an ascertainable, fixed meaning when it was adopted.

3       *Bruen* also made clear that "individual rights enumerated in the Bill of Rights

4   and made applicable against the States through the Fourteenth Amendment have the

5   same scope as against the Federal Government." 142 S. Ct. at 2137. In other words,

6   the Bill of Rights, including the Second Amendment, cannot have one meaning

7   when applied against the federal government and a different meaning when

8   incorporated against the states. *See also McDonald v. City of Chicago*, 561 U.S. 742,

9   763 (2010) (citing *Malloy v. Hogan*, 378 U.S. 1 (1964)). So whatever the Second

10  Amendment meant in 1791 about the restraints on the federal government, it must

11  mean the same thing when applied to restrain the states in 1868 and later. And

12  whatever the ratifiers of the Fourteenth Amendment may have understood about the

13  meaning of the Second Amendment in 1868 cannot change the 1791 meaning.

14      Although both *Heller* and *Bruen* examined some limited evidence from the

15  mid- to late-Nineteenth Century, they did so merely to confirm the original

16  understanding of the Second Amendment in 1791. *Bruen* notes that "we made clear

17  in *Gamble [v. United States*, 139 S. Ct. 1960 (2019)] that *Heller*'s interest in mid- to

18  late-19th-century commentary was *secondary*." *Bruen,* 142 S. Ct. at 2137 (quoting

19  *Gamble*, 139 S. Ct. at 1975-76) (emphasis added). It was treated as "mere

20  confirmation of what the Court thought had already been established." *Id*.

21      Furthermore, both *Heller* and *Bruen* held that little weight should be given

22  such evidence under any circumstances. *Bruen* expressly cautioned "against giving

23  postenactment history more weight than it can rightly bear." 142 S. Ct. at

24  2136. And, citing *Heller*, *Bruen* observed that because post-Civil War discussions of

25  the right to keep and bear arms "took place 75 years after the *ratification of the*

26  *Second Amendment*, they do not provide as much insight into its original meaning as

27  earlier sources." *Bruen*, 142 S. Ct. at 2137 (emphasis added). Evidence from the

28  Nineteenth and Twentieth Centuries, the Court held, does "not provide insight into

1    the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at

2    2154, n.28.

3         Of course, the State relies almost exclusively on historical analogues from the

4    late Nineteenth Century precisely *because* it contradicts earlier evidence. Based on

5    the State's own citations, laws restricting the arms in sensitive places and places

6    where people regularly gather were practically nonexistent at the time of the

7    Founding, except for a few laws prohibiting carry in "legislative assemblies, polling

8    places, and courthouses." *Bruen*, 142 S. Ct. at 2133. That was the relevant historical

9    tradition. As time went on, restrictions on public carry—though still few—were

10   adopted. The State would like this court to consider those later regulations, often

11   from a century or more after the Founding, as determinative of the original public

12   understanding of the Second Amendment when, in fact, they contradict it.

13                                  * * * *

14        In short, the meaning of a constitutional provision is fixed according to the

15   understanding at the Founding, so the laws of that period—not of Fourteenth

16   Century England, colonial America, or the Reconstruction Era—should guide this

17   Court's analysis. The State identifies dozens of proposed historical analogues, but

18   *only one* of them is from the Founding. State's Suppl. Br. 4. A handful were adopted

19   too early. *Id.* at 4, 12-13; *see also* App'x A at 1-2. But most were adopted far too

20   late, having been adopted during the Civil War period or later. State's 2d Suppl. Br.

21   at 6-16; *see also* App'x A at 2-25. Such can hardly be characterized as evidence of

22   the enduring American tradition of regulation that *Bruen* demands.

23

24   **B.    The State's Status As a Landlord of a Public Marketplace Does Not
          Confer the Power to Ban Otherwise Lawful Activities**

25        Even though the State cited just one law from the Founding to justify the

26   Challenged Statutes—a Maryland law that banned the carry of arms in the House of

27   Assembly while the legislative body was sitting—the State claims it has broad

28   (nearly unfettered) authority as the proprietor of the State's fairgrounds to dictate

9

1   what activities take place there. State's 2d Suppl. Br. 4 (citing 63 Proceedings and

2   Acts of the General Assembly 338, § 5 (June 15-July 3, 1773)). While it *may* be true

3   that the government has some authority to restrict activities on its own property, the

4   State's citation of just one irrelevant Founding-era law (buttressed by just three more

5   Nineteenth Century laws and a handful of pre-*Bruen* circuit court decisions) is not

6   sufficient under *Bruen* to justify the State's modern ban on sales of protected, lawful

7   arms at California's fairgrounds.

8          To the contrary, the State's authority to ban constitutionally protected

9   activities on government-owned property that is open to the public for its use has

10  long been circumscribed. For instance, in the First Amendment context, the State

11  cannot ban the use of government facilities otherwise open to the public for

12  expressive activities, assembly, or association based on the content or viewpoint of

13  the participants. *See, e.g.*, *Police Dep't of Chic. v. Mosley*, 408 U.S. 92, 96 (1972);

14  *B&L Prods., Inc. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226,  1249 (S.D. Cal.

15  2019). Nor can it ban the commercial speech associated with the sale of otherwise

16  lawful products—including constitutionally protected arms. *Nordyke v. Santa Clara*

17  *Cnty.*, 110 F.3d 707, 713 (9th Cir. 1997). In the Second Amendment context, the

18  government cannot ban the possession of firearms carried for lawful purposes in

19  non-sensitive places. *Nordyke v. King*, 681 F.3d 1041, 1045-46 (9th Cir. 2012). And

20  finally, the Equal Protection Clause bars the State from discriminating against

21  people exercising their aggregated, fundamental rights. *See, e.g.*, *Mosley*, 408 U.S. at

22  96. Here, seeking to effectively ban gun shows at all state-owned fairgrounds,

23  including the Orange County Fair & Event Center, the State is in a box. The four

24  walls of its box are these four fundamental rights.

25         The United States Supreme Court applies a species of Equal Protection

26  analysis to government regulations that discriminate against "disfavored groups."

27  *Romer v. Evans*, 517 U.S. 620 (1996). The same analysis applies when unequal

28  treatment occurs in the context of exercising a fundamental right, or the government

1    is motivated by animus toward a disfavored group, where courts apply heighted
2    scrutiny. *See generally Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936); *San*
3    *Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973); *Minn. Star & Trib. Co. v.*
4    *Minn. Comm'r of Revenue*, 460 U.S. 575 (1983). Here, the evidence shows that the
5    State's interest is in banning gun shows and the constitutionally protected conduct
6    that takes place at those events—based on political animus for America's gun
7    culture and those who take part in it. *See* Mot. 18. Such irrational discrimination
8    cannot survive any level of judicial review, let alone strict scrutiny.

9        Yet the State presses on with an almost frivolous argument that it can engage
10    in irrational discrimination because it is a "property owner" with the power "to
11    exercise exclusive dominion and control over its land." *See* State's 2s Suppl. Br. 3.
12    But the "government as proprietor" authorities the State cites do not give the State
13    much quarter. As noted above, this Court has stated that it is not interested in a
14    rearguard rescue of pre-*Bruen* Ninth Circuit jurisprudence. Evidently taking that
15    direction quite literally, the State went in search of pre-*Bruen* Tenth and Eleventh
16    Circuit decisions.

17        First, even though it acknowledged that *GeorgiaCarry.org, Inc. v. Georgia*,
18    687 F.3d 1244, 1265 (11th Cir. 2012), was abrogated by *Bruen*, the State relies on
19    the case for the broad principle that "[a]n individual's right to bear arms as
20    enshrined in the Second Amendment, whatever its full scope, certainly must be
21    limited by the equally fundamental right of a *private property owner* to exercise
22    exclusive dominion and control over its land." State's 2d Suppl. Br. 2 (emphasis
23    added). But citing only a law review article and three pre-*Bruen* decisions, the State
24    expands the "right of a property owner to control conduct on its own land … to the
25    government when it operates as a proprietor." *Id.* (quoting Eugene Volokh,
26    *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev.
27    1443, 1474-75 (2009); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015);
28    *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019), *abrogated by Bruen*, 142 S.

11

1   Ct. 2111; *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*, 212 F. Supp. 3d

2   1348 (N.D. Ga. 2016)).

3       The State relies on the Tenth Circuit's decision *Bonidy* upholding a restriction

4   on the carry of firearms in postal parking lots and the D.C. Circuit's *Class* decision

5   upholding a similar restriction applicable to a U.S. Capitol parking lot. To be sure,

6   both circuits did recognize that the government has some managerial authority to

7   restrict the activities that take place on its property. State's 2d Suppl. Br. 4 (quoting

8   *Bonidy*, 790 F.3d at 1126; *Class*, 930 F.3d at 464). But as the Northern District of

9   Illinois observed in *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675,

10   694 (N.D. Ill. 2021), these holdings were predicated not on the fact that the

11   government owned the property, but on the fact that a parking lots for the post office

12   and the U.S. Capitol are areas "immediately around a sensitive place." *Id.* (citing

13   *Bonidy*, 790 F.3d at 1123). Similarly, the district court in *GeorgiaCarry*.org, which

14   upheld a restriction on the use of firearms on the U.S. Army Corps of Engineers'

15   property, assumed that the property is a "sensitive place." 212 F. Supp. 3d at 1361;

16   *see Solomon,* 559 F. Supp. 3d at 694-96. Post *Bruen*, that assumption is, of course,

17   dubious. Because, as discussed below, California's fairgrounds are *not* sensitive

18   places, *Bonidy*, *Class*, and *GeorgiaCarry.org* are unpersuasive.

19       The State's citation to this trio of cases is also inapt because firearms,

20   ammunition, and firearm components are not present at California's fairgrounds as

21   tools for self-defense during gun shows. They are strictly items of commerce. In

22   fact, state laws not challenged here ban the carry of firearms and ammunition

23   together at gun shows, even by holders of valid carry permits. *See* Cal. Penal Code

24   §§ 27330, 27340. Fatal to the State's "government as proprietor" argument is that

25   the very purpose of the Orange County Fair & Event Center is "to hold fairs,

26   expositions and exhibitions in Orange County to exhibit the industries and industrial

27   enterprises, resources, and *products of every kind or nature of the state*, with a view

28   toward improving, exploiting, encouraging, and stimulating them." 32nd District

Agricultural District, *Board of Directors Governing Manual,* Introduction 1, *available at* https://s3.us-west-1.amazonaws.com/ocfair.com/wp-content/uploads/2021/02/02141413/Policy-Combo-All.pdf (last visited Mar. 10, 2023) (emphasis added).[2]

For all the reasons described above, the State cannot open its fairgrounds to the public to use as marketplaces for all kinds of lawful products then shut the door to one kind of lawful product and the people that buy and sell that product just because it does not approve of it—*even when acting as a property owner*.

### C.   Not One of the State's Proposed Historical Analogues Is "Relevantly Similar" to the Challenged Statutes

#### 1.   Regulations on the commercial sale of arms

After arguing that the State's role as the proprietor of the fairgrounds affords it practically boundless authority to decide what activities take place there, the State argues that the government has, historically, enjoyed broad authority to regulate the commercial sale of arms. Plaintiffs do not generally disagree that such laws have some historical pedigree. But the laws the State relies on for that broad premise do *not* justify the very specific sales restriction here because they are not "relevantly similar" (in kind or in justification) to the Challenged Statutes.

---

[2] *Bonidy* is inapt for another reason. The U.S. Postal Service itself handles firearms as items of commerce on its premises, even assuming *arguendo* it can still ban the public from carrying them for self-defense. Indeed, "the U.S. Postal Service recommends that long guns be sent by registered mail and that no marking of any kind which would indicate the nature of the contents be placed on the outside of any parcel containing firearms. Handguns are not mailable; a common or contract carrier must be used to ship a handgun." 18 U.S.C. 1715, 922(a)(5) and 922 (a)(2)(A); 27 CFR 478.31. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Q&As, *May a Nonlicensee Ship a Firearms Through the U.S. Postal Service?*, https://tinyurl.com/47ujx9n9 (last visited Mar. 10, 2023)

In other words, the U.S. Postal Service can no more refuse the purely commercial delivery of firearms on its property based on its business model, than the Fairgrounds can refuse the purely commercial disposition of firearms on its property in accordance with its business model.

PLS.' RESPONSE TO THE STATE'S SECOND SUPPLEMENTAL BRIEF

The State's "commercial sales" regulations generally fall into one of two categories, zoning or licensing requirements and gunpowder quality regulations. Plaintiffs address each type of law in turn.

*Zoning and Licensing Requirements*: The State first cites a few regulations that restricted the location of various arms-related businesses, including indoor shooting galleries and gunpowder manufactories, usually requiring that such businesses operate in the less populated or "compact" parts of town. *See, e.g.*, An Act to Regulate Gun Powder Manufactories and Magazines within this State, 1811 N.J. Laws 300, § 1 (requiring all manufactories of gunpowder and storage magazines to be located away from populated area); 1851 R.I. Pub. Laws 9, An Act in Amendment of an Act Entitled an Act Relating to Theatrical Exhibitions and Places of Amusement, §§ 1-2, in *The Revised Statutes of the State of Rhode Island and Providence Plantations: To Which are Prefixed, The Constitutions of the United States and of the State*, ch. 80, § 2 (Jan. Sess. 1857), at 204-05 (1857) (banned shooting galleries (or any building or enclosure) where firearms are used for practicing firing ball or shot from the "compact part of the town of Newport"); *The Laws and General Ordinances of the City of New Orleans: Together with the Acts of the Legislature, Decisions of the Supreme Court, and Constitutional Provisions Relating to the City Government: Revised and Digested, Pursuant to an Order of the Common Council*, Sec. 1, art. 636 (5), 257 (Henry Jefferson Leovy, Simmons & Co. New Ed. 1870).

These early zoning regulations may be vaguely similar to the Challenged Statutes insofar as they limit where arms-related business may take place. But they were adopted because of the specific threat posed by indoor shooting galleries and large stores of combustible gunpowder in heavily populated areas, where buildings are close to one another. The Challenged Statutes are not concerned with such threats. Indeed, the restrictions are not on shooting or discharge of firearms on state-property, nor are they about manufacturing or possessing large quantities of

14

gunpowder or other highly combustible products at gun shows (which is, in fact, still banned by California state laws not challenged here, *see, e.g.*, Cal. Penal Code §§ 16510, 27305). Because the purpose of these historical zoning regulations differs so greatly from the Challenged Statutes, they are not "relevantly similar" analogues under the *Bruen* analysis.

Some of those restrictions also required that such businesses obtain a license to operate. *See, e.g.*, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page, ch. 5, art. VI., at 147-148 (October 7, 1863) (WM. H. Bridges, Argus Book and Job Office 1863) (requiring a license to set up a shooting gallery in the city of Memphis); Alabama Acts of the General Assembly 329-35 (1868); Ordinances and Joint Resolutions of the City of San Francisco: Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council 220, Ordinance No. 498, sec. 13 (Dec. 29, 1853), at 220 (Monson & Valentine 1854) (requiring that "[e]very person, house or firm engaged in keeping a pistol or rifle shooting gallery" to pay for and obtain a license to operate). These requirements are not similar in kind to the Challenged Statutes, which are not about permitting or licensing at all. And other state laws not challenged here require that gun show vendors obtain and maintain all necessary licenses.

*Gunpowder Regulations*: Next, the State cites a handful of Nineteenth Century laws regulating the quality, storage, or sale of gunpowder. Like the zoning and licensing regulations discussed above, none of the gunpowder regulations the State cites were adopted in the during the founding, so this Court should give them little weight. *Bruen*, 142 S. Ct. at 2136 (cautioning "against giving postenactment history more weight than it can rightly bear"). But even if the State had shown that such laws were also common place when the Second Amendment was ratified, they are not "relevantly similar" to the Challenged Statutes for two reasons.

First, they do not impose a similar burden on the Second Amendment. Two of

15

the laws regulate only the storage of gunpowder and authorize "selectmen," fire marshals, or other officials to search for gunpowder that they reasonably suspect to be stored improperly. *See, e.g.*, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, 1821 Me. Laws 98-99, ch. 25, § 5 (Maine law authorizing local "selectmen," having obtained a search warrant, to search for gunpowder they reasonably suspect to be stored in violation of local law); An Act to Regulate the Keeping and Selling, and Transporting of Gunpowder, 1825 N.H. Laws 74, §§ 1-2 (banning the storage of more than ¾ cask or 75 pounds of gunpowder in any building and requiring storage of smaller quantities in noncombustible vessels); An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 (Connecticut law authorizing local towns to regulate "the bringing in, and conveying out, or storing of gun-powder" in excess of 25 pounds). And one other such law sets minimum quality standards for gunpowder manufactured in the state for sale and authorized official inspectors to ensure those standards are met. *See, e.g.*, An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, 1820 N.H. Laws 274, ch. XXV, §§ 1-9 (repealed by act of Dec. 23, 1842).[3] None of these things are like flat bans of the sale of protected arms in any given place.

Second, laws regulating gunpowder storage and quality were enacted to prevent catastrophic explosions and fires in town limits and near powder houses. They were necessary because of the highly combustible and unstable nature of loose gunpowder in early America, which is not a modern concern. They were not enacted to combat crime, in general, or gun violence, more specifically. And, more

---

[3] An 1814 Massachusetts law set similar quality standards for all "musket barrels and pistol barrels, manufactured" in the state, requiring each "to be proved by the person appointed according to the provisions of an act . . . with a charge of powder equal in weight to the ball which fits the bore of the barrel to be proved." An Act in Addition to an Act, entitled "An Act to Provide for the Proof of Fire Arms, Manufactured within this Commonwealth," 1814 Mass. Acts 464, ch. 192, § 2.

PLS.' RESPONSE TO THE STATE'S SECOND SUPPLEMENTAL BRIEF

importantly, most such laws regulated only the *manner* of keeping of gunpowder; they did not restrict the sale of any common arm. These distinctions are key because, again, the State's proposed historical analogues must be similar in both type and justification. *Bruen*, 142 S. Ct. at 2133.

The State comes closest to finding a genuine historical analogue in its citation to an 1825 New Hampshire law that restricted the retail sale of gunpowder on "any highway, or in any street, lane, or alley, or on any wharf, or on parade or common." *See* State's 2d Suppl. Br. 8 (citing An Act to Regulate the Keeping and Selling, and Transporting of Gunpowder, 1825 N.H. Laws 74, § 5). But, aside from being adopted half a century after the Second Amendment's ratification, it is the *only* law the State could identify that restricted the sale of a common arm in certain public spaces that might resemble today's fairgrounds. It is a marginally relevant outlier that provides no insight into the original meaning of the Second Amendment. To paraphrase the *Heller* Court, "we would not stake our interpretation of the Second Amendment upon a single law, in effect in a single [jurisdiction], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms.…"

### 2.    Restrictions on arms in "sensitive places" and other places where people gather

Finally, the State relies on nearly two dozen different historical restrictions on carry or possession of arms in "sensitive places" and other public places where people regularly gather. State's 2d Suppl. Br. 11-6. The State groups these laws together as if public gathering spaces are "sensitive places" per se. But, as explained above, laws restricting public carry were not adopted until the mid- to late-Nineteenth Century. They were thus adopted far too late—often by more than a century—to be of much use to this Court. Indeed, such laws *contradict* the broad historical traditional of *not* broadly restricting the public carry of arms except for in truly sensitive places, like courthouses, legislative buildings, and polling places.

1    What's more, the State's historical "sensitive places" and public carry laws are

2    simply not genuine analogues that are "relevantly similar" to California's modern

3    ban on selling lawful firearms and components on state properties. They are vastly

4    different in kind because they restrict the possession of firearms in certain public

5    places, while the Challenged Statutes ban the sale of lawful firearms and firearm

6    components (and the speech necessary to engage in those sales), *while deliberately*

7    *leaving possession untouched*.

8    And they are vastly different in justification because those historical laws were

9    adopted to minimize the potential for violent disruption of the legal, electoral, and

10   legislative processes ("sensitive places") and the specific risk to the public when

11   large groups of people gather with weapons (other places where people regularly

12   gather). While the Challenged Statutes were adopted, according to the bill's

13   legislative history, to make a symbolic statement that the State should not profit

14   from the sales of guns. Mot. 18 (citing Pls.' Req. Jud. Ntc., Ex. 14 at 77; Barvir

15   Decl., Ex. 30; Sen. Pub. Safety Committee Hrg., Mar. 16, 2021, at 4:12:59, available

16   at https://tinyurl.com/bdda9ejh (last visited Mar. 10, 2023)).

17   But even if the Challenged Statutes' purpose were to promote public safety, a

18   ban on the sale of arms at the fairgrounds without likewise banning their possession

19   is clearly not about the potential danger to groups of people gathering at gun shows,

20   rather it is about decreasing the overall supply and demand for firearms in hopes that

21   doing so will have some impact on gun violence. These are not similar justifications.

22   The Court does not have to take Plaintiffs' word for it. The State's own

23   opposition claims it is not banning gun shows or even the possession of guns at the

24   State's fairgrounds. *See* Defs.' Opp'n Mot. Prelim. Inj. 10-11 ("Opp'n"). And its

25   latest brief concedes that "the purchase or sale of firearms or ammunition is

26   prohibited only on state property—and such items may be sold and are readily

27   accessible in ample alternative locations." *See* Defs.' 2d Suppl. Br. 1 (citing Defs.'

28

PLS.' RESPONSE TO THE STATE'S SECOND SUPPLEMENTAL BRIEF

Suppl. Br. 1, 4-5).[4] This means that, aside from conflicting with *Bruen*, historical laws that banned public carry of firearms are irrelevant unless the State can make the case that fairgrounds really are "sensitive places"—that is, that they are analogous to courthouses, polling places, and legislative buildings. This, the State cannot prove. Gun shows have been taking place, largely without incident, at California's fairgrounds for more than 30 years. Olcott Decl. ¶ 2. And, they have taken place in public venues all over the country, including "public arenas, civic centers, *fairgrounds*, and armories," for generations. Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Gun Shows: Brady Checks and Crime Gun Traces* 4 (Jan. 1999), *available at* https://www.atf.gov/file/57506/download (last visited Mar. 10, 2023).[5] What's more, the types of activities that take place at state fairgrounds are not like the official activities of the courts, legislatures, and electoral polling places that have historically made those places subject to greater regulation.

In short, any argument that the Orange County Fair & Event Center, or any fairgrounds for that matter, is too sensitive for the presence of guns, whether for self-defense or items of commerce, borders on frivolous. This is especially true because the Challenged Statutes do not restrict possession at all. Indeed, it can hardly be argued with a straight face that state fairgrounds are so sensitive that the State must ban the sale of guns and ammunition, but it is fine to possess them.

---

[4] The claim that sales of firearms, ammunition, and firearm parts can take place in "ample alternative locations" sounds an awful lot like the now-forbidden interest-balancing argument that, because people can buy guns elsewhere, the law does not really burden the Second Amendment much (or at all). After *Bruen*, the question is no longer whether people can buy guns elsewhere today, but whether there is evidence of an enduring American tradition of restricting the sales of lawful, protected arms on public property.

[5] *See also* Firearm Owners' Protection Act, 100 Stat. 449, 455-56 (May 19, 1986). The Act was passed 37 years ago to amend the 1968 Gun Control Act so that "licensed dealer[s] may … conduct business temporarily at a location other than the location specified on the license if such temporary location is the location for a *gun show* or event sponsored by any national, State, or local organization, or any affiliate of any such organization devoted to the collection, competitive use, or other sporting use of firearms in the community, and such location is in the State which is specified on the license." (Emphasis added.)

PLS.' RESPONSE TO THE STATE'S SECOND SUPPLEMENTAL BRIEF

1

## CONCLUSION

2    For these reasons, and those discussed in Plaintiffs' earlier briefs, this Court

3 should find that Plaintiffs are likely to succeed on the merits of their constitutional

4 claims and enjoin the enforcement of the Challenged Statutes while this case

5 proceeds.

6 Dated:  March 10, 2023          **MICHEL & ASSOCIATES, P.C.**

7                                               */s/ Anna M. Barvir*
                                                Anna M. Barvir
8                                               Counsel for Plaintiffs B&L Productions, Inc.,
                                                California Rifle & Pistol Association,
9                                               Incorporated, Gerald Clark, Eric Johnson, Chad
                                                Littrell, Jan Steven Merson, Asian Pacific
10                                              American Gun Owner Association, Second
                                                Amendment Law Center, Inc.
11

12 Dated:  March 10, 2023          **LAW OFFICES OF DONALD KILMER, APC**

13                                              */s/ Donald Kilmer*
                                                Donald Kilmer
14                                              Counsel for Plaintiff Second Amendment
                                                Foundation
15

16                          **ATTESTATION OF E-FILED SIGNATURES**

17    I, Anna M. Barvir, am the ECF User whose ID and password are being used

18 to file this PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' SECOND

19 SUPPLEMENTAL BRIEF RE: MOTION FOR PRELIMINARY INJUNCTION. In

20 compliance with Central District of California L.R. 5-4.3.4, I attest that all

21 signatories are registered CM/ECF filers and have concurred in this filing.

22

23 Dated: March 10, 2023            */s/ Anna M. Barvir*
                                                Anna M. Barvir

24

25

26

27

28

# APPENDIX

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 12 | 1328 | England | 2 Edw. 3, c. 3 (1328) (Eng.) | | ⊘ | ⊘ | ⊘ | ⊘ | *Statute of Northampton.*  This is an ancient English statute regulating possession and carrying of "arms" to terrify the people. "[T]he Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791." *Bruen,* 142 S.Ct. 2111, 2139. |
| 12 | 1403 | England | 4 Hen 4, c. 29 (1403) (Eng.) | | ⊘ | ⊘ | ⊘ | ⊘ | Ancient English statute regulating possession and carrying weapons "in affray of the Peace or the King's Liege people" with exceptions for such activity if they are "lawful Liege People to our Sovereign Lord the King." |
| 13 | 1647 | Maryland | 1647 Md. Laws 216 | Proceedings and Acts of the General Assembly January 1637/8- September 1664  https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000001/html/am1--215.html | ⊘ | ⊘ | ⊘ | ⊘ | The context of the citation (i.e., reading the previous page) makes it clear that the lower house of the colonial Maryland legislature was making rules for its legislative sessions and not statutes applicable to the public at large. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 4, 13 | 1650 | Maryland | 1650 Md. Laws 273 | Proceedings and Acts of the General Assembly January 1637/8-September 1664  https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000001/html/am1--273.html | ⊘ | ⊘ | ⊘ | ⊘ | The context of the citation (i.e., reading the previous page) makes it clear that the lower house of the colonial Maryland legislature was making rules for its legislative sessions and not statutes applicable to the public at large. |
| 4 | 1773 | Maryland | 63 Proceedings and Acts of the General Assembly 338, § 5 (June 15-July 3, 1773) | Proceedings and Acts of the General Assembly, 1771 to June-July, 1773  https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000063/html/am63--338.html | ✔ | ⊘ | ⊘ | ⊘ | The context of the citation (i.e., reading the previous page) makes it clear that the lower house of the colonial Maryland legislature was making rules for its legislative sessions and not statutes applicable to the public at large. |
| 13 | 1810 | Georgia | The Minutes of the Senate Academicus of the State of Georgia, 1799-1842, at 86 (1810) | https://perma.cc/7RJR-9JYR | ⊘ | ⊘ | ⊘ | ⊘ | The language of the law on the Duke Center webpage lacks context, but the Center includes a link to the primary source. What is controversial is that this college rule appears to forbid the possession of weapons, including firearms, to its students even when they are not on campus.  Assuming the student is otherwise qualifed to possess firearms, and assuming that this regulation would constitute state action, it is likely unconstitutional. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 8 | 1811 | New Jersey | An Act to Regulate Gun Powder Manufactories and Magazines within this State, 1811 N.J. Laws 300, § 1 | Laws of the State of New Jersey, 1811, p. 225, An Act to regulate Gun-Powder Manufactories and Magazines within this state. https://books.google.com/books?id=3bf_dYwJ11MC&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false | 🚫 | ✔ | 🚫 | 🚫 | The language of the law on the Duke Center webpage is incomplete and lacks context. The full text of this law begins on pg. 225 of the Primary Source. This "Act to regulate Gun-Powder Manufactories and Magazines with this state" is more in the nature of a zoning ordinance: It requires manufactories and storage magazines to be located away from populated areas. The law contains a exemption for any manufactories already located in populated areas. |
| 8 | 1814 | Mass. | An Act in Addition to an Act, entitled "An Act to Provide for the Proof of Fire Arms, Manufactured within this Commonwealth," 1814 Mass. Acts 464, ch. 192, § 2 | Laws of the Commonwealth of Massachusetts Vol. VI., p. 464, Chap. CXCII, An Act in addition to an act, entitled "An act to provide for the proof of Fire Arms, manufactured within this Commonwealth." http://lldc.mainelegislature.org/Open/Mass/1806-1820/Ma | 🚫 | ✔ | Unknown | 🚫 | The language of the law on the Duke Center webpage is incomplete and lacks context. Pg. 158 of the Primary Source pdf shows pg. 464 of Massachusets laws from 1814. Chap. CXCII (192) is the cited law. This law does address manufacturing standards for musket and pistol barrels and requires a conforming proof-mark before any sale. The penalty is a civil fine of $10. Musket and pistol barrels manufactured in a United State armoury or for the United States |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 8 | 1820 | New Hampshire | An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, 1820 N.H. Laws 274, chap XXV, §§ 1-9 | Laws of New Hampshire, Including Public and Private Acts, Resolves, Votes, Etc., Volume Eight, Second Constitutional Period, 1811-1820. https://books.google.com/books?id=Cb9GAQAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage | 🚫 | ✔ | 🚫 | 🚫 | The citation in the State's brief is incorrect, and on the Duke webpage, it is also incorrect. The "Act to Provide for the Appointment of Inspectors and Regulating the Manufactory of Gun Powder" is set forth in chapter 24 (not chapter 25). The law begins on 907 of the Alternate Source. **This law was repealed by act of December 23, 1842**. See Revised Statutes (1842), Chap. 230. |
| 8 | 1821 | Maine | An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, 1821 Me. Laws 98; chap. 25, §5 | Laws of the State of Maine, Vol. I, Published March 8, 1821, p. 112, Chapter XXV, An Act for the prevention of damage by Fire, and safe keeping of Gun Powder https://lldc.mainelegislature.org/Open/Laws/1821/1821_PL_c025.pdf | 🚫 | ✔ | 🚫 | 🚫 | The State cites a single subsection (i.e., § 5) of a law that has eight sections. The entire Chapter XXV is a state law that authorizes towns of certain sizes in Maine to promulgate regulations for the storage of gun powder. Section 5 of this law merely requires obtaining a warrant before conducting a search for any person suspected to violating any town's regulation. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 13 | 1824 | Virginia - University of Virginia | University of Virginia Board of Visitors Minutes 6-7 (October 4-5, 1824) | University of Virginia Board of Visitors Minutes (October 4-5, 1824). https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/#:~:text=At%20its%20meeting%20of%20October,bring%20personal%20slaves%20onto%2 | 🚫 | 🚫 | 🚫 | 🚫 | This citation is not a law, but a rule for students of the University of Virginia. Along with keeping servants, horses, and dogs on campus, it restricts students from "keep[ing] or us[ing] arms of any kind or gunpowder." Violation could result in "minor punishments, at the discretion of the Faculty, or of the board of Censors, approved by the Faculty." |
| 8 | 1825 | New Hampshire | An Act to Regulate the Keeping and Selling, and Transporting of Gunpowder, 1825 N.H. Laws 74 | Laws of New Hampshire, Including Public and Private Acts, Resolves, Votes, Etc., Volume Nine Second Constitutional Period, 1821-1828 https://www.google.com/books/edition/Laws_of_New_Hampshire_Second_constitutio/pr9GAQAAIAAJ?hl=en&gbpv=1&bsq=Gunpowder | 🚫 | ✔ | 🚫 | 🚫 | The citations in the government's brief and at the Duke Center webpage are incomplete and lack context. The full text of the law can be found at pg. 461 of the Primary Source. The full statute authorizes the storage and sale (up to seventy-five pounds) of gunpowder if fire code regulations are obeyed. Non-conforming sales are "punished" by forfeiture and civil fines. |

**APPENDIX A: Historical Laws Cited by the State Defendants**

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 13 | 1832 | Maine - Waterville College | Laws of Waterville College, Maine 11 (1832) | Laws of Waterville College, Maine, 1832. https://www.google.com/books/edition/Laws_of_Waterville_College_Maine/n0wMAQAAMAAJ?hl=en&gbpv=1&pg=PA11&printsec=frontcover | ⊘ | ⊘ | ⊘ | ⊘ | This citation is to a publication titled: *Laws of Waterville College, Maine* by Hallowell: Glazier, Masters & Co., 1832. Chapter VI (Moral Deportment and Miscellaneous Regulations) of these rules for the college begins on pg. 10. Rule 6 on pg. 11 reads: "No Student shall keep firearms, or any deadly weapon whatever. He shall bring no gunpowder upon the College premises; nor shall cats or dogs be kept by Students for their private use or pleasure." |
| 9 | 1836 | Conn. | An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 | Public acts passed by the General Assembly of the state of Connecticut, 1836-1850 https://collections.ctdigitalarchive.org/islandora/object/30002%3A22002122#page/102/mode/2up | ⊘ | ✔ | ⊘ | ⊘ | The language of the law on Duke Center webpage is incomplete and lacks context. The Primary Source link to this law begins on pg. 102 of 1024 of Public acts passed by the General Assembly of Connecticut, 1836-1850. This state law grants powers to these new cities and includes a power to regulate (via fine or forfeiture) "the bringing in, and conveying out, or storing of gun-powder." The State's citation omits the following: quantities of gun-powder that do not exceed twenty-five pounds are not subject to fine or forfeiture. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 10 | 1841 | Iowa - Burlington [Territory] | Ordinances of the City of Burlington, with Head Notes and an Analytic Index, § 1 (1841), at 149-150 (Chas. Ben. Darwin, Thompson & Co. Printers, 1856) | | ⊘ | ⊘ | ⊘ | ⊘ | Iowa was admitted as state on December 28, 1846. The citation and text at the Duke Center webpage sets forth a city ordinance that regulates the "erecting a shooting battery" by any gunsmith conducting a gun shop within the city. The regulations contemplate that said shooting battery shall be kept in good and safe condition. |
| 9 | 1845 | Iowa [Territory] | An Act to Incorporate and Establish the City of Dubuque, 1845 Iowa Laws 119, chap 123, § 12 | Laws of Iowa, Passed at the Annual Session of the Legislative Assembly, Which Commenced on the First Day of December, Eighteen Hundred and Forty-Five https://www.legis.iowa.gov/docs/publications/iactc/1846.1/1846_Iowa_Acts.pdf | ⊘ | ✔ | ⊘ | ⊘ | Iowa was admitted as state on December 28, 1846. The 1845 Iowa territorial law cited by the State's brief merely authorizes the City of Dubuque to adopt regulations regrding the sale and keeping of gun-powder in the city. The pincite of the Alternate Source is pg. 91 of the pdf (or pg. 727 of the document). |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 9 | 1847 | Vermont | An Act to Amend an Act Entitled "An Act to Incorporate the Village of Rutland" 1865 Vt. Acts & Resolves 213 § 10 (November 15, 1847) | Acts and Resolves Passed by the General Assembly of the State of Vermont https://books.google.com/books?id=QCREAAAAYAAJ&pg=PA213&lpg=PA213&dq=1865+Vt.+Acts+and+Resolves+213+10&source=bl&ots=yjZyXmZfp4&sig=ACfU3U1xkVeFkLKrMca-JdL60wquoYcC-w&hl=en&sa=X&ved | ⊘ | ✔ | ⊘ | ⊘ | The citation in the State's brief is incomplete and the language of the law on Duke Center webpage is incomplete and lacks context. The full text of the cited section can be found on pg. 213 of the Primary Source. The cited section is part of an act to incorporate the Village of Rutland within the state of Vermont, and sets forth the powers of the local fire-wardens. |
| 9 | 1847 | Indiana | An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto into One Act, and to Amend the Same, 1847 Ind. Acts 93, chap 61, § 8, pt. 4 | Indiana acts, 1847-48, 32nd session, local, by Indiana. General Assembly. https://archive.org/details/isl-ind-gov-acts-1848-l-03/ISL_IND_Gov_Acts1848L_01/page/n45/mode/2up?q=explosive | ⊘ | ✔ | ⊘ | ⊘ | The citation in the State's brief is incomplete and the language of the law on Duke Center webpage is incomplete and lacks context. The full text of the cited section can be found on pg. 93 of the Primary Source. The cited section is part of an act to incorporate the City of Madison within the state of Indiana, and sets forth the powers of the city for general regulation and licensing for such activities as ferries, wagons, coaches, foreign insurance companies, "and the keepers of gun powder and other explosive compounds." |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 9 | 1848 | Lousiana - East Feliciana Parish | Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish, sec. 1. (September session, 1847), at 80 (John C. White, Whig Office, September 1, 1848) | | 🚫 | 🚫 | 🚫 | 🚫 | The law cited by the State's brief and set forth on the Duke Center website does *not* prohibit the carrying or sale of firearms. Rather, it prohibits their discharge in the city limits in the town of Clinton, Louisiana. There is an exception for good cause such as shooting a mad dog, and presumably for self-defense and/or sale. The fine is ten dollars for violation. |
| 9 | 1851 | Rhode Island | 1851 R.I. Pub. Laws 9, An Act in Amendment of an Act Entitled an Act Relating to Theatrical Exhibitions and Places of Amusement, §§ 1-2, in The Revised Statutes of the State of Rhode Island and Providence Plantations: To Which are Prefixed, The Constituti | None found and no primary source material is available on the Duke Center for Firearms Law website. | 🚫 | 🚫 | 🚫 | 🚫 | The language cited as law on the Duke Center webpage is a regulation of shooting galleries in the town of Newport imposing licensing requirements and an annual tax. |

**APPENDIX A: Historical Laws Cited by the State Defendants**

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 10 | 1853 | California - San Francisco | *Ordinances and Joint Resolutions of the City of San Francisco: Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council 220,* Ordinance No. 498, section 13 (December 29, 1853), at 220 (Monson & Valentine 1854) | Ordinances and Joint Resolutions of the City of San Francisco, 1853. p. 220, § 13. https://books.google.com/books?id=EMxMAQAAMAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false | ⊘ | ✔ | ⊘ | ⊘ | The citation in the State's brief is incomplete. The full text of the law can be found on pg. 220 of the Primary Source. It reads: "Sec. 13. Every person, house or firm engaged in keeping a pistol or rifle shooting gallery, shall pay for a license to carry on same, the sum of ten dollars per quarter, in addition to the amount of the powder license."  The provision addressing a powder license is set forth in Sec. 12. |
| 15 | 1857 | New York - Central Park | First Annual Report of the Improvement of the Central Park, New York (January 1, 1857) Appendix A, 106 (Chas. W. Baker 1857) | https://advance.lexis.com/usresearchhome/?pdmfid=1000516&crid=5e94066f-dec3-4b23-8877-5225af3ec3dc&ecomp=43kxk&prid=42d9c028-c1d7-4db5-a4cc-70fc3bc73852&aci=la&cbc=0&lnsi=9f6e5c3f-9fbf-488b-8d53-736659dfa57e&rmflag=0&sit=null | ⊘ | ⊘ | ⊘ | ⊘ | The language of the law on the Duke Center webpage is incomplete and lacks context, but it includes a link to the source document (see Primary Source link at pg. 166). The ordinance cited restricts various activities in Central Park, including "to carry fire-arms or to throw stones or other missiles within it." The restrictions on general public carry may be overbroad and thus invalid in light of the *Bruen* decision. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 14 | 1858 | Tennessee | Public Statutes of the State of Tennessee since the Year 1858, at 108 (James H. Shankland ed., 1871) | Public Statues of the State of Tennessee, Since the Year 1858. p. 108. https://books.google.com/books?id=1IE0AQAAMAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q=weapons&f=false | ⊘ | ⊘ | ⊘ | ⊘ | The language of the law on the Duke Center webpage clearly indicates that the statute is part of the Tennessee election code making this a sensitve place regulation. To the extent this statute acts as a restriction on general public carry, it may be overbroad and thus invalid in light of the *Bruen* decision. |
| 15 | 1861 | New York - Central Park | Fourth Annual Report of the Board of Commissioners of the Central Park 106 (1861) | https://babel.hathitrust.org/cgi/pt?id=hvd.32044106439805&view=1up&seq=124&skin=2021 | ⊘ | ⊘ | ⊘ | ⊘ | The language of the law on the Duke Center webpage is incomplete and lacks context, but it includes a link to the source document (see Primary Source link at pdf pgs. 333-334). This appears to be a duplicate citation to the same ordinance restricting carry of firearms and throwing of stones in a a subsequent report of the Board of Commissioners of Central Park. Again, the restrictions on general public carry may be overbroad and thus invalid in light of the *Bruen* decision. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 10 | 1863 | Tennessee - Memphis | Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page, Chp. 5, Art. VI., at 147-148 (October 7, 1863) (WM. H. Bridges, Argus Book and Job Office 1863) | Digest of the Charters and Ordinances of the City of Memphis (1863), https://books.google.com/books?id=8BJHAQAAMAAJ&pg=PA275&lpg=PA275&dq=Digest+of+the+City+of+Memphis+1863&source=bl&ots=OXrPKaDnAK&sig=ACfU3U2ze9gEm2qhqejqUx_-9rJeJXA1zg&hl=en&sa=X&ved=2ahU | ⊘ | ⊘ | ⊘ | ⊘ | The Duke Center webpage and the Primary Source (at pgs. 147-48) cite the same law requiring a license to set up a shooting gallary in the city of Memphis. All gun sales at California compliant gun shows are required to be conducted through a licensed dealer; that requirement is not challenged here. |
| 7 | 1868 | Alabama | *Alabama Acts of the General Assembly*  329-35 (1868) | Plaintiffs have been unable to locate any primary or secondary source to verify the text of this cited ordinance | ⊘ | ✔ | ✔ | ⊘ | All firearm dealers, including dealers at gun shows, are already licensed by the Federal Government and the State of California. |

**APPENDIX A: Historical Laws Cited by the State Defendants**

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 5 | 1870 | Georgia | 1870 Ga. Laws 421 | Acts and resolutions of the General Assembly. 1870 https://babel.hathitrust.org/cgi/pt?id=nyp.33433009066832&view=1up&seq=429 | 🚫 | 🚫 | 🚫 | 🚫 | The correct citation to this law is:  Ga.L. 1870, p. 421, §§ 1, 2. The modern law is found at O.C.G.A. § 16-11-127. The 1870 law generally prohibited the carrying of deadly weapons at courts of justice, election ground or precinct, place of public worship or any other public gathering, except militia muster grounds. The Georgia State Supreme Court interpreted the law in 1905 in *Wynne v. State* , 123 ga. 566 (1905), recognizing that the purpose of the law was to protect against the risk of danger arising from the carry of deadly weapons at public gatherings. The restrictions on general public carry may be overbroad and thus invalid in light of the *Bruen* decision. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 14 | 1870 | Texas | An Act Regulating the Right to Keep and Bear Arms, Aug. 12, 1870, reprinted in 2 A Digest of the Laws of Texas: Containing the Laws in Force, and the Repealed Laws on Which Rights Rest from 1864 to 1872, at 1322 (George W. Paschal 1873) | Gammel, Hans Peter Mareus Neilsen, The Laws of Texas, 1822-1897, vol. 6, (1898), https://texashistory.unt.edu/ark:/67531/metapth6734/m1/243/: (last accessed Mar. 10, 2023) | 🚫 | 🚫 | 🚫 | 🚫 | This citation in the State's brief appears to be from a Digest compiled by someone named George W. Paschal. And the language of the law on the Duke Center webpage is incomplete and lacks context. The full text can be found on pg. 63 of the Primary Source. It restricts carry of any bowie-knife, dirk, or butcher-knife, or firearms,whether known as a six-shooter, gun, or pistol of any kind at any church or religious assembly, any school-room or other place where persons are assembled fo reducational, literary, or scientific purposes, or into a ball room,social party, or other social gathering, composed of ladies and gentleman, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly. The restrictions on general public carry may be overbroad and thus invalid in light of the *Bruen* decision. |

**APPENDIX A: Historical Laws Cited by the State Defendants**

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 10 | 1870 | Louisiana - New Orleans | *The Laws and General Ordinances of the City of New Orleans: Together with the Acts of the Legislature, Decisions of the Supreme Court, and Constitutional Provisions Relating to the City Government: Revised and Digested, Pursuant to an Order of the Common Council,* Section 1, art. 636 (5), 257 (Henry Jefferson Leovy, Simmons & Co. | The Laws and Revised Ordinances of the City of New Orleans, 1870, p. 257. https://books.google.com/books?id=xitPAQAAIAAJ&printsec=frontcover&source=gbs_ViewAPI#v=onepage&q&f=false | 🚫 | 🚫 | 🚫 | 🚫 | At pg. 256 of the Primary Source, the New Orleans legislature enacted ordinances addressing "Offences and Nuisances." Art. 635. (4.) prohibits the discharge of any gun, pistol, fowling piece or firearm within the city limits. Military reviews and self-defense are exceptions. Art. 636. (5.) makes it unlawful to establish or operate a shooting gallery without obtaining the consent of two-thirds of neighbors and the common council. |

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 14 | 1871 | Texas | Tex. Act of April 12, 1871, Art. 320 | Gammel, Hans Peter Mareus Neilsen, The Laws of Texas, 1822-1897, vol. 6 (1898), https://texashistory.unt.edu/ark:/67531/metapth6734/m1/917/?q=circus: (last accessed Mar. 10, 2023) | ⊘ | ⊘ | ⊘ | ⊘ | The citation in the State's brief is incomplete and lacks context. The full text of this law begins on pg. 25 of the Primary Source. This 1871 law amends the 1870 law. It expands the places where carrying a weapon may be prohibited to include "places where persons are assembled for amusement [... including] any circus, show, or public exhibition of any kind [...]" -- however, the law makes an exception "as may be required or permitted by law." Gun shows are permitted by law under CA Penal Code § 27300 et seq. The restrictions on general public carry may be overbroad and thus invalid in light of the *Bruen* decision. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 5 | 1873 | Georgia | Code of the State of Georgia 818 (§ 4528) (1873) | Clark, Richard H.; Cobb, Thomas R.R.; Irwin, David; Lester, George N.; and Hill, Walter B., "1873 Irwin's Code, 2nd ed." (1873). Historical Georgia Digests and Codes. 16. https://digitalcommons.law.uga.edu/ga_code/16 | 🚫 | 🚫 | 🚫 | 🚫 | This law codified at § 4528 in 1873 [available at pg. 818 of the Primary Source] is merely a re-codification of the Acts of 1870, pg. 421. The preceding § 4527 [available at pg. 817 of the Primary Source] authorizes the carrying "in an open manner and fully exposed to view, any pistol (except a horseman's pistol)." And the annotation makes clear that "[t]he offense consists not in *having* the pistol at a particular place and time but, in having it concealed: 36 Ga., 245." To the extent the law is a broad restriction on general public carry, it is likely overbroad and thus invalid in light of the *Bruen* decision. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 16 | 1873 | Illinois - Chicago | *Laws and Ordinances Governing the City of Chicago,* Part I, Chp. 31, § 6, 88-89 (Murray F. Tuley, Bulletin Printing Company 1873 | Laws and Ordinances Governing the City of Chicago, 1873, p. 88-89; https://books.google.co.mz/books?id=aUCVhqQeRE8C&printsec=frontcover&hl=pt-PT&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false | 🚫 | 🚫 | 🚫 | 🚫 | The full text of this ordinance can be found on pgs. 88-89 of the Primary Source. The cited city ordinance is part of the chapter on Parks and Public Grounds. Section 6 is entitled "Firearms and Missiles Prohibited--Protection Shrubbery." It reads: "All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, bridges, or other contruction or property, within or upon any of the said parks." To the extent the law is a broad restriction on general public carry, it is likely overbroad and thus invalid in light of the *Bruen* decision. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 14 | 1874 | Missouri | An Act to Prevent the Carrying of Weapons in Public Assemblies of the People, Acts of the . . . General Assembly of the State of Missouri 43 (1874) | Laws of Missouri Passed at the General Assembly   https://books.google.com/books?id=Pw1GAQAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q=weapons&f=false | 🚫 | 🚫 | 🚫 | 🚫 | The full text of the cited law begins on pg. 420 of the Primary source. This law is part of a broader grant of authorities to local governments, giving towns the "power by ordinance" to, among other things, restrict the carrying of concealed, *but not openly carried*, weapons (including firearms) in various places. The State did not cite any local ordinance from Missouri adopting such a law. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 5 | 1879 | Missouri | Revised Statutes of the State of Missouri 1879, at 224 (§ 1274) | Revised Statutes of the State of Missouri, 1879, Volume 1, p. 224 (p. 310 of image). https://mdh.contentdm.oclc.org/digital/collection/p16795coll26/id/10273 | ⊘ | ⊘ | ⊘ | ⊘ | The full text of the cited law begins on pg. 224 of the Primary Source. This law restricts the carrying of concealed, *but not openly carried*, weapons (including firearms). It also restricts the carry of any weapon (including firearms) into any church or place of religious assembly, school room or place of educational, literary, or social assembly, election precinct on election day, court room during the sitting of the court, or any other public assemblage of people (except militia drills or meetings of the militia). It also restricts the "rude, angry or threatening" brandishing of a weapon and the carry of weapons while intoxicated. Also restricts the transfer to minors without the consent of aparent or guardian. To the extent this statute acts as a restriction on general public carry, it is likely overbroad and thus invalid in light of the *Bruen* decision. |
| 14 | 1883 | Missouri | Laws of Missouri Passed at the Session of the Thirty-Second General Assembly 76 (1883) | | ⊘ | ⊘ | ⊘ | ⊘ | As footnote 7 of the State's brief notes, this 1883 statue merely amended the 1874 law by increasing the fine. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 14 | 1887 | Kansas - Rooks County | Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons, July 1, 1887, reprinted in Stockton Review and Rooks County Record (KS) 1 (July 1, 1887) | Plaintiffs have been unable to locate any primary or secondary source to verify the text of this cited ordinance | Unknown | Unknown | Unknown | Unknown | |
| 16 | 1887 | Penn. - Philadelphia | *A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887*, A.14 ap. 1868 § 21 P.L. 10851 VII. 57, 2, at 513 (Frank F. Brightley, Kay & Brother, 1887) | A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887, A.14 ap. 1868 § 21 P.L. 10851 VII. 57, 2, at 513 (Frank F. Brightley, Kay & Brother, 1887) | ⊘ | ⊘ | ⊘ | ⊘ | The full texts of the cited ordinance begins on pg. 513 of the Primary Source citation. When read in context, the law is a prohibition on hunting in city parks. To the extent this statute acts as a restriction on general public carry, it is likely overbroad and thus invalid in light of the *Bruen* decision. |
| 15 | 1889 | Arizona [Territory] | 1889 Ariz. Sess. Laws 16-17, No. 13, § 3 | Session Laws of the Territory of Arizona, 1889. Session begun on the twenty-first day of January, 1889. https://azmemory.azlibrary.gov/nodes/view/88885 | ⊘ | ⊘ | ⊘ | ⊘ | Arizona was admitted as a state on February 14, 1912. Section 4 of this territorial law specifically authorizes possession of arms by persons "authorized or permitted by law." To the extent this statute acts as a restriction on general public carry, it is likely overbroad and thus invalid in light of the *Bruen* decision. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 15 | 1890 | Missouri - Town of Columbia | Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, *reprinted in General Ordinances of the Town of Columbia, in Boone County, Missouri* , at 34, 35 (Lewis M. Switzler ed., 1890) | Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, reprinted in General Ordinances of the Town of Columbia, in Boone County, Missouri, at 34, 35 (Lewis M. Switzler ed., 1890), https://books.google.com/books? | 🚫 | 🚫 | 🚫 | 🚫 | The citation in the State's brief is incomplete and lacks context. The full text of the law begins on pg. 34 of the Prmary Source. Section 163 of the law appears be a "sensitive place" regulation. Furthermore, the general prohibition on concealed carry, Section 162, does not "apply to persons moving or traveling peaceably through the state." To the extent this statute acts as a restriction on general public carry, it is likely overbroad and thus invalid in light of the *Bruen* decision. |

APPENDIX A: Historical Laws Cited by the State Defendants

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 15 | 1890 | Oklahoma [Territory] | *Statutes of Oklahoma 1890,* Article 47: Concealed Weapons, undated (Will T. Little, L.G. Pitman, & R.J. Barker eds., 1891). | The Statutes of Oklahoma, 1890. Guthrie, Oklahoma: The State Capital Printing Co., Publishers. 1891. Article 47, p. 495. https://books.google.com/books?id=4NlOAQAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false | ⊘ | ⊘ | ⊘ | ⊘ | Oklahoma was admitted as state on November 16, 1907. The citation in the State's brief is incomplete and lacks context. The full text of this territorial law begins on pg. 495 of the Primary Source. Sec. 1 prohibits carrying concealed weapons, "except as in the article provided." Sec. 2 prohibits the open carry of weapons, "except as in this article provided." Sec. 3 restricts transfers to minors. Sec. 5 authorizes the carrying of "shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, [...] or while travelling or removing from one place to another, not otherwise." Sec. 7 restricts carry of certain arms into churches, schools, ball rooms, parties, elections, bars/liquor stores, political conventions, or other public assemblies. Sec. 8 restricts the carry or wear of any arm with the intent to injure another person. Sec. 9 restricts brandishing. |

**APPENDIX A: Historical Laws Cited by the State Defendants**

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 16 | 1891 | Minnesota - St. Paul | *Proceedings of the Common Council of the City of Saint Paul, June 2, 1891* (St. Paul: The Herald Print 1892) | Proceedings of the City of St. Paul, Ramsey County, Minnesota. 1891. St. Paul: the Herald Print 1892. | 🚫 | 🚫 | 🚫 | 🚫 | The full text of the cited ordinance begins on pg. 133 of the Primary Source, "Of Ordinances Passed and Resolutions Adopted by the Common Council of the City of St. Paul." Section 6 reads: "No person shall carry firearms or shoot birds in any park, or within fifty yards thereof, or throw stones or other missles therein. To the extent this statute acts as a restriction on general public carry, it is likely overbroad and thus invalid in light of the *Bruen* decision. |
| 16 | 1892 | Mass. - City of Lynn | Annual Report of the Park Commissioners of the City of Lynn for the Year Ending December 20, 1892, at 45 (United States: Whitten & Cass 1893 | https://www.google.com/books/edition/Annual_Report_of_the_Park_Commissioners/LTICAAAAYAAJ?hl=en&gbpv=1&pg=RA2-PA23&printsec=frontcover | 🚫 | 🚫 | 🚫 | 🚫 | The language of the ordinance on the Duke Center webpage is incomplete and lacks context, but it includes a link to the source document (see Primary Source link at pg. 23). When read in context, the cited ordinance is clearly a prohibition on hunting in a city park. To the extent this statute acts as a restriction on general public carry, it is likely overbroad and thus invalid in light of the *Bruen* decision. |

**APPENDIX A: Historical Laws Cited by the State Defendants**

| State's Br. Pg. No. | Year | Jdx | Citation from Govt Brief [Link to Duke Center for Firearms Law, if available] | Primary Source Link | Passed Between 1750-1800 | Regulates Sales of Arms, Ammo, or Parts | Regulates Sales on Govt Property | Purpose: Govt Should Not Profit From Gun Sales | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 16 | 1897 | Penn. Pittsburgh | A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, from 1804 to Jan. 1, 1897, with References to Decision Thereon, 496, § 5 (July 27, 1893) (W.W. Thomson, W. T. Nicholson Sons, Printers and Binders 2d ed. 18 | https://www.google.com/books/edition/A_Digest_of_the_Acts_of_Assembly_Relatin/Jdk-AAAAYAAJ?hl=en&gbpv=1&pg=PA496&printsec=frontcover | 🚫 | 🚫 | 🚫 | 🚫 | The language of the ordinance on the Duke Center webpage is incomplete and lacks context, but it includes a link to the source document (see Primary Source link at pg. 496). It appears that the ordinance, when read in context, is a prohibition on hunting in a city park. And section 2 of the ordinance indicates that the law's purpose is the control, maintenance, supervision and preservation of the public parks." To the extent this statute acts as a restriction on general public carry, it is likely overbroad and thus invalid in light of the *Bruen* decision. |

1

2

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

3

4

Case Name: *B & L Productions, Inc., et al. v. Newsom, et al.*
Case No.: 8:22-cv-01518 JWH (JDEx)

5

IT IS HEREBY CERTIFIED THAT:

6

7

     I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

8

9

     I am not a party to the above-entitled action. I have caused service of:

10

11

**PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' SECOND SUPPLEMENTAL BRIEF RE: MOTION FOR PRELIMINARY INJUNCTION**

12

13

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

14

Nicole J. Kau, Deputy Attorney General
nicole.kau@doj.ca.gov

15

16

300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
    *Attorney for Defendants*

17

18

     I declare under penalty of perjury that the foregoing is true and correct.

19

Executed March 10, 2023.

20

Christina Castron

21

22

23

24

25

26

27

28