1   C.D. Michel-SBN 144258
    Anna M. Barvir-SBN 268728
2   Tiffany D. Cheuvront-SBN 317144
    MICHEL & ASSOCIATES, P.C.
3   180 East Ocean Blvd., Suite 200
    Long Beach, CA 90802
4   Telephone: (562) 216-4444
    Email: cmichel@michellawyers.com
5
    Attorneys for Plaintiffs B&L Productions, Inc., California Rifle & Pistol Association,
6   Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, Asian
    Pacific American Gun Owner Association, Second Amendment Law Center, Inc.
7
    Donald Kilmer-SBN 179986
8   Law Offices of Donald Kilmer, APC
    14085 Silver Ridge Road
9   Caldwell, Idaho 83607
    Telephone: (408) 264-8489
10  Email: Don@DKLawOffice.com
11  Attorney for Plaintiff Second Amendment Foundation

            IN THE UNITED STATES DISTRICT COURT
12
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
13

| | |
|---|---|
| 14  B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST; GERALD CLARK; ERIC JOHNSON; 15  CHAD LITTRELL; JAN STEVEN MERSON; CALIFORNIA RIFLE & 16  PISTOAL ASSOCIATION, INCORPORATED; ASIAN PACIFIC 17  AMERICAN GUN OWNERS ASSOCIATION; SECOND 18  AMENDMENT LAW CENTER, INC.; and SECOND AMENDMENT 19  FOUNDATION, | CASE NO: 8:22-cv-01518 JWH (JDEx)  **PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**  Action Filed: August 12, 2022 |

20                          Plaintiffs,

21                 v.

22  GAVIN NEWSOM, in his official
    capacity as Governor of the State of
23  California; ROB BONTA, in his official
    capacity as Attorney General of the
24  State of California; KAREN ROSS, in
    her official capacity as Secretary of
25  California Department of Food &
    Agriculture and in his personal capacity;
26  TODD SPITZER, in his official capacity
    as District Attorney of Orange County;
27  32nd DISTRICT AGRICULTURAL
    ASSOCIATION; DOES 1-10;

28                          Defendants.

PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

Plaintiffs B & L Productions, Inc., d/b/a Crossroads of the West, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., Asian Pacific American Gun Owners Association, and Second Amendment Foundation, Inc. (collectively "Plaintiffs") submit this notice of supplemental authority in support of Plaintiffs' Motion for Preliminary Injunction, which was fully briefed as of March 24, 2023, and which is currently set for hearing on April 6, 2023.

On March 20, 2023, the United States District Court for the Central District of California, Judge Cormac J. Carney presiding, issued an Order Granting Plaintiffs' Motion for Preliminary Injunction in *Boland v. Bonta*, Case Number 8:22-cv-01421-CJC-ADS. A true and correct copy of the Order is attached as **Exhibit 1**.

Dated:  April 4, 2023          **MICHEL & ASSOCIATES, P.C.**

/s/ Anna M. Barvir
Anna M. Barvir
Counsel for Plaintiffs B&L Productions, Inc., California Rifle & Pistol Association, Incorporated, Gerald Clark, Eric Johnson, Chad Littrell, Jan Steven Merson, Asian Pacific American Gun Owner Association, Second Amendment Law Center, Inc.

Dated:  April 4, 2023          **LAW OFFICES OF DONALD KILMER, APC**

/s/ Donald Kilmer
Donald Kilmer
Counsel for Plaintiff Second Amendment Foundation

## ATTESTATION OF E-FILED SIGNATURES

I, Anna M. Barvir, am the ECF User whose ID and password are being used to file this PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY. In

compliance with Central District of California L.R. 5-4.3.4, I attest that all signatories are registered CM/ECF filers and have concurred in this filing.

Dated: April 4, 2023                    */s/ Anna M. Barvir*
                                        Anna M. Barvir

PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| LANCE BOLAND, MARIO SANTELLAN, RENO MAY, JEROME SCHAMMEL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10, <br><br> Defendant. | Case No.: SACV 22-01421-CJC (ADSx) <br><br> ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [Dkt. 23] |

I.    INTRODUCTION

     The Second Amendment guarantees the right to keep and bear arms for self-defense.  U.S. Const. amend. II.  That right is so fundamental that to regulate conduct covered by the Second Amendment's plain text, the government must show more than

that the regulation promotes an important interest like reducing accidental discharges or solving crime. *New York State Rifle & Pistol Association, Inc., v. Bruen*, 142 S. Ct. 2111, 2126 (2022). Rather, to be constitutional, regulations of Second Amendment rights must be "consistent with this Nation's historical tradition of firearm regulation." *Id.*

California's Unsafe Handgun Act (the "UHA") seeks to prevent accidental discharges by requiring handguns to have particular safety features. First, the UHA requires certain handguns to have a chamber load indicator ("CLI"), which is a device that indicates whether a handgun is loaded. Cal. Penal Code §§ 16380, 31910(b)(4). Second, the UHA requires certain handguns to have a magazine disconnect mechanism ("MDM"), which prevents a handgun from being fired if the magazine is not fully inserted. *Id.* §§ 16900, 31910(b)(5). Third, the UHA requires certain handguns to have the ability to transfer microscopic characters representing the handgun's make, model, and serial number onto shell casings when the handgun is fired, commonly referred to as microstamping capability. *Id.* § 31910(b)(6). No handgun available in the world has all three of these features.

These regulations are having a devastating impact on Californians' ability to acquire and use new, state-of-the-art handguns. Since 2007, when the CLI and MDM requirements were introduced, very few new handguns have been introduced for sale in California with those features. Since 2013, when the microstamping requirement was introduced, not a single new semiautomatic handgun has been approved for sale in California. That is because the technology effectuating microstamping on a broad scale is simply not technologically feasible and commercially practical. The result of this is that when Californians today buy a handgun at a store, they are largely restricted to models from over sixteen years ago.

In this case, Plaintiffs Lance Boland, Mario Santellan, Reno May, Jerome Schammel, and California Rifle & Pistol Association, Incorporated, allege that the UHA's CLI, MDM, and microstamping requirements are unconstitutional, contending that they violate the Second Amendment under *Bruen*.[1]  Before the Court is Plaintiffs' motion for a preliminary injunction enjoining California from enforcing those requirements.  (Dkt. 23 [Motion for Preliminary Injunction, hereinafter "Mot."].)  Because the plain text of the Second Amendment covers Plaintiffs' proposed course of conduct of purchasing state-of-the-art handguns, and the UHA's CLI, MDM, and microstamping requirements are not consistent with this Nation's historical tradition of firearm regulation, Plaintiffs' motion is **GRANTED**.

## II.  BACKGROUND

The California legislature enacted the UHA in 1999.  The statute's goals include "reduc[ing] the number of firearm deaths in the state," *Pena v. Lindley*, 898 F.3d 969, 973 (9th Cir. 2018), and "curbing handgun crime, as well as promoting gun safety," *Fiscal v. City & Cnty. of San Francisco*, 158 Cal. App. 4th 895, 913 (2008).  Under the Act, a handgun may not lawfully be manufactured or sold on the primary market if it is "unsafe."  Cal. Penal Code §§ 31910, 32000.  An "unsafe handgun" is defined as "any pistol, revolver, or other firearm capable of being concealed upon the person" that does not meet firing reliability requirements, satisfy drop safety requirements, or have certain safety features.  *Id.* § 31910.

All handgun models that have been tested by a certified testing laboratory and have been determined not to be "unsafe handguns" are added to an official list known as the

---

[1] Although their Complaint appears to challenge the entire UHA, Plaintiffs clarified that they seek to enjoin only the CLI, MDM, and microstamping requirements.  (Dkt. 34 [Reply] at 7; Dkt. 50 at 96, 98.)

"Roster." Cal. Penal Code § 32015. Admission to the Roster is valid for one year and must be renewed annually with a fee. Cal. Code Regs. tit 11, §§ 4070(a)-(b) & 4072(b).

Over time, the California legislature changes what features a handgun must have to be considered not "unsafe." *See Pena*, 898 F.3d at 973. When it does so, handguns previously on the Roster that do not have the newly required features are not removed from the Roster, but rather are "grandfathered" and are still permitted to be sold even though they now would be considered "unsafe." *See* Cal. Penal Code § 31910(b)(5), (7); *Pena*, 898 F.3d at 974; (Dkt 54 [Transcript for Proceedings of Evidentiary Hearing Day 1, hereinafter "Tr."] at 173 [Testimony of Special Agent Salvador Gonzalez]).

For example, as of 2007, to be eligible for primary market sale in California, new-to-market semiautomatic pistols must have two "safety features designed to limit accidental discharges that occur when someone mistakenly believes no round is in the chamber." *Pena*, 898 F.3d at 974. First, a new-to-market centerfire semiautomatic pistol must have a chamber load indicator, which is a "device that plainly indicates that a cartridge is in the firing chamber." Cal. Penal Code §§ 16380, 31910(b)(4). Second, a new-to-market centerfire or rimfire semiautomatic pistol must have a magazine disconnect mechanism (sometimes referred to as a magazine detachment mechanism), which is "a mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol." *Id.* §§ 16900, 31910(b)(5); *Pena*, 898 F.3d at 974.

Since these requirements were added to the UHA, only 32[2] semiautomatic pistols have been added to the Roster that have a CLI and MDM. (Mot. at 5; Tr. at 179 [Special

---

[2] This number is misleadingly high, as the Roster treats handguns that are the same except for small details like color or coating as different handguns. (*See* Tr. at 224 [Special Agent Gonzalez].)

Agent Gonzalez].)  But handguns on the Roster before 2007 that lack a CLI or MDM are "grandfathered" and may still be sold.  *See* Cal. Penal Code §§ 31910(b)(4), (5) (defining as "unsafe handguns" only those without the required features "not already listed on the roster").  Accordingly, 800 "unsafe" handguns remain on the Roster without a CLI or MDM.  (*See* Tr. at 179.)

More problematic, as of 2013[3], new-to-market semiautomatic pistols must "include a feature called 'microstamping': each such pistol must imprint . . . microscopic arrays of characters that identify the make, model, and serial number of the pistol onto the cartridge or shell casing of each fired round."[4]  *Pena*, 898 F.3d at 974; *see* Cal. Penal Code § 31910(b)(6).  "Designed to help solve crimes, microstamping provides law enforcement with identifying information about a handgun fired at a crime scene."  *Pena*, 898 F.3d at 974.

The microstamping requirement has prevented any new handgun models from being added to the Roster since May 2013.  Although the California Department of Justice certified on May 17, 2013 that the technology used to create the imprint is available to more than one manufacturer unencumbered by any patent restrictions, the technology still was not available.  *See Nat'l Shooting Sports Found., Inc. v. State*, 420 P.3d 870, 872 (Cal. 2018) (noting the government's concession that the certification did not confirm "the availability of the technology itself").  Indeed, to this day, a decade after

---

[3] The California legislature amended the definition of unsafe handguns in 2007 to include all semiautomatic pistols not already on the Roster that lacked microstamping capability.  *Nat'l Shooting Sports Found., Inc. v. State*, 420 P.3d 870, 871 (2018).  That definition was to take effect in 2010, but only if the Department of Justice certified that the technology used to create the imprint was available to more than one manufacturer unencumbered by any patent restrictions.  *Id.* at 872.  Because the Department of Justice did not so certify until 2013, the microstamping requirement did not take effect until then.  *Id.*

[4] When the microstamping requirement was first implemented, the law required microstamping in two locations.  As of September 2020, only single-location microstamping is required.  (Mot. at 6; Opp. at 4; Tr. at 85 [Salam Fatohi].)

the requirement took effect, no firearm manufacturer in the world makes a firearm with this capability.  (*See* Tr. at 77 [Salam Fatohi testifying that no commercial manufacturer has ever produced a handgun with microstamping technology]; *id.* at 114 [Michael Beddow testifying that he was not aware of efforts by firearm manufacturers to implement microstamping]).)

As a result, *none* of the 832[5] Roster listings meets the current definition of a handgun that is not "unsafe."  (*See* Tr. at 180 [Special Agent Gonzalez testifying that no handgun with microstamping has been added to the Roster].)  *Not one* of the handguns currently being sold in California has a CLI, MDM, and microstamping ability.  (*See id.*)  *Every single* handgun on the Roster is a grandfathered handgun—one the California legislature now deems "unsafe."  (*See id.*)

The UHA's prohibition on sales of "unsafe" handguns is subject to exceptions as well.  It does not apply to sales to law enforcement personnel, personnel from agencies including the California Highway Patrol, the Department of Justice, the Youth and Adult Correctional Agency, and the district attorney's office, or any member of the military. *See* Cal. Penal Code §§ 31910(b), 32000(a)–(b).  It also does not prohibit *possessing* Off-Roster handguns lawfully acquired on the secondary market or lawfully transferred into California.  *See id.* § 32110.  The result is that "unsafe" Off-Roster handguns may be purchased by ordinary people on the secondary market from law enforcement officials and others, often at a high markup.  (*See* Tr. at 51 [Reno May testifying that "[b]ecause of the high demand (for Off-Roster handguns) and the very low supply, usually being supplied by law enforcement or people who move from out of state into this state with one of those firearms, it's hard to come by, and it is very expensive"].)

---

[5] This number is current as of March 20, 2023.  The Roster is available at https://oag.ca.gov/firearms/certified-handguns/search .

There are legitimate reasons a person might want a handgun California considers "unsafe."  One reason is that it is difficult to find a handgun well-suited for a left-handed shooter on the Roster.  (*See* Tr. at 36 [Lance Boland testifying that he advises clients to find ergonomic firearms for left-handed shooters Off-Roster].)  Numerous Off-Roster semiautomatic handgun models allow fully ambidextrous configuration of critical firearm controls—including the slide stop and release, magazine release, and any manual safety—allowing left-handed shooters to handle the handgun more easily, more quickly, and more safely.  (*Id.* at 35–36 [Lance Boland testifying that left-handed shooters sometimes have to "add[] steps of manipulation to the gun that, if we had an ambidextrous firearm or a left-handed firearm, we wouldn't have to do," which takes time in a situation where "seconds or micro-seconds of time can be the difference between being able to use your firearm successfully, defensively, and potentially losing your life"].)  According to Plaintiffs, only one semiautomatic handgun on the Roster is completely ambidextrous, and not only is it expensive, but its sub-compact size means it is harder to grip and has a sharp recoil impulse.  (Mot. at 9; *see* Tr. at 233 [Special Agent Gonzalez testifying that he was not familiar with "any models currently on the roster that have the ability to configure the magazine release, the safety and slide release ambidextrously"].)

## III.  DISCUSSION

A preliminary injunction is an extraordinary and drastic remedy that may only be awarded upon a clear showing that the moving party is entitled to relief.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  To obtain a preliminary injunction, Plaintiffs must establish (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that the public interest favors an injunction.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *AK Futures LLC v. Boyd Street Distro, LLC*, 35

F.4th 682, 688 (9th Cir. 2022). "When the government is a party, the last two factors merge." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). The Ninth Circuit balances these factors using a "sliding scale" approach, in which "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). However, Plaintiffs must "make a showing on all four prongs." *Id.* at 1135.

## A. Likelihood of Success on the Merits

Plaintiffs are likely to succeed on the merits of their claim that the UHA's CLI, MDM, and microstamping requirements violate the Second Amendment of the United States Constitution.

In the years after the Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Courts of Appeals "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *New York State Rifle & Pistol Association, Inc., v. Bruen*, 142 S. Ct. 2111, 2125 (2022). Courts analyzed whether there was a "reasonable fit between the government's stated objective and the regulation" considering "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." *Pena*, 898 F.3d at 979. The Supreme Court recently expressly rejected that approach. *Bruen*, 142 S. Ct. at 2126. Instead, the Supreme Court in *Bruen* held "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

There are two steps in the *Bruen* framework.  First, courts determine whether "the Second Amendment's plain text covers an individual's conduct."  *Id.*  Second, the government bears the burden to show that the regulation "is consistent with the Nation's historical tradition of firearm regulation."  *Id.*

*Bruen*'s first step asks "whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct."  *Bruen*, 142 S. Ct. at 2134; *Doe v. Bonta*, 2023 WL 187574, at *6 (S.D. Cal. Jan. 12, 2023) ("[T]he first step in assessing whether a regulation violates the Second Amendment is to determine whether the plain text of the Second Amendment covers the conduct regulated by the challenged law.").  The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  "The first step under *Bruen*, therefore, is to determine whether the law at issue 'infringe[s]' on 'the right of the people to keep and bear Arms.'"  *United States v. Kelly*, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022).

The challenged UHA provisions unquestionably infringe on the right to keep and bear arms.  Plaintiffs seek to purchase state-of-the-art handguns for self-defense.  (Mot. at 16 [explaining that Plaintiffs seek to have the "full scope of choices for the quintessential self-defense weapon that the marketplace has to offer"].)  The UHA prevents this.  To acquire the latest model of a semiautomatic handgun, Plaintiffs must buy one secondhand if they can find one, and at a high markup.  (*See* Tr. at 37 [Lance Boland testifying he purchased his Off-Roster firearms used and at "significant price markups"]; *id.* at 51 [Reno May testifying that it is "very difficult" to find Off-Roster handguns in California and "when you do find one, it is usually two, potentially three times the asking price of a brand new firearm in another state"].)

Put differently, under the UHA, Californians must rely for self-defense on handguns brought to market more than a decade ago.  Since 2007, when the CLI and MDM requirements were added to the UHA, only 32 new semiautomatic firearms have been added to the Roster of over 800 handguns.  (Tr. at 179 [Special Agent Gonzalez].)  Not a single new semiautomatic handgun has been added to the Roster since May 2013, when the microstamping requirement was implemented.  (*See id.*)  Requiring Californians to purchase only outdated handguns for self-defense without question infringes their right to keep and bear arms.

Nevertheless, the government contends that the plain text of the Second Amendment does not protect Plaintiffs' proposed course of conduct because Plaintiffs are still able to purchase *some* firearms and therefore keep and bear them.  (Dkt. 30 [Opposition, hereinafter "Opp."] at 13–14 ["[T]he CLI, MDM, or microstamping requirements do not prevent plaintiffs from either keeping handguns in the home or carrying them in public for self-defense."]; *see* Dkt 56 [Defendant's First Closing Brief, hereinafter "Govt. Cl. Br."] at 3 [framing the Step One inquiry as "whether the regulation at issue prevents any 'people' from 'keep[ing]' or 'bear[ing]' 'Arms' for lawful purposes"].)  But a law does not have to be a complete ban on possession to meet *Bruen*'s first step.  *Kelly*, 2022 WL 17336578, at *3 (rejecting the government's argument that step one was not met because "a bar on receiving a new firearm is not a total ban on weapons possession," and noting that the law found to be unconstitutional in *Bruen* was not a total ban on possession of firearms either).

Indeed, the Constitution protects much more than the bare right to keep and bear any outdated firearm for self-defense.  *Cf. Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed.").  The Second Amendment also protects attendant rights that make the underlying right to keep and bear arms

meaningful.  *See, e.g.*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (explaining that the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them, because "without bullets, the right to bear arms would be meaningless"); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (striking down Chicago ordinance that barred firing ranges within city limits, and stating that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective"); *Rigby v. Jennings*, 2022 WL 4448220, at *8 (D. Del. Sept. 23, 2022) (reasoning that "the right to keep and bear arms implies a corresponding right to manufacture arms" because "the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm").  Those attendant rights include the right to acquire state-of-the-art handguns for self-defense.[6]

Contrary to the government's assertion, the fact that Californians may purchase other firearms—including long guns or single-shot guns (which are not subject to the UHA), outdated On-Roster handguns, or Off-Roster handguns on the secondary market—does not mean that the Second Amendment does not cover their proposed conduct of purchasing state-of-the-art handguns on the primary market.  *Cf. Frein v. Pennsylvania State Police*, 47 F.4th 247, 250 (3d Cir. 2022) (rejecting government's argument that seizure of parents of murder convict's guns did not violate the Second Amendment because they could retain or acquire other firearms, explaining, "[w]e would never say the police may seize and keep printing presses so long as newspapers may replace them,

---

[6] Indeed, before *Bruen*, it was clear in the Ninth Circuit that acquiring arms was conduct covered by the Second Amendment because people cannot keep and bear arms without acquiring them.  *See, e.g.*, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (referring to the "right to acquire arms" that a "would-be operator of a gun store. . . ha[d] derivative standing to assert . . . on behalf of his potential customers").

or that they may seize and keep synagogues so long as worshippers may pray elsewhere").

The Constitution presumptively protects Plaintiffs' proposed conduct. The burden now shifts to the government. Since the UHA provisions implicate conduct protected by the Second Amendment, they are presumptively unconstitutional unless the government can meet its burden to "demonstrat[e] that [the relevant UHA provisions are] consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

To carry its burden, the government must provide "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 2131–32 (cleaned up); *see id.* at 2127–28 (reiterating *Heller*'s statement that "*the public understanding* of a legal text in the period after its enactment or ratification" was "a critical tool of constitutional interpretation"). The government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133. In other words, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* "The core question is whether the challenged law and proffered analogue are 'relevantly similar.'" *United States v. Rahimi*, 2023 WL 2317796, at *6 (5th Cir. Mar. 2, 2023) (citing *Bruen*, 142 S. Ct. at 2132).

The government proffers two historical analogues to the UHA's CLI and MDM requirements: "proving" laws and gunpowder storage laws. Neither is sufficiently analogous. To compare the government's proffered analogues to the challenged law, courts look to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and

whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* (cleaned up).

The first type of law the government cites as analogous to the CLI and MDM requirements are "proving" laws. (Govt. Cl. Br. at 13; Dkt. 56-3 [Declaration of Saul Cornell, hereinafter "Cornell Decl."] ¶¶ 32–33.)  These laws, which Massachusetts enacted for firearms in 1805 and Maine in 1821, required the appointment of inspectors "who would 'prove,' i.e. test and inspect, all musket barrels and pistol barrels" before the firearm could be sold. (Cornell Decl. ¶¶ 32–33.)  New Hampshire, Maryland, and Pennsylvania also enacted similar "proving" laws as early as 1775. (*Id.* Ex. 31 at 2.) Proving involved "testing the firearm to ensure it would not fail and that it could carry a shot over a certain distance." (*Id.* ¶ 32, Ex. 31 at 4.)  Inspectors stamped passing firearms with the inspector's initials and the year onto the barrel so that the stamp could not be erased or disfigured. (*Id.*)  Only firearms that passed inspection and were stamped could be sold, and the sale of firearms without a stamp was subject to a fine. (*Id.*)[7]

The "modern-day regulation[s]" of CLI and MDM requirements are not "analogous enough" to "historical precursors" of proving laws "to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.  CLIs and MDMs are "safety features designed to limit accidental discharges that occur when someone mistakenly believes no round is in the chamber." *Pena*, 898 F.3d at 974.  Their goal is to ensure that the user of the gun has appropriate expectations, understanding whether the gun is loaded or not.  They do this by requiring handgun models to have additional features beyond basic handgun features, specifically a CLI, which helps users see whether a bullet is in the chamber, and an MDM, which prevents users from firing the handgun if the magazine is not fully inserted.

---

[7] The government also points to similar "proving" laws that required the inspection of gunpowder in Massachusetts, Rhode Island, New Jersey, New Hampshire, and Pennsylvania. (Govt. Cl. Br. at 13; Cornell Decl. ¶ 48.)

The goal behind proving laws, on the other hand, was to ensure that a firearm was adequately manufactured. (*See* Cornell Decl. ¶ 31 [explaining that proving laws combatted "[t]he danger posed by defective arms, or poorly manufactured ones"].) They did this by making sure that the firearm's basic features were not defective. (*See id.*)

The differences between how and why these laws burden a law-abiding citizen's right to armed self-defense is evident. *See Bruen*, 142 S. Ct. at 2133. Whereas CLI and MDM requirements add additional required features to and alter the operation of an otherwise well-manufactured handgun, proving laws focused only on confirming the basic operating features of a firearm. Whereas CLI and MDM requirements aim to prevent harm to others resulting from the user not knowing the firearm is loaded, proving laws targeted the firearm itself and aimed to protect the safety of the person using the firearm. (Tr. at 153 [Clayton Cramer].) Whereas CLI and MDM requirements are effectuated by checking only a few examples of a particular handgun model, proving laws were effectuated by examining each firearm manufactured. Whereas proving laws supported the use of firearms for self-defense by ensuring the weapon worked properly and safely, the MDM requirement can actually work against the use of a handgun for self-defense because it will not fire without the magazine. Put simply, requiring each model of handgun to contain additional features to potentially help a user safely operate the handgun is completely different from ensuring that each firearm's basic features were adequately manufactured for safe operation.

Moreover, the CLI and MDM requirements do not impose a comparable burden as proving laws on the right of armed self-defense. *See Bruen*, 142 S. Ct. at 2133. Whereas proving laws kept out of the hands of law-abiding citizens only firearms with manufacturing defects, CLI and MDM requirements keep out of their hands virtually all new, state-of-the-art handguns. Indeed, since 2007, an exceptionally small number of handguns with CLIs and MDMs have been added to the Roster of over 800 handguns.

(Tr. at 179 [Special Agent Gonzalez].)  Despite California's law, manufacturers are simply not making handguns with these features.  (*See id.* at 17 [Stephen Helsley testifying that "they're just not needed from the manufacturer's standpoint"]; *id.* at 73 [Salam Fatohi testifying "because it's not something that is desired by the market, manufacturers will not spend the time and money and resources to implement those designs into their manufacturing process for their pistols"].)  This is a much greater burden on the right of armed self-defense than the proving laws presented.

The next category of laws that the government contends are analogues to CLI and MDM requirements are gunpowder storage laws.  (Govt. Cl. Br. at 14.)  Gunpowder is corrosive and "attract[s] moisture like a sponge."  (Cornell Decl. ¶ 27.)  And it has a "dangerous potential to detonate if exposed to fire or heat."  (*Id.* ¶ 43.)  For those reasons, numerous historical laws regulated gunpowder storage and the government's ability to conduct searches to ensure compliance with gunpowder storage laws.

For example, a 1783 Massachusetts law prohibited the storage of a weapon loaded with gunpowder in a home, and a 1792 New York City law and 1821 Maine law allowed government officials to search for gunpowder in any building.  (*Id.* ¶¶ 44, 52.)  An 1825 New Hampshire law penalized the sale of gunpowder "in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common."  (*Id.* ¶ 45.)  Numerous state laws from the 1800's delegated authority to local governments to regulate the sale of gunpowder for public safety.  (*Id.* ¶ 46.)  And other laws limited the amount of gunpowder people could store in their homes.  (Tr. at 152 [Clayton Cramer].)

But the goals of gunpowder storage laws and the means used to achieve those goals are very different from those of the UHA's CLI and MDM requirements.  The main goal of the gunpowder storage laws was to prevent fire.  (*See* Cornell Decl. ¶ 43 ["Every aspect of the manufacture, sale, and storage of gun powder was regulated due to the

substance's dangerous potential to detonate if exposed to fire or heat."].)   The primary way they achieved this goal was to regulate where and how gunpowder could be stored and sold, and to allow searches to ensure compliance with those storage laws.  (*Id.* ¶¶ 44, 45, 52.)  In contrast, the CLI and MDM requirements are meant to prevent inadvertent discharge or firing of the firearm.  *See Pena*, 898 F.3d at 974.  They achieve this goal by requiring particular safety features in handguns.  How and why these regulations burden a law-abiding citizen's right to armed self-defense are too different to pass constitutional muster.  *Cf. Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 2022 WL 3083715, at *10 (N.D. Cal. Aug. 3, 2022) (explaining that historical gunpowder regulations "were often specific to gunpowder and not easily translatable to firearm regulations").

Next, the government argues that since microstamping is "an extension of identification methods long used in imprinting serial numbers on guns," "historical analogues sufficient to support the federal law prohibiting the possession of a firearm with an obliterated serial number are sufficient to support the microstamping requirement."  (Govt. Cl. Br. at 15.)  It points to "commercial firearm regulations relating to the conditions of the firearms trade, the government's storage of guns, and the locations where individuals could sell guns."  (*Id.*)  The Court is not persuaded.

In analyzing possible analogues, one of the aspects of the laws the Court must consider is whether the historical "restrictions imposed a substantial burden on [the Second Amendment right] analogous to the burden created by" the current law.  *Bruen*, 142 S. Ct. at 2145.  Historical laws regarding serial numbers, and the historical analogues justifying serial numbers, do not impose anywhere close to the substantial burden on people's Second Amendment right that the UHA's microstamping provision does.  The microstamping provision requires handguns to have a particular feature that is simply not commercially available or even feasible to implement on a mass scale.

Michael Beddow, a forensic firearms examiner for the Phoenix Police Department, testified about a study he performed regarding the feasibility of microstamping while he was a graduate student at the University of California at Davis in 2005.  (Tr. at 92–93, 95–96.)  Beddow published the study as his master's thesis through the University of California, and it was also published as a paper written to the California Policy Research Center and in the Association of Firearm and Toolmark Examiners Journal.  (*Id.* at 93, 97.)  At all three levels, it was peer reviewed.  (*Id.* at 97.)

Beddow's study concluded that microstamping technology "was not suitable for mass implementation."  (*Id.*)  It "could not be directly implemented into every make and model of new firearms or semi-automatic handguns without additional research to determine if it would work in those firearms."  (*Id.* at 98.)  In other words, "because of the vast differences that exist between the mechanical design of the firearms and the differences in metallurgy of the different brands of ammunition to include finishing processes such as primer, lacquer, things of that nature in combination together," it would be very difficult to develop any technology that could work on multiple models of handguns.  (*Id.* at 98–99.)  According to Beddow's communications with manufacturers, the technology would have to be adapted for every make and model of handgun and design of a firing pin.  (*Id.* at 104–05; *see id.* at 127 [agreeing that microstamping "is not practically, as we sit here today, a technology that is capable of being taken by a manufacturer and implemented into their handguns right now, without further development for their specific handgun"].)

More telling and in contrast to the requirement of a serial number, which has been universally and easily implemented by manufactures across the globe, not a single manufacturer has implemented microstamping technology, and indeed it is not feasible to implement such technology broadly.  Because of this, not a single new model of semiautomatic handgun has been added to the Roster since the microstamping

requirement was implemented in May 2013.  Californians have not had access to new semiautomatic models of handguns since that date.  (*See* Tr. at 180 [Special Agent Gonzalez].)  The rest of the country, on the other hand, has access to handguns that over the years have become more ergonomic, durable, reliable, affordable, and possibly even safer.  (*See* Dkt. 59 [Plaintiffs' Rebuttal Brief] at 10.)  This is a substantial burden on Californians' Second Amendment right to keep and bear arms.  *See Bruen*, 142 S. Ct. at 2145 (rejecting historical analogues because "[n]one of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime").

Because Plaintiffs' proposed course of conduct is covered by the plain text of the Second Amendment, and the government has failed to proffer any historical regulation analogous to the UHA's CLI, MDM, or microstamping requirements, Plaintiffs have shown that they are likely to succeed on the merits of their claim that those requirements are unconstitutional.

## B.    Irreparable Harm

To obtain a preliminary injunction, a plaintiff must show that irreparable harm is likely in the absence of preliminary relief.  *Winter*, 555 U.S. at 20.  "The right to keep and bear arms has long been recognized as a fundamental civil right."  *Rahimi*, 2023 WL 2317796, at *12 (Ho, J., concurring) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49–50 n.10 (1961)).  It "is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up); *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (explaining that a party seeking preliminary injunctive relief for violation of a constitutional right can establish irreparable injury sufficient to merit the grant of relief by demonstrating the

existence of a colorable constitutional claim); *see Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("[I]njuries to constitutional rights are considered irreparable for even minimal periods of time.") (cleaned up); *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("An alleged constitutional infringement will often alone constitute irreparable harm."); Wright and Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2019) ("When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary."). Because Plaintiffs have shown it is likely that the UHA's CLI, MDM, and microstamping requirements violate their Second Amendment rights, they have demonstrated that irreparable harm is likely without a preliminary injunction enjoining the enforcement of those requirements.

## C.     Balance of Equities and Public Interest

Before issuing a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017); *CTIA - The Wireless Association v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019). Because the government is a party, the Court considers the balance of the equities and the public interest together. *Azar*, 911 F.3d at 581.

The balance of the equities and the public interest weigh in favor of granting an injunction. Without a preliminary injunction enjoining enforcement of the UHA's CLI, MDM, and microstamping provisions, Plaintiffs will continue to suffer harm because the government will continue infringing their Second Amendment rights. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Cal. Chamber of Commerce v. Council for Education and Research on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (cleaned up). Indeed, "public interest concerns are implicated when a

constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005); *see Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (explaining that it is in the public interest to halt the "ongoing enforcement of the potentially unconstitutional regulations" because those regulations would infringe not only on the constitutional rights of the plaintiffs but also of the rest of the public subject to the same regulation).  Moreover, the government "cannot suffer harm from an injunction that merely ends an unlawful practice" such as denying Californians' Second Amendment rights. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).  The balance of the equities therefore tips in Plaintiffs' favor.

The government argues that the balance of the equities weighs in its favor because an injunction would "permit[] unsafe handguns to be sold in California prior to trial, creating public safety risks."  (Opp. at 18.)  But the government's safety concern rings hollow.  Every single semiautomatic handgun available for sale in California at this time is a grandfathered handgun—one the government ostensibly considers "unsafe."  800 of 832 handguns on the Roster today lack CLI and MDM features.  (*See* Tr. at 179 [Special Agent Gonzalez].)  The government cannot credibly argue that handguns without CLI, MDM, and microstamping features pose unacceptable public safety risks when virtually all of the handguns available on the Roster and sold in California today lack those features.

Similarly, if Off-Roster firearms were truly unsafe, California would not allow law enforcement to use them in the line of duty, when the stakes are highest.  But the substantial majority of California's law enforcement officers use Off-Roster handguns in the line of duty.  (Dkt. 57-2 [Declaration of Brian R. Marvel, President of Peace Officers Research Association of California, hereinafter "Marvel Decl."] ¶ 5 ["Most agencies issue officers the latest models of either Glock or Sig Sauer handguns, which lack

magazine safety disconnects, chamber load indicators, and of course microstamping."]; *see id.* ¶ 7 ["For example, many officers are issued 4th or 5th-generation Glock pistols, which are off-roster and lack magazine safety disconnects, chamber load indicators, and of course microstamping."].)  Indeed, the government's own witness, Special Agent Salvador Gonzalez, testified that he uses an Off-Roster duty handgun without a CLI, MDM, or microstamping capability.  (Tr. at 243–44.)  If CLIs and MDMs truly increased the overall safety of a firearm, law enforcement surely would use them.  (Marvel Decl. ¶ 5.)  But they do not.  Instead, they choose to use "newer, improved and safer generations of handguns" that are Off-Roster.  (*Id.* ¶ 7.)

In support of its position, the government points to studies that indicate CLIs and MDMs could have prevented accidental shooting injuries and deaths.  (*See, e.g.*, Tr. at 200–05 [discussing Exhibits 12 and 13]; *see also* Govt. Cl. Br. at 19.)  But the idea that *if* firearms used for unintentional violence *in the past* had CLIs and MDMs, such unintentional violence could have been prevented, is unhelpful to the government here.  Indeed, only 32 out of 832 firearms currently authorized for purchase in California have those features.  (*See* Tr. at 179 [Special Agent Gonzalez].)  The likelihood that a person will purchase a handgun with a CLI and MDM and that those features will prevent accidental shootings, injuries, or deaths is entirely speculative.[8]

//

//

---

[8] Similarly, Plaintiffs present a study concluding that between 2005 and 2015, "[s]elf-inflicted [firearm] injuries and unintentional injuries remained relatively stable."  (Dkt. 57-1 [Declaration of Alexandra A. Frank], Ex. 1 [Spitzer, *et al.*, *Incidence, Distribution, and Lethality of Firearm Injuries in California from 2005 to 2015*, JAMA Network Open 1 (2020)].)  This tends to indicate that CLIs and MDMs have not made a meaningful impact on injuries from accidental discharges.  Admittedly, the study states that "self-inflicted injuries decreased by 13.4% and unintentional injuries decreased by 12.7%."  (*Id.*)  But there is absolutely no indication that CLI or MDM requirements, instituted in 2007, caused these decreases, when handguns with CLIs and MDMs remain exceedingly rare.

## IV.   CONCLUSION

The Second Amendment enshrines a fundamental constitutional right for law-abiding citizens to keep and bear arms for self-defense.  Increasingly in modern times, with "the ubiquity of guns and our country's high level of gun violence," ordinary law-abiding people feel a need to possess handguns to protect themselves against violence. *Bruen*, 142 S. Ct. at 2158 (Alito, J., concurring).  This may be because they "live in high-crime neighborhoods," or because they "must traverse dark and dangerous streets in order to reach their homes after work or other evening activities," or because they "reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury." *Id.*

Californians have the constitutional right to acquire and use state-of-the-art handguns to protect themselves.  They should not be forced to settle for decade-old models of handguns to ensure that they remain safe inside or outside the home.  But unfortunately, the UHA's CLI, MDM, and microstamping requirements do exactly that. Because enforcing those requirements implicates the plain text of the Second Amendment, and the government fails to point to any well-established historical analogues that are consistent with them, those requirements are unconstitutional and their enforcement must be preliminarily enjoined.  Accordingly, Plaintiffs' motion for a preliminary injunction is **GRANTED**.

DATED:     March 20, 2023

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *B & L Productions, Inc., et al. v. Newsom, et al.*
Case No.: 8:22-cv-01518 JWH (JDEx)

IT IS HEREBY CERTIFIED THAT:

      I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

      I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Nicole J. Kau, Deputy Attorney General
nicole.kau@doj.ca.gov
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
    *Attorney for Defendants*

      I declare under penalty of perjury that the foregoing is true and correct.

Executed April 4, 2023.

_____
Laura Palmerin