**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE JOHN W. HOLCOMB, U.S. DISTRICT JUDGE**

B&L PRODUCTIONS, INC., et al.,          )
                                        )
                        Plaintiffs,     )     **Certified Transcript**
                                        )
            vs.                         )     Case No.
                                        )     8:22-cv-01518-JWH-JDE
GAVIN NEWSOM, in his official           )
Capacity as Governor of the State       )
of California, et al.,                  )
                                        )
                        Defendants.     )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

THURSDAY, APRIL 6, 2023

10:05 A.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

```
1                          APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFFS:

4             MICHEL & ASSOCIATES PC
              BY:  ANNA M. BARVIR, ATTORNEY AT LAW
5             180 East Ocean Boulevard
              Suite 200
6             Long Beach, California 90802
              562-216-4444
7             abarvir@michellawyers.com

8             LAW OFFICES OF DONALD KILMER
              BY:  DONALD E.J. KILMER, JR., ESQ.
9             14085 Silver Ridge Road
              Caldwell, Idaho 83607
10            408-264-8489
              don@dklawoffice.com
11
     FOR DEFENDANTS:
12
              CALIFORNIA DEPARTMENT OF JUSTICE
13            BY:  NICOLE JULIET KAU
              CAAG - Office of the Attorney General
14            300 South Spring Street
              Los Angeles, California 90013
15            213-897-2442
              nicole.kau@doj.ca.gov
16
              DEPATMENT OF JUSTICE
17            BY:  CHARLES J. SAROSY
              Office of the Attorney General
18            300 South Spring Street
              Suite 1702
19            Los Angeles, California 90013
              213-269-6356
20            Charles.Sarosy@doj.ca.gov

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

**SANTA ANA, CALIFORNIA; THURSDAY, APRIL 6, 2023**

**10:05 A.M.**

**- - -**

10:05AM   THE COURTROOM DEPUTY:  Calling Item Number 1, Case Number SACV-22-01518-JWH, B&L Productions, Inc., et al., vs. Gavin Newsom, et al.

Counsel, please state your appearances for the record, beginning with the plaintiff.

10:05AM   MS. BARVIR:  Thank you.  Anna Barvir, B-a-r-v-i-r, for Plaintiffs B&L Productions, et al.

THE COURT:  All right.  Ms. Barvir, good morning.

MR. KILMER:  Good morning, Your Honor.  Donald Kilmer.  I'll be assisting with Ms. Barvir if she needs it.  I 10:05AM don't think she will.

THE COURT:  All right.  Good morning, Mr. Kilmer.

MS. KAU:  Deputy Attorney General -- Deputy Attorney General Nicole Kau on behalf of the State defendants.

THE COURT:  All right.  Ms. Kau, good morning.

10:05AM   MR. SAROSY:  Good morning.  Deputy Attorney General Charlie Sarosy, also on behalf of State defendants.  I'm a colleague of Ms. Kau; so I'm not speaking today.

THE COURT:  Okay.  And good morning, Mr. Sarosy.

We are here on defendant's motion for a preliminary 10:06AM injunction pertaining to a couple of California statutes.

         1              Counsel, thank you very much for the extensive

         2    briefing.  I reread my orders asking for supplemental briefing

         3    yesterday.  They were perhaps harsher than I intended them to

         4    be.  So I hope you haven't taken too much offense.  But I

10:06AM  5    deeply appreciate the additional briefing and explanations that

         6    you have given to me.

         7              What I would like to do is -- I'll tell you, I have

         8    a hard stop at noon.  I'm hoping that this hearing won't go

         9    that far.  But if it does, it does.  And if we need to come

10:06AM 10    back after lunch, please be prepared to do that.  But I hope to

        11    get through all of my questions and hear what you want to tell

        12    me before then.

        13              So in terms of how we're going to conduct the

        14    hearing, what I'd like to do is I have a number of questions

10:07AM 15    I'm going to pose to each of you.  Just the way I've structured

        16    and the way I'm thinking about it, I think I'll start with the

        17    defendant -- defendants.  But I'll ask you both questions.

        18    Please focus on the question and don't feel you need to get

        19    your whole argument in in response to my sort of rifle-shot

10:07AM 20    question.  I didn't mean to make a pun there, but my narrow

        21    question.

        22              And then the point is I'm going to give you each a

        23    chance, after all my questions are done, to tell me whatever

        24    else you want to tell me.  Maybe my questions will have covered

10:07AM 25    what you want to -- what you want to accomplish in this

```
         1   hearing, and maybe they don't.  And if they don't, you'll have
         2   a chance to tell me.
         3          Okay.  Let me start with defendants, as I said.  So
         4   let me start with the commercial speech question.  As I
10:08AM  5   understand it, defendants contend that these two statutes are
         6   not pertaining to they do not prevent anyone from engaging in
         7   commercial speech; correct?
         8          MS. KAU:  Right.
         9          THE COURT:  Okay.  Now, the statutes themselves
10:08AM 10   specifically prohibit certain individuals -- state officer, an
        11   employee, operator, lessee or licensee of any state
        12   property from -- and here's the critical part -- contract --
        13   well, showing contract for, authorize, or allow the sale of any
        14   firearm, et cetera.  I want to focus on the verbs: contract
10:09AM 15   for, authorize, or allow.
        16          Now, as I understand defendant's argument pertaining
        17   to commercial speech, defendants say transactions themselves,
        18   the mere exchange of money for a firearm, that's not speech,
        19   commercial, or otherwise.  It's simply a transaction.  And
10:09AM 20   defendants rely on Nordyke -- I'll call it Nordyke 1997 for
        21   that proposition; correct?
        22          MS. KAU:  Right, Your Honor.
        23          THE COURT:  And -- but where I'm going -- let me
        24   play devil's advocate.  How can defendants maintain that
10:10AM 25   position when the statutes themselves prevent contracting for,
```

**UNITED STATES DISTRICT COURT**

authorizing, or allowing the sale of firearms?  Doesn't

contracting for, authorizing, or allowing, perhaps each verb in

itself, doesn't each pertain to -- necessarily pertain to

speech?

10:10AM         MS. KAU:  So vendors are allowed to advertise, but a

consummation of a sale is not allowed.

        THE COURT:  By the statutes?

        MS. KAU:  Yes.  Effectively.

        THE COURT:  So the papers get into this a little

10:10AM  bit, and I think plaintiffs dispute this.  I think plaintiffs

say that -- I'm paraphrasing, but my understanding of

plaintiff's argument was plaintiffs contacted the 32nd District

officials and tried to set up a gun show that did not involve

actual transactions.  And they were put off and put off and put

10:11AM  off.  So effectively, what you say is not true, that even

advertising is not permitted.  But you dispute that?

        MS. KAU:  We do.  We have spoken to our client, and

it has been made clear between the parties that they are able

to conduct a gun show as long as the laws are complied with.

10:11AM         THE COURT:  When you say "law is complied with," no

transactions?

        MS. KAU:  Right.

        THE COURT:  You can -- gun culture discussions,

communications are fine, it's just no transactions?

10:11AM         MS. KAU:  That's right.

THE COURT:  How does that square with *Nordyke* 1997?
Doesn't *Nordyke* 1997 explicitly say that -- and again, I'm
going to paraphrase -- that communications around transactions
are necessarily commercial speech?

10:12AM  MS. KAU:  So in that case, there was a lease
prohibiting actual sales, and the lease specifically prohibited
offering for sale.  And that it also noted that as a threshold
question, that the transactions there is not prohibited outside
of that lease.  So in contrast here, the laws don't prohibit
10:12AM  offering for sale, like an advertisement, and the laws do
preclude the transaction.

THE COURT:  I should have highlighted it in my copy
of *Nordyke* 1997.

What page are you on when you referred to what it --
10:13AM  what that case holds?

MS. KAU:  I'm just looking at my notes.  Sorry.

THE COURT:  Oh, okay.  But the terms of that lease
didn't just prohibit sales, but also offering for sale.  Okay.
I think I understand your argument.

10:14AM  One more question on this.  Defendants' position
that the statutes at issue, if I may characterize it this way,
only pertain to -- only prohibit transactions and, therefore,
do not touch upon the speech.  How do you account for the fact
that transactions -- transactions could never be completed at
10:14AM  gun shows because of the ten-day waiting period and the

      1    requirement that one also -- a buyer always has to retrieve the

      2    firearm, pick it up from a brick-and-mortar store?

      3               So the transaction is never going to be completed at

      4    a gun show.  California is unlike, as I understand it, some

10:15AM  5    other states that have so-called gun show loopholes.  That is

      6    not the case here.  So transactions never occur at gun shows.

      7               So how do you account for that in taking the

      8    position that all that is prohibited by these statutes is

      9    transactions?

10:15AM 10               MS. KAU:  I'm not sure I understand your question,

     11    Your Honor.

     12               THE COURT:  Well, defendants take the position that

     13    there's no speech prohibited by these statutes, and that is

     14    because what is prohibited is not speech, but transactions;

10:15AM 15    right?

     16               MS. KAU:  Right.

     17               THE COURT:  Do I understand defendants' position so

     18    far?

     19               MS. KAU:  Right.

10:15AM 20               THE COURT:  How can that be the case?  How could you

     21    possibly be right in saying it is merely transactions that are

     22    prohibited here?  Given the fact that in California,

     23    transactions could never be completed at a gun show because

     24    California requires a ten-day waiting period, among other

10:16AM 25    things, a ten-day waiting period and the actual retrieval of

1    the firearm at a brick-and-mortar store?

2         MS. KAU:  Well, it is well within the legislature's

3    discretion to address a problem that's -- for some reason at

4    gun shows there is a high risk of gun trafficking, even from

10:16AM 5    the recent apps report from the Department of Justice.

6         THE COURT:  So you're talking about a policy

7    argument.  And I have no doubt that the legislature was very

8    sincere in what it was attempting to accomplish.  I don't know

9    that that is at issue here in terms of the sincerity or perhaps

10:16AM 10   even -- what's the word I'm looking for? -- significance of the

11   problem, no doubt.  I mean, let's -- for the purposes of this

12   argument, I think that's conceded and agreed upon.

13        But the question is -- the question is more -- is

14   less about policy.  It's more about the law and Supreme Court

10:17AM 15   jurisprudence on commercial speech.  How could it be the case

16   that these -- how could you take the position that these

17   statutes merely prohibit transactions when the transaction is

18   never going to be done at a gun show?  It could only be

19   ultimately completed, you know, later after a ten-day waiting

10:17AM 20   period and at a brick-and-mortar store.

21        MS. KAU:  Well, if I'm understanding the question

22   correctly, the legislature can prohibit the initial offer and

23   acceptance, that consummation, that contract, if you will, on

24   state property.  So even if there are subsequent actions that

10:18AM 25   have to be taking place to follow through, the legislature can

```
 1    prohibit that offer and acceptance on its state property.
 2           THE COURT:  So you're saying there are multiple
 3    elements to a transaction.  Offer and acceptance are a couple
 4    of them.  And those two, for example, are prohibited at the gun
 5    show by these statutes?
 6           MS. KAU:  That's right.
 7           THE COURT:  Okay.  I think we touched upon this, but
 8    what's presently in the record in terms of defendants'
 9    willingness to contract with plaintiffs to -- so that gun shows
10    could be conducted where there are no transactions?
11           MS. KAU:  We've submitted a declaration from the
12    district saying that it will allow and facilitate and
13    accommodate their events as long as all laws are complied with.
14           THE COURT:  So -- and let's see.  Whose declaration
15    was that?
16           MS. KAU:  It is Document 2020-1, declaration of
17    Jennifer Olvera.  22- -- sorry -- 22-1.
18           THE COURT:  So this is paragraph -- well, it's
19    really paragraph 10 of that declaration; correct?  Ms. Olvera
20    is saying if contacted -- paraphrasing -- the district will
21    allow plaintiffs to conduct a gun show that does not involve
22    transactions?
23           MS. KAU:  Yes, Your Honor.
24           THE COURT:  Okay.  But that hasn't happened yet?
25           MS. KAU:  From what I understand, there has not been
```

```
 1   a request to reserve the facilities and not allow the
 2   transactions.
 3              THE COURT:  Okay.  Let's go to Central Hudson test
 4   for commercial speech.  Let's assume, for the sake of these
 5   questions, that these statutes prohibit commercial speech.
 6   Well, let's say we're analyzing commercial speech.  The first
 7   step of the Central Hudson test is does the regulation concern
 8   a lawful activity and speech that's not misleading.  Again, I'm
 9   paraphrasing.  But that's basically the first step, is it not?
10              MS. KAU:  Yes.
11              THE COURT:  Okay.  Now, the defendants say, "Well,
12   this speech does not concern a lawful activity because the
13   activity has been prohibited by these statutes."
14              Is that defendants' position?
15              MS. KAU:  It is precluded by the statutes.
16              THE COURT:  But isn't that circular?  This activity
17   is prohibited because we said this activity is prohibited.
18   Aren't we analyzing whether or not it's a lawful activity?
19              MS. KAU:  So in the Santa Clara case, it wasn't a
20   law precluding it.  It was just a lease term.  And here we have
21   state laws that do preclude the transaction.
22              THE COURT:  Are you talking about *Nordyke* 2003?
23              MS. KAU:  Yes.
24              THE COURT:  What was the ultimate resolution of that
25   case?
```

10:21AM 5
10:22AM 10
10:22AM 15
10:22AM 20
10:23AM 25

1          MS. KAU:  That case held that because this was just

2     a county lease, the transaction is lawful.

3          THE COURT:  The regulation -- the lease --

4          MS. KAU:  So the county lease regarding the use of

10:23AM 5     the property prohibited sales of firearms and offering for

6     sales of firearms on its county property.  And so that case

7     noted that this is a lease.  This isn't a law that is

8     disallowing the transactions.  And so here it is not just a

9     lease, not just a contract, it is laws that are precluding this

10:24AM 10    activity.

11         THE COURT:  What laws preclude the activity?  The

12    ones that are at issue in the case; right?

13         MS. KAU:  Right.

14         THE COURT:  Okay.  Are you saying that the law's

10:24AM 15    existence, that is, the existence of SB 264 and 915, the law's

16    existence is the source of its own constitutional validity?

17         MS. KAU:  So commercial speech, there is protection

18    there, assuming that the underlying activity is lawful.  And

19    here, it is significant that the laws have made that underlying

10:25AM 20    activity not allowed.  So it is significant to that threshold

21    question.

22         THE COURT:  It's these two statutes themselves --

23         MS. KAU:  Right.

24         THE COURT:  -- that render the activity unlawful

10:25AM 25    and, therefore, the activity fails the Central Hudson test for

         1    commercial speech.  Is that defendants' position?

         2            MS. KAU:  So to be clear, the laws don't necessarily

         3    punish a vendor.  It doesn't seem to read like that, but it

         4    does make it not allowed.  It does preclude the transaction,

10:25AM  5    which is different from just saying the Orange County

         6    Fairgrounds has made its own policy, or the Orange County

         7    Fairgrounds went into a contract because that is -- it has a

         8    different effect than the law that is precluding certain

         9    activity.  So that is very relevant to that threshold question.

10:26AM 10            THE COURT:  Okay.  Now, I'm trying to understand the

        11    relationship between a Central Hudson commercial speech

        12    analysis and a limited public forum analysis.  From defendants'

        13    perspective -- well, I think plaintiffs argue that the

        14    fairgrounds is not a -- not merely a limited public forum, it's

10:27AM 15    perhaps much broader than that.  It's a public forum.

        16    Defendants dispute that and -- but did defendants concede that

        17    the fairgrounds is at least a limited public forum?

        18            MS. KAU:  Yes.

        19            THE COURT:  Okay.  So how -- trying to understand

10:27AM 20    how to do the constitutional -- the First Amendment analysis

        21    under Central Hudson test for commercial speech.

        22            Now, again, I think plaintiffs contend that this is

        23    not merely commercial speech.  But put that aside, if we're

        24    thinking about commercial speech here, what is the relationship

10:28AM 25    between the Central Hudson test and the limited public forum

analysis?  That is, which do I do first?  Which should the
Court do first?  What if the regulation at issue, these
statutes, fail one but not the other?  Help me with the
relationship.

10:28AM 5          MS. KAU:  (No audible response.)

6          THE COURT:  You want to come back to that one?  You
want your colleague to answer it?

8          MS. KAU:  So we would suggest that the Court analyze
under commercial speech first.

10:29AM 10         THE COURT:  Okay.

11         MS. KAU:  And under that analysis, it is highly
significant that it is laws themselves that are precluding an
activity rather than just an internal policy or a contract
between parties.  And that makes it distinguishable from the
10:29AM 15 2003 case.

16              The Government has a substantial interest, as the
Court mentioned, in reducing firearms trafficking and to
increase public safety.  And under this intermediate scrutiny
test under the Central Hudson, the regulation directly advances
10:30AM 20 that interest in targeting transactions on its property and is
not more extensive than necessary.

22         THE COURT:  Well, let's say we're at that point of
the analysis.  And let's say -- let's say plaintiffs clear the
hurdle of it being -- this speech being -- pertaining to a
10:30AM 25 lawful activity and it's not misleading.  You establish that

**UNITED STATES DISTRICT COURT**

the regulations advances substantial government interest.  So

now we're at the last step of the Central Hudson test.  You're

saying that these regulations are not broader than necessary to

serve that public -- that governmental interest; correct?

10:30AM  MS. KAU:  That's right.

THE COURT:  So the governmental interest is to

prohibit, among other things, the illicit -- the improper

gun-related transactions that occur at gun shows; is that

correct?

10:31AM  THE WITNESS:  That's correct.

THE COURT:  So tell me why these regulations are not

much broader than necessary to address that.  Because these

regulations prohibit negotiations for transactions that, were

they conducted in a brick-and-mortar store, would be perfectly

10:31AM  acceptable, perfectly legal.

MS. KAU:  That's right.  And so the legislature is

trying to address illegal transactions at gun shows.  And,

also, there is a significant amount of guns used at crimes

that, at one point, are traceable to gun shows.  And so in

10:32AM  targeting that only, it created a law that addresses gun

transactions on state property which would affect gun shows.

It does not affect a brick-and-mortar store transactions.  And

so it is targeted.

THE COURT:  Are you saying that statistics have

10:32AM  shown that there are firearms used in crimes, and the sources

```
 1   of those firearms were from transactions that were initiated at
 2   gun shows, and that's a higher proportion than transactions
 3   that were initiated at brick-and-mortar stores?
 4           MS. KAU:  No, we're not saying that it's a higher
 5   proportion necessarily, but it is a significant amount that are
 6   traceable to gun shows.  And it might not necessarily be that a
 7   criminal has gone to a gun show to get it, but for some reason,
 8   at gun shows studies have shown that that's the point where the
 9   guns become less regulated and move off the regulated sphere.
10           And so studies have shown that if you look through
11   the line of transactions, many guns used at crimes are
12   traceable to, at one point, having been transferred at a gun
13   show.
14           THE COURT:  Legally transferred at a gun show, but
15   then subsequently illegally transferred?
16           MS. KAU:  Both.
17           THE COURT:  Okay.  And what -- help me.  Where in
18   the record are you referring to?  Where is that analysis or
19   study?
20           MS. KAU:  So the legislative histories cite to many
21   gun studies.  And you can look at one of the attachments to the
22   motion for preliminary injunction.
23           THE COURT:  One of plaintiffs' papers?
24           MS. KAU:  Yes.
25           THE COURT:  What page, please?
```

10:32AM   5
10:33AM  10
10:33AM  15
10:33AM  20
10:34AM  25

**UNITED STATES DISTRICT COURT**

|   |   |
|---|---|
| 1 | MS. KAU:  It is -- so looking at the motion, it is |
| 2 | the Declaration of Anna M. Barvir, Exhibit 10. |
| 3 | THE COURT:  Okay. |
| 4 | MS. KAU:  And in addition -- |
| 10:34AM 5 | THE COURT:  So hold on.  20- -- it's 21-3? |
| 6 | MS. KAU:  21-2. |
| 7 | THE COURT:  Okay.  What page? |
| 8 | MS. KAU:  50. |
| 9 | THE COURT:  Five-zero.  Okay.  That is Exhibit 8? |
| 10:35AM 10 | MS. KAU:  Exhibit 10. |
| 11 | THE COURT:  You're looking at the page numbers at |
| 12 | the bottom right; I was looking at the ECF page numbers. |
| 13 | MS. KAU:  Oh, sorry. |
| 14 | THE COURT:  I'm there.  Exhibit 10.  Ms. Barvir's |
| 10:35AM 15 | declaration in support of the motion, Exhibit 10, ECF 21-2, and |
| 16 | it's page -- starting on page 58 of 177 -- or 59, I guess, at |
| 17 | 177 is the substantive exhibit. |
| 18 | So this is the senate committee -- California senate |
| 19 | committee on public safety.  This is a report from that |
| 10:36AM 20 | committee; is that correct? |
| 21 | MS. KAU:  Right. |
| 22 | THE COURT:  And where is the -- where are the |
| 23 | statistics that you were talking about that show that |
| 24 | transactions of firearms at gun shows, as I understood your |
| 10:36AM 25 | argument, are involved in a great number of crimes? |

1            MS. KAU:  It starts at -- so I'm looking at the

2     pages at the top now, 61.

3            THE COURT:  Uh-huh.

4            MS. KAU:  And at the second half.

10:36AM 5            THE COURT:  Yes.

6            MS. KAU:  So that first full paragraph below the

7     "Need For This Bill."  And it continues on to the next page.

8            THE COURT:  So sort of in the middle of that

9     paragraph I'm reading:

10:37AM 10           "According to the Giffords Law Center to

11           prevent gun violence, gun shows often create the

12           opportunity to circumvent gun safety laws and are a

13           common venue for straw purchases and illegal gun

14           transfers."

10:37AM 15           Is that what you're referring to?

16            MS. KAU:  Yes.

17            THE COURT:  Okay.

18            MS. KAU:  I also want to note that in addition to

19     studies cited by the legislative history here, there are -- the

10:37AM 20    Department of Justice apps report have found illegal

21     transactions occurring at gun shows as well.  So...

22            THE COURT:  So is it your argument that --

23            MS. KAU:  I'm sorry, the next page, second paragraph

24     also discusses how:

10:38AM 25           "Gun shows rank second to corrupt dealers as

a source for illegally trafficked firearms.  Though
violent criminals do not buy most of their guns
directly from gun shows, gun shows are the critical
moment in the chain of custody for many guns, the
10:38AM  point at which they move from the somewhat
regulated legal market to the shadowy,
no-questions-asked illegal market."

THE COURT:  Okay.  So you're citing articles and
studies that show that there are illegal transactions that
10:38AM  occur at gun shows or through gun shows or as a result of gun
shows; is that correct?

MS. KAU:  Yes, Your Honor.

THE COURT:  But those transactions are already
prohibited by other law.  I mean, there's a whole body of law
10:39AM  that regulates how firearms transactions can take place in
California, put aside gun shows; correct?

MS. KAU:  Correct.  And the legislature is well
within its discretion to further address the concern.

THE COURT:  The statutes at issue here would make
10:39AM  it -- it would be a violation of these statutes for individuals
to engage in what would otherwise be legal transactions for
firearms; correct?

MS. KAU:  Well, the law is now -- preclude those
transactions on state property.

10:40AM  THE COURT:  These two statutes?

1          MS. KAU:  Correct.

2          THE COURT:  Right.  But for the statutes, the

3    transactions that are now prohibited by these statutes, they

4    would otherwise be permissible under California law; correct?

10:40AM 5          MS. KAU:  Right.  They have been permissible.  But

6    the legislature now wants to address -- further address this

7    problem.

8          THE COURT:  And you're saying these statutes

9    prohibit transactions but do not prohibit gun shows generally

10:40AM 10   if the gun shows do not involve transactions; correct?

11         MS. KAU:  Correct.

12         THE COURT:  So given that that's the case, how do

13   the -- how is it that these statutes are not broader than

14   necessary to address the problem?  I mean, as I'm reading what

10:41AM 15   you've cited here from Ms. Barvir's declaration, it's the gun

16   shows themselves that supposedly lead to illegal transactions

17   and, I'm assuming, increased crime, and the things that the

18   legislature is legitimately trying to prevent; correct?

19         MS. KAU:  So the laws strike that balance of

10:41AM 20   allowing the public to still gather and engage in free speech

21   rights while limiting the transactions on state property in

22   those kinds of events, and it allows the public to meet vendors

23   and purchase firearms at their local store.

24         THE COURT:  Well, do these statutes permit that?  So

10:41AM 25   let's say there was a gun show that you say is permissible

under these statutes where nobody is engaging in transactions.
I understood you just now to say that an individual could go to
that gun show, there could be a vendor there, and they could
talk all about a firearm, which one the individual may want to
10:42AM 5  purchase, why one would be better than another for the
individual's needs, desires, talk about a price.  The only
thing that cannot happen is enter into the contract to buy.
The two of them, the individual and the vendor, would then have
to go over to the brick-and-mortar store and finish that deal;
10:42AM 10  is that correct?

           MS. KAU:  That's right.

           THE COURT:  And all that is permitted under these
statutes?

           MS. KAU:  Yes.

10:42AM 15             THE COURT:  Well, how can that be the case given
that the statutes expressly prohibit an operator licensee --
lessee or licensee of the state property, that is, I assume,
the vendor, from contracting for, authorizing, or allowing the
sale of any firearm?  Isn't what I just -- hypothetically just
10:43AM 20  gave you, aren't they contracting for?

           MS. KAU:  So actually, it is the district that is
not allowed to let transactions occur on its property.

           THE COURT:  Okay.  Well, take my hypothetical.  Are
you saying the vendor would have to be -- you're saying this
10:43AM 25  statute doesn't regulate what the vendor can and cannot do.

1   It's the District that gives the lease or the license to, say,

2   Crossroads.  So that lease or license has -- will say, "Hey, no

3   contracting for firearms."  And then Crossroads presumably

4   turns around and contracts with vendors to show up.  But does

10:44AM 5   Crossroads have to say, "Oh, by the way, vendors, you can't

6   contract for firearms"?

7            You told me my hypothetical was a permissible --

8   would be permissible even under these statutes.  How can that

9   be?

10:44AM 10           MS. KAU:  So the District cannot allow vendors or a

11   promoter to allow contracts or sales of firearms, et cetera, on

12   this property.  So when a member of the public meets a vendor

13   at the gun show, they cannot make an agreement to purchase a

14   firearm.  They can discuss what is being sold in interest, but

10:44AM 15   any further discussion of offer and acceptance must be done

16   outside of the event.

17           THE COURT:  Okay.  So the individual can talk to the

18   vendor, and the individual can say, "Great.  Thanks for all the

19   information.  I want to buy firearm X, and I'm willing to pay Y

10:45AM 20   for it.  Let's do this."  The vendor has to say, "I'll stop.

21   We got to go over to my brick-and-mortar store to get this

22   done"?

23           MS. KAU:  That's right.

24           THE COURT:  And that would be permissible?

10:45AM 25           MS. KAU:  That's right.

1          THE COURT:  Okay.  Backing up to the record and

2     Ms. --

3          Probably mispronouncing your name.  Barvir?

4          MS. BARVIR:  Barvir.

10:45AM  5          THE COURT:  Backing up to Ms. Barvir's declaration

6     that we were looking at a moment ago, what's the link, if any,

7     between these statistics, these studies, that are cited in this

8     California senate committee on public safety report?  What's

9     the linkage, if any, between them and Orange County

10:46AM 10    Fairgrounds?

11          MS. KAU:  So these studies do seem to be broader on

12    gun shows and are not specific to Orange County Fairgrounds.

13          THE COURT:  Is there any linkage to the Orange

14    County Fairgrounds in the record?

10:46AM 15          MS. KAU:  You mean from these studies?

16          THE COURT:  From these studies or -- is there

17    anything in the record that says, "Oh, wow.  Orange County

18    Fairgrounds, that's where bad things are happening.  And this

19    gun violence and these things that the legislature is

10:46AM 20    legitimately trying to address and prohibit, it's the Orange

21    County gun show that's the problem or is the source or is

22    involved somehow"?

23          MS. KAU:  I don't believe there has been a specific

24    study about the Orange County Fairgrounds.  However, the

10:47AM 25    legislative history does discuss illicit concerns from the

```
 1    San Diego Fairgrounds.  And, also, the more recent apps report
 2    from the Department of Justice discuss gun shows in California
 3    as well.  And under immediate scrutiny, it doesn't require that
 4    the studies have to be direct to the Orange County Fairgrounds.
 5    It just needs to show that the government interest is
 6    substantial.
 7              And so the government interest is about reducing
 8    firearms trafficking from gun shows, and the laws are only
 9    targeting transactions at gun shows on state property.  This is
10    not -- I'm sorry.
11              THE COURT:  No, I'm sorry.  I don't want to cut you
12    off.  Please continue.
13              MS. KAU:  Oh, yes.  So we are under intermediate
14    scrutiny, not strict scrutiny.
15              And the *Nordyke* -- sorry.  That's all.  The *Nordyke*
16    2011 cases is irrelevant on that point.
17              THE COURT:  Remind me about the outcome of that one.
18              MS. KAU:  Can I get back to you on that, Your Honor?
19              THE COURT:  Yes.
20              Let's go back to the relationship between the
21    Central Hudson commercial speech test and analysis and the
22    limited public forum analysis.
23              Is commercial speech afforded lesser protection in a
24    limited public forum?
25              MS. KAU:  So the limited public forum test only
```

**UNITED STATES DISTRICT COURT**

```
 1   requires that laws are viewpoint neutral, and then also the

 2   intermediate scrutiny analysis.  So that covers commercial and

 3   noncommercial speech.

 4          THE COURT:  Okay.  In terms of neutral

 5   applicability, have vendors or promoters, other than plaintiffs

 6   or those associated with plaintiffs, have any of them been

 7   impacted or affected by these two statutes at issue?  I mean,

 8   playing devil's advocate, how could these statutes have neutral

 9   applicability if the only vendors, promoters that are affected

10   are gun show vendors?

11          MS. KAU:  Because their speech is allowed, but the

12   transaction, which is not speech, can be regulated.  So if the

13   sale of the gun is not speech or commercial speech, then the

14   regulation is not regulating speech or commercial speech.

15          THE COURT:  Okay.  But I don't think that answers my

16   question.  Are there any other vendors that have been impacted?

17   I mean, are the car show vendors impacted?  Are the -- I'm

18   making this up -- are the alcohol and beer shows -- whatever

19   other types of shows.  I know it's in the record, but the other

20   types of shows, are any of those shows affected or impacted in

21   any way by these two statutes at issue?

22          MS. KAU:  To the extent if the vendor wanted to sell

23   guns at a car show, then they would be impacted.  But

24   importantly, guns are different from selling a car or selling

25   books.  It is a very unique regulated industry.  And so it
```

10:50AM (line 5)
10:50AM (line 10)
10:51AM (line 15)
10:51AM (line 20)
10:51AM (line 25)

applies to not just B&L, but all vendors that seek to sell

firearms on state property.  So in that way, it is viewpoint

neutral.

Because it's, first of all, not regulating speech.

It's not regulating commercial speech.  And it would apply to

all parties seeking to sell guns on state property.  And

vendors not at gun shows are not impacted.  Or vendors, once

they leave state property and conduct the transaction at their

brick-and-mortar stores, they are not impacted.  And it is

reasonable, in light of the forum, because it still allows the

public to gather and engage in speech, and it only targets

transactions on state property.

THE COURT:  Just now you said it allows the public

to gather and engage in speech.  So the State is not seeking to

quell or quench so-called gun culture speech.

MS. KAU:  That's right.

THE COURT:  So long as it does not involve a

transaction; is that correct?

MS. KAU:  That's right.  The Ninth Circuit has held

that the exchange of money for a gun is not speech.

THE COURT:  That's *Nordyke* 2007; right?

MS. KAU:  3, Santa Clara.

THE COURT:  But 1997.

MS. KAU:  Yes.

THE COURT:  I think I was -- I understood you to be

27

```
 1    quoting or referring to Nordyke 1997; am I right?
 2              MS. KAU:  Right.
 3              THE COURT:  Okay.  Let's turn to the Second
 4    Amendment analysis.  The first step in the Bruen analysis
 5    asks -- I'm going to paraphrase -- does the regulation restrict
 6    an individual's Second Amendment rights, the rights expressly
 7    articulated in the Second Amendment?  And is it the defendants'
 8    position that Second Amendment rights are not impacted or
 9    affected or restricted by these regulations, these statutes at
10    issue?  Because one never has the right to -- the right to
11    transact in firearms is not covered by the Second Amendment; is
12    that right?  Am I understanding that argument correctly?
13              MS. KAU:  Excuse me.  The Second Amendment does not
14    encompass a right to acquire arms in a specific location.  And
15    so in that context when there are 1,610 firearms dealers across
16    the state, and six in the same ZIP code as the fairgrounds, the
17    Second Amendment right to acquire firearms is not implicated
18    here.  And to add on to that, gun shows occur several weekends
19    in a year, whereas brick-and-mortar stores, they hold their
20    regular hours.
21              THE COURT:  Are there any other gun shows on -- that
22    have -- are we only talking about the OC Fairgrounds in terms
23    of gun shows in Orange County?  The fairgrounds in Costa Mesa?
24              MS. KAU:  Yes.  So 264 is about the Orange County
25    Fairgrounds.
```

10:54AM (line 5)
10:54AM (line 10)
10:55AM (line 15)
10:55AM (line 20)
10:55AM (line 25)

1           THE COURT:  But are there any other fairgrounds --
2  are there any other -- put aside fairgrounds, are there any
3  other state properties in Orange County where gun shows have
4  been hosted or have been sought to be hosted?
10:56AM  5           MS. KAU:  I don't think so, Your Honor.  I have not
6  done specifically a search on that.
7           THE COURT:  What's the closest other state property
8  where gun shows have been hosted or have been sought to be
9  hosted?  Is it down in Del Mar?
10:56AM 10           MS. KAU:  There is one in Del Mar, yes.  I'm not
11  sure specifically mileagewise.
12           THE COURT:  What if you go north or east?  How about
13  the Inland Empire, L.A.?  What are the gun shows up there?
14           MS. KAU:  There's that one in San Bernardino.
10:56AM 15           THE COURT:  Is that the closest, those directions,
16  nonsouth?
17           MS. KAU:  That is my guess.  I have not looked
18  closely at this.
19           THE COURT:  Are there any private venues in
10:57AM 20  Orange County that host or have sought to host gun shows?  I'm
21  not talking about brick-and-mortar stores, I'm talking about
22  gun shows.
23           MS. KAU:  Not that I know of.
24           THE COURT:  So I told you at the very beginning, I
10:57AM 25  appreciated the -- all of the supplemental briefing.  What is

1    the -- assuming we get to the second step of *Bruen*, what's the

2    best historical analog to these regulations at issue?

3                MS. KAU:  So first there is no longstanding

4    tradition that firearms dealers can sell wherever they want

10:57AM 5    especially not on state property.  That has not been found

6    historically.

7                Second, the laws are consistent with the

8    well-established right to control one's own property and the

9    tapestry of laws regulating firearms and ammunition for public

10:58AM 10   safety, including regulations on gunpowder, shooting galleries,

11   sales locations, factory locations, preventing firearms

12   trafficking, and sensitive places.

13               THE COURT:  Okay.  Let me turn to -- what's the

14   current status of those San Diego cases?  That was

10:58AM 15   Judge Bencivengo's case that involved the moratorium where she

16   granted a preliminary injunction; right?  And then there was

17   Judge Battaglia's case, recently last August, where he -- it

18   was procedurally a little bit different.  I think it was a

19   motion to dismiss.  But he -- his order there, I think, found

10:59AM 20   that AB -- the regulation at issue there -- I don't have it

21   right in front of me.

22               MS. KAU:  893.

23               THE COURT:  Thank you.

24               -- 893, he found that that did not implicate

10:59AM 25   commercial speech; right?

1            My question is what's the status of each of those

2     two cases?

3            MS. KAU:  In the B&L parallel case about 893, the

4     Court granted defendants' motion to dismiss the First Amended

10:59AM  5     Complaint.  And that includes the First Amendment and Second

6     Amendment.

7            THE COURT:  And then did plaintiff choose not to

8     amend and the case was over?  Is that what happened?

9            MS. KAU:  Yes.  That's right.

10:59AM 10            THE COURT:  So that case is completely done?

11            MS. KAU:  There's no judgment yet, but the status is

12     that the Court dismissed the First Amended Complaint.  And I

13     believe plaintiffs have noted that they will not amend.

14            THE COURT:  But there's no judgment.  So there may

11:00AM 15     be an appeal?

16            MS. KAU:  That's --

17            THE COURT:  That's a question for them?

18            MS. KAU:  Yeah.

19            THE COURT:  And then the -- that earlier case, that

11:00AM 20     was a B&L against the 22nd District Agricultural Association

21     and many other defendants.  What's the procedural status of

22     that one?

23            MS. KAU:  I don't know, Your Honor.

24            THE COURT:  Okay.  All right.  Counsel, thank you

11:00AM 25     very much.  Like I said, I'll give you a chance to make any

**UNITED STATES DISTRICT COURT**

```
 1   additional argument that you'd like to, but let me turn to

 2   plaintiffs' counsel.

 3             MS. KAU:  Thank you, Your Honor.

 4             THE COURT:  Thank you.

 5             Good morning again, Ms. Barvir.

 6             MS. BARVIR:  Good morning, Your Honor.

 7             THE COURT:  I'll try to pronounce it correctly.

 8             MS. BARVIR:  You're doing great.

 9             THE COURT:  Okay.  Well, let's start with where I

10   left off.  Judge Battaglia's order last August in the B&L

11   against 22nd Association District, there he -- he pretty

12   expressly held that AB 893, which seems very similar, if not

13   identical, for practical purposes, to the statute -- statutes

14   at issue here, he found that there was -- that that statute did

15   not implicate commercial speech relying on -- well, the Nordyke

16   line of cases.  How do you overcome that here?

17             MS. BARVIR:  Overcome the Nordyke line of cases or

18   overcome Judge Battaglia's ruling?

19             THE COURT:  His ruling, I understand, is not

20   precedential, of course.  But his reasoning, why is his

21   reasoning not correct?

22             MS. BARVIR:  With respect, we disagree with

23   Judge Battaglia's reasoning on the First Amendment speech

24   analysis from start to finish, but especially with regard to

25   the commercial speech analysis because it creates this, I
```

think, false nuance of a difference between a transaction and the speech that surrounds it.

And I think that Your Honor's questioning of my colleague from the DOJ, she got very clear in saying speech was implicated. Offer and acceptance is necessarily speech. Even if words aren't used, there's expressive contact that shows "I want to buy this. I'm willing to offer you $500 for it. I'll take it." That is speech. The money -- sorry, Your Honor.

THE COURT: I'm sorry. Forgive me for interrupting you. I want to hear the rest, but on that point, I also understood Ms. Kau --

Am I pronouncing your name correctly?

MS. KAU: Yes, Your Honor.

THE COURT: Ms. Kau also -- understood her to say that under my hypothetical with the individual and the vendor, they can do everything short of the transaction. They can talk all about it, get it all set up. They just simply -- I'm paraphrasing what I understood her to say. There would not be a -- an enforceable contract that could be completed at the fairgrounds. They would have to step out, go over to the brick-and-mortar store, and then finish that up. But they could talk about it all they wanted, negotiate it. That's all perfectly fine.

MS. BARVIR: That's an interesting answer to Your Honor's hypothetical because earlier in her remarks,

```
 1    counsel did say that offer and acceptance would be -- would

 2    be -- would not be permissible under the statute.

 3              THE COURT:  I don't think she was saying -- I think

 4    she was saying the same thing.  I think at the end there where

 5    she -- "conceded" is the right word -- but agreed that there

 6    could be all kinds of communications, discussions about the

 7    transaction, there just couldn't be -- what I understood her

 8    position to be, they could not create an enforceable contract.

 9    There could not be offer and acceptance.

10              I guess it would be possible for the two of them,

11    the individual and the vendor, to step over to the

12    brick-and-mortar store and say, "Great, I want that deal we

13    just talked about," and the vendor could say, "Oh, no, no.

14    That deal isn't good here.  You're going to have to pay twice

15    as much now.  We never had a valid contract."  That's what I

16    understood her to say.  There was no offer and acceptance at

17    the fairgrounds.

18              MS. BARVIR:  Right.  I'm not sure how the statute is

19    clear about that.  Just says sales can't happen.  I don't

20    know -- I think that that kind of goes to how would this even

21    be enforceable against these folks, these vendors.  How are

22    they to know what constitutes the okay speech versus the speech

23    that that is what -- that now is a transaction.  And I think

24    that that goes to -- that goes to -- and I think a reason that

25    that becomes really unclear is something Your Honor was getting
```

1    at earlier, which is the fact that this law, you would think,

2    has to do something; right?

3         And the law, as it stands under the gun show act,

4    already says that the transaction, the actual giving of money

11:06AM 5    and the handing over the firearm cannot happen at gun shows for

6    any purpose, like it can only happen at least ten days later

7    after the background check is handled, and it has to happen at

8    the brick and mortar.

9         So if it doesn't -- if it doesn't affect the kind of

11:06AM 10   speech that we're talking about here, the "I want to buy this

11   from you."  "Okay, let's get that paperwork started, but we

12   have to finish it later," if it doesn't ban that, then what

13   does it ban?  I think that's the question that my clients are

14   curious to have answered.

11:06AM 15        Can we get it cleared up, that they're allowed to do

16   that?  I don't know.  I don't know that counsel standing here

17   today can bind the State or anyone that would be enforcing this

18   law against my clients, I don't think that what she says here

19   can say that that's actually true, can make sure that it

11:06AM 20   doesn't get enforced against them, and that the 32nd District

21   would allow those kinds of speeches to happen because that

22   creates liability for the District.

23        THE COURT:  I talked a little bit about Ms. Kau,

24   what the record reveals in terms of gun shows that don't

11:07AM 25   involve transactions.  I understand plaintiffs to take the

1    position that plaintiffs tried to negotiate to do that,

2    notwithstanding the fact that it probably would not have been

3    profitable.  They tried to negotiate for that and they got put

4    off, whereas Ms. Kau says that the declaration that she pointed

11:07AM  5    to, which I failed to note, but the one she pointed to, I think

6    somebody from the 32nd District said, "Oh no, we're happy to

7    have those negotiations."

8            Does that not indicate we need more factual

9    development?  How can I rule on that when that seems up in the

11:08AM 10    air?

11            MS. BARVIR:  Because it's not up in the air,

12    Your Honor.  If you look at Ms. Olvera's declaration that the

13    DOJ pointed to, she says, "If we were contacted, we'd do this."

14    However, that -- but then she goes no further to say, "Hey, we

11:08AM 15    actually were contacted."

16            And what Ms. Tracy Olcott says in her declaration,

17    which is Docket Number 21-5, paragraphs 6, 7, and 9,

18    Ms. Olcott, who is the producer for Crossroads, explains that

19    she had both, in late 2021, sought to get her contract dates

11:08AM 20    for 2022 before the 32nd District Agricultural Association to

21    be approved in advance of this law taking effect.  The District

22    refused to put those contracts on their calendar, put it off

23    until January when they could deny them, which they did.

24            And in December, it's not clear from the declaration

11:09AM 25    exactly which dates she -- Ms. Olcott reached out to the DAA,

1  but she says "We offered to host, I guess, gun show-and-tell,"

2  because it wouldn't be their business model of a gun show to

3  have transactions happen.

4         THE COURT:  Did you just coin "gun show-and-tell"?

11:09AM  5         MS. BARVIR:  I think I did.  We tend to call it

6  that.

7         THE COURT:  Was that in your papers?

8         MS. BARVIR:  No, sir.

9         THE COURT:  That's the first time I'm hearing that.

11:09AM 10  So we'll use that, gun show-and-tell.

11         MS. BARVIR:  Gun show-and-tell.

12         She -- they did offer to -- because it is correct,

13  what Ms. Olvera says if we reach out to -- we would allow it to

14  happen as long as the laws are abided by.  Ms. Tracy Olcott

11:09AM 15  responded, "Yeah, okay, we'll do that.  Even though that's not

16  going to be profitable for us, we'll try it to mitigate our

17  damages while we have our MPI heard."  But nothing.  There had

18  been crickets, crickets, crickets.  And there were repeated

19  attempts.  Perhaps she could have worked harder maybe, more and

11:10AM 20  more emails, but got nowhere.  Up to today, there are still no

21  gun shows in Orange County.  And B&L has them not at Del Mar or

22  anywhere in the state.

23         With regard to -- I think Your Honor was asking

24  questions about other locations for gun shows.  My clients were

11:10AM 25  trying to find private places because the State has not

```
 1    overturned or repealed the gun show.  So gun shows can

 2    apparently still happen on private properties.

 3            Unfortunately -- excuse me -- a couple things are

 4    happening there.  When the State kind of artificially limits

 5    where these things can happen by taking away this public

 6    avenue, the private properties can charge whatever, and that

 7    makes it difficult.  But more than that, these fairgrounds kind

 8    of are a very unique type of venue.  They're very much larger

 9    than any type of private venue.  There isn't something similar

10    that can accommodate my client's business model.

11            THE COURT:  So it affects the market.

12            MS. BARVIR:  Correct.

13            THE COURT:  Let's turn to the Central Hudson test in

14    the lawful prong.  You heard my questions to Ms. Kau about the

15    circularity of defendants' reasoning.  I think you may have

16    highlighted that in your papers; right?

17            MS. BARVIR:  Yes, Your Honor, I think that's right.

18            THE COURT:  But the -- let me play devil's advocate

19    with you.  To determine whether or not what is prohibited by

20    the statutes at issue is lawful activity, do we have to do a

21    Bruen analysis first?  That is, do plaintiffs need to show --

22    to satisfy the Central Hudson test for commercial speech?  Do

23    they have to show that these regulations really restrict

24    someone's First Amendment rights?  And --

25            MS. BARVIR:  You mean Second Amendment rights?
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Yes.  I meant Second Amendment rights.

2     That is, do plaintiffs need to show that because of these

3     regulations, individuals who want to engage in transactions

4     cannot, that their Second Amendment rights is sort of

11:12AM 5     derivative rights to buy and sell arms?  You have the right

6     under the Second Amendment to bear them, to keep and bear them.

7     But to keep and bear them, you got to own them.  To own them,

8     you got to buy them presumably or be gifted them.  And so

9     there's a derivative Second Amendment right to transact in

11:13AM 10    arms; right?

11          MS. BARVIR:  Correct.

12          THE COURT:  Is that derivative right to transact in

13    arms, is that implicated?  Is that harmed in any way by these

14    regulations?  If there are lots of -- sorry for the long and

11:13AM 15    winding question.  But if there are lots of ways for

16    individuals to transact in arms, lots of gun and --

17    brick-and-mortar stores nearby so it's not like this could --

18    these transactions could only be initiated at gun shows, is

19    there any restriction of anyone's Second Amendment rights as a

11:13AM 20    result of these restrictions, these statutes?  And if so, does

21    that implicate the lawful activity piece of the Central Hudson

22    test?  That was probably the longest --

23          MS. BARVIR:  It was a long question there.  I'm

24    going to unpack each of them.  And I think I'm going to start

11:14AM 25    with explaining that while -- I think Central Hudson's analysis

UNITED STATES DISTRICT COURT

about the lawful speech can be handled in two ways.  And one
would, of course, be to find that, well, the law that would bar
these transactions, it violates the Second Amendment because
there is an intended right to buy and sell firearms that is
necessary to the right to keep and bear arms under the Second.
That would be one way to say, well, you can't use the law at --
these challenge laws themselves to then establish their own --
the First Amendment constitutionality because they violate the
Second.  And so those laws would have to go away and then
restrict -- and so there's no underlying unlawful sale to make
speech -- commercial speech that would be able to be restricted
under the commercial speech doctrine Central Hudson test.

       But you don't have to get there, I think, because
sales of lawful firearms in California aren't illegal, only
this very specific type are.  To say that we can pass a law
that makes only -- makes lawful -- otherwise lawful
transactions, really only unlawful in this one very specific
place, I think that if -- if firearms transactions were
illegal, obviously all of them, that would obviously violate
the Second.  But it might support like a statement that you
can't have speech about unlawful sales.

       If we're talking -- if the statutes were to say
something about restricting unlawful sales and so having
conversations, for instance, to try and overcome, I don't know,
maybe restrictions on sales of machine guns at the Orange

```
        1    County Fairgrounds, well, then, maybe you're talking about

        2    unlawful sales that the statutes can restrict the speech

        3    regarding, but not all sales which would incorporate -- would

        4    include lawful sales.  Does that make sense?

11:16AM 5            THE COURT:  Yes.  Yes, but let me back up a bit.

        6    You said we don't even need to get there.  But let's say my

        7    analysis leads me to we do need to get there.  Can

        8    plaintiffs -- do I need to have more evidence about the impact

        9    of these regulations in terms of individuals' ability to

11:16AM 10   transact in firearms?

       11            MS. BARVIR:  Absolutely not, Your Honor.  That would

       12    be reliance on Teixeira which is dead law after Bruen.  In

       13    talking about -- in making the record about how -- basically

       14    how severe a burden on pulling sales off of public property,

11:16AM 15   just because you can maybe buy similar firearms, and that

       16    itself is hard to say because gun shows have a very -- are a

       17    very specific market.  A lot of times folks sell things that --

       18    excuse me -- that they may not be able to stock in Turner's

       19    because that is going to be something that's more commercially

11:17AM 20   wanted.  So you might find more rare items, the antiques and

       21    such.  But setting that aside --

       22            THE COURT:  Did you use the word "Turner's"?

       23            MS. BARVIR:  Yes.  Sorry.  Turner's is a large-scale

       24    sporting goods store.

11:17AM 25           THE COURT:  Okay.
```

            MS. BARVIR:  So bigger brick-and-mortars might sell

things that are really common to sell because that's better for

their business as opposed to a gun show where people might be

looking for more different types of ammunition or whatever.

            In any event, that was kind of getting off onto a

tangent, because what I'm trying to say here is that the

existence of other places to buy firearms is a severity of the

burden test.

            The first step of *Bruen* talks about whether or

not -- excuse me -- contact is covered by the plain text of the

Second Amendment.  There's no talk about how well you can

exercise it somewhere else.  Fundamental rights just don't work

that way anyway.  But *Bruen* specifically tells us that the

Government takes the burden of proving its historical tradition

as soon as -- as soon as the Court finds that the Second

Amendment's plain text is implicated.

            So when you're talking about a restriction on a sale

of firearms or ammunition, Ninth Circuit already tells us in

*Duncan*, in *Jackson*, in other cases, in *Teixeira* itself -- maybe

that was the panel decision that got en banc, but those cases

already tell us that we do have a right to acquire firearms,

ammunition, and necessary parts.

            So I think that it's already an open-shut case that

the Second Amendment is, at a minimum, implicated.  So now the

Government needs to prove an enduring American tradition of

1    distinctly similar historical laws.

2            THE COURT:  Let me ask -- let me test your

3    position that -- I understood your position to be any

4    regulation that impedes one's Second Amendment right to keep

11:19AM  5    and bear arms satisfies Step 1 of *Bruen*.  And then we go to

6    Step 2; right?

7            MS. BARVIR:  I think that's right, Your Honor.

8            THE COURT:  So let's say there's a bizarre

9    regulation that said, "Yeah, you get to keep and bear arms in

11:19AM 10    this state, but not if you're wearing plaid.  You're wearing

11    plaid, sorry, can't keep and bear arms."  Now, it would seem

12    like if you want to keep and bear arms, just don't wear plaid.

13    Doesn't seem like that big of a deal.

14            Would that be -- would that regulation pass muster

11:19AM 15    under Step -- where does this fall in Step 1?

16            MS. BARVIR:  If it's a ban on the certain group of

17    people, just because I'm wearing plaid or not, or if they are

18    plaid, that is a restriction on their ability to possess

19    firearms, you know, protected arms, that passes half of the

11:20AM 20    first step.  And it probably would -- wouldn't survive the

21    historical analysis either because it's a ban on possession.

22            THE COURT:  Let's put that aside.  Let's put Step 2

23    aside.  Just do Step 1.  So is it your position that the

24    regulation says you cannot keep and bear arms in this state if

11:20AM 25    you wear plaid; implicates, restrains an individual's Second

```
    1   Amendment rights such that we -- such that we then go to

    2   Step 2?

    3              MS. BARVIR:  100 percent.  Probably also violates

    4   the First Amendment because we have a right to express

11:20AM  5   ourselves in what we wear.

    6              THE COURT:  And putting that aside -- and I

    7   deliberately chose plaid because I didn't want to implicate

    8   somebody's race or gender or anything like that.  Trying to

    9   pick something bizarre.

11:20AM 10              MS. BARVIR:  I understand.

   11              THE COURT:  Anyway, so your answer is yes?

   12              MS. BARVIR:  Definitely.

   13              THE COURT:  Okay.  What's the best case that I can

   14   look at that helps me understand whether or not a seemingly

11:21AM 15   benign restriction, like the plaid restriction, violates Step 1

   16   of the Bruen test, such that you need to go to Step 2?

   17              MS. BARVIR:  Post-Bruen, I don't think you're going

   18   to find someone like that, because I think most courts that

   19   have taken these cases since Bruen came down last June,

11:21AM 20   understand that that first step is almost -- it's almost a

   21   hypothetical question.  I mean, you might -- there may be a

   22   situation, for instance, like local business licensing that

   23   impacts firearms businesses where they can -- maybe you have to

   24   have a license.  Maybe that would be something that's not --

11:21AM 25   that's something that applies to everyone.  But there really
```

         1     aren't cases like that.

         2             Perhaps a similar sort of benign -- I don't know of

         3     a case like that.  You've got current -- the most recently we

         4     have *Boland*, which had to deal with California's handgun roster

11:22AM  5     requiring -- that had minimum -- excuse me -- minimum -- the

         6     State called them safety standards for firearms, but these were

         7     chamber load indicators, magazine disconnect mechanisms, and

         8     microstamping.  And the Court there found that these types of

         9     requirements -- you can call them safety or can you call them

11:22AM 10     plaid requirements, they impact the ability to have firearms.

        11             THE COURT:  Talking about Judge Carney's case?

        12             MS. BARVIR:  Yes.  And I think there was a similar

        13     companion case in the Southern District called *Renna* found the

        14     same thing.

11:22AM 15             THE COURT:  The Ninth Circuit recently did

        16     something --

        17             MS. BARVIR:  Did something.

        18             THE COURT:  -- pertaining to those two District

        19     Court decisions; is that correct?

11:22AM 20             MS. BARVIR:  Not *Renna*.  I think the Court -- the

        21     District Court in *Renna* I think issued a stay on its own -- on

        22     its injunction.  In *Boland*, the State immediately sought an

        23     emergency stay from the Ninth Circuit of the injunction, which

        24     not entirely surprising that that would happen.

11:23AM 25             THE COURT:  But just help me understand

procedurally.  Both the *Boland* case -- in the *Boland* case,

Judge Carney issued an injunction preventing the State from

enforcing that particular regulation; correct?

MS. BARVIR:  The -- all the chamber load indicator,

11:23AM magazine disconnect, and microstamping, yes.  The State only

sought to enjoin or stay the injunction of the magazine

disconnect mechanism and CLI and allow the microstamping

injunction to take effect, as I understand it.

THE COURT:  Okay.  Where I'm going with this is the

11:24AM Ninth Circuit's emergency stay of a piece of the *Boland*

injunction doesn't affect what we're talking about here;

correct?

MS. BARVIR:  I do not think it does.  That is more

of a -- I think a stopgap measure to prevent in case that it

11:24AM gets overturned on appeal so that the DOJ isn't dealing with

new -- you know, an influx of new guns coming into the roster

in the meantime.  It's one of those can of worms you can't put

the lid back on.  And so I don't think it changes anything

about the analysis of whether or not the Second Amendment is

11:24AM implicated by those kinds of laws.

THE COURT:  You heard me ask the -- ask Ms. Kau the

question about the relationship between Central Hudson test

involving commercial speech and the limited forum analysis.  I

didn't articulate it very well because I'm not sure I know

11:25AM precisely what I'm asking.  I'm just trying to understand the

contours and the relationship between the two doctrines.  Can you flesh it out for me at all?

MS. BARVIR:  It -- I think that you're having a hard time coming with the question because it is a kind of a confusing analysis.  A lot of times when you see courts getting into the commercial speech doctrine, it's because it's really clear that it's a commercial speech case.  And they don't talk a whole lot oftentimes.  They don't talk a whole lot about those kind of threshold questions of whether or not speech is implicated at all and whether or not it's in a limited or public forum.  And so a lot of times they dive just right into Central Hudson.

But I think I would agree with opposing counsel in saying that the limited public forum analysis doesn't really change if it's a commercial speech or not -- or an idealogical speech question because the test is as they are.  There's no -- if it's limited public forum or not, the test for Central Hudson is the test for Central Hudson.  That said, there is --

THE COURT:  I want to hear that, but let me make sure I'm tracking you so far.

The parties -- the lowest common denominator here in terms of the parties -- in terms of the type of forum we have here, public versus nonpublic versus all the different flavors, Ms. Kau conceded that this is at least a limited public forum.  And, of course, plaintiffs agree that this is at least a

```
 1    limited public forum.  You think it's much more, and they think

 2    it's --

 3              MS. BARVIR:  Plaintiffs' briefing does say it's, at

 4    minimum, a designated public forum.  But the tests aren't

 5    really different regardless.

 6              THE COURT:  So as I understand it, Ninth Circuit

 7    limited public forum is a subset or a type of designated public

 8    forum; is that correct?

 9              MS. BARVIR:  I think that's right.

10              THE COURT:  But the bottom line is because everybody

11    agrees we can talk for these purposes as if the fairgrounds --

12    the State-owned spaces that we're talking about here, are at

13    least a limited public forum, the analysis we need to do is the

14    commercial speech analysis under Central Hudson; is that

15    correct?

16              MS. BARVIR:  Plaintiffs do not concede that,

17    Your Honor, because --

18              THE COURT:  Okay.  Tell me plaintiffs' position.

19              MS. BARVIR:  Plaintiffs' position is that it can be

20    either way.  We think that commercial speech is not the only

21    speech that's affected here.  Because for all intents and

22    purposes and the very -- the whole reason for the bill was to

23    ban gun shows, and they have effectively been banned.  They

24    have not happened since 2021.

25    ///
```

11:26AM (line 5)
11:27AM (line 10)
11:27AM (line 15)
11:27AM (line 20)
11:27AM (line 25)

```
  1              (Reporter requests clarification

  2              for the record.)

  3              MS. BARVIR:  I'm sorry.

  4              They've not happened since 2021.  All of the speech

11:27AM 5   that happens at these events has been banned effectively.

  6              THE COURT:  So you don't concede that this is merely

  7   commercial speech?

  8              MS. BARVIR:  That's correct.

  9              THE COURT:  You believe that this is the highest

11:28AM 10  level of protected political speech?

 11              MS. BARVIR:  That's correct, Your Honor.  Many of

 12   the vendors at these places, my client, California Rifle &

 13   Pistol Association, my colleague's client's Second Amendment

 14   foundation, these are nonprofit organizations who spread progun

11:28AM 15  Second Amendment right to self-defense messages at gun shows,

 16   and they've been shut out as well because they can't

 17   effectively have these events.

 18              I think it's really important to understand that the

 19   model of a gun show relies on these transactions.  We can sit

11:28AM 20  here and tit for tat about what point does it become a

 21   transaction?  At what point is it speech versus not speech in

 22   that commercial transaction?  When it comes down to it, if a

 23   vendor cannot make money at an event, it will not pay money to

 24   be at the event.  It will continue its business as it does at

11:29AM 25  its brick-and-mortar stores.  And if they're not there to be
```

1    the financial foothold of this event, the event can't happen.

2    And the State knew that when it passed the bill.

3              And so what happens is they have to take their balls

4    and go home, and CRPA is left out in the cold unable to go to

11:29AM 5    gun shows to spread a message to encourage people to join their

6    nonprofit membership organization.

7              THE COURT:  So you're saying -- well, I think you

8    said it -- I want to confirm you said a number of things here.

9    I heard you say a "gun show-and-tell," if I can adopt that --

11:29AM 10              MS. BARVIR:  You may.

11              THE COURT:  -- clever moniker.  A gun show-and-tell

12    implicates the highest most protected level of speech.

13              MS. BARVIR:  It would if some vendors come to a gun

14    show to show off their really cool old historic curios and

11:30AM 15    relics.  They might show them on a table and people are going

16    to look at them.  And they're not for sale.  They're just to

17    see, show-and-tell, talk about them.  But the organizations

18    that come, that really allow the business to happen are the

19    sale -- the sellers of firearms, ammunition, and parts.

11:30AM 20              THE COURT:  Where I was going was I understood the

21    defendants to concede that a gun show-and-tell is not

22    prohibited by these statutes at issue.  Put aside whether the

23    representation made today comports with the record.  I know you

24    dispute that.  Put that aside for the moment.  The defendants

11:30AM 25    concede that a gun show-and-tell is perfectly fine.  The

1    defendants concede that.  Plaintiffs say, well, a gun

2    show-and-tell is not economically feasible, a mere gun

3    show-and-tell.  There needs to be a full-blown gun show.

4          But as far as that analysis goes, why is that the

11:31AM  5    State's problem?

6          MS. BARVIR:  Because that's why they passed it.  The

7    legislative record is really clear that that's why they passed

8    it.

9          THE COURT:  Do we need to get into legislative

11:31AM 10    intent to address those issues?

11          MS. BARVIR:  We could, and the record is full of

12    legislative intent about that.  The documents that are attached

13    to plaintiffs' request for judicial notice and my declaration

14    as well as statements made to the media and to the district

11:31AM 15    associations themselves, the sponsor of the bill, Senator Min

16    wrote to the defendant District -- 32nd DAA and told them

17    "We've banned gun shows.  You can't adopt these contracts.  And

18    if you do, I'll sue you."

19          THE COURT:  If the Court were to engage in a peer

11:31AM 20    textualist analysis, the Court -- this court or a court would

21    not get into all of that legislative history and what

22    Senator Min wrote and said and did in -- and what motivated the

23    bill.  We look merely at the -- a court would look merely at

24    the text of the statute.

11:32AM 25          So my question is, to get into this -- what

defendants are telling me now is that a gun show-and-tell is

perfectly fine.  If that's the case, if I issue an injunction

here, it's to permit the full-blown gun show?

        MS. BARVIR:  Uh-huh.

11:32AM        THE COURT:  But the gun show-and-tell, if a gun

show-and-tell is permissible -- again, I'm struggling with

where the First Amendment starts and stops and commercial

speech versus political speech.  Defendants are telling me that

plaintiffs' First Amendment rights are not implicated because

11:33AM plaintiffs can have a gun show-and-tell.

        So I guess where I am is don't we have to do a

commercial speech analysis?  If what plaintiffs are asking me

to enjoin is the statute to the extent that it prohibits

full-blown gun shows, don't I have to get into commercial

11:33AM speech?

        MS. BARVIR:  Sure, but the ruling is -- I mean, the

analysis is going to end the same -- the conclusion is the

same.  They can't meet intermediate scrutiny.

        I really don't -- but I still do not see how it's

11:33AM possible to say the peer speech isn't implicated.  The

understanding is that if you can't afford to have -- you know,

you can't financially have this, it's not the business model of

gun shows.  The gun shows goes away, and so the peer speech

goes away too.  I don't know how you can divorce the two.

11:34AM        But if we're going to go down the lane and get to

commercial speech, the state has not established that the

challenge statutes meet intermediate scrutiny either.

    THE COURT:  Your point is you still win --

    MS. BARVIR:  Yes, sir.

    THE COURT:  -- if we do commercial speech analysis?

    MS. BARVIR:  Yes, sir.

    THE COURT:  Okay.

    MS. BARVIR:  And I think I want to actually add to

that too, because I think it's really clear, and Your Honor

started to go down this line of questioning earlier about

whether or not it's content neutral or even viewpoint neutral.

And the point that I think I was hearing -- or the question you

were asking about is does this -- does this law affect people

at the quilt show?  Does it affect the car show?  Does it

affect, you know, the food and wine fairs?  And the response I

hear is, well, of course, to the extent that they want to sell

guns.

    The business model of a car show is not to sell

guns.  The business model of a food and wine festival is not to

sell guns.  The business model of a quilt show is not to sell

guns.  Guns are sold at gun shows.  It affects gun show vendors

at gun shows in a very unique way.

    And the fact that it only restricts that kind of --

and I'm going to keep saying it -- this is speech, the speech

related to those commercial sales, that is not a

1    content-neutral position.  It is -- and because, as

2    Judge Bencivengo found -- and I believe it was 2019's B&L case

3    in the Southern District, in practical terms because the gun

4    shows, the messages there are overwhelmingly progun.  It

11:35AM 5    probably goes into viewpoint discriminatory territory.

6            So regardless of whether we're talking about

7    commercial speech or pure idealogical speech, because the law

8    is not content neutral, strict scrutiny applies.

9            THE COURT:  I understand.

11:36AM 10            You mentioned the -- I'll call them the San Diego

11    cases.

12            MS. BARVIR:  Yes.

13            THE COURT:  Those two cases, the two decisions by

14    those two district judges, they are irreconcilable, are they

11:36AM 15    not?

16            MS. BARVIR:  That's our position.  I'm the attorney

17    for both those cases.  It was a very surprising 180 for us to

18    see, yes.

19            THE COURT:  Well, it's two different --

11:36AM 20            MS. BARVIR:  Two different judges.  And

21    Judge Battaglia was within his Article III authority to find

22    the way he did.  But I think that Your Honor and

23    Judge Bencivengo are also within their authority to find

24    differently than he did.

11:36AM 25            THE COURT:  And what is the status?  Did we talk

about that?  I want to make sure of the status of the

Judge Battaglia case.

MS. BARVIR:  Judge Battaglia issued -- there have

been two grants of a motion to dismiss from the State.  The

11:37AM  first motion to dismiss was with leave to amend on the First

Amendment and equal protection claims.  And we were speaking a

bit about that earlier whether or not plaintiffs could show --

it was ruled on basically the *Nordyke* analysis of whether or

not a transaction is speech.

11:37AM  The more recent -- very recent ruling came down --

excuse me -- from Judge Battaglia that also dismissed the First

Amended Complaint.  The First Amendment and equal protection

claims were dismissed with prejudice no more -- on that

amendment.  It opened the door for amendment on the Second

11:37AM  Amendment claims if plaintiffs could show that there was no

other place for them to buy the arms and ammunition that they

wanted to at the gun show.

Plaintiffs, as we are here, dis- -- filed a notice

to the Court.  We were not going to amend.  There's no way

11:38AM  that -- we're not going to allege that because *Teixeira* isn't

the law anymore.  And to establish that severity of burden is

not on plaintiffs anymore, but that case will be appealed once

a judgment is final.

THE COURT:  Okay.  Let me check my notes, see if I

11:38AM  have any more questions for you before we go into your

 1  respective arguments.

 2          MS. BARVIR:  If I could, Your Honor, I would like to

 3  point to some of the record on the State's evidence -- well,

 4  the legislature's record of what types of crime and crime guns

11:38AM 5  are emerging from gun shows.

 6          THE COURT:  Hold on.  Hold that.  I do want to hear

 7  that, but hold that thought, please.

 8          **(The Court and court reporter confer**

 9          **off the record.)**

11:40AM 10         THE COURT:  Let's take a five-minute break for the

 11  court reporter, and then we'll come back and finish up.  We'll

 12  be done before we break for lunch.  Thank you very much,

 13  Counsel.  Five minutes.

 14          **(Recess from 11:40 a.m. to 11:49 a.m.)**

11:49AM 15         THE COURT:  So you don't need to recall the case.

 16  Thank you, Madam Clerk.

 17          Let's just pick up where we left off and then finish

 18  up hopefully in just a few minutes.

 19          I was going to ask a question.  The -- it's a little

11:49AM 20  off the wall, but the Amended Complaint has this allegation

 21  about California legislatures -- California legislatures have

 22  threatened the 32nd District's board members with personal

 23  liability?

 24          MS. BARVIR:  Yes, sir.

11:49AM 25         THE COURT:  Where does that fit in, if at all?  That

```
 1    was in the Complaint.  Is there any evidence?
 2              MS. BARVIR:  I believe the letter was attached to
 3    my -- I think the Declaration of Anna Barvir, which would be
 4    Docket Number 21-3, I believe, that the letter is attached.  It
11:50AM 5    was what I was referencing earlier, Your Honor, Senator Min.
 6              So the history has to do with there was a clause in
 7    the law, the first -- the one that was specifically about the
 8    Orange County Event Center --
 9              THE COURT:  Yes.
11:50AM 10              MS. BARVIR:  -- that would allow contracts that were
11    entered into before January 1st, 2022, to go forward.  So if
12    there were shows that were planned for 2022, for instance, they
13    could happen without the limitations of the law.  So in trying
14    to finalize their contracts for 2022, my clients requested that
11:50AM 15    the DA -- the 32nd DAA adopt those contracts.  It's part of the
16    procedure for getting your events on schedule.  They had -- the
17    dates had been set, but the contracts hadn't yet been approved
18    by the board.
19              And so they requested repeatedly that those be
11:51AM 20    adopted and so that the contracts for 2022 could go in effect
21    before the law took effect.  And so the -- while the board was
22    considering this -- considering adopting those contracts,
23    Senator Min got word that they were considering adopting those
24    contracts and sent them a letter.  It is Document 21-3,
11:51AM 25    Exhibit 31, PDF page 45, Bates-stamped 208.
```

1          THE COURT:  45 at 108 [sic]?

2          MS. BARVIR:  Yes.  That's correct.  It's a letter

3    from Senator Min.  So if you scroll down to -- or go down to

4    the second page of that letter, he goes on about that he's

11:52AM  5    surprised that they're considering adopting those contracts and

6    that -- let me find it.

7          Is this the letter?  Oh, it's the third page.

8    (Reading:)

9          "Let me be clear, should the Board vote to

11:52AM 10          approve Item 6B and preapprove a long-term contract

11          with Crossroads of the West or any other gun show

12          operator, I would explore litigation and

13          legislation seeking to avoid these contracts.  I

14          also believe that any such action by the Board

11:52AM 15          would potentially expose its members to personal

16          liability, since they would be acting specifically

17          with clear intent to subvert and evade the purpose

18          of a statute they believed was likely to take

19          effect in opposition to clearly establish public

11:52AM 20          policy."

21          THE COURT:  And therefore, what?  Where does that

22    fit into this --

23          MS. BARVIR:  Why was it raised?

24          THE COURT:  -- preliminary injunction analysis?

11:53AM 25          MS. BARVIR:  It was just going to the -- the

```
 1    indication that --

 2              THE COURT:  Animus?

 3              MS. BARVIR:  Was going to animus.  It was going to

 4    the legislative intent that this was a ban of gun shows.  If

 5    you read the entire letter, he does explain -- he calls it a

 6    "ban on gun shows."  It goes to the legislative intent behind

 7    the law.  It goes to the animus for gun shows and gun culture.

 8    And it also explains why the district -- the defendant district

 9    kind of felt -- at least felt like it had its hands tied and

10    could not adopt the contracts that weren't sitting for it.  So

11    all of those things.  It just shows that they did not adopt the

12    contracts as well.

13              THE COURT:  Okay.  That exhausts my questions.  It's

14    your motion, Ms. Barvir, so tell me whatever else you'd like to

15    tell me, and then I'll hear from Ms. Kau.  I'll give you the

16    last word, but we are pressed for time.  And we've gone through

17    a lot.  And I think it's apparent that I've reviewed the

18    papers.

19              MS. BARVIR:  Yes.  Very.  And I appreciate

20    Your Honor's time and, obviously, clear detailed attention to

21    all of our briefing and the evidence.  That is very much

22    appreciated.

23              I just really wanted to, I think, quickly turn

24    Your Honor's attention.  There was some conversation.  If we're

25    talking about our first amendment claim and the interest and
```

why the Government passed the law, this State was pointing

to -- I think -- they were calling it my declaration, but it

was actually an exhibit to the request for judicial notice.  It

was a legislative history document that had a couple of quotes

about this is where gun shows -- or they become -- where gun

transactions may be legal become seedy or something like that.

These were quotes from gun control advocate groups, like

Giffords and Violence Policy Center.

        If Your Honor, though, looks at my -- the Barvir

Declaration, Docket 21-3, Exhibit 34 is one of the documents --

is one of the reports that the legislature relied on.  It is a

report from the Violence Policy Research Program.  It's kind of

where a lot of these quotes from the gun control groups kind of

come from and where they based their allegations about criminal

guns or access to criminal guns, gun trafficking relating to

gun shows.

        But I think it's really clear that those reports

that the State's relying on, the quotes that they're taking

from the Giffords policy center and I think Americans For

Progress [sic], those are all nationwide concerns.  Concerns

about what happens at gun shows that do not have -- that have

what Your Honor earlier called gun show loopholes.  Things that

do not have the strict, heavy regulation that California has.

        California's restrictions at gun shows are the same

as they are at brick-and-mortar stores, except now you can't

60

```
 1    sell guns on state property.  But before under the Gun Show
 2    [sic] Control Act, they're the same.  And the Violence Policy
 3    Research Program's report expressly recognizes that, quote:
 4              "In California, where both gun shows
 5         themselves and gun commerce generally are
 6         regulated, sales at gun shows are not a risk factor
 7         among licensed retailers for disproportionate sales
 8         of crime guns."
 9              That is in the report that the State cited in its
10    legislative report.
11              THE COURT:  Is that Exhibit 34 or 33?
12              MS. BARVIR:  I think I cited 33.  But when I looked
13    at 33, it appears to be another letter.  I believe it's
14    Exhibit 34.
15              THE COURT:  I think it's Exhibit 33.
16              MS. BARVIR:  Oh, so I was right the first time.
17              THE COURT:  But what page of the exhibit did you
18    read from just now?
19              MS. BARVIR:  32 and 33, which would be the Bates
20    page stamps.  Oh, it is 33, Your Honor.  Sorry for the
21    confusion.
22              THE COURT:  I think it's ECF page 84 and 85 of 108
23    on document 21-3.  Do you have a number on the bottom right or
24    the bottom left of the page you're looking at?
25              MS. BARVIR:  Sorry.  So many page numbers on one
```

**UNITED STATES DISTRICT COURT**

         1    document, Your Honor.
         2              THE COURT:  Just give me any page number because I
         3    think I have them all.
         4              MS. BARVIR:  I believe the original pagination was
11:58AM  5    32 and 33.
         6              THE COURT:  Okay.  I think that corresponds to, like
         7    I said, pages -- ECF pages 84 and 85 of 108.
         8              MS. BARVIR:  I think you're right.
         9              THE COURT:  Yeah.  I think I found your quote.
11:58AM 10              MS. BARVIR:  Yes.
        11              THE COURT:  I believe that's where it is.  I just
        12    wanted to make sure we nailed down where in the record you're
        13    referring to.
        14              MS. BARVIR:  And on top of that, there was also some
11:58AM 15    discussion of -- in the legislative record or at least in the
        16    bill they -- the legislature cited a few -- a handful of crimes
        17    that were snuffed out in the Del Mar Fairgrounds that were
        18    then -- that language was copied and pasted in the
        19    OC Fairgrounds bill and then into the statewide bill.
11:59AM 20              THE COURT:  So is the point there is a paucity of
        21    evidence linking Orange County-based gun shows with the sorts
        22    of violence and crime that the legislature is legitimately
        23    seeking to address and prohibit?
        24              MS. BARVIR:  There's no evidence that
11:59AM 25    California-based gun shows -- not just Orange County and not

     1    just Del Mar.  The evidence that the State was relying on is

     2    nationwide.

     3                THE COURT:  Okay.  I understand the point.

     4                MS. BARVIR:  And -- okay.

11:59AM  5          But the -- and so moving on from that part of the

     6    speech analysis, we wanted to really quickly move to -- just

     7    shift gears to the Second Amendment analysis and wanted to be

     8    really clear for Your Honor about what plaintiffs' position is

     9    about how the analysis actually works.

11:59AM 10          We are in an interesting time having *Bruen* just come

    11    down something like nine months ago to -- how that operates as

    12    kind of moving quickly in different cases.  So our briefing may

    13    be unclear from one to the next about exactly what our position

    14    is.  Our position -- plaintiffs' position is that once the

12:00PM 15    Second Amendment's plain text is implicated, Government has to

    16    prove --

    17                THE COURT:  Which, I believe, it is here --

    18                MS. BARVIR:  We do.

    19                THE COURT:  --  for the reasons that we discussed.

12:00PM 20                MS. BARVIR:  Correct.

    21          If we're going to get to the second part of the

    22    analysis, it's plaintiffs' position that the State has to prove

    23    a history of -- an enduring American history of distinctly

    24    similar laws.  And in this case, that would be laws going back

12:00PM 25    to the founding era -- not the 20th Century, not the late 19th

Century that -- to the founding era that are very, very close
to what they're doing here, which is a restriction on
commercial sales of all lawful firearms, including commonly
owned protected arms.

12:00PM      And the reason they have to be that close, and we're
not talking about something a little -- a lower bar because the
State hasn't established and doesn't even argue that this is a
case of a law that is trying to address a new societal concern
or a dramatic technological change.  If it had, we may be in a
12:01PM world where *Bruen* says we talk about relevantly similar laws,
and that's when we start considering the how and the why, if
something is a comparable type of restriction or a comparable
justification.

      So we think -- plaintiffs think that the State has
12:01PM to show the distinctly similar.  Haven't done that.  But even
if the State were to be given that slightly lower bar of
relevantly similar, none of the laws that the State has put
forth meet either of those metrics.

      THE COURT:  I understand that argument.  Thank you.
12:01PM      One question.  You said has to be -- the focus --
the State's focus, the defendants' focus has to be founding
era.

      MS. BARVIR:  Yes.

      THE COURT:  Since the Fourteenth Amendment is
12:02PM necessarily implicated because of the incorporation doctrine,

```
 1   do we also look or instead look or additionally look at post
 2   Civil War times?
 3            MS. BARVIR:  That's a really good question, Your
 4   Honor.  And to an extent there is some debate about whether or
12:02PM  5   not that's up in the air, it's plaintiffs' position that both
 6   Heller and Bruen have led us to the answer that 19th Century
 7   times surrounding the Fourteenth Amendment ratification is not
 8   as relevant as founding era 18th Century laws.  And that to the
 9   extent they're relevant at all, it is only to confirm what was
12:02PM 10   already known about the Second Amendment's scope and what can
11   be restricted during the founding, during the 1700s.
12            And that has to be because the law -- the
13   Constitution -- I'm sorry -- the rights cannot mean one thing
14   as against the federal government than they mean against the
12:03PM 15   states or the local government.
16            Plaintiffs talk about this at length, I believe,
17   around page 5 of their most recent supplemental brief.  That's
18   Document Number 32.
19            THE COURT:  Yes.  Yes.  Okay.  Thank you.
12:03PM 20            MS. BARVIR:  Thank you, Your Honor.
21            THE COURT:  As I said, I'll give you a brief last
22   word.
23            MS. BARVIR:  Thank you, Your Honor.
24            THE COURT:  Thank you.
12:03PM 25            Ms. Kau, did you care to say any more?
```

1          MS. KAU:  Yes, Your Honor.

2          The Court had asked the procedural status of two

3     older cases, the B&L case from 2019.  That case was about a

4     complete ban on gun shows, the whole event.  And the status is

12:04PM 5     that the case is ended.  The Court had granted the injunction

6     given the severity of that -- the underlying action with the

7     whole ban.

8          And the *Nordyke* 2011 case, it has been affirmed the

9     dismissal of the First Amendment claim, and it did not violate

12:04PM 10    the Second Amendment either.  And that held that the possession

11    of arms on county property is not speech.

12          And to address plaintiffs' argument, there is a lot

13    of emphasis on the business model, but there is no right to

14    profitable speech.  The First Amendment doesn't provide it, and

12:05PM 15    the Second Amendment doesn't provide it.  Any group that wants

16    to engage in speech will take their own business decisions and

17    make that for themselves when they engage in that speech.

18    There is no right to restriction-free speech.

19          As for the commercial speech, we do address that in

12:05PM 20    our papers of page 15 in our opposition.  But going over that

21    briefly here, we iterate that the exchange of money for a gun

22    is not speech, nor is it commercial speech.

23          The Central Hudson test first discusses lawfulness.

24    And the law -- the statutes are highly relevant here and that

12:05PM 25    it is the laws that are precluding it, which is very different

```
 1   from the Nordyke vs. Santa Clara case just discussing a county

 2   lease that wanted to preclude such transactions.  And so all

 3   speech about firearms is allowable short of that offer and

 4   acceptance.

 5           THE COURT:  So on that point, looking into two

 6   San Diego cases, the earlier one, Judge Bencivengo's case

 7   disagrees with the position you're taking now.  The later one,

 8   Judge Battaglia's case, agrees with the position you're taking

 9   now; correct?

10           MS. KAU:  Well, the earlier one was a complete ban

11   on sales, which is very different from here.  And so --

12           THE COURT:  The moratorium?

13           MS. KAU:  Right.

14           THE COURT:  Moratorium --

15           MS. KAU:  On gun shows.

16           THE COURT:  It's easier to find commercial speech on

17   a moratorium versus an AB 893 or S- -- the two statutes at

18   issue here; correct?

19           MS. KAU:  Correct.

20           THE COURT:  I understand.

21           MS. KAU:  Because the prohibited activity is very

22   different.

23           THE COURT:  I understand your argument.

24           MS. KAU:  And there was a -- there is no vagueness

25   claim either.  So to the extent there is any vagueness claim
```

12:06PM (line 5)
12:06PM (line 10)
12:06PM (line 15)
12:07PM (line 20)
12:07PM (line 25)

```
     1  brought up here, that would not be allowed procedurally.
     2            THE COURT:  I don't follow your point.
     3            MS. KAU:  Plaintiffs had discussed the vagueness of
     4  whether -- what conduct or what speech was allowed and not
12:07PM 5  allowed.  But to the extent they bring a vagueness claim, that
     6  is not procedurally correct right now.
     7            THE COURT:  I understand.  I understand.
     8            MS. KAU:  There is also discussion about the
     9  public's ability to purchase firearms with these two laws in
12:07PM 10 effect.  But plaintiffs have not produced any statistics that
    11  law-abiding people purchased the majority of their firearms at
    12  gun shows.  And so we look at 150 firearms dealers in
    13  Orange County, eight in the same city, six in the same ZIP
    14  code, one cannot plausibly argue that the public is unable to
12:08PM 15 purchase firearms.
    16            THE COURT:  And that goes to what aspect of the
    17  arguments?  Are you on Bruen Step 1?
    18            MS. KAU:  Yes.  That goes to Bruen Step 1, but it
    19  can also be applied to Bruen Step 2.
12:08PM 20            THE COURT:  I understand.
    21            MS. KAU:  As to whether the laws are relevant from
    22  the 1800s, plaintiffs' counsel did rightly say -- correctly say
    23  that the laws from the 1800s confirm the understanding of the
    24  Second Amendment.  So therefore, laws from the 1800s are highly
12:09PM 25 relevant because they show what was consistent and understood
```

1    to be about the Second Amendment that has continued through the

2    1800s.

3            There was also discussion about how before these two

4    laws came into effect, transactions were allowed, but

12:09PM 5   afterwards they are not.  Just because laws are new does not

6    make them unconstitutional.  There can be new laws prohibiting

7    sales of firearms, for example, at a certain distance from a

8    school.

9            Just because it was allowed before and not allowed

12:09PM 10  now doesn't mean that the new law is invalid because there is

11   no right to sell a firearm in any particular location, but it

12   is allowed.  And as the numbers show, there are plenty of

13   firearm dealers for the public to purchase from.

14           THE COURT:  Well, there must be some limit to that.

12:10PM 15  Taking your example of some distance from the school, if a

16   state said, "Sure, you can sell firearms, vendors, but not

17   within 100 miles of the school," well, that's going to -- there

18   are probably very few places in the state of California, as an

19   example, that are not within 100 miles of any school.  And

12:10PM 20  those places are probably so remote that it wouldn't be --

21   wouldn't make any sense to have a business there anyway.

22           So that would probably not pass the *Bruen* test.

23   Concur?

24           MS. KAU:  Right.  If it effectively banned sales in

12:10PM 25  the country and made it extremely hard and inaccessible to buy

```
 1   firearms, then yes.  But that is not at all the case here.

 2            THE COURT:  But you're saying that's just not our

 3   facts here.  That may be correct that there's some -- there's

 4   some limit, if we take your school example, some distance from

 5   a school that would be too long of a distance, there would be a

 6   Second Amendment violation.  You concede that?

 7            MS. KAU:  Right.

 8            THE COURT:  But that's just not our facts here?

 9            MS. KAU:  Not at all.

10            THE COURT:  Okay.

11            MS. KAU:  There is also discussion about Teixeira

12   being good law or not.  Teixeira discussed whether the Second

13   Amendment was implicated.  And that is the plain text analysis.

14            THE COURT:  You think Teixeira -- the outcome of

15   Teixeira would not change under Teixeira's analysis or if

16   Teixeira had been analyzed under Bruen; correct?

17            MS. KAU:  That's right.

18            THE COURT:  I understand.

19            MS. KAU:  Plaintiffs also brought up the exhibits

20   regarding gun show studies.  That quote did not address private

21   transactions at gun shows.  It did not address ammunition

22   transactions which do not require the same waiting period.  So

23   ultimately, the legislature, in its discretion, can continue to

24   address a problem even if it may be a lesser problem than

25   outside the state.  It can still address a pressing concern.
```

1          As to who has the burden in the plain text, *Bruen*

2     does not specify that the states do have that burden.  The

3     state's burden comes at the second stage regarding the

4     historical inquiry.

12:12PM 5          THE COURT:  Plaintiff has to -- plaintiff has to

6     satisfy the first step of the *Bruen* test.  Is that your

7     position?

8          MS. KAU:  It's unclear who has that burden.  I

9     believe that both parties need to address that issue.

12:12PM 10          THE COURT:  Okay.

11          MS. KAU:  And under plaintiffs' argument and

12     understanding, the Second Amendment would always be implicated

13     if anything was tangentially related to the Second Amendment.

14     But that cannot be true.

12:13PM 15          I'd like to correct myself.  And as to the first

16     step, it is plaintiffs' burden for the plain text argument.

17          THE COURT:  What do you do with my plaid

18     hypothetical?  Do you remember it?

19          MS. KAU:  Yes.

12:13PM 20          THE COURT:  State says "Yes, citizens, individuals,

21     you have the right to keep and bear arms, Second Amendment.

22     Great.  Good for you.  Yes, you have those rights, but not if

23     you're wearing plaid.  If you're wearing plaid, no, not in our

24     state."

12:13PM 25          MS. KAU:  So that hypothetical deals to keeping and

1    bearing arms.  Here we're not at keeping and bearing arms,

2    we're actually buying firearms on state property.

3            THE COURT:  Well, I know, but I'm trying to explore

4    *Bruen* Step 1 and what sorts of regulations restrict an

12:14PM  5    individual's abilities to enjoy his or her Second Amendment

6    rights.

7            MS. KAU:  So in that example, it's specific to

8    keeping and bearing arms, which is in the plain text of the

9    Second Amendment.  And so, therefore, it would implicate the

12:14PM 10    Second Amendment.

11            THE COURT:  Okay.  So are you saying that if the

12    regulation was -- if you're wearing plaid, you cannot transact

13    an arms, you can't buy or sell if you're wearing plaid?  That

14    would be an acceptable regulation because that's not direct,

12:14PM 15    pure Second Amendment rights.  Is that what you're saying?

16            MS. KAU:  Aside from First Amendment right?

17            THE COURT:  Put that aside, yes.

18            MS. KAU:  I think it's -- it would be more likely

19    constitutional.

12:15PM 20            THE COURT:  Okay.

21            MS. KAU:  Because the ability to acquire firearms is

22    not at all meaningfully constrained.

23            THE COURT:  I understand.  Thank you.

24            MS. KAU:  As to whether a legislator's intent means

12:15PM 25    that the law is discriminatory, the Supreme Court has said that

**UNITED STATES DISTRICT COURT**

```
 1   it is about the text of the law, not about an alleged

 2   legislature's motive.

 3           Lastly, I want to emphasize that not only does

 4   plaintiff have to show likelihood of success, but there are

 5   also the equitable factors.  And the public interest weighs

 6   against injunctive relief here because we are addressing

 7   firearms trafficking.  We are addressing increasing public

 8   safety, whereas plaintiffs can still have their gun shows and

 9   engage in speech.

10           They can still gather, and they can also purchase

11   their firearms.  There is no allegation that the public is

12   unable to purchase their firearms because they are not able to

13   buy them on the occasional weekend at a gun show.

14           THE COURT:  I understand.

15           MS. KAU:  And for the record, if the Court does

16   grant the motion, we ask for a stay pending appeal.

17           THE COURT:  I understand.  Okay.  Ms. Kau, thank you

18   very much.

19           MS. KAU:  Thank you, Your Honor.

20           THE COURT:  Ms. Barvir, any brief reply argument?

21           MS. BARVIR:  I'm going to rest after two -- just two

22   points of clarification.

23           With regard to any statement that the law is unclear

24   about what a sale is is not about bringing a vagueness claim at

25   this point.  It has everything to do with the chilling effect
```

**UNITED STATES DISTRICT COURT**

 1    the law might have on speakers, which is a speech claim and

 2    overbreadth issue.

 3          Aside from that, plaintiffs would object to any

 4    11th-hour seeking of a stay that has not been fully briefed by

12:17PM  5    the parties and would ask that if that's going to happen, that

 6    the Court entertain full briefing before issuing something like

 7    that.  And with that, plaintiffs would rest on their papers and

 8    argument today.

 9          THE COURT:  Thank you.

12:17PM 10          I meant to ask this earlier.  Both parties had asked

11    the Court to take judicial notice of certain documents.  I'm

12    inclined to do that.  I didn't see any big objection to that,

13    putting aside the declarations on the supplemental briefing.

14          So no objections to the request for judicial notice;

12:17PM 15    correct?

16          MS. KAU:  No, Your Honor.

17          MS. BARVIR:  No, sir.

18          THE COURT:  And I'm not inclined -- well, the

19    declarations in support of the supplemental briefing, those

12:18PM 20    declarations just seem like more briefing.  Was I missing

21    something?  Was there really any evidence that was provided?

22          MS. KAU:  Yes, they helped provide context to the

23    times when from the founding era -- that's the 1600s and

24    through the 1800s for the types of laws that were needed,

12:18PM 25    technology, what was happening.  And so it helps show --

         1              THE COURT:  So it really is evidence.  It's expert

         2    opinion?

         3              MS. KAU:  Right.

         4              THE COURT:  Okay.  And it's objected to?

12:18PM  5              MS. BARVIR:  That's right, Your Honor.

         6              THE COURT:  Well, I'm not going to resolve that

         7    right now.  I'll think about that some more.

         8              Counsel, thank you very much.  I do need to move on

         9    for lots of reasons.  Court reporter has other important

12:18PM 10    matters to get to.  I do very much appreciate the quality of

        11    your briefing, both sides.  And, again, thank you for

        12    responding to my requests for supplemental briefing.  I really

        13    do appreciate that.  Thanks for your preparation and your

        14    argument and your time here today, and I'll try to get an order

12:19PM 15    on this motion as quickly as I can, and then we'll just see

        16    where it goes from there.

        17              I understand this very last piece about if I grant

        18    it, State wants a chance to -- would like me to stay the --

        19    stay the injunction for some period of time.  You're way ahead

12:19PM 20    of me.  I understand the request.  I understand the objection

        21    to the request.  We'll get there when we get there and, also,

        22    obviously, figure out where the rest of this case goes after I

        23    make a decision on this motion.

        24              So with that, thank you very much.  Have a good rest

12:20PM 25    of the day and rest of the week.

1        THE COURTROOM DEPUTY:  All rise.

2            **(Proceedings concluded at 12:20 p.m.)**

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                            )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  May 14, 2023*

16

17

18

19                            */S/ DEBBIE HINO-SPAAN*
                              _____

20                            *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**